IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| ROBERT J. NAGY, | ) | |
| | ) | No. 2:08-cv-2555-DCN |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| YURI DEBEVC, | ) | |
| | ) | No. 2:08-cv-2755-DCN |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff Robert J. Nagy's (Nagy) motion for summary judgment, the government's motion for partial summary judgment, plaintiff Yuri Debevc's (Debevc) motion to sever and stay proceedings, and Nagy's objections to the magistrate judge's order denying his motion to amend his answer and granting the government's motion for a protective order. For the reasons set forth below, the court grants the government's motion for partial summary judgment, denies Nagy's motion for summary judgment, denies Debevc's motion to sever and stay proceedings, and affirms the magistrate judge's rulings on Nagy's motion to amend his answer and the government's motion for a protective order.

1

## I. BACKGROUND

Plaintiffs Nagy and Debevc filed these actions against the government in July 2008 and August 2008, respectively, challenging the government's assessment of penalties against them under 26 U.S.C. § 6700.[1] The government counterclaimed in both refund suits, alleging plaintiffs' involvement in the organization and sale of the 90% Stock Loan Program subjects them to penalties under the Internal Revenue Code.[2]

Charles Cathcart developed and, along with Debevc, operated the 90% Stock Loan Program though Derivium Capital, LLC (Derivium), which they owned and controlled. Derivium marketed the 90% Stock Loan Program through major financial publications and direct mailings to prospective customers, who were solicited to receive 90% of the value of their publicly traded stock. Nagy, a certified public accountant, provided tax memoranda and other services to Derivium concerning the program. He also allegedly reviewed and edited Derivium's marketing materials, as well as at least some of Derivium's 90% Stock Loan Program documents.

One of the major selling points of the 90% Stock Loan Program was the flexibility it offered the customer. As the name implies, a customer might receive up to 90% of the current value of the stock offered as collateral. However, the purported loan was non-recourse such that if the value of the collateral decreased during the loan term,

---

[1] The court consolidated these cases in April 2009. Despite not opposing the government's motion for consolidation at the time, Debevc now moves to sever the cases and stay the proceedings.

[2] The program apparently had two products: the 90% Stock Loan and the 90% ESOP-QRP Loan. The court uses the term "90% Stock Loan Program" to refer to both products.

typically three years, the customer could surrender the stock to Derivium in satisfaction of the loan with no further obligation. The customer also had the option upon maturity of tendering principal and interest and demanding the return of his collateral (or the difference in cash between the stock price and the payoff amount), which a customer would typically elect if the collateral's value had risen during the loan term. Also of great benefit to the customer was favorable tax treatment because the transactions were marketed as "loans" by Derivium.

As has been discovered through related litigation involving the 90% Stock Loan Program, Cathcart and Debevc concealed the exact use made of the collateral during the loan term. Derivium's employees were instructed to tell potential customers that their stock would be "hedged" pursuant to a highly confidential, complex, proprietary formula developed by Cathcart. Derivium's employees and its marketing materials touted Cathcart's and Debevc's experience in developing derivative instruments. In fact, the stock was sold upon receipt, commissions were paid, and Cathcart and Debevc used the remaining proceeds to fund their start-up companies in the construction industry (the purported "hedge"). All but one of these ventures, Charleston Aluminum, failed. Because Derivium had sold all of the stock, maintained no capital reserves, and entered into no derivative transactions, if the stock price rose Derivium was unable to return customers' stock at maturity.

The government assessed penalties against plaintiffs under 26 U.S.C. § 6700, which prohibits,

> a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by

> reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter.

26 U.S.C. § 6700(a)(2)(A). The government asserts that plaintiffs are subject to penalties under the statute because the 90% Stock Loan was not really a "loan" at all; rather, the transactions were in fact taxable sales of securities. Plaintiffs counter that the government has erroneously lodged penalties against them.

## II. DISCUSSION

### A. Summary Judgment Motions

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. Evidence should be viewed in the light most favorable to the nonmoving party and all inferences drawn in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

#### 1. Government's Motion for Partial Summary Judgment

The government has moved for partial summary judgment on the issue of whether, as a matter of law, the 90% Stock Loan Program transactions were sales of securities, not

bona fide loans. This issue is central to the case because the gain recognized on a sale of securities is taxable income, whereas loan proceeds are not. In a parallel case involving injunctive relief instead of monetary penalties, United States District Judge Phyllis J. Hamilton of the Northern District of California sided with the government on this issue and granted its motion for partial summary judgment filed in that case. Judge Hamilton concluded that the "government [had] established, through reliance on legal precedent and the undisputed evidence in the record, that the 90% loan transactions at issue constitute sales of securities for purposes of tax code treatment, as opposed to bona fide loans." United States v. Charles Cathcart, et. al., No. 07-4762, 2009 WL 3103652, at *1 (N.D. Cal. Sep. 22, 2009). Thus, Judge Hamilton has already decided this exact motion in the government's favor.[3] This court will follow Judge Hamilton's lead for several reasons.

First, the court notes that the issue presented in the government's motion is the same issue already decided by Judge Hamilton. What is more, both Debevc and Nagy were parties to the California action. As Judge Hamilton noted in her order, "Defendant Robert Nagy appeared through his counsel, Tom Prountzos . . . Defendant Yuri Debevc was not present." Cathcart, 2009 WL 3103652, at *1. At oral argument before this court, Nagy's counsel reluctantly conceded that the government's motion for partial summary judgment in the California action was the same motion it filed in this action. While not bound by Judge Hamilton's decision, this court chooses to follow it because it involves the same facts, the same issue, and the same parties.

---

[3] As of the date of this order, no party has appealed from Judge Hamilton's ruling, though Cathcart has apparently signaled to the government that he may pursue an appeal.

Second, having considered the merits of this issue, it is clear to the court that Judge Hamilton got it right. One of the authorities relied upon by Judge Hamilton was Grodt & McKay Realty, Inc. v. Comm'r, 77 T.C. 1221 (1981). In Grodt, the Tax Court noted that the "term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money." Id. at 1237 (citing Commissioner v. Brown, 380 U.S. 563, 570-71 (1965)). The court said that the "key" question in determining whether transactions are sales is "whether the benefits and burdens of ownership have passed from" one party to another. Id. Some factors to use as guideposts in this inquiry are,

> (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.

Id. at 1237-38 (citations omitted). Judge Hamilton did not specify which factors she relied on, but it appears to the court that all the factors except factor six come down on the side of classifying the 90% loan transactions as sales, not loans.

Judge Hamilton also relied on Welch v. Comm'r, 204 F.3d 1228 (9th Cir. 2000). The Welch court identified the following factors to assess whether a transaction is a bona fide loan:

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had

>  sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

Id. at 1230 (citing Crowley v. Comm'r, 962 F.2d 1077, 1079 (1st Cir. 1992); Frierdich v. Comm'r, 925 F.2d 180, 182 (7th Cir. 1991); Piedmont Minerals Co. v. United States, 429 F.2d 560, 563 (4th Cir. 1970)). Judge Hamilton found that a review of the factors from Grodt and Welch "compels the conclusion that the transactions in question constitute sales of securities, rather than bona fide loan transactions." Cathcart, 2009 WL 3103652, at *2. This court agrees.

Finally, no controlling law from the United States Court of Appeals for the Fourth Circuit changes the result. Indeed, Fourth Circuit law dictates a finding that the 90% Stock Loan Program transactions were sales of securities, not bona fide loans. The Fourth Circuit has noted that "the doctrine of 'substance over form' recognizes that the substance of a transaction, rather than its form, governs for tax purposes." BB&T Corp. v. United States, 523 F.3d 461, 471 (4th Cir. 2008) (citation omitted). Moreover, a loan cannot exist without genuine indebtedness. Id. at 475. "Generally, the underlying 'indebtedness' is defined as 'an existing, unconditional, and legally enforceable obligation for the payment of a principal sum.'" Id. (citation omitted). Though there were "loan documents" signed in connection with the 90% loan transactions, the "substance over form" doctrine requires the court to look past that formality to the reality of the transactions. In so doing, it is clear to the court that the 90% Stock Loan Program did not generate genuine indebtedness because: (a) Derivium had to sell the securities to fund the "loan"; (b) the customer could not repay his "loan" prior to maturity and Derivium could not force a repayment; (c) the customer was never required to repay the

7

"loan proceeds" he received; (d) the only collateral Derivium ever retained, if any, was 10% of the value of the sale of the securities; (e) the customer retained a contractual return-of-stock right; and (f) because a customer would only repay his "loan" and get his securities back (securities Derivium would have to purchase on the open market) if the their value had increased, Derivium would only lose if the customer repaid the "loan," which stands in stark contrast to the ordinary risk assumed by a lender, i.e., not being repaid by the borrower.

Consistent with the applicable legal precedent, the undisputed facts about how the 90% Stock Loan Program operated, and Judge Hamilton's prior ruling on this issue, the court finds that the 90% Stock Loan Program transactions were sales of securities, not bona fide loans. The government's motion for partial summary judgment is granted.

### 2. Nagy's Motion for Summary Judgment

Nagy has moved for summary judgment on his first claim (erroneous and illegal assessment of section 6700 penalties) and the government's counterclaim. Because the court finds that genuine issues of material fact exist as to these claims, summary judgment is not appropriate. Therefore, the court denies Nagy's motion.

### B. Debevc's Motion to Sever and Stay Proceedings

The court granted the government's motion to consolidate Debevc's and Nagy's cases on April 30, 2009. At the time, Debevc consented to consolidation. Now, Debevc has moved to sever the cases and stay his jury trial until after Nagy's jury speaks. It is clear to the court that Debevc wants to have the strategic advantage of seeing what happens with Nagy's case before proceeding with his own case. Debevc argues that he is

pro se and that he acted hastily when he consented to consolidation.[4]  After further reflection, he thinks the "dissimilarities of circumstances" between himself and Nagy warrant severance.  Debevc also asserts an issue regarding a Collection Due Process hearing that originally appeared in Count II of his complaint.  The court dismissed that count, and that issue has no bearing on the issue of severance.

The court denies Debevc's motion to sever and stay proceedings because nothing has changed since the court consolidated the cases.  The facts, legal issues, and other factors relevant to the court's consolidation decision are the same now as they were then.[5]

### C.  Nagy's Objection to Magistrate Judge's September 9, 2009 Order

Nagy has timely filed an objection to Magistrate Judge Carr's September 9, 2009 order in which he denied Nagy's motion to amend his answer and granted the government's motion for a protective order.  Federal Rule of Civil Procedure 72(a) requires the court to modify or set aside a magistrate judge's rulings on nondispositive matters if they are "clearly erroneous or . . . contrary to law."  This is a different, and more deferential, standard of review than the de novo review applied to magistrate judge's recommendations on dispositive matters.  See Schur v. L.A. Weight Loss Ctrs., Inc., 577 F.3d 752, 760 (7th Cir. 2009) (recognizing that standard of review varies depending on whether matter was dispositive or nondispositive).  Having reviewed

---

[4]  Although Debevc is acting pro se, it is clear that he is having his pleadings ghost-written by someone with legal training.

[5]  As noted in the April 30, 2009 consolidation order, should the court determine that, at some point prior to trial, the risk of prejudice to the parties and/or confusion of the jury outweighs the benefits of consolidation, it retains the ability to sever these two cases.

Nagy's motion to amend and the government's motion for a protective order, the court finds that Magistrate Judge Carr's rulings on these issues are not clearly erroneous or contrary to law. Therefore, the court affirms the denial of Nagy's motion to amend and the granting of the government's motion for a protective order.[6]

### III.  CONCLUSION

For the foregoing reasons, the court **GRANTS** the government's motion for partial summary judgment, **DENIES** Nagy's motion for summary judgment, **DENIES** Debevc's motion to sever and stay proceedings, and **AFFIRMS** the magistrate judge's rulings on Nagy's motion to amend his answer and the government's motion for a protective order.

---

[6] Nagy requests to amend his answer to the government's counterclaim to add the affirmative defense of equitable estoppel. Under Federal Rule of Civil Procedure 15, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has declared that "this mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182 (1962). The law is well settled "that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986) (citing Foman, 371 U.S. at 182). Delay alone is an insufficient reason to deny leave to amend; rather, the delay must be accompanied by prejudice, bad faith, or futility. Johnson, 785 F.2d at 510 (citations omitted).

"Equitable estoppel against the government is strongly disfavored, if not outright disallowed, because it allows parties to collect public funds in a situation not expressly authorized by Congress." Volvo Trucks of North Am., Inc. v. United States, 367 F.3d 204, 211 (4th Cir. 2004). "If equitable estoppel ever applies to prevent the government from enforcing its duly enacted laws, it would only apply in extremely rare circumstances." Id. at 211-12. "In 'leav[ing] for another day whether an estoppel claim could ever succeed against the Government,' the Supreme Court has ominously observed that 'we have reversed every finding of estoppel that we have reviewed.'" Id. at 212 (quoting OPM v. Richmond, 496 U.S. 414, 422-23 (1990)). Based on these authorities, it appears that the defense of equitable estoppel would be futile. Futility and the unquestionable delay in raising this issue warrant denial of Nagy's motion to amend.

10

**AND IT IS SO ORDERED.**[7]

---

**DAVID C. NORTON
CHIEF UNITED STATES DISTRICT JUDGE**

**December 22, 2009
Charleston, South Carolina**

---

[7] The court notes that the government's motion to exclude expert witness testimony (Dkt. No. 65) remains unresolved. The court will schedule oral argument on this motion.