```
1                 IN THE DISTRICT COURT OF THE UNITED STATES
                        DISTRICT OF SOUTH CAROLINA
2                          CHARLESTON DIVISION

3        ROBERT J. NAGY,            )            2:08-CV-2555
                                    )
4                    Plaintiff      )            Charleston,
                                    )            South Carolina
5        VS                         )            June 21, 2010
                                    )
6        UNITED STATES OF AMERICA,  )              VOLUME I
                                    )
7        Defendant                  )

8                        TRANSCRIPT OF JURY TRIAL
                  BEFORE THE HONORABLE DAVID C. NORTON,
9                  CHIEF UNITED STATES DISTRICT JUDGE

10       APPEARANCES:

11       For the Defendant:    MR. NATHAN CLUKEY
                               MR. GREGORY SEADOR
12                             MS. ELLEN WEIS
                               US Department of Justice Tax Division
13                             P.O. Box 7238
                               Ben Franklin Station
14                             Washington, DC 20044

15

16       For the Plaintiff:   MR. LINDSEY W. COOPER, JR., ESQ.
                              LW Cooper Jr. Law Offices
17                            36 Broad Street
                              Charleston, SC 29401

18

19

20

21

22

23       Court Reporter:     Amy C. Diaz, RPR, CRR
                             P.O. Box 835
24                           Charleston, SC 29402

25              Proceedings recorded by mechanical shorthand,
         Transcript produced by computer-aided transcription.
```

1          THE COURT:  Okay.  What do we need to do first?  Do
2     you want me to put Mr. Debevc on the record and let him go
3     home?
4          MR. CLUKEY:  Nathan Clukey for the United States.
5          Your Honor, on Sunday we had discussions with Mr.
6     Debevc; and ultimately, we wanted to put on the record that
7     Mr. Debevc agreed to an Entry of Judgment against him for the
8     full amount of the penalties that are at issue in this case,
9     $3,353,633 assessed against him without admitting
10    liability -- I'm sorry -- without admitting or denying the
11    allegations in the Government's countersuit.
12         THE COURT:  All right.  Is that your understanding,
13    Mr. Debevc?
14         MR. DEBEVC:  Yes, Your Honor, that is.
15         THE COURT:  Goodbye.  All right.
16         MR. CLUKEY:  Your Honor, Mr. Debevc has been served
17    with a subpoena to testify tomorrow.
18         THE COURT:  Okay.  So you know how to get in touch
19    with each other?
20         MR. DEBEVC:  I'm aware I have a subpoena and know
21    that I have to be here.
22         THE COURT:  Okay.  Thank you very much, Mr. Debevc.
23         What's next?
24         MR. CLUKEY:  We've got the -- this issue of
25    conspiracy we would like to argue.  But before we do that,

1    Your Honor, the Government would like to reraise its

2    objection to the no-change letter, given what has just

3    happened.

4         The fact that Yuri Debevc is out, we believe that

5    when you asked for an argument, one of the factors you may

6    have considered when allowing the no-change letter into

7    evidence is that Yuri Debevc was not a tax professional.

8         And as was discussed during the prior argument, the

9    fact that.  Mr. Nagy is a tax professional, he is charged

10    with knowledge, under 26, USC, 6700, he's charged with

11    knowledge of tax laws.  And we just would like to reraise

12    that in the event the fact that Mr. Debevc was in the case at

13    the time played any role in your decision.

14         THE COURT:  All right.  Those are the no-change

15    letters to Derivium and Scott Cathcart, Mr. Debevc?

16         MR. CLUKEY:  Yes, Your Honor.

17         THE COURT: Yes, sir?

18         MR. COOPER:  We would just maintain the same

19    arguments, that had an impact on his state of mind.  Mr.

20    Altemose is going to talk about what they mean in the

21    industry practice of the tax professionals.

22         THE COURT:  I don't know about that.

23         MR. COOPER:  Well, I mean, certainly, when you go to

24    the IRS, the communications with the IRS that are relevant to

25    his state of mind.

```
 1              Your Honor, may I pass up -- we wrote something

 2     briefly on the conspiracy issue.

 3              THE COURT:  Sure.

 4              (Pause in proceedings.)

 5              THE COURT:  All right.  I'm ready on the conspiracy.

 6              MR. CLUKEY:  Ms. Weis is going to talk about the

 7     conspiracy.

 8              THE COURT:  Sure.

 9              MS. WEIS:  Your Honor, we understand that Mr. Cooper

10     has handed you a brief that takes issue with the legal

11     standard saying that South Carolina state law, for what a

12     cause of action in a civil conspiracy applies, rather than

13     the federal cases applying Rule 801's definition of

14     conspiracy.

15              So I can address that, in addition to our general

16     arguments.  And also, he takes issue with the factual

17     predicates of Mr. Nagy being a coconspirator under 801.

18              As we stated to the Court on Friday and mentioned to

19     the Court in oral argument, it's already been established

20     that the 90% Loan Program is a plan or arrangement under

21     Section 6700.

22              In other words, through the actions of a number of

23     individuals acting in concert towards the common goal of

24     profiting from the business venture of a 90% Loan Program,

25     that constitutes a conspiracy under Rule 801.
```

1          In addition, there has been several cases that we

2    cite in our brief, and I can provide another one, in which

3    801 has allowed coconspirator sections in circumstances that

4    are similar to what exists here.

5          For example, in *USF Red Star*, a Fourth Circuit case,

6    a civil case, the Court allowed coconspirator exceptions to

7    be admitted by statements that were made by company

8    management to be admitted against the union, where a union

9    representative had gotten company management to fire an

10   employee that he didn't like.  Simply put: Those acts of

11   trying to fire an employee are sufficient to satisfy the

12   coconspirator exception in the Fourth Circuit.

13         In addition, relevance, which is an Eighth Circuit

14   case -- I can provide the citation to this, it's not

15   contained in our brief -- is a case in which there is a tax

16   scheme where an accountant and a company president are

17   working together through a tax scheme to lose tax loan

18   proceeds to hide income.  And the Court, under the

19   coconspirator exception, said it was not an agent admission;

20   allowed the accountant statements to be used against the

21   company president.

22         Under *Nguyen*, a D.C. Circuit case from 2006, the

23   Court allowed statements made in connection with a pump and

24   dump fraudulent stock promotion scheme to be used against the

25   promoters.

1          And in *Renfrow*, a 2009 D.C. Circuit opinion, the

2     Court allowed statements by a realtor to use -- the

3     defendant's realtor -- to be used against the defendant.

4     Again, not under the agent only, but under the coconspirator

5     exception to a Rule 801, because the two were engaged in the

6     common goal of attempting to purchase or acquire, in that

7     case fraudulently, real estate property.

8          Now, factually, we believe that Mr. Nagy satisfies

9     the coconspirator exception, and we will need to look at the

10    exhibits that are already in evidence to provide a factual

11    predicate to allow Rule 801 to apply.

12         We know from Government Exhibit 210 that Mr. Nagy

13    became involved in 1997, the same year that the scheme began.

14    He signed a confidentiality agreement through Government

15    Exhibit 334, in which he "agreed to" "serve as backup to

16    Charles Cathcart."  He considered Derivium Capital to be his

17    number one priority plan, as shown in Government Exhibit 200.

18    And he provided business services for many of the entities

19    involved in the scheme.

20         He sent, what we call a status update memo, to

21    Charles Cathcart in 2001 describing his -- what the work he

22    had been doing for all sorts of intents in regards to the 90%

23    Stock Loan Program.  And he says -- this is a very good

24    example of how Mr. Nagy is a coconspirator under Rule 801,

25    which is Exhibit 147, "I would like to continue the

1    development of now offshore products."

2            This is not a short-term priority, but in the

3    long-term, it can be the most significant and lucrative area

4    for expansion of stock loan products.

5            As the Court is aware, Mr. Nagy also provided tax

6    advice to Derivium in the 90% Loan Program, and looking to

7    Government Exhibit 80, in his own words, Mr. Nagy knew, "The

8    bottom line is that Derivium cannot market a product that

9    does not work tax-wise."

10           In addition, these tax memos were substantively

11    edited by Charles Cathcart.  Mr. Nagy would like to portray

12    himself an outside advisor who was ignorant of what was going

13    on.

14           Setting aside the coconspirator does not need to

15    know exactly everything that is happening in the conspiracy,

16    for 801 purposes, the fact that Charles Cathcart, as shown in

17    Exhibit 94, made substantive edits, further indicates that

18    Mr. Nagy was working with him towards the common goal of the

19    90% Loan Program.

20           Mr. Nagy, as we know, wanted to continue from the

21    90% Program even after Derivium closed its doors --

22    Government Exhibit 189 -- on Friday, and he was paid

23    extremely well for this work.

24           Government Exhibit 193 is a $20,000 check from

25    Derivium Capital that Mr. Nagy applied to work he did for

1    Derivium, Yuri Debevc, Scott Cathcart, Charles Cathcart,

2    Shenandoah and Scienda.

3         Therefore, we would ask the Court to admit the

4    statements, the coconspirator statements, statements by

5    coconspirators of the 90% Program against Mr. Nagy under Rule

6    801.

7         We are not asking the Court to make a broad ruling

8    at this point that every single exhibit would come in; we

9    obviously agree that we need to still show the statements

10   were made during the course and in furtherance of the

11   conspiracy, but at this point, we believe that there is

12   sufficient evidence that Mr. Nagy is a coconspirator for the

13   Rules of Evidence purpose that this exception applies.

14        And when Mr. Cooper cites to the Court South

15   Carolina civil law, we would like to point out that we have

16   cited Fourth Circuit case law and District -- D.C. Circuit

17   case law, which do not indicate in any regard that state law

18   applies.

19        And in fact, the Fourth Circuit in a case which is

20   cited in our brief looks to criminal conspiracy, the

21   standards of agency principal law, to figure if a conspiracy

22   exists as a separate matter, and then applies that standard,

23   not state law, to decide that there is a conspiracy for the

24   purposes of Rule 801.

25        So under those principles, we believe that Rule

1    801(d)(2)(E), that they should apply to Mr. Nagy.

2              THE COURT:  Would you give the cite of that Eighth

3    Circuit case?

4              MS. WEIS:  It's *United States vs. Sullivan*, 985

5    F.2d, 962, Eighth Circuit, 1993.

6              THE COURT:  Okay.  Great.  Thanks.

7              Yes, sir?

8              MR. COOPER:  Your Honor, the conspiracy theory here

9    should not apply.

10             Mr. Nagy was an outside accountant giving tax

11   advice, and that was the focus of his participation.  He also

12   did the tax returns for the other entities, and those were

13   his activities.

14             They are trying to apply this coconspiracy theory to

15   everything that was going on behind the scenes that Mr. Nagy

16   did not know about.

17             Now, when she talks about which law should apply,

18   she said they looked to the criminal statute of conspiracy

19   for that case; and in fact, the majority of their cases are

20   in the criminal context.  This is not a criminal case.

21             So at that point, in implying what does conspiracy

22   mean in the federal law, a lot of times Federal Courts do

23   take state law to determine how to apply that federal

24   statute.

25             And we are saying here, if you look at civil

1    conspiracy under South Carolina law, his intent, and the

2    intent of when he was providing his advice, would have had to

3    have been to harm the IRS.  We don't know how you could find

4    that intent of Mr. Nagy; when in fact, during the audits, he

5    disclosed the loan transaction to the very person that now

6    complains about it.  He told them that the stock was sold.

7         So if any harm was caused by his advice of what they

8    were doing, it was because they didn't do anything for four

9    and a half years.

10        So there couldn't have been that intent to harm by

11   his very actions from 2001 to 2003.  So we don't think there

12   is any intent to harm.

13        In addition, Mr. Nagy didn't take profits in this

14   scheme, just like us lawyers down here, we get paid by the

15   hour for our services.  He wasn't a partner of Derivium; he

16   didn't get income from Derivium.

17        THE COURT:  That's a little thin right there.  He

18   got income from Derivium, right?

19        MR. COOPER:  Well, he was paid hourly for his

20   services.

21        THE COURT:  So he got income.

22        MR. COOPER:  He didn't participate in profits.

23   Thank you, Your Honor.

24        THE COURT:  All right.

25        MR. COOPER:  And in addition, they have to show that

1    the statements were in furtherance of the conspiracy.

2         And I don't know exactly, like if you talked about

3    Nigel Wood or Colin Bowen, they both testified in their

4    transcripts they didn't even know who Mr. Nagy was. So how

5    could the exception apply there?  So we would ask that this

6    broad hearsay exception not be applied in these

7    circumstances.

8         Oh, Your Honor -- and by the way, the comment she

9    made about that confidentiality agreement, he testified over

10   and over about that.  He said when he signed it, it meant

11   nothing because Scott Cathcart came on board, and that has

12   been over and over.

13        So I don't know how they can say the signing of the

14   agreement is evidence of he's testified to that fact again.

15        THE COURT:  Yes, ma'am?

16        MS. WEIS:  Your Honor, first we would say that

17   intent to deceive or harm the IRS or the other party in a

18   case is not a requirement under Rule 801.

19        Second, we say that Mr. Cooper has not cited any

20   cases that would indicate that, to my knowledge.  And I just

21   got the brief, so I briefly know what the Court is saying,

22   they do not apply state civil conspiracy law to a Rule 801

23   standard.

24        Third, I would say with the first case that I cited,

25   you, *USF Red Star,* is a civil case.  And as the Supreme Court

1    has said in *Abergele* -- I might be butchering that name --
2    but that the, under Rule 801, is the same under civil and
3    criminal cases.
4         So the fact that we've cited criminal cases simply
5    isn't involved here.
6         THE COURT:  Okay.  Thank you.
7         All right.  What's next?
8         MR. CLUKEY:  Your Honor, we would like to elaborate
9    a little bit more on our motion -- our request to exclude the
10   McDermott Will & Emery opinion that was discussed on Friday.
11        And Mr. Seador would like to make a few additional
12   comments regarding that.
13        THE COURT:  Sure.
14        MR. SEADOR:  Good morning, Your Honor.
15        THE COURT:  Good morning.
16        MR. SEADOR:  We believe that the McDermott Will &
17   Emery memo should not be admitted into evidence for a number
18   of reasons.
19        First of all, let's talk about the facts.  The fact
20   of the matter is that this McDermott Emery memo --
21        THE COURT:  No.  When you start with the facts, does
22   that mean that you concede that the declaration that Mr.
23   Cooper provided to us on Friday is sufficient for Rule 901?
24        MR. SEADOR:  No, Your Honor.
25        THE COURT:  Okay.

1           MR. SEADOR:  The fact of the matter is that on the

2     very first page of this memorandum, in bold type and

3     underlined, it says "This memorandum is not an opinion.  It's

4     not an opinion on the 90% transaction and it's not an opinion

5     on any transaction.  It's not a tax payment."

6           It says, "This memorandum is not an opinion that any

7     particular stock or tax transaction achieves tax results

8     where that a stock cash transaction, in general to

9     individuals entering into a stock cash transaction, should

10    not rely on this memorandum; they should consult their own

11    tax advisors regarding the applications of the principles set

12    forth in the memorandum."

13          Number two, Mr. Nagy himself admitted that he asked

14    McDermott for a tax opinion on Derivium's 90% Stock Loan, and

15    that McDermott Will & Emery did not give him one.

16          And I have his deposition testimony here where he's

17    asked by  Mr. Clukey -- and his deposition was taken just

18    last year -- about whether or not he asked McDermott Will &

19    Emery about his tax opinion.

20          He said under oath, "Evidently Dr. Cathcart asked

21    that I speak to him about a tax opinion" -- him being Jerry

22    Kaplan of McDermott Will & Emery -- "about McDermott

23    providing a tax opinion on the 90% Loan.  I assume I did

24    speak to him about that.  To my knowledge, nothing ever came

25    of it.  I don't recall the substance of the situation,

1    whether it was a situation that Derivium decided it was too

2    expensive or whether McDermott just did not want to do it."

3         If I could have -- if you could pull up Government

4    69 -- and this is an e-mail where we find out, in fact, why

5    McDermott Will & Emery did not provide an opinion, a tax

6    opinion, on the 90% program.  And you can pull up the first

7    e-mail in time at the bottom there.

8         And this is from the McDermott Will & Emery.  It

9    says: "Upon reflection and consultation with the opinion

10   group partners in our firm, we believe we have a professional

11   responsibility to perform due diligence sufficient to

12   understand Derivium's and the lender's business as it relates

13   to the opinion and to satisfy ourselves that Derivium and the

14   lender would be able to meet their obligations to deliver

15   shares to borrowers willing to repay their loans at the end

16   of the term.

17        "We believe this would include, at a minimum, a

18   review of the lenders, and D.C.'s" -- being Derivium

19   Capital's -- "financial statements."

20        "Although we are willing to consider alternative

21   means of satisfying our due diligence obligation, we would

22   like to know the relationship, affiliation and relationship

23   with the lenders and its principals, Derivium's relationship

24   to the lender."

25        And on the second page:  "The lender is subject to

1    insurance or banking regulations and other businesses engaged

2    by the lender."

3          And it says, "We will keep all that information

4    confidential."

5          And if you look at the top -- Sam, if you could zoom

6    into the first page.

7          The second e-mail, we can see what Derivium's

8    reaction to this was:  "We can try to be responsive to this

9    short of providing financials, but the part about wanting to

10   know whether or not the lender is subject to insurance or

11   backing regulation and the general "witch hunt" Karch is on

12   over and above what the assignment calls for suggests to me

13   that we will never satisfy them; and even if we could, it

14   would take months to get them to a successful conclusion.

15          "Unfortunately, as much as we like Jerry Kaplan, I

16   think we have to conclude that we are in the wrong pew with

17   McDermott Will & Emery on this and we need to find another

18   firm to work with for tax opinions."

19          And this e-mail is -- this comes one month right

20   after they received the McDermott Will & Emery memo.

21          So now let's talk about the law.  And as a matter of

22   law, it is unreasonable for someone to claim a reliance on a

23   tax opinion when that opinion is not -- what's not based on

24   all the relevant facts, or incorrect facts, for that matter.

25          And in the Ninth Circuit under a 2009 case, U.S.

1    versus Kapp, the case cite is 564 F.3d, 1103, that case

2    stands for the unremarkable proposition that a tax return

3    preparer is not considered to have relied in good faith on

4    advice that he received if he knew or should have known that

5    the other party providing advice was not aware of all the

6    relevant facts.  It seems like common sense.

7         THE COURT:  It seems like you are mixing things up

8    right now.  I mean, that might be a nice final charge, but we

9    are talking about evidence now and relevance and

10   admissibility, as opposed to people relying on --

11        MR. SEADOR:  That's exactly why we believe it's

12   irrelevant and prejudicial to the jury because he's now

13   saying he relied on a tax opinion.

14        THE COURT:  That's what cross-examination is all

15   about, you know.  I mean -- you know, I mean, if he wants to

16   take up -- I mean, I can't keep people from taking positions

17   in court.  I mean, I can if that's good law.  I mean, I'll be

18   glad to charge it to the jury if it's good law.  And then you

19   can tell the jury that, you know, that's what the law is, you

20   may say he relied on it, but you just can't do it.

21        Let's talk about the evidence, you get it into

22   evidence, it's a 402 right now, irrelevant.  I think that's

23   your objection right now, right?

24        MR. SEADOR:  Right.  So we have 402 irrelevant, 403

25   prejudicial, because it just doesn't apply to the 90% scheme,

1    and it's not even an opinion on the 90% Stock Loan, and they

2    are saying he received this and relied on it.

3            THE COURT:  People can say all kinds of crazy things

4    in court, that's what the jury is for.  He can rely that the

5    sun came up in the west.  If he wants to say that, that's up

6    to him.

7            MR. SEADOR:  We believe under 801 that the document

8    is hearsay and that the declaration submitted doesn't get --

9    doesn't actually authenticate the document.

10           THE COURT:  Okay.  Now let's go -- you know, now we

11   are back to where I started from, all right?

12           Why does it not authenticate the document?

13           MR. SEADOR:  First of all, this document was sent

14   to, apparently Mr. Straus, that we've never spoken about, at

15   the EMC Corporation.  There is nobody at McDermott Will &

16   Emery that can authenticate this memo, and there is all sorts

17   of testimony in here that obviously we would want stricken,

18   including his claims that this was some sort of opinion on

19   the 90% Stock Loan Program.

20           THE COURT:  You mean testimony in the -- in the

21   declaration?

22           MR. SEADOR:  Correct.

23           THE COURT:  The declaration is not coming in anyway.

24           MR. SEADOR:  That's all I would say, Your Honor.

25           THE COURT:  Okay.

1          Yes, sir?

2          MR. COOPER:  Starting with 402, 403, whatever this

3     document is, the disclaimers on it, the purpose of it is the

4     structure of the transactions are identical, if not -- and at

5     the very least, similar.

6          Mr. Nagy was able to take two documents and compare

7     his research to understand if his research had a basis.  And

8     that's the relevance of it and that's the relevance to the

9     state of mind.

10          That e-mail that he spent a lot of time going over,

11     you are exactly right, they can cross him all they wanted,

12     but I think the thing that jumped out at me is Mr. Nagy is

13     nowhere on that e-mail.

14          And lastly, we believe that not everyone has been

15     satisfied that it's a reliable document and hasn't been

16     altered.

17          THE COURT:  All right.

18          What's next?

19          MR. COOPER:  I think opening statements.

20          MR. SEADOR:  Your Honor, I do have one final

21     housekeeping matter.

22          THE COURT:  Okay.

23          MR. SEADOR:  When we were going through the exhibits

24     to be admitted into evidence on Friday, there was a series of

25     exhibits that Mr. Nagy had withdrawn objection to, but Mr.

1    Debevc had maintained his objections.  And so now, since Mr.

2    Debevc is out of the case, I believe those are to be

3    admitted.

4            If I could read those?

5            THE COURT:  Sure.  We'll put those in.

6            MR. SEADOR:  So Government Exhibits 11, 12, 20, 54,

7    116, 120, 142, 143, and then 38 and 40.

8            THE COURT:  Yes, sir?

9            (Thereupon, Exhibit Numbers 11, 12, 20, 38, 40, 54,

10   116, 120, 142 and 143 were received in evidence.)

11           MR. CLUKEY:  Your Honor, there were a couple of

12   items from Friday, as well.

13           We brought up this issue about certain facts that we

14   believe to have been established in summary judgment, and we

15   weren't sure if you had a chance to look at what we included

16   in our pretrial brief.  We had a statement there and we also

17   had it in the jury instructions.

18           THE COURT:  The summary judgment included it's a

19   sale, not a loan, okay?  I don't think it's a -- that it has

20   anything to do -- I didn't believe it was material.  I guess

21   you've got to prove that.

22           Right?

23           MR. CLUKEY:  We would disagree, Your Honor.

24   Materiality and the law does not require reliance by a

25   customer.

```
 1              MR. COOPER:  We would totally disagree with that.

 2              THE COURT:  You win.

 3              MR. COOPER:  Thank you.

 4              THE COURT:  You've got to prove materiality.

 5              MR. COOPER:  And, Your Honor, also just to reraise

 6      again -- and I talked to my client now that Mr. Debevc is

 7      out -- again, to shorten the trial, we would concede that

 8      first part of the Statute that he participated in it, because

 9      our reading of the Statute on how broad it is, that if he

10      gave any advice, that would be some sort of participation.

11              I mean, we would like to get the trial down to what

12      this is about, and it's about his tax advice and whether or

13      not he knew there were hedges.

14              So I would just throw it out there one more time, so

15      maybe we could get on the boat this weekend.

16              THE COURT:  It takes two to stipulate; we've only

17      got one.  So until you start dancing with somebody else -- I

18      mean, we are going to have to stay in the same position.

19              MR. COOPER:  I have that problem a lot.

20              MR. CLUKEY:  Your Honor, we had also raised with the

21      Court the initial penalty amount.  I think we just wanted

22      some clarification on that to make sure we were all on the

23      same page.

24              We thought that you said -- we were wondering

25      whether the ruling is whether the initial penalty amount can
```

1    be raised, given the fact this is a de novo proceeding and

2    the jury will be deciding how much penalties to impose, if

3    any?

4         THE COURT:  Yeah?

5         MR. COOPER:  What he's referring to is my

6    Exhibit 68, which is the notice of assessment to Mr. Nagy.

7         That document, regardless of the penalty amount, is

8    critical for us to prove evidence that the IRS didn't assess

9    that penalty until four and a half years after the close of

10   the audit, and that is a critical piece of evidence in our

11   case.

12        And we also do think it is relevant, the amount,

13   because that's the amount that still sits on Mr. Nagy's tax

14   lien down at the Charleston Courthouse.

15        MR. CLUKEY:  Your Honor, the fact of the

16   investigation certainly occurred during the scheme, and so

17   the IRS told Mr. Nagy that he was under investigation under

18   6700 in 2004.  The penalties weren't assessed until the

19   scheme was basically over, Derivium was defunct.

20        And so there are no penalties that are pending from

21   the time that the assessment actually came out, I believe it

22   was in 2007, so it can have no bearing on his scienter,

23   because those years aren't at issue.  The penalties go up

24   through 2005 when they stopped.  That's the only issue before

25   the jury.  So that fact would have no bearing on the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    scienter.

2         In addition, there is also -- in addition to that,

3    there is also our concession, the Government conceded the

4    penalties for 1997 and the Government recalculated the proper

5    amount of the penalties for this last portion of 2004 and

6    2005 because the Statute changed, and the IRS did a different

7    calculation.  And so we've recalculated and now are

8    requesting the jury to impose what we believe to be the

9    proper amount of the penalty.

10        And given the fact that this is a de novo review and

11   that has been litigated in this case on multiple occasions,

12   and the Government has prevailed on that issue more than

13   once, we believe that that -- that this -- these subsequent

14   events should not have any relevance.  The concession memo is

15   Exhibit 91 and I think he referenced 61.

16            THE COURT:  68, I think you said.

17            MR. COOPER:  Yes, Your Honor.

18        Let me point out one thing in your motion in

19   limine -- and this is why that kind of argument of him saying

20   that Mr. Nagy knew he was under investigation in '04 --

21   Exhibit 65, the 6700 letter to Mr. Nagy when the -- when it

22   was begun, it didn't start until March of '06, he just said

23   '04.  And this is the problem we are going to have with the

24   trial with all this information being kept out.

25        And in addition to the damages penalty, he's

1    indicating that I have to prove the amount of damages, or

2    it's my burden.

3            Now, if the Government, after doing this from '06 to

4    '08, can't get the penalty amount right, I think that's

5    something I get to cross people on and bring in and show the

6    jury that this is complicated, and it's not clear, because

7    that's critical.

8            They -- they did a calculation after two years of

9    work and it was completely wrong.  And I should be able to

10   bring that in and argue it.

11           MR. CLUKEY:  Your Honor, Mr. Nagy admitted during

12   his deposition that he knew about the IRS's investigation in

13   2004.  He admitted that fact.

14           The penalty amount is statutory.  It's two separate

15   issues.  It's the issue of whether he engaged in the conduct.

16   And if he did, he can be enjoined and the fact Mr. Nagy has

17   been enjoined from further promoting this scheme.  So that's

18   one aspect of the Statute.  Separate from that, penalties can

19   be imposed if you've engaged in that conduct.

20           So it's predicate to the penalties being imposed.

21   The Government does obviously have the burden of proof of

22   showing that Mr. Nagy engaged in the conduct, and then

23   pursuant to the cases we cited and we argued on Friday, Mr.

24   Nagy then -- the burden of proof then shifts to Mr. Nagy to

25   prove the amount of the penalties.

1          And part of the penalties, the later years, those

2     penalties are based on the amount of money that he earned

3     from the scheme.

4          Mr. Nagy didn't even produce his billing records to

5     the Government until late in -- late in 2009.  We asked for

6     those informally from Mr. Cooper in early 2009.

7          I asked Mr. Nagy about this during his deposition.

8     I said, What took you so long to give us these records?  And,

9     you know, he just said it just took him a while.

10         So we finally got those records just prior to his

11    deposition.

12         THE COURT:  Okay.  And what kind of penalties did

13    you assess Mr. Nagy on that last issue prior to receiving his

14    billing records?

15         MR. CLUKEY:  The IRS had taken -- it's basically

16    what they do in a whipsaw position.

17         THE COURT:  What's a whipsaw position?

18         MR. CLUKEY:  Let me explain that.

19         They took the -- when the Statute changed in

20    October, 2004, the way you calculate the penalties is you

21    take all the income that has been earned by the scheme that

22    someone has earned, or could have earned, you can use billing

23    records if there is no receipts.  So the IRS in -- all this

24    which was done in 2006, by the way, Your Honor.

25         So the IRS took all the income that was earned by

```
1    the scheme because they didn't know who earned the income,
2    they just knew how much income had been earned by the scheme.
3    They assessed Charles Cathcart, Yuri Debevc, Scott Cathcart,
4    and then Mr. Nagy, and waiting to find out how much income
5    each person earned.
6             So we, of course after this case came out, we asked
7    for the billing records so we could find out how much he
8    really earned.  Once we figured it out, we dropped the amount
9    of the assessment -- the assessment is significant, it was
10   about $5 million -- and when we figured out what we thought
11   the penalty should be, how much he really earned, took it at
12   face value to the billing records he provided to us, I think
13   the last part of 2004 is approximately 20,000, and it's about
14   57,000 for 2005.
15            THE COURT:  You said 5 million and dropped it
16   significantly?
17            MR. CLUKEY:  Correct.
18            MR. COOPER:  Your Honor, first of all, in the --
19   after March of '06 -- and they had an investigation on Mr.
20   Nagy -- the IRS never asked for a single document from Mr.
21   Nagy.  So of course they didn't know what his billing records
22   were.
23            Secondly, the way they assessed the penalty, the
24   penalty is 50 percent of the income that you derived or
25   expect to derive from the plan or arrangement.
```

1          What they did is they took all of Derivium's income,

2     all of it, 100 percent, 10 percent of the collateral value,

3     right?  That is what they said the profit of Derivium was,

4     that remaining ten percent, and they allocated 100 percent of

5     that to Mr. Nagy, and then they chopped it in half.  They

6     knew from the audit, and they've always known from Derivium's

7     corporate papers, that Mr. Nagy didn't own a single percent

8     interest in Derivium.

9          So how he could earn 100 percent of Derivium's

10    money -- and this is one of those issues we want to talk

11    about -- here is the assessment, it's difficult, and I need

12    to be able to argue to the jury that these calculations are

13    not easy.

14          MR. CLUKEY:  Your Honor, one last thing.

15          The amount of the assessment has no bearing on

16    whether he engaged in this conduct years earlier; it's just

17    not relevant to his conduct.

18          Mr. --

19          THE COURT:  It's relevant to the case.

20          MR. CLUKEY:  It is.

21          THE COURT:  It may not be relevant to the conduct;

22    it's relevant to the case because the burden shifts to him to

23    say what the penalties should be.

24          MR. CLUKEY:  Well, if it's a de novo proceeding,

25    Your Honor, we are not entirely clear what the IRS thought

1     the penalty was years earlier, how that can have any bearing

2     on what the jury is going to be asked to decide, what the

3     Government has now conceded that the penalty amount was too

4     large.

5          In addition, Your Honor, if -- if Your Honor

6     concludes that it is relevant, we would ask -- we think this

7     could be bifurcated very easily.  The jury could decide

8     whether he was liable, and then we have a single -- a single

9     witness that we are calling on the amount of penalties.  He's

10    just a summary witness.  He will testify about what we

11    believe the penalty should be.  We think it's like an hour's

12    worth of testimony.  It would be a very easy matter to

13    bifurcate, if you thought what the IRS was doing somehow

14    played into the proper calculation of the penalty.  But to

15    introduce it during the case in chief, we believe would be

16    unfairly prejudicial, Your Honor.  Because as I keep saying,

17    this is a de novo proceeding.

18          Thank you.

19          MR. COOPER:  Your Honor, we would just rather not

20    bifurcate it and do it all at once, but I think I've argued

21    everything else.

22          THE COURT:  What he wants to do is do it all at once

23    and have the jury finding whether what liability, for lack of

24    a better term, and then if, in fact, the jury finds that he

25    is quote/unquote liable, then the Court will have a damages

```
 1              hearing, which is one witness.  That's my understanding.
 2                        Is that right?
 3                        MR. CLUKEY:  That's correct, Your Honor.
 4                        THE COURT:  Okay.  Anything else?
 5                        MR. COOPER:  Not from me, Your Honor.
 6                        THE COURT:  Okay.
 7                        MR. CLUKEY:  No, Your Honor.
 8                        THE COURT:  Who is going to open for the Government?
 9                        MR. CLUKEY:  I am, Your Honor.
10                        THE COURT:  All right.  And I don't, like I said, I
11              don't keep time.  How long do you think you are going to be?
12                        MR. CLUKEY:  About 40 minutes.
13                        THE COURT:  Okay.  How about you?
14                        MR. COOPER:  Cut that in half.
15                        THE COURT:  I won't hold you to it, all right?
16                        MR. COOPER:  Thank you, Your Honor.
17                        THE COURT:  All right.
18                        MR. COOPER:  And although he's going to present his
19              case first, since I'm the plaintiff, do I get to open first?
20                        THE COURT:  No.  He gets to go first.  Take it up to
21              the Fourth Circuit.  I decided that last week.
22                        MR. COOPER:  Yes, Your Honor.
23                        THE COURT:  All right.
24                        As far as bifurcation, I think it's a good idea to
25              bifurcate the matter of the penalties for the reason that you
```

1    just brought up, all right?  Under penalties, you have the

2    burden of proof, so you get to go first, and then you get to

3    go last.  And the first part of the case he gets to go first

4    and he gets to go last.  So that gives you the two arguments

5    on the amount of the penalties.

6         MR. COOPER:  Well, let me ask you this -- and I'm

7    sorry I'm -- if -- for Exhibit 68, which is the assessment, I

8    can still bring that in to show when the assessment was made?

9         THE COURT:  You mean the date of the assessment?  I

10    mean, I don't know if that has bearing on something else.

11         MR. COOPER:  Yes.  I mean, it's my theory of the

12    case, when the audit happened, when the assessment happened.

13         MR. CLUKEY:  Your Honor, we'll concede the date of

14    the assessment.

15         MR. COOPER:  So I can show the document?

16         MR. CLUKEY:  We object to the document.  We would

17    stipulate to the date of the assessment.

18         MR. COOPER:  Well, I mean, the document is very

19    powerful.  May I redact out -- I mean, I don't want to redact

20    out the numbers, but I would still like to be able to show

21    them the document because it's an IRS document.

22         THE COURT:  If you want to -- if you wanted to

23    redact it, that's fine.  Perhaps it will get in in the

24    bifurcated hearing.  I mean, I might let it in, but we will

25    have to wait for the bifurcation, okay?

1          Because, I mean, if -- I don't want -- Mr. Nagy, you

2     need -- Mr. Nagy, you need to pay attention to what I'm

3     saying rather than whisper to your lawyer, because he needs

4     to pay attention to what I'm saying.  You will have plenty of

5     time to talk to him.

6          MR. NAGY:  Yes, Your Honor.

7          THE COURT:  The reason for that is that that date

8     may be important in your theory of your defense case, and it

9     may have another reason for your plaintiff's case, which is

10    the second part of that.

11         If, in fact, the first part of the case -- you win

12    the first part of the case, then we don't even go to the

13    second part of the case, we really don't need the document at

14    all except for the date, okay?

15         MR. COOPER:  Okay.  I mean, I would just, for the

16    jury -- I mean, to put -- I mean, it's all about context,

17    Your Honor, and there is millions of dollars at issue.

18         THE COURT:  I understand.

19         MR. COOPER:  And I think the jury has got to

20    understand that.  I mean, this is a significant.  It's not

21    like they are going to slap him on the wrist.  I mean, it's

22    millions of dollars my client is facing.  And if the IRS

23    sends that document, doesn't it do so at its own peril and

24    can't I show the jury that to show what they did at that

25    point in time?  I don't understand why I can't bring that

1    number in.

2              THE COURT:  Because I said so.

3              MR. COOPER:  Yes, Your Honor.  Okay.  You are right.

4    Yes, Your Honor.

5              THE COURT:  All right?  For lack of a better reason.

6              All right, and as far as the coconspirator

7    exception, I'm going to overrule your objection to that.  You

8    are talking about state court; we are talking about

9    coconspirator and an evidentiary matter, as long as they

10   establish the conspiracy to begin with.  And the

11   coconspirator exception would apply -- no-change letter can

12   still come in with regard to Mr. Nagy's state of mind.  It's

13   a scienter case.  I think it's very important.

14             As far as the McDermott Will & Emery report, I'll

15   overrule your objection to that.  It can come in as to his

16   state of mind, and then you can cross-examine him on it, and

17   he acted really stupid for relying on it, and the jury can

18   take that just because the no-change letters come in, this is

19   fraught -- if you start coming out there and telling the jury

20   that this no-change letter means everything, it was A-1

21   proved by the Federal Government, I'm going to define it at

22   the end that it's not going to say that.

23             The Ninth Circuit case that they cited last week of

24   the definition of a no-change letter is what the jury is

25   going to be told, which essentially says it really doesn't

 1    mean anything.  You can argue anything you want, but the jury

 2    is going to be told that as a matter of law.

 3          So Mr. Altemose is not going to come in here and say

 4    it's the gold standard.  You can argue anything you want as

 5    far as what you think it is.  I'll tell the jury today that

 6    what the lawyers say is not evidence, it's just argument and

 7    it's not the law; it's just argument.  So you can say

 8    anything you want, you've got a First Amendment right, but

 9    I'm just telling you you ought to be careful, okay?

10          I understand you don't like it.

11          MR. COOPER:  Yeah, but Your Honor, the Ninth Circuit

12    case -- again -- and the confusion is there is a difference

13    between tax and penalty.  We cited you a plethora of -- not a

14    plethora, we cited you cases that say that when a no-change

15    letter is issued, it can be used as a defense to penalties

16    under the reasonable cause basis, so we would agree that for

17    tax purposes, yes, but for penalty purposes -- I mean,

18    that's -- I think that's the distinction that's being lost

19    here.  This is a penalty case.

20          THE COURT:  Okay.  Well, maybe we'll have one

21    standard of in the quote/unquote liability case, and that

22    shows the wisdom of bifurcating the case because you may have

23    another standard in the penalty phase.

24          How about that?

25          MR. COOPER:  Well, I mean, but the penalty is going

1    to apply if they find a violation of 6700.  So then it's my

2    job to chop it down, right?

3          But his state of mind -- because those cases say

4    it's a defense to penalties -- I mean, that's what those

5    cases say.  So if that's the law -- and there is not a lot of

6    6700 cases out there, Your Honor.  This is not an everyday

7    case.  If the law is in aspects of the Internal Revenue Code

8    that a no-change letter is a defense to the assessment of

9    penalty, and this is a penalty case --

10         THE COURT:  Not until the second half of it.

11         MR. COOPER:  But that -- that's what I don't

12   understand.  If they show he violated 6700, the penalty

13   applies.

14         THE COURT:  Then you get to litigate the penalty in

15   the second half of the case.

16         MR. COOPER:  So you are saying that if I can take

17   that no-change letter and demonstrate, Mr. Altemose could

18   then come in and say this is the gold standard?

19         THE COURT:  Maybe in the second half of the case,

20   but not in the violations state of the case.

21         MR. COOPER:  Okay.

22         THE COURT:  I mean, it's relevant to his --

23         MR. COOPER:  State of mind.

24         THE COURT:  -- scienter, state of mind.

25         He can say everything he wants as to what the

1    memorandum that was in their files in 2001 of state of mind,

2    okay?

3            All right.  So I'm not telling you you can't say

4    anything you want to say, and he can't say anything he wants

5    to say; I'm telling you that you better watch out.

6            MR. COOPER:  Thank you.

7            THE COURT:  Okay.

8            All right.  Is there anything else y'all talked to

9    me about that I haven't decided?

10            MR. COOPER:  Not that I'm aware of, Your Honor.

11            THE COURT:  So we'll be at ease, and you can

12    arrange, and the jury is going to have pens and pencils and

13    all that to take notes, and you can argue from anywhere you

14    want.  You can question from anywhere you want.  You can

15    approach any witness you want to.  If you've got one that is

16    hostile, if he hits you, that's not problem, but you can do

17    that.  You can give the witness whatever you want.  You can

18    give the exhibits to the jury if you think you need to do

19    that.  And I don't have any problem with that whatsoever, all

20    right?  So --

21            MR. SEADOR:  Your Honor, we have two boxes of our

22    binders of exhibits for the Court.  If you would prefer to

23    look at those rather than hard copies?

24            THE COURT:  Um, we'll just bring them up here.  And

25    if we need them, we'll do that.

1                    And you've still got yours?

2                    MR. COOPER:  They are right down there.  I would

3      just ask if they are going to show them, if I could look at

4      them.

5                    THE COURT:  Oh, sure.  You mean for in opening?

6                    MR. COOPER:  Yes, Your Honor.

7                    THE COURT:  Yeah.  As long as it's in evidence or

8      demonstrative, you probably already talked about it.

9                    We'll wait until all the jurors get here and start,

10     okay?  Thanks.

11                   (Thereupon, there was a recess.)

12                   THE COURT:  Okay.  Anything else before we bring the

13     jury in?

14                   All right.  We are down to nine because this case is

15     causing people to be sick.  Another one was at the VA

16     Hospital, and he's got about 18 medications and high blood

17     pressure and yada, yada, yada, but he's better off than the

18     guy that fell and is in a coma for a couple of days and the

19     woman who has shingles.  They had other things to concentrate

20     on.

21                   I'm going to give them a short opening charge, very

22     generic, burden of proof and all that kind of stuff, and then

23     go to Mr. Clukey, okay?

24                   (Thereupon, the jury entered to the courtroom.)

25                   THE COURT:  Okay.  Why don't y'all everybody shift

1     this way, if you want to go to the back row, because this is

2     where the action is right here.  That's the witness stand.

3     So the closer you can get there, the better you'll be.  And

4     you can pass out those pens and pencils.  And if you want to

5     take notes, you are welcome to do so.

6          If y'all decide to take notes, you can either take

7     them back to your jury room or turn them upsidedown in the

8     chair; nobody will bother them, okay?

9          And I'm David Norton, I'm the trial judge.  You've

10    never seen me before.  I think I was out of town when y'all

11    were selected.  So I'll be trying this case with y'all.

12         So since you've already been sworn as the jury to

13    try this case, I'm going to give you some preliminary

14    instructions at this time.

15         At this trial, you will decide the disputed issues

16    of fact in this case and I'll decide all questions of law

17    that arise during the trial.  And before you retire to

18    deliberate together and decide the case at the end of the

19    trial, I'm going to instruct you again on the rules of law

20    that you must follow and apply in reaching your decision.

21    And you will have a copy of that charge, so you can go over

22    it.

23         Now, because you will be called upon to decide the

24    facts in this case, you should give careful attention to the

25    testimony and the evidence presented for your consideration

during this trial, but you should keep an open mind and
should not form or state any opinion about the case one way
or the other until you've heard all the evidence and have had
the benefit of the closing arguments of the lawyers, as well
as my final instructions to you on the applicable law.

Now, during the trial, you must not discuss the case
in any manner among yourselves or with anyone else.  And you
must not permit anyone else to attempt to discuss it with you
in your presence.  The reason for these cautions will be it
will be your duty to decide this case only on the basis of
the testimony and evidence that is presented during this
trial without consideration of any other matters whatsoever.

Now, from time to time during the trial, I may be
called upon to make rulings on law or motions or objections
made by the lawyers.  You should not infer or conclude from
my ruling that I might make that I have any opinions on the
merits of the case favoring one side or the other.

If I sustain an objection to a question that goes
unanswered by a witness, you should not speculate on what
answer might have been given; nor should you draw an
inference or conclude from the question itself.

During the trial, it may be necessary to confer with
the lawyers from time to time out of your hearing concerning
questions of law or procedure or evidence that should be
considered by the Court alone.

1           On some occasions, you may be excused from the

2     courtroom as a convenience to you and to discuss the matters

3     with the lawyers, but everyone is going to try to avoid such

4     interruptions as much as possible.  You should remember at

5     all times that you should be patient, even though the case

6     may seem to be going slowly.

7           In that regard, the case is going to last probably

8     into sometime next week, okay?  It will last this entire

9     week.  There will be no court on Monday, okay?  But then it

10    will start again on Tuesday next week.

11          Now that in order that you might better understand

12    the beginning of the case and the nature of the decisions you

13    will be asked to make and how you should go about making

14    them, I'm going to give you some preliminary instructions at

15    this time concerning some of the rules of law that may apply.

16    Of course, these preliminary instructions that I give you now

17    will not cover all the rules of law applicable to this case.

18          As I said before, I'll instruct you fully at the end

19    of the trial just before you retire to deliberate on your

20    decision, and will probably restate at that time some of the

21    rules of law I want to tell you about now.

22          In any event, you should not single out any one

23    instruction alone in stating the law, but you should consider

24    all my instructions as a whole.  This case involves a

25    transaction known as the 90% Stock Loan Program a man by the

1    name of Charles Cathcart developed and a man by the name of

2    Yuri Debevc, through Derivium Capital LLC, also known as

3    Derivium, which they owned and controlled.

4         Mr. Nagy is a certified public accountant and he

5    provided tax memoranda and other accounting services to

6    Derivium concerning the program.

7         The United States claims Mr. Nagy is subject to

8    civil penalties under Internal Revenue Code 6700.  Because of

9    his participation in the organization of the sale of the 90%

10   Loan Program, the United States alleges that Mr. Nagy,

11   through his involvement in the organization and/or sale of

12   the 90% Loan Program, may, or caused to be made, false

13   statements with regard to certain aspects of the 90% Loan

14   Program.

15        The United States alleges that these statements were

16   material; that these statements were false or fraudulent, and

17   that Mr. Nagy knew or had reason to know that the statements

18   were false or fraudulent.  At the close of the evidence, I'll

19   explain the legal standards for evaluating each of these

20   elements.

21        Now, Mr. Nagy denies that he's liable for penalties

22   under Section 6700 and challenges the amount of penalties

23   assessed against him.  Although the Government has assessed

24   penalties against Mr. Nagy, you will hear referred to Mr.

25   Nagy as the plaintiff and the Government as the defendant.

1          Your job in this case is to decide whether Mr. Nagy

2     is liable for the penalties assessed against him under

3     Internal Revenue Code 6700.  And if you decide that the

4     plaintiff is liable, you will then have to decide the proper

5     amount of penalty that the plaintiff should pay after you

6     decide whether he's liable or not.

7          This is a civil case.  The United States has the

8     burden of proving a violation of the Internal Revenue Code

9     6700 by a preponderance of the evidence.

10          When a person has the burden of proof on any claim

11     by the preponderance of the evidence, it means that you must

12     be persuaded that the claim is more likely true than not

13     true.

14          To put it differently, if you were to put the United

15     States and Mr. Nagy's evidence on opposite sides of some

16     scales, the Government wins if the scales tips slightly in

17     its favor.  Some of you will know that in criminal cases the

18     burden of proof is beyond a reasonable doubt.  That is a much

19     stricter standard.  It requires a lot more proof than a

20     preponderance of the evidence, and the reasonable doubt

21     standard does not apply in this case and you should therefore

22     put it out of your mind.

23          Now, because the United States has the burden to

24     prove its case by the preponderance of the evidence, it must

25     prove that it is more likely or not that Mr. Nagy engaged in

1    conduct subject to Penalty Code 6700.

2            Accordingly, if the United States proves by the

3    greater weight of the evidence that Mr. Nagy engaged in

4    penalty conduct, you most vote in favor of the Government on

5    that issue.  Of course, if the Government fails to meet this

6    burden, your verdict then must be for Mr. Nagy.

7            If the United States proves that Mr. Nagy violated

8    the Internal Revenue Code 6700, then the burden will shift to

9    him, to Mr. Nagy, to prove by a preponderance of the

10   evidence, number one, that the amount of the penalties

11   assessed against him should be less; and two, the proper

12   amount of penalties that should be applied to him.  We will

13   not go into that until y'all decide the burden on issue one.

14           Now, in determining the facts of this case, you

15   should consider the following evidence:  The sworn testimony

16   of evidence, both on direct and cross-examination regardless

17   of who called the witness.  Any exhibits that are received

18   into evidence and any facts the lawyers have stipulated to.

19           Certain things are not evidence, and you may not

20   consider them in determining what the facts are:  The

21   arguments and the statements by lawyers are not evidence.

22   The lawyers are not witnesses.  What they say in their

23   opening statements, closing arguments and at other times is

24   intended to help you interpret the evidence, but it is not

25   evidence.

1          If the facts as y'all remember them differ from the

2    way the lawyers have stated them, your memory then controls.

3          Questions and objections by the lawyers are not

4    evidence.  Attorneys have a duty to their clients, and to the

5    Court, to object when they believe a question is improper

6    under our Rules of Evidence.  You should not be influenced by

7    the objection or by my ruling on it.  If the objection is

8    sustained, you should disregard the question.  If it is

9    overruled, treat the answer just as any other answer.

10          Testimony that has been excluded or stricken, or

11    that you have been instructed to disregard, is not evidence

12    and must not be considered.

13          In addition, if testimony or exhibits are received

14    only for limited purposes, you must follow the limiting

15    instructions that I will have given you.  And of course,

16    anything that y'all have seen or heard outside the Court is

17    not evidence.  You are to decide this case solely on the

18    evidence at this trial.

19          Now, as you listen to the testimony, you should

20    remember that you all are the sole judges of the credibility

21    or the believability of the witnesses and the weight to be

22    given to any witness's testimony.

23          In deciding whether to believe or disbelieve any

24    witness, you should consider his or her relationship to the

25    Government or Mr. Nagy.  His or her interest, if any, in the

1    outcome of this case.  His or her manner of testifying.  His

2    or her opportunity to observe or acquire knowledge concerning

3    the facts about which the witness testifies.  His or her

4    candor, fairness and intelligence.  The extent to which the

5    witness has been supported or contradicted by other credible

6    evidence.  You may, in short, accept or reject the testimony

7    of any witness in whole or in part.

8          Now, during the trial, you will hear and receive all

9    the evidence which may be properly considered in reaching

10   your verdict.  You are not permitted to gather information,

11   investigate, or do anything else to learn about this case,

12   including researching facts or terms you may hear during the

13   trial.

14         Specifically, you may not, under any circumstances,

15   form any research regarding any issue related to the case on

16   the Internet.  This includes searches on Google, Wikipedia,

17   Yahoo or any other Internet search engine.  You should not

18   send or receive any witness by e-mail, text mail or any other

19   electronic media.  Moreover, you may not communicate with any

20   juror or anyone associated with the case if you have any

21   social media.  This includes, or is not limited to, Twitter,

22   adding such person as a friend, contact, on Facebook, My

23   Space, or any social networking site.  And you must avoid

24   exposure to any media coverage of this case on television, on

25   the radio, in the newspapers, on the Internet or otherwise

1    until after your verdict has been rendered.

2            Now, the question sometimes arises as to whether

3    jurors can take notes.  Obviously, you can take notes,

4    because I wouldn't have given you pencils and pads.

5            On the other hand, you don't have to take notes if

6    you don't want to.  That will be left to each one of you

7    individually.

8            If y'all decide to take notes, be careful not to get

9    so involved with note taking that you become distracted from

10   the ongoing proceedings.  Also, your notes should be used

11   only as aids to your memory, and if your memory should later

12   differ from your notes, you should rely on your memory.  If

13   you don't take notes, you should rely on what your own

14   independent recollection of what the testimony was.  You

15   should not be unduly influenced by the notes of the other

16   jurors.  Notes are not entitled to any greater weight than

17   the recollection or impression of each juror as to what the

18   testimony is.

19           Now, you will notice that a complete record of the

20   trial and all the testimony is being recorded and transcribed

21   by the court reporter; however, you should not expect to have

22   typewritten transcripts available in your jury room.

23   Preparation of a transcript is a time-consuming job.  It is

24   not completed until long after the trial itself.  You will be

25   required to rely your own individual collective memories

1    during your deliberations.

2            On the other hand, any papers or other tangible

3    exhibits that are received into evidence will be available to

4    you for your study in your jury room during your

5    deliberations.

6            On some occasions during the trial, exhibits may be

7    handed to you for brief inspection to you in the jury box.

8    You will get to see and inspect at the end of the trial all

9    the exhibits that you have received into evidence.

10           Now we are going to begin the trial by affording the

11   lawyers an opportunity to make opening statements to you in

12   which they may explain issues in the case and summarize the

13   facts as they expect the evidence will show.

14           After all the testimony and evidence has been

15   presented, the lawyers will then get another opportunity to

16   address you at the end of the trial and make their final

17   arguments of the case.  The statements that the lawyers are

18   making now, as well as the arguments that they present at the

19   end of the trial, are not to be considered by you as evidence

20   in the case, which comes from the witness stand and exhibits,

21   or your instructions on the law, which comes from me.

22           Nevertheless, these statements or arguments are

23   intended to help you understand the evidence as it may come

24   in, the issues or disputes you will be called upon to decide,

25   as well as the position taken by each side.

1          So I'm going to ask you that you now give the

2    lawyers your close attention as I recognize them in turn for

3    the purpose of openings.

4          Mr. Clukey and Mr. Cooper?  Come over here for a

5    second.

6          (Thereupon, there was a brief off-the-record

7    discussion.)

8          THE COURT:  Okay.  Mr. Clukey, I'll be glad to hear

9    from you, sir.

10          MR. CLUKEY:  Thank you.

11          Ladies and gentlemen, the case that you are here is

12    about deception.  It's about deception and false statements

13    regarding the billion dollar tax scheme.

14          The deception starts with the name of the scheme

15    itself.  It was called the 90% Loan Program.  But the truth

16    is, there was no loan.

17          In fact, this very court has already ruled there was

18    no loan, and this court has ruled that statements claiming

19    there was a real loan, those were false statements.

20          Ladies and gentlemen, the evidence will show that

21    the 90% loan scheme was perpetrated by this man here, Robert

22    Nagy.  Perpetrated by Mr. Nagy and by others, including

23    Charles Cathcart, Yuri Debevc, Charles Cathcart's son, Scott,

24    and by a company called Derivium, that you just heard about,

25    Derivium Capital.

1           Derivium Capital is at the heart of the scheme.

2    Derivium was owned by those gentlemen there, Cathcart and Mr.

3    Debevc, it was not owned by Mr. Nagy.

4           But the evidence will show that Mr. Nagy told

5    Derivium Capital this program was a real loan under the tax

6    laws.

7           As you just heard me say, those are false

8    statements.  Mr. Nagy provided those false statements to

9    Derivium Capital, provided them to its owners, and Derivium

10   Capital shared those false statements with its marketing

11   people.  And its marketing people, in turn, shared those with

12   customers.

13          Mr. Nagy provided those false statements in tax

14   memos, and those tax memos were also given to customers, and

15   Mr. Nagy communicated those to customers.  He talked directly

16   to customers, too.

17          The evidence will show the 90% loan scheme roots

18   here in Charleston South Carolina, but from here, it spread

19   across the United States and beyond the far reaches of the

20   globe, distant shores such as the Isle of Man, Ireland, Hong

21   Kong, St. Vincent and the Grenadines.

22          The 90% loan scheme really started in 1997 and it

23   was wildly successful.  It continued on until 2005 and

24   eventually collapsed.  Mr. Nagy was involved almost from the

25   beginning, 1997, until its end.

1           The evidence will show the 90% loan scheme targeted

2    customers who were well-to-do.  You had to have at least

3    $100,000 in stock to be able to participate in this scheme.

4    If you did, you are lucky enough to have $100,000 stock.

5    Derivium Capital told you that this was a real loan.

6           Now, the amount of the loan you were told you would

7    get was 90 percent of the face value of the stock.  That's

8    why they called it the 90% Loan Program.

9           So for example, you had $100,000 worth of stock, you

10   went to Derivium, you gave that stock to Derivium Capital.

11   Derivium, in turn, would give you back $90,000, 90 percent of

12   $100,000, and they told you when they did that, that it was a

13   real loan.  They also told you that your stock was going to

14   be collateral; told you it would be collateral.

15          The truth is, ladies and gentlemen, as soon as

16   Derivium Capital got a customer's stock, they sold it.  They

17   sold the stock before the transaction was even finalized.

18   They sold the stock before the customer ever got a penny.

19          The truth is, there was no loan, it was just a sale

20   of stock.  And you already heard me tell you this Court has

21   already ruled there was no loan.

22          Ladies and gentlemen, the truth is there was no

23   collateral.  What's collateral?  You know what collateral is?

24   Collateral is something valuable to ensure repayment, like a

25   house.  You go buy a house, you put down some money, you also

1    get a loan from the bank, and the bank gives you money.  If

2    you don't repay that loan, the bank can take that house.  The

3    house is collateral.

4          Well, customer stocks weren't collateral because

5    they sold them, sold it on the open market, and the stock was

6    gone.  They sold it before the transaction started.

7          Ladies and gentlemen, the evidence will show that

8    customers were told this transaction was tax free.

9          Now, what kind of tax are we talking about?  Stock.

10   Taxes on stock.  Everybody knows that when you buy stock, you

11   want to buy low.  You want to buy low; you want to sell high.

12         If you can do that, buy low, sell high, the

13   difference there is your profit.  And with the good comes the

14   bad.  You got that profit, you have to pay taxes on that

15   money.  Those taxes are called capital gains taxes.

16         What Derivium -- what Mr. Nagy told customers is

17   that you don't have to pay capital gains taxes on this

18   transaction, on this particular transaction.  You don't have

19   to because it's a loan; it's not a sale.

20         The truth is, it was a sale and you do have to pay

21   capital gains taxes on those profits.  Ladies and gentlemen,

22   customers were told that there was a real lender involved in

23   this scheme.  There was no lender.  There were paper

24   companies, shell companies that didn't do anything.

25   Everything happened at Derivium.  Derivium controlled all the

1    stock.  They controlled the entire transaction.  There were

2    no lenders involved.  And you didn't need a lender because

3    all you did was you took commerce stock, you sold it, and you

4    gave them back 90 percent of their own stock and you kept ten

5    percent.

6            Now, ladies and gentlemen, in addition to the tax

7    benefits customers were bringing in, they were given a no

8    lose proposition.  They were told, give us your stock, we'll

9    give you this loan.  And if your stock goes down in value and

10   you can't repay the loan, don't worry about it.  Keep all the

11   money that we've given you.  Keep all the money.  Don't pay

12   it back.  Don't pay it back.

13           In addition, although we are charging you interest,

14   supposedly under this loan, don't pay any interest.  Keep

15   everything.

16           On the other hand, if your stock goes up, if your

17   stock goes up, you can get it back.  If your stock goes up,

18   doubles, triples, goes up ten times in value, you can get the

19   stock back, just repay the amount we gave you, the interest,

20   and you get the stock back no matter how much it goes up.

21   Unlimited upside, they would call it.  As part of that,

22   customers were told that Derivium Capital would hedge the

23   transactions.

24           Now, what's a hedge?  You are going to hear

25   testimony throughout this trial about what a hedge is.  For

1    example, you are going to hear testimony from a professor

2    from Stanford University, Paul Pfeiffer.  And Professor

3    Pfeiffer is a professor in economics and finance.  And he's

4    going to explain what a hedge is.

5         Basically, it's a protection against risk.  In this

6    case, it was a protection that customers would be able to get

7    their stock back and be able to get their stock back if it

8    went up dramatically in price.

9         The truth is, ladies and gentlemen, there was no

10   hedge.  There was no hedge.  Derivium, because they sold the

11   stock, they didn't have it, they couldn't give it back if the

12   customer wanted it back.  They didn't do any financial

13   transaction.  They didn't engage anything to ensure that the

14   customers could get their stock back.

15        Now, ladies and gentlemen, on its surface, this

16   scheme is complex, but over the coming days, you are going to

17   see in the end the deception is really pretty simple.  And

18   you are going to see that the scheme itself isn't really that

19   complicated; it's pretty straightforward.

20        I'm going to ask you to be detectives in this case

21   and I'm going to ask you to follow the evidence.  And there

22   is going to be a lot of it, lot of documents, different

23   witnesses.  I'll ask you to follow the evidence from here in

24   Charleston to California to some of those countries I just

25   mentioned, like the Isle of Man, Hong Kong.

1            So who is Robert Nagy?  Robert Nagy is an

2       accountant.  He's not just an accountant, he's the only

3       accountant, the only person who would tell Derivium Capital

4       in writing, is that Derivium Capital could use those memos to

5       customers who could rely on that advice.  He was the only

6       person to tell Derivium that this was real, it was a real

7       loan under the tax loans.  Nobody else would do that.  This

8       was a billion dollar scheme, and no other accountant, no

9       other lawyer, no other law firm, nobody would tell Derivium

10      that this was a real program, this was a real loan.

11           And you might hear testimony in claims that Mr. Nagy

12      was independent, he was a third party outside advisor, he

13      didn't own Derivium, that's true; but you are also going to

14      see evidence that Mr. Nagy considered Derivium as a number

15      one priority client.

16           And Mr. Nagy profited from Derivium not just for

17      providing tax advice, Mr. Nagy profited from doing things

18      like editing marketing materials.  He will admit that.  He

19      profited from loan documents, the contractual documents that

20      are actually used with customers.  Mr. Nagy profited from

21      talking directly with customers.  Mr. Nagy profited from

22      doing other things for Derivium, providing other tax

23      services, accounting services, preparing tax returns.  He

24      prepared the tax returns for Charles Cathcart, Charles's son,

25      Yuri Debevc.  He prepared the tax returns for other

1    companies, too.

2            And Robert Nagy didn't just profit from the work he

3    was doing for Derivium Capital, he was profiting from a whole

4    host of companies that were interrelated to this scheme.

5    Actually, I want to talk about a couple of those real

6    quickly.

7            Now, to help you understand some of the companies in

8    this case, because the promoters of the scheme created a

9    whole bunch of different entities, I prepared a little chart

10   here -- well, a big chart.

11           And so we have been talking about this company here,

12   Derivium Capital.  It's had some history over the years.  We

13   are going to get into this over the course of the trial, I'm

14   not going to talk about all that now, it's called First

15   Security Capital, and some other things happened throughout

16   the years and it split off.  It was sued; decided to create

17   new companies.  Well, Mr. Nagy profited from these companies

18   here.

19           And we see right here, something called startup

20   companies. Those startup companies were owned by the owners

21   of Derivium Capital.  They are owned by Charles Cathcart, his

22   son Scott, and Yuri Debevc.

23           More importantly, those companies were all funded

24   through the proceeds of the sale of customer stocks.

25   Customers didn't know that.  Derivium Capital took nearly

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    $45 million and stuck it into these companies, these

2    companies personally owned by the owners of Derivium, Robert

3    Nagy profited from these companies. Robert Nagy sat on the

4    advisory boards of numerous companies. Robert Nagy charged

5    all of these companies.  He profited from all of them from

6    different work he was doing.

7         He profited from C3, Scienda.  He profited from

8    Charleston Aluminum.  He profited from Charleston

9    Construction Company.  He profited from this company right

10   here, Shenandoah, another shell company.  Mr. Nagy wasn't

11   just doing work in the United States, because these were all

12   American companies, there were foreign companies involved,

13   too.

14        And Mr. Nagy was doing work for those companies,

15   too.  He was doing work for a company, DDA, Diversified

16   Design Associates, a shell company in Ireland, and he was

17   getting paid from people at Derivium for a shell company in

18   Ireland.  He was doing work for a company called Bancroft

19   Ventures, Ltd., an Isle of Man company.  And you are going to

20   hear testimony from some of these directors, and I'm going to

21   talk a little bit about them more in a minute.

22        But they don't even know who Robert Nagy is, and he

23   was billing Bancroft.  And guess who is paying his bills for

24   the work he is doing for Bancroft?  Derivium Capital.

25        We are going to come back to this in a minute.  I

1     also want to mention -- we are speaking about independence,

2     some of the inside information that Robert Nagy knew about

3     this scheme.  Robert Nagy knew information that not even some

4     of Derivium's own employees knew.  For example, some of the

5     marketing people of Derivium Capital didn't even know who the

6     lender was.  For years, they didn't know the identity of the

7     lender.  Robert Nagy knew from DDA initially, Diversified

8     Design Associates, Robert Nagy knew it was Bancroft Ventures,

9     Ltd. Robert Nagy didn't just know there wasn't a lender; he

10    helped form the new Bancroft, participated in its formation.

11    Robert Nagy knew that the stock was sold.  He knew that it

12    was sold before the transaction ever began.  He knew it was

13    sold before customers ever got a penny.  Customers didn't

14    know that.

15          Robert Nagy knew that there were no hedges.  Robert

16    Nagy had access to the books of Derivium.  He had access to

17    the books of that shell company, Bancroft Ventures Ltd., as

18    they were kept here in the United States.

19          He got a chance to look at those books and he saw

20    that not one penny was spent on hedges, on anything that

21    could protect a customer, that could protect a customer to

22    ensure that they would get their stock back.

23          Ladies and gentlemen, guess what happened when some

24    customers' stocks eventually went up, as was inevitable,

25    guess what happened?  The evidence will show those customers

1    came back and they asked for their stock back.  Hey, great

2    news, my stock has skyrocketed, I would like my stock back,

3    please, here's my money.

4           What do you think Derivium did?  They didn't give it

5    back.  They didn't give it back because they couldn't.  There

6    were no hedges in place.  They didn't have stock; it was

7    sold.  They had no way to give that stock back to customers.

8    Robert Nagy knew that.

9           And how did Derivium Capital attract customers?

10   They placed ads in international publications, *Investers*

11   *Business Daily*, *Forbes* and the *Wall Street Journal*.  Let's

12   take a look at an ad they ran.

13          Y'all have monitors there?

14          THE COURT:  No.

15          MR. CLUKEY:  So here we see an ad, go down to the

16   bottom there.  If we blow that up.  Derivium Capital.  There

17   is the logo of the company, okay?

18          If we go down now to the bottom of the page,

19   there is a name and a number there.  There is a name for that

20   thing, it's called a Bates number.  It's used in litigation.

21   And that Bates number, Nagy_09 with the rest of that number,

22   that indicates that this document came out of the files of

23   Robert Nagy.

24          Okay.  If we can go up to the image itself.  You see

25   we've got a fish here, it's about to eat something.  It's

1    pretty funny.  The fish is made up of words.  What's it about

2    to eat?  Beware of the tax money.  If you go back to the

3    fish -- and we look in some of the language there, you are

4    told, customers are told, you might be tempted to sell your

5    stock; instead, suggest using their 90% Stock Loan.  Don't

6    sell your stock, use the 90% Stock Loan.

7         If we go down a bit more.  If a customer is

8    intrigued by this and, what can they do?  They can go and

9    call 888-Derivium.  They can do that.  If they did, Derivium

10   would send out marketing materials, a marketing package,

11   further information so they could followup and rope them in,

12   or you can go to derivium.com.

13        What happens if you go to derivium.com?  Let's take

14   a look.  Right here we see -- we've got a page we can blow

15   up.  Right there we've got the Derivium Capital logo again.

16   If we go up to the top of the page, and we see here we've got

17   the web address up at the top, derivium.com, and the welcome

18   page here.  We go down to the bottom.  Again, we've got that

19   Bates number, that number telling us that this document came

20   out of the files of Robert Nagy.

21        Down at the bottom of this welcome page, this is the

22   last text box here, it says, Welcome to Derivium, read on to

23   show you what you can do when you open the box.  So let's

24   read on.

25        Here we have the services page.  And here you are

1     being told this is a real loan, 90% Stock Loan.  There is

2     different benefits and features of this stock loan.  One of

3     the objectives that customers are told they should have is

4     capital gains tax deferral, tax free while you are in this

5     transaction.  Capital gains tax.  Taxes on your stock.  You

6     are not going to have to pay any capital gains taxes now.

7     Those will be pushed off into the future, not with this

8     transaction.

9          Go down to the futures and benefits.  And here

10    again, they are talking about the tax benefits.  And I would

11    like to read that:  "Features and benefits.  You don't have

12    to sell your shares and trigger a tax liability because loans

13    are not taxable events.  In fact, depending on your

14    individual tax situation, our structure may even enable you

15    to generate more cash than selling the position outright.

16    Net of capital gains tax liabilities."

17         Okay.  Now, I've already told you the only person

18    who would tell Derivium Capital in writing that this program

19    was a real loan under the tax laws, the only person who could

20    do that was Robert Nagy.

21         Let's take a look at one of the memos that he wrote.

22    Here we go.  If you can blow up the top there, this memo,

23    Robert J. Nagy, Certified Public Accountant, and we see it's

24    dated June 8th.  He's writing a memo to Dr. Charles Cathcart

25    and Derivium Capital, LLC.  So let's go down to some of the

1    text.

2           And this is what he's telling this memo is about.

3    "Gentlemen, you've asked that I address certain tax

4    considerations of the Derivium 90% Stock Loan."  And he says:

5    "This memo is intended to provide an overview of the tax

6    considerations which may be helpful when discussing a

7    Derivium loan with a potential client for their tax advisor."

8           So he's telling you here this memo and this advice

9    can be used when you are talking to a potential client.

10          If we read on, Robert Nagy tells Derivium, he tells

11   customers that Derivium is going to provide custodial

12   services for the collateral security.

13          So for the stock, he's telling you, stock is going

14   to be collateral.  And you read on.  And so Derivium, as

15   custodian of the collateral, they are going to effect hedges,

16   hedges to protect the stock.

17          And we go on to the next page.  And his tax

18   considerations that he's telling people about, the principal

19   tax consideration discussed below is whether the transaction

20   is a loan, thereby being a nontaxable event, or whether it

21   should be viewed as a constructive sale.

22          Ladies and gentlemen, you've already heard me say

23   this Court has ruled that it was a sale; it was not a loan.

24   The statements claiming that it was a loan, those were false.

25   And this memo, in the end, Robert Nagy concludes this is a

1   loan.  Those statements were false.

2          So ladies and gentlemen, after you investigate all

3   of the evidence, what are we going to ask you to decide?  You

4   were just told by Judge Norton, you are going to be asked to

5   decide whether Robert Nagy should have penalties imposed

6   against him for violation of a particular law.  That law, as

7   Judge Norton told you, is 6700 USC -- I'm sorry -- 26, USC,

8   Section 6700.

9          And the Judge, Judge Norton, at the end of the

10  trial, he can tell you exactly what that law means and what

11  has to be shown under the law.  But in its broadest sense,

12  that law prohibits people from making false statements, false

13  or fraudulent statements regarding the tax benefits of a plan

14  that's marketed to the public.

15         Now, the Court's already ruled claiming this is a

16  real loan, those are false statements, so you don't have to

17  decide that part.  What you are going to have to decide is

18  whether Robert Nagy knew or had reason to know that the

19  statements he was making were false or fraudulent.

20         Judge Norton also just told you the United States

21  has the burden of proof here.  And he told you that this

22  isn't a criminal case, it's a civil case, so it's got a

23  different standard of proof.

24         The United States has to prove its case by a

25  preponderance of the evidence.  And Judge Norton said that

1      means something.  The preponderance of the evidence means

2      something is more likely true than not.  And I think he used

3      the analogy of the scale.  Put all the evidence on the scale,

4      if it tips just ever so slightly in the Government's favor,

5      that means the Government has proved its case by a

6      preponderance of the evidence.

7            I think about it in football terms.  What that means

8      is he doesn't have to score a touchdown, we don't have to

9      fall in the end zone, all we have to do is cross the 50-yard

10     line.

11           The Government in this case is represented by three

12     lawyers, and Judge Norton just introduced me, and we met, in

13     a sense, when you were selected to be jurors in this case

14     nearly two months ago.

15           Just to remind you, my name is Nathan Clukey.  You

16     also met my cocounsel Ellen Weis, and I would like to

17     introduce you to Greg Seador, he's also with the Department

18     of Justice.  And I also want to introduce you to Sam

19     Sullivan, he's also with the Department of Justice, but he's

20     an IT specialist.  He's going to help us with exhibits and

21     electronics during the course of the trial.

22           Now, ladies and gentlemen, the types of evidence you

23     are going to be asked to consider as detectives, basically in

24     two categories, documents and testimony.

25           Now, you've just seen a couple of documents, and

1     there is going to be a lot of them, I warn you.  And you are

2     also going to hear testimony, testimony from people like the

3     first one I just mentioned, Professor Paul Pfeiffer from the

4     United States.

5           You are also going to hear testimony from Boyd

6     Strickland.  Boyd Strickland is an expert hired by the

7     Government.  Boyd Strickland was a local guy, born in

8     Charleston, born and raised here.  He is a certified fraud

9     examiner, and he's also a CPA, Certified Public Accountant.

10    We asked Lloyd to look at the books and records of Derivium

11    Capital, the books and records that Robert Nagy had access

12    to.  We asked him to look at all those records and see what

13    he thought.

14          And he did that.  And he'll tell you that when he

15    looked at the books and records, not one penny was spent on

16    hedges.  He looked at the same books and records that Robert

17    Nagy had access to, no money was found on hedges.  He is also

18    going to tell you that the way Derivium kept its books and

19    records, it did it in such a way as to hide what was really

20    going on with this transaction.

21          So if a third-party ever came in, they wouldn't know

22    what was going on.  And Roy Strickland is going to tell you

23    that that money, that $45 million was funneled from the sale

24    of customers' stock.  It was funneled from the customers that

25    owned Derivium Capital.  Those companies on which Robert Nagy

1    sat on the advisory boards for, from companies which Robert

2    Nagy profited from doing all kinds of work.  He's going to

3    tell you that, too.

4         Ladies and gentlemen, you are also going to see

5    evidence in this case that there were no lenders, no real

6    lenders.  And I'll bring up this board here again for just a

7    second.

8         I'm going to talk about just three of these

9    companies on here real quickly.  Start with that first one,

10   Diversified Design Associates, DDA in Ireland.  DDA in

11   Ireland, they didn't do anything.  It was a shell company.

12   They didn't do anything.  They didn't have to.

13        You are going to hear testimony from a guy named

14   Jerry Pryor who is also a local guy.  Jerry Pryor got mixed

15   up in this scheme early on, '97, and got out, but he saw what

16   was really happening from the very beginning.

17        Customers would turn their stock over to Derivium

18   Capital, supposedly as collateral.  Derivium just sold the

19   stock, took the money, gave it back to customers.  The

20   customer kept ten percent.  He's going to tell you there was

21   no DDA that actually did anything because DDA didn't have to

22   do anything, they didn't need a real lender.

23        You are also going to hear testimony about a company

24   called Bancroft Ventures Ltd. in the Isle of Man, another

25   shell company, another company that didn't do anything.

1          You are going to hear testimony from a guy named

2     Colin Bowen and Nigel Wood.  They were directors at Bancroft.

3     They existed, the company existed, but it didn't do anything,

4     and they are going to tell you that.  They are going to tell

5     you they didn't do any loans.  They are going to tell you

6     they didn't do anything real, anything substantive like a

7     real bank or a real lender would do.  They are going to tell

8     you they didn't have any reserves for money, they didn't have

9     any reserves over there.  They didn't do any underwriting,

10    didn't approve any loans, didn't interact with customers.

11    They didn't talk to customers.  They didn't see the stock.

12    The stock never went to them.  Everything happened right

13    here, Derivium Capital.  In short, they are going to tell you

14    it was a shell company.

15         Now, I need to warn you, their testimony is going to

16    be by video and by written transcript, and there is going to

17    be other testimony in this case just like that.

18         Now, you need to know that that doesn't mean their

19    testimony isn't as important as any of the live testimony

20    that you are going to hear.  It's just as important, but the

21    parties here can't force people who live far away to come

22    here.  You can't do it.  Even the Government can't do that.

23    And since these folks live in the Isle of Man, a country off

24    the Coast of Ireland, a country I had to look up on a map

25    when I first started this case, they obviously aren't close

1     by and we couldn't force them to be here.

2          You are also going to hear testimony about a company

3     called Optech, another shell company just like DDA, just like

4     BVL, a company in Hong Kong.  And you will hear testimony

5     from a gentleman named James Sutherland.  And he's going to

6     tell you -- he's also go to testify by video because he's in

7     Hong Kong -- we had to fly to Hong Kong to depose him and

8     track him down -- he's going to tell you Optech didn't do

9     anything as a real lender.  The scheme worked the same way,

10    stock came in, sold the stock, gave the proceeds back to the

11    customer, kept ten percent.

12         And you might hear talk in this case about an IRS

13    audit that took place at Derivium Capital, an audit that

14    concluded in 2003.  And if you do, you are also going to see

15    evidence that the IRS was deceived, that the misstatements

16    were made to the IRS -- false statements were made to the

17    IRS, and those false statements were made by Robert Nagy.

18         You are also going to hear about an investigation by

19    the California Franchise Tax Board.  And what is that?  It's

20    the largest state taxing authority in the country.

21         In 2004, February of 2004, the California Franchise

22    Tax Board told Derivium -- Robert Nagy knows this -- told

23    Derivium that it thought the scheme was a tax shelter, a

24    scam, didn't work under the tax laws.  That didn't stop

25    Robert Nagy.  That didn't stop Derivium.  They kept on

1    promoting the scheme.

2            That same year, the IRS came back and told Robert

3    Nagy, told Derivium Capital, that this scheme violates the

4    tax laws.  Didn't stop them.  Kept on promoting this scheme.

5            In fact, after the IRS was -- after the IRS told

6    them -- told Derivium that this thing was a scam, in 2004

7    Robert Nagy writes another tax memo in 2005 telling the

8    customers, here is more general tax advice about how the

9    scheme works.  Do you think he put in that memo the fact that

10   the IRS has now challenged this thing?  Do you think that was

11   in there?  The evidence will show it was not.

12           I want to discuss one last thing, one last thing

13   that Robert Nagy was doing while he was providing these tax

14   memos, writing these tax memos.  And you might see a chart --

15   I don't know if you are going to see this or not, you might,

16   that Mr. Cooper prepared -- and this chart, it's nice looking

17   and it's got some of the tax memos that Robert Nagy wrote

18   over the years.

19           It starts in 1998, '99, goes on through the years.

20   It's actually got images of the tax memos, includes in 2005,

21   that 2005 memo I just told you about, it doesn't tell

22   customers that the IRS thinks this is a sham.

23           Well, one other thing to think about if you see that

24   chart is that 1998, when Robert Nagy is writing his '98 memo,

25   he didn't pay his taxes that year.  He didn't pay them.

1   Y'all know you have to pay your taxes when they are due.

2   Everyone knows that.

3       Robert Nagy is an accountant.  In 1999, he doesn't

4   pay his taxes.  Another memo, 2000.  Another memo, doesn't

5   pay his taxes.  2001, doesn't pay his own taxes, his own

6   personal income taxes.  2002, doesn't pay his own taxes.  He

7   doesn't pay those taxes until 2005.

8       Ladies and gentlemen, so think about that.  If you

9   are shown that chart, you think about what Robert Nagy knew

10  and what he had reason to know during the existence of the

11  scheme.

12      Ladies and gentlemen, ultimately over the course of

13  more than eight years, Derivium Capital and these companies

14  caused the sale of more than one billion dollars of its

15  customers' stocks, all the while Derivium Capital falsely

16  told customers, and Robert Nagy falsely told customers that

17  this was a real loan, customer stocks would be collateral,

18  and that this transaction would be tax free, get the tax

19  deferral, no capital gains taxes, that real lenders were

20  involved, and that hedges would be in place to protect

21  customers, ensure the customers would get their stock back.

22      Ladies and gentlemen, the United States contends

23  those statements were false and fraudulent, and that Robert

24  Nagy knew or had reason to know that those statements were

25  false or fraudulent.

1          Thank you for your attention and your hard work to

2     follow.

3          THE COURT:  Thank you, Mr. Clukey.

4          Yes, sir.  Mr. Cooper?

5          MR. COOPER:  May I begin, Your Honor?

6          THE COURT:  You sure can.

7          MR. COOPER:  My name is Lindsey Cooper.  I'm a

8     lawyer here in Charleston.  I practice down on Broad Street,

9     and I'll be talking to y'all.

10         This man here is my client, Robert J. Nagy.  Sitting

11    next to him is Erica Vann, she's a paralegal in my office and

12    we will be sitting at that table and talking to you today and

13    in the coming days.

14         This case is about tax advice.  As he talked about,

15    it's about the tax advice that Robert J. Nagy gave to his

16    client.  This is a case whether Mr. Nagy, when he gave that

17    advice at the time, he knew or had reason to know it was

18    false and fraudulent.

19         That man there is going to get on the stand and he's

20    going to tell you he believed it was right.  He's going to

21    tell you what he did in coming to that conclusion, and he's

22    going to tell you why he did not make a false or fraudulent

23    statement.

24         Now, I'm going to give you an example.  A father and

25    son sit on the couch in the evening in the living room

1    watching TV.  The son comes in every night with a glass of

2    grape juice and they sit there and drink grape juice with his

3    father and watch TV.  The days go by.  The weeks go by.  The

4    months go by and the father doesn't say anything about

5    drinking grape juice.

6          Then one day the father realizes if he spills that,

7    he's going to stain the carpet.  And he says, you cannot do

8    that anymore, and he punishes them for all those months.  The

9    story you are going to hear is the same kind of punishment

10    Mr. Nagy received.

11          In 2001, the IRS initiated an audit of Derivium

12    Capital.  The IRS agent in town, Neva Gadsden, is a CPA like

13    Mr. Nagy.  At the end of the audit, the IRS issued a

14    no-change letter.  Mr. Nagy is going to tell you he believed

15    his position was correct.

16          Now, let me introduce my client.  My client

17    graduated from the University of South Carolina in 1972.

18    During college, he was with the Reserves with the U.S. Air

19    Force.  He went and served two years of active duty, came

20    back in 1974 to Columbia, South Carolina and started

21    practicing as a CPA when he got his license.

22          He was subsequently honorably discharged from the

23    Air Force and started his family with that lady there.  She

24    has been his wife for 39 years.  They have three children,

25    Robert Nagy, Jr., English Preston, who is married to a

1    professor at the Citadel, and a younger daughter, Sarah Nagy.

2    He's also a grandfather.  Mr. Nagy is a CPA.  He's a solo

3    practitioner here in Charleston and he does provide tax

4    advice to his clients, and he did provide tax advice to

5    Derivium Capital.

6         Derivium Capital, it had its own employees.  It

7    wasn't just Mr. Nagy; Derivium Capital had an internal CPA.

8    Derivium Capital also had bookkeepers.  Mr. Nagy was the

9    outside tax advisor.  Derivium Capital has its own internal

10   employees.  And they will tell you they didn't suspect

11   anything was wrong, but somehow the Government expects you to

12   think that Mr. Nagy expected that.

13        The third person in this cast of characters is the

14   IRS.  And what happened?  Now, also there are two categories

15   of statements that were talked about.  One is tax advice,

16   that's what we'll be focused on; two is the hedging strategy.

17        So let's start with the tax advice.  This is the

18   memorandum timeline.  And Mr. Nagy provided his advice not in

19   a vacuum, but it was over a continuum of time.  So when you

20   think about time, think about when the statements were made

21   and what was happening.

22        His first advice was in 1998.  As you go down the

23   timeline, the IRS started its audit in November of 2001.  The

24   audit no-change letters were then issued in May and June of

25   2003.  Mr. Nagy had provided almost all of its advice before

1     the IRS issued the no-change letters.

2              There were two subsequent memos to that.  There was

3     an April 2004 memo, which was a memo that Mr. Nagy wrote to

4     Derivium as a defense paper to the California Franchise Tax

5     Board.  This was their business.  They weren't just going to

6     roll over.  They believed it was a loan.  They fought it.

7              The second memo was January 2005 and at that time

8     the IRS had started auditing the transaction, which was two

9     years after the no-change letters.  Again, the memorandum was

10    written to fight the IRS's position.  Just because the IRS

11    says something is right doesn't mean it's right.

12             Now, I do want to show you a piece of his tax

13    memorandum.  And this is the memorandum written on

14    September 29th.  Here at the very beginning, he writes a

15    disclaimer at the beginning of these memos, and he tells

16    Derivium, I specifically disclaim any responsibility for

17    providing tax advice, and I disclaim any tax advice that your

18    clients might rely on.  Those clients didn't hire Mr. Nagy,

19    he disclaimed it.

20             Then at the back of the memorandum -- he didn't hide

21    anything -- in the conclusion, you see that word "however".

22    However, the IRS may challenge it.  He's telling his client,

23    yeah, the IRS may change its mind.  These were fully

24    disclosed.  And in his tax memoranda, he sets forth, while

25    certain details may vary, this is my understanding of the

1    transaction.  And as you see, and Mr. Nagy will testify, he

2    goes through page and page, cites law, cites the Internal

3    Revenue Code Section 2059.  He was providing support for his

4    opinions.

5         Also, in 2001 you will see that Mr. Nagy received a

6    memorandum from the law firm of McDermott Will & Emery.  It's

7    a very big law firm.  They wrote this memorandum on a 90%

8    Stock Loan.  And you will see the work that Mr. Nagy did and

9    the work that they did were similar.  He believed his advice

10   was good.

11        Now let's talk about how the stock loan worked.  If

12   a client came in, they signed a loan document.  It says:

13   Loan Document.  The collateral was the stock.  I give you

14   $100 worth of stock; they gave back $90.  There was an

15   interest rate associated with it.  There was a maturity date

16   associated with it.  And the document created an

17   unconditional obligation to repay.  That's why those

18   borrowers wanted it back because of the unconditional

19   obligation to repay it.  This document looked like a loan

20   document and the amount of the loan was less than the value

21   of the stock.

22        You heard about this court, and His Honor on the

23   bench, he ruled that it was a loan.

24             When did he rule?  December --

25             MR. CLUKEY:  Objection, Your Honor.

1              THE COURT:  You said I ruled it was a loan.

2              MR. COOPER:  I'm sorry.  I wish he ruled it was a

3      loan.

4              THE COURT:  Okay.

5              MR. COOPER:  He ruled it was a sale.  The date of

6      the ruling was December, 2009.  That's not even on my

7      timeline.  From 1998 to 2009, Mr. Nagy will testify to you

8      that he knew of no tax court case, federal case or any IRS

9      issuance that said this transaction was a loan.  Here is

10     where the IRS comes into the story.

11             In 2001, Neva Gadsden opened an audit.  And during

12     the audit, she first met Mr. Nagy on December 4th.  And why

13     does she meet with Mr. Nagy?  Derivium hired Mr. Nagy to be

14     what is called his power of attorney.  That means Mr. Nagy

15     was representing Derivium during the audit.

16             Information went through him from his client to the

17     IRS and back.  He first met with Ms. Gadsden in December of

18     '04.  And he sat down with her and he told her Derivium's

19     business was stock loans.  He gave her the general ledgers of

20     the company showing the stock loans.  He discussed with her

21     the mechanics of the transactions that I discussed with you.

22     He gave to her the loan document, that marketing material you

23     saw on the screen.

24             It was in Mr. Nagy's file because he gave it to the

25     IRS because Mr. Nagy disclosed the stock loan.  Ms. Gadsden

1     went out, and a woman named Mary Socks, who was also an IRS

2     agent, joined the audit.  Her title is called Financial

3     Products Specialist.  She deals with complex transactions.

4     Mr. Nagy also told Ms. Gadsden that there was that foreign

5     lender.

6          So who else joined the audit?  Mr. Guida, IRS agent,

7     international examiner.  All of these folks sent something

8     called an information document request to Derivium through

9     Mr. Nagy.  This is the information document request sent from

10    Ms. Socks to Mr. Nagy.

11         Ms. Socks is the Financial Products Specialist,

12    scroll back up, please.  No, this is not right.  This is the

13    IDR sent from Ms. Socks to Mr. Nagy.  Subject.  See at the

14    top?  Loans and hedging activities.  17 categories of

15    information requests were sent through, submitted to Robert

16    J. Nagy.

17         Number two, explain your hedging activities.

18         Number nine, give me your promotional materials.

19         Number seven, describe hedging activities.

20         Mr. Nagy responded throughout the audit.  Ms.

21    Gadsden will tell you Mr. Nagy was cooperative; to the best

22    of her knowledge provided all information that was requested.

23         And the sale of the stock that they were talking

24    about, he told the IRS that the lender sold the stock.  He

25    didn't tell them just once.

1          Number seven, all collateral securities were sold is

2     the first part of the hedging activity.

3          At the same time this audit is going on, the IRS

4     audited Scott Cathcart, the owner of Derivium.  Do you know

5     how many stock loans that he did during the year 2000, the

6     year they were auditing?  Don't even have enough fingers.

7     Eleven.  I'll put the pencil up.  Eleven.  Those stock loans

8     were in excess of a million dollars.

9          Mr. Cathcart took a $150,000 investment interest

10    expense on his tax return related to the Derivium stock

11    loans.  It was written on the tax return.  And Neva Gadsden

12    was auditing him, too, with the same type of financial

13    products specialists.  Do you know what happened?  Both

14    examinations to Derivium, to Scott Cathcart, and the IRS no

15    changed both of them.

16    1998, no change.  Derivium, Scott Cathcart, 2000 tax

17    year, no change.  Did the IRS ever breathe a word of bad

18    conduct to him, Mr. Nagy?  No.  Mr. Nagy believed it was a

19    loan.

20          After those letters were sent in 2003, Mr. Nagy was

21    assessed by the IRS for allegedly promoting this stock loan.

22    That assessment was made in January, 2008.  And the penalties

23    are from 1998 to 2005.  So they are trying to penalize him

24    even after the no-change letters were sent in 2003.

25          Let's talk about the hedges.  And when we talk about

1    hedges, it's just basically a way to pull that collateral

2    back.  And it's complicated stuff.  Puts and calls,

3    derivatives.  Mr. Nagy does not have a Ph.D. in economics.

4    Mr. Nagy has not written textbooks on economics.  Mr. Nagy

5    has no experience trading on Wall Street.

6          Who had this experience?  Doctor Cathcart, Vice

7    President of Citibank.  Dr. Cathcart, Ph.D. in economics.

8    Dr. Cathcart wrote on economics.  Dr. Cathcart taught at the

9    Charleston College.  Dr. Cathcart worked for public companies

10    managing their risk.

11          Dr. Cathcart was the one that was supposed to be

12    doing the hedging; not Mr. Nagy.  And Dr. Cathcart, he told

13    the world there were hedges.  Those same promotional

14    materials, Charles Cathcart has a Coca-Cola syrup formula for

15    hedging portfolio concentration listing.  That's what he told

16    my client.

17          My client did at one point have access to Derivium's

18    books and records because they have the brokerage accountant

19    statements for the lenders.  He didn't see hedging.  He

20    thought what he did what was right.  He went to Robert

21    Brandenburg, where are the hedges?  Mr. Brandenburg said, you

22    won't see any of those in the house.

23          He went to Tim Scrantom, Mr. Nagy will tell you, and

24    said, where are the hedges?  Mr. Scrantom, who was Derivium's

25    lawyer said, I don't know.

77

POLK - DIRECT

1           Mr. Nagy then went to the horse's mouth, Charles

2    Cathcart.  Mr. Cathcart told him the lender was doing them

3    offshore, and Mr. Cathcart was very secretive about his

4    hedging strategy.  And there is no denying Dr. Cathcart makes

5    stupid decisions, but Mr. Nagy did not know about them.

6           When we get done here, I'm going to ask you to find,

7    based upon what is brought into evidence, that Mr. Nagy did

8    not have the state of mind, he did not know.  He had no

9    reason to know his tax advice was false.

10           Thank you.

11           THE COURT:  Yes, sir, Mr. Clukey?  Do you want to

12    call your first witness?

13           MR. CLUKEY:  Yes, Your Honor.  For its first

14    witness, the United States calls Mr. Ken Polk.

15           THE CLERK:  Right here, Mr. Polk.  Place your left

16    hand on the Bible.

17           State your name for the record.

18           THE WITNESS:  Kenneth Howell Polk.

19           THE CLERK:  Thank you.  Be seated on the witness

20    stand.

21    THEREUPON:

22                   MR. KENNETH POLK,

23    Called in these proceedings and having been first duly sworn

24    testifies as follows:

25                   DIRECT EXAMINATION

POLK - DIRECT

1     BY MR. SEADOR:

2      Q. Good morning, Mr. Polk.

3      A. Good morning.

4      Q. Can you please tell us your full name?

5      A. Kenneth Polk.

6      Q. Where are you from?

7      A. Birmingham, Alabama.

8      Q. What do you do for a living?

9      A. I'm a financial advisor.

10     Q. Can you briefly describe for the jury your educational

11    background?

12     A. I am a CPA.  I graduated from high school in 1990, and

13    then from Lipscomb University in 1994 out of Nashville,

14    returned to Birmingham and worked for Deloitte & Touche and

15    got my CPA license.

16     Q. Have you got any professional licensures?

17     A. Yes.  I'm a Certified Financial Planner, also.

18     Q. You mentioned you worked for a period for Deloitte &

19    Touche.  What did you do after you left that firm?

20     A. In January of 1998, having been at Deloitte & Touche for

21    approximately two years, I started Arlington Partners, which

22    is a financial services firm.

23     Q. And before we get to Arlington partners, what did you do

24    at Deloitte & Touche?  What did you do there?

25     A. I was a tax consultant.

1    Q. What are your duties now that you formed Arlington

2    Partners?

3    A. I'm a CEO of Arlington.

4    Q. Can you give the jury some examples of what you do from

5    day-to-day for your clients?

6    A. Most of the time the families that we serve will have a

7    liquidity event where they sell a business and then have --

8    have capital or money from that transaction and we'll help

9    them from taxes to investments to any type of planning that

10   they need in their situation.

11   Q. Are you familiar with something called a 90% Stock Loan?

12   A. Yes.

13   Q. And can you tell us how you were introduced to that?

14   A. The first time was just through a publication that I saw

15   the advertisement.

16   Q. Did you do anything after you saw the publication?

17   A. Not initially.  I had seen one and then I saw that one

18   later on, which had me contact Derivium.

19   Q. You called them?

20   A. Yes.

21   Q. And what, if anything -- did they send you anything when

22   you called?

23   A. They did.  They inquired about our firm and then they

24   sent a package of information.

25   Q. Okay.  And did you review that?

1     A. I did.

2     Q. And what was your understanding of the 90% Stock Loan at

3     this time after you reviewed the marketing materials that

4     were sent to you?

5     A. The transaction like this is, that there are similar

6     transactions that we had entered into before with typical

7     Wall Street firms, so this transaction was similar in that

8     you had limited downside, which was the 90% you received

9     upfront.  The difference in this one, in our experience, was

10    that it had unlimited outside potential.

11    Q. Can you explain what that means for the jury, "unlimited

12    upside"?

13    A. If you were to have a stock that doubled or tripled in

14    value, normally you wouldn't get to have all of that benefit.

15    And in this, the way it was explained to us in the materials

16    we received, it said that you could receive all of the upside

17    after you pay your interest on your loan.

18    Q. And let's talk about sort of the mechanics.  What did you

19    understand the mechanics to be if you had a client that

20    wanted to actually enter into the transaction?

21    A. The client would transfer the money, um -- or I'm

22    sorry -- the stock, they would transfer their stock to a

23    financial organization, Wachovia, Morgan Keegan.  And at that

24    time then they would hedge the stock and then send you

25    90 percent.

1    Q. What was your understanding of what the tax benefits of

2    the program were?

3    A. The tax benefits were that at the time of the sale, that

4    there were no -- there were no tax consequences at that time.

5         MR. SEADOR: Will you pull up Government Exhibit 38,

6    please?

7         May I approach the witness, Your Honor?

8         THE COURT:  Sure.

9    Q. I've handed you what's been marked into evidence as

10    Government Exhibit 38.

11         Take a look at that for a minute.  There's a number

12    of pages.

13         Do you recognize that?

14    A. I do.

15    Q. What is it?

16    A. It's a -- it's a package of information similar to the

17    one that I received.

18    Q. What sort of information is it?

19    A. A combination of letters that -- loan agreements and

20    different marketing materials.

21    Q. Okay.  And you received something like that from

22    Derivium?

23    A. Yes.

24    Q. If you could turn to page 26 of that document -- and I've

25    got that page up on the screen here for the jury --

```
 1                    MR. SEADOR: Sam, if you could blow up the top half
 2       of that.
 3        Q. Are you with me, Mr. Polk?
 4        A. Yeah.
 5        Q. Okay.  You see those bullet points on there on page 26 at
 6       the top it says "90% Stock Loan Overview," and there are
 7       several bullet points there.
 8                    Does that comport with your understanding of how the
 9       program worked and the tax benefits that were supposedly
10       offered?
11        A. Yes.
12        Q. Now, once you received the marketing materials, what, if
13       anything else, did you do after that?
14        A. We entered into a period of due diligence.
15        Q. And can you just describe for the jury what you mean by
16       due diligence?
17        A. Our clients hire us to represent them.
18                    So what we would do is get a list of references and
19       call those individuals and talk to individuals who had
20       participated in this same program.
21        Q. Did you do that?
22        A. Yes.
23        Q. And did you pose any additional questions to Derivium?
24        A. Yes.  We came back to them and inquired just more about
25       the tax consequences; and also some of the references that we
```

1    received, we asked some questions.

2    Q. And when you were asking them those questions, did they

3    tell you that the stock was sold immediately?

4    A. No.

5    Q. Did they tell you there was no hedge?

6    A. No.

7    Q. And if they had told you those things, would you have

8    recommended to your clients that they enter into this

9    transaction?

10   A. No.  Our specific question is, do you hedge?  And the

11   answer was yes.  And so we would not have done it if there

12   was not protection.

13          MR. SEADOR:  Sam, can you pull up Exhibit 45 for me,

14   please?

15          May I approach again, Your Honor?

16          THE COURT:  Sure.

17   Q. I am handing you what's been marked into evidence as

18   Government Exhibit 45.  Just take a minute to look at that.

19          Do you recognize that document?

20   A. Yes.

21   Q. And what is it?

22   A. It's a memo discussing the tax consequences in the

23   Derivium transaction.

24   Q. Did you receive that document from Derivium?

25   A. Yes.

1    Q. Okay.  And did you review that in connection with your

2    due diligence?

3    A. Yes.  There was one.  It's one of the items I requested.

4    Q. You see there on the first paragraph on the very first

5    page, it says," This letter is an update from my previous

6    correspondence to provide the tax considerations discussed

7    herein which may be helpful when discussing a Derivium loan

8    for a potential client."

9         Did you find when you reviewed this document that it

10   was helpful?

11   A. Yes.

12   Q. And what was the primary thrust of the document, what did

13   it talk about?

14   A. The document just summarized the reasons why you would

15   not have to pay taxes if you were to enter into this

16   transaction.

17   Q. And did it tell you, this memo from this accountant, Mr.

18   Nagy, to tell you that the stock was immediately sold upon

19   receipt?

20   A. No.

21   Q. Did it tell you that there were no hedges to protect the

22   stock?

23   A. No.

24   Q. If it had told you those things, would you have entered

25   into this transaction?

1     A. Absolutely not.

2     Q. Now, after receiving Mr. Nagy's memo and conducting your

3     due diligence, did you, in fact, have clients that entered

4     into a 90% Stock Loan?

5     A. We did.

6     Q. And approximately how many?

7     A. Approximately eight.

8     Q. Okay.  And I wonder if you could describe what your role

9     was vis-à-vis Derivium and your clients, what did you do?

10    Did you coordinate?  How did you --

11    A. We would, um, give our clients different options.  We

12    would let them look at the Derivium transaction and other

13    Wall Street options that were similar and then work with them

14    on which one they wanted to use, help them make a choice.

15    Q. And documents that needed to be completed by your clients

16    in order to enter into the 90% Stock Loan transaction, did

17    they come through you first?

18    A. They did.

19    Q. Okay.

20          MR. SEADOR: If you could pull up Government

21    Exhibit 237, please.

22          Can I approach, Your Honor?

23          THE COURT:  Sure.

24    Q. I've given you what's been marked for identification as

25    Government Exhibit 237.

1              Do you recognize that document?

2     A. Yes.

3     Q. Can you tell us what it is?

4     A. It's a document related to one of our clients related to

5     the transaction.

6     Q. If you flip to the second page, the signature -- maybe

7     it's the third page.  Go one more.  Yeah.

8     Q. There at the bottom, the signature, John R. Moody.  Do

9     you know who that is?

10    A. Yes.

11    Q. Who is it?

12    A. A partner.

13    Q. And did you maintain a copy of this document in your

14    files?

15    A. Yes.

16    Q. And you received a subpoena from the Government in this

17    case, didn't you?

18    A. From?

19    Q. The U.S. Government?

20    A. In the -- I believe so -- in the Charles Cathcart matter,

21    yes.

22    Q. But in response to that subpoena, did you turn over all

23    the documents in your files related to the 90% Stock Loan?

24    A. Yes.

25    Q. And this was one of those?

1    A. Yes.

2    Q. And does this appear to be an accurate copy of the MLA

3    from Mr. Moody?

4    A. Yes.

5         MR. SEADOR:  Your Honor, I move Exhibit 235 into

6    evidence, please.

7         MR. COOPER:  No objection.

8         THE COURT:  In evidence.

9         (Thereupon, Government Exhibit Number 235 was

10   received in evidence.)

11   Q. Now, did your client, Mr. Moody, enter into a 90% Stock

12   Loan transaction?

13   A. He did.

14   Q. And what do you understand the import of this document to

15   be between Mr. Moody and Derivium?

16   A. This is a Master Agreement, as it says at the top, a

17   financing or a loan agreement.  It states the terms of which

18   they send you back the 90 percent, includes an interest rate

19   and a term of being three years of when the payment is due.

20        MR. SEADOR: If we could turn to Government

21   Exhibit 236, please?  Can I approach, Your Honor?

22        THE COURT:  Sure.

23   Q. I've handed you what's been marked for identification as

24   Exhibit 236.

25        Do you recognize that document?

1    A. Yes.

2    Q. Can you tell us what the first page of that is?

3    A. This is an evaluation confirmation.  So when we entered

4    into a transaction, then Derivium would fax this or send us

5    this and say that the transaction is completed and they would

6    verify the price of the stock.

7    Q. Did you maintain that document in your files?

8    A. Yes.

9    Q. Did you turn that also over to the Government pursuant to

10   a subpoena?

11   A. Yes.

12   Q. And it appeared to be accurate?

13   A. Yes.

14          MR. SEADOR:  I move this into evidence, Your Honor,

15   236.

16          MR. COOPER:  No objection.

17          THE COURT:  In evidence.

18          (Thereupon, Government Exhibit Number 236 was

19   received in evidence.)

20   Q. The name at the top of that document, John R. Moody, is

21   that the same Mr. Moody we saw on the previous document?

22   A. Yes.

23   Q. And can you tell us what information is conveyed on this

24   document?

25   A. The -- there is a part that says "SECURITIES RECEIVED,"

1     in all caps, and it says at Morgan Keegan.  So that would be

2     the firm that held the stock.  And then it also says Morgan

3     Keegan, the symbol RF, Regions Bank, and the number of

4     shares.  And then it shows the total valuation of those

5     shares in the part that is highlighted.

6     Q. So if I understand what you are saying, your client,

7     Mr. Moody, transferred 45,000, or was going to transfer

8     shares of RF stock to Derivium?

9     A. That's correct.

10    Q. Okay.

11         MR. SEADOR: Can we blow that back up again?

12         If you could flip to the second page for me, next

13    page.

14         Can you tell us what that is?

15    A. This is a, what's called an activity confirmation that

16    confirms the hedge value of the stock.

17    Q. And when you say "the hedge value," you are referring to

18    that number there, 1,446,497?

19    A. Yes, where it says "securities hedged," it just gives a

20    summary of the hedge value.

21    Q. What did you understand that to mean, the hedged value?

22    A. It was protected or it was hedged.

23    Q. If you look down there towards the bottom, there is a

24    bold sentence, second one down, says "net due to client as a

25    result of hedging activities to date" and that's 1.3 million.

```
 1                   What did you understand that to mean?
 2       A. That after the completion of the hedges, that we were to
 3   receive the 90 percent, which was the million three.
 4       Q. Does this document anywhere on here say that the stock
 5   was being sold immediately to fund the loan?
 6       A. No.
 7                   MR. SEADOR: Can I approach, Your Honor?
 8                   THE COURT: Sure.
 9       Q. I've handed you what's been marked as Government
10   Exhibit 235 for identification.
11                   Do you recognize that?
12       A. Yes.
13       Q. And can you tell us what that is?
14       A. It's a letter from Bancroft when the actual transactions
15   were -- the investor or someone who entered in to do the
16   transaction is going to be coming through.
17       Q. Let me just -- did you maintain that in your files?
18       A. Yes.
19       Q. And did you turn that over to the Government pursuant to
20   a subpoena?
21       A. I believe so.
22       Q. And does that appear to be an accurate copy of the
23   document?
24                   MR. SEACORD:  I would like to move that document in
25   at this time.
```

1              MR. COOPER:  No objection.

2              THE COURT:  In evidence.

3              (Thereupon, Government Exhibit Number 235 was

4    received in evidence.)

5   Q. That's Exhibit 235 for the record.

6          Now, from whom did you receive this particular

7   document, or documents like it?

8   A. From either Derivium or Bancroft.

9   Q. And at the time you received this, did you know who

10  Bancroft was?

11   A. I don't remember exactly when, but there was a point in

12  time where they entered into the transaction after we had

13  already entered into the loan agreement and got the hedge

14  confirmation.

15   Q. Did you try to find out who they were?

16   A. We did.  We called the number that is listed on here on

17  the page, and we tried to contact them and did contact

18  Bancroft.

19   Q. Did it work?

20   A. Um, when we called the first time, they didn't even know

21  who Yuri Debevc was.

22   Q. What about Derivium?

23   A. The person who answered the phone first did not know who

24  it was and made a couple of comments that said we needed to

25  call back.

1           So we called back and that person initially said we

2      needed to talk to Charles Cathcart.

3      Q. Now, when you receive a letter like this, either from

4      Mr. Moody or from one of your other clients, does it lay out

5      some options for the client?

6      A. Yes.

7      Q. And what are those?

8      A. There were three options that I was aware of.  One is

9      that if you have a loan, then you just pay the loan back and

10     get your stock back.  So that would be one option, one of the

11     three options that I'm aware of. And then this letter

12     summarizes those options.

13          And the second one is you could renew it so you

14     could push the loan forward, so you just say, I want to renew

15     the loan and keep going forward, was the second option.

16          And the third option is just if the stock were to go

17     down, you just enter your collateral, you just walk away from

18     it.

19     Q. And did you have clients that exercised the first option?

20     In other words, their stock had gone up in value and they now

21     wanted it back?

22     A. Um, we never had any clients that wanted to pay.  What

23     they wanted was really to surrender the collateral and get

24     excess back to them.

25     Q. Did you ever have any client that experienced the same

1     difficulty with their 90% loan transaction?

2      A. Yeah, there was, I believe in 2004.

3      Q. And can you describe what happened?

4      A. One of the first clients who entered into a transaction,

5     he was owed money, the stock had gone up significantly.  And

6     so we immediately, you know, contacted Derivium to try to

7     figure out the best way to collect the excess collateral, and

8     that -- and to Derivium.  And they said, okay, no problem.

9     We're still a couple of months out, let's wait until we get a

10    little bit closer.

11         So we got a little bit closer.  We contacted them

12    again when the day passed where we were due the money, and

13    they kept putting it off and saying, well, it's very complex

14    hedges, and it's going to take a long time.

15         And so after about six months, we -- we got nervous

16    after about a month, but they were still kind of pushing it

17    along several months after this.

18     Q. Did they ever tell you during that point in time, gosh,

19    the reason we don't have the money is because we already sold

20    the stock and it was transferred to us?

21     A. No.

22     Q. Now, I wonder if you could tell us what impact did this

23    have on your clients that had engaged Derivium for this 90%

24    loan transaction?  What happened --

25         MR. COOPER:  Objection, 402, 403.

1           THE COURT:  Rephrase that question, okay?

2      Q. Do you have any understanding of any consequences to your

3      clients from entering into a 90% Stock Loan transaction?

4      A. There were several.  It was horrible.  I'm their

5      fiduciary, so I had to go explain to them the whole thing was

6      a scam.

7           And then the other part was the very first person

8      who had collateral had bought a business, um, with that

9      money, and you know, he calculated t and he -- and it was

10     going in and sitting down with that person, and each of these

11     individuals, and explain to them that it was bad.

12     Q. And did that have any affect on your business?

13          MR. COOPER:  Objection, 402, 403.

14          THE COURT:  Sustain that.

15     Q. Did you have any understanding of what ultimately

16     happened to Derivium?

17     A. Nobody could -- we couldn't find out.

18     Q. Are you familiar with the term called qualified advisor?

19     A. Yes.

20     Q. And what's your understanding of that term?

21     A. That's what Arlington was.  We were a qualified advisor,

22     which means that they send you a package of information to

23     review, a qualified group, in order to refer them, the

24     clients.

25     Q. That being Derivium?

1     A. Derivium.

2     Q. And do they promise you any -- did Derivium promise you

3     any referral fees for that service?

4     A. Yes.

5     Q. And do you recall how much that was per transaction?

6     A. Approximately one percent.

7     Q. One percent of the amount of stock?

8     A. The amount of stock.

9     Q. Okay.  And what did you do with that money that you

10    received as a referral fee?

11    A. Rebated it back to our clients.  We did accept it, but we

12    rebated it back to our clients.

13    Q. So you personally didn't make any money off of this?

14    A. No

15    Q. Just a couple more questions, Mr. Polk.

16         Did you ever ask anyone at Derivium what they were

17    doing with the stock when they received it?

18    A. Yes.

19    Q. Did you have an understanding of what it was?

20    A. Um, no.

21    Q. They just -- they just, what?

22    A. I specifically spoke with Charles, and that was -- that

23    was the secret source.

24    Q. They didn't tell you?

25    A. They didn't tell me.

1   Q. And did any of your clients that entered into this
2   transaction get their stock back?
3   A. No.
4   Q. You are from Alabama, you said that earlier?
5   A. Yes.
6   Q. Does your practice there keep you pretty busy?
7   A. Yes, very.
8   Q. Why did you take time out of your busy schedule to come
9   here to South Carolina to testify?
10  A. Because I promised each of those clients that I would.
11          MR. SEACORD:  I don't have any further questions.
12                      CROSS-EXAMINATION
13  BY MR. COOPER:
14  Q. You said you went to school at David Lipscomb?
15  A. I did.
16  Q. I'm from Nashville.
17          Exhibit 45 that was shown to you, the letter, Mr.
18  Nagy's letter, do you have that?
19  A. Yes.
20  Q. Did Mr. Nagy send that letter to you?
21  A. No.
22  Q. And do you remember Exhibit 38, which was what you said
23  was the promotional materials for Derivium?
24  A. Yes.
25  Q. Did Mr. Nagy send those to you?

1     A. No.

2     Q. And the letter from Mr. Nagy was only sent to you when

3     you specifically asked for it, correct?

4     A. That's correct.

5     Q. So it wasn't in that standard promotional materials,

6     right?

7     A. I don't recall actually if it was in the original

8     package.  I do not recall that.

9     Q. But you recall specifically asking for some type of

10    letter about the tax consequences?

11    A. That was one of our due diligence items.

12    Q. You are a CPA; that's correct?

13    A. That's correct.

14    Q. You are also a Certified Financial Planner, correct?

15    A. That's correct.

16    Q. And you said while you were at Deloitte you were in the

17    tax practice?

18    A. That's correct.

19    Q. And at Arlington Partners, when you said you represent

20    family, you actually have a family office, right?

21    A. That's correct.

22    Q. And in family offices you represent very wealthy

23    families, correct?

24    A. That's correct.

25    Q. And in fact, they hire you because you are supposed to do

1       the due diligence, right?

2        A. That's correct.

3        Q. And your reputation is staked on your ability, your

4       office's ability to do due diligence, right?

5        A. Correct.

6        Q. Now, in Exhibit 38 that was sent to you -- and there is

7       no Bates stamp number, so I'll -- did Derivium disclaim in

8       the promotional materials that it didn't provide tax advice?

9        A. Yes.

10       Q. And on the next page they again disclaim they didn't

11      provide tax advice, correct?

12       A. Correct.

13       Q. Do you at Arlington Partners provide tax advice to your

14      clients?

15       A. Yes.

16       Q. Right.

17              And in fact, if we look at your website that I

18      printed out for Arlington Partners, on the second page, you

19      actually say the taxes have a large impact on the ultimate

20      success of wealth.  "Arlington Associates provides the

21      resources to deliver tax integration and planning across the

22      family office".

23       A. Right.

24       Q. Would you agree that tax is a significant asset to your

25      clients?

1      A. Correct.

2      Q. And you are a CPA, correct?

3      A. Correct.

4      Q. How many other CPA's in your firm?

5      A. I believe nine.

6      Q. Nine?

7          So when you got Mr. Nagy's opinion, did y'all

8      research what he wrote in there?

9      A. Yes.

10     Q. How much time did you spend on that?

11     A. I don't recall.

12     Q. How many people researched it?

13     A. Probably two at that time.  When we did it, we only had

14     six people in our firm.

15     Q. But there was enough research done to comfort yourself

16     that there was support for the tax treatment as a loan?

17     A. I'm not sure.

18     Q. So you are not sure.  You would advise clients to do a

19     tax transaction that you weren't sure about?

20     A. No, we -- I mean, every document that there is out there

21     from the third-party, from our attorney, it says -- there is

22     always these, well, you can't rely on this.  So there is --

23     we had the same disclaimer to our families that we represent.

24     Q. But what I'm saying is:  You at Arlington Partners, you

25     said you think two people researched whether this was a loan

1    or sale under the Internal Revenue Guide?

2     A. Yes.

3     Q. And the question is:  Did you come to the conclusion that

4    it was a loan?

5     A. We came to the conclusion that the facts in the memo we

6    received were reasonable.

7     Q. Did you know any facts that would have been inconsistent

8    with the memo?

9     A. I do not.

10     Q. And again, you wouldn't have referred your client to do a

11    transaction if you believed it wouldn't have held up at the

12    IRS, correct?

13     A. Correct.

14     Q. Because you wouldn't expose your clients to that kind of

15    risk with the IRS, would you?

16     A. No.

17     Q. And in fact, at the end of the memo that Mr. Nagy wrote,

18    do you -- you just talked about your lawyers say disclaim

19    everything, right?

20          You've got to answer.  She's taking it down on

21    paper.

22     A. What's that?

23     Q. You have to --

24     A. I'm sorry.  Excuse me.

25     Q. You have to answer the question.

1    A. What was the question?

2    Q. Do your lawyers tell you that you need to disclaim the

3    advice you give your clients?

4    A. No.

5    Q. Okay.  You said disclaimers are -- lawyers, when they

6    write stuff, they put disclaimers on it?

7    A. No.  I said if every document, every memo or anything you

8    get from -- I get from our attorney -- it always says, there

9    is -- in other words, that disclaimer is a way out -- is,

10   we'll give you this advice, but there could be other facts

11   that are not considered with the other things that you need

12   to consider.  You need to consider other facts.

13   Q. Right.

14           You need to do the work yourself?

15   A. Right.

16   Q. And in fact, didn't Mr. Nagy's memo have those same

17   disclaimers on it?

18   A. All of them have the same ones in my industry.

19   Q. Is that a yes?

20   A. Yes.

21   Q. Now, did your clients have other reasons for doing the

22   stock loan transaction besides tax?

23   A. Yes.

24   Q. Such as diversification reasons?

25   A. Yes.

1       Q. Such as, maybe if they wanted to buy insurance for estate

2       claiming reasons?

3       A. Not particularly in our client's case, but not --

4       Q. I'm sorry.

5       A. -- diversification is the biggest reason.

6       Q. And in fact, at the end -- if the borrower -- did any of

7       your clients walk away from the loan and surrender the

8       collateral?

9       A. Yes.

10      Q. So they did get 90 percent of the value up front,

11      correct?

12      A. In every case.

13      Q. And that was real cash in the client's pocket?

14      A. In every case.

15      Q. So when they surrender the collateral, they were able to

16      get that 90 percent?

17      A. Yes.

18      Q. And it was also a protection for that ten percent

19      downside risk, right?

20      A. Yes.

21      Q. Now, when they surrendered the collateral, they had to

22      pay tax then, didn't they?

23      A. That's correct.

24      Q. So at the end of the loan term, there was a tax law done?

25      A. Yes.  But we actually advised our clients to close it

1    earlier.  After we found out what we thought was a scheme, we

2    actually went back to the clients and encouraged them to

3    close them out early.

4     Q. Right.

5          But they still had to pay tax even if they closed it

6    out otherwise?

7     A. That's correct.

8     Q. And you said you were a fiduciary to your client,

9    correct?

10    A. That's correct.

11    Q. Did any of your clients sue you over those?

12    A. They did not.

13    Q. Did they agree not to sue you so you could come here

14    and -- and when you did your due diligence, what was Dr.

15    Cathcart's experience in hedging as you recall?

16    A. I recall there was economics, but that was his -- his

17    forte, yes, was the financial part of it, the stock part of

18    it.

19    Q. Now, did you talk to Mr. Nagy?

20    A. No.

21    Q. And then the Government showed you exhibits, I think 235,

22    and 236.  Um, did Mr. Nagy send you those documents?

23    A. No.

24    Q. Did Mr. Nagy send you the promotional materials?

25    A. No.

1      Q. Did Mr. Nagy send you the letter about renewing the loan?

2      A. No.

3      Q. Did Mr. Nagy send you the valuation confirmation report?

4      A. No.

5      Q. Did Mr. Nagy send you the activity report?

6      A. No.

7      Q. And you said when you found out that BVL was a lender,

8      you went and looked at the website?

9      A. I called the number off the bottom of the page.

10      Q. Did you go look at the website?

11      A. Yes.

12      Q. This is Exhibit 40.  That should be BVL.

13              Do you recall that being the website?

14      A. I don't recall, but...

15      Q. Did you read the website?

16      A. Yes.

17      Q. Did you read the page about how we work, how they had

18      syndicated pools of European investors' money?

19      A. I don't recall.

20      Q. But you read the website, right?

21      A. I do recall going to the website.

22      Q. Do you recall the section in there about stability in

23      their commitment to the long-term success of their clients?

24      A. No.

25      Q. From the website, did you get the impression that it was

1    a large financial institution?

2    A. It's just hard to tell that.  No, I didn't.

3    Q. Besides internally, did you get any other tax advice on

4    the 90% Stock Loan?

5    A. From outside?

6    Q. Yes, sir.

7    A. No.

8    Q. As part of your family office services, do you prepare

9    tax returns for your clients?

10   A. Yes.

11   Q. Did you prepare -- does your company prepare any tax

12   returns of your clients that did the 90% Stock Loans?

13   A. I would have to double-check, but I don't believe so.

14   Q. Did you provide any advice to your clients' tax return

15   preparers that they should treat this as a loan for tax

16   purposes?

17   A. Yes.  Initially when we entered the transaction.

18   Q. And you wouldn't have given that advice to your clients'

19   tax return preparers if you didn't believe that was true?

20   A. That's correct.

21   Q. Now, you said that as a qualified advisor Derivium paid

22   you a percent of a referral fee?

23   A. That's correct.

24   Q. And I believe that one of the activity reports you did

25   said that there was a $1.4 million stock loan?

1    A. Yes, or actually $1.3 million stock loan.

2    Q. Okay.  Did you get paid on the value of the collateral or

3    the loan?

4    A. I believe it's on the value of the collateral -- or the

5    loan, I'm sorry -- yeah, the loan.

6    Q. Okay.  So the loan was 1.3 million?

7    A. Correct.

8    Q. So your referral fee would have been about $13,000?

9    A. Correct.

10   Q. So by being -- by receiving a fee from Derivium and being

11   a qualified advisor, um, did you think you were participating

12   in a scheme?

13   A. No.

14   Q. So the mere fact that you were paid money in your mind

15   didn't mean that you were participating in this scheme?

16   A. No.

17   Q. And because you were paid a fee, do you think that you

18   should be assessed for promoting a tax shelter by the IRS?

19            MR. SEACORD:  Objection, Your Honor.

20            THE COURT:  Sustained.

21   Q. Has the IRS contacted you about 6700 penalties?

22            MR. SEACORD:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  No.

25   Q. From 2000 to -- when was the first year your client did

1      one of these transactions?

2       A. I believe it was late 2001; it could be early 2002.

3       Q. Are you aware that any of your clients' tax returns, any

4      of your clients that did stock loans, that any of the tax

5      returns were audited?

6       A. I believe most of them were sent notices that the IRS was

7      looking at this transaction.

8       Q. Let me put down the day.  Prior to 2004, because those --

9      that's when all -- prior to 2004, was one of your tax loans

10     audited?

11      A. I don't know.

12           MR. SEACORD:  I'm going to object to relevance

13     grounds.

14           THE COURT:  Go ahead.  He said he didn't know.

15      Q. Did anyone from Derivium tell you that the IRS had issued

16     a no-change letter?

17      A. I don't recall.

18      Q. And again, while we were talking about disclaimers, this

19     is Exhibit 54, which is a page off the Derivium website.

20           Did you -- did you review the Derivium website?

21      A. Yes.

22      Q. And did you see the on providing tax advice?

23      A. I don't recall that.

24      Q. It was important to you to do your own research as to

25     whether it was a loan or a sale on relying on something that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    Derivium provided?

2     A. If the stock wasn't sold, it was easy to be a loan.  If

3    the stock was sold, it can't be a loan.

4     Q. Did you know Mr. Nagy told the IRS the stock was sold?

5            MR. SEACORD:  Objection, Your Honor.

6            THE COURT:  Sustained.

7     Q. From the document, did the transaction to you look like a

8    loan?

9     A. Yes.

10     Q. The stock was the collateral?

11     A. Yes.

12     Q. It was a maturity date?

13     A. Yes.

14     Q. There was an interest rate?

15     A. Yes.

16     Q. The amount of the loan was less than the collateral?

17     A. At the inception, yes.

18     Q. And the loan document created an obligation for Derivium

19    to return the stock at the end of the loan if your client

20    wanted it?

21     A. If they chose, yeah.

22     Q. Do those terms comport with your general understanding of

23    what a loan should look like?

24     A. Yes.

25            MR. COOPER:  One second.

```
 1                    THE COURT:  Sure.

 2                    (Pause in proceedings.)

 3      Q. And again, when you talked to Derivium, you inquired

 4      about the hedging transaction?

 5      A. When --

 6      Q. When you were doing your due diligence?

 7      A. Yes.

 8      Q. And did you speak to Dr. Cathcart about the hedging?

 9      A. Yes.

10      Q. Mr. Nagy never told you anything about the hedging, did

11      he?

12      A. I never spoke to Mr. Nagy.

13      Q. And in Exhibit 38, which is the promotional materials, do

14      you recall this article about Dr. Cathcart referring to his

15      hedging strategy as a Coca-Cola syrup?

16      A. Not specifically.

17      Q. You said other banks do this transaction, right?

18      A. Correct.

19      Q. And sometimes maybe it's called a prepaid variable

20      forwards maybe?

21      A. That's correct.

22      Q. And the major banks do it, like Deutsche Bank does it,

23      right?

24      A. Correct.

25      Q. Merill Lynch does it?
```

```
 1        A. Correct.

 2        Q. Citibank does it?

 3        A. Yes.

 4        Q. They all do it, don't they?

 5             MR. SEACORD:  I'm going to object at this point.

 6   It's a trans -- he said a pre --

 7             THE COURT:  Follow up on redirect.

 8             MR. COOPER:  I forgot which bank.

 9             THE COURT:  Citibank.

10        Q. But generally I'm asking, even today, banks do stock loan

11   transactions, don't they?

12        A. Not similar to this.

13        Q. Can you explain that?

14        A. Not similar to the Derivium transaction.

15        Q. But they do stock loan transactions?

16        A. True.

17        Q. Yes?

18        A. Yes.

19             MR. COOPER:  Thank you.

20                       REDIRECT EXAMINATION

21   BY MR. SEADOR:

22        Q. I just have a couple more questions for you, Mr. Polk.

23             Mr. Cooper put a number of documents up there.  A

24   lot of them had disclaimers in them; some of them didn't.

25             Did any of those documents that you received from
```

1    Derivium tell you that the stock was being sold on receipt?

2     A. No.

3     Q. And let's stay on the disclaimers for a moment.

4           There were a number of them that were flashed up on

5    the screen.  And you said sometimes you use them in your

6    practice, too.  But just because you use a disclaimer, does

7    that mean you can tell your client anything?

8           MR. COOPER:  Objection.  Calls for legal conclusion.

9           THE COURT:  Overruled.

10          THE WITNESS:  No, I believe if you go on our

11   website, you've got disclaimers.

12    Q. Doesn't mean you can make stuff up?

13    A. Right.

14    Q. And you said in response to Mr. Cooper's questions that

15   you never talked to Mr. Nagy.

16          Is that your testimony?

17    A. No.

18    Q. Do you know whether or not someone from your office

19   talked to him?

20    A. I believe, but I'm not sure, my partner talked to him.

21    Q. Who is your partner?

22    A. William Nacrosi.

23          MR. COOPER:  Objection.  801.

24          THE COURT:  Overruled.

25    Q. Would that have been a part of the due diligence process?

 1      A. Yes.

 2      Q. Mr. Cooper asked you about the referral fee that you

 3   received and showed you the activity confirmation for the 1.3

 4   million, and mentioned that that would be in the $13,000

 5   referral fee.

 6           Can you tell us again what that $13,000 --

 7      A. That $13,000 was given back to the client.

 8      Q. You didn't put it in your pocket?

 9      A. No.

10      Q. In all the marketing materials that you received in the

11   due diligence that you did, if you had found out that

12   Derivium was selling the stock upon receipt, would you advise

13   your clients to enter into the transaction?

14      A. No.

15      Q. Why not?

16      A. Because there would be no way to hedge, to protect it.

17      Q. Now, Mr. Cooper asked you about your own research and due

18   diligence that you did before you recommended this to your

19   clients.

20           Did you have access to Derivium's books and records

21   when you did that research?

22      A. No.

23      Q. And Mr. Cooper ran through a litany of banks that he

24   claims do prepaid variable forwards.

25           You expressed familiarity with those?

1    A. Yes.

2    Q. And in those transactions, is the stock sold immediately

3    upon receipt?

4    A. No.

5              MR. SEACORD:  I have no further questions.

6              MR. COOPER:  Nothing further, Your Honor.

7              THE COURT:  Okay.  Thank you, sir, you are excused.

8              All right.  Why don't we -- did everybody bring an

9    umbrella?  Look out the window.

10             We'll break for lunch at this time and we'll start

11   again at 2:00, all right?  So we may have some umbrellas

12   downstairs.  If you need one, call up, I have some in my

13   office, and I'll loan them to you, all right?

14             So just have the CSO call up there and I'll give

15   them to you if you want them.

16             So we'll see you at 2:00.

17             (Thereupon, the jury retired from the courtroom.)

18             THE COURT:  Okay.  I think we have corrected it, but

19   don't show those things on the monitor until they are

20   confirmed in evidence.

21             MR. CLUKEY:  We have the deposition order.

22             THE COURT:  Okay.  Thank you.

23             All right.  Anything else before we quit?  I'll see

24   you at 2:00.

25             (Thereupon, there was a lunch recess.)

1          THE COURT:  Anything before we bring the jury back

2     in?  Y'all said there was no objection to Bowen's, and one of

3     the other English depositions.

4          MS. WEIS:  That's correct.  Nothing was ever

5     provided to us.

6          THE COURT:  I've got something that they gave me.

7          MS. WEIS:  My understanding is we never received

8     anything from Mr. Cooper containing any objections.

9          MR. COOPER:  I believe we provided them.

10          THE COURT:  Okay.  Well, they are right here.

11          MS. WEIS:  Your Honor, it's a little more

12     complicated.  And is it Bowen or Boyd?

13          THE COURT:  I've got objections from Bowen and Wood

14     that Mr. Cooper gave me last Friday.  And I don't know

15     whether they --

16          MR. CLUKEY:  We were never provided with those

17     objections.  And how long ago were they due?

18          MS. WEIS:  A couple of weeks ago.

19          MR. CLUKEY:  And so the reason why I'm raising it is

20     because --

21          THE COURT:  That's the reason I'm raising it, too.

22          MR. CLUKEY:  -- it's a video deposition that was cut

23     to be played today because we were never provided with any

24     objections.

25          MR. COOPER:  I suppose out of memory -- I don't

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    know -- I mean, the standard is we send everything to

2    everyone, so...

3              THE COURT:  Well, I mean, this -- this is dated

4    June 18th.

5              MR. COOPER:  That document, yeah.  We just tried to

6    provide it in a different format.

7              THE COURT:  You know, nothing I can do about it.  I

8    just -- I'm reacting to it.  They said no objections and

9    then --

10              MR. COOPER:  I believe that there was just a few

11    objections, aren't there?

12              THE COURT:  Not very many good ones.

13              MR. COOPER:  Well, I mean also, Your Honor -- I

14    mean, in the opening statement, they said this fellow never

15    even talked to Mr. Nagy.  So with Mr. Debevc out of it, is it

16    even relevant anymore?

17              MR. CLUKEY:  During the opening statement, Your

18    Honor, government counsel also explained that Mr. Nagy was

19    paid by Bancroft Ventures after Bancroft Ventures -- well, he

20    was paid until the very end.

21              THE COURT:  All right.  It looks like, going over

22    these, that the -- all of the objections, at least from

23    Mr. Wood's deposition, are based on 402.  There is a

24    relevance objection, which I looked at after the opening

25    statements, I think I overruled all of them, I let it all in.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    There is no harm no foul, as far as Mr. Wood goes.

2              Now I did sustain Mr. Bowen.

3              Who is first, Wood or Bowen?

4              MR. CLUKEY:  We were going to play Wood first.

5              THE COURT:  Why don't you take a look.  I sustain

6    the objections and we're not going to get to it until

7    tomorrow.

8              MR. CLUKEY:  For Bowen, the videotape was destroyed,

9    so we were going to read them anyway, but Wood is ready to

10   go.

11             THE COURT:  Okay.  So once you take this to your

12   videographer, and you can have all of these -- since I did it

13   on here, I guess after court y'all can go over these and look

14   at my rulings and see if you want to argue any of them.  I

15   made the rulings on her.

16             MR. COOPER:  Just from procedural, do they read

17   theirs in and we take the book from them?

18             THE COURT:  I would read it straight through.  It

19   wouldn't make any sense to do it that way, okay?

20             All right.  Anything else before we bring the jury

21   in?

22             MR. CLUKEY:  No, Your Honor.

23             THE COURT:  Do you have any objection, when y'all do

24   the responsive reading, that the court reporter not take down

25   what you are reading since it's all been taken down once?

```
 1                      MR. CLUKEY:  That's fine.

 2                      THE COURT:  Okay.  Any problem with that, Mr.

 3     Cooper?

 4                      MR. COOPER:  Okay.

 5                      (Thereupon, the jury returned to the courtroom.)

 6                      THE COURT:  Okay.  Well, I hope y'all survived the

 7     flood.  So we are going to start now.

 8                      All right.  Do you want to call your next witness,

 9     please?

10                      MR. SEACORD:  The next witness, the United States

11     calls Mr. Roy Strickland.

12                      THE CLERK:  Place your left hand on the Bible and

13     raise your right hand.

14                      State your name for the record.

15                      THE WITNESS:  Leroy Eugene Strickland, II.

16     THEREUPON:

17                            MR. LEROY EUGENE STRICKLAND, II

18     Called in these proceedings and having been first duly sworn

19     testifies as follows:

20                      THE CLERK:  Be seated around on the witness stand.

21                              DIRECT EXAMINATION

22     BY MR. SEACORD:

23      Q. Good afternoon, Mr. Strickland.

24      A. Good afternoon.

25      Q. Can you please tell us your full name and occupation.
```

1      A. Leroy Eugene Strickland, II.  I'm a CPA.

2      Q. And have you come here today prepared to state your

3      expert opinion about the source and use of funds by Derivium

4      from the 90% Stock Loan scheme?

5      A. Yes, I am.

6      Q. Where are you from?

7      A. I grew up in North Charleston.  I was raised in

8      Charleston.  I presently live in Summerville, South Carolina.

9      Q. Can you describe for the jury your educational

10     background?

11     A. I graduated from Stahl High School in 1981, then went to

12     the Citadel.  Graduated from the Citadel in 1985.

13             After that, went to work as a CPA.  Since that time,

14     I've had at least 40 hours of continuing professional

15     education each year.  I think I've had over a thousand hours

16     since 1985.  So a long time.

17     Q. You mentioned you are a CPA.

18             Do you hold any other professional certifications?

19     A. Yes.  I'm, as I stated, a certified public accountant.

20     I'm also certified in financial forensics by the American

21     Institute of Public Accountants.  I'm a Certified Fraud

22     Examiner and I am a Certified -- I'm a Certified Financial

23     Forensics Analyst.

24     Q. You mentioned you were a certified fraud examiner.  Can

25     you tell us what that is?

1      A. That is basically, it's -- the certification is through

2      the Association of Certified Fraud Examiners.  It's an

3      international organization.  And it's basically, you work in

4      the area of prevention, detection and deterrence of fraud.

5      Q. Can you please describe your professional employment to

6      date as it relates to why you believe you are qualified as an

7      expert in this case?

8              MR. COOPER:  Your Honor, we'll stipulate that he can

9      be tendered as an expert, if you want to speed things along.

10             MR. SEACORD:  I would like the jury to get the

11     background.

12             THE COURT:  Give the *Readers Digest* version.

13             THE WITNESS:  After graduating from the Citadel, I

14     went to work with Arthur Andersen in Columbia, South

15     Carolina, went to work there until 1991.

16             Moved back to Charleston and started the CPA

17     practice with Barry, Patricia Wilson and Pratt Thomas.

18             And then in 2007, we merged in with a larger

19     regional firm called Dixon Hughes, where I have practiced

20     from '85 until the last probably two years.

21             My primary practice area was auditing.  I worked in

22     the audit practice.  And then in addition, I've worked in the

23     forensic area of our practice since the early '90s.  And

24     presently, I am the partner in charge of the forensic

25     evaluation practice for Dixon Hughes, the entire firm.

1            And then naturally, I work in that practice area in

2     the Charleston office.

3            MR. SEACORD:  The United States tenders

4     Mr. Strickland in the field of accounting and as a Certified

5     Fraud Examiner.  He's qualified by the training, experience

6     and education providing opinions on the source of funds of

7     Derivium.

8            THE COURT:  No objection.  Go ahead.

9            MR. SEACORD:  I would also like to move at this time

10    in evidence a copy of Mr. Strickland's CV.

11           MR. COOPER:  No objection.

12           MR. SEACORD:  That will be 351.

13           THE COURT:  Okay.  Thank you.

14           (Thereupon, Government's Exhibit Number 351 was

15    received in evidence.)

16    Q. Mr. Strickland, what were you asked to do in this case?

17    A. Basically, I was asked to get an understanding of the

18    cash flows related to Derivium and the Derivium-related

19    entities on the cash coming in, the cash going out.  And then

20    specifically, to try to get an understanding of the 90% Stock

21    Loan transaction Program, how that actually operated.

22    Q. And did you form any opinions in connection with this

23    assignment?

24    A. Yes.  Basically, that is summarized into four or five

25    opinions.

1    Q. From an accounting standpoint, did you form an opinion

2    regarding the hedges that were supposedly in place?

3    A. Yes.  In looking at these transactions from when we

4    started in early '98 through 2005, I saw no evidence of

5    hedges being placed on any of these investments.

6    Q. And from an accounting standpoint, did you form an

7    opinion about the collateral, the stock that was given by the

8    customer to Derivium?

9    A. Based on the work that we did, all the bank statements,

10   brokerage statements looking at detailed records from the

11   beginning to the end, the stock, when it was transferred to

12   Derivium, it was sold, in most cases immediately, at least

13   within a couple of days.

14   Q. And from an accounting standpoint, did you form an

15   opinion about the quarterly statements that were sent by

16   customers, sent to customers by Derivium?

17   A. Yes.

18       As they've already -- the exhibits show that on a

19   quarterly basis there was a statement that was issued showing

20   the activity in the account.  And at the bottom it had a

21   listing of collateral that -- and that was -- that statement

22   was provided throughout the loan.  That collateral did not

23   exist.  It was sold on day one.  The stock did not exist.

24   Q. From an accounting standpoint, did you form an opinion

25   about the condition of Derivium's books and records?

```
1        A. When we looked at the books and records for Derivium,

2     their QuickBooks' records, their general ledgers were based

3     on two areas -- there were a lot of areas, but two primary

4     areas:  The stock that was transferred from the clients to

5     Derivium was never recorded on Derivium's books.  $1 billion

6     worth of transactions, close to that, where individual

7     stocks, Microsoft, IBM, etcetera, were transferred into

8     accounts in Derivium's name and subsequently sold, though

9     that transaction was not reflected on the books and records.

10            And then the second primary area is with the ten

11    percent money, they started -- Derivium started making

12    transfers to third -- to startup entities, is what you would

13    call them, little companies in Summerville and Orangeburg.

14    They were paying expenses directly for those companies, and

15    they were actually transferring some funds to those

16    companies.

17            That -- and that was happening frequently, you know,

18    like in accounting, everything is kind of day-to-day.  Those

19    entries, in most cases, were booked in bulk.  Sometimes they

20    were only booked until the end of the month or the end of the

21    year.  There was no detail from the evidence that I looked

22    at, no supporting documentation other than a transfer.

23       Q. You just testified that one of your opinions was related

24    to the hedges.

25            Can you explain from an accounting perspective what
```

1    a hedge is?

2     A. Basically, hedging is a bet, from a simple standpoint.

3    It's something you purchased to address a risk in the future,

4    stock going up; stock going down.  And there are a variety of

5    hedges, but that's basically a look at it.  Think of hedging

6    your bets.

7     Q. And in this situation, risk against what?  What are you

8    trying to determine?

9     A. The risk -- you are trying to protect -- I mean, the risk

10   is to the customer, the client.  And giving the stock to

11   Derivium, there was the potential that in the future if it

12   goes up in value, they will participate in that.  That risk

13   was not addressed.  There was no hedging product purchased

14   that I could identify on their accounting records for that

15   risk.

16    Q. You also use the word "collateral," and talking about one

17   view.  From an accounting perspective, tell us what

18   collateral is?

19    A. I'll just tell you, from an accounting perspective,

20   anybody's perspective, collateral is basically something of

21   value that you pledge in order to receive something in

22   return.

23          Some -- and a simple example is you want to get --

24   you've got a car or a house, you want to get a loan on that.

25   Well, you actually pledge that to the bank in order to

1    secure, if you don't pay your loan in the future, that

2    they'll have that property.  That's what collateral is.

3    Q. Now, in order to form the opinions you just told the jury

4    about, can you tell us what work you performed?

5    A. Yes.  We -- we started out with basically trying to get

6    our arms around it.  We are dealing with a pretty long period

7    of time from, I think it was March of 1998 to -- it was July

8    of 2005.  So we wanted to identify the companies, the period

9    of time, the -- and then we went and found the bank

10   statements and brokerage statements.  And we put all that

11   information into -- we used QuickBooks, also.  It's just a

12   way to get paper into the computer system to where you can

13   work with it.

14         Once we got the information in, everything tied into

15   the banking records, we had all the detailed activity.  And

16   then we went -- we had, I think it was 600,000 pages of

17   documents, and it's 190,000 files that we went through, to

18   try to classify the transactions.  Those documents included

19   loan agreements, the quarterly statements that we've already

20   mentioned, might be wire transfer documents, could be e-mails

21   and things of that nature.  So we took all that information

22   and went back into the QuickBooks and tried to classify the

23   transactions.

24         We also read, there is various depositions,

25   testimony, etcetera that was taken in this case to help us

1    add up some of the details of actually what was happening.

2         And then lastly, we compared our work to a

3    QuickBooks report for Derivium, and we didn't -- we didn't

4    try to reconcile it to the penny.  As a matter of fact, there

5    is some pretty big differences, but we wanted to get a true

6    understanding overall if it tied in.

7         And then lastly, we did enough work to make sure

8    that -- that we understood how the cash flow was working and

9    how these loans were working, and reconciled from that

10   standpoint.

11   Q. You mentioned -- you looked at a number of bank

12   statements.

13        Can you tell us approximately how many bank accounts

14   you were looking at?

15   A. We were dealing with 38 bank accounts.  I think we looked

16   at -- the total months was over 1,200 months, and we had in

17   excess of 45,000 transactions that we dealt with.

18   Q. From your review of the records, what is your

19   understanding of how the 90% Stock Loan worked?

20   A. This is one of the things we also did early on is, as I

21   mentioned, going through these documents, um, there was a

22   variety of marketing information that was put out, and some

23   of that I think has already been displayed earlier today.

24        But in a simple form, if somebody held a stock for

25   $500 and it went up in value to $1,000, well, if you want --

1    a stock is a piece of paper.  You can't spend -- Piggly

2    Wiggly doesn't take stock, you can't spend it.  So you want

3    to turn that into cash.  Well, if you turn it into cash and

4    sell it, you've got to pay taxes on it.

5          So what this program was marketed is a way to turn

6    that paper into cash without paying taxes.  You signed a --

7    you gave -- you pledged your stock and they gave you a note

8    for 90 percent of that money, but it had these benefits.

9          You weren't required to pay the loan back, you could

10   just walk away.  But then the other benefit was substantial,

11   that if it actually went up in price in the future, they were

12   going to loan you the money and also give you 90% of that

13   increase.

14         And they were going to do this through, in the

15   literature it's called a proprietary hedging model.  That's

16   how they were supposed to do this.  We didn't see this.  All

17   we saw was the 90% loan and the cash that there was no

18   hedging.

19    Q. You sort of anticipated my next question, but based on

20   your review of the books and records of Derivium, what did

21   you determine actually happened?

22    A. This is what happened.  You pledged your stock.  Derivium

23   gave you 90% of it back; they kept ten percent for their own

24   benefit and they let it ride.  There was no hedging activity

25   that I could identify.  You just hope that the stock went

1    down in value.

2    Q. And did you create a chart or a pictorial of that -- what

3    you just described?

4    A. Yes, I did.

5    Q. Okay.  If we can pull that up.

6         Who created this chart, Mr. Strickland?

7    A. Well, the actual -- I put all the information in.  It was

8    created by my group.

9    Q. Okay.  And is this an accurate representation of the

10    transaction, based on your review of the books and records?

11    A. Yes.

12    Q. Okay.  And can you tell us in a little bit more detail

13    what's pictured on here?

14    A. Yeah.

15         If you look at it, you start over on the left-hand

16    side, that's the customer, the client.  You basically get a

17    piece of paper, it's a stock certificate.  Now we know those

18    are in accounts.  You don't actually get a piece of paper,

19    but it's a piece of paper.

20         The -- once the stock comes over, that little house

21    there, that's Derivium and the Derivium-related entities, it

22    comes in.  They sell it; turns that piece of paper into cash.

23    They give you $900,000 back tax free.  They kept 100,000 for

24    their own benefit.  That's how the transaction worked.

25         You don't see the 100,000, you see the 900,000 cash

1   going to the client.  You start -- you turn it into a million

2   dollars.  The hundred thousand that was left over stayed with

3   Derivium.

4    Q. In your review of the books and records -- and I think

5   you sort of mentioned this already -- but were customers sent

6   any sort of communications indicating what was going on with

7   their stock?

8    A. Yes, they were.

9    Q. And can you talk generally about what sorts of

10  communications they were given?

11   A. Yeah.

12        When you -- we use these documents in pulling this

13  information together.  And basically, after you fill out the

14  loan application, we have a valuation report.  The valuations

15  report really didn't mean anything, it had a value and it

16  said stock received.

17        Once you transferred the stock in, they sent what

18  was called an activity report.  And it says on the report,

19  securities hedged, and it would give the number of security,

20  the number of shares and the value.

21        So you end up at the end with a million dollars.

22  And then they would give you the loan balance, which in the

23  case of a million dollars would be 900,000.  That's basically

24  what it showed, but it showed that it was hedged.

25        Well, what was actually happening is it was sold.

1    It sold the stock to get that value to determine how much

2    actually they had to send back to the client.  That was the

3    transaction.  There was no hedging.

4         MR. SEADOR: Sam, can we pull up Government

5    Exhibit 236, which has already been entered into evidence?

6    Q. Mr. Strickland, do you recognize this document?

7    A. Yes.

8    Q. And is this the activity confirmation you were just

9    describing?

10   A. Yes.

11        As you can see here at the top left-hand corner, it

12   would give the name of the client, client number, loan

13   number.  And the comment I was referring to is where it says

14   in the middle, securities hedged to date, securities hedged

15   to date.  And then you've got the date, the stock symbol, the

16   number of shares; and it actually says shares hedged, not

17   shares sold, it's shares hedged, and then the hedge value,

18   the shares remaining, and then the total value of $1,446,000.

19        And then down below, you will see the actual loan

20   amount of 1.3 million.  That's what the customer would

21   receive back in return.  And the difference between the

22   1,466,000 and the 1,301,000, that's the money that Derivium

23   would retain.  And you can also see at the bottom it has the

24   net due to client as a result of the hedging activities to

25   date.

1      Q. Just so I understand, the line in that middle section, it

2      says "actual loan amount at 90% of hedged value 1.3 million".

3      That's what the customer would receive?

4      A. That would be the amount that the client would get back.

5      Q. And I think I understand your testimony, correct me if

6      I'm wrong, the money that they got back was from the actual

7      sale of their stock?

8      A. Just get back to the simple example, it would be like

9      going to get a car loan, taking the title.  You got a car

10     that's worth $2,000 -- let's say $1,000.  Make it simple.

11           You go to the car, title loan place, and you say, I

12     want to pledge my car to get a loan.  It would be like them

13     taking the car and selling it and giving you $900 back.

14           That's what happened here.  That car that you -- you

15     couldn't drive your car anymore.  That's what was happening.

16     Q. Did you discover any other correspondence in the files

17     that you reviewed that was sent by Derivium to customers

18     about what was going on with collateral?

19     A. The other major report, as I've already talked about, was

20     the quarterly summary they would send the client every

21     quarter.  And it would tell you the balance of the loan.

22     Now, this loan accrued interest, so it had the balance of the

23     loan.

24           Then it would also have at the bottom, they would

25     track the securities as if they were still held.  It would

1    actually say the number of shares, if they were dividends,

2    and it said collateral.

3         If there were dividends that were paid on the stock

4    each quarter, that would show up in there.  If there was a

5    stock split, or if somebody bought the company, that would

6    show up as if those shares existed.

7         It says collateral.  And then it actually had the

8    value of the collateral on the quarterly statement.

9         And as I understand it, that was received every

10   quarter showing the activity in the loan.  That collateral

11   did not -- the collateral did not exist; it was sold.

12        MR. SEACORD:  Your Honor, can I approach the

13   witness?

14        THE COURT:  Sure.

15   Q. Mr. Strickland, I handed you what's been marked as

16   Government Exhibit 155 for identification.

17        Can you identify that?

18   A. Yes.  This is a quarterly account statement I was just

19   talking about.

20   Q. Is that the type of statement that you reviewed in the

21   files of Derivium?

22   A. Yes.

23   Q. Does that appear to be an accurate copy of that

24   statement?

25   A. Yes.

1                MR. SEACORD:  I would like to move Exhibit 155 into

2       evidence.

3                MR. COOPER:  602 objection.  801.

4                MR. SEACORD:  First we are not offering it for the

5       truth of the matter asserted.

6                THE COURT:  All right.  Overruled.

7                Just to explain, when they are spouting out these

8       numbers, that means something to me; that doesn't mean

9       anything to you.  They are Federal Rules of Evidence.  They

10      are my numbers.

11               What the lawyers do, when they tell me what the

12      number is, I know what the number is, I know what the basis

13      of the objection is, and I can rule on it.  You don't have to

14      worry about the numbers.  I promise you, you don't want to

15      know all those numbers.

16               So go ahead.

17               (Thereupon, Government Exhibit Number 155 was

18      received in evidence.)

19       Q. Okay.  Mr. Strickland -- well, why don't you explain

20      what's on this document.

21       A. Maybe y'all can't see it, but up at the top, left hand

22      is, again, the client address.  And then you have on the

23      right-hand corner the loan application -- or excuse me -- the

24      loan information that's at the very top.  It all stays the

25      same between these statements.

                    And then in the middle section, this is -- this is

          showing the loan balance, as you can see, gives the beginning

          of the quarter balance.  As I've explained, the loan did

          accrue interest, um, then the end of the quarter loan

          balance.

                    And then if you look down at the bottom, it has end

          of quarter collateral value.  That's the collateral we have

          been talking about that was sold on day one.

                    On the right-hand side is the account details, and

          it basically tells you the original loan amount, date of

          maturity, interest rate, etcetera.

                    And then if you go down to the bottom, on the very

          bottom section here, this is where I was explaining, they

          were actually keeping track of the activity as if the shares

          still existed.  It's the symbol, the company's name, the

          number of shares at the beginning, if there were dividends

          paid, that would be put in there.  Um, stock split, they say

          there is none.

                    In addition, if somebody purchased a company, you

          would show -- it would show that stock going to zero, and

          then the new company stock replacing it to get you an ending

          number of shares that represents the collateral, which is --

          that's -- it's gone.  It's sold.

      Q. So if I understand your testimony, this quarterly account

          statement shows 350,000 shares of Labor Ready, Inc. stock.

1            In this particular quarter, was that stock, based on

2    your review of the books and records, actually there?

3    A. No.  I mean, I didn't look specifically on it -- I didn't

4    look specifically at this one.

5            But basically, each time the stock came in, it was

6    sold.  There was no stock held -- excuse me --

7    stock/collateral.  It was sold immediately.

8    Q. In your view as an accountant, is this document conveying

9    that the collateral actually exists?

10   A. Let me see what it says.  Collateral activity details.  I

11   think it looks like it exists.  I mean, I don't know that I

12   can add anything to that.  It says what it says.

13           And I'm going to take that in conjunction.  If you

14   go up -- if you could go back up in the middle section, not

15   only do you have the shares activity, but you actually -- it

16   gives you the end of quarter collateral value.

17   Q. That's the value of the supposed stock that's being held?

18   A. Yes.

19   Q. Let's talk about a customer's options at the end of the

20   loan.

21           Based on your review of the books and records, what

22   options did they have at the end of the three-year period, or

23   whatever the loan came due?

24   A. There were basically three options at the end.

25           The first option, and the best option for Derivium,

1    is your stock goes down and you just walk away from the loan.

2    You didn't have to pay anything back; you got your 90%; you

3    are gone.

4         The middle option is, it could happen when the stock

5    is down or the stock went up in value.  At the end of the

6    three-year period, you could actually just renew the loan.

7    If the stock -- if you thought it was going to go up in

8    value, maybe it wasn't there yet, you just renew it for three

9    years.

10        If the stock went up in value during that time

11   period, you could actually ask them to pay you the cash

12   difference between this present value and your loan balance,

13   90%.  So you could get an additional piece of money, cash,

14   for that appreciation.  That was the second option, renew or

15   refinance is what it's called.

16        The third option, and this is the worst case for

17   Derivium, your stock goes up, maybe it doubles, and you've

18   got a million dollars' stock, and it goes up to $2 million,

19   you actually tell them, I want my stock back.  What they

20   would have to do -- you would pay your loan off.  They would

21   have to find the cash to go out and buy that stock.  It

22   didn't -- it was gone.  So they would have to go into the

23   market and buy those shares for you in order to replace your

24   stock.

25        That's the worst scenario for Derivium.

1    Q. What happens, based on your review of the records, when a

2    client elected that third option to get the stock back, let's

3    say appreciated, using your example, to $2 million, what did

4    Derivium do?

5    A. Derivium would have to -- you've got to realize, Derivium

6    had no capital.  When I say "capital," it wasn't like other

7    people put outside money into this deal.  They started off in

8    2001 with negative equity.  There is no capital.

9         At the end, they had a negative $5 million in

10   equity, so there is no other money than that ten percent.  So

11   you had to hope that there was enough money in the ten

12   percent, you had enough people doing this, to be able to go

13   out in the market and buy this stock.

14        Well, that's the problem with this.  They weren't

15   able to meet those obligations and things fell apart.

16   Q. Did you create a graph or pictorial of that, what you

17   just described?

18   A. Yeah.  I've got one on the worst case that kind of

19   explains it.

20   Q. Can you describe, Mr. Strickland -- did you create this?

21   A. Yes.

22   Q. Okay.  Can you describe what is depicted here?

23   A. This is the worst case scenario for Derivium.  The client

24   has the loan, and I used the example a million dollar loan.

25   It's -- three years later there has been interest that's

1    accrued on there.  Now the loan has a balance of $1,200,000.

2    The stock now is worth $2 million.  They don't have the

3    stock.

4          So the client would pay them the loan, pay them

5    $1.2 million.  And you can see again, it's all happening in

6    the same house.  It's Derivium-related companies.  The client

7    pays the 1.2 in.  Derivium's got to find $800,000 out of that

8    ten percent, they've got to find that.

9          They go to Wall Street, go to the market, buy those

10   specific shares and give them back to the customer.  That's

11   what they weren't able to do.  There was no protection.  They

12   didn't have any protection in place, hedging to address that

13   risk.  You just had to let it ride and hope that you had the

14   money.

15   Q. I think you answered this already, Mr. Strickland, but

16   were there cases, based on your review of the books and

17   records, where a client's stock had appreciated, the client

18   wanted that stock back; and as you said, they go and buy it

19   back, but were there cases when Derivium couldn't do that?

20   A. Yes.  That's why this thing went down.  They couldn't do

21   it.  There was no hedging in place.  They only had ten

22   percent to work with.

23   Q. Now, you've testified that you have examined Derivium's

24   books and records.

25   A. Yes.

1    Q. And did you identify any issues with those books and

2    records?

3    A. Yeah.  The -- the first thing we noticed right away is,

4    realizing we've got a billion dollars worth of transactions

5    here, but it's made up of a lot of loans, a lot of

6    individuals with stock, their books and records did not show,

7    anywhere that we can find, the receipt of that stock.  When

8    the customer transferred the stock into a brokerage account

9    in their name, in Derivium's name, the books and records

10   didn't reflect it, nor did the books and records reflect that

11   detailed sale.  It just didn't show it, that major piece.

12            $1 billion worth of individual transactions coming

13   into this business, individual stocks coming into a Derivium

14   brokerage account, were not recorded on the books and

15   records.

16   Q. As an accountant, would you expect to see those recorded

17   on the books and records?

18   A. Yes.

19   Q. Why is that?

20   A. They are received in your account -- it would be similar

21   to a bank.  When we deposit money into the bank, they record

22   the cash and they record a liability on their books for that.

23            Well, in this case, it wasn't cash, it was stock

24   that was received into their brokerage account.  They didn't

25   record that at all.

1    Q. In your review of the books and records and all the

2    various banks and bank accounts that you described, where

3    were they located geographically?

4    A. The --

5    Q. The bank accounts.

6    A. The bank accounts were --

7    Q. The U.S. accounts.

8    A. Yeah.  You will hear about all these different entities,

9    um, the bank accounts were U.S. accounts, they were, the --

10   bank accounts were all coming to Derivium.  Everything was

11   coming into Derivium that I can -- that I could find.

12   Q. Did you see any evidence of lenders?

13   A. You see documents about lenders, um, letters and things

14   like that at the very beginning.  All these transactions

15   occurred on Derivium's books.

16          Later on, they developed some offshore lender, but

17   the transactions still continued.  They set up a new bank

18   account, but all the transactions were directed, all the

19   activity, was directed by Derivium employees.

20          And they actually -- there was supposedly some

21   financial declarations that the offshore lenders had to

22   report.  Derivium had to provide that information, too.

23          So all of this happened within Derivium, all of the

24   cash, all the activity, it happened within Derivium.

25   Q. Now, you said it twice "their activity".  What do you

mean "activity sale" and --

A. Yeah.  This is all we do all day, stocks coming in, cash, selling it and getting cash in return, and then giving the client back 90% of their money and keeping ten percent of the money.

Ten percent of the money was used for their operating expenses, payroll, etcetera, and then we'll talk about this a little later, they also started making investments in these startup companies in Summerville and Orangeburg.

Q. That was my next question for you, Mr. Strickland.

Besides the fact that the receipt and sale of stock wasn't reflected on the books and records of Derivium, did you see any other issues with the books and records?

A. Yeah.  The -- they had -- and I'm talking in the tune of $30, $40 million worth of transactions with these startup companies, and these -- basically, you had transfers, and the transfers were going directly from Derivium, in most cases to these companies.

And in some cases, these companies actually, like their payroll, or they've got a bill from their vendor, Derivium paid it directly.  Those were booked in bulk entries.  Sometimes they booked it at the end of the month; sometimes they trued it up at the end of the year.

But the key here is, as I understand it, they are

1    saying that these are -- that's not unusual -- but there was

2    supposedly an unrelated third-party entity involved with

3    this -- and they will get into this later on.

4         If there was a third party, like the bank being a

5    separate offshore company, there was a third party, you have

6    detailed records.  Those -- you wouldn't just willy-nilly

7    send $100,000 based on an e-mail.  You would have detailed

8    records on each one of those transactions.  And those records

9    did not -- those records and the transactions were not

10   recorded; they were only recorded in bulk at the end of the

11   month.

12   Q. Let me ask you a couple of followups.

13        You mentioned a couple times startup companies.

14   What is a startup company?

15   A. A startup company is basically a company that is starting

16   from scratch.  They typically either have very little

17   revenues, because they are just starting up, maybe brand

18   new -- it's basically taking a business with no sales and

19   getting it off its feet.

20        A lot of times it's in a new technology, a new

21   product.  A lot of these are in the building industry, that

22   they were basically startups and from scratch.

23   Q. And you mentioned there were multiple transfers to those

24   companies without any substantiation.

25        Would you expect to see substantiation for

1    transfers?

2     A. Yes.  You would have day-to-day -- these transactions

3    would be recorded day-to-day.  As the money was coming -- you

4    wouldn't send somebody $100,000 and not record it on your

5    books and records; wait until the end of the month if it was

6    truly a third-party transaction.

7     Q. And how did Derivium, based on your review of the

8    records, how did they describe or explain what was going on

9    here with these transfers from Derivium to the startups?

10    A. They explained that these weren't -- that -- they are

11    explaining, on one hand, that you want to explain -- they

12    want to explain that this is a true third-party entity.

13    These are true hedges or investments that they are making.

14    And that -- and there is an entity that you will hear about

15    that they say is in there.

16          If you use that argument, then every transaction is

17    detailed.  Now, most of these entities were owned, they were

18    owned by Debevc and Cathcart.  So you set this company up,

19    you take your money out of Derivium, and you are transferring

20    it over to these entities owned by Debevc and Cathcart.  I

21    don't see how that addresses the risk of these customers.  I

22    mean, that is what was happening.

23    Q. Did you create a, sort of a chart to explain this?

24    A. Yeah.  We probably should have gotten to that before.

25    Q. So let's take a look at this.

1          And why don't you explain to the jury what's

2     depicted here?

3      A. This is the $100,000 we are talking about.  A million

4     dollar transaction.  Client gets 900.  They keep 100.  They

5     had to pay their cost of operations, things of that nature,

6     that's down at the bottom, but they are saying that they then

7     put $100,000 into a company called Spencer Partners, which is

8     supposedly this offshore company, then to Shenandoah, which

9     is -- Shenandoah is an entity owned by the Cathcarts and

10     Debevc.  And then it went to all these other little

11     companies.

12          What they would do, the money would go directly from

13     Derivium to these entities.  And then at the end of the

14     month, they would make journal entries, just record to make

15     it look like it went through those companies. It didn't.

16          And if it really was going through those companies

17     and Spencer Partners was a true third-party, unrelated

18     third-party "offshore company," these transactions would have

19     happened on a day-to-day basis.

20          Spencer Partners would be taking a 40-plus million

21     dollar liability for these amounts, and I don't think they

22     would take that lightly.

23          So this is why we went -- they went back and made

24     the books look like this, but this is what was actually

25     happening.  There is another chart.

1    Q. I probably should remind the jury that these are just

2    demonstratives to sort of illustrate for what Mr. Strickland

3    did.  It's not evidence.

4    A. The money was going from Derivium entities directly to

5    these startup entities.  Sometimes it didn't even go to the

6    startup entity; it went directly to their vendor.  The vendor

7    sent a bill and Derivium just paid it.

8           And then they would go and make the journal entries

9    to make it look like this is what was actually happening, and

10   then they would go and make it look like -- if you will go

11   back to the previous chart -- they make the books look like

12   this.

13   Q. So if I understand you correctly, the money was really

14   going right to the startups, but at some later time, they

15   would go back and change the books so it really looked like

16   it was flowing like this?

17   A. In the majority of the cases, it was direct.

18          MR. SEACORD:  Thank you, Mr. Strickland.  I don't

19   have any other questions.

20                    CROSS-EXAMINATION

21   BY MR. COOPER:

22   Q. I just want to hand you a copy of the report.

23   A. Yes, sir.

24   Q. Mr. Strickland, during your testimony, you didn't -- I

25   don't believe you even said Mr. Nagy's name, did you?

1     A. No, sir.

2     Q. And when we were looking at those demonstratives and we

3     were talking about Derivium, that was a Cathcart/Debevc

4     controlled entity?

5     A. Which entity?

6     Q. Derivium?

7     A. Derivium?  It was controlled by Mr. Cathcart and Mr.

8     Debevc.  Mr. Nagy was involved, as I understand it from the

9     information that I've read, from the very beginning of these

10    organizations, in the structure, the tax structure of these

11    transactions; in the preparation of the tax returns for these

12    entities; in the -- assisting with the books and records at

13    the end of the month, or the end of the quarter, or the end

14    of the year; with pulling these reports together that

15    supposedly were going to these third-party entities; with

16    reviewing and commenting on the marketing materials.  And I

17    didn't mention that previously, he was involved with it from

18    the beginning to the end from an accounting standpoint and a

19    tax advice standpoint, yes, sir.

20    Q. Thank you for that.

21          Was Derivium a Cathcart- and Debevc-controlled

22    entity?

23    A. It was owned by Mr. Cathcart and Mr. Debevc, yes.

24    Q. Did Mr. Nagy own any of Derivium?

25    A. I don't believe he owned any of Derivium.

1     Q. Was he an employee of Derivium?

2     A. No, he was not.

3     Q. Did Derivium have its internal -- have an internal

4     Certified Public Accountant?

5     A. Did he have an accountant?  I think he was a CPA, yes.

6     Q. And his name is Mr. Robert Brandenburg.  Is that your

7     recollection?

8     A. Robert or Mark, yes, it's Brandenburg.

9     Q. And then in addition to Mr. Brandenburg, Derivium also

10    had other bookkeepers?

11    A. Yes, they had other bookkeepers.

12    Q. Debbie Young.  Is that one of them?

13    A. I don't know all the names by heart, but they had a

14    bookkeeping staff.

15    Q. What about Ms. Hawk?

16    A. I've heard that name.

17    Q. What about Catherine Sandifer?

18    A. I don't know all the specific names.  I apologize.

19    Q. And Mr. Nagy was a solo practitioner that was the outside

20    accountant for Derivium, right?

21    A. Mr. Nagy was, as I understand, the outside accountant for

22    Derivium --

23    Q. And in your report --

24    A. -- and for Derivium and all the -- that I know of, all of

25    the related entities.

1      Q. And in your report, you didn't mention Mr. Nagy's name

2      once; is that right?

3      A. No, I did not.

4      Q. So you are not giving an opinion as to what books and

5      records Mr. Nagy looked at?

6      A. In the -- I don't know the specific books and records,

7      but I've read, you know, hundreds of pages of depositions

8      related to his involvement, so...

9      Q. And as an outside accountant, isn't the information you

10     have access to what your client gives to you?

11     A. Yes.

12     Q. Like yourself, you are a CPA at Dixon Hughes, so you only

13     have access to what your client gives you, right?

14     A. Yes, sir.

15     Q. Did you review any of the accounting information in Mr.

16     Nagy's files?

17     A. I think we might have been provided that at the end, if

18     there was some -- we -- we were provided information by the

19     various law firms.  We didn't get to talk with the various

20     professionals.  A lot of them were being sued individually at

21     the time and we didn't go through that effort, but I do

22     believe we had somebody talk with Mr. Nagy regarding the

23     books and records, though.

24     Q. And I -- and that brings up a good point.  In Exhibit

25     Appendix C to your report, the information you relied on,

1    that there is not a single deposition testimony listed there;

2    is that correct?

3    A. I don't know that there is.

4    Q. So you didn't read Mr. Nagy's specific testimony in

5    forming your opinion?

6    A. Yeah, I read Mr. -- we read Mr. Nagy's -- he had some

7    depositions outstanding.  I believe we had them prior to the

8    issuance of the report.

9    Q. Well, this report was issued in June of '09.

10    A. No, I think there was -- I might be mistaken on this, but

11    I thought he had some depositions in the prior matter. I've

12    read a variety of depositions.

13    Q. But you didn't list them in that report, did you?

14    A. No, I didn't.

15    Q. And then what's your billable rate?

16    A. My rate is -- my rate is $325 an hour.

17    Q. How much have you billed on this matter?

18    A. The Government is in the $60,000 range.

19        And to explain that, I haven't done all this work

20    myself.  We have staff that work on this with me.  Our

21    average rate staff is as low as $100 an hour.  Our average

22    rate is $165 to $175 an hour for everybody working on the

23    engagement.

24    Q. You also mentioned your report was used on another

25    matter?

1    A. There was another suit.

2    Q. Hold on.  How much did you bill in that matter?

3    A. It was -- I don't know the exact number -- it was over

4    $200,000.

5    Q. So a total of $260,000?

6    A. That's in the ballpark.  We --

7    Q. There is no --

8        MR. COOPER:  Your Honor, there is no question

9    pending.

10       THE COURT:  Go ahead.

11       THE WITNESS:  Can I explain, sir?

12       That represents 27 or 2800 hours of work, um, 26

13   people working on this engagement since March of 2006.

14       We -- we first got involved with this engagement in

15   March of 2006, so that dollar amount is over a long period of

16   time and a lot of work.

17   Q. Now, you talked about the company's books and records.

18   And you said that there was no indication of stock being sold

19   in the books and records.

20       Is that correct?

21   A. That's correct.

22   Q. But Derivium did have in its possession the brokerage

23   account statements, correct?

24   A. They had the brokerage account statements.

25   Q. And like you said, in 2001 the brokerage account

1   statements were actually in the name of Bancroft Ventures

2   Ltd., the lender, right?

3    A. In prior -- there was a period of time, and I don't know

4   the exact dates, Mr. Cooper, but for a while, this was all

5   done within Derivium.  And then the attorneys and everybody

6   met and they put in this new layer, which is these offshore

7   companies.  The documents, the brokerage statements,

8   etcetera, they all continued to come to Derivium.

9            And as I can tell, all the transactions were

10  directed by Derivium, loan applications, everything.  Nothing

11  really changed other than the name on the brokerage

12  statement, but it was called Bancroft, and sometime in '01,

13  and I think it stayed that way to -- maybe until the end.

14   Q. Are those brokerage account statements books and records?

15   A. That would be support.  That would be support for the

16  books and records.

17           There -- the reason we go to the brokerage

18  statements is that's third-party information, just like we

19  all have bank accounts, it's coming from the bank.  So we

20  start with that.

21           And then what you will see is that information would

22  be recorded in your financial statements, you know, all your

23  checks are recorded in the books and records, all your stock

24  transactions, etcetera, would be recorded in the books and

25  records.

1          So to answer the question, it probably would be more

2     accurate, more reasonable to call that support for the books

3     and records.

4     Q. But the brokers' statements weren't for Derivium stocks?

5     A. Yes, we had brokers' statements.

6     Q. And you also indicated these, the value confirmation

7     reports.

8          Is your understanding these reports are maintained

9     from a database maintained by Derivium?

10    A. I don't know exactly where they actually -- I think they

11    came from various files and records.

12    Q. Well, physically how they were generated, do you have an

13    understanding of whether or not that when the stock came into

14    the brokerage account, that information was put into a

15    database by Mr. Kelley?

16    A. Yes, it was.

17    Q. And when the information was put into the database,

18    didn't it spit out this report?

19    A. Yes, sir.

20    Q. And as well, when you turn the page, the activity

21    confirmation report, correct?

22    A. Yes, sir.

23    Q. And my understanding is when the stock was sold, again,

24    Mr. Kelley inputted into the database the date of the sale

25    and what was sold.

1             Is that your understanding?

2    A. Yes, sir.

3    Q. And when he put that into that database, did it -- it

4    spit that report out.

5             Is that your understanding?

6    A. Yes, sir, that's how it happened.

7    Q. So they were putting in the receipt of the stock into the

8    database and they were putting in the sale of the stock into

9    the database, right?

10    A. They were putting it into the database.  They were not

11    recording the transaction in their financial statements.

12    Q. Oh, so those are different books, but it was in that

13    database's books and records?

14    A. It would be like, um, somebody recording sales.  You've

15    got all these invoices and you are keeping track of them over

16    here, but you don't put it in your financial statements.

17    It's the same example.

18             So they were keeping track of it on, as I understand

19    it, in these off the books, in these off the book databases,

20    but they were not recording that.  They weren't recording it

21    in the financial statements.

22    Q. And you said you use QuickBooks?

23    A. Yes, we do.

24    Q. Is that what Derivium used, too?

25    A. That's the accounting software that they used.

1          And it goes to show -- I mean, QuickBooks can -- we

2    actually put all the transactions in QuickBooks.  You can

3    record the stock, so...

4     Q. So you can record the sale of the stock in QuickBooks,

5    right?

6     A. There is two points here.  Let me make this clear.  They

7    did not record the receipt of the stock on their financial

8    statements, nor the sale of that stock, and you can do that

9    in QuickBooks.

10    Q. So they didn't record either one?

11    A. No, sir.

12    Q. What about, did they record the loans?

13    A. Yes, they did.

14    Q. And how much was the total amount of sales that were not

15    recorded in Derivium's QuickBooks?

16    A. The stock receipts and sales, based on our records, stuff

17    we put in, I believe it was $940 million.  I think there is

18    some other detailed records that show it was close to a

19    billion dollars.

20    Q. Okay.  Well, on page 29 you said it was over 800 million

21    of sales?

22    A. That's the actual loan amount.

23    Q. Okay.  And in QuickBooks, I guess, could you open an

24    account for one of those brokerage statements and show the

25    sale there?

1    A. Yeah, you could.  I'm going to make -- I don't have --

2    there is not an issue, is you could record it in a separate

3    database, but those transactions should be recorded on the

4    books and records, the receipt of that stock.  It wasn't.

5    Q. Well, I guess what I'm trying to say is, is in

6    QuickBooks -- because that's what you are saying the books

7    and records are, right?

8    A. That's where they kept their general ledger books.

9    Right.

10   Q. I'm a solo practitioner and I use it.  And God bless

11   Erica, she did mine.

12        My understanding is an activity -- you can set up an

13   account for that activity?

14   A. Yes, you can.

15   Q. Like if I'm going to pay you, Mr. Strickland, I can name

16   the account statement?

17   A. Yes.

18   Q. It can record payments to you and payments to me; is that

19   right?

20   A. That's right.

21   Q. And you put it all in the general ledger in QuickBooks,

22   as I understand it, and then you assign it in an account in

23   the general ledger?

24   A. Actually, QuickBooks goes through subsidiary ledgers.

25   And the subsidiary goes into the QuickBooks's general ledger.

1    Q. Does that mean if I pay a lot of accountants, I could

2    have a general description as accountants, and then

3    underneath it, and that number is ten, and then for each

4    account, like you could be 11, and then, you know, Mr. Nagy

5    is an accountant, he could be 12, so I could have the

6    subaccounts for accountants?

7    A. You could either -- you are talking about on the general

8    ledger?  You could do it on the ledger in separate accounts,

9    but you could also do it in a subsidiary ledger and have it

10   booked into one account.

11   Q. From the whole ledger, the ledgers where you put in

12   everything, right?

13   A. It can be, or it can be -- the ledger can be generated

14   from the subsidiary registers.

15   Q. And then QuickBooks allows you to sort of slice and dice

16   information, if you will, like you want it?

17   A. Yeah.  It's pretty flexible software.

18   Q. So you can pull out, like, a trial balance sheet off the

19   ledger?

20   A. Yes.

21   Q. You can pull off an income statement off the ledger?

22   A. Yes.

23   Q. And the Government gave you Derivium's QuickBooks, I

24   noticed on your Appendix C?

25   A. Yeah.  We've got a, I think it's through 2004, the

1      QuickBooks database.

2       Q. Okay.  And did y'all look at that stuff?

3       A. Yes, we did.

4       Q. And then some of the accounts that they use to sell the

5      stock in I think you listed in your report, but there was

6      like a J.C. Bradford account?

7       A. They had, um, various brokerage accounts.

8       Q. Do you recall J.C. Bradford being one?

9       A. Yes, I do.

10      Q. Paine Webber being one?

11      A. Yes.

12      Q. H.A. Edwards was one?

13      A. Yes.

14      Q. And then there was Morgan Keegan in Memphis?

15      A. There were a lot of brokerage accounts.  I think we had a

16     total of 38.

17      Q. So in QuickBooks, you could open up an account in each

18     one of those if they were going to put it in?

19      A. Yes.

20      Q. If they opened up an account for that brokerage account,

21     they should have showed the sales in that, right?

22      A. Make sure I make this clear:  They did not show the

23     receipt of the stock in that account.

24          When the client -- when the customer gave the shares

25     to Derivium on their books and records, just like you would

1    give a deposit to the bank, they didn't record that.

2    Q. Yeah, but I heard you say they didn't record the receipt

3    or sale of the stock?

4    A. The sale side of it was specific for that stock.  They

5    showed the cash coming in, but they don't show the sale of

6    that stock.

7    Q. Yeah.  But the cash coming in comes from the sale, right?

8    A. What they did is they debited cash and credited the

9    liability account.  They skipped the whole section that the

10   stock came in and was sold.

11   Q. Well, I'm going to show you what I pulled out of what was

12   given to Mr. Nagy by his client at the end of the year.  And

13   this is a 2001 trial balance?

14   A. Yes, sir.

15   Q. And it says Derivium LLC?

16   A. Yes, sir.

17            THE CLERK:  What is that exhibit number?

18            MR. COOPER:  It's a demonstrative.

19            THE COURT:  That's not a demonstrative of anything.

20            MR. COOPER:  It's of what their books and records --

21            MR. SEACORD:  Your Honor, we are going to object to

22   this.  It's not a demonstrative.  It's clearly a document

23   that's not in the record.

24            THE COURT:  A demonstrative is made by the lawyers.

25   That's not a demonstrative.  I'll sustain the objection.

1              If you want to try to get it in evidence, that's

2         fine.

3         Q. You testified earlier that you were given Mr. Nagy's

4         records in the QuickBooks?

5         A. We were given a Derivium QuickBooks file, which I've

6         printed off various reports, yes.  I don't know that I -- I

7         don't know that I have that specific item.

8         Q. But you were provided reports by the Government, what

9         documents were produced?

10        A. Yes.

11             MR. COOPER:  Your Honor, I would like to move this

12        into evidence.

13             MR. SEACORD:  We are going to object.  There is no

14        foundation.  I'm not even sure what that is.

15             THE COURT:  Show it to him.

16             MR. CLUKEY:  What exhibit number is that?

17             MR. COOPER:  It's not listed.

18             THE COURT:  Well, I think we were supposed to list

19        all the exhibits several weeks ago, I think.

20             MR. COOPER:  I was going to use it to impeach him,

21        Your Honor.

22             MR. SEACORD:  We are going to object on that ground,

23        as well.  This clearly was not provided to us.

24             THE COURT:  Sustain the objection.

25             MR. COOPER:  Your Honor, may I talk to you at the

1    side bar?

2             THE COURT:  Unless you can tell me that you've given

3    it to him before, identified it, which I don't believe you

4    have, I don't think you have any reason to do that.

5             MR. COOPER:  The expert can rely on information

6    that's not in evidence.

7             THE COURT:  You can't show it.  It's not in

8    evidence.  It doesn't go up there.  If it's in evidence, you

9    can use it wherever you want.

10            MR. COOPER:  May I hand it to --

11            THE COURT:  Sure.

12            MR. COOPER:  Thank you, Your Honor.

13   Q. Mr. Strickland, I've handed you what's Bates marked Nagy

14   75_8465.

15            And if you turn to the next page, 866, you go about

16   halfway down, do you see the section called long-term

17   liabilities?

18   A. Yes, I do.

19   Q. And then you see underneath it that it has the 2500 code

20   due BVL?

21   A. Yes.

22   Q. And then if you go to the bottom where it says 2501,

23   where it says broker activity?

24   A. Yes.

25   Q. Does that number read 800?

1          MR. SEACORD:  I'm going to object again.  Now he's

2     reading it into the record instead of showing it.

3          THE COURT:  I'll sustain that.

4    Q. Does the document show $800 million?

5          MR. SEACORD:  Same objection, Your Honor.  He's

6     still reading it into the record.

7          THE COURT:  Sustained.

8    Q. Does the document show broker activity?

9          THE COURT:  Every time you ask the question, "Does

10    this document show," he's going to object and I'm going to

11    sustain it, okay?

12         MR. COOPER:  Thank you.

13         THE COURT:  Okay.

14   Q. Did the books and records -- on the 2001 sheet, are there

15    broker accounts listed?

16   A. There is.  There --

17   Q. And are there numbers next to the brokerage account?

18   A. Yes, there are.

19         MR. SEACORD:  Your Honor, Mr. Cooper is determined

20    to get this in the record one way or the other.  Now instead

21    of him reading it, he's having the witness read it.

22         So I'm going to object again.

23         THE COURT:  I mean, experts can rely on things that

24    aren't in evidence; experts cannot read things that aren't in

25    evidence to the jury.

1          MR. COOPER:  Well, I'm not asking him to read it.

2          THE COURT:  You aren't?  I must have missed

3     something.

4          All right.  Maybe it's time to take an afternoon

5     break.  You can go to your jury room and we'll talk about

6     this and then we'll be back with you in about 15 minutes.

7          (Thereupon, the jury retired from the courtroom.)

8          THE COURT:  Okay.  I mean, there are literally

9     thousands of documents.  And I know you've got them lined up

10     in front of you.  You've given them to me.  Unless you

11     identify them ahead of time, you are supposed to swap

12     exhibits.

13          You can't pull something out of the air and say it's

14     a demonstrative.  I mean, that's something that is in the

15     books and records of Derivium.

16          If you lay a foundation, you can get it in evidence

17     if you've identified it.

18          Now, what do you want me to do besides let you throw

19     it up on the screen?  Which I'm not going to do unless you

20     give me a good reason for it.

21          MR. COOPER:  Well, the reason is he relied on the

22     books and records given to him.

23          And my understanding is the Rules permit you with

24     the expert, even though it's not in evidence, because he can

25     rely on facts that are not in evidence as part of his

1    opinion.  He relied on these books and records.  I want to

2    ask him about it in coming to his opinion.

3          MR. SEACORD:  Mr. Strickland's report, as well as

4    what he relied on, was provided to you many, many, many,

5    months ago.  You've had -- you've had plenty of time to pour

6    over that and look through the exhibits and figure out which

7    ones he wants to use for this case and he didn't do it; and

8    instead, he brought -- picked one out and brought it here

9    today by surprise.

10         MR. COOPER:  I don't think it's a surprise.  He

11   relied on it and he testified about the books and records.

12         And secondly, he said it wasn't recorded in the

13   books and records, and it's clearly listed there on all the

14   brokerage accounts.  And I think I've got to show it to him

15   to test the basis of his opinion.

16         MR. SEACORD:  There are thousands and thousands and

17   thousands of pages of books and records of Derivium; all of

18   which were provided to Mr. Cooper, all the ones that

19   Mr. Strickland relied on.

20         If he had one that he wanted to ask Mr. Strickland

21   about, he could have picked it out and put it in his evidence

22   binder and marked it as an exhibit and provided it to us when

23   he was supposed to.

24         MR. COOPER:  My understanding of the Rule is he can

25   testify as to issues not in evidence, and he said it wasn't

1   on the books and records.  And I believe this document

2   demonstrates it is in the books and records.

3           Now I can use it for impeachment purposes to test

4   the basis of his opinion.

5           THE COURT:  But you've got to identify them.  Why --

6   why did you go through all this work identifying all these

7   exhibits and then your objections to them and all that?

8           MR. COOPER:  We did do a lot of work.

9           THE COURT:  I didn't say you didn't do a lot of

10  work; nobody is disputing that.

11          MR. COOPER:  We get n here -- and the

12  understanding -- and you are preparing for it -- and my

13  understanding of the Rules is if he said that there -- they

14  didn't have it in their books and records, and there it is on

15  a balance sheet, I mean --

16          THE COURT:  You may be able to get it in.

17          MR. COOPER:  Expert impeachment.

18          In laying the foundation, he said that he reviewed

19  Mr. Nagy's documents and that's a Nagy Bates stamp and --

20          THE COURT:  And that part of the Nagy Bates stamped

21  document was in the material that was given to you months

22  ago.

23          MR. COOPER:  Yes, Your Honor.

24          MR. CLUKEY:  Years ago, Your Honor.

25          THE COURT:  Years ago.

1          All right.  I mean, you may be able to get it in

2    with somebody else, you know, get them in with Mr. Nagy, but

3    not through this witness, unless you identified it ahead of

4    time.

5          Now, if you want to put that on your exhibit list

6    for Mr. Nagy today, you are welcome to do so.

7          MR. COOPER:  Okay.

8          THE COURT:  Okay?

9          MR. COOPER:  So no impeachment with it either?

10         THE COURT:  Nope.  Unless you want to call him back,

11   unless you get it in evidence -- I mean, you know, y'all --

12   you know, y'all have been running this case yourselves.  I

13   remember when this case came in, you were adamant to try it

14   in six or seven months, okay?  And I said fine, we'll try it

15   in six or seven months.

16         And then you've cooperated, done what y'all were

17   supposed to do, and we scheduled it -- we scheduled it ahead

18   of time, you know, and things slip through.  You can't use it

19   through this witness.

20         If you want to go through it with Mr. Nagy, that's

21   fine with me.  He can come up and testify it was on the books

22   and records and Mr. Strickland doesn't know what the devil

23   he's talking about.

24         MR. COOPER:  I understand.  I thought it would be a

25   little more potent with him.

1          THE COURT:  Potency, is that 1202?  I guess potency

2     is a subset of relevancy, okay?

3          All right.  How much longer -- we can take a break

4     now.  Do you want to come back in -- what do you want to do?

5          Amy, what do you want?

6          The ruling is going to be the same on anything else.

7          MR. COOPER:  No, I understand that.

8          THE COURT:  Anything else before we bring the jury

9     in?

10         MR. COOPER:  No, Your Honor.

11         THE COURT:  I think your confusion would be looking

12    at Rule 703, which is the actual witness rule.  It says:

13    "Facts or data that are otherwise inadmissible shall not be

14    disclosed to the jury."

15         So that's consistent.  So we'll start again, all

16    right?  Thanks.

17              (Thereupon, the jury returned to the courtroom.)

18         THE COURT:  Okay.  Mr. Cooper?

19         MR. COOPER:  Thank you, Your Honor.

20         THE COURT:  You are welcome.

21    Q. This is Exhibit 293 that IRS counsel used with you.

22    A. Yes, sir.

23    Q. And from here, from the depiction, um, was the sale of

24    the stock.  Were the funds from the sale of the stock, those

25    very funds, used to pay for borrowers?

1    A. In some cases we could tie it in specifically.  You would

2    see the stock, the stock sale, the cash coming in and the

3    transfer out.  Sometimes it would be round -- it would be

4    rounded off, but usually, it would tie in pretty closely.

5    Q. But my question is:  Was the sale and the proceeds from

6    the sale of the stock, was that used to fund the borrower's

7    money?

8    A. The cash was, yes.

9    Q. Was that done on every occasion?

10   A. Not -- if you had a -- somebody was refinancing sort of

11   thing, they would have to get the money out of whatever was

12   left, the ten percent, and it wasn't tied in.

13        Again, some transactions you could tie in real

14   clean, but this thing was really going full blast.  There was

15   some fluidity of the account and then selling the stock.

16   Q. I'm going to hand you what was a chart in your report.

17        MR. SEACORD:  Your Honor, I'm going to object to

18   this.  This isn't in evidence.

19        MR. COOPER:  They listed his report and the charts

20   in his report.

21        MR. SEACORD:  His report was within the exhibit

22   binder for counsel only.

23        THE COURT:  Is it marked into evidence?

24        MR. SEACORD:  No.

25        THE COURT:  Well, maybe you could get it

1     authenticated and we'll go from there.

2      Q. Would you mind looking at page 15 of your report, Your

3     Honor -- I mean, Mr. Strickland?  And those are -- the charts

4     I handed to you appear in the report?

5      A. Yes, it does.

6      Q. And does -- is that report reflective of the report that

7     you sent to the Government in this case?

8      A. Yes, it does.

9           MR. COOPER:  Your Honor, if I could move it into

10    evidence?

11          THE COURT:  Is it marked with an exhibit number?

12          MR. SEACORD:  I don't have any objection, but for

13    completeness, we might as well put his whole report in

14    evidence.

15          MR. COOPER:  He's got a copy of it.

16          THE COURT:  Mark that page as exhibit, whatever it

17    is.

18          What's the next one, Gail?

19          THE CLERK:  Is that going to be yours, Mr. Cooper?

20          MR. COOPER:  Yes, ma'am.

21          THE CLERK:  Obviously.  Okay.  It would be Number

22    89.

23          THE COURT:  In evidence.

24          MR. COOPER:  Thank you, Your Honor.

25          (Thereupon, Defendant's Exhibit Number 89 was

1     received in evidence.)

2      Q. And I wanted to discuss what the report shows.

3          Does this reflect the analysis, or part of the

4     analysis you would have done for the J.C. Bradford account?

5      A. No.

6      Q. Is it reflecting a particular stock transaction that you

7     analyzed in your report?

8      A. Yes.  This is relating to one of the specific examples,

9     the examples of the scenarios that I mentioned, and this is

10    the example of a loan renewal and the actual transactions

11    that occurred.

12     Q. And to tell the jury, on the top chart where you have the

13    date received, is that the date that the borrower transferred

14    the stock into the J.C. Bradford account?

15     A. That should be the date that -- what you have here is

16    you've got activity from three separate accounts.

17          Notice, this is early on.  This is before this other

18    offshore lender account was created.  These were all First

19    Security Capital, when everything was under one roof.

20          The first section is the Bradford account, which is

21    a brokerage account.

22          Second section is that same Bradford account.

23          And then the third is the First Union account, and

24    it shows the activity related to this transaction.

25     Q. Okay.  And sticking with the columns, the date received

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    column, is that the day the stock was transferred into the

2    Bradford account?

3     A. Yes, that should be.

4     Q. And then moving to your right, the trade day, is that the

5    day that the stock -- the execution for the sale occurred?

6     A. That typically means the date that they put the trade in,

7    and then the settlement date, as I understand it, would be

8    the date that the cash would actually --

9     Q. Right.

10          So the cash came into the account on the settlement

11    day?

12     A. It would have come in on the -- right around the

13    settlement day, correct, when the trade was settled.

14     Q. And the gross proceeds minus commissions, that's the net

15    proceeds?

16     A. That's correct.

17     Q. And then if you go to the middle part of the chart there,

18    you are identifying when the cash was in, and your date is

19    down here, the 6-4, 6-7 and 6-8, are the total of the cash

20    that came in on those settlement dates, correct?

21     A. That's correct.

22     Q. So the cash didn't come in -- so 34,000 came in on 6-4?

23     A. Yes.

24     Q. And then the rest of the $3 million came in subsequent to

25    that?

1    A. Yeah.  It came in on -- at 3 million on June 7th, and

2    then 34,000 on June 8th.

3    Q. And then the money was wired out from the Bradford

4    account to the First Union account on 6-2 and then on

5    June 2nd and then on June 4th?

6    A. That's correct.

7    Q. And then --

8    A. To make sure you -- the -- there were securities on -- I

9    think this had a margin balance.  They had to pay a margin

10   loan off.  That was 6-2.  You would have to do that in order

11   to settle the stock and then wire transfer out of

12   $2.2 million.

13   Q. So I guess that's my first question, the first $887,000,

14   that couldn't have been paid from the sale of that borrower's

15   stock because they had to pay it off first?

16   A. You have to pay it off in order to sell it.  Really all

17   of these -- this happened -- came in on the 2nd, June the

18   2nd, and trade was executed, put in, it said, sell my stock

19   on June the 2nd.

20        In order to sell that stock, there was a related --

21   the client already had a loan out with a brokerage company.

22   He had to pay that loan off.

23   Q. Right.

24        So my question is:  They couldn't have paid that

25   loan off from the sale of that borrower's stock?

1    A. No.  Once this thing got up, they had flow in the

2    account, it was all related to the ten percent in all this

3    commerce money, just depending on the timing.  Sometimes they

4    wouldn't be able to do that and sometimes they had the float

5    in there.

6    Q. And looking to the middle chart, because they transferred

7    out the 2.2 million into the First Union account, and then

8    from the First Union account it went to the borrower,

9    correct?

10   A. Yes.

11   Q. So the 2.2 million had to be paid out of a different

12   source of funds to be transferred into the First Union

13   account?

14   A. Yes.  It was all in the same pot.

15   Q. But the 2.2 couldn't have been the borrower's money

16   because it was transferred out before the cash came in on the

17   7th and 8th?

18   A. Right.

19         What they did was put the trade in on June the 2nd.

20   It takes them a little while to actually execute the trade.

21         Once you put the trade in; it's accepted, they are

22   going to get the cash on a settlement date.  So you basically

23   use someone else's money to put the 2.2.  They didn't have

24   any of their own money, it all had to come from the ten

25   percent.  I don't know whose money this is.  It's somebody

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1     else's money.

2      Q. You mentioned that there was a lender, Bancroft Ventures

3     Ltd., correct?

4      A. Supposedly an entity, unrelated lender, correct.

5      Q. So -- but let's not use Bancroft.  What happens --

6      A. Can I expand on that?

7             In this transaction, there is no lender.  This is

8     all happening -- these are all Derivium accounts.  This is

9     before they put in this supposed offshore lender.

10     Q. But when there was a lender, let's just -- when the

11     lender was there, Bancroft, if it was a real lender, couldn't

12     the money come from a lender's capital, other capital

13     resources?

14     A. If they had capital.  But the activity -- we had the

15     Bancroft statements.  Nothing really changed that we could

16     tell; they just added another name of a company.

17     Q. That's what I'm driving at.  Bancroft is, I believe Mr.

18     Clukey said, was located in the Isle of Man, but that was his

19     jurisdiction, somewhere in the U.K. over there?

20     A. Yes.

21     Q. So -- and real banks are in the U.K., like Abbey over

22     there?

23     A. Yeah.  There is plenty of banks over there.

24     Q. And you know the Royal Bank of Scotland is over there?

25     A. Yes.

1      Q. So even though there could have been an account for the

2      Royal Bank of Scotland, they could have capital reserves over

3      there in the U.K. to pay that loan with, couldn't they?

4      A. There was no evidence that we could find from day one to

5      the end of any cash coming in from any other source other

6      than the ten percent.  We didn't see any evidence of that.

7              Could they have capital?  I guess they could.  We

8      didn't see any evidence.  The money that was used -- the only

9      money they had to use was the float on these customers'

10     accounts, this lag between when they received the cash and

11     paid the cash to the customer and the ten percent that they

12     retained, that's the only money they had that we could tell.

13     Q. And you don't know if it was represented to Mr. Nagy

14     about the lender?  Do you know?

15     A. It's --

16     Q. By Mr. -- Dr. Cathcart?

17             MR. SEACORD:  I'm going to object on hearsay

18     grounds.

19             THE COURT:  Overrule that objection.

20             You can answer that question.

21             THE WITNESS:  No.  Oh, you mean Mr. Nagy's

22     deposition?

23             THE COURT:  No.  The question was:  "You don't know

24     what was represented to Mr. Nagy by Dr. Cathcart?"

25             THE WITNESS:  Other than reading what he, Mr. Nagy

1       mentioned in his deposition, no, sir.

2        Q. And if you will turn to page 18 of your report.

3              MR. SEACORD:  Your Honor, I'm going to have the same

4       objection.

5              THE COURT:  Go ahead and authenticate it and we'll

6       go from there.

7        Q. And does the chart I just handed you appear on page 18 of

8       your report?

9        A. Yes, sir.

10             MR. COOPER:  Your Honor, may I publish it to the

11      jury?

12             MR. SEACORD:  I'm still going to object.  He hasn't

13      established the authenticity.

14             THE COURT:  Okay.  Go ahead and ask him the

15      questions about -- first put a number on it.

16             I guess it's 90.  Would that be right, Gail?

17             THE CLERK:  Yes, sir.

18             MR. SEACORD:  As long as it's numbered with an

19      exhibit, I'll withdraw my objection.

20             THE COURT:  Okay.  So Exhibit 90 in evidence without

21      objection.

22             (Thereupon, Defendant's Exhibit Number 90 was

23      received in evidence.)

24             THE CLERK:  Do you need a sticker?  Thank you.

25       Q. And again, the -- sort of the same analysis we did

1    yesterday -- not yesterday, it feels like yesterday, but just

2    a second ago -- that you traced the funds from the receipt of

3    the First Union account?

4    A. The receipt into the First Union account, again, this is

5    the First Security Capital account.

6    Q. And then below, you again show when the cash is in and

7    when is the cash out, and it's transferred into the bank

8    account at First Union?

9    A. That's correct.

10   Q. And so here the settlement day is 3-2 on your top chart?

11   A. That's correct.

12   Q. And the wire into the First Capital account is also on

13   3-2, correct?

14   A. Which wire?  Excuse me.

15   Q. The cash out of the First Union Securities account --

16   A. That's correct.

17   Q. -- also happened on 3-2?

18   A. Yes.

19   Q. And if you go to the bottom, the proceeds were sent to

20   the borrower on March 1st, correct?

21   A. That's correct.

22   Q. So again, Derivium funded the borrower's loan from funds;

23   not from the sale of the stock?

24   A. As you can see here, they had -- this $300,000, you can

25   tie each one of these in.  There is no activity in these

1    accounts, other than these transfers.

2           There were other loans, if you go in here, that make

3    up that they had to pay for it, that same timeframe.  That's

4    why the balance is $300,000, but it's the same -- same issue.

5    Q. If you go to Exhibit 4 of your report, and I tried to tab

6    it for you to speed things up, and it's the account statement

7    for First Union?

8    A. Yes.

9    Q. And was this bank account part of your report?

10   A. Yes.  It's an exhibit.

11   Q. Okay.  Was it something you relied on?

12   A. It's one of the bank accounts that I relied on, yes.

13          MR. COOPER:  Your Honor, may I publish it to the

14   jury?

15          THE COURT:  That would be 91?

16          MR. SEACORD:  Can I see it first?

17          I don't have any objection.

18          THE COURT:  91 into evidence.  Then you can publish

19   it to the jury.

20          (Thereupon, Defendant's Exhibit Number 91 was

21   received in evidence.)

22          Let Gail put a sticker on it so Gail won't lose it.

23   Q. And the transaction out to the borrower happened on

24   March 2nd, which is the highlighted 88,000?

25   A. That's correct.

1    Q. And this shows that they had a $529,000 balance as of

2    March 1st in the account?

3    A. Yes.  That's correct.

4    Q. And then below, I believe I've highlighted, as well,

5    where you showed the 300,000 coming in?

6    A. That's correct.

7    Q. And the 300,000 came in after the money was sent to the

8    borrower?

9    A. Yes.  That's exactly right.

10   Q. So it couldn't have been funded from the sale of that

11   borrower's stock?

12   A. If you look at this over time, the only source of funds,

13   in my opinion, yes, it was funded from that sale of that

14   stock.  If you -- there was enough, unless they happened to

15   have extra money in there.

16         The only -- the only place they were able to get

17   money was the ten percent, okay?  So the only activity you

18   had in here -- no one else put any money in.  The only source

19   of funds with this statement was the sale of somebody's

20   stock.  In a lot of them, you could tie in exactly.  This is

21   one that you can't tie in exactly.

22   Q. It's one of the examples that's in your report, right?

23   A. It's one of the statements.  That's correct.

24   Q. So my question is narrower than the one you just answered

25   because the money was transferred out from the borrower

1    before the 300,000 came in, the payment to that borrower

2    could not have been from the sale of that borrower's stock?

3     A. It wouldn't have been from that 300,000.

4          But the source for that payment came from the sale

5    of the borrower's stock.  That's the only thing they had.

6     Q. I mean, how could -- if it went out on 3-1 to the

7    borrower -- and you just said the settlement day was when the

8    cash came in -- how could it be from that borrower's stock?

9     A. It's in the end, the timing of all of this that we talked

10   about this, but there is no other source of funds but that

11   borrower's stock.

12    Q. And back to Exhibit 91.

13         Do you know why you picked the 300 instead of the

14   260?  I mean, the 260 is closer to the 88 than the 300.

15    A. We just picked -- we could have picked hundreds of

16   examples.  We just happened to pick these.  No particular

17   reason.  There were hundreds and hundreds of examples.

18         MR. COOPER:  I'm going to hand the witness pages 21

19   through 24.

20         THE COURT:  Of his report?  Why don't you get a

21   sticker up front.

22         MR. COOPER:  Yes, Your Honor.

23         THE COURT:  92?

24         THE CLERK:  Yes, sir.

25         THE COURT:  Show it to Mr. Seador before you put it

1  into evidence to make sure he knows what we are talking

2  about.

3             MR. COOPER:  Yes, Your Honor.

4             MR. SEACORD:  I have no objection.

5             THE COURT:  Okay.  In evidence.  You can show it.

6             (Thereupon, Defendant's Exhibit Number 92 was

7  received in evidence.)

8  Q. Are you ready?

9  A. Yes.

10  Q. Okay.  The question here is the same, if you look at the

11  bottom chart, it went out to the borrower on May 3rd --

12  April 3rd?

13  A. Yes.

14  Q. And the money didn't come into the bank account on your

15  chart until April 4th?

16  A. That's correct.

17  Q. And the same question:  Because the money went to the

18  borrower the day before, according to your chart, it couldn't

19  have been funded from the proceeds of that borrower's stock?

20  A. Make sure you understand.  We took every brokerage

21  statement, and the only thing you have on the brokerage

22  statements is the stock coming in, the stock being sold, and

23  that money being transferred in one of these accounts.

24             In many situations, you could tie it in exactly, but

25  there was no other source of money at the beginning of the

1    month.  You can roll each one forward and tie each one into a

2    loan.

3         And when you have these bulk transfers, what is

4    happening is, the money is coming into the brokerage account,

5    but they might have two or three loans to fund.  Stocks come

6    in, they've sold it and they are moving it over in a bulk

7    amount.  It's the same money.

8    Q. Well, how could it be the same money if the money is not

9    even there yet?

10   A. It might not be the exact same dollar bill, but it's the

11   same source of funds.  There is no other source of money

12   other than the sale of the securities.

13   Q. Now, Mr. -- Mr. Strickland, you didn't -- you are not

14   giving an opinion on Mr. Nagy's tax advice, are you?

15   A. No, sir.

16   Q. Did the Government lawyers tell you that Mr. Nagy told

17   the IRS the stock was sold?

18   A. I don't know that they told me that, no.  I think -- I

19   don't know.

20        MR. COOPER:  That's all I have.

21                     REDIRECT EXAMINATION

22   BY MR. SEACORD:

23   Q. I just have a couple of questions for you,

24   Mr. Strickland.

25        Mr. Cooper showed you a series of charts, this one

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    has been marked Exhibit 90, he showed you a series of these,

2    and I just want to make sure the jury understands.

3             This isn't an actual statement from Derivium, is it?

4    A. No.  See, we took this -- we had hundreds of monthly

5    brokerage statements.

6             We looked at -- like I said, we looked at, I think

7    it's $940 million worth of these transactions, these stock

8    transactions.  And what we were trying to do in our report is

9    just give three examples of exactly how it worked.

10            And the way it worked is the stock came in, they

11   sold the stock and they gave the customer ninety percent;

12   they kept ten percent.

13            And as I already mentioned, that ten percent was

14   used for the operating cost to fund the startups and if they

15   had to pay money on these loans.  They didn't have a hedge.

16            So we went in -- we could have picked -- there is

17   hundreds of transactions we could have picked.  I could have

18   found, I'm sure, plenty that tied in exactly.

19            What I want you to understand is there was no other

20   source of money, and it flows -- each one we were able to

21   flow it right on through the transaction.

22   Q. And when that money comes in, where does it go?  Does it

23   all go into the same account?

24   A. The money -- the securities would go into a brokerage

25   account, and in these early days, they didn't have all these

1     other entities; it was all First Security Capital.

2      Q. If I could just stop you right there.

3           Who is First Security Capital?

4      A. First Security Capital is the company that they started

5     out before Derivium.  They had First Security Capital, and

6     some things happened and the name changed in the structure.

7     They started doing these offshore companies.

8      Q. I'm sorry I interrupted you.  You were talking about

9     where the funds go.

10     A. They go into the brokerage statement.  They sell it and

11    then they transfer the money out of the brokerage statement

12    into an operating account that they would then cut a check to

13    the customer.

14     Q. And so it all goes into the same pot, and if they need to

15    they pay out of the pot from the sale of securities?

16     A. Yes.  The key is it's all the same pot, but it's all

17    coming from the same source, is to sell the stock.

18           MR. SEACORD:  I don't have any other questions.

19           MR. COOPER:  I don't have anything else.

20           THE COURT:  Thank you, Mr. Strickland.

21           MR. SEACORD:  Before Mr. Strickland leaves the

22    stand, I just have an evidentiary question for him.

23           THE COURT:  Sure.

24           MR. SEACORD: This just relates to his report, and if

25    Your Honor will allow me I'll hand his report to him.

1           THE COURT:  Sure.

2    Q. If you could take a look at that binder, Mr. Strickland,

3    and take a look at your expert report that you prepared in

4    this case, do you see it there?

5    A. Yes.

6    Q. And is that the report that you prepared after you looked

7    at the books and records of Derivium?

8    A. Yes.

9    Q. Does that appear to be an accurate copy of your report?

10   A. Yes, it does.

11   Q. And the page -- the charts and things that Mr. Cooper was

12   putting up here on the Elmo, were those specific pages within

13   your report?

14    A. They were just certain pages.

15           MR. SEACORD:  Your Honor, at this time I would move

16   Mr. Strickland's entire report into evidence.

17           THE COURT:  Any objection?

18           MR. COOPER:  No, Your Honor.

19           THE COURT:  Okay.  In evidence.

20           MR. SEACORD:  Thank you.  That's all.

21           THE COURT:  I guess we ought to get a number.

22           THE CLERK:  What is that number?

23           MS. WEIS:  259.

24           THE COURT:  Thank you.

25           (Thereupon, Government's Exhibit Number 259 was

```
1    received in evidence.)
2              MR. SEACORD:  Actually, his report is only a small
3    part of that, so I can just take it out.
4              THE COURT:  All right.  I'll give that to you and
5    you can gave it to Gail or whatever.
6              MR. SEACORD:  Thank you, Your Honor.
7              THE COURT:  Anything else?  Mr. Strickland is
8    excused?
9              MR. SEACORD:  Yes, he's excused.
10             THE COURT:  Good.  Thank you.
11             Yes, ma'am?
12             MS. WEIS:  Your Honor, the Government calls as its
13   next witness, Patrick Kelly.
14             THE COURT:  Mr. Kelley, do you want to come up and
15   be sworn for me?
16             THE CLERK:  Place your left hand on the Bible and
17   raise your right hand.
18             State your name for the record.
19             THE WITNESS:  Patrick Russell Kelly.
20   THEREUPON:
21                   MR. PATRICK RUSSELL KELLY,
22   Called in these proceedings and having been first duly sworn
23   testifies as follows:
24             THE CLERK:  Thank you.  Be seated on the witness
25   stand.
```

```
 1                        DIRECT EXAMINATION
 2    BY MS. WEIS:
 3     Q. Mr. Kelley, can you see that demonstrative?
 4     A. I can barely hear you.  I can see this.
 5     Q. I'll do my best to speak up.
 6            MR. COOPER:  If need be, can I move?
 7            THE COURT:  Sure.  You can go anywhere you want to.
 8    No problem.
 9            MR. COOPER:  Thank you.
10     Q. Mr. Kelley, do you know this gentleman, Robert Nagy?
11     A. Yes, I do.
12     Q. How do you know him?
13     A. I know him from my association with Derivium Capital.
14    And I'll use that to -- for the different entities, if that's
15    okay.
16     Q. That was my plan.
17            So when you say "the different entities," what was
18    the name of Derivium when you first started working there?
19     A. When they hired me, it was First Security Capital.
20     Q. And then I assume it changed its name to Derivium?
21     A. It did.  It changed its name to Derivium.
22     Q. After that, did you work for a Derivium company that had
23    a different name?  When you say "Derivium," you are referring
24    to the various entities?
25     A. I only worked for Derivium Capital then, because I worked
```

1    in the back office operations.  That company was separated

2    and the people here in Charleston started to work instead for

3    Veridia.

4        Q. Okay.  So you worked for FSC, Derivium and then Veridia?

5        A. That's correct.

6        Q. Now, you said that when you were started, when you were

7    hired, it's called FSC.  Do you remember what year you were

8    hired by FSC?

9        A. I think it was 1999.

10       Q. And was this a new position that was created for you or

11   did you replace someone else?

12       A. I replaced someone else.

13       Q. What was that person's name?

14       A. Jonathan Sandifer.

15       Q. How long did you work for Derivium, as we call the

16   companies?

17       A. Well, I don't remember the exact year, but I stopped

18   working for Derivium and started working for Veridia, but I

19   think it was maybe around 2001.

20           So I probably worked for First Security Capital and

21   then Derivium from 1999 to 2001 and then started working for

22   Veridia.

23       Q. How long did you work for Veridia?

24       A. Um, I think it was late 2005 or maybe just the beginning

25   of 2006.

1      Q. When you were at all three companies, FSC, Derivium and
2      Veridia, did you have an immediate supervisor?
3      A. Yes, I did.
4      Q. What was his or her name?
5      A. Yuri Debevc.
6      Q. And he was your immediate supervisor the entire time you
7      were with those three companies?
8      A. That's correct.
9      Q. Now, you said that you worked in the back office; is that
10     correct?
11     A. Correct.
12     Q. Could you give the jury sort of the 30,000-foot view of
13     what that entails?
14     A. Okay.  The -- a back office, or our financial services
15     firm was, we dealt with a client, a borrower after they had
16     decided that they wanted to take out a loan and made sure
17     that they signed their contracts.  We helped them transfer
18     the stock from their accounts to our brokerage accounts.
19             We managed the database that tracked all of their
20     transactions during the time that they were a client, and
21     then we sent out the reports at the end.
22             So sort of, you know, nuts and bolts kind of stuff.
23     Q. Thank you.
24             Did Veridia or Derivium, when you were working,
25     whatever it was called, provide services to any other

1    companies?

2      A. Um, I'm not sure what you mean.  We had several vendors.

3    Is that what you mean?

4      Q. Yes.  What were those called?

5      A. Well, let's see, I was aware of -- and looking at this is

6    a little bit helpful -- DDA, um, Bancroft, WITCO and Optech.

7      Q. Now, Mr. Kelley, when you first began at FSC, how many

8    people worked in the back office with you?

9      A. Um, there was three of us.

10     Q. You, Yuri Debevc?

11     A. And, gosh, I don't know, it was our secretary and an

12   assistant.  And at the moment, I don't remember her name.

13   She didn't work for very long, but there was --

14     Q. A third person?

15     A. A third person.

16     Q. I assume the office got bigger at some point?

17     A. It did.

18     Q. At its height, how many people worked in the back office?

19     A. I think we probably had at least nine, 12 people.

20     Q. And at the very end when you ended your employment with

21   Veridia, how many people were working in the office at that

22   time?

23     A. Just Yuri and I.

24     Q. And I don't remember if I asked you this before, do you

25   remember what year it was when you stopped working at

1    Veridia?

2    A. Um, I think it was either late 2005 or early 2006.

3    Q. Now, Mr. Kelley, you worked with Yuri Debevc, it sounds

4    like, for seven years, plus or minus?

5    A. Yes.

6    Q. And would you consider him a friend of yours?

7    A. Yes.

8    Q. Do you still keep in touch with him now that you don't

9    work at Veridia?

10   A. I do.

11   Q. How often do you keep in touch with him?

12   A. Um, he doesn't live in Charleston anymore, but if he

13   comes into town, then we'll try and have breakfast or

14   something like that.

15   Q. Have you been sued because of the work that you did at

16   Veridia?

17   A. Yes, I have.

18   Q. And you are currently being sued?

19   A. I am.

20   Q. Not by the United States; is that correct?

21   A. No.

22   Q. Now, you also said that you met Mr. Nagy through your

23   work at Derivium; is that correct?

24   A. Yes, I did.

25   Q. Of the seven or so years that you were at

1    Derivium/Veridia, how many years do you associate Mr. Nagy

2    being there, as well?

3     A. I couldn't tell exactly, but very early in the time when

4    I started working there.  So I would think it was 1999 or

5    2000.

6     Q. And was he there throughout the entire time after that?

7     A. Certainly into 2005.  Um, I don't remember at the very

8    end whether he was -- um, whether we were working or whether

9    he was generating reports.

10     Q. During your time at Veridia and Derivium, I assume there

11    were sort of work events out of the office, happy hours,

12    Christmas parties; that kind of thing?

13     A. That's correct.

14     Q. Did Mr. Nagy attend some of those?

15     A. Yes, he did.

16     Q. Do you still keep in touch with Mr. Nagy?

17     A. It's a small town.  We see each other, but I have no

18    business dealings with him.

19     Q. When you came in the courtroom today, did you say hi to

20    Mr. Nagy?

21     A. I did.

22     Q. You visited with him?

23     A. Yes.

24     Q. Would you consider yourself on friendly terms with Mr.

25    Nagy?

1    A. Oh, certainly friendly terms, yes.

2    Q. Now, when you were at Derivium and Veridia, what was the

3    nature of your contact with Mr. Nagy?

4    A. Um, Mr. Nagy would help us in creating reports if -- for

5    instance, making sure that we properly recorded any tax

6    events that a client would need to know in regards to their

7    loan, and also help us in making sure that the information

8    that we pulled out of our database for, like month-end

9    reports and such, you know, he might ask for some specific

10   information.

11   Q. So when you say that you help in creating reports for

12   clients when they had tax events, what kind of reports are

13   you talking about?

14   A. Specifically, we would send out a report at the end of

15   the year that would let the client know whether they had

16   any -- that would help them file their taxes in regards to

17   their loan and performance of their, either the loan or the

18   stocks that were held in there.

19   Q. What kind of information would be contained in these

20   reports?

21   A. Um, things as to whether -- for instance, a company might

22   have to pay dividends and -- I'm not an accountant -- I

23   understand there is different types of dividends; therefore,

24   when they reported it on their taxes, they would need to

25   produce it.

1    Q. Now, the dividends that you were reporting to the 90%

2    Loan customers --

3    A. Yes.

4    Q. -- they would be submitted as stock for collateral; is

5    that correct?

6    A. That's correct.

7    Q. But you worked in the back office?

8    A. I did.

9    Q. So would you agree that the -- with Mr. Strickland's

10   testimony that the stock was sold when each customer ends the

11   transaction?

12   A. That was the start of the hedging process, as explained

13   to us.  And, you know, we would sell the stock and establish

14   a value for that client's portfolio, that borrower's

15   portfolio on the day they submitted it, if possible to do

16   that.

17   Q. So when you sent out the annual statements to the

18   customers for the dividends that were received on the stock,

19   those dividends weren't actually received by Derivium; is

20   that correct?

21   A. That's correct.

22   Q. How did you find data you put in the reports about the

23   dividends of those stocks?

24   A. We would use such things as Standard & Poor's, we would

25   sometimes use Bloomberg.  We would use different companies

1     that would provide this information to us.

2      Q. So you needed to look up that information because the

3     companies themselves, the stock companies, weren't providing

4     that information to Derivium correctly; is that correct?

5      A. That's correct.

6      Q. And who helped you find that information in Standard &

7     Poor's?

8      A. At times, Mr. Nagy.  Um, at times it was whatever firm we

9     worked with.  If we worked with Bloomberg, then we might work

10    with Bloomberg's own personnel.

11     Q. Now, you mentioned that there was data that you would

12    pull from databases to provide to Mr. Nagy on occasion?

13     A. Yes.

14     Q. What kind of data would he request from you?

15     A. Um, we would -- at the end of each month, we would submit

16    to the owners a report of all the activity that had gone on

17    during the month.  If we worked with borrowers and we had

18    done loans, we would sum all of this up into one or two

19    pages.

20          So rather than let them having to look at all the

21    transactions, they would look and see, you know, what

22    activities the business had had during that month.

23          So it might reflect loans, stock opinion, loans, I

24    mean, there is a big report.  I can keep going.

25     Q. Please do.

1      A. Okay.  There would be collateral values for existing

2      loans, and what the loan value -- say, if I had done a loan a

3      year earlier and there was two more years to go on the loan,

4      then you might say, okay, the loan today, they owed this

5      amount of money.

6      Q. Now, when you say "the collateral values," that was how

7      much -- well, could you explain what that was?

8      A. Yes.

9           As explained to us, the client retained what they

10     call beneficial ownership of their stocks.  So if we reported

11     that a client had a loan, say, of $100,000, then the stock

12     since the beginning of the loan may have gone up or gone

13     down.

14          And that value would be reported on this, so that

15     you would know whether the collateral that the clients owned

16     was more or less than the value of the loan at that

17     particular time.

18     Q. So the -- you were tracking basically how much this --

19     the value of the stock that was sold initially, but had

20     been -- had changed since the loan transaction began?

21     A. Correct.

22     Q. And Mr. Nagy got copies of those reports?

23     A. Um, I'm not sure.  He was on our monthly distribution,

24     but no question at times he would contribute to whether we

25     were creating the reports correctly.

```
 1              I responded to him like I might respond to an
 2    accountant who would say, you know, you are not doing things
 3    correct, because I'm not an accountant, so I would take his
 4    documents, yes.
 5    Q. You got his guidance on how to create these reports to
 6    get to the owners of the company; is that correct?
 7    A. Well, I did the actual creation of the reports, but he
 8    might guide me as to whether I was getting right -- you know,
 9    whether he would ask me questions about was I getting right
10    data out of it so that it would be reported correctly, I
11    assume.
12    Q. Now, when you say "owners of the company," who are you
13    talking about?
14    A. Well, Dr. Cathcart and Scott Cathcart, and then certainly
15    Bob Brandenburg would get a copy of the reports, and Yuri
16    would get a copy of the reports.
17    Q. Bob Brandenburg, he was an accountant for that company?
18    A. He was an accountant also.
19    Q. Was he an owner of the company?
20    A. Not that I'm aware of.
21    Q. Did Mr. Nagy, that you recall, request any other types of
22    data for you to pull out of the database?
23    A. I'm sure he did.  You know, we would correspond, and my
24    direction was that I could respond to either Mr. Brandenburg
25    or Mr. Nagy.  You know, if they had an accounting question,
```

1    I -- there was only a couple of us that could get reports out

2    of the database very well.  So they would -- we had

3    permission to, you know, generate a report, a requested one.

4     Q. It was reasonable always to give them that report if they

5    requested it?

6     A. Yes.  We had permission to, you know, give them the

7    report.

8     Q. How often did Mr. Nagy request reports from you?

9     A. Not -- not that often, I mean -- but I couldn't say --

10   you know, it was just one of those things.  We would respond

11   to, you know, whichever of the accountants asked questions.

12    Q. Now, since we are talking about sort of an accounting

13   role, did you ever work with Mr. Nagy to set up company

14   accounts and invoices to make sure that the companies'

15   paperwork was being generated correctly?  Invoices, for

16   example?

17    A. Um, I don't think so.  You mean like general ledger or

18   accounting reports, a business might --

19    Q. Let's go a step back.

20    A. Okay.

21    Q. So Derivium had a server in Canada; is that correct?

22    A. That's correct.

23    Q. And the server was just to maintain data from its

24   computer files?

25    A. Yes.  Correct.

1        Q. And there was a third party that, you know, provided

2    services to Derivium to maintain that server; is that

3    correct?

4        A. Right.

5            We had a small technology firm that could make sure

6    that it kept working, yes.

7        Q. IT team?

8        A. IT team, yes.

9        Q. Now, did you work with Mr. Nagy in making sure that the

10    invoices that IT provided to Derivium were correct?

11       A. Certainly.

12           I mean, you know, from the standpoint of making sure

13    that, you know, if Derivium was -- how to phrase this --

14    since we used the servers, you wanted to make sure that we

15    were billed properly for them.  I'm not sure I'm answering

16    the question correctly.

17       Q. No.

18       A. Okay.

19           MS. WEIS:  May I approach the witness?

20           THE COURT:  Sure.

21           MS. WEIS: I'm going to be handing the witness what's

22    been previously marked for identification as Government 339.

23           THE COURT:  Okay.

24       Q. Mr. Kelley, take a minute to look at that and let me know

25    when you are done.

1      A. Yes.

2      Q. Now, if you look down at the very bottom, Mr. Kelley, do

3      you see an e-mail address?

4      A. Yes.

5      Q. Is that your e-mail address?

6      A. It is.

7      Q. And if you look at the date at the top, is that a date

8      that you were working at Derivium?

9      A. Yes.

10     Q. Is this the kind of e-mail that you would be sending in

11     the course of your duties as part of your employment with

12     Derivium?

13     A. Yes.

14            MS. WEIS:  Your Honor, at this time we would move

15     into evidence Government Exhibit 339.

16            MR. COOPER:  402.  403.

17            THE COURT:  Overruled.

18            THE WITNESS:  What's that?

19            THE COURT:  In evidence.

20            MS. WEIS:  339.

21            (Thereupon, Government's Exhibit Number 339 was

22     admitted in evidence.)

23     Q. If you just sort of zoom in on the entire e-mail.

24            So Mr. Kelley, that's your name and address, e-mail

25     address at the top --

1       A. Yes.

2       Q. -- is that correct?

3              THE COURT:  Wait, Ms. Weis.  If y'all can't see it,

4       you let us know, we can blow it up some more.  As long as you

5       can see it, just -- if you can't see anything, raise your

6       hand to make sure you see it, okay?

7              Thanks.  Go ahead.

8       Q. And the subject is network accounting; is that correct?

9       A. I'm sorry?

10      Q. The subject of the e-mail is network accounting?

11      A. Yes.

12      Q. All right.

13      A. To my point of view, it's dealing with technology.

14      Q. Okay.

15      A. Okay.

16      Q. So this is the sort of thing that we would -- we were

17      talking about invoices, setting up accounts and paperwork so

18      that it will be clear that the equipment is owned by Derivium

19      and not by First Security Capital of Canada?

20      A. Right.

21             You know, the technology part is, you know, probably

22      the only thing that I deal with, but you know, I dealt with

23      invoices with technology.

24      Q. And you talked with Mr. Nagy about those invoices?

25      A. Or Bob Brandenburg --

1      Q. Okay.

2      A. -- either one of those two.

3      Q. So up at the beginning -- actually I have a question.

4           Do you see where it says, "Charles, per our

5      conversation regarding technology invoices that relate to the

6      Hamilton location" -- what's the Hamilton location?

7      A. That's -- the servers were in Canada and Hamilton was --

8      is a small town just outside of Toronto.  And that's where

9      the people that worked with First Security Capital and our

10     technology, the people who were maintaining the servers,

11     that's where their office was.

12     Q. And First Security Capital Canada, was that in some way

13     affiliated with Derivium or FSC?

14     A. Had the same name.  The person that was up there I had

15     met through Dr. Cathcart, so I had to go out there, see what

16     its relationship was.

17          But obviously, it had to be related from that

18     standpoint.  And, you know, it was -- and that was who I

19     would see when I would go up there.

20     Q. So I, just for the jury's reference, FSC Canada down

21     here, I'll be talking about that same --

22     A. Okay.

23     Q. Mr. Kelley, do you see down three lines, the last big

24     paragraph, and it says:  "This also gives us paper trails to

25     show ownership"?

1     A. Yes.

2     Q. Do you recall what you were referring to when it says,

3     "This also gives us paper trails to show ownership"?

4     A. From an accounting standpoint, you know, I don't -- I

5     don't want to have something and not be able to show, you

6     know, how it -- how it occurred, how you acquired it.

7          And you don't want, you know -- these servers were

8     in Canada, so you don't want to not record it down here

9     because we didn't have these servers down here anymore.  So

10    you wanted to still show that, you know, this is part of the

11    business, so you want to make sure that you have a paper

12    trail.

13    Q. Okay.  Thank you.

14          Just one other question, it says CH.  Who is CH?

15    A. He's the person that was at First Security Capital of

16    Canada.  He's the person that, you know, if he was in town, I

17    would see him.

18    Q. Do you know what his -- what the CH stands for?

19    A. Um, actually -- um, well actually, I think the C stands

20    for Charles, but all I recall was CH.

21    Q. What was Charles's last name?

22    A. It's Hsin, H S I N, or something.  I'm probably murdering

23    it, the pronunciation.

24    Q. That's all I have for 339.

25          Now, Mr. Kelley, if a customer called Derivium and

1    had a question about, you know, the taxes, for instance -- at

2    the end of the year they had a question about the taxes,

3    their taxes, was there a person that Derivium could direct

4    them to, a go-to person?

5     A. Depending on, you know, what questions they asked, yes,

6    we could.  Um, Bob -- yeah -- I'm sorry -- both Bobs -- too

7    many Bobs -- but Bob Nagy on occasion, you know, would talk

8    to a client because we knew that he had done research on it

9    and had helped us in creating the year-end report to make

10   sure that the clients could report, you know, the -- what was

11   happening with their loan properly.

12         So we did not use him -- just because a client asked

13   a question, we didn't automatically send them to Bob, but he

14   was a resource that we had.

15    Q. And when you were working at Derivium, you had staff that

16   is -- would you say you had staff underneath you that you

17   were more senior to?

18    A. Yes.

19    Q. And you could pass on instructions to them about -- for

20   instance, you know, whether or not to use Mr. Nagy as a

21   resource for a topic?

22    A. That's correct.

23         MS. WEIS: At this time I would like to approach the

24   witness again.

25         THE COURT:  Sure.

1          MS. WEIS: I handed the witness what's been

2     previously marked for identification as 153.

3      Q. Would you take a look at 153 and let me know when you are

4     done?

5      A. Okay.

6      Q. Mr. Kelley, if you look down at the very bottom, you see

7     an e-mail address?

8      A. I do.

9      Q. That's your e-mail address?

10     A. That's mine.

11     Q. And again, I understand the format is a little bit

12     different on this one.  If you look at the top, you can find

13     a date, and working at Derivium, December 24, 2002?

14     A. Yes.

15     Q. And looking at this e-mail, do you generally recognize

16     the subject matter of this e-mail?

17     A. Yes.

18          MS. WEIS:  Your Honor, at this time I would move for

19     admission into evidence Government Exhibit 153.

20          MR. COOPER:  No objection.

21          THE COURT:  In evidence.

22          (Thereupon, Government's Exhibit Number 153 was

23     received in evidence.)

24          MS. WEIS:  So Sam, if you could just blow up the

25     body of the text and then the signature.

1    Q. So Mr. Kelley, is this an e-mail that you sent to the

2    other employees in the back office at Derivium?

3    A. Certainly some.  I don't know if it went to all of them,

4    but it definitely went to some of the people there.

5    Q. And if you see in the, I guess it's the fourth paragraph

6    where it says:  "Bob will be able to give some background on

7    his research in this area"?

8    A. Yes.

9    Q. Is this Bob Nagy that you are referring to?

10   A. It is Bob Nagy.

11   Q. And then it says:  "But again, I don't think even Bob

12   would be giving tax advice.  I think he mainly gives them

13   guidance as to what codes and tax advice is typically to our

14   product."

15        Is that your understanding in Mr. Nagy's role in

16   discussing tax consequences with customers?

17   A. Yes, that's correct.  Generally speaking, according to

18   what the market told us, they would usually direct the client

19   to talk to their own tax advisor.

20   Q. And you say on the next paragraph:  "Please don't overuse

21   Bob"?

22   A. That's correct.

23   Q. "He's a great resource.  And for clients, he specifically

24   asks tax-related questions.  He is the go-to person."

25        Is that correct?

1    A. Yes.  Yes.  That's for our office.

2    Q. That's all I have for 153.

3         Now Mr. Kelley, you heard some testimony about some

4    quarterly account statements that will be sent to customers.

5    Are you familiar with those?

6    A. Yes, I am.

7    Q. And if we could pull up Government Exhibit 155, which has

8    been admitted into evidence.  Go up to the first two

9    sections.

10        Looking at Government Exhibit 155, does this look

11    like the kind of quarterly account statement that would be

12    sent to a customer?

13    A. Yes.

14    Q. And were you personally involved in sort of inputting the

15    data into the database that would generate these reports?

16    A. I or my staff, yes.

17    Q. Now, if we could come back out to the main document and

18    go down to the collateral activity details section.

19        So again, Mr. Kelley, you see where it says

20    dividends dollar per share?

21    A. Yes.

22    Q. So this is a Labor Ready stock, 350,000 shares that is

23    used in this particular commerce loan?

24    A. Yes.

25    Q. And when it says that -- well, would you agree with me

that, at this moment when the report was sent out, that
Derivium did not have 350,000 shares of Labor Ready stock in
its physical possession?

A. I couldn't say that.  I can say that I was not -- I would
not have had any access to accounts as to what, you know,
whether it was in an account other than what we controlled in
our office, and it was not any of those things.

Q. Okay.  Now, to put together the activity report, or I'm
sorry, the quarterly account statements, what kind of
research or -- what would you have to do to create those?

A. We would go through -- usually, we would use Bloomberg.
It's a data provider that you can look up stocks and
activities of stocks.  And we would look up, you know, a
stock such as this.  And we would see whether in that, the
course of that quarter, whether that stock had paid any
dividends or anything that would materially change the
client's portfolio.

Q. Now, when it says "dividends purchased per share," or
"dividends dollar per share," and then, "dividends zero total
dollar," how did you know there had been no dividends issued
on this particular stock during that quarter?

A. We would have looked that stock up for that three-month
period.

Q. So you had to monitor what was happening to the stock,
because again, the company wasn't sending information about

1    the dividends to Derivium; is that correct?

2     A. That's correct.

3     Q. Because the stock had been sold initially; is that

4    correct?

5     A. Well, it was in the possession of the office.  That's all

6    we would do.  And we were the people that generated the

7    reports.

8            MS. WEIS:  Sam, can you back out to the main

9    document?

10    Q. Mr. Kelly, what role did Robert Nagy have in putting

11    together the quarterly account -- quarterly account

12    statements?

13    A. Well, I'm not -- I don't know specifically if he had

14    direct input into the quarterly account statement.

15            I know that I worked very closely with him on the

16    annual statements.  As far as the quarterly account

17    statement, you know, from an accounting standpoint, he may or

18    may not have had input, but I don't remember anything

19    specific.

20    Q. So you don't remember if you might have asked him if

21    there should be any items on the report going to customers

22    that would reflect the interest that accrued on a loan?

23    A. Well, the report was already in existence when I was

24    hired.

25            So as far as, you know -- and I know that changed

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    over the years, you know, I worked there.  But as far as

2    something specific for the quarterly report, I couldn't -- I

3    couldn't say I remember this specifically from Bob Nagy.

4    Q. Would it help to look at one of your e-mails?

5    A. Yes, it would.

6         MS. WEIS:  Your Honor, may I approach the witness?

7         THE COURT:  Sure.

8    Q. So Mr. Kelly, if you could read all that through --

9    A. Okay.

10   Q. -- and pay attention to D and C.

11   A. Okay.

12   Q. Let me know when you are finished.

13   A. Okay.

14        THE COURT:  Have you got a number on that?

15        MS. WEIS:  No, it's just being used to refresh his

16   recollection.

17        THE COURT:  Okay.

18        THE WITNESS:  Okay.

19   Q. Now, Mr. Kelly, I'm sorry, the Rules require me -- I'm

20   going to come and take that back from you.

21   A. Okay.

22   Q. Mr. Kelly, do you now recall if you ever asked Mr. Nagy

23   if there were -- if he thought that you should include any

24   interest year-to-date item on the quarterly account

25   statements being sent to customers?

1     A. Yes, that -- well, I don't remember that specific e-mail,

2     but it relates to the fact that he brought it out at our

3     annual report.

4           Now, we needed to make some changes to it, and so I

5     asked if that was something that would be appropriate to go

6     into the quarterly report.

7     Q. So you asked Mr. Nagy if that data should go on the

8     quarterly statements that were being sent to customers?

9     A. That's correct.

10    Q. Did you ever ask him if there was anything else that he

11    felt needed to be added to the quarterly client report or

12    anything else that should be reported to the clients in

13    separate reports?

14    A. I would have -- I would have done that at that time

15    because these were difficult reports to change. And if I'm

16    going to make a change, I want to do them all at once. They

17    are complicated.

18    Q. So if he wanted you to make a change, he wanted to know

19    about it then?

20    A. Correct.

21    Q. Mr. Kelly, I would like to ask you -- you said that

22    Derivium provided services to a couple of different of the

23    so-called foreign lenders; is that correct?

24    A. I said that --

25    Q. I'm sorry. I know I talk pretty quick.

 1              You said that Derivium provided services to a couple

 2     of the so-called foreign lenders; Optech being one of them?

 3     A. Yes.

 4     Q. Did you provide -- did Derivium provide end-of-month

 5     reports to Optech?

 6     A. Um, I'm certain we did.

 7     Q. Was Mr. Nagy involved in deciding what data was included

 8     in those reports to send to foreign lenders?

 9     A. He might have something to say.  I might ask to talk to

10     each of the Bobs from an accounting standpoint for questions

11     like that.

12     Q. Would it refresh your recollection to take a look at an

13     e-mail of yours?

14     A. Sure.  Yes.

15              MS. WEIS:  Your Honor, may I approach the witness?

16     Q. So again, Mr. Kelly, take a look through all of that and

17     let me know when you are done.

18     A. Okay.

19     Q. Mr. Kelly, having looked at the document I just handed

20     you, does that refresh your recollection about whether or not

21     you asked Mr. Nagy for input on the type of data that would

22     be sent, end-of-month reports to the so-called foreign

23     lenders?

24     A. Right.

25              I asked both the accountant people -- because again,

1    that was a very complicated report to generate, as well, if I

2    look at that as an accounting report, which I don't know what

3    should go in the report.

4    Q. Do you recall what kind of information was contained in

5    this report?

6    A. It would have been just what we had talked about before.

7    It's a summary of what has been done during the month, both

8    activity wise and a snapshot of, you know, the portfolios at

9    that particular last day of the month usually.

10   Q. And did you ever ask Mr. Nagy if the mock report you sent

11   him met his expectations?

12   A. Um, it's -- yes, I did.

13   Q. Did you ask for his feedback on whether or not the report

14   did, you know, have everything that he wanted?

15   A. I did.

16   Q. And did you send portions of the report to Mr. Nagy that

17   you didn't even send to the so-called lender?

18   A. It looks like I did, yes.

19           MS. WEIS:  Your Honor, may I approach the witness?

20           THE COURT:  Yeah.

21           MS. WEIS: For the record, I've handed the

22   exhibit -- handed the witness what's been previously marked

23   as Government Exhibit 13.  And I only have a clean page of

24   the second page.  So page 2, government exhibit.

25   Q. Mr. Kelly, have you had a chance to look at it?

 1          A. I'm sorry?  I just glanced at it.  Is there something

 2     specific you want me to look at?

 3          Q. Well, is this the type of end-of-month report that

 4     Derivium or Veridia would send to Optech?

 5          A. Yes, it is.

 6               MS. WEIS:  Your Honor, at this time we would move to

 7     enter -- offer into evidence Government Exhibit 13.

 8               MR. COOPER:  No objection.

 9               THE COURT:  In evidence.

10               (Thereupon, Government's Exhibit Number 13 was

11     received in evidence.)

12               MS. WEIS:  Can you pull up 13?  So if you just blow

13     up, let's say the first, the top, and then the first two

14     boxes.

15          Q. So this is the kind of information that when we were

16     talking about the end-of-month reports, that you consulted

17     with Mr. Nagy about; is that correct?

18          A. Okay.

19               MS. WEIS: Sam, would you turn to the second page and

20     do the same?

21          Q. Mr. Kelly, looking at this, is this the type of

22     end-of-month report --

23          A. Yes, it is.

24          Q. -- you would ask Mr. Nagy's input on?

25          A. Yes.

1     Q. So it has things like the number of loans that are

2     occurring, the amount of the active loans, number of maturing

3     loans and so forth?

4     A. Yes.

5     Q. That's all I have for Government Exhibit 13.

6     A. What's that?

7     Q. That's all I have for Government Exhibit 13.

8          Now, Mr. Kelly, I think you said that, the way you

9     described it, was when you first -- Derivium first received

10    the stock in the brokerage account from the customer, they

11    would sell the stock as the first part of the hedge?

12    A. That's correct.

13    Q. And what was the name of the company that held the

14    brokerage account, or companies?

15    A. Well, it depends on, you know, over time we had -- we

16    worked with a number of different people.  So is there a

17    specific time that --

18    Q. Well, let's say when you first started working for FSC,

19    the very beginning, what was the name of the brokerage

20    account or the name of the company that held the brokerage

21    account?

22    A. The name on the account was First Security Capital.

23    Q. And did the name on the account change over time?

24    A. Yes, it did.

25    Q. Do you recall what the next name was?

1      A. Probably the next name was probably Derivium.

2           As we changed, the company changed its name, and

3      then it was somewhere around, I guess 2001, 2002, we were

4      told a lender was willing to disclose its name, and at that

5      point the accounts changed to the lender's name.

6      Q. So for instance, the account was in the name of Bancroft

7      Ventures, Ltd., not Derivium; is that correct?

8      A. Correct.

9      Q. Now, did you work for Bancroft?

10     A. No, I did not.

11     Q. But -- sorry, I didn't mean to cut you off -- but you

12     were authorized to tell the brokerage firm for Bancroft's

13     account to sell stock from Bancroft's account; is that

14     correct?

15     A. Right.

16     Q. How would you have that authority?

17     A. Bancroft authorized it.

18     Q. How do you know that?

19     A. Um, because the -- we had our piece of paper that said

20     Bancroft authorized this, these members of our staff, to work

21     with the -- their brokerage account.

22     Q. Did you ever talk with anyone from the Isle of Man,

23     Bancroft?

24     A. Um, well, I talked to a couple of people over a bit of

25     time, not about that in particular, but you know, about

1    technology issues from the standpoint -- and how we

2    transferred our, you know, the data back and forth, so better

3    from an electronic standpoint, and I'm sure -- and in person,

4    from the standpoint of when we are getting the contracts,

5    we'll be getting information, any information that we might

6    need from them.

7    Q. So you called someone in the Isle of Man and you spoke to

8    them?

9    A. I would call -- they might call me or we might exchange

10    an e-mail.

11    Q. You would talk to someone in the Isle of Man?

12    A. No.  I say I don't know, well, I wouldn't know if they

13    were in the Isle of Man or not.  It would just be a long

14    distance phone call.

15    Q. And the technology services that you referenced before,

16    was that a person that came into the office?

17    A. A technical person came and talked to us about, you know,

18    tried to make sure that if we were going to transfer our data

19    to them in a timely fashion, you know, he wanted to see how

20    we captured the data.

21         So then I would send the information to him so that

22    we wouldn't have to be faxing things or mailing.

23    Q. This tech person, this was in the United States; is that

24    correct?

25    A. He came to our office, yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    Q. Did he say if he was from the Isle of Man?

2    A. Um, I don't think so.  I think he was from London maybe;

3    had a British accent.

4    Q. Now Mr. Kelly, were you able to tell brokerage firms or,

5    you know, Optech being another example, to sell brokerage --

6    to sell stock that was in Optech's brokerage account?

7    A. Yes.

8         MS. WEIS:  Your Honor, may I approach the witness?

9         THE COURT:  Sure.  You have blanket permission to

10    approach the witness unless he says no.  How about that?

11        MS. WEIS:  Okay.  Keep it simple.

12    Q. And for the record, I'm going to be handing you what's

13    been previously marked as Government Exhibit 317.  317.

14        Mr. Kelly, could you take a look at that account or

15    that document?

16    A. Okay.

17    Q. All right.  And again, Mr. Kelly, if you look down at the

18    very, very bottom, is that your e-mail address?

19    A. It is.

20    Q. And at the top, the date, were you working at Derivium on

21    April 1, 2004?

22    A. You mean Veridia?

23    Q. Veridia.  I'm sorry.

24    A. Yes.

25        MS. WEIS:  Your Honor, at this time we would move

1   into evidence Government Exhibit 317.

2              MR. COOPER:  No objection.

3              THE COURT:  In evidence.

4              MS. WEIS: Sam, could you blow up as of April 1,

5   2004?

6    Q. Mr. Kelly, this is an e-mail that you wrote stating as of

7   April 1, 2004:  "We currently have seven accounts, DC USA;

8   DC; LLC; Veridia; Bancroft; Optech; Shenandoah and Spencer."

9              Is that correct?

10   A. That's correct.

11   Q. All right.  Now, when you say "seven accounts," what are

12   you referring to?

13   A. Well, this is -- refers to the being able to access bank

14   accounts on line, which at the time required a different

15   level of permissions.

16              In other words, you couldn't, you know, talk to a

17   bank, and this outlined each of the people that was working

18   and what they could do online with these accounts.

19              It has -- you know, we would never send any funds

20   that we didn't have one person initiate; another person would

21   confirm.  So you always had two eyes, two sets of eyes, you

22   know, on each one.

23              And since at least one of these accounts, companies

24   is not something I lended with, I would imagine that I was

25   given the information of who to -- who would have access and

1    then I distributed that information.

2     Q. Okay.  So when it says "DC USA," do you understand that

3    to be Derivium USA?

4     A. Yes.

5     Q. And when it says "DC LLC," do you understand that to be

6    Derivium Capital LLC?

7     A. I think so.  Um, after I started to work for Veridia,

8    Derivium changed, you know, as far as its corporate

9    structure.  And whether Derivium Capital is the same as DC

10    LLC, I'm not sure.  But certainly DC USA is DC USA as you

11    show there.

12     Q. And then Veridia, is Veridia that you were working for?

13     A. That's who I worked for.

14     Q. Bancroft being the so-called lender you referred to

15    earlier?

16     A. Yes.

17     Q. And I'm just saying "so-called lender" not to confuse

18    you.

19     A. Okay.

20     Q. Optech?

21     A. Is in Hong Kong.

22     Q. Right.

23          Shenandoah, this entity over here?

24     A. Yeah.  I actually don't know much about Shenandoah, but

25    Yuri did take ill at one point and they needed someone to be

1  able to transfer, so they asked me to.  They added me to that

2  list so that I could confirm.

3  Q. "Yuri," being Yuri Debevc?

4  A. Yuri Debevc.  I'm sorry.

5  Q. And then Spencer -- what did you understand about

6  Spencer?

7  A. I'm not very -- I'm not familiar with Spencer, other than

8  I've heard the name.

9  Q. Okay.  It lists Ron, Walter, Catherine, Rebecca.  Are

10  those four individuals, were they employees in the back

11  office?

12  A. Yes.

13  Q. And Catherine in particular, do you remember what her

14  last name was?

15  A. Sandifer.

16  Q. Was she married to Jonathan Sandifer --

17  A. Yes.

18  Q. -- the gentleman you replaced when you first started with

19  the company?

20  A. Yes, she was.

21  Q. Yuri down below, "Do everything for DC LLC, do everything

22  for DC LLC, Veridia, Bancroft, Optech, Shenandoah," and that

23  is Yuri Debevc?

24  A. My eyes -- I blanked out which person you were following.

25  You were following Catherine?

1    Q. We are following Yuri.

2    A. Okay.  I'm sorry.  Okay.

3    Q. That's Yuri Debevc?

4    A. That is Yuri Debevc.

5    Q. And then the next line down it says "Pat".  Is that you,

6    Patrick Kelly?

7    A. Yes, it is.

8    Q. So you had access for DC LLC, which you think was

9    Derivium Capital, but you are not sure; is that correct?

10   A. That's correct.

11   Q. And then Veridia, Bancroft, Optech -- and then you've

12   already explained Shenandoah.

13   A. Yes.

14   Q. And then down at the very bottom:  "Jonathan, do

15   everything for Spencer.  Yuri confirms wires."

16        Who is Jonathan?

17   A. That's Jonathan Sandifer, the person I replaced.

18        MS. WEIS: That's all I have for Government

19   Exhibit 317.

20        THE COURT:  Okay.

21   Q. And Mr. Kelly, in addition to telling brokerage firms to

22   sell stock from, you know, Bancroft's account, for example,

23   what other services did Veridia provide to Bancroft?

24   A. Actually, what names did you already say?

25   Q. What other services did Derivium provide to Bancroft?

1    A. Besides?

2    Q. Besides, you know, telling brokers to trade securities in

3    their account?

4    A. We would report to them every month.  We would -- if a

5    client was a borrower who is going to take out a loan, then

6    we send all the contracts to Bancroft.  We notify Bancroft

7    before funds were distributed, the end of the month stuff.

8    Q. Okay.

9    A. I'm sure there is more.

10    Q. If a customer wanted to send Bancroft some mail, were --

11    what -- do you know where that mail would be sent?

12    A. I -- I probably had an address somewhere, but I don't

13    know what the address was.

14         The clients, I believe for the most part, if they

15    wanted to send something to Bancroft if it related to the

16    loan, then they would send it to us because we were their

17    U.S. representative.  So if they had a question about their

18    reports, anything like that, we created all of them;

19    therefore, they would ask us.

20    Q. So you could receive mail on Bancroft's behalf?

21    A. Yes, we do.

22    Q. And where was your office?  Was it here in Charleston?

23    A. It was here in Charleston, um, 1 Poston Road, which is on

24    Cosgrove, Sam Rittenburg, that area.

25    Q. Now, the mail that was addressed to Bancroft, was that

1    also sent to 1 Poston Road?

2     A. That's what I just said, yes.

3     Q. Did you also receive mail from Optech at that address?

4     A. Yes, we would.

5     Q. Now, what about sending mail on Bancroft letterhead,

6    could you do that?

7     A. If it related to a borrower and their loan, yes.

8     Q. Did Veridia have a manual in place to help its employees

9    out to figure out, you know, in its manual, day-to-day

10   operations; that kind of thing?

11    A. Yes, we did.

12    Q. For the record, I've just handed the witness Government

13   Exhibit 265.

14    Q. Mr. Kelly, would you just take a minute to look through

15   it?  It's a big document.

16    A. It's a big document.  It makes more sense for where

17   you've got a question.

18    Q. Does it look to be some of the materials that were

19   included in Veridia's operations manual that you were aware

20   of?

21    A. It does.

22         MS. WEIS:  We would move into evidence 265.

23         MR. COOPER:  402.  403.

24         THE COURT:  Do you want to do it page at a time?

25   Which page are you looking at?

1          MS. WEIS:  There will be a couple different ones.

2          THE COURT:  Take them out individually.

3          MS. WEIS:  Sure.

4          It's going to be -- we have to take it back from

5     him.

6          THE COURT:  Okay, or you can use mine.

7          MS. WEIS:  That's okay.  It's not page numbered.

8          If you just bear with me for a second.

9     Q. Mr. Kelly, could you take a look at what's before you,

10    the first page of Government Exhibit 265, and let me know

11    when you are done?

12    A. Okay.

13    Q. Mr. Kelly, is this the kind of document that you would

14    send customers on Bancroft letterhead, as far as your work

15    with Derivium?

16    A. Yes, it is.

17          MR. COOPER:  Your Honor, I couldn't hear the page

18    number.

19          MS. WEIS: Page 41.  At this time we would move into

20    evidence what we'll mark as Government Exhibit 352.

21          MR. COOPER:  I can't find what she's talking about.

22          THE COURT:  Okay.  She'll show it to you.

23          MR. COOPER:  Again, 402.  403.

24          THE COURT:  Overruled.

25          (Thereupon, Government's Exhibit Number 352 was

1    received in evidence.)

2         MS. WEIS: At this time, we would move into evidence

3    Government Exhibit 352.

4         THE COURT:  Okay.

5         MS. WEIS: Could you pull up 265041?  And can you

6    blow up the top half of that document?

7    Q. So Mr. Kelly, could you explain what "delivery of loan

8    proceeds instructions" are to the jury?

9    A. Yes.  If a borrower, you know, submitted a portfolio to

10   us and when we funded their loan, we would have to have

11   something in writing from them with their signature stating

12   exactly where they wanted the funds transferred.

13   Q. And it says:  "Please submit completed form to Bancroft

14   loan processing via fax and submit the original via mail" --

15   the last sentence of that first paragraph -- and it says --

16   "via mail/overnight, attention Patrick Kelly."

17        That's yourself; is that correct?

18   A. That's correct.

19   Q. And then there is an address there that says:  "Loan

20   processing representative, Bancroft loan processing, 1 Poston

21   Road, Suite 120, Charleston, South Carolina."

22        So is that the address you were referring to

23   earlier --

24   A. That's correct.

25   Q. -- all that half?

1              MS. WEIS: And that's all I have for Government

2      Exhibit 352.

3      Q. Now, Mr. Kelly, how about if a customer wanted to call

4      and had a question about a loan that was through, you know,

5      if it was papered as being Bancroft, is there someone in the

6      United States that they can call?

7      A. Depending on what the question was, they would probably

8      call our office.

9      Q. Now, what they call Veridia or what they call the

10     Bancroft U.S. Processing Office?

11     A. We had several lenders that we worked with.

12              Consequently, if a client, you know, was calling our

13     office, we were authorized to talk to them about any of the

14     lenders that we worked with directly there at Veridia.

15              So yes, if a Bancroft client called and would call

16     and ask us -- because we handled all of the, you know, back

17     office operations for Bancroft here in the United States for

18     their loans.

19     Q. Would you identify yourselves as working for Veridia or

20     for Bancroft?

21     A. It's -- usually if it was -- if they called on a Bancroft

22     phone line, then we would answer it as Bancroft, but --

23     because, you know, the client -- many of the clients had

24     called in before when they just talked to Veridia.  So, you

25     know, you might --

1     Q. So there was different phone lines that came into your

2     office; one designated for Bancroft and one designated for

3     Veridia?

4     A. Correct.  So you know, when you answer the phone, you

5     wouldn't confuse the client.

6     Q. What about WITCO?  Was there a line that came into

7     Veridia's office for WITCO?

8     A. I don't think so.  If there was, I don't remember, um,

9     that, because we maintained their database, but -- and I

10    could be mistaken, but it seems that WITCO was an offshore

11    entity that we were just handling back office operations for.

12         I don't -- I don't remember if they had a

13    representative in our office.  I don't think I ever was one.

14    Q. Would it refresh your recollection to look at any --

15    A. Yes, it would.

16    Q. -- to the document?

17         MS. WEIS:  For the record, I've handed, for purposes

18    of refreshment, Government Exhibit 238.

19    Q. And Mr. Kelly, if you could look at item 7 and let me

20    know when you are done.

21    A. Okay.

22    Q. Are you done?

23    A. Yes.

24    Q. Mr. Kelly, is your memory refreshed as to whether or not

25    Derivium could answer phone lines for WITCO?

1        A. Yes, we did.

2        Q. What about Optech?  Would you answer phones for Optech?

3        A. We would.

4        Q. Now, as I understand it -- well, was there a time in

5     which customers were not told the name of the particular

6     so-called lender?

7        A. Yes.

8        Q. And do you remember when the transition occurred when

9     customers were told of the name of the so-called lender?

10        A. Not exactly.  I think it was around 2000, 2001, something

11     in there, but I might have, you know, some documents that,

12     you know, would tell me.  It seems like it was the first of

13     the year for -- but I could be mistaken.

14        Q. And from the back office perspective, did you get

15     questions from customers about why they were being, you know,

16     given the name of the lender now?

17        A. Yes.

18        Q. In particular for Bancroft, do you recall customers

19     calling with questions about who is Bancroft and that sort of

20     thing?

21        A. Well, we had always received questions about who the

22     lender was, and we had been directed that the lender was not

23     wanting to disclose who they were, as they do not want people

24     contacting them directly.  And then to the point where

25     Bancroft, you know, made us official representative, we list

1    their name and they had -- list the website information and

2    who they were.

3          And at that point, yes, and you know -- so some

4    clients had been expecting it and some clients didn't know

5    who the lender had been and never asked.

6    Q. Now, you keep saying you know Bancroft wanted these

7    things.  Who communicated this to you?

8    A. Dr. Cathcart.

9    Q. So it was Dr. Cathcart that was the one telling you about

10    what Bancroft supposedly wanted; is that correct?

11    A. Either Dr. Cathcart or Scott Cathcart.  Scott was the

12    head of marketing and, you know, that was a challenge for

13    them to transition, so it would come from either of them.

14    Q. So you weren't personally involved in any -- any

15    negotiations or anything that would have occurred between

16    Derivium and Bancroft, for example?

17    A. No.

18    Q. And any conversations about whether or not they were the

19    lender, so-called lender --

20    A. No.

21    Q. -- or who they were in the first place; is that correct?

22    A. We were just told that they are the lender and unwilling

23    to disclose who they were, and now they were willing to

24    disclose that.

25    Q. And that was told to you by Charles Cathcart or Scott --

1      A. Right.

2      Q. -- his son?

3      A. Correct.

4      Q. Mr. Kelly, I'm going to hand you what's been previously

5      marked as Government Exhibit 182.

6          Again, just let me know when you've had a minute to

7      look at it.

8      A. Okay.

9      Q. Mr. Kelly, if you look at the last page again, is that

10     your e-mail address at the very bottom?

11     A. It is.

12     Q. And if you look at the first page, in the middle of the

13     page with the date, is that a date you were employed by

14     Derivium or Veridia?

15     A. I think the change actually happened the first of

16     January.

17     Q. Okay.  So --

18     A. I should probably have had Veridia e-mail.

19     Q. But you were with one of the two companies at that point?

20     A. Well, based on what the e-mail says, um, probably at that

21     point I was probably a Veridia employee, and still using the

22     e-mail that I had always used.

23     Q. Okay.  And when you look at this e-mail, does this

24     accurately reflect what you recall about answering questions

25     for customers about the revelation of BVL's name as a lender?

1    A. Yes.

2         MS. WEIS:  Your Honor, at this time we would move to

3    offer into evidence Government Exhibit 182.

4         MR. COOPER:  No objection.

5         THE COURT:  In evidence.

6         (Thereupon, Government's Exhibit Number 182 was

7    received in evidence.)

8    Q. And Sam, if you could look at the second e-mail down

9    below on the first page, the bottom.

10        So Mr. Kelly, this is an e-mail from you to Charles

11   Cathcart, C. Hsin, Catherine Sandifer and Yuri Debevc.

12   "Subject: BVL script for staff."

13        Is that correct?

14   A. Say that last part again.

15   Q. "BVL script for staff."

16        Is that correct?

17   A. Yes.

18   Q. And you say:  "Charles, Catherine and I created a rough

19   draft of how Lynn will answer the phone and direct the caller

20   to BVL and how additional questions might be answered if

21   needed."

22        So my first question is:  Do you recall who Lynn is?

23   A. Lynn worked in the second building that we had, but she

24   worked in our separate office and she was in marketing.

25   Q. So she worked for Derivium USA after the split?

1    A. Well, I think so.  I'm a little confused about which

2    company was which, but that sounds right, she did not work

3    for Veridia.

4    Q. And if you look down, there is sort of a, you know,

5    dialogue.  And it says:  "DC USA, Derivium Capital, how may I

6    help you?"  Caller identifies himself.  And then DC USA says,

7    "Bancroft Ventures, Ltd., your lender of record, is now

8    handling these questions directly.  I can transfer you to an

9    agent of BVL now and for future reference they may be reached

10   directly at 843-725-1130."

11        843.  That's a Charleston area code?

12   A. Correct.

13   Q. And is that the -- you know, you may not remember the

14   exact number -- but those were the phone lines that you were

15   referring to before where Veridia employees could answer for

16   Bancroft if need be?

17   A. Correct.

18        MS. WEIS: Now, would you turn to the second page.

19   Just blow up -- actually, that's good.

20   Q. Look at question 5 at the end.

21        So now Mr. Kelly, these are questions that you were

22   anticipating, or you, Ms. Sandifer and Mr. Cathcart were

23   anticipating from customers?

24   A. Well, actually it's sent to Charles, and it's --

25   Catherine and I created this language to see if he likes it.

1    Q. Okay.  All right.  So --

2    A. I mean, I could be mistaken, but that's what I thought I

3    was saying here.

4    Q. Okay.  So question 5 is one of those questions that you

5    sort of, you know, anticipated that might need to be

6    addressed; is that correct?

7    A. Yes.

8    Q. And that question is the client asking:  "I've talked

9    with a BVL office.  Why am I still working for the same

10   people that used to work for Derivium in the processing

11   office."

12        Is that correct?

13   A. Yes.

14        MS. WEIS: That's all the questions I have for

15   Government Exhibit 182.

16   Q. Now, Mr. Kelly, at the end of the 90% Loan Transaction,

17   when that transaction came to maturity, what options did the

18   customer have at that point?

19   A. Um, without looking at our sheet -- basically, if their

20   collateral value was worth less than their loan payoff, then

21   they could return -- just walk away.  In other words, they

22   didn't have to do anything.  They could notify us that they

23   did not want to renew the loan and that was the end of the

24   relationship.

25        The -- they could have -- um, if the collateral was

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

worth less than the loan payoff but they wanted to renew the

loan, then depending on what year this was, the terms changed

over time, but they could transition where they could pay a

fee.

And I have forgotten however it was technically

termed, but basically, you know, their collateral was worth

less than their loan payoff, but they would pay a fee and

they would renew the loan for a set period of time, say,

another three years.

If the loan was -- the collateral was worth more

than the loan payoff, then they could renew the loan and

receive funds, you know, for -- relating to the difference in

the value.  They could pay the loan off and receive a

collateral back.  And it seems like there was a 51, and I

can't remember, but maybe I miscounted.

Q. Now, when a customer wanted to renew the loan, and I'll

refer to renew regardless of the value of the collateral --

A. Okay.

Q. -- whether it was above the so-called collateral, whether

it was above or below the loan amount at maturity, from a

back office perspective, what did you need to do if a

customer said, I want to sign on for another three years?

A. We would contact the marketing department and they would

start working with the client to generate the contracts for

them.

Q. So there would be a new, you know, so-called loan
agreement, for example, that the customer would have to sign?

A. Um, yes.

    I -- and again, it comes back to, you know, depends
on whether if they had maybe already signed, it was basically
a loan, single-page document, and then there is sort of an
umbrella document.

    If they had signed the most recent of these umbrella
documents, then they would just have the single page to renew
that loan.  If they had an old document, then we would have
to update the paperwork to the most current paperwork.

Q. Now, when they signed this new paperwork, would you use
the same -- exact same loan number that you had used
originally?

A. No.

Q. You would assign a new loan number to it?

A. Correct.

Q. And that loan number had an R in it?

A. Certainly.  I think that all of them did.  You know, we
worked our way through some teething problems in how to do it
so we couldn't get confused, and it's entirely possible that
the first couple that we did, we did put an R until we
realized that that was a mistake, but -- we got confused with
the client, but for the most part, yes.

Q. Now, some customers, they elected to, instead of renewing

1    the loan, to pay off a loan to get the stock back; is that

2    correct?

3      A. That's correct.

4      Q. And are you aware of any problems that customers might

5    have encountered at that point?

6      A. Some customers had problems; some customers did not.

7      Q. Now, for the customers that had problems, were you given

8    any special instructions for the back office on how to handle

9    those customers?

10     A. Well, we had -- a few customers had problems and we were

11   given explanations for why, you know, they were having

12   problems, or at least a brief snapshot of it, and if that

13   client called, then they needed to talk to Dr. Cathcart;

14   possibly Yuri.  Though if Dr. Cathcart was available, I know

15   calls all went to him, and I don't know what was discussed.

16     Q. Okay.  So if a customer, one of the customers identified

17   as having a problem called, who was it that instructed you to

18   pass them on to Mr. Cathcart or Mr. Debevc?

19     A. Well, probably the initial person is Dr. Cathcart, but in

20   a small office, you know, you might be reminded of this, um,

21   you know, by Mr. Debevc, but I'm reasonably certain that it

22   probably came from Dr. Cathcart.

23     Q. Okay.  Now, just a couple last questions for you.

24          If we could back up a couple stages in the

25   transaction.  When Derivium received the customer stock or

1    the stock was received into the lender's account after the

2    change, when you would call the brokerage account, would you

3    call the brokerage account to tell them what to do with the

4    stock?  How would you communicate with them?

5    A. Um, we could do faxes, we would do phone, um, we had,

6    depending on what was being communicated, certain things, you

7    know, had to be done by forms, by paperwork, rather than, you

8    know, just a phone call.  You know, they would not accept,

9    say, a client's portfolio into the account without something

10   signed, you know, so that, you know, there would be no

11   confusion over phone calls to a client to transfer something.

12   Q. And I should have clarified, when we were talking about

13   problems with customers you would encounter, those problems

14   were that Derivium, they were asking for their stock back and

15   they weren't getting the stock back; is that correct?

16   A. I don't know that it was all that they were asking for

17   was their stock back, um, there -- it was explained that, you

18   know -- I remember one client had a problem with their

19   contracts; another client, it's entirely possible that maybe

20   they should not -- the SEC wouldn't come out to do the

21   original transaction.

22   Q. But the problem that had -- those were things that were

23   communicated to you by Mr. Cathcart; is that correct?

24   A. Well, for -- you know, as I said, for these few clients,

25   there was -- and I don't remember what the number -- it's

1   like four or five specific clients, they, you know -- there

2   was a problem with, you know, their loan at maturity, and

3   they were going to have to owe Dr. Cathcart, whether they

4   were going to lawyers beyond that --

5   Q. Yeah, I'm not --

6   A. -- dealing with lawyers.

7   Q. So when I say the problem the customer encountered, I

8   guess I'm not asking for what the explanation was that was

9   provided for why, you know, from Derivium's perspective there

10  was a problem, but that specific thing that the customer was

11  requesting was their stock back; is that correct?

12  A. I don't know that for certain.  I mean, they might have

13  been wanting to renew the loan.

14  Q. Okay.  Now -- I'm sorry.

15  A. Either way they could not do it.  They couldn't do

16  something they wanted to do.

17  Q. Okay.  So we were talking about when you communicated

18  with brokerage accounts, the brokerage firms, the brokers,

19  and if you needed at the beginning of a transaction to have,

20  as you called it, the first step of the hedge to sell the

21  stock, what language would you use?  What wording would you

22  use to communicate that to the broker?

23  A. Well, we would tell them we -- when you work with a

24  broker, you've got a very specific set of words and languages

25  and you have to say it in the right order.  Because when you

1    are handling a large transaction -- you know, if you say the

2    words even out of order, they may stop and they say -- you

3    know, you are communicating by phone, you've got to say it in

4    this record, you have to -- you know, the stock has to come

5    to a certain place, the quantity, the selling price, so you

6    had a specific language.

7            So we would tell them, you know, in essence, you

8    know, that we had to sell a certain quantity of this at this

9    price.

10   Q. So you would use the word "sell"; not "cash"?

11   A. Definitely.  No.  With the brokerage firm there is only

12   one word.

13   Q. Okay.  And when you communicated with customers, were you

14   allowed to say that, we sold your stock?

15   A. No.  We would tell them that the hedging process started

16   in our office.

17   Q. So you weren't allowed to say "sell," you had to say

18   "hedge"?

19   A. Because that, as explained to us, that was the start of

20   the hedging process.

21   Q. That was explained to you by Dr. Cathcart?

22   A. Um, and Yuri.

23   Q. And Yuri Dubevc?

24   A. Um-hum.

25   Q. Now, Mr. Kelly, as part of your work at Derivium, did you

1     sign a confidentiality agreement that prohibited you from

2     talking about, you know, what you were doing in the back

3     office?

4      A. About anything, yes.

5      Q. So anything, including that you were selling stock, that

6     wasn't something you were allowed to disclose?

7      A. Right.  You know, sort of like a nondisclosure, we

8     don't -- you know, we don't talk about this company with

9     anybody until, you know, a certain period of time after we

10     were gone.

11      Q. But you were allowed to talk with Mr. Nagy about that; is

12     that correct?

13      A. That's correct.

14           MS. WEIS:  No other questions at this time.

15                     CROSS-EXAMINATION

16     BY MR. COOPER:

17      Q. Hello, Mr. Kelly.

18           Now, just starting where we left off there at the

19     end, it was Dr. Cathcart and Yuri who told you to tell

20     clients the stock was hedged, correct?

21      A. That is correct.

22      Q. Mr. Nagy didn't tell you that?

23      A. No.

24      Q. He wasn't your boss?

25      A. No.

1    Q. And you also said there was several lenders, correct?

2    A. Yes.

3    Q. Did you believe they were real lenders?

4         MS. WEIS:  Objection, relevance.

5         THE COURT:  Overruled.

6    Q. What is your answer?

7    A. Yes.

8    Q. Did you -- when did you start working there again?

9    A. Um, I think it was 1999.  It could have been '98, but I'm

10   pretty sure 1999.

11   Q. So '99 to 2006; is that correct?

12   A. Yes.

13   Q. And then Derivium filed bankruptcy in April of '05, I

14   believe?

15   A. Um, I don't know.  I'll take your word for it.

16   Q. Okay.  So let's just say from '99 to 2005, from being an

17   employee for that extent of time, did you believe that all of

18   these lenders were real?

19   A. Yes.

20   Q. And you wouldn't have been engaged in this if you thought

21   they were fictitious lenders over there, right?

22   A. Well, no.  I mean, that's -- we thought that we had, you

23   know, we were working for a legitimate company.

24   Q. And then she asked you some questions about these phone

25   lines?

1    A. Yes.

2    Q. Did Mr. Nagy answer phones at Derivium?

3    A. No.

4    Q. Did Mr. Nagy set up that, those phone lines?

5    A. No.

6    Q. Did Mr. Nagy tell you how to answer the phone?

7    A. No.

8    Q. Let me ask you this:  Have you ever called customer

9    support?

10    A. Sure.

11         As a matter of fact, that's what we were.  That was

12    how it was explained to us was, you know, we are like a

13    customer support office, the back office, that worked with

14    multiple lenders; and therefore, we answered based on who the

15    client was.

16    Q. Well, my question is this:  Did you ever call customer

17    support about somebody in India?

18    A. Yes.

19    Q. Did that mean to you that something bad was going on?

20    A. No, other than if I couldn't understand sometimes.

21    Q. They do speak English, though?

22    A. Right.  Some.

23         THE COURT:  No, they speak the King's English.  We

24    speak our own.

25         MR. COOPER:  That's right.  We speak southern.

1              THE WITNESS:  Yes.

2      Q. Dr. Cathcart, you worked for him the whole time you were

3      there, right?

4      A. Well, I didn't work for Dr. Cathcart specifically once it

5      became Veridia.  As explained to me, Yuri was the owner of

6      Veridia and I worked for Yuri.

7      Q. But were you familiar with Dr. Cathcart?  You said it was

8      a small office?

9      A. Oh, it was a small office, and we still, per Yuri, we

10     took direction from Dr. Cathcart because at that point

11     Derivium was one of our clients.

12     Q. What's your owner's standing as to Dr. Cathcart's

13     background in economics?

14     A. He had had a Ph.D. in economics, taught some at the College

15     of Charleston.  He had worked at Citibank.  He had awards on

16     his shelf from, you know, starting new types of transactions

17     that had never been done before from, you know, here in the

18     U.S. and --

19     Q. So he was -- he was considered pretty ingenuous in

20     financial products?

21             MS. WEIS:  Objection, foundation.

22     Q. Was it your understanding that he was ingenuous with

23     financial products?

24     A. That is --

25             MS. WEIS:  Objection, relevance.

1              THE COURT:  Go ahead and restate the question.  I

2      didn't understand the question.

3              MR. COOPER:  Okay.

4      Q. From your interaction with Dr. Cathcart and what you saw,

5      was it your belief that he had a deep background in financial

6      products?

7      A. Yes.

8              MS. WEIS:  Objection, 402.

9              THE COURT:  Overruled.

10     Q. And what was your understanding that actually Dr.

11     Cathcart worked with the CIA?

12             MS. WEIS:  Objection.

13             THE COURT:  Sustained.

14     Q. Well, was Dr. Cathcart open with his communicating his

15     hedging strategy?

16     A. No.

17     Q. And you were in the office, within that small office with

18     him for about six years?

19     A. Well, he was not there all the time, but he was, you

20     know -- but over -- yes, he was there a lot during that six

21     years.

22     Q. And during that six-year period, you never heard him

23     explain the hedging strategy to anyone?

24     A. Well, at my interview when they hired me, you know, that

25     was when I asked about that.  I was told at that point that

1    that was not something that he disclosed, and he never did

2    for the rest of the time.

3         But after that, he was quite specific about that and

4    there was no point in asking after that.

5    Q. What understanding did you have as to what the hedging

6    strategy was?

7    A. Um, we just -- for our office, we were told that we

8    started the process, the hedging process by, you know,

9    selling stock, establishing the value, so that the client

10   knew how much their loan would be.  And after that, it was

11   out of our hands.  We were not --

12   A. So Dr. Cathcart, the expert in economics --

13        MS. WEIS:  Objection.

14   Q. -- explained -- Dr. Cathcart, who had a Ph.D. in

15   economics, explained to you that the sale of the stock was a

16   hedge?

17   A. That's correct.

18        Well, he said it was the start of the hedging

19   process, is the way he phrased it.

20   Q. There was an inference there was something more?

21   A. That's correct.

22   Q. And we know ultimately -- do you have an understanding

23   that part of the hedge was the Summerville and Orangeburg

24   companies?

25        MS. WEIS:  Objection.  He's already stated --

1           THE COURT:  I'll sustain that.

2    Q. Did you ever come to understand that there were no

3    hedges?

4           MS. WEIS:  Objection, 602.

5           THE COURT:  Overruled.

6           THE WITNESS:  Um, no, I -- you know, I can speak to

7    things that I know now, right?  As opposed to what I knew

8    then, you know, as far as what I learned after the fact?

9           THE COURT:  Make that two questions then.

10          MR. COOPER:  Okay.

11          THE WITNESS:  Okay.

12   Q. When did you first understand that there were no hedges?

13   A. After, you know, when the court cases started, and at the

14   point when I was named in one of the suits by loan borrowers.

15          And at that point I was sent a lot of information, I

16   guess, depositions, you know, things that were said.  And at

17   that point they stated that the money that, you know, beyond

18   the part that was returned to the client, that ten percent,

19   part of that was put into these entities in Orangeburg, and

20   is --

21   Q. Let me ask you --

22   A. -- that that was supposed to somehow pay for anybody's

23   stock that went up.

24   Q. And you became aware of that after you stopped working

25   for Veridia?

1    A. That's correct.

2    Q. So that would have been post-2006?

3    A. That's correct.

4    Q. So prior to 2006, you didn't know anything?

5    A. We started the hedging process in our office.

6    Q. Were you ever privy to a conversation in a room with Mr.

7    Nagy where he was told --

8            MS. WEIS:  Objection.

9            THE COURT:  What's the basis of that objection?

10            MS. WEIS:  802.

11            THE COURT:  Let him finish the question, and let's

12    see what the answer is, and we'll go from there.

13            MS. WEIS:  Your Honor, my concern is with the

14    question itself, with the subject in the question.

15            THE COURT:  Go ahead.  Ask the question again.

16    Q. Mr. Kelly, were you ever sitting in a room with Mr. Nagy

17    where he was told that there weren't any hedges?

18    A. No.

19    Q. Now, Mr. Nagy was not an employee of Derivium, correct?

20    A. That's my understanding.

21    Q. And you also said that you didn't interact with him

22    often, correct?

23    A. I -- yeah.  Depends, I guess.  Certainly not weekly, and

24    not even necessarily monthly, but, you know, enough that we

25    knew each other very well.

1    Q. When need be?

2    A. Correct.

3    Q. He was an outside resource?

4    A. Correct.

5    Q. Now, she kept on talking about these reports that Mr.

6    Nagy and Mr. Brandenburg asked for.

7         Do you recall that questioning?

8    A. I do.

9    Q. Okay.  I want to clarify what those reports are.

10        Were those reports that you generated in order to

11   help Mr. Brandenburg and Mr. Nagy understand the income that

12   they should report?

13   A. Yes.  Well, not just the income, but everything that our

14   operations office did, which meant that, you know, it would

15   be, you know, portfolios submitted to us, you know, income

16   generated, um, and snapshots of what -- the portfolios, the

17   loans, all of this, you know -- what that snapshot at the end

18   of the month, what I think was accounting information, so

19   that someone can generate an accounting report of our

20   company's -- our office's business.

21   Q. Right.

22        And was your understanding that that information was

23   needed in order to do the quarterly financial reporting?

24   A. That's what I assumed, it was all accounting related from

25   the standpoint of discussions about how to properly report

1    things.

2     Q. Okay.  So the reports weren't related to how well the

3    loan portfolio was doing?

4     A. That would -- it depends on, you know, I guess you have

5    to define how well.

6     Q. I want to show you what's marked as Government's

7    Exhibit 172.

8                THE COURT:  Government's Exhibit 172?

9                MR. COOPER:  Yes, Your Honor.

10               THE COURT:  Okay.

11    Q. And do you recognize that report?

12    A. Yes.

13    Q. And when I refer to a report about how well the loan

14   portfolio is doing, does that help you recall what report

15   that is?

16    A. Yes.

17    Q. Was that a report that you produced as an employee of

18   Veridia?

19    A. Yes.

20               THE COURT:  I guess it's in evidence, right?

21               THE CLERK:  No, sir.

22               MR. COOPER:  I move it into evidence.

23               THE COURT:  Do you have any objection to your own

24   exhibit?

25               MS. WEIS:  No, Your Honor.

1          THE COURT:  Okay.  Got it.

2          MR. COOPER:  Thank you.

3          (Thereupon, Government's Exhibit Number 172 was

4     received in evidence.)

5      Q. These are called the "In The Money loan reports,"

6     correct?

7      A. That's correct.

8      Q. And it showed the loan portfolio, correct?

9      A. That's correct.

10     Q. And this document was a document that was distributed to

11     Charles and Scott Cathcart to let them know how things were

12     going, correct?

13     A. That's correct.

14     Q. This was not a report that was circulated to Mr. Nagy?

15     A. I do not know.  If I had, um, I would be given a -- we

16     had sort of a standard list of who it was distributed to.  I

17     was given, you know, these names and I just put it in my

18     e-mail program, and we put those reports together, I clicked

19     on that group.  And at the moment, I don't remember who was

20     in the group.

21     Q. And do you recall specifically distributing this to Mr.

22     Nagy?

23     A. I don't recall.

24     Q. And then internally at Derivium, Bob Brandenburg was a

25     CPA, right?

1      A. That's correct.

2      Q. And there were bookkeepers?  Debbie Young?

3      A. Yes.

4      Q. Ms. Hoff, was she a bookkeeper?

5      A. Could very well be, yeah.

6      Q. Catherine Sandifer?

7      A. Yes, we had -- we had several people that filled that

8      position.  Some didn't stay as long as others stayed.

9      Q. Did Bob Brandenburg ever communicate to you that --

10          MS. WEIS:  Objection, hearsay.

11          THE COURT:  Sustained.

12     Q. From being in a small -- understanding -- I mean, in a

13     small office, did you ever come to the understanding that

14     anything wrong was going on?

15     A. Not until after the fact, but -- not while we were

16     working there.

17          And I guess I'll clarify that.  You know, some of

18     the things, you know -- as far as when you say "wrong," um,

19     some of the things that, you know, I understood that they

20     could charge with seems to be open to interpretation.  So I'm

21     not sure I --

22          MS. WEIS:  Objection, Your Honor.

23          THE COURT:  Overruled.

24          MS. WEIS:  Can we get a clarification?  When he says

25     "charge," there is no criminal matter.

1          THE COURT:  No criminal matter.

2          THE WITNESS:  Oh, okay.

3     Q. I'm going to show you our Exhibit Number 36.

4          And you talked to Ms. Weis about the year-end

5     statements?

6     A. Yes.

7     Q. Is that one of the year-end statements?

8     A. I -- yes.

9     Q. Well actually, it's several year-end statements, isn't

10    it?

11    A. Right.  It is.

12    Q. And who were those statements for?

13    A. Um, do you want me to just work from the top one?

14    Q. No.  To whom were the statements sent?

15    A. All of them?

16    Q. Yes, sir.

17    A. Um, went to Scott and Cathcart.

18    Q. And were those documents produced by Derivium?

19    A. Yes.

20    Q. And would those have been the year-end reports that you

21    spoke about that y'all generated?

22    A. Yes.

23          MR. COOPER:  If I can move Exhibit 36 in, please,

24    Your Honor.

25          THE COURT:  Any objection?

1              MS. WEIS:  I'm not quite sure whose Exhibit 36 it

2       is.

3              MR. COOPER:  It's ours.

4              THE COURT:  It's Government's Exhibit 36?

5              MR. COOPER:  No, this is mine.

6              THE COURT:  Okay.  Show it to her.

7              MS. WEIS:  Your Honor, we have an 801 objection to

8       Mr. Nagy offering these exhibits.

9              THE COURT:  Let me see it.

10             Lay a foundation for it and go from there.

11             MR. COOPER:  May I hand the document to the witness?

12             THE COURT:  Sure.

13      Q. Mr. Kelly, would this have been a document that was

14      produced from Derivium's files?

15      A. Yes.

16      Q. And would this have been a document that was produced by

17      the database that you ran?

18      A. Yes.

19      Q. And do you recognize this document?

20      A. We produced a lot of them.  It looks just like, you know,

21      the hundreds of documents that we would produce.

22             So I would say that it's genuine, yes.

23      Q. And would this have been a document that was produced in

24      the ordinary course of Derivium's business?

25      A. Yes.

1                    MR. COOPER:  Your Honor?

2                    THE COURT:  Okay.  Any objection?

3                    MS. WEIS:  Your Honor, we still have an 801

4        objection.

5                    THE COURT:  I think under 803(6) it's a business

6        record, isn't it?  He just laid out a whole foundation for

7        that.

8                    So assuming it's an 801 objection, I'll overrule it.

9                    Go ahead.

10       Q. This is the year-end statement that you said Mr. Nagy

11       assisted you with, correct?

12       A. That's correct.

13       Q. And specifically, he says that -- he gave you advice on

14       correctly reporting the interest expense, correct?

15       A. That's correct.

16       Q. And was your understanding the interest expense needed to

17       be there so the borrowers could --

18                    MS. WEIS:  Objection.

19                    THE COURT:  Sustained.  I assume that's an 801 and

20       I'll sustain that.

21       Q. And there is also on the document dividends, correct?

22       A. Yes.

23       Q. And is that something Mr. Nagy wanted, that reported on

24       the report?

25       A. Yes.

1    Q. And the interest, was that something that Mr. Nagy wanted

2    on the report?

3    A. Yes.

4    Q. And was your understanding that that information was so

5    people could correctly report their taxes?

6    A. Yes.

7    Q. So Mr. Nagy was helping Derivium help its clients comply

8    with the tax laws?

9           MS. WEIS:  Objection.

10          THE COURT:  Sustained.

11   Q. Was your understanding that this was supposed to help?

12          THE COURT:  Sustained.

13   Q. Exhibit 313 --

14          MS. WEIS:  Objection, Your Honor, I don't think this

15   is in evidence.

16          MR. COOPER:  I thought she put this one in.

17          THE COURT:  Government's 313?

18          MR. COOPER:  Yes, Your Honor.

19          THE COURT:  Okay.

20          THE CLERK:  It's not in evidence.

21          THE COURT:  I didn't think so.  Okay.

22          You can show it to her, it's her exhibit, she may

23   not --

24   Q. I'll show you what's Government 123.  Is that your

25   signature at the bottom?

1     A. Yes, it is.

2     Q. Was this a document you sent as an employee of Derivium?

3     A. Yes, it was.

4          MR. COOPER:  May I move this into evidence, please?

5          MS. WEIS:  123 or 313?

6          THE COURT:  The Government's or yours?

7          MR. COOPER:  I'm sorry.  The Government's exhibit.

8          MS. WEIS:  No objection.

9          THE COURT:  Okay.

10          (Thereupon, Government's Exhibit Number 123 was

11     received in evidence.)

12     Q. This is a Derivium letter, correct?

13     A. That's correct.

14     Q. And it's signed by you?

15     A. It is.

16     Q. Is there anything in that letter about tax advice?

17     A. About what?

18     Q. Tax advice.

19     A. No.

20     Q. Did Mr. Nagy cause you to send this letter out?

21     A. No.

22     Q. Exhibit 339 where you were seeking advice --

23          THE COURT:  I assume that's Government's Exhibit 339

24     and it's already in evidence?

25          MR. COOPER:  Yes, Your Honor.

1          MS. WEIS:  Yes, Your Honor.

2          THE COURT:  Okay.  I just wanted to make sure.

3   Q. Mr. Kelly, did you seek this advice so you could properly

4   account for Derivium's books and records?

5   A. Yes.  In other words, I -- are you asking if this is

6   related to an accounting posting, making sure what accounts

7   the expenses, you know, for the technology went into?

8   Q. Right.

9   A. Yes.

10  Q. Is there anything when you wrote this that you thought

11  was untoward about the advice you were seeking?

12  A. I don't -- I just knew that -- no, we were going to use

13  it and therefore we should be -- my position is why should we

14  be paying for those?  But I didn't want us to pay for all of

15  it.

16  Q. So you were trying to do things right?

17  A. Yes.  But I just thought it was better to ask an

18  accountant than guess.

19  Q. I'll show you what's Exhibit 235.

20          These were the renewal notices that y'all sent.

21  A. Oh, okay.

22  Q. Is there any tax advice in the renewal notices?

23  A. I would doubt it.  Um, I have to read the document to

24  see.  But, you know, I don't recall that there would be any

25  tax advice in there.

 1          Q. Did Mr. Nagy cause y'all to send these to borrowers?

 2          A. No.

 3          Q. Exhibit 236, the valuation confirmation reports.  Is

 4      there any tax advice in these reports?

 5          A. No.

 6          Q. Did Mr. Nagy cause you to send these to borrowers?

 7          A. No.

 8          Q. The activity confirmation report, is there any tax advice

 9      in this?

10          A. No.

11          Q. Did Mr. Nagy cause you to send this to borrowers?

12          A. No.

13          Q. Mr. Kelly, was it your understanding that Derivium did

14      not provide tax advice?

15          A. That's correct.

16          Q. And in fact, weren't there disclaimers on the promotional

17      materials that you didn't provide tax advice?

18          A. That's correct.

19          Q. Weren't there disclaimers on the website that you didn't

20      provide tax advice?

21          A. We were pretty adamant that we didn't even come across

22      as, you know, talking about, you know, the tax implications.

23              Because as explained to us, every client was

24      different and we couldn't give one answer to one client and

25      one answer to another.  And we weren't accountants, so

1    they -- um, everything that we were always told in most of

2    the literature was -- is tell the client to first talk to,

3    you know, their own tax advisor, and/or in this case, you

4    know, if they had -- this related to the year-end statement

5    and we were sending out that information so at least -- I

6    think that's what this one is.

7    Q. And, in fact, it was your understanding that Mr. Nagy

8    wouldn't provide tax advice to either the client's advisors

9    or the borrowers?

10   A. Well, let's say his client -- in other words, from the

11   standpoint if someone -- if we -- someone called and asked us

12   a tax question and we thought that it was something related

13   to, you know, the research we had done, we could, you know,

14   have them talk to Bob.

15          But, you know, unless he took them on as a client or

16   something, you know, he didn't have any relationship with the

17   people that would call our office.  He was a resource.

18   Q. Right.

19          And when you say "borrowers," how many borrowers did

20   these transactions -- was it in excess of 1300?

21   A. Um, I couldn't -- I mean, it's a lot of folks.  I don't

22   remember the exact number, but that sounds like a

23   conservative -- over a thousand people.

24   Q. And I think during your testimony you said you recall

25   having problems returning the stock on four or five

1     occasions?

2      A. Well, in what her specific reference was, yes.

3      Q. Do you recall occasions when Derivium did give the stock

4     back?

5      A. Yes.

6      Q. And of these thousand borrowers, I think you testified

7     that only a handful were sent to Bob Nagy?

8      A. I couldn't tell you how many, but it was not -- it was

9     not real common, but it was something, as I said, he was a

10    resource, you know, for if we thought that a client needed,

11    you know, that he could answer a question.

12     Q. And to your knowledge, was the tax advice on, that Mr.

13    Nagy gave in the letters, was that on the Derivium website?

14     A. Um, I'm sorry.  Letters?

15     Q. Have you ever even seen Mr. Nagy's --

16     A. I've seen some things that, you know -- I'm sure this

17    might be a technical term that I shouldn't use, but he had,

18    like, an opinion or something that certain things -- certain

19    parts of the Tax Code were relevant, you know, he outlined

20    them in a paper.

21          I don't know if it was on, in fact, a letter that

22    you might send somebody that was written up because -- and

23    I'm assuming that it was so that a client could take them to

24    their own tax advisor and say, you want to look at these

25    areas of the Tax Code because they are applicable?  And that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    was how I understood it.

2      Q. This document that you saw, was it on the Derivium

3    website?

4      A. I probably would have seen a paper copy.  I don't think

5    it was on the website, but I couldn't say for sure.  We

6    didn't use the website that much in our office.

7      Q. And the database that you kept, did you enter into the

8    database when this borrower stock was received into the

9    brokerage account?

10     A. Yes.

11     Q. And did you enter into the database when the stock was

12   sold?

13     A. Yes.

14     Q. And did you keep meticulous records about when the stock

15   was sold and how much for?

16     A. Yes.

17     Q. And were these Derivium's books and records?

18     A. In -- yes.

19     Q. You were shown Exhibit -- Government Exhibit 317 about

20   who could view the bank accounts?

21     A. Yeah.

22           It's -- at the time -- and I'll just give you

23   background -- this is early when the banks are starting to

24   let you do online banking and funds transfers, and it was a

25   rather cumbersome process at the time, but we would

1    electronically transfer our -- the borrower's funds, you

2    know, to their account.  We would transfer them to, you know,

3    lender's accounts, and so we had to set up a whole second set

4    of records just for the online, that's what the Wachovia

5    connection was called.

6         And so this was to put on one piece of paper who had

7    access and what they could do, so you know -- because

8    sometimes you needed someone to confirm a transfer or

9    initiate with several people in the office, you couldn't --

10   you would not want to have someone initiate the transfer and

11   then not have anybody in the office that could refer, so you

12   needed to know what their jobs were.

13   Q. Well, Mr. Nagy wasn't part of this e-mail, was he?

14   A. No.

15   Q. And he didn't have any of those duties or authorities you

16   just described?

17   A. No.

18   Q. And then Government's Exhibit 182 that they showed you,

19   that y'all talked about, the script?

20   A. Yes.

21   Q. Again, Mr. Nagy's not part of this e-mail?

22   A. No.

23   Q. He didn't have any input into the script, did he?

24   A. No.

25   Q. And these quarterly report statements that she showed you

1    in Exhibit 155, these were documents that you sent, or you or

2    Derivium sent to borrowers, correct?

3    A. Correct.

4    Q. And did Mr. Nagy cause you to send these documents out to

5    folks?

6    A. No.

7    Q. And you remember she refreshed your recollection with

8    this document about Mr. Nagy's input?

9    A. Yes.

10   Q. And again, like the year-end statement, wasn't your

11   understanding was that so borrowers could correctly report

12   any taxes?

13            MS. WEIS:  Objection.

14            THE COURT:  Sustained.

15   Q. Was -- from your work with Mr. Nagy, was your

16   understanding that his input was related to give borrowers

17   information related to taxes?

18            MS. WEIS:  Objection.

19            THE COURT:  Lay a foundation for it.  I'll sustain

20   that.

21   Q. From the e-mail that you have, do you even recall talking

22   to Mr. Nagy about what his input was on this document?

23            MS. WEIS:  Objection, 802, 801.

24            THE COURT: Overruled.

25            THE WITNESS:  I'm sorry.  Can you ask the question

1   again?
2    Q. Sure.
3        Can you even recall what Mr. Nagy's input was into
4   this document?
5    A. I do not remember, you know, specifically which lines he
6   might have had input into.
7        THE COURT:  Okay.  That's enough.
8        THE WITNESS:  Okay.
9        THE COURT:  You answered the question.
10   Q. Was the form of this document ultimately approved by Yuri
11   Debevc?
12   A. Um, or Dr. Cathcart, I don't remember.
13   Q. So Mr. Nagy did not give approval for this form of the
14   document?
15   A. Um --
16        MS. WEIS:  Objection.
17        THE WITNESS:  I don't recall if he would have given
18   the approval.
19   Q. What I'm trying to get at, it's in the hierarchy that Mr.
20   Nagy was not the ultimate decision maker?
21   A. That's correct.
22        THE COURT:  Mr. Cooper, how close are you to being
23   done?
24        MR. COOPER:  Um, if we could take a five-minute
25   break.

1          THE COURT:  We don't take five-minute breaks after

2     6:00, we take ten-hour breaks after 6:00.

3          So how close are you to being done?

4          MR. COOPER:  I believe I'm pretty close -- well --

5          THE COURT:  I mean, are you going to have any

6     redirect, Ms. Weis?

7          MS. WEIS:  Less than five minutes.

8          THE COURT:  We'll start again at 9:30 in the

9     morning.  She's the one that is really working hard here.

10          So can everybody be here at 9:30 rather than 10:00?

11     Yes?  Except the witness?

12          THE WITNESS:  I do some volunteer work for somebody.

13     They called a monthly meeting tomorrow at 8:30.  I can be

14     here by 10.  I'm sorry, Your Honor.

15          THE COURT:  Okay.  All right.  So we'll start at

16     10:00 tomorrow morning.

17          MS. WEIS:  Your Honor, we have some things we could

18     do.

19          THE COURT:  We'll do things before y'all get here

20     and after y'all leave, too, all right?

21          So let's come back at 10:00 tomorrow morning, and

22     turn your notes upside down or take them in the jury room,

23     leave them there, whatever you want to do.

24          Don't discuss the case among yourselves, don't let

25     anyone discuss it with you, don't decide this case until

1    after you've heard all the evidence.

2          So we'll see y'all at 10:00 in the morning.  Thank

3    you.

4          (Thereupon, the jury retired from the courtroom.)

5          THE COURT:  Okay.  We'll start again at 10:00 in the

6    morning.  You need to be here at 9 or 9:30.  I thought you

7    wanted to go over --

8          MS. WEIS:  I was actually referring to we had some

9    deposition testimony, it will take less than an hour, but we

10   are not going to object to starting at 10.

11         THE COURT:  How about -- do we need to discuss the

12   deposition?  Okay.  Why don't we show up here at 9:00 in the

13   morning.  If we've got some arguments over the deposition, we

14   need to get those out of the way anyway.  If we get done

15   before 9:30, we'll take a break.

16         Okay.  We'll see y'all at 9.

17         (Thereupon, the court was in recess.)

18

19

20                    *****      *****      *****

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-titled matter.

3

4

5

6      ---------------------------

7

8      Amy C. Diaz, RPR, CRR              January 8, 2011

9

10     S/  Amy Diaz

11

12       Exhibit Numbers 11, 12, 20, 38, 40, 54, 116, 120,   19

13       142 and 143

14                     MR. KENNETH POLK                    77

15     DIRECT EXAMINATION                                  77

16     BY MR. SEADOR

17     Government Exhibit Number 235                        87

18     Government Exhibit Number 236                        88

19     Government Exhibit Number 236                        88

20     Government Exhibit Number 235                        91

21     CROSS-EXAMINATION                                    96

22     BY MR. COOPER

23                     REDIRECT EXAMINATION               110

24     BY MR. SEADOR

25            MR. LEROY EUGENE STRICKLAND, II             117

1    DIRECT EXAMINATION                                    117

2    BY MR. SEACORD

3    Government's Exhibit Number 351                       120

4    Government Exhibit Number 155                         132

5    CROSS-EXAMINATION                                     144

6    BY MR. COOPER

7    Defendant's Exhibit Number 89                        167

8    Defendant's Exhibit Number 90                        174

9    Defendant's Exhibit Number 91                        176

10   Defendant's Exhibit Number 92                        179

11   REDIRECT EXAMINATION                                 180

12   BY MR. SEACORD

13   Government's Exhibit Number 259                       183

14   MR. PATRICK RUSSELL KELLY,                           184

15   DIRECT EXAMINATION                                   185

16   BY MS. WEIS:

17   Government's Exhibit Number 339                       198

18   Government's Exhibit Number 153                       203

19   Government's Exhibit Number 13                        212

20   Government's Exhibit Number 352                       223

21   CROSS-EXAMINATION                                     239

22   BY MR. COOPER

23   Government's Exhibit Number 172                       249

24   Government's Exhibit Number 123                       255

25