```
 1                  IN THE DISTRICT COURT OF THE UNITED STATES
                         DISTRICT OF SOUTH CAROLINA
 2                         CHARLESTON DIVISION

 3     ROBERT J. NAGY,              )           2:08-CV-2555
                                    )
 4                     Plaintiff    )           Charleston,
                                    )           South Carolina
 5     VS                           )           June 22, 2010
                                    )
 6     UNITED STATES OF AMERICA,    )           VOLUME II
                                    )
 7     Defendant                    )

 8                        TRANSCRIPT OF JURY TRIAL
                   BEFORE THE HONORABLE DAVID C. NORTON,
 9                 CHIEF UNITED STATES DISTRICT JUDGE

10     APPEARANCES:

11     For the Defendant:    MR. NATHAN CLUKEY
                             MR. GREGORY SEADOR
12                           MS. ELLEN WEIS
                             US Department of Justice Tax Division
13                           P.O. Box 7238
                             Ben Franklin Station
14                           Washington, DC 20044

15

16     For the Plaintiff:    MR. LINDSEY W. COOPER, JR., ESQ.
                             LW Cooper Jr. Law Offices
17                           36 Broad Street
                             Charleston, SC 29401
18

19

20

21

22

23     Court Reporter:       Amy C. Diaz, RPR, CRR
                             P.O. Box 835
24                           Charleston, SC 29402

25              Proceedings recorded by mechanical shorthand,
       Transcript produced by computer-aided transcription.
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1           THE COURT:  Okay.  Y'all got anything to talk about?

2           MR. COOPER:  Your Honor, I have one thing in light

3      of your bifurcation.

4           THE COURT:  Yeah.

5           MR. COOPER:  The special interrogatory I sent to

6      y'all with my jury instructions, I amended it for the first

7      part of the trial, just to talk about liability.

8           THE COURT:  Okay.

9           MR. CLUKEY:  Your Honor, would there be a time where

10     we could submit some additional jury instructions, as well?

11          THE COURT:  Yeah.  I mean, that's fine.  You know,

12     what you are going to end up with is I'm going to give you a

13     copy of the jury instructions and you can make additions and

14     corrections.  I'll also give you a copy of the proposed

15     verdict forms or -- unless you want to agree on a verdict

16     form, that's fine with me.  If you can agree on a verdict

17     form, I think I've said before, I'll sign anything the

18     lawyers agree to unless it's a check, all right?

19          All right.  So we got that.  Thank you.  Anything

20     else?

21          MR. COOPER:  The other thing is, to help me along

22     with the -- I know they are going to put Mr. Nagy up in their

23     case in chief, and you've discussed this, and I was up last

24     night thinking about it -- about when he goes up in their

25     case in chief, that I have the opportunity to question him at

1     that point in time?

2                THE COURT:  Yeah.

3                MR. COOPER:  But I can't redo it on my direct if I

4     bring him in my case in chief?

5                And specifically, my issue is, is the whole tax

6     return issue that they brought up in the opening.  I would

7     want to retalk to him about that after their examination but

8     reserve my ability to do my full direct in my case in chief.

9                THE COURT:  Do you want to talk to him about his tax

10    situation on cross-examination after the Government has

11    called him and then you want to do it again --

12               MR. COOPER:  No.

13               THE COURT:  -- if you want to, as long as -- we only

14    have one time.  I mean, I don't want to --

15               MR. COOPER:  And that's my second question, is when

16    I recall him in my case in chief and do my direct, if the

17    Government's already -- and I'm sorry, I'm just trying to

18    clarify -- if the Government is already asking the questions,

19    they can't recross him on that issue again?

20               THE COURT:  Depends on what he says.  I mean, if

21    he's got -- if he takes inconsistent positions on the same

22    issue, I think they probably can.

23               MR. COOPER:  Okay.

24               THE COURT:  Yeah.

25               MR. COOPER:  I was just trying to figure it out from

1    a time -- what would be the most efficient for the

2    presentation.

3               MR. CLUKEY:  If he elaborates, we obviously have the

4    right to follow-up.

5               THE COURT:  The same issues.  And if you think they

6    are cumulative, or something like that, you think it's

7    cumulative, you object and I'll make a ruling on it at the

8    time.  Those are just kind of the general parameters.

9               MR. COOPER:  I've just never done it this way and so

10   I just wanted to make sure.

11              THE COURT:  All right.  Anything else?

12              MR. COOPER:  No, Your Honor.  That's all I had on my

13   list.

14              THE COURT: Okay.  Yes, sir?

15              MR. CLUKEY:  That's all we have right now, Your

16   Honor.

17              There are a number of exhibits that I was going to

18   propose using on Mr. Debevc.  We can talk about a couple of

19   those, it might speed things up because there are pending

20   objections.

21              THE COURT: All right.  Have y'all talked about them

22   yet?

23              MR. CLUKEY:  No.

24              THE COURT:  Why don't y'all talk about it.  If you

25   want some rulings, I'll be upstairs, we can use this time

1    more efficiently.  And if you agree on them, then it's no big

2    deal.

3            If you can't agree on them, give me a call and I'll

4    come down and take a look at them.

5            Anything else, Mr. Cooper?  Mr. Clukey?  Mr. Debevc?

6    You have been called today as a witness, too.

7            MR. DEBEVC:  Yes, Your Honor.

8            THE COURT:  So who do we have after we get done with

9    this witness?  What's next?

10            MR. CLUKEY:  The next person is Colin Bowen, who

11    will be played by John Douglas and --

12            THE COURT:  In his Chesterfield accent.

13            MR. CLUKEY:  Exactly.  Slightly different.

14            And then it will be Mr. Debevc, and then it will be

15    a video.  I think that will probably take the day, if not,

16    then --

17            THE COURT:  Go from there.  All right.  Good.

18    Thanks.

19            (Thereupon, there was a brief recess.)

20            THE COURT:  What have we got?

21            MR. CLUKEY:  A couple of things, Your Honor.

22            We have one exhibit we want to talk about, and we

23    also had -- Mr. Cooper wanted to raise some response to the

24    rulings on the transcripts.

25            THE COURT:  Okay.  All right.  What about the

1    exhibit?

2              MR. CLUKEY:  The exhibit is 297.

3              THE COURT:  Government 297?

4              MR. CLUKEY:  Yes.  Government 297.

5              MR. CLUKEY:  And go to page, I think it's 58 or 59.

6    58.

7              This is the tax return of Yuri Debevc, next page

8    there, prepared by Mr. Nagy.

9              So go back to the first page of this document -- no,

10   just 58 -- it shows his income for the year, we think it's

11   relevant to this case and that -- tax dollars for the year

12   with that kind of income.

13             THE COURT:  Okay.  What's your objection, Mr.

14   Cooper?

15             MR. COOPER:  It's a 402, 403 objection.  That Mr.

16   Debevc's tax returns have no bearing on Mr. Nagy's tax

17   advice, whether it was false or fraudulent.  This is simply a

18   tax return, that it's my understanding, has never been

19   audited and was accepted by the IRS.

20             MR. CLUKEY:  That's actually an incorrect factual

21   assumption.

22             And secondly, it was prepared during the existence

23   of the scheme.

24             THE COURT:  Well, what does it make more or less

25   likely in your case against Mr. Nagy?

1          MR. CLUKEY:  That he knew or had reason to know that

2     the other tax advice he was providing was not true, it was

3     untruthful.

4          THE COURT:  How do you connect this tax -- well, Mr.

5     Debevc's tax return to Mr. Nagy?

6          MR. CLUKEY:  Mr. Nagy is the one who told him that

7     he could take a $7 million loss.  Those losses come from the

8     startup companies.  On the prior page, there is Mr. Nagy's

9     signature.

10          THE COURT:  Okay.

11          MR. COOPER:  I mean, he signed a tax return, but

12     again, it's his tax advice to Derivium, and I'm not

13     understanding now Mr. Debevc, coming in here as a witness,

14     how simply filling out a tax return has any bearing on what

15     advice he gave on a 90% stock loan, I don't see how the dots

16     are connected at all.

17          MR. CLUKEY:  Circumstantial evidence, Your Honor,

18     regarding he knew or had reason to know regarding the truth

19     or falsity of the tax advice he was giving at the identical

20     time to the identical person, Yuri Debevc.

21          MR. COOPER:  I'm not aware of anything in evidence

22     that would be false in this, and this is Mr. Debevc's

23     personal return.  We are talking about his advice to

24     Derivium.  I don't understand how Mr. Debevc's return

25     reflects a 90% Stock Loan at all.

1          MR. CLUKEY:  That's obviously not the limited scope

2     of 6700.  You consider what businesses were doing during the

3     scheme, all of their activities that may have some bearing

4     that they knew or had reason to know.

5          And by telling someone you can take a $6 million

6     loss when you don't have $6 million in assets, that clearly

7     would go to -- would go to whether someone knew or had reason

8     to know that the other tax advice to the identical time, to

9     the identical people, was false or fraudulent.

10          THE COURT:  I'll overrule your objection to that

11     one, okay?  Or that series of them.

12          MR. COOPER:  There was one part of Mr. Scrantom's

13     deposition we agreed where you had stricken part of the

14     designation, and I thought it was out of context, so we

15     agreed to strike the rest of it.

16          THE COURT:  Okay.

17          MR. COOPER:  The other one was with, starting with

18     Mr. Anderson, your objections, they are specifically page 10.

19          Would you like me to hand it up?

20          THE COURT:  I think I've given it back to you, so --

21     okay.  I just --

22          THE COURT:  All right.  So Mr. Anderson.  All right.

23          MR. COOPER:  Page 10, line 17 --

24          THE COURT:  All right.

25          MR. COOPER:  -- through page 11, line 5.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1           THE COURT:  Let's see here.

2           MR. COOPER:  From the testimony, Mr. Anderson was

3   asked specifically what his understanding was when he

4   testified to that.  We do think there is grounds.

5           THE COURT:  Okay.  Yes?

6           MS. WEIS:  Your Honor, as we stated when we first

7   made the objection Mr. Anderson was basically relaying

8   hearsay, and anything that he would be saying, my

9   understanding is, would be lack of foundation because he's

10   relying simply again on hearsay.

11          Mr. Anderson's scienter understanding, or what he

12   had reason to believe, is not at issue in this case.

13          So we believe that the Court correctly ruled to

14   exclude it under 801 and 602.

15          THE COURT:  Okay.  I mean, isn't he just parroting

16   what he was told, hearsay?

17          MR. COOPER:  The question is what was his

18   understanding?  I don't think there was a hearsay question.

19          THE COURT:  Well, there is a hearsay answer that was

20   implied.  I mean --

21          MR. COOPER:  He was at Derivium, as well, like

22   everyone else, Mr. Kelley, for, what, five or six years?  And

23   over time in a small office, as Mr. Kelley put it, you know,

24   you come to understand certain things.

25          THE COURT:  Well, the hedge, quote unquote, from

```
 1    what your testimony is, by Coca-Cola syrup, Mr. Cathcart

 2    didn't let anybody know what it was.

 3              MR. COOPER:  I understand.

 4              THE COURT:  Okay.  So, I mean, how is his

 5    understanding of something that Dr. Cathcart kept secret not

 6    hearsay or speculation, or whatever?

 7              MR. COOPER:  I just believe it's a 602 on personal

 8    knowledge and questions.

 9              THE COURT:  All right.  I'll overrule your objection

10    to my ruling on their objection.

11              What's next?

12              MR. COOPER:  The next one is pages 86 through 87,

13    25.

14              You ruled on it because the McDermott Will & Emery

15    opinion is not into evidence.  It's now into evidence.

16              MS. WEIS:  Actually, Your Honor --

17              MR. COOPER:  Hold on.

18              MS. WEIS: We would agree that if there is another

19    tax opinion mentioned in there, that you would strike out

20    that portion, so the testimony was only reflective of the

21    McDermott Will & Emery opinion.

22              He saw a memo from, I believe McDermott Will &

23    Emery.  On page 89, he stated that he never even saw that

24    opinion.

25              So he would be relaying hearsay about a hearsay
```

1    document that we understand the Court has admitted only for

2    the purpose of Mr. Nagy's scienter.  And Mr. Nagy did not

3    work in the San Francisco office, and he explained the

4    substantive contact with the marketing office in the first

5    place.

6                THE COURT:  Okay.  I think the Government's problem

7    with this is probably, the basis for the objection is the top

8    of page 89:

9                "Question.  What about the McDermott Will & Emery

10   memorandum report?

11               "Answer.  I don't recall actually seeing this.  I

12   recall hearing about it."

13               Okay?  All right.  I'll keep my ruling the same.

14               MR. COOPER:  The other one dealt with the McDermott

15   opinion, as well.  It's on page 143, 12 through 23.

16               THE COURT:  143, 12 through 23?

17               MS. WEIS:  Your Honor, Mr. Anderson is testifying as

18   to what contact he had with McDermott Will & Emery, if any.

19               It's actually not quite clear he had any personally,

20   but again, there is no indication that Mr. Nagy was involved

21   in any of those conversations.  And so we don't understand --

22   it's clearly hearsay, the conversations that occurred, the

23   substance of them.  And given that Mr. Nagy, as far as this

24   testimony goes, was not a party to those conversations, we

25   don't understand the relevance, either.

1                    THE COURT:  Who is Jerry Kaplan?

2                    MR. COOPER:  He's a lawyer at McDermott Will &

3         Emery.

4                    THE COURT:  That's what I thought.

5                    What's the ESOP QRP program?

6                    MR. COOPER:  That's a program in which Mr. Nagy

7         authored a memorandum in 2002 about it.  It was essentially

8         another stock loan, just using a different kind of property,

9         as defined in the Internal Revenue Code.

10                   THE COURT:  Is it the same program or --

11                   MR. COOPER:  The structure is the same, yes, sir.

12                   MR. CLUKEY:  It's a variation, Your Honor, but the

13        only two programs in this case are the 90% Stock Loan and the

14        90% FRL, I don't know if any transactions were ever done on

15        the QRP.

16                   MS. WEIS:  It's the same thing, so the ESOP QRP

17        involve lots of letters that mean the same thing.

18                   THE COURT:  Okay.  Somebody mentioned something, I

19        might be wrong, about Mr. Nagy having some contact with

20        McDermott Will & Emery, or was it Mr. Cathcart?  I don't

21        remember.  Somebody was independently, from what's in

22        evidence.

23                   MR. CLUKEY:  Mr. Nagy did, Your Honor.

24                   MR. COOPER:  There was an e-mail where we were first

25        arguing the exhibits that we -- the objection was, I think

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    they brought it up, where someone asked Mr. Nagy, did he have

2    contact with McDermott Will & Emery.  That's my recollection.

3         MR. CLUKEY:  Your Honor, there is no evidence --

4    this relates to the same thing, we talked to --

5         THE COURT:  Well, I'll think about that one, okay?

6    We'll -- none of these are for today anyway, right?

7         MR. CLUKEY:  Two are for tomorrow, Your Honor.  We

8    can do them during the break.

9         THE COURT:  We'll go over them, but we just don't --

10   I don't want the jury sitting back there while we are doing

11   this.

12        MR. CLUKEY:  Of course.

13        THE COURT:  All right.  So Mr. Kelley, come on back.

14        (Thereupon, the jury returned to the courtroom.)

15        THE COURT:  Okay.  Welcome back, ladies and

16   gentlemen of the jury.  We'll continue with the examination

17   of Mr. Kelley at this time.

18        Yes, sir.  Mr. Cooper?

19        MR. COOPER:  Thank you, Your Honor.

20             CONTINUED CROSS-EXAMINATION

21   BY MR. COOPER:

22   Q. Your volunteer work went well?

23   A. Yeah.

24   Q. This is Government's Exhibit 13 that we were talking

25   about, the reports that you did for, in this case, the

KELLY- CONTINUED CROSS-EXAMINATION

1    lender, Optech?

2     A. Okay.

3     Q. Do you recall where we left off on there yesterday?

4     A. No, not exactly.

5     Q. Okay.

6     A. Okay.

7     Q. Did you send this report to Optech?

8     A. Yes, it looks like a report I would send out.

9     Q. And was it sent monthly?

10     A. Yes.

11     Q. And because you sent a report to a lender monthly, did

12    that make you believe it was a real lender?

13              MS. WEIS:  Objection.

14              THE COURT:  Sustained.

15              Go ahead and rephrase that question.

16     Q. Were you required under the contract with Optech to send

17    them monthly reports?

18     A. That was my understanding, yes.

19     Q. And because you were having to do activities for a

20    lender, was it your belief that Optech was --

21              MS. WEIS:  Objection.

22     Q. -- an offshore lender?

23              THE COURT:  Basis?

24              MS. WEIS:  Argument.

25              THE COURT:  Overruled.

KELLY- CONTINUED CROSS-EXAMINATION

1            THE WITNESS:  Say that again?

2     Q. Okay.  Because you were sending monthly reports to Optech

3     under your administration agreement, did you believe Optech

4     was an offshore lender?

5            MS. WEIS:  Objection, 602.

6            THE COURT:  Overruled.

7     Q. Will you answer?

8     A. Yes.  We -- that was how they were portrayed to us in --

9            MS. WEIS:  Objection, hearsay.

10           THE COURT:  Sustain that part, okay?

11    Q. And you sent information to Optech about the receipt of

12    the collateral?

13    A. Yes.  That's correct.

14    Q. And you sent information to Optech about the sale of the

15    collateral?

16    A. Yes.

17    Q. And this report was sent to Optech, correct?

18    A. I'm sorry.  Say that again?

19    Q. It was sent to Optech?

20    A. Yes.

21    Q. And it was an internal report?

22           MS. WEIS:  Objection, foundation.

23    Q. It was an internal report for Veridia?

24    A. Yes.

25           THE COURT:  Mr. Cooper, you know, they pay me a

KELLY- CONTINUED CROSS-EXAMINATION

1    pretty good salary to rule on objections.

2         MR. COOPER:  I'm sorry.

3         THE COURT: And if I don't get to rule on them, then

4    I don't earn my salary.  It's terrible.  If you want to rule

5    on them and say that they are okay, just let me know, and

6    when you want to rule on one, let me know, okay?

7         MR. COOPER:  I'm sorry.

8         THE COURT: That's all right.

9         Go ahead.

10   Q. Was this an internal report for Veridia?

11   A. Um, I'm -- I'm not sure what you mean by "internal report

12   for Veridia".  It was created by Veridia and it was something

13   that we would then send to Optech; we would not send it to

14   anyone other than our internal office and the lender.

15   Q. And that was my next question.

16        Were these monthly reports sent to the borrowers?

17   A. A report like this?

18   Q. Yes, sir.

19   A. No.

20   Q. This is Government Exhibit Number 49.

21        And the last report was for Optech.  This one is for

22   Bancroft Ltd.

23        MS. WEIS:  Objection, Your Honor.  This document is

24   not in evidence.

25        THE CLERK:  Not in evidence.

284

KELLY- CONTINUED CROSS-EXAMINATION

1              MR. COOPER:  Okay.  I'm sorry.

2              THE COURT: So go ahead.

3              MR. COOPER: Well, it's Government Exhibit 49.  Do

4      you have an objection to it?

5              MS. WEIS:  No, Your Honor.

6              THE COURT:  Now it's in evidence.  All right.  Fine.

7              (Thereupon, Government's Exhibit Number 49 was

8      received in evidence.)

9      Q. Is this a monthly report that Veridia would send to

10     Bancroft?

11     A. Yes.

12     Q. And again, because you were sending monthly reports to

13     Bancroft, did you believe it was a real lender?

14             MS. WEIS:  Objection.

15             THE WITNESS:  Yeah.

16             THE COURT:  Overruled.

17     Q. And were these monthly reports sent to borrowers?

18     A. No.

19     Q. And you mentioned yesterday that someone from England

20     visited the office in Charleston?

21     A. Yes.

22     Q. Do you recall that person's name?

23     A. No.

24     Q. Would -- what about the name Recorden?

25     A. I'm sorry?

KELLY- CONTINUED CROSS-EXAMINATION

1    Q. Recorden.  Does that ring a bell?

2    A. A person's name Recorden?

3    Q. Yes, sir.

4    A. It doesn't ring a bell, but I don't remember what the

5    person's name was.

6    Q. Did you interact with an IT specialist at Bancroft?

7         MS. WEIS:  Objection, foundation.  I think he

8    testified yesterday he never spoke to anyone in IT.

9         THE COURT:  Overruled.

10        Go ahead.

11        THE WITNESS:  Um, you asked if I talked to

12   someone -- I'm sorry.  Say the question again, please.

13   Q. Did you ever speak with an IT specialist at Bancroft?

14   A. Well, I don't know -- I don't know what you mean by

15   with -- we spoke with an IT specialist who was working with

16   Bancroft to help us transmit --

17        MS. WEIS:  Objection, hearsay.

18        THE COURT:  Overruled.

19        THE WITNESS:  I don't -- I don't know what his, you

20   know, employment relationship was with Bancroft, whether he

21   was a subcontractor or whether he worked for them in IT.

22        It's quite common to have a subcontractor, you know,

23   as a representative of the company you are working with,

24   because they are technical people that you can talk to.

25   Q. And yesterday, I believe when you first met Dr. Cathcart,

KELLY- CONTINUED CROSS-EXAMINATION

1    he was very secretive about his hedging strategy?

2     A. Yes.  That part he did not disclose.

3              MR. COOPER:  Thank you.  That's all, Your Honor.

4              THE COURT:  Yes, ma'am?

5                        REDIRECT EXAMINATION

6    BY MS. WEIS:

7     Q. Mr. Kelley, just a couple of questions and hopefully you

8    can go home.

9              Now, yesterday Mr. Cooper asked you about the number

10   of customers you were aware of that -- where Derivium wasn't

11   able to return their stock back.

12             Do you recall that topic, testimony?

13    A. Well, right.  We talked about the ones that Dr. Cathcart,

14   you know --

15    Q. Okay.

16    A. -- yes.

17    Q. Are you aware that there was more than 120 transactions

18   in which Derivium was not able to return the stock?

19    A. I don't know the number, but --

20    Q. Okay.

21    A. -- later.

22    Q. Now, you said that you would occasionally -- you were

23   asked about times that you would refer customers to Mr. Nagy

24   to answer questions about, you know, tax aspects of their

25   participation in the program?

KELLY- CONTINUED CROSS-EXAMINATION

1    A. Yes.  That's correct.

2    Q. Mr. Nagy was, I believe you said in your e-mail, the

3    go-to person for those sorts of questions; is that right?

4    A. For our office?

5    Q. Right.

6    A. Yes.

7    Q. You worked in the back office or the operations?

8    A. Yes.

9    Q. You didn't work in marketing; is that correct?

10   A. No, I did not.

11   Q. So to the extent that Mr. Nagy's memos were talked about

12   with customers by marketing staff, you wouldn't have known

13   anything about that; is that correct?

14   A. Other than the fact that, you know, we knew that his

15   services were.

16   Q. Right.

17        Now, Mr. Kelley, I didn't really ask you much about

18   your background, but you are not a CPA, are you?

19   A. No, I'm not.

20   Q. You are not an accountant, certified or --

21   A. I'm not.

22   Q. -- otherwise?

23   A. No.

24   Q. You are not a tax professional?

25   A. No.

KELLY- CONTINUED CROSS-EXAMINATION

1    Q. You don't consider yourself to be giving tax advice or

2    being a tax advisor?

3    A. Definitely not.

4    Q. You weren't involved in setting up Bancroft Ventures

5    Ltd., were you?

6    A. No, I wasn't.

7    Q. And you didn't have access to their books, Bancroft's

8    books, did you?

9    A. No, I did not.

10   Q. Now, Mr. Cooper was asking you some questions about

11   different reports that you -- you know -- send out, um -- and

12   you know, in addition to referring customers with tax

13   questions to Mr. Nagy, you had asked for his input on what

14   should go into some of those reports; is that correct?

15   A. From an accounting standpoint, that's correct.

16   Q. Okay.  So the quarterly reports that went to customers, I

17   think we talked about that, you asked for his input on

18   whether or not interest should be included in those reports?

19   A. The quarterly reports were already in existence before I

20   started working there, so the basic format was already there.

21        And so if I directed a question to Mr. Nagy, it was

22   about the report as a whole.  I don't believe that there was

23   any, you know, word line, unless it related to how we would

24   calculate in doing the math.

25   Q. Okay.  So you asked him at least some questions about the

KELLY- CONTINUED CROSS-EXAMINATION

1    content of the report?

2     A. I'm sure I did.

3     Q. And the annual reports, you asked for his input on the

4    content, the annual reports sent to customers; is that

5    correct?

6     A. Worked closely on the annual reports.

7     Q. Right.

8         And the invoices that Bancroft -- or I'm sorry --

9    that Derivium used -- for instance, we talked about the

10   Canadian server, you talked with him about setting up, making

11   sure those invoices were correct, accurate; is that correct?

12    A. Well, properly accounted for.  Not the accuracy of the

13   invoice, but as far as how it fit within the accounting side.

14    Q. Okay.  And the reports we looked at just now, Mr. Cooper

15   pulled up Exhibit 13, one of the reports you would send to

16   Optech.

17        You -- I believe you talked about this yesterday,

18   you asked Mr. Nagy what he thought about those reports, the

19   format of that report before you sent it to Optech; is that

20   correct?

21    A. I'm -- if I did, and it wouldn't be for me to ask for

22   something from that, it would be from the accounting

23   standpoint, yes.

24    Q. Okay.  Now, you said that those reports were only, you

25   know, either used for internal purposes or sent to Optech.

KELLY- CONTINUED CROSS-EXAMINATION

1    They weren't sent to customers; is that correct?

2     A. That's correct.

3     Q. But Mr. Nagy, you showed them to Mr. Nagy, the draft of

4    the report; is that correct?

5     A. Well, I'm certain -- you know, if I asked him questions

6    about the format of the reports, he would have seen the

7    report, yes.

8     Q. Okay.  Now, were you here yesterday when Mr. Strickland

9    talked about sort of the worst case scenario from his view

10   with Derivium where a stock for a customer was up here and it

11   was worth more than the amount of the loan payoff?  Do you

12   recall that testimony?

13             MR. COOPER:  Objection.  602.

14             THE COURT:  She's asking him to establish something.

15   So I'll overrule that objection.

16             THE WITNESS:  Um, I was -- yes, I was in the room

17   for his testimony yesterday.

18    Q. So you recall where he described that if the stock was

19   worth more than the amount the customer had to pay back,

20   Derivium would have to come up with extra cash to return that

21   customer's stock, he described that as sort of a worst case

22   scenario?

23             MR. COOPER:  Objection.  Outside the scope of

24   direct.

25             THE COURT:  That I'll sustain.

KELLY- CONTINUED CROSS-EXAMINATION

1           MS. WEIS:  Well, it goes to Exhibit 172, which Mr.

2      Cooper raised on cross.

3           MS. WEIS:  Sam, could you pull up Exhibit 172?  Can

4      you rotate it around?

5           THE COURT:  Okay.  Overruled.

6      Q. Now, Mr. Kelley, these "In The Money" reports that Mr.

7      Cooper asked you about --

8      A. Yes.

9      Q. -- they describe -- if you go over, they describe the

10     amount of the customer's stock relative to how much money

11     they are going to need to get back to Derivium at the end of

12     the loan; is that correct?

13     A. Um, I'm not sure I follow the question exactly, you know,

14     as you phrased it, but this does show, you know, the value of

15     their, you know, loan at the beginning, the value of the loan

16     at their end, the value of their collateral at the beginning

17     at the end.

18     Q. Okay.  And so --

19     A. Is that what you are asking?

20     Q. Sure.

21          So if you look at the second line, can you highlight

22     the Don Hancock line?  That last number over there:

23     "Negative."  Meaning -- you understand that to mean negative?

24     A. Correct.

25     Q. Okay.  So negative $20,218,887 that his stock, his

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

KELLY- CONTINUED CROSS-EXAMINATION

1    collateral, is worth $20 million more than what he would owe

2    at maturity, is that --

3    A. At the date of this report.

4    Q. Okay.  Now, you said that you weren't sure if you sent

5    these reports to Mr. Nagy; is that correct?

6    A. That's correct.

7    Q. But you could have sent them to Mr. Nagy?

8    A. It's -- yeah.  I would have to look at, you know, the

9    e-mails, you know, on the distribution list.

10   Q. And if you weren't sending these reports to him, you did

11   send some reports to Mr. Nagy containing information about

12   how much the customer's stock was worth relative to what they

13   would owe at maturity; is that correct?

14              MR. COOPER:  Objection, 602.

15              THE COURT:  Overruled.

16              THE WITNESS:  Um, are you referring to, you know, if

17   I sent him something asking him about, you know, the format

18   of the report or --

19   Q. No.  Would you send it -- I'm sorry -- you said that he

20   would request data from you on occasion?

21   A. Yes.

22   Q. Okay.  So one of those types of reports that you would

23   put together for him would include the same type of

24   information, how much the customer's stock was worth relative

25   to how much was owed on the loan at maturity?

KELLY- CONTINUED CROSS-EXAMINATION

1    A. It's possible.  I mean, I don't remember -- as I said, I

2    don't remember the specific reports that I might have

3    included Bob Nagy on, but it's entirely possible.

4    Q. Would it help to take a --

5    A. Sure.

6    Q. So Mr. Kelley, if you look up at the top, right-hand

7    corner, is that your handwriting?

8    A. Yes.

9    Q. And is this -- you see where it says:  "Request by B.

10   Nagy, 9-7-01"?

11   A. Yes.

12   Q. So Mr. Kelley, did you -- did you, in fact, provide

13   reports to Mr. Nagy that described how much customer's stock

14   had changed in value?  For instance, how much it had gone up

15   in value?

16   A. Let me look at the report here.

17   Q. Sure.

18   A. Okay.  I'm sorry.  Ask your question.

19   Q. Did you, in fact, provide reports to Mr. Nagy that

20   contained the same topic of information as the "In The Money"

21   reports?

22   A. Yes.  That's what is shown in this report.

23   Q. Now, Mr. Kelley, I think you said yesterday that you are

24   being sued by a customer in connection with your work at

25   Derivium?

KELLY- CONTINUED CROSS-EXAMINATION

1    A. That's correct.

2    Q. And I don't want to get into the details of it, but he's

3    made some allegations that you misled him in some respect; is

4    that correct?

5    A. Um, I believe so.  It's been a long time since I've seen

6    it, but yes.

7    Q. Now, I'm sorry --

8    A. Nothing.  I'm sorry.

9    Q. Mr. Cooper asked you, you know, if you suspected anything

10   while you were working at Derivium and you said no, you

11   didn't think anything was wrong; is that correct?

12   A. Well, we were talking about, you know, his use of the

13   word, you know, broad, over --

14   Q. Untoward?

15   A. -- things, but you know, from a legal standpoint, no.

16   Q. But --

17   A. I did not think that we were doing anything, you know,

18   illegal there.

19   Q. But if you were to say today that you might have

20   suspected something along those lines, that would have

21   personal implications for you in connection with that

22   lawsuit; isn't that right?

23   A. Um, I have not actually discussed that with my lawyer,

24   but, you know, I would -- he's not here, but I -- I would

25   imagine that's entirely possible that, you know --

KELLY- RECROSS-EXAMINATION

1    Q. Okay.

2    A. -- we -- I'm sure they are looking at everything I say.

3    Q. All right.

4        MS. WEIS: Well, thank you very much, Mr. Kelley.

5        THE WITNESS: Okay.

6        MS. WEIS:  You were more than generous with your

7    time.  We don't have any other questions.

8        THE COURT:  Thank you.

9                    RECROSS-EXAMINATION

10   BY MR. COOPER:

11   Q. Mr. Kelley, everything you say up there was the truth?

12   A. Yes.

13   Q. Thank you.

14       THE COURT:  Mr. Kelley, the truth is you can leave

15   right now, okay?  You can just leave all that stuff and we'll

16   take care of it.

17       THE WITNESS:  Leave all this stuff?

18       THE COURT:  Right.

19       Okay.  What's next?

20       MR. CLUKEY:  Your Honor, the United States calls

21   Colin Bowen.

22       THE COURT:  Okay.  Ladies and gentlemen of the jury,

23   I think that one of the lawyers talked about pretrial

24   preparation and not being able to call witnesses who are out

25   of state, or some rule about it.

KELLY- RECROSS-EXAMINATION

1          But in preparation, the lawyers go and take a

2     deposition.  And the deposition is just like testimony.  The

3     person is sworn to tell the truth.  And although that person

4     can't be here, the deposition is here, and the lawyers will

5     read the questions and somebody will read the answers.

6          And so it's testimony that you can consider in this

7     case as like this witness was right here except we are doing

8     it in this way.  But this is a written deposition.

9     Mr. Douglas will prove to us that he can read, and so he's

10    going to be role playing the deponent, which one?

11          MR. CLUKEY:  Colin Bowen.

12          THE COURT:  Colin Bowen.

13          And he's going to ask him questions, and Mr. Douglas

14    will respond to what Mr. Bowen said.

15          Now, later on in the trial, I believe there is going

16    to be some video depositions, which is the same thing, the

17    same kind of testimony, so you can consider it in trying an

18    arrive at your judgment of his credibility just like any

19    witness, all right?

20          Mr. Douglas?

21          (Thereupon, the deposition of Colin Bowen was read

22    to the jury.)

23          MR. CLUKEY:  Your Honor, we would like to offer

24    Exhibit 41 into evidence.

25          THE COURT:  Any objection?

KELLY- RECROSS-EXAMINATION

1           MR. COOPER:  I've got an 802, a 402, a 403 objection

2     to it.

3           MR. CLUKEY:  802 would be consistent with your prior

4     ruling on the conspiracy.

5           THE COURT:  Okay.

6           MR. CLUKEY:  And also, we are not offering it for

7     the truth of the matter asserted.

8           THE COURT:  Okay.  You are offering the whole thing,

9     all five or six pages?

10          MR. CLUKEY:  Yes, Your Honor.

11          THE COURT:  Okay.  Overruled.

12          (Thereupon, Government's Exhibit Number 41 was read

13    into the record.)

14          (Thereupon, the reading of the deposition of Colin

15    Bowen continued to be read to the jury to its completion.)

16          THE COURT:  Okay.  Thank you.

17          MR. CLUKEY:  Your Honor, we call as our next witness

18    Yuri Debevc.

19          THE COURT:  Okay.  Mr. Debevc.

20          THE CLERK:  Place your left hand on the Bible and

21    raise your right hand.

22          THE COURT:  You've got to be sworn for me, Mr.

23    Debevc.

24          THE CLERK:  Place your left hand on the Bible and

25    raise your right hand.

DEBEVC - DIRECT

1                State your name for the record.

2                THE WITNESS:  Yuri Debevc.

3        THEREUPON:

4                        MR. YURI DEBEVC,

5        Called in these proceedings and having been first duly sworn

6        testifies as follows:

7                THE CLERK:  Thank you.  Be seated on the witness

8        stand.

9                        DIRECT EXAMINATION

10       BY MR. CLUKEY:

11        Q. Good morning, Mr. Debevc.

12        A. Good morning.  I'm able to see the first box from this

13       angle.  Thank you.

14        Q. Mr. Debevc, you were involved in the 90% loan program

15       from 1998 through the end of 2005; is that right?

16        A. That is correct.

17        Q. You were a coowner of Derivium Capital?

18        A. I was a minority owner starting in 2000.

19        Q. Starting in the year 2000?

20        A. I joined Derivium First Security Capital as an employee,

21       and then I was given a participation in the company that was

22       essentially backdated to my joining; however, that happening

23       in late 1999 or 2000.

24        Q. You say "backdated".  There was an agreement in place

25       that at one point in time -- we are going to see that

DEBEVC - DIRECT

1    document later on -- but there was a document that was

2    backdated to reflect ownership at an earlier point in time?

3     A. At an earlier point in time.  Actually, when I wasn't

4    even -- back to January of 1998 when I was not even here.

5     Q. And you signed the document saying that you were an owner

6    in 1998, and you weren't really an owner in 1998.

7          Is that right, Mr. Debevc?

8     A. This was something presented to me by the attorneys for

9    the company and they said it was fine and I believed the

10   attorneys.

11    Q. You also owned a company called Veridia, didn't you?

12    A. Yes, I did.

13    Q. And so if we look on this chart here we see Derivium

14   Capital, and we see that company Veridia?

15    A. There was one in, I think -- I believe December of 2002,

16   early 2003.

17    Q. And what's FSC on here?

18    A. That would be First Security Capital.  When I joined the

19   firm, it was called First Security Capital, and there was a

20   name change to Veridia Capital, I believe in January of 2000.

21    Q. So right here we've got a box name of a company FSC First

22   Security Capital.  There is a name change, still the same

23   company, right?

24    A. Name change only.  Correct.

25    Q. And then -- we are going to get into this a little bit

DEBEVC - DIRECT

1    later -- but then the company splits up into two companies

2    doesn't it?

3    A. Um, that is correct.

4    Q. And you own this company a hundred percent, right?

5    A. That is correct.

6    Q. You owned 25 percent of this company, right?

7    A. That is correct.

8    Q. Charles Cathcart owned 50 percent?

9    A. That is correct.

10   Q. And Scott Cathcart, his son, owned 25 percent; is that

11   right?

12   A. That is also correct.

13   Q. Now, Mr. Debevc, when a 90% Loan customer gave Derivium

14   stock, that stock was sold, wasn't it?

15   A. Um, yes, it was.  It's a first part of the hedging.

16   Q. It was sold?

17   A. Yes.  It was sold that -- the sale was necessary.  If I

18   may explain?

19   Q. We'll come back to this.

20        THE COURT:  No, he can explain an answer.

21        Go ahead.

22        THE WITNESS:  May I?

23        THE COURT:  Yeah.

24        THE WITNESS:  Thank you.

25        The sale of the stock was used at -- the valuation

301

DEBEVC - DIRECT

1   of the sale of the stock was used to calculate the value of

2   the stock.  So the sale was a necessary ingredient to

3   determine the value of the stock.

4    Q. The sale of the stock actually was necessary to determine

5   the amount of the loan, wasn't it?

6    A. The value of the -- the value of the stock, and then

7   calculate 90 percent of that value, is the loan.

8    Q. Derivium didn't even know how much to loan a customer

9   until it sold the stock; isn't that right?

10   A. Um, that was correct and that was in the documentation.

11        There was an estimate as to what the value of the

12   stock would be, but not the exact value until the stock was

13   sold.

14   Q. All right.  So the way the program worked, a customer had

15   a stock, transfer the stock to Derivium, and you would give

16   an estimate at that point in time just by looking on

17   Bloomberg, looking on some market information; is that right?

18   A. Negative.

19        The customer would know what their stock --

20   approximate the share price was.  And they had the need for a

21   certain amount of cash or loan, they would calculate, more or

22   less, how much their stock -- how much of their securities

23   they needed to transfer.  And the loan was based on that --

24   the documentation was based on that approximation.

25   Q. The documentation was based on the approximation, but the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1    actual amount of the loan was based on the sale amount; isn't

2    that right?

3        A. That is correct.

4        Q. Mr. Debevc, you and your employees told customers, after

5    the stock had been sold, you told them it had been hedged,

6    didn't you?

7        A. That was -- the sale was, in fact, the hedge.

8        Q. You didn't tell them it was sold, though, did you?

9        A. Um, the -- no, we did not, but the sale was -- from the

10   program to Dr. Cathcart, was for trade as a hedge, initial

11   hedge.

12       Q. I just want to make sure I'm clear:  You did not tell

13   customers their stocks had been sold; is that right?

14       A. That is correct.

15       Q. Between 1998 and 2000, I believe you said the 90% Loan

16   Program generated nearly a billion dollars in stock

17   transactions; is that right?

18       A. I don't believe that I said that.  Somebody else might

19   have said that, but it's approximately correct.

20           They presented approximately a billion dollars worth

21   of collateral, or approximately $90 million worth of stock

22   loans.

23       Q. You believe that to be true based on a billion dollars of

24   stock loans?

25       A. I think that is a good number.

DEBEVC - DIRECT

1    Q. Now, Mr. Debevc, you admit that some of the 90% Loan

2    customers that participated in this scheme did not get their

3    stock back; is that right?

4    A. That's correct.

5    Q. Some 90% Loan customers' loans, those were defaulted on,

6    right?

7    A. That is correct.

8    Q. Now, the first default was in 2001; is that right?

9    A. I don't recall, but maybe you can refresh my memory.

10            MR. CLUKEY: Show Mr. Debevc Exhibit 256.  It's going

11    to be item number 70, but don't publish it.

12    Q. It's item number 70.  You can go back to the first page,

13    Mr. Debevc.  You -- if you can take a look at this document,

14    it's on the screen in front of you.

15            Is there a document up on the screen in front of

16    you?

17    A. No.

18            THE CLERK:  No, there is not.  Hold on.

19            MR. CLUKEY:  Sorry.

20            MS. WEIS:  May I approach the witness, Your Honor?

21            THE COURT:  Sure.

22            THE CLERK:  We are not going to get it to him

23    without them seeing it.

24            MR. CLUKEY:  Is that right?

25            THE CLERK:  Yeah.

DEBEVC - DIRECT

1              MR. CLUKEY:  Okay.

2              THE CLERK:  It's off to the jury and to the

3     witness --

4              MR. CLUKEY:  I see.

5              THE COURT:  -- for the Judge to look at and

6     attorneys.

7              So you have a hard copy for him to look at?

8              MR. CLUKEY:  He's got one now.

9              THE WITNESS:  What am I looking at?

10    Q. So the first page of this document, you recognize this?

11    A. Yes, I do.

12    Q. The United States asked you for some admissions?

13    A. Correct.

14    Q. And then if you flip ahead to paragraph 70.

15    A. 70.  Thank you.  Yes, I see that.

16    Q. You see that?

17    A. Yes, I do.

18    Q. So I'll ask you again:  The first default, you would

19    agree, was in 2001; is that correct?

20    A. That refreshes my memory since -- that is correct.

21    Q. And the second default was in 2002?

22    A. Um, that is -- that is also correct from this document.

23    Q. All told, there was 126 customer defaults; isn't that

24    correct, Mr. Debevc?

25    A. I think that you would qualify that as in the timeframe,

DEBEVC - DIRECT

1    Bancroft -- rather Derivium, went bankrupt in September of

2    2005, I believe, and I don't know how many of those defaults

3    would have occurred after that date.

4    Q. But in the end, you are aware that there were 126

5    defaults on customers' 90% Loan obligations?

6    A. I'm not aware of the exact number, but there were

7    defaults.

8    Q. Would you look down at paragraph number 73, Mr. Debevc?

9         So you previously admitted that there were 126

10   defaults, didn't you, Mr. Debevc?

11   A. That is correct.  As I said, this is nine years ago.

12   Q. So there were approximately, in your view, approximately

13   1400 loans in the 90% Stock Loan, and of those 1400 loans,

14   126 loans went into default?

15   A. That is correct.

16   Q. You said it was nine years ago.  There were so many

17   defaults, it's hard to remember them all, isn't it, Mr.

18   Debevc?

19   A. I have been involved in this process for six years.  Yes,

20   it is.

21   Q. Mr. Debevc, former 90% Loan customers who had their

22   transactions defaulted on, they sued you for fraud, didn't

23   they, Mr. Debevc?

24   A. Yes, they did.

25   Q. And those customers won and got a judgment against you?

DEBEVC - DIRECT

1    A. Yes, they did.

2              MR. COOPER:  Objection, Your Honor.

3              THE COURT:  Basis?

4              MR. COOPER:  402, 403.  It's not a final judgment.

5              MR. CLUKEY:  That's exactly our point, Your Honor.

6    Goes to his credibility.

7              THE COURT:  All right.  It's okay.  Overruled.

8              THE WITNESS:  And that judgment is being appealed.

9    Q. So there is a judgment against you; is that correct?

10   A. There is a judgment against me and the company and all

11   the other parties.

12   Q. And that judgment is for fraud; is that right?

13   A. Um, yes, sir.

14   Q. Mr. Debevc, I want to talk about some taxes of yours, or

15   rather some taxes that you didn't pay.

16             For the years 2002, 2003, 2004, 2005, you paid $0 in

17   federal income taxes; isn't that right, Mr. Debevc?

18   A. I paid the social security tax and the Medicare taxes.  I

19   did not pay the income tax.

20   Q. You earned a good deal of money during that time, didn't

21   you, Mr. Debevc?

22   A. Yes, I did.

23   Q. You didn't have to pay any taxes on any of that money?

24   A. Apparently, since I also had ownership participation in

25   another entity, that the tax losses, according to

DEBEVC - DIRECT

1    accountants, those tax losses would be carried forward from

2    my tax return.

3        Q. And those tax laws were for -- those tax losses were

4    related to -- related to this company here, didn't it, Mr.

5    Debevc?

6        A. Yes, they did.

7        Q. This company Shenandoah is a startup entity; is that

8    right?

9        A. It, um -- yes, it was a startup company entity.

10       Q. So we've got startup entities, or startup companies here;

11   we've got the names of some companies; this isn't all the

12   startup companies; is that right?  This is just some of them?

13       A. I think this is the majority of them.  I don't recall

14   which is missing.

15       Q. So we've got a company Aquilus, C3, Scienda, Charleston

16   Aluminum, CCC -- which is Charleston Construction Company --

17       A. I believe so, yes.

18       Q. -- Steel Homes, Spray Foam and H2?

19       A. That is correct.

20       Q. These are primarily startup construction companies; is

21   that correct?

22       A. They were involved in one aspect or another, one aspect

23   of the construction business, with the exception of

24   Charleston Aluminum.

25       Q. Shenandoah is a company you owned -- coowned?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1    A. I beg your pardon?

2    Q. You coowned Shenandoah?

3    A. I was a coowner of Shenandoah, and the single portion is

4    Derivium Capital, 25 percent, 50 percent Charles Cathcart and

5    25 percent Scott Cathcart.

6    Q. So the ownership structure was the same for Derivium

7    Capital and Shenandoah; is that right?

8    A. That is correct.

9    Q. And these companies were funded through the sales --

10   through the proceeds of the sales of customer stocks in the

11   90% Loan Program; is that right, Mr. Debevc?

12   A. They were funded through Spencer -- you see a company

13   called Spencer Partners, and therefore, we directed.  That is

14   correct.

15   Q. Make sure I'm clear.  The money to fund these companies

16   came from the sale of customer stocks, the 90% Stock Loan; is

17   that right?

18   A. Negative.

19        The -- the customers received 90 percent of the

20   stock.  The ten percent that was left over was part of the

21   operating expenses and also the profit of -- and of the

22   profit to the lender, so --

23   Q. Those companies got $45 million, didn't they?

24   A. Yes, they did.

25   Q. That $45 million came from the sale of customer stocks,

DEBEVC - DIRECT

1     didn't it?

2      A. Yes.  From the ten percent that was left over.

3      Q. Okay.  So it's $45 million over to those companies, and

4     somehow you get to generate losses for your tax returns;

5     isn't that right?

6      A. Well, unfortunately, the majority of those companies

7     failed, and there -- I'm not an accountant -- but therefore,

8     the accountants said that they were losses.

9      Q. This is losses of $45 million that happened was because

10    you owned 25 percent of Shenandoah, you got to take roughly

11    25 percent of that $45 million as personal losses; is that

12    correct?

13     A. Um, that was my understanding.

14     Q. Okay.  It was 9 or $10 million, something around there,

15    something in that ballpark?

16     A. I think it was less than that, but...

17     Q. $7, $8 million, something like that?

18     A. Something to that effect.

19     Q. Now, did you ever personally have $7 or $8 million?

20     A. Never.

21     Q. But you got to take $7 or $8 million in losses on your

22    personal tax returns; is that right?

23     A. Um, that is true.  But the manufacturing business also

24    never had money, that was operating losses.

25     Q. This is -- this is your personal tax returns, you are

310

DEBEVC - DIRECT

1    taking $7 or $8 million of money that you never had; is that

2    correct?

3     A. I don't -- I'm -- the losses were flow-through losses

4    that were accounted for by accountants.  I am not an

5    accountant.  They were aware of these, this construction.

6     Q. Okay.  Mr. Debevc, I would like to talk about the losses

7    that you took in 2005.

8             MR. CLUKEY: If you could pull up Exhibit 297, which

9    we would like to move into evidence, Your Honor.  You already

10   ruled on that --

11            THE COURT:  Okay.

12            MR. CLUKEY:  -- before the break.

13            THE COURT:  All right.

14            (Thereupon, Government's Exhibit Number 297 was

15   received in evidence.)

16            MR. CLUKEY: 297, page 58, please.

17            THE CLERK:  That's in evidence, right?

18            MR. CLUKEY:  Yes.  It's in evidence.

19            THE CLERK:  Okay.

20            MR. CLUKEY: So if we can go up to the top of the

21   page there, highlight the 1040, the top part of the box.

22   Come down.

23     Q. "Yuri Debevc.  2005."

24            This is your tax return; isn't that right, Mr.

25   Debevc?

DEBEVC - DIRECT

1    A. That is correct.

2            MR. CLUKEY: Scroll out.  And we go down.  Can you

3    highlight the box, basically the bottom half of the document?

4    Q. "Wages, salaries, tips."

5            Mr. Debevc, you made $220,000 in 2005; is that

6    right?

7    A. That is correct.

8    Q. Let's look at the amount that you paid.  We've got --

9    that's back on the front page.  Oh, no, I'm sorry.

10           If you look down on where we just were, the prior

11   page, if you look down in box 36, 37 down there, just do the

12   whole "adjusted gross income."

13           This is your adjusted gross income, line 37 minus

14   $7 million.  So $7 million you never had; is that right, Mr.

15   Debevc?

16   A. This was a pass-through loss.  That is correct.

17   Q. You paid zero income taxes that year, 2005; is that

18   right?

19   A. That is correct.

20   Q. Mr. Debevc, tell me, who is your accountant?  Who

21   prepared this return for you?

22   A. It was my CPA.

23   Q. Who is that?  What's his name?

24   A. Robert Nagy.

25   Q. Robert Nagy.

DEBEVC - DIRECT

1          Robert Nagy said you could take $7 million in
2    losses, money that you never had; is that right?
3    A. He is a CPA who prepared -- based on the data that was
4    available to him, he prepared the tax return.
5    Q. You trusted what Robert Nagy told you, didn't you?
6    A. Yes, I do.
7    Q. Mr. Debevc, I would like to go ahead a few pages --
8    actually to page -- or back, sorry, back a few pages to page
9    36 -- and I'll ask before we get there:  In 2004 you made
10   $268,000; isn't that right?
11   A. That's probably correct.
12   Q. That's a pretty good year for you, wasn't it?
13   A. Yes, it was.
14   Q. Paid zero in taxes that year, didn't you?
15   A. That is correct.  It was flow-through losses from the
16   Shenandoah entities.
17   Q. Let's highlight the top box again.
18          Yuri Debevc, income tax return, 2004.
19          Down to the bottom, second half.  See the bottom?
20   It's your adjusted gross income, negative 8 million.
21          $8 million you didn't have; isn't that right, Mr.
22   Debevc?
23   A. That is correct.  That was as a result of the
24   flow-through losses from the Shenandoah entity.
25   Q. So you paid zero taxes in that year?

313

DEBEVC - DIRECT

1       A. That is correct.

2       Q. And who was your --

3       A. Other than the social security tax and the --

4       Q. FICA that's taken out automatically.

5       A. FICA.  Those were all paid to the maximum.

6       Q. Who was your tax return preparer this year?

7       A. Robert Nagy.

8       Q. Can we highlight the preparer's -- on the bottom there,

9       that's Mr. Nagy's signature on there, isn't it?

10      A. That appears to be, yes, Mr. Nagy's signature.

11      Q. 2002, 2003, paid zero in income taxes again; is that

12      right?

13      A. That is correct.  And I paid the FICA and the social

14      security.

15      Q. Let me guess.  Tax return preparer, Robert Nagy?

16      A. That is correct.

17      Q. Mr. Debevc, you met Robert Nagy around 1998; is that

18      right?

19      A. Um, no, it was towards the end of 1998.

20      Q. And he did work for Derivium and Derivium-related

21      companies for years, didn't he?

22      A. He was introduced as the CPA for the -- then for Security

23      Capital.

24      Q. He was the CPA for First Security Capital way back in the

25      beginning, right?

314
DEBEVC - DIRECT

1      A. I don't know about the beginning because I was not there

2      at the beginning, but when I joined in towards the end of

3      1998 or the beginning of 1999, I was introduced to Mr. Nagy,

4      and at that time the entity was known as First Security

5      Capital.

6      Q. And he was the -- he was the CPA for First Security

7      Capital?

8      A. Yes, sir, the CPA for the firm.

9      Q. He was the CPA for Derivium Capital, wasn't he?

10     A. That is correct.

11     Q. He was CPA for Veridia, right?

12     A. That is correct.

13     Q. CPA, as far as you know, for Derivium USA?

14     A. I don't have any knowledge on that.

15     Q. You've got this company hanging out down here, FSC

16     Canada.  What was that?

17     A. That was a subsidiary that was formed at the end of year,

18     sometimes in, I don't have the year recollection, either 2000

19     or 2001, to explore the security of the 90% Stock Loan in

20     Canada.

21     Q. It's a company that you owned, it's one of your subs?

22     A. I did not own it.  I did not have any -- to the best of

23     my knowledge, I had no participation in that company.  I

24     don't have information.

25     Q. You don't recall whether Derivium owned 100 percent of

DEBEVC - DIRECT

1    FSC Canada?

2    A. I do not recall the specific structure of that

3    organization.

4    Q. Fair enough.

5         To your knowledge, Robert Nagy was the accountant

6    for FSC Canada, wasn't he?

7    A. I cannot speak to that.  I don't know.

8    Q. Mr. Nagy told you at one point in time that he considered

9    Derivium to be his number one priority client, didn't he?

10   A. When you say that he told me that, I don't know that  --

11   whether he told me that or not, there might have been in some

12   memo.

13   Q. Okay.  Let's pull up Exhibit 200, which is in evidence.

14        Go to, if we could, the top half of the document.

15        From Charles Cathcart to Yuri Debevc.  Let me see.

16   FCI.  "Re: Bob's loan.  In dealing with same, please call me

17   for feedback."

18        Look at the date there.  It's December 17, 2003?

19   A. Correct.

20        MR. CLUKEY: If we scroll out and if we could

21   highlight the bottom half of that document.

22   Q. We see Mr. Nagy's writing Charles Cathcart.  He's talking

23   about a loan in the amount that he owes to Shenandoah for

24   $142,000?

25        So Mr. Nagy has a loan from this company, one of

DEBEVC - DIRECT

1       your companies that you own, correct --

2        A. That is correct.

3        Q. -- for $142,000.

4              And he says, that's the original principal amount

5       without interest.

6              The next line below there and then the next line

7       after that says:  "The agreement called for an interest

8       amount that was to be calculated based on a stated return

9       from a project that I anticipated would provide significant

10      returns."

11             If we go to the next page, let's highlight all that

12      text.

13             And Mr. Nagy's proposing a deal here for you, isn't

14      he?

15       A. The document speaks for itself.

16       Q. So he's owed some money from some of your own companies,

17      right?  He's done some work, it looks like, it says DC USA.

18             So that's Derivium Capital USA, right?

19       A. That is not a company that I had any ownership in.

20       Q. And Veridia, that's a company you had ownership in,

21      right?

22       A. Small amount.  600 and some odd dollars.

23       Q. But he owed you some money or you owed him some money, it

24      looks like, right?

25       A. Probably after tax operation or some service that we

DEBEVC - DIRECT

1    provided to the company.

2    Q. $55,000, that's some tax preparation.  Is that how you

3    get $7 million in losses that you don't really have?

4    A. Excuse me.  Veridia was needed to pay a balance of 600

5    some odd dollars.  If you look at the first page at the

6    bottom, I can only speak to that.

7    Q. Okay.  Fair enough.

8         So he says here, we have -- if we look at the

9    bottom, it's the bottom portion right there -- "We have not

10   discussed the matter of interest on the note.  Certainly, I

11   am very appreciative of your assistance when I desperately

12   needed it.  From my standpoint, I have attempted to put your

13   group in my number one priority position."

14        He's talking about the Derivium Group, right?  This

15   Derivium Group of companies; is that right?

16   A. That's what the document says.

17   Q. "Have hopefully been of significant assistance to you,

18   and have billed my time at less than a standard rate,

19   virtually since the inception of our relationship.  I have

20   continued to work on your accounts despite the financial

21   problems and the datedness of some of the invoices.  Taking

22   all this together, I respectfully request that we forego

23   interest on the balance owed."

24        He's asking you, I don't want to pay interest on

25   this -- this $142,000 loan; is that right?

318

DEBEVC - DIRECT

1    A. Excuse me, sir.  This document was directed to Mr.

2    Cathcart and Mr. Cathcart send that to me only for -- for

3    your information.

4    Q. Well --

5    A. I was not part of the -- let me finish.

6    Q. Sure.

7    A. I was not part of this discussion.  And this document is

8    directed at Mr. Cathcart, who was the principal owner of the

9    company, and that he made this loan arrangement with Mr.

10   Nagy.  And now --

11   Q. Mr. Cathcart made the loan arrangements directly with Mr.

12   Nagy; is that right?

13   A. That would be my belief.

14   Q. Let's look at the bottom.  Please review this proposal.

15   "Discuss it with Yuri"?

16   A. And Scott.  He's asking to discuss this proposal with the

17   owners of Derivium.

18   Q. So Mr. Nagy is sending this to Charles Cathcart, asking

19   him to discuss it with you and Scott.  "Best regards, Bob,"

20   right?

21   A. That's what this says.  However, this document, this

22   request, was initially directed at Charles Cathcart and

23   Charles Cathcart then shared it with us.

24   Q. If we go back to the first page.  The very top again.

25        "FYI.  Please call me with feedback."

DEBEVC - DIRECT

1          And it's directed to Yuri Debevc.  So you got this

2     document, right, Mr. Debevc?

3      A. Yes, I did.  I'm not denying that I did not get it.

4      Q. And after this time -- this document was in 2003 -- after

5     this time, Mr. Nagy continued to work on the 90% Loan scheme,

6     didn't he?

7      A. Um, what you call -- what you mean by --

8      Q. He continued to be -- he continued to be involved, he

9     continued to provide tax memos; do that type of stuff; is

10    that right?

11     A. I believe there were some tax memos that were related

12    after those days.

13     Q. Actually, he continued to work on the 90% Loan scheme

14    well into 2005, didn't he?

15     A. I think that there were some memos that are dated 2005,

16    correct.

17     Q. And he got paid even after -- they got paid in 2005.  He

18    was profiting off of the 90% Loan scheme in 2005, wasn't he?

19     A. I would have to take a look at the records, what he was

20    paid or what he was not paid in 2005.

21     Q. Let's pull up Exhibit 193, please.

22          Mr. Debevc, is that your signature on this check?

23     A. That is correct.

24     Q. What's Meridian Services Ltd.?

25     A. It is the legal end of that Bob Nagy owned.

DEBEVC - DIRECT

1    Q. It's Bob Nagy's company?

2    A. Bob Nagy's company.

3    Q. How much is this check for, Mr. Debevc?

4    A. $20,000.

5    Q. What is this check dated?

6    A. The check is dated March 1, 2005.

7    Q. You see in the side there, "Check applied as follows,

8    Derivium, $8,849 dollars," caps S.  What's that?

9    A. I --

10   Q. Is that Scott Cathcart?

11   A. I don't know.  That is not my handwriting, sir.

12   Q. Okay.  "Debe."  Is that you, Debevc?

13   A. I don't know.

14          As I said, this is not my handwriting.  I did not

15   make those notations.  The individual that made those

16   notations should be able to describe them to you.

17   Q. You think it might be you, though, Debbie?

18   A. Possible.

19   Q. Debevc?

20   A. It's possible, $685.

21   Q. Shenandoah.  That's Shenandoah, right, "S H E N,"

22   Shenandoah?

23   A. That's speculation, but it would seem reasonable.

24   Q. CDC, Charles Cathcart, right?

25   A. Right.

DEBEVC - DIRECT

1   Q. "Scien," Scienda.  That's Scienda, right?

2   A. That would -- that -- as I said, the individual that made

3   those notations should be able to explain what those

4   notations are.

5   Q. Robert Nagy also continued to do work for other companies

6   after this, other companies related to the 90% Loan scheme,

7   didn't he?

8   A. Which other companies would that be?

9   Q. Bancroft?

10  A. I would not know.  I wouldn't see any.

11  Q. Actually, Mr. Debevc, you paid Robert Nagy for work on

12  Bancroft, didn't you?

13  A. It is -- I paid, as a matter of course of operations, we

14  paid many invoices.  You would have to refresh my memory.

15  It's possible.  But as I said, during the span of ten years,

16  many courses were paid.

17  Q. You paid Mr. Nagy for work in Bancroft in 2005, at least

18  in 2005, didn't you?

19  A. I don't recall such a payment, but if you have a document

20  that shows that, it's very possible that we did.

21  Q. I'm going to show you something in just a second.  "DDA

22  Ireland."  That was a supposed lender in this scheme, wasn't

23  it?

24  A. That was a lender that was in place before I joined the

25  company.

DEBEVC - DIRECT

1    Q. Okay.  Then it went away, right?

2    A. The DDA, I imagine under the circumstances of the

3    transfer, sold the portfolio to Bancroft Ventures.  I don't

4    know the financial terms.

5    Q. We are going to get into that a little bit later, but

6    then Bancroft becomes the supposed lender in this scheme;

7    isn't that right?

8    A. Bancroft, to the best of my knowledge, was the lender.

9    Q. Okay.  WITCO.  That was another supposed lender in the

10   scheme, wasn't it?

11   A. I believe that they did maybe half a dozen for ten

12   months.

13   Q. Optech, another supposed lender in the scheme?

14   A. It was a lender in Hong Kong.

15   Q. Optech is in Hong Kong, is that right?  You just said

16   that.

17   A. That's correct.

18   Q. WITCO is in the United Kingdom?

19   A. That is correct.  That's my belief.  I don't know that

20   that is correct, but that's my belief.

21   Q. Bancroft is in the Isle of Man?

22   A. Um, Bancroft is in Isle of Man, whether the entity that

23   we dealt with in Charleston was the Bancroft Ventures in

24   United Kingdom.

25   Q. And DDA was in Ireland; is that right?

DEBEVC - DIRECT

1      A. Um, DDA?

2      Q. Supposedly.

3      A. The point of contact for DDA was an attorney by the name

4      of Cliff Lloyd.

5      Q. An attorney by the name of Cliff Lloyd?

6      A. Correct.

7      Q. He was your contact person for this Irish company, DDA?

8      A. Correct.

9      Q. Cliff Lloyd was also an employee of Derivium Capital,

10     wasn't he?

11     A. He was.  It is my understanding that, not Derivium

12     Capital, but First Security Capital, he was one of the

13     members of First Security Capital before I joined.

14     Q. He was an owner of First Security Capital, wasn't he,

15     Cliff Lloyd?

16     A. I believe so.

17     Q. And he's also the point of contact for this company,

18     isn't he?

19     A. I believe so, but -- I don't know the relationship there

20     between Cliff Lloyd, but he was a point of contact for that

21     lender.

22     Q. Actually, he formed this company, didn't he?

23     A. I don't have any knowledge about that.

24     Q. You think he did, don't you?

25     A. I don't know.

DEBEVC - DIRECT

1          THE COURT:  This might be a good time to take a

2     morning break because Amy has been going about an hour and a

3     half.

4          MR. CLUKEY:  Perfect, Your Honor.

5          THE COURT:  Ladies and gentlemen, go to the jury

6     room and relax and we'll start again in about 15 minutes.

7              (Thereupon, the jury retired from the courtroom.)

8          THE COURT:  Start again at quarter till.

9              (Thereupon, there was a brief recess.)

10         THE COURT:  All right.  Anything before we bring the

11    jury back in?

12         MR. COOPER:  My concern is on that 801 objection

13    where he said, Your Honor, he said conspiracy on the ruling

14    and then you overruled the objection, I mean, that -- the

15    jury, from my point of view, took that to mean that you ruled

16    there was a conspiracy and --

17         THE COURT:  You want me to declare a mistrial and

18    we'll start over again?

19         I think it was -- if it happens again, just cite the

20    Rule, and we'll do the 802, whatever it is, 802(2)(1)(e).

21         MR. COOPER:  I mean, I just find that highly

22    prejudicial coming out of --

23         THE COURT:  Okay.  So I mean, there is two things

24    you can do.

25         One of the things, you can ask me to instruct the

DEBEVC - DIRECT

1    jury that when I use the term "conspiracy," it doesn't mean

2    anything and it's not pejorative or anything, which

3    highlights it to the jury, or you can figure out that they

4    just blew it off, kind of an aside.

5        You let me know what remedy you want me to do and

6    I'll consider doing it, but you don't have to do it right

7    now.

8        MR. COOPER:  Okay.  I just -- thank you.

9        THE COURT:  But don't -- don't use that word again,

10   okay?

11       MR. CLUKEY:  I'm sorry, Your Honor.  I couldn't

12   remember the specific rule, that's why I tried not to use it.

13       THE COURT:  801(d)(2)(E), I think, all right?

14       MR. SEACORD:  There are a number of exhibits that we

15   can either agree with Mr. Cooper or there is no objection to;

16   or like yesterday, it was Mr. Debevc that objected, and we

17   would like to read them in, five of them.

18       THE COURT:  Okay.

19       MR. SEACORD:  Government Exhibits 3, 43, 60, 81, 87,

20   90 and 101.

21       (Thereupon, Government's Exhibits 3, 43, 60, 81, 87,

22   90 and 101 were received in evidence.)

23       MR. COOPER:  What was the last one?

24       MR. SEACORD:  101.

25       MR. COOPER:  I have an objection to 101.

DEBEVC - DIRECT

1          MR. CLUKEY:  We just resolved that.

2          THE COURT:  Okay.  So 3, 43, 60, 81, 87, 90 and 101

3    in evidence without objection.  Okay.  Bring them in.

4          (Thereupon, the jury returned to the courtroom.)

5          THE COURT:  Okay.  Mr. Clukey?

6          MR. CLUKEY:  Thank you, Your Honor.

7    Q. Mr. Debevc --

8    A. Let me just check the court reporter that this -- she can

9    hear me well.

10   Q. Mr. Debevc, when we left off, you were telling us about

11   DDA, FSC and a gentleman by the name of Cliff Lloyd.

12   Q. Cliff Lloyd was a former owner of FSC Capital, or I'm

13   sorry, First Security Capital?

14   A. I believe so, and he was also an attorney.

15   Q. And he was your point person for DDA.  You knew that much

16   about him, right?

17   A. He was the one that had the relationship with DDA.  That

18   is what was --

19          MR. CLUKEY: Can you pull up Exhibit 45 in evidence?

20   Q. Look at the top half of this document, please.

21          This is one of Robert Nagy's tax memos that he

22   provided to Derivium, isn't it?

23   A. Um, I'm not sure that I saw all the tax memos, but it

24   appears that from the tax, that it appears that.

25   Q. And we see up in -- who is this addressed to?  Dr.

DEBEVC - DIRECT

1    Charles Cathcart.  And what's the name there right below Dr.

2    Charles Cathcart?

3     A. Clifford Lloyd, Esq., company counselor and director of

4    legal services.

5     Q. I asked you if he was an employee earlier of Derivium

6    Capital and he was, wasn't he, Cliff Lloyd?

7     A. Well, I think at that time he was still a member of

8    Derivium Capital.

9     Q. So he was an owner of Derivium Capital?  He wasn't an

10    employee; he was an owner?

11     A. I believe -- I am not the legal expert, but it certainly

12    appeared that way, yes.

13     Q. Okay.  That's DDA Bancroft.  Bancroft takes over for DDA.

14    You just mentioned that a few minutes ago.

15     A. That is correct.

16     Q. And then Bancroft is the supposed lender really until

17    sometime in 2005, right?

18     A. Um, yes, in 2005.

19     Q. And you were here in the courtroom, weren't you, when you

20    heard the testimony that was read from Colin Bowen?

21     A. Yes, I was.

22     Q. And you heard that Colin Bowen testified that he was no

23    longer a director as of April, 2005.  You heard that, right?

24     A. That's the best -- I think that's what I --

25     Q. April 2005.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1            So Colin Bowen, the real guy, Bancroft in the Isle

2    of Man, you already testified Bancroft didn't do anything,

3    you heard that, right?

4    A. I heard that Bancroft -- I heard that he testified that

5    Bancroft Isle of Man did not do anything.

6    Q. Right.

7    A. He did not mention anything of Bancroft U.K.

8    Q. Bancroft Isle of Man didn't do anything, you already said

9    that, right?

10   A. That was his testimony.

11   Q. Now, Mr. Debevc, did you ever live in the Isle of Man?

12   A. I've never visited the Isle of Man.  I have never been to

13   the Isle of Man.

14   Q. You've never visited there; you've never lived there?

15   A. No, I did not.

16   Q. To your knowledge, did Mr. Nagy ever think you lived in

17   the Isle of Man?

18   A. I have no basis to believe that.

19   Q. You don't think he thought you lived in the Isle of Man,

20   do you?

21   A. I don't think so.

22           MR. CLUKEY: So can we pull up Exhibit 194, please?

23   It's in evidence.

24   Q. Mr. Debevc, is that your signature?

25   A. That is my signature.

DEBEVC - DIRECT

1    Q. Veridia Services, you testified earlier, that's Bob

2    Nagy's company, isn't it?

3    A. That is correct.

4    Q. This is a check for $10,000, you would agree with that?

5    A. That is correct.

6    Q. Let's look at the top.

7         Who are the checks from, Bancroft Ventures Ltd.,

8    Ioma House, Hope, Douglas, Isle of Man?

9    A. That is correct.

10        However, may I point out something?  This check is

11   from First Union Bank.  This was a domestic bank account

12   which the attorneys for Bancroft Ventures would instrument in

13   opening and giving us signature authority on that account.

14   Q. This isn't really a check from the Isle of Man, is it,

15   Mr. Debevc?

16   A. It is not a check from the Isle of Man.

17        As you can see by the issuing bank by First Union

18   National Bank, and that is a domestic bank in the United

19   States.

20   Q. But the address on the check is Bancroft Ventures, Isle

21   of Man, you agree with that?

22   A. Yes, I do.

23   Q. And it's issued to Bob Nagy's company, Meridian Services,

24   for $10,000.  Let's look at the date on the check.  6-15-05.

25   A. That had to be an invoice and that invoice had to be

DEBEVC - DIRECT

1    approved by somebody.

2    Q. We know Colin Bowen is not there anymore, don't we?  You

3    just testified he was gone in April of 2005.

4         Colin Bowen didn't approve it, did he?

5    A. I was not aware of that in April, in June of 2005.

6    Q. And that's your signature on the check, right?  You wrote

7    this check?

8    A. That's correct.

9    Q. Mr. Debevc, I would like to show you Exhibit 40.

10        You were here when Mr. -- when Mr. Bowen testified

11   about this document, weren't you?

12   A. Yes, I was.

13   Q. Now Mr. Debevc, you've told me in the past during one of

14   your depositions that you knew this -- about this document,

15   right?  You saw it in the past?

16   A. I saw it in the past and it was provided to me by the law

17   firm for Bancroft and Derivium, 10 State Street.

18   Q. You saw it in 2003; isn't that right?

19   A. I do not recall the exact date, but I'm sure that the

20   record is -- the records which I testified is correct, but I

21   don't -- I can't recall the exact date right now.

22   Q. You think 2003 is probably right?

23   A. It's very possible.  It could have also been in 2002.

24   Q. 2002/2003.  Okay.

25        So Mr. Bowen, say the first time he saw this

DEBEVC - DIRECT

1      document, was in 2008?

2       A. I can't speak to what Mr. Bowen saw or not.  This

3      document was provided to me by the attorneys for Bancroft, 10

4      State Street, and Mr. Tim Scrantom.

5       Q. Attorneys for 10 State Street?

6       A. Attorneys for Bancroft Ventures, their law firm of 10

7      State Street.

8       Q. 10 State Street.  I would like to talk about that.

9              10 State Street, were they located over here, in

10     Ireland or the Isle of Man?

11      A. No, they were located here in Charleston.

12      Q. Here in Charleston.

13             And they were Bancroft's lawyer, right?

14      A. They were attorneys for Bancroft.  To the best of my

15     knowledge, they were attorneys for Bancroft and they

16     presented themselves as such.

17      Q. They were also attorneys for Derivium Capital, weren't

18     they?

19      A. They were also attorneys for Derivium Capital.

20      Q. Same attorneys?

21      A. That is correct.

22      Q. So you heard Mr. Bowen testify this document was a

23     complete fabrication.  You heard that, right?

24      A. That's what I heard.

25      Q. You didn't authorize this picture to be used in this

DEBEVC - DIRECT

1     document.

2          You heard him say that, didn't you?

3     A. I had no knowledge how this document was produced.

4     Q. But you knew about it; you saw this document in

5     2002/2003?

6     A. I saw it on the website.

7          As a matter of fact, I -- you could have this copy

8     from my files because I copied it in my files.

9          MR. CLUKEY: I would like to pull up Exhibit 189,

10    please.  10 State Street.

11         It's in evidence.

12    Q. Take a look at this document, Mr. Debevc.

13    A. Yes, sir.

14    Q. From Robert Nagy, Yuri Debevc, 7-14, 2005, proposal from

15    Mr. Nagy to you; is that right?

16    A. That is, that is correct.

17    Q. I want to -- before we talk about it, a little context,

18    July of 2005.  July 2005.

19         You testified earlier customer defaults in 2001,

20    customer defaults in 2002, by July of 2005, there were a

21    whole bunch of customer defaults, weren't there, in the 90%

22    Loan stock program?

23    A. There were at that time, to the best of my recollection,

24    12 or 13.

25    Q. 12 or 13.  And ultimately, there were 126?  You testified

DEBEVC - DIRECT

1    to that earlier?

2    A. Right.  That occurred after Derivium, those numbers --

3    Q. July 2005, is that the only thing going on now, right?

4    You are getting sued by customers, correct?

5    A. Um, not -- not in July.

6         Go ahead.

7    Q. Well, you were sued before -- you were sued before this,

8    right?

9    A. The company was sued before.

10   Q. The company was sued before, okay.

11        Not you personally; Derivium Capital is being sued

12   now, right?

13   A. Correct.

14   Q. And there is other litigation that's going on, there is

15   other government entities that are litigating with you right

16   now, 2005, California Department of Corporations, for

17   example?

18   A. Um, that was -- that's still an ongoing case.

19   Q. And so Mr. Nagy's giving you a proposal.

20        "Yuri, the proposal is attached.  It's not fancy,

21   but I believe it encompasses our discussions.  Please review

22   with John and let me have any comments or changes.  Perhaps

23   you can give me a call after you both have reviewed it and we

24   can nail it down that way."

25        Let's flip ahead and see what this proposal is.

DEBEVC - DIRECT

1            "Current situation - FRN transactions generate

2       approximately $100,000 per quarter" -- it looks like --

3       what's an FRN?

4        A. That was a floating rate note that where the -- there are

5       certain interest payments that are generated on a quarterly

6       basis.

7        Q. Floating rate notes, it's kind of like a bond, right?

8        A. Not quite, but it's a specialized instrument that was

9       developed many years ago.

10       Q. So you got stocks.  Everyone knows what stocks are.  Then

11      you've got this other thing?

12       A. Which is essentially a corporate paper.

13       Q. It's a corporate paper?

14       A. Essentially a corporate paper.

15       Q. But it's similar to a bond, you are going to get an FRN,

16      and you are going to get payments over a period of time, like

17      bonds, bonds payoff; is that right?

18       A. More or less.

19       Q. Similar, yeah.

20            So the 90% Stock Loan, you used basically two

21      things, one was for stock transactions, customers producing

22      stocks, those are -- most of the transactions was stock,

23      right?

24       A. That would be the dominant share of business

25      transactions.

DEBEVC - DIRECT

1    Q. And you also had this other market you started to develop

2    with FRN transactions, correct?

3    A. That is correct.

4    Q. "Tentative Proposal To Continue FRN Administration

5    Support."

6         "Current situation - FRN transactions generate

7    approximately $100,000 per quarter."

8         That's for Derivium, right, generated $100,000 a

9    quarter?

10   A. Negative.  That was generating for the lender, Bancroft.

11   Q. Okay.  It was part of the scheme, it was generating

12   $100,000 a quarter; is that correct?

13   A. You continue to refer to this as "a scheme".  To the best

14   of my knowledge, Bancroft was a legitimate lender.

15   Q. Okay.  Generating $100,000 for the -- this -- whatever

16   you want to call it -- hundred thousand dollars is coming in;

17   is that right?

18   A. That is correct.

19   Q. And this is an assured cash flow for a potential 30 to

20   40 years.  Wow.  $100,000, 30 to 40 years?

21   A. This is only assured as long as the clients or customer,

22   or whoever is the borrower, is willing to pay the interest;

23   and also obviously depends on the tenor of the loan.  And

24   these loans were, in fact, between 17 and 28 years, but not

25   40 years, as you suggest.

DEBEVC - DIRECT

1          MR. CLUKEY:  If we can scroll out.  And actually, if

2     you could just blow up that section and see a little bit

3     more.

4          "Veridia Solutions has terminated its relationship

5     with Bancroft."

6     Q. Okay.  So we are in July of '05.  What's the date of this

7     document -- sorry.

8          First page.  July 14th, '05, right?  In July.

9          "Veridia Solutions has terminated its relationship

10    with Bancroft.  This means no entity is in place to service

11    the FRN loans.  Veridia is generating statements for the

12    second quarter of 2005 in the next day or so.  Once that is

13    completed, Veridia's services are completed."

14         "The FRN borrowers will be remitting interest

15    payments as soon as their statements are received.  No

16    structure or designated entity is in place to receive the

17    payments.  Borrowers will be concerned about going into

18    default, and there will not be any point of contact.  My

19    current understanding is that an address and phone number is

20    Cyprus has been provided, but there is no response."

21         If we can scroll out.  And this bottom half.

22    Starting with, "If there is no address."

23         "If there is no address to which payments will be

24    sent or forwarded, I assume that the payments will be

25    returned."

DEBEVC - DIRECT

1          So that means a hundred thousand dollars for 30 to

2     40 years, something doesn't happen, that money is going to go

3     back, customers are -- the way this is working with the

4     FRN's, people are sending in interest payments to part of

5     their --

6      A. Well, people would be hand -- sending in the interest

7     payments, which we deposited in the lender's bank account.

8     And obviously, Veridia severed the relationship with

9     Bancroft.

10          Also in mid-summer, in June, July, Bancroft is its

11     last act.  It sent out second, I believe, second quarter

12     statements.  And then with all the documentation in public

13     storage, and that was the end of the relationship between

14     Veridia and Bancroft.

15     Q. Okay.  So Veridia is doing this July, 2005?

16     A. And the reason that Veridia severed their relationship

17     with Bancroft is because the two would not get responses for

18     Bancroft in the responsibility of borrowers' inquiries.

19     Q. The FRN's -- the question I want to ask -- the program

20     worked basically the same way:  You've got stocks, you've got

21     FRN's, those both came in to Derivium and then the stocks

22     were sold and the FRN's were sold, too, right?

23     A. The FRN's were also sold; however, the pricing mechanisms

24     would be --

25     Q. But they were sold?

338

DEBEVC - DIRECT

1   A. That is correct.

2   Q. And so now customers, they don't know their FRN's had

3   been sold and they are remitting payments in to the program,

4   right?

5   A. However, unlike the stock, the floating rate notes never

6   appreciate in value.

7   Q. So there is no hope for appreciation of a floating rate

8   note, is there?

9   A. It is, because essentially, the difference and the tenor

10   of the loan was before the maturity of the commercial date.

11   Q. Now, I know you are not an accountant, but you are aware

12   that because there are FRN's and they are structured

13   differently when they are sold, there are even bigger tax

14   problems with selling an FRN, weren't there?

15   A. I'm not aware of -- I did not deal with tax matters on

16   that -- on those loans.

17   Q. Now, Derivium was told by Robert Nagy that there were

18   serious problems with selling an FRN, didn't they?

19   A. I saw memos that were addressed to Charles Cathcart that

20   were shared, and the Government, that were shared with me.

21   Q. So Robert Nagy wrote memos to Charles Cathcart saying

22   there is problems with selling these FRN's and those were

23   shared with you?

24   A. That is correct.

25   Q. Well, what kind of proposal are we talking about here?

339

DEBEVC - DIRECT

1           This is Robert Nagy's proposal to you, right?

2      A. This is not Robert Nagy's proposal, essentially to

3      Veridia, rather than he is addressing me as Veridia.

4      Q. Okay.  What is it?  What's he doing here?

5      A. The meaning of this proposal would be to have -- to

6      continue to service this, um -- this -- the document says the

7      former company which will continue to serve as the floating

8      rate note business.

9      Q. Robert Nagy's proposing to you to form another company,

10     we don't have enough companies here, right?  "Let's form

11     another company, then we can service these FRN's that are

12     sold that are problematic from the tax laws."

13          Robert Nagy is proposing that to you.  Did you take

14     him up on his offer, Mr. Debevc?

15     A. Not at that time did it materialize.

16     Q. You said no thanks?

17     A. No.  That is correct.

18          MR. CLUKEY: I would like to pull up Exhibit 101,

19     please -- I'm sorry -- can we go back to that one second?  We

20     can just do "The proposal," just the top part.

21          "Newco will be formed immediately and will contract

22     with BVL and probably Optech also" --  Optech on here on the

23     chart -- "to continue loan administration.  Newco will be a

24     domestic entity and will perform loan administration related

25     strictly to FRN transactions."

DEBEVC - DIRECT

1              If you pull up Exhibit 101.  Okay.  Top there.

2              "Robert Nagy, Certified Public Accountant, to Cliff

3      Lloyd.  Cliff Lloyd, FSC, DDA, Derivium Capital, Cliff

4      Lloyd."

5              We talked about that earlier, correct?

6      A. That -- this is our 1999, the top priority was sometime I

7      think in 2003 or '4.

8      Q. Okay.  But Cliff Lloyd is the same guy we were just

9      talking about, right?

10     A. He is the same individual.

11     Q. Tim Scrantom.  Who is Tim Scrantom?

12     A. Tim Scrantom is the principal attorney for 10 State

13     Street.

14     Q. 10 State Street, the firm that you just mentioned

15     representing Derivium Capital?

16     A. The law firm represented Derivium Capital and also

17     represented Bancroft.

18     Q. It also represented Bancroft.

19              It also represented Optech, didn't it?

20     A. I am not aware of their representation of Optech, but I

21     believe so.

22     Q. Represented WITCO, too, didn't it?

23     A. I believe so.

24     Q. Represented Spencer, didn't it?

25     A. I believe so.

DEBEVC - DIRECT

1    Q. Represented Shenandoah?

2    A. I believe -- I believe so.

3    Q. So Tim Scrantom's a lawyer at 10 State Street

4    representing all these companies; is that correct?

5    A. That is correct.

6    Q. And Robert Nagy's writing Cliff Lloyd and Tim Scrantom

7    and Bob Brandenburg.

8         Who is that?

9    A. Bob Brandenburg was the internal accounting person for --

10   for First Security Capital, Derivium Capital after the name

11   changed.

12   Q. Okay.

13        MR. CLUKEY: Can we zoom out?  Go to the next page,

14   please.  If you just blow up "the tax".

15   Q. Robert Nagy is writing to Cliff Lloyd from Bob Nagy,

16   1999?

17        "Meeting issues.  I thought I would get this out to

18   you today."

19        And then the next paragraph says:  "I think that we

20   should plan to conclude the meeting with a firm plan in

21   place.  The current structure is fraught with problems.  The

22   longer it continues, the more transactions pile up in this

23   problematic entity.  Not only do we need to untangle the past

24   to the extent possible, but we need to design the proper

25   structure in which to move forward for the future.  We want

DEBEVC - DIRECT

1   to be sure that the new structure is in place and ready to go

2   by the end of the year."

3          Mr. Debevc, were you directly involved in this?  You

4   know this is talking about restructuring DDA, right?

5   A. I, um -- Mr. Clukey, I believe that I told you that at

6   that point in time I was an employee not privy to these

7   discussions.  I was still an employee for Security Capital,

8   and I became an owner sometime in the very late 1999 or 2000.

9          So this discussion was for -- because I became an

10  owner, a minority owner, as Cliff Lloyd left the firm.

11  Q. Okay.

12  A. So --

13  Q. So -- but you are working at Derivium Capital at that

14  time?

15  A. I'm strictly as an employee, and this document would not

16  have been shared with me.

17  Q. So Cliff Lloyd is an owner, he leaves, you step in as an

18  owner after this; is that right?

19  A. As a minority.  I receive a minority ownership position.

20  Q. Okay.  So Robert Nagy here is proposing how to

21  restructure what's going on.  He says down below:  "Review of

22  the discussion Tim and I have had and the problems we see

23  with the current structure."

24          And the number two.  "Desired relationship between

25  FSC, and DDA."

DEBEVC - DIRECT

1           Review of information requested my 10-3-99 memo to
2    you.  (We need this information in order to know exactly what
3    has transpired in the past, and what information is on file
4    with the different government entities."
5           What's FSC Texas?
6    A. It is my understanding that prior to First Security
7    Capital South Carolina in 1997, there was an entity called
8    First Security Capital Texas where some of the first loans
9    were generated.
10          Again, this was all done prior to my joining the
11   firm and so this is what I heard, but I don't know that to be
12   a fact.
13   Q. Discussion of FSC South Carolina, transfer of
14   assets/business from FSC Texas, ownership structure,
15   separation from DDA."
16          So it's your testimony that you weren't involved in
17   all this, but Bob Nagy was doing it at this point in time;
18   helping to restructure the company.
19          You weren't even involved that deeply because you
20   were just employed while Bob is doing all this; is that
21   right?
22   A. That is correct.
23          MR. CLUKEY: Pull up Exhibit 223, please.
24          Robert Nagy, a little later now, July 3rd.
25          Now, you are an owner of Derivium Capital at this

DEBEVC - DIRECT

1    point in time now, right?  July 2000?

2     A. I don't know exactly the date, but I bet it would be year

3    2000 that I became an owner.  I don't know whether on

4    July 3rd I was already the owner or not.

5     Q. Okay.  And so Mr. Nagy is writing to Charles Cathcart:

6    "Action items for DDA, Optech."  Let's scroll out.  Let's see

7    what he's talking about here.

8         "I met with Tim Scrantom" -- that's the lawyer who

9    represents all these entities we were talking about earlier,

10   right -- "this morning to discuss in detail the finite steps

11   to be taken to conclude the restructure.

12        "The items the three of us need to focus on are

13   listed below.  After each item, I have noted the initials of

14   the individuals who should handle each item.

15        "Item one.  We need to schedule and identify all

16   existing customer accounts.  These include not only the

17   brokerage accounts but any bank accounts or other accounts on

18   Derivium's books that hold accounts for assets belonging to

19   DDA.

20        "Open new broker accounts to receive existing

21   collaterals, collateral securities."

22        MR. CLUKEY:  Go back up to one.

23   Q. "RJN."

24        That's Robert J Nagy; is that right?

25   A. Um, that's what I would believe, yes.

DEBEVC - DIRECT

1    Q. And so we are looking at two.

2         "Open new broker accounts to receive existing

3    collateral securities.  The existing brokers will be

4    contacted after Tim drafts model letter to be given to each

5    broker explaining the transition, and after Optech receives a

6    federal I.D. number."

7         Optech.  That's the Hong Kong company, right?

8    A. That is correct.

9    Q. "CDC".  Is that Charles Cathcart?

10   A. That is correct.

11   Q. "YD".  Of course that's you, right, Yuri Debevc?

12   A. That is correct.

13   Q. "CWL".  Cliff Lloyd, is that right?

14   A. That's what I would imagine, that those are his initials.

15   Q. Okay.  Number three.  "Apply for federal I.D. number for

16   Optech.  RJN."  That's Robert Nagy.  We saw this was a

17   July 2000 memo.

18        Robert Nagy's the guy who applies for a federal I.D.

19   number for Optech in the United States, correct?

20   A. That is what -- the document speaks for itself.

21   Q. It does this in 2000.

22        Is Optech starting to get involved in this program

23   in 2000?

24   A. No, it does not.

25   Q. When does Optech get involved in this program?

DEBEVC - DIRECT

1     A. Um, Optech, if my memory serves me correctly, the first

2     loans for Optech were sometime in 2003.

3     Q. Item number five.  "Deliver old loan documents to

4     Optech."  Old loan documents in quotes.  Your name is by

5     that.

6          There were no old loan documents for Optech because

7     Optech hadn't been created yet?

8     A. That is correct.

9          And I also wanted to point out that this is a

10    proposal by somebody designating names that would wish that

11    those people would be doing those things.  That was not

12    necessarily the fact that the memo was followed.

13    Q. Good point.

14         Who was this proposal by?

15    A. This proposal is by Tim Scrantom.

16         MR. CLUKEY: Let's back out again.

17    Q. Who is on the letterhead at the top of this memo here?

18    A. Robert J. Nagy.

19    Q. This is Robert J. Nagy's proposal, isn't it?

20    A. I don't know whether it's his proposal or an

21    expression of -- it suggests, meaning that Tim, Tim Scrantom,

22    that it is an expression of that meeting.

23    Q. At a minimum, you would agree that Robert Nagy is

24    participating in the formation of Optech.  You would agree

25    with that, wouldn't you?

DEBEVC - DIRECT

1    A. I don't know what involved -- the document speaks for

2    itself -- I don't know what is involved in the company.

3    Q. The document speaks for itself?

4    A. Correct. "Identify other accounts existing or needed for

5    the transition from DDA to Optech. RJN. Make sure that the

6    terms of the marketing administration agreement between DDA

7    and Derivium, then FSC, has been reduced to writing. RJN."

8         I want to talk about that for a minute.

9         The terms of the Marketing Administration Agreement

10    between DDA and Derivium, there is no such agreement at this

11    point in time; it's got to be reduced to writing, correct?

12    A. Well, that's what the document suggests. I did not see

13    such an agreement.

14    Q. Right. That's right.

15         The document suggests that you didn't see such an

16    agreement; is that correct?

17    A. That is correct.

18    Q. And who is going to participate in that?

19    A. The initials that are shown are Charles Cathcart and RJN

20    and completed with Cliff Lloyd and Tim Scrantom.

21    Q. So Robert Nagy is going to help create a document that

22    doesn't exist between a company that doesn't exist then, FSC,

23    it's gone, it's now Derivium Capital.

24         Is that correct?

25    A. That's what the document suggests.

DEBEVC - DIRECT

1    Q. So the date on this document is July 3rd.

2              MR. CLUKEY: Can we get a copy of Exhibit 185?  It's

3    not in evidence.  Can you pull up 185?

4              THE CLERK:  185.

5              MR. CLUKEY: Let's do the bottom half, pull it up.

6    I'm sorry.  Go back at the top.

7    Q. So Mr. Debevc --

8    A. Yes.

9    Q. -- this says "To Yuri Debevc" is on there?

10   A. Yes.  This was a forwarding of a memo from Charles

11   Cathcart to Scott Cathcart and Yuri Debevc.

12   Q. And this would have been received by you July 5, 2000.

13             So a couple days after that, Robert Nagy's memo we

14   just saw on this transition --

15   A. That is correct.

16   Q. -- DDA transition?

17             MR. CLUKEY:  I would like to move this document into

18   evidence.

19             MR. COOPER:  402, 403 objection.

20             MR. CLUKEY:  It's concerning matters that Mr. Nagy

21   just wrote that memo about two days earlier, the same topic.

22   And what it's explaining is some of what's going on behind

23   the scenes and some of the people that are involved.

24             MR. COOPER:  Mr. Nagy is not on the --

25             THE COURT:  I don't think -- it's not the exception

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1    we talked about earlier.  I don't see -- what does it more or

2    less make a problem in this case?  I mean, it's not --

3           MR. CLUKEY:  It's not actual knowledge, Your Honor,

4    it's what Mr. Nagy had reason to know.

5           THE COURT:  But Mr. Nagy -- I don't know how you

6    connect it with Mr. Nagy, number one.

7           Number two, the bulk of that memo is not anybody

8    that we've ever heard of before.

9           MR. CLUKEY:  Right.  That's what I want to talk to

10   Mr. Debevc about.  Do you want me to lay the foundation?

11          THE COURT:  So I'll sustain the objection right now,

12   and when you move it back into evidence, we'll see, okay?

13   Q. Look at the bottom half, Mr. Debevc.

14          Who is David Kekich?

15   A. David Kekich was, I think, one of the original founders

16   of First Security Capital, but I don't know that it was First

17   Security Capital Texas or First Security Capital South

18   Carolina.

19   Q. But you know that David Kekich was involved in some

20   manner with FSC, whether it was FSC here in South Carolina,

21   in Charleston, or FSC in Texas; is that correct?

22   A. That is correct.

23   Q. And Mr. Debevc, you are aware that David Kekich and Cliff

24   Lloyd's interests in this program, in the 90% Loan program,

25   those interests were bought out, weren't they?

DEBEVC - DIRECT

1    A. They were bought out, I believe, sometime after the date

2    of this memo; sometime in 2000, yeah, 2000.

3    Q. And so in July, and going on through 2000, you received

4    correspondence and there were communications about buying out

5    David Kekich's and Cliff Lloyd's interests in the 90% Loan

6    program; isn't that correct?

7    A. I might have received the, um, correspondence to that

8    effect in this first -- sometime during the first half of

9    2000, because at that time it was -- the organization of the

10   company was openly discussed, and it was also discussed that

11   I would become a member.

12           So this is, for your information, that I might have

13   received some -- I don't know that I received all of the

14   communications.

15   Q. Some of these communications, and you were otherwise

16   aware, that David Kekich and Cliff Lloyd, their interests in

17   DDA, were bought out, too, weren't they?

18   A. I'm not aware of that.  I don't recall that that was the

19   case.

20           As I said, I paid casual attention to that because

21   that was something that was being done between Charles

22   Cathcart and the other partners.

23           MR. CLUKEY:  Your Honor, looking at the -- just the

24   bottom four paragraphs.  Your Honor, the second paragraph

25   there, we believe that establishes the relevance of this

                            DEBEVC - DIRECT

1     document.

2                 THE COURT:  You mean, "starting since"?

3                 MR. CLUKEY:  Yeah.  "I would be out of line" --

4                 THE COURT:  Well, I'll sustain the objection.

5      Q. Mr. Debevc, you, in fact, were told that David Kekich was

6      a founder of DDA, weren't you?

7      A. I don't know if I was told "you," I might be, but I don't

8      recall that specifically.

9      Q. Why don't you look down the page there, second paragraph,

10     in that bottom portion of the e-mail, tell me if you

11     remember --

12     A. Second --

13     Q. -- starting with, "Since I'm not".

14     A. Yes, but at the same time, I think that it also said, um,

15     "I may be just irritating Yuri and Scott there".  So we were

16     not there at the meeting.

17     Q. But my question is:  You were told that David Kekich and

18     Cliff Lloyd were founders of DDA, weren't you?

19     A. I don't see that in that sentence.

20     Q. I'll -- owners, yeah.  It says outside owners.

21                 MR. COOPER:  Your Honor, he's reading in the

22     document.  You sustained the objection.

23                 THE COURT:  Sustained.  Strike that and go ahead to

24     the next question.

25     Q. As you just mentioned, you understood that some meeting

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1    that is going to go on with David Kekich and Cliff Lloyd, for

2    some reason, David Kekich thought it was going to be annoying

3    to have you there?

4    A. Well, I think that there was -- as the organization of

5    the company was happening, perhaps they thought that they --

6    new people coming in sort of people, in wanting to be at the

7    meeting, that that would be annoying.  I mean, I think that

8    was his view.

9    Q. All right.  Mr. Debevc, I'll take that back.

10          You see another company on here, on this chart,

11   called Transcent.  You signed formation documents for that

12   company, didn't you?

13   A. Yes, I did.

14          The formation documents were drawn up and given to

15   me by 10 State Street, who was the attorney for Derivium

16   Capital, and they formed this company; said that this would

17   be ultimately for my benefit.

18   Q. Transcent is a company that was a company located in St.

19   Vincent in the Grenadines?

20   A. I don't believe it was located in -- I can't recall the

21   location -- that it was in St. Vincent in the Grenadines.

22   Q. You formed a company you don't even know where it was

23   located?

24   A. I trusted the attorneys and my partner, senior partner,

25   who is a Ph.D. in economics.  And they said this would be --

DEBEVC - DIRECT

1    that forming this -- ultimately, that it's going to be of

2    benefit down the road.  I trusted the individuals and I

3    signed it.

4     Q. Mr. Debevc, who was the protecter of that company

5    Transcent?

6     A. I don't recall who.  It's Robert Nagy, wasn't it?

7             I would have to take a look at the document to take

8    a -- as I said, I do not recall.

9             MR. CLUKEY: A copy of Exhibit 190, please.  Pull it

10   up.  Put it to page 4, please.

11    Q. Turn to page 4.  It's Exhibit Number -- that's 0222.

12            Mr. Debevc, that's your signature on the page?

13    A. Yes, it is.

14            MR. CLUKEY: Go back to the first page of this.

15    Q. And that's your name on the first page of this document,

16   Yuri Debevc?

17    A. That is correct.

18    Q. Could you go to page 14, please, 0232?

19    A. Did you say 14?

20    Q. Yes.  Thank you.

21            MR. CLUKEY:  Your Honor, I move this document into

22   evidence.

23            MR. COOPER:  Your Honor, 402, 403.  Mr. Nagy's name

24   is not even on this document, his signature.

25            THE COURT:  Overruled.

DEBEVC - DIRECT

1            (Thereupon, Government's Exhibit Number 190 was

2    received in evidence.)

3    Q. Could you pull this document up on the first page,

4    please, Mr. Debevc?

5    A. Yes, sir.

6    Q. "Ordinary Member Contract".

7            "Ordinary Member Contract is made this 17th day of

8    June, 2000 between Transcent Ltd., the company, a company

9    limited by guarantee and having a share capital, incorporated

10   in Saint Vincent and the Grenadines."

11           Does that refresh your recollection that you had a

12   company in Saint Vincent in the Grenadines?

13   A. That's what this document says.

14   Q. And the next line down there:  "Yuri Debevc, guarantor."

15           MR. CLUKEY: If we could flip ahead to page 4,

16   please.

17   Q. And you just told the jury that's your signature on the

18   bottom there, isn't it?

19   A. Yes, I did.

20   Q. If we could flip ahead to 14 pages to, it's .0232.

21           "Appointment Of Protector".  "Whereas the company

22   wishes to appoint Robert J. Nagy (the protector) as the

23   Protector of the Company with the rights and duties set out

24   in the bylaws."

25           "Now therefore, be it resolved that Robert J. Nagy

DEBEVC - DIRECT

1    be appointed Protector of the Company until further notice.

2    July 28, 2000."

3         Robert J. Nagy was the protector of your company,

4    this offshore company of yours, wasn't he?

5     A. That's what the document says.

6         MR. CLUKEY: Is Exhibit 58 in?

7         MR. SEACORD:  Yes.

8         MR. CLUKEY:  Pull this up, please.

9     Q. Mr. Debevc, we talked about this earlier.  You mentioned

10    a document that you signed when you became an owner of

11    Derivium Capital.  That wasn't really dated on the date, the

12    time that you signed it.  It was a document that was

13    backdated to make it look like it had been signed earlier,

14    right?

15    A. That's correct.  That's the writing.

16    Q. So here we've got a letter to Charles Cathcart, Yuri

17    Debevc in reference to the operating agreement.

18         "Dear Charles, Yuri and Scott" -- and we see the

19    date in the top, November 22nd.  If we can zoom out.  You see

20    there is a number on the bottom of the page.  Nagy 110, the

21    very bottom there, it's a Bates number indicating this

22    document came out of Robert Nagy's files.  And then if we can

23    zoom in on the text a little bit.

24         "Charles, Yuri and Scott.  On the cover of this

25    letter you will find a draft of the reference document for

DEBEVC - DIRECT

1    your review.  You will note the agreement is in the name of

2    First Security Capital" -- it relates back to the inception

3    South Carolina company -- "you will note that this agreement

4    is in the name of First Security Capital as it relates back

5    to the inception of the South Carolina company."

6            So this is in 2000.  The company is called Derivium

7    Capital at this point in time, right, Mr. Debevc?

8    A. There was a name change, that is correct.

9    Q. So you are being given a document, an operating

10   agreement, that is calling it First Security Capital, what it

11   used to be called, correct?

12   A. That is correct.

13   Q. If we scroll out again.  This is a document from Robert

14   Nagy's files -- zooming in on that reference -- "operating

15   agreement" -- about the middle.

16           That's Mr. Nagy's handwriting, isn't it?

17   A. I can't -- I'm not a writing expert.  I don't know that

18   that is or is not Mr. Nagy's handwriting.

19   Q. That's okay.  We'll ask Mr. Nagy about that.

20           MR. CLUKEY: And if we go to the next document.  This

21   is a cover letter.  If we can zoom in on this, include the

22   date down there on the bottom.  "Operating Agreement of First

23   Security Capital".

24   Q. What's the date on that agreement, Mr. Debevc?

25   A. January 2, 1998.

357

DEBEVC - DIRECT

1     Q. And you testified earlier you did not sign this on

2     January 2, 1998, did you?

3     A. That is correct, I testified to that fact.

4     Q. You signed this in -- sometime in 2000?

5     A. Um, in all likelihood around there.

6     Q. Mr. Debevc, Derivium got legal advice from a law firm

7     called Shartsisfriese in 2000 and 2001, didn't they?

8     A. They received legal advice from many law firms,

9     Shartsisfriese was one of them.

10     Q. Shartsisfriese told Derivium that the 90% Loan program,

11     they looked at it and they said it likely violates the

12     securities laws.  Didn't they tell you that?

13     A. It was a long memo, the relation -- I think the letter

14     speaks for itself.  I don't think I need to reread the

15     letter.

16     Q. As part of that advice, they told you that they didn't

17     think the loans were real.  They said, these aren't bona fide

18     loans in our view, didn't they?

19     A. No, um, I believe that the terminology was that if they

20     were not -- they are qualifying it -- if they were not, then

21     it could present a profit.

22     Q. They said those loans were probably not bona fide under

23     the securities laws, didn't they?

24     A. I don't recall that specific language, but if you are

25     telling me that that is in there -- it may be in there.

DEBEVC - DIRECT

1    Q. Can I get a copy of Exhibit 67, please?

2        Now, Mr. Debevc, as part of that, they also told you

3    if the loans aren't bona fide, it's going to present a

4    problem under the tax laws, didn't they?  But not genuine,

5    not real loans, that is going to be a problem for you in the

6    tax laws, right?

7    A. If it was a case that they were not, and I think there

8    was a reference made to that.

9    Q. And they told you you need to immediately go to a law

10   firm and get a legal opinion from a real law firm, respected

11   law firm, you need to do that immediately.

12       They told you that, right?

13   A. I believe that the phrase was you may want to go there.

14   I don't believe that it would be directed to go immediately.

15   The individual that wrote that memo was a securities

16   attorney, not a tax attorney, and suggested -- and that that

17   memo suggested to go seek a tax lawyer, did not say anything

18   about it immediately.  It says you may want to -- to take a

19   look at that; get another tax opinion.

20   Q. She urged you to go get a tax opinion, didn't she?

21   A. I don't know about the specific language that was used.

22   I think it would be, but it is in the document.

23   Q. Okay.  So you got a lawyer who has looked at the 90% Loan

24   program, and she's suggesting, shall we say, for you to go

25   get a tax opinion about the legality of this program, isn't

DEBEVC - DIRECT

1    she?

2     A. That's what the letter says.

3     Q. Derivium Capital tried to do that, didn't they?

4     A. Derivium Capital, the tax matters were purview of their

5    principal, Charles Cathcart and Scott Cathcart, which

6    together would seek law opinions.

7     Q. Derivium Capital tried to get a tax opinion from a law

8    firm called McDermott Will & Emery, correct?

9     A. My recollection of the conversation was that the

10   McDermott law firm wrote an opinion that -- and they wanted a

11   significant amount of money to write the same opinion for a

12   product which was almost identical, if not identical, to the

13   90% Stock Loan -- that they wanted a significant amount of

14   money just to produce the same work for Derivium.  And so it

15   was not -- so the principals did not go.

16    Q. Make sure I understand your testimony, Mr. Debevc.

17          Derivium Capital was recommended by a law firm,

18   Shartsisfriese, to go get a tax opinion on this program.

19   This is in 2001.

20          How this program really works under the tax laws,

21   you did go talk to a law firm in 2001 and they wouldn't give

22   you a legal opinion on this, saying this works under the tax

23   laws, will they?

24    A. Well, um --

25          MR. COOPER:  Objection, mischaracterizes --

DEBEVC - DIRECT

1           THE COURT:  Okay.  I think you need to rephrase that

2      question and lay a foundation for his knowledge of that

3      question.

4       Q. Mr. Debevc, Derivium Capital spoke with McDermott Will &

5      Emery in 2001, and they would not give Derivium Capital a

6      legal opinion saying this program was okay; isn't that true?

7       A. It is my understanding that Charles Cathcart, who is the

8      senior partner, contacted McDermott Will & Emery; that there

9      was discussion about producing law opinion; however, that

10     since they already produced a law opinion from a competitor

11     who had the identical product, they wanted excessive fees to

12     produce the same law opinion.  That's what was relayed to me.

13          MR. CLUKEY: Exhibit 69, please.  Can you pull that

14     up, too?  Just not on there.

15      Q. Take a look at this memo, Mr. Debevc.  We've talked about

16     this memo before, haven't we, Mr. Debevc?  We've talked about

17     this e-mail before?

18      A. Yes, I have.

19          MR. CLUKEY:  Your Honor, we would move Exhibit 69

20     into evidence.

21          MR. COOPER:  We have a 402, 403.  Mr. Nagy is not on

22     the e-mail to tax advice.

23          MR. CLUKEY:  This directly concerns the document

24     that he got from McDermott Will --

25          THE COURT:  Overruled.

361

DEBEVC - DIRECT

1              MR. CLUKEY:  Would you bring this up, please,

2    Exhibit 69?  And then can you bring up the top half there?

3    Mr. Debevc -- it says "May 25, 2001," Tim Scrantom, Scott

4    Cathcart, Yuri Debevc:  Opinions.

5              "FYI.  We can try to be responsive to this short of

6    providing financials, but the part about wanting to know

7    whether or not the lender is subject to insurance or banking

8    regulations and the general 'witch hunt' Karch is on over and

9    above what the assignment calls for suggests to me that we

10   will never satisfy them; and, even if we could, it would take

11   months to get them to a successful conclusion.

12             "Unfortunately as much as we like Jerry Kaplan, I

13   think we have to conclude that we are in the wrong pew with

14   McDermott, Will & Emery on this and we need to find another

15   firm to work with for tax opinions."

16             Mr. Debevc, you got this?

17    A. Yes, I did.

18    Q. Let's see what we are talking about here.  Let's see what

19   McDermott, Will & Emery is asking for.

20             MR. CLUKEY: If we can blow up the bottom half of the

21   document.

22    Q. "Dear Charles:  Upon reflection and consultation with

23   opinion review partners in our firm, we believe we have a

24   professional responsibility to perform due diligence

25   sufficient to understand Derivium's and the lender's business

DEBEVC - DIRECT

1    as it relates to the opinion and to satisfy ourselves that

2    Derivium and the lender will be able to meet their

3    obligations to deliver shares to borrowers willing to repay

4    their loans at the end of the term.  We believe this would

5    include at a minimum our review of the lender's and DC's

6    financial statements, although we are willing to consider

7    alternate means Derivium Capital's financial statements,

8    although we are willing to consider alternate means of

9    satisfying our due diligence obligation.  We would like to

10   know the ownership, affiliation and history of the lender and

11   its principals, Derivium's relationship to the lender, where

12   -- the next page -- "where the lender is subject to insurance

13   or banking regulations and other businesses engaged in by the

14   lender.  We would keep all information confidential."

15            Mr. Debevc, in there anywhere does McDermott, Will &

16   Emery tell you, do they tell you that they are not going to

17   give you an opinion because they are going to charge you a

18   higher rate?  Is that anywhere in that document?

19    A. Not in this document, but that was what was initially

20   relayed to me by Charles Cathcart.

21    Q. Okay.  But then you got a communication that was also

22   relayed by Mr. Cathcart; you got something that told you the

23   people at McDermott, Will & Emery --

24            MR. COOPER:  Your Honor, I need to discuss something

25   with you outside of the jury with Mr. Clukey, please?  May I?

DEBEVC - DIRECT

1    It has to do with what is going on.

2            THE COURT:  Okay.  Well, it's time for lunch anyway.

3    So we'll break for lunch at this time.  We'll start again at

4    about 2:15.

5            Have a nice lunch.  At least it's not pouring rain

6    today, okay?

7            (Thereupon, the jury retired from the courtroom.)

8            THE COURT:  Yes, sir?

9            MR. COOPER:  This e-mail he's talking about, and

10   what McDermott is talking about, about we have a professional

11   standard -- you remember we stood up and said we were going

12   to exclude circular 230 evidence -- that is exactly what he's

13   talking about on the due diligence -- when we were talking

14   about keeping the experts out to shorten the trial.  And I

15   think all that testimony should be stricken and disregarded

16   on our stipulation.

17           THE COURT:  Luckily enough, in my -- since I have

18   been a judge for 20 years, a lawyer for 15 years and

19   three years of law school before that, I have no conception

20   of what circular 230 is.

21           That's one of the blessings of my life so far.  I

22   guess you are going to ruin the rest of my life by telling me

23   what it is.

24           MR. COOPER:  It's on the e-mails.

25           THE COURT:  Because you call it "circular 230".

DEBEVC - DIRECT

1        MR. COOPER:  I'm sorry, Your Honor.

2        Circular 230 were regulations that were promulgated

3   by the Treasury, which is the professional standards for tax

4   professionals, in sum.

5        And when we stood up and talked about not bringing

6   the experts in on the malpractice issue, one of the specific

7   things we talked about was not introducing evidence as a

8   circular 230.

9        So when he's talking about doing tax opinions in our

10  professional responsibilities, that is circular 230.

11       MR. CLUKEY:  Your Honor, if I could be heard?  I'm

12  not arguing failure to comply with professional standards;

13  all I'm saying, what I think this document is saying, is they

14  want financials.  They want some information to know that

15  this is a real -- this is really going on, so they are not

16  going to give an opinion unless they know what is really

17  going on; that's all.  They just want more information.

18       Mr. Debevc just testified that they were going to

19  give an opinion because they were charging too much.  And the

20  truth is that they wanted more information, they suspected

21  this thing was a scam, so they wanted more info.

22       MR. COOPER:  Absolutely not.  An opinion is a

23  defined term under circular.

24       THE COURT:  How in the world -- I mean, you know,

25  like I said, three years of law school, 15 years of law

DEBEVC - DIRECT

1    practice, 20 years as a judge, and I don't know what it

2    means.

3            How in the world is that going to be something the

4    jury understands?

5            MR. COOPER:  I don't want it to go any further

6    because that is -- that is putting Nagy to that standard for

7    giving a tax opinion, which is way up here.  Due diligence,

8    6700, you remember, has no duty of inquiry.  That's the --

9    that's what the *Estate Preservation* case says.  So he's using

10   this e-mail to say McDermott wouldn't do it because they had

11   to hit the circular 230 standard by doing all this due

12   diligence that's required.

13           What this is insinuating is my client should have

14   done it, too, when 6700 has no duty to.

15           THE COURT:  I'll overrule that objection, okay?

16           All right.  So we'll start again at 2:15.

17           All right.  How much longer do you think you are

18   going to be going with Mr. Debevc?

19           MR. CLUKEY:  We've got a little ways, Your Honor.

20           (Thereupon, there was a lunch recess.)

21           THE COURT:  Are y'all ready to go?  Okay.

22           (Thereupon, the jury returned to the courtroom.)

23           THE COURT:  Okay.  I hope y'all had a nice lunch.

24           Mr. Clukey?

25           MR. CLUKEY:  Thank you, Your Honor.

DEBEVC - DIRECT

BY MR. CLUKEY:

Q. Can you pull up Exhibit 69?  And if you go down to the bottom again.

Mr. Debevc, when we left, broke for lunch, we were talking about this e-mail that was sent, forwarded on to you from McDermott, Will & Emery, and they are talking about some of the information they wanted from Derivium Capital before they would give you tax advice; is that correct?

A. In part, some of this information they are looking at is part of that magical formula that Charles sent in for hedging.  I think it's not unusual for a company not to give financials.

As a matter of fact, I worked for the largest company, Cargil, $69 billion, and they would not provide financials to anyone.

Q. But here it looks like they are trying to figure out whether these lenders are even real.  Wouldn't you agree with that?

A. I think that's part of their discord, yeah.

Q. So if you go up to the top -- and it's at the top of the e-mail, we can just put this in context now.  Charles Cathcart sending it to you and Scott and Tim Scrantom, the lawyer who worked for all these companies, right, the saying, "We can try to be responsive in short of providing financials," but the part of "wanting to know whether or not

DEBEVC - DIRECT

1    the lender is subject to insurance or banking regulations and

2    the general 'witch hunt' over and above what the assignment

3    calls for, suggests to me we will never satisfy them.  And

4    even if we could, it would take months to get them to a

5    successful conclusion.  Fortunately, as much as we like Jerry

6    Kaplan, I think we would like to conclude that we are in the

7    wrong pew with McDermott, Will & Emery and we need to find

8    another firm to work with tax advice."

9            They didn't give you tax advice, did they?

10    A. No, they did not.

11    Q. And you never got a tax opinion -- Derivium and you

12    personally never got a tax opinion saying the 90% program is

13    okay?

14    A. I did not get that from McDermott.

15    Q. You never got a -- Derivium itself never got a written

16    tax opinion saying this program is okay under the tax law?

17    A. An opinion?  I think there were various memoranda that

18    were produced that suggests I think was.

19    Q. Very clear on my question.

20            Derivium Capital, and you personally, never got a

21    tax opinion, a written opinion, that said this was okay from

22    the tax office that was written to Derivium?

23    A. I personally never got it.

24    Q. And Derivium Capital?

25    A. To the best of my knowledge, no.

DEBEVC - DIRECT

1    Q. The only person -- the only person who ever gave Derivium

2    Capital a memo, a tax memo saying this thing was okay under

3    the tax laws, was Robert Nagy; isn't that right?

4    A. I have seen memos to that effect.  I don't know if there

5    were others that I have not seen.

6    Q. You have never seen any?

7    A. I have not.

8    Q. Mr. Debevc, February of 2004, the California Franchise

9    Tax Board, the largest state taxing authority in the country,

10   they told Derivium that they thought this 90% Loan program

11   violated the tax laws, didn't they?

12   A. There were two causes of action.  And again, I was not

13   the lead person on the tax opinion, that was -- or tax

14   matters for Derivium -- I was only in operations, but to the

15   best of my understanding was that there would be two

16   causes -- two views, I mean, from California --

17   Q. Again, Mr. Debevc, let me stop you because I think you

18   might be talking about two different things.

19   A. Perhaps I'm confused.

20   Q. Does the California Franchise Tax Board -- and then there

21   is the California Department of Corporations action?

22   A. Perhaps I'm confusing the two.

23   Q. Are you thinking about the California Department of

24   Corporations action that was earlier?

25   A. Um, I think so.

DEBEVC - DIRECT

1    Q. Okay.  So let me show -- let me ask you this question:

2    When the California Franchise Tax Board was, the entity in

3    California, when they challenged this transaction in 2004,

4    did Robert Nagy tell you, you better stop promoting this

5    program?

6    A. No, I don't believe that he did.

7    Q. In fact, Mr. Nagy thought this was another way to make

8    some more money, didn't he?

9    A. I don't recall that he made reference to.

10          MR. CLUKEY: Let's pull up Exhibit 207, it's in

11    evidence.

12    Q. Look at the top of the page here.  From Tim Scrantom to

13    Charles Cathcart.  We see Yuri Debevc right there.

14          You are getting this -- the date on this is

15    February 26, 2004, regarding the FTB Franchise Tax Board

16    opinion position.

17          And then we see that Tim Scrantom, your lawyer, is

18    writing to you and telling you, "Speaking very frankly among

19    us, I think Bob sees this as an opportunity to generate more

20    business from target borrowers."

21          See that, Mr. Debevc?

22    A. I see that.

23    Q. Do you recall Tim Scrantom telling you that?

24    A. I -- there was so many e-mails -- certainly -- obviously

25    he sent this e-mail.

DEBEVC - DIRECT

1    Q. Now, Mr. Debevc, in December of 2004, the IRS told
2    Derivium Capital that it violated the tax laws, didn't it?
3    A. Um which -- because again, there is so many -- there are
4    many things going on at the same time, would you please
5    enlighten me a little bit?
6    Q. Sure.
7        So February 2004, the California Franchise Tax Board
8    tells you it violates tax laws. Later that year, the IRS
9    comes to you and tells you this thing violates the tax laws?
10   A. I don't recall the specific document that -- perhaps you
11   tell me that's what happened.
12   Q. The IRS comes to Derivium, it's a billion dollar program,
13   right?
14   A. Correct.
15   Q. They tell you this thing violates the tax laws and you
16   don't remember that happening?
17   A. I don't remember saying IRS comes to tell you that.
18   Q. So you don't remember that?
19   A. The first time the IRS told me that I was violating
20   something was in 2006 when they sent me a letter.
21   Q. Okay. Mr. Debevc, what's an In The Money report?
22   A. It was just a -- simply a descriptor, for lack of a
23   better word, which loans were the -- a database that was
24   normally descriptive for a database report that would list
25   the loans which were -- in which the collateral was worth

DEBEVC - DIRECT

1    less than the payoff amount.

2     Q. It was a report that showed the company's exposure; isn't

3    it?

4     A. It was a snapshot -- um, as I said, it was a snapshot of

5    that particular moment; not the end of the loan term.

6     Q. So at that moment in time, it was a snapshot of the risk

7    that the company faced, if employees?

8     A. If the world stopped right now.

9     Q. If the world stopped right now, this is how much exposure

10    the company has as far as customers' loans going up, and you

11    are going to have to pay this back; is that correct?

12     A. For the loans that were, um, underwater and the customers

13    would walk away.

14          THE CLERK:  What's the number?

15          MR. CLUKEY:  There is no objection, Your Honor.  We

16    would ask to move in Exhibit 16.

17          THE COURT:  Okay.  Without objection.

18          (Thereupon, Government's Exhibit Number 16 was

19    received in evidence.)

20     Q. In The Money loans, this is just names of customers

21    here -- and I think Patrick Kelly talked about this

22    earlier -- Patrick Kelly worked for you, is that right, Mr.

23    Debevc?

24     A. Yes, he did.

25     Q. And so that those parenthesis at the final column there,

372

DEBEVC - DIRECT

1    that's a negative number; that represents the exposure of the

2    company; is that correct?

3    A. That would represent the exposure of the company, 30th of

4    September of 2000.

5    Q. Okay.  Go to the last page, please.

6        And it says September 30th of 2000.  Mr. Debevc, can

7    you tell the jury what the exposure is of the company at that

8    snapshot in time?

9    A. That snapshot in time, the exposure is $219,319,120.

10       I think also that, if you take a look, you have

11   loans in here that would only mature in 2003.

12       And so to say "a snapshot," as we all know, the

13   stock market goes up and down.  To say "a snapshot" today

14   is -- what will be reflective of three years from now will be

15   erroneous.

16   Q. Exposures.  Those were loans that the company might have

17   to pay the company back?

18   A. It's a snapshot at this particular -- at this point in

19   time, since these loans were not callable and were not

20   repayable.

21       For example, a loan of August 30, 2003 would only be

22   essentially a risk, if you will call it, financial risk at

23   that point in time.

24   Q. Mr. Debevc, we were looking at one of the memos, that FRN

25   proposal for Mr. Nagy, where he's asking if you want to start

DEBEVC - DIRECT

1    a new company at that point in time.

2            Derivium Capital hadn't declared bankruptcy yet,

3    correct?  It was in July of 2005.  Derivium declared

4    bankruptcy in September of '05?

5     A. I believe that that would be correct.

6     Q. At that point in time, the company had actually

7    defaulted, I think you said -- was it 11 -- on 11

8    transactions about that time?

9     A. I think I said something between 11 and 14.  Something to

10    that effect.

11     Q. Okay.  So this is the exposure when the company did, in

12    fact, default on commerce transactions, correct?

13     A. They did default on some of the customers' transactions,

14    out of 1400, ours -- 13 -- more than 1300 transactions

15    performed very well.

16     Q. Let's make sure I understand.

17            So at the end, though, there are about 126 defaults,

18    correct?

19     A. Correct.  That -- I think that number is accurate.

20     Q. Okay.  And so this is a document that's generated -- more

21    than one person within Derivium seeing this.  Patrick Kelly

22    talked about it.  You knew about this.

23            So this information, this exposure of information is

24    something that Derivium Capital knew, right?

25     A. This is a snapshot that Derivium Capital knew, and also

DEBEVC - DIRECT

1    the lender would know, because this was provided as part of

2    the reporting requirement.  Initially Derivium, and then

3    Veridia.

4     Q. Mr. Debevc, I think you've testified previously to your

5    knowledge there was no hedge in the 90% Loan program that

6    consisted of European puts and calls; is that right?

7     A. I testified that I -- if there were, I did not see.  To

8    my knowledge, I did not see one on this side of the border,

9    if you want to call, in the United States.

10     Q. You never saw evidence of European puts and calls from

11    what you could see; is that correct?

12     A. The only time I saw evidence of puts and calls was when

13    certain transactions that Bancroft issued option coverage for

14    transactions through Optech.

15     Q. And I think your signature is on those documents, right?

16     A. That is correct.

17     Q. As far as money actually being spent, you didn't see any

18    money being spent on European puts and calls, correct?

19     A. No, I did not.

20     Q. And Dr. Cathcart, I think you testified previously, you

21    didn't -- you don't recall him ever telling you that the

22    company was spending money on European puts and calls, do

23    you?

24     A. No, I do not recall that.

25     Q. Mr. Debevc, I think the way I understand it, the way

DEBEVC - DIRECT

1   you've explained it in the past, you've said that the hedge

2   is really two things:  The hedge was the sale of the customer

3   stock, and then it was the investment in these companies

4   here, right?

5    A. That was what was reasonable to me.

6    Q. And by "these companies here," I mean the startup

7   companies?

8    A. That is correct.

9    Q. Companies that you owned?

10   A. I owned two Shenandoah, um -- participation in those

11   companies.

12   Q. You owned them; you just didn't own them directly.

13        You owned them through a holding company, a shell

14   company?

15   A. That's the way that the attorneys for Charles Cathcart

16   had set it up.

17   Q. Now, these companies here, some of these companies, you

18   were on the board of directors of some of these?

19   A. Yes, I was.

20   Q. Robert Nagy was on the advisory board of some of those

21   companies, too, wasn't he?

22   A. That is my recollection.

23   Q. And all of those companies were funded -- we talked about

24   this earlier, right -- all those companies were funded from

25   $43 million of sales of customers' stocks?

DEBEVC - DIRECT

1    A. They were funded through Bancroft profits and Derivium,

2    through Derivium.

3    Q. Make sure we are clear here.

4         You were funded through the sale of customer stocks,

5    right?  That's where the money came from?

6    A. That -- the ten percent profit remained for the state of

7    costs, and it came out of that pool of money, it did not come

8    from -- as the 90 percent of the value of their stock was

9    returned to the borrower, of those remaining ten percent,

10   there were expenses, brokerage fees, and so on, it was out of

11   that pool of money where that was the source of that money

12   for this.

13   Q. Ten percent remaining from the sale of the customer

14   stock, correct?

15   A. That would be correct.

16   Q. And that money was used to fund these companies that you

17   owned?

18   A. Well, it was already less than ten percent.  Because

19   after fees, the brokerage houses to Bancroft, to Derivium, to

20   other people, it was -- it was from that general one, call it

21   pool of money.

22   Q. So some of the money?

23   A. Correct.

24   Q. Some of the money went to it, correct?

25   A. Correct.  Some of the money.

377

DEBEVC - DIRECT

1    Q. Now, Mr. Debevc, in cases where the startup companies

2    were funded, sometimes the money went straight from Derivium

3    Capital here in the early years.  That's what happened,

4    right?

5    A. In the earlier -- correct.  That the direction was that

6    if there were calls or requests for funding, um, those

7    requests would be approved by Charles Cathcart, the funds

8    would be transferred.  However, the book entries I was told

9    would show essentially the -- the flow of money as going

10   through from Derivium to Spencer, from Spencer to Shenandoah.

11   Q. I want to break it up.

12          In the earlier years and the later years, the

13   earlier years the money just went straight there, right?

14   A. The money went directly, but it was to be booked.  That

15   was my understanding.

16   Q. The money went straight there early on.  And then later

17   on, your accountants came back and made adjusting entries,

18   didn't they?  To make it look like it had gone through

19   Spencer; is that right?

20   A. I believe that to be the case, but again, I'm not an

21   accountant.

22   Q. You believe that to be the case?  After the fact, the

23   accountants came back and made adjusting entries to make it

24   look like the money was actually going a different way; is

25   that correct?

DEBEVC - DIRECT

1     A. That's correct.

2     Q. Mr. Debevc, every one of these startup companies failed

3     during the 90% Loan Program except for one; isn't that right?

4     A. That is correct.  And that they were all managed by the

5     same person.

6     Q. Who were they managed by?

7     A. Jerry Pryor.

8     Q. Jerry Pryor managed all these companies?

9     A. At one time or another.

10    Q. He wasn't managing them all at the same time, was he?

11    A. Um, no.  In succession.

12    Q. Okay.  You were on the board of directors of the

13    companies, weren't you?

14    A. I was one of their, um, many board members.

15    Q. Charles Cathcart, your partner, was on the board, wasn't

16    he?

17    A. Yes, he was.

18    Q. He was the president of a bunch of these companies,

19    wasn't he?

20    A. I don't know that he was the president, but I think he

21    was on the board.

22    Q. So they all failed except for one?

23    A. And eventually, he also removed Jerry Pryor.

24    Q. Now, after they failed -- they all failed basically by

25    2002, right?

DEBEVC - DIRECT

1    A. I think that Scienda, um, lingered on for another year,

2    or a year and a half, and Charleston Aluminum actually is a

3    success.

4    Q. Scienda was actually in bankruptcy, though, right?

5    A. Yes, it was in bankruptcy.  It came out of bankruptcy and

6    then it went back into bankruptcy.  It couldn't resuscitate.

7    Q. And so this was supposed to be, as you claim, one of the

8    hedges for the program, but after these companies all failed,

9    Derivium kept doing the 90% Loan transaction, didn't they?

10   A. Well, Derivium actually was bankrupt and continued to do

11   these transactions.

12   Q. Derivium and Veridia USA, they were doing the

13   transactions, right?

14   A. They were outsource service providers to Bancroft.

15   Q. So your company that you 100 percent owned, it was still

16   involved in the 90% Loan Program; is that correct?

17   A. Which company is that?

18   Q. Veridia.

19   A. When you say "involved," provided a reporting service to

20   Bancroft and Optech, there was a -- an agreement to that

21   effect.

22   Q. There was involved --

23   A. If that is what you call by "being involved," by

24   providing a service through a service contact, then it was

25   involved.

DEBEVC - DIRECT

1    Q. I just want to talk, for a minute, about Veridia and

2    Derivium USA.  When this happened -- when this happened from

3    Derivium Capital to Veridia USA, Veridia's employees were the

4    same people who had been at Derivium Capital, weren't they?

5    A. Yes.  They were dismissed at Derivium Capital and they

6    were rehired.

7    Q. Veridia used the same office equipment that used to be

8    used by Derivium?

9    A. Um, the office equipment, yes, it did, but that office

10   equipment belonged to Bancroft.

11   Q. Veridia serviced the same customers related to the same

12   loans as Derivium; is that right?

13   A. Veridia was a service company to service loans on the

14   contract.

15   Q. And Derivium Capital USA continued to market the 90% Loan

16   Program for the same website that was used previously by

17   Derivium; isn't that right?

18   A. I don't have any ownership of Derivium Capital USA.  That

19   was an entity that was sold solely by Charles Cathcart.

20   Q. And Derivium USA maintained an employee in the office

21   previously occupied by Derivium at 1 Poston Road; isn't that

22   right?

23   A. It was a separate office and a separate entrance and an

24   individual there.

25   Q. 1 Poston is where Derivium used to be, right?

DEBEVC - DIRECT

1    A. That is correct.

2    Q. And Derivium USA, at 1 Poston?

3    A. I beg your pardon?

4    Q. There was somebody still there after Derivium?

5    A. It was Derivium USA going in one of the offices with a

6    separate entrance.

7    Q. Mr. Debevc, I just have a few more documents to show.

8    Not that many more to go.

9         MR. CLUKEY: Exhibit 199, please.

10   Q. Mr. Debevc, so this company appeared, Derivium U.K., it

11   says Gibraltar, you were a director of that company, weren't

12   you?

13   A. Um, Derivium U.K. was formed.  I was involved in that.  I

14   didn't know where they come from.

15   Q. Take away that document, Mr. Debevc.

16        MR. CLUKEY: Don't pull it up, it's not in evidence.

17        Can you scroll ahead to the next page?  Go again,

18   next page.  There we go.

19   Q. Is that your signature in about the middle of the page,

20   it's about the third page in?

21   A. Yes, it is.

22        MR. CLUKEY:  Your Honor, do you see the Bates number

23   on the document?  We would ask to move this document into

24   evidence.

25        MR. COOPER:  402, 403, relevance.

382

DEBEVC - DIRECT

1          THE COURT:  Overruled.

2          Go ahead.  199 in evidence.

3          (Thereupon, Government's Exhibit Number 199 was

4     received in evidence.)

5      Q. Mr. Debevc -- and actually, you can just do the top half.

6          This is a board meeting of Derivium Capital U.K.

7     Ltd. Company Inc. in England, Wales, 143 Main Street,

8     Gibraltar, June 2001.

9          What's this company doing, Mr. Debevc?

10     A. Derivium Capital U.K. was formed to explore the ability

11    of doing the 90% Stock Loan business in England.

12         And I think you will also see that there was a

13    meeting, and I was not present at this meeting, and

14    unanimously decided to appoint Scott Cathcart, Charles

15    Cathcart and myself and Jonathan as directors of the company

16    without anyone being present.

17     Q. So you were appointed as a director of this company by

18    these folks in Gibraltar, the U.K. Gibraltar, and you are

19    being appointed as a director of this company and you knew

20    about this company, right?

21     A. Obviously, I signed the document, the information that he

22    pay attention with references to the Gibraltar, I just -- I

23    signed the document that was given to me to sign.

24     Q. Okay.  Who is Jonathan Sandifer?

25     A. John Sandifer was also an employee of Derivium, initially

DEBEVC - DIRECT

1   First Security Capital, and then an employee of Derivium

2   Capital United States.

3   Q. Jonathan Sandifer was an employee of First Security

4   Capital originally?

5   A. Yes.

6   Q. And then Derivium?

7   A. Yeah.  There was only a name change from First Security

8   Capital to Derivium in 2000.

9   Q. And now in 2001, he's a director of this Gibraltar

10   company; is that right?

11   A. He was sent to the United Kingdom to explore the

12   possibility of expanding the 90% Stock Loan in the United

13   Kingdom.

14        MR. CLUKEY: If we go ahead just a couple of pages,

15   top half with Mr. Debevc's signature.

16   Q. I'll ask you, Mr. Debevc, is that your signature on the

17   page?

18   A. Yes, it is.

19   Q. And if you zoom all the way up, we see that Bates number

20   there, Nagy.

21        So Mr. Nagy knew about this company, this Gibraltar

22   company, that you were director of; is that right?

23   A. Um, that's what the Bates stamp would suggest.

24   Q. Mr. Debevc, you also participated in the formation of

25   this company right here, WITCO, correct?

DEBEVC - DIRECT

1    A. I don't recall.  I know -- in all likelihood I signed

2    certain documents.

3    Q. In all likelihood you signed certain documents in

4    connection with this company WITCO?

5    A. I don't recall which documents I might have signed, but

6    I'm sure that you have them on hand to refresh my memory.

7    Q. I think that's actually all I need, Mr. Debevc.  We don't

8    need to waste the jury's time with that.

9          MR. CLUKEY: Can we pull up Exhibit 264, please?

10         There is no objection to this exhibit, Your Honor,

11   we move it into evidence.

12         THE COURT:  Okay.  In evidence.

13         (Thereupon, Exhibit Number 264 was received in

14   evidence.)

15   Q. Okay.  From Robert Nagy, Tim Scrantom.  That's the lawyer

16   who was working for all these companies, right?

17         And Robert Nagy is writing the lawyer saying:  "Tim,

18   I received another call from Bob Brandenburg this morning.

19   He is very concerned about the timing for implementing the

20   new structure.  He's aware of USA Newco and Yuri's company,

21   but he is not sure who will be in each, when all of this is

22   to take place, and where is Scott will land."

23         What's going on here?  This is November of 2002.

24   What's happening right here?  What's he talking about?

25   A. Derivium Capital LLC was -- essentially stopped doing

DEBEVC - DIRECT

1    business, and the business was being separated into a

2    marketing company and a service company, and Scott was at the

3    heart.  He was head of marketing in San Francisco, so I think

4    that this maybe makes reference as to where Scott worked.

5    Q. I see.

6    A. You have the question that the memo is documented.

7    Q. It's a question of Mr. Nagy that's happening here.  Is

8    that what you are suggesting?

9    A. The document speaks for itself.

10   Q. Mr. Debevc, we didn't really touch on this.  Derivium

11   Capital had two offices, right?  It had an office here in

12   Charleston; that was where your office was, right?

13   A. That is correct.

14   Q. Robert Nagy was down the street from you, right?

15   A. He was in -- um, 1 Poston Road is in West Ashley, it's in

16   Charleston, and Robert Nagy is downtown.

17   Q. Okay.  And for much of the time when this was going on

18   there was actually an office here in Charleston; there was

19   also an office in California, right?

20   A. The office in California was actually the office that

21   preceded the office in Charleston.

22   Q. I'm sorry.  Can you say that again?

23   A. The office in California was opened before the office in

24   South Carolina was opened.

25   Q. Okay.

DEBEVC - DIRECT

1      A. And that was the marketing office where all -- initially,

2      the marketing and loan servicing program was all done out of

3      San Francisco.

4      Q. Okay.  So Derivium Capital had two -- you are on both

5      coasts.  You are here in Charleston and you are in

6      California, too?

7      A. That is correct.

8      Q. So the marketing is happening there and the

9      administration and operations that's here in Charleston; is

10     that correct?

11     A. That is correct.

12     Q. I want to make sure I understand the timing of it.

13           First Security Capital was First Security Capital of

14     Texas first, right?

15     A. That is -- that's my understanding.

16           And again, that is before I came to the firm.

17     That's my understanding.

18     Q. And First Security Capital actually comes here with

19     Charles Cathcart here in Charleston first, doesn't it?

20     Before it expands out to California?

21     A. I think that they were already in California, but then

22     also currently opened an office, or shortly thereafter, an

23     office here in Charleston.  And again, this was before my

24     time.

25     Q. So you don't actually have personal knowledge?

DEBEVC - DIRECT

1    A. I do not have personal knowledge.

2         MR. CLUKEY: Okay.  Will you pull up Exhibit 2.

3    Q. If you look at 2 first, please, Mr. Debevc.

4         Do you know what this document is, Mr. Debevc?

5    A. Give me a second, please.

6    Q. Sure.

7    A. It's minutes of a meeting of C3 Industry.  It's a copy of

8    minutes of C3 Industries.  It shows the predecessor to

9    Scienda.

10        Now we would ask to move this into evidence.

11        MR. COOPER:  It would be a 402, 403.

12        THE COURT:  Overruled.

13        (Thereupon, Government's Exhibit Number 2 was

14   received in evidence.)

15   Q. C3 Industries.  Meeting in January of '99.  All members

16   are present.  Additional members were accepted as follows:

17   Jerry Pryor, 20 percent.  Diversified Design Associates --

18   DDA is a member -- DDA is a member of C3 Scienda, is that

19   right, Mr. Debevc?

20   A. That's what this document suggests.

21   Q. Members accepted the appointment of Yuri Debevc as the

22   director.

23        So you become a director at this point in time to

24   C3; is that right?

25   A. That is correct.

388

DEBEVC - DIRECT

1    Q. And then who else is appointed as an advisory board

2    member?

3    A. Two individuals, Howard Rudd and Robert Nagy.

4    Q. Could you go to the next page?  Thermalseal of South

5    Carolina, that's another startup company?

6    A. Thermalseal is the predecessor to Spray Foam.

7    Q. Here is Spray Foam on the chart.  Thermalseal?

8    A. And they're -- Spray Foam and Thermalfoam were also.

9    Q. Okay.

10    MR. CLUKEY: And Sam, can you go to the next -- is

11    there another page of this?  This is the next page.  So let's

12    take a look at this here.

13    H2, another one of the startups on here.

14    A. That's a different document.  One moment, please.

15    Q. And this is in October of '99, members that were

16    accepted, Diversified Design Associates, DDA and Jerry Pryor;

17    is that right?

18    A. That is correct.

19    Q. And then there is Yuri Debevc.

20    So you are appointed to the board of directors?

21    A. That is correct.

22    Q. And then can you tell us who the advisory board members

23    are?

24    A. Robert J. Nagy and Howard Rudd.

25    Q. We see a couple of other names.  Go up to the board of

DEBEVC - DIRECT

1    directors.  A couple of people we have been talking about

2    today, Jonathan Sandifer --

3    A. That is correct.

4    Q. -- your codirector of DC U.K., right?

5    A. That was, um, still First Security Capital.

6    Q. So this is still First Security Capital.  He's an

7    employee of First Security Capital and he's also on the

8    advisory -- he's also a board member of H2; is that correct?

9    A. That's correct.

10   Q. And we see Cliff Lloyd, the lawyer we have been talking

11   about, Robert Brandenburg.

12         Who is Robert Brandenburg?

13   A. I think -- I thought I mentioned to you Robert

14   Brandenburg was also -- is also a CPA, and he was the

15   internal accountant for Security Capital, Derivium Capital.

16   Q. Did Bob Brandenburg have an office with you in Derivium

17   Capital?

18   A. No.

19   Q. Where was his office?

20   A. Normally -- he would work normally from home.  He would

21   telecommute or visit the office, but he lives in Summerville,

22   South Carolina.

23   Q. He worked out of his home?

24   A. I believe so.

25         MR. CLUKEY: Go to the next 36.

DEBEVC - DIRECT

1          Your Honor, we would ask to move in Exhibit 36.

2          MR. COOPER:  Same 402, 403.

3          THE COURT:  Same ruling.  In evidence.

4          (Thereupon, Government's Exhibit Number 36 was

5     received in evidence.)

6     Q. I just want to talk about this first page here, Mr.

7     Debevc.

8          Charleston Construction Company.  So that's CCC?

9     A. One moment, please.  Let me read it.

10    Q. Sure.

11    A. Thank you.  Yeah.

12    Q. That's this company here, CCC, right?  Charleston

13    Construction Company, another one of the startup companies?

14    A. That is correct.

15    Q. So this is in September of 2000.

16         And we see Robert Nagy is on the advisory board at

17    that time, isn't he?

18    A. Um, that's what the document shows.

19    Q. And you are on the board of directors at that time?

20    A. That is correct.

21         MR. CLUKEY:  Your Honor, I have something very, very

22    quick.  Would it be okay if we took a two-minute break?  I

23    just want to look at the document and I don't want to waste

24    the Court's time.  Are you ready for a break now?

25         THE COURT:  Y'all can stand up and stretch, or

DEBEVC - DIRECT

1    whatever you want to do.

2             THE COURT:  Did you find what you needed?

3             MR. CLUKEY:  Yes, Your Honor.

4             THE COURT:  You can tell them to come back on in.

5             (Thereupon, the jury returned to the courtroom.)

6             THE COURT:  Okay.  Mr. Clukey?

7             MR. CLUKEY:  Yes, Your Honor.

8    Q. Mr. Debevc, just one last thing, there was a judgment

9    that was rendered against Derivium Capital by a customer by

10   the name of Hammond.  Do you recall that?

11   A. Yes, I do.

12   Q. In 2003?

13   A. If it shows that to be the case, then yes, 2003.

14   Q. Do you remember the day when the judgement was rendered

15   against Derivium Capital by this customer?

16   A. I do not recall the specific date.

17   Q. If I showed you a document, would it refresh your

18   recollection?

19   A. Yes, it would. The date file shows September 12th -- no,

20   I'm sorry.

21   Q. Why don't you look at the last page and then I'll come

22   and take it from you.  See if it refreshes your recollection.

23   A. Yes, it does.

24   Q. Mr. Debevc, when was that judgment rendered against

25   Derivium?

DEBEVC - DIRECT

1    A. Um, in 2003.

2    Q. And it was for $25 million, wasn't it?

3    A. Yes, it was.

4         MR. CLUKEY:  Mr. Debevc, I have nothing further at

5    this time.  Thank you.

6                          CROSS-EXAMINATION

7    BY MR. COOPER:

8    Q. Good afternoon, Mr. Debevc.

9    A. Good afternoon.

10   Q. Do you remember when Mr. Clukey was talking to you about

11   the IRS challenging the stock loan in December of 2004?

12   A. Yes, he did.  I do.

13   Q. And did Derivium Capital hire a law firm to defend its

14   position against the IRS?

15   A. Yes, it did.

16   Q. Like when the IRS takes a position, that doesn't

17   necessarily mean it's right, does it?

18   A. No.  That's why attorneys have a job.

19   Q. Thank God.

20        And did y'all hire the law firm of Sherman &

21   Sterling?

22   A. Yes, we did.

23   Q. And did Derivium Capital enter into a retainer agreement

24   with Sherman & Sterling?

25   A. Yes, it did.

DEBEVC - DIRECT

1            MR. CLUKEY:  Objection, Your Honor.

2            THE COURT:  Basis?

3            MR. CLUKEY:  Relevance.

4            THE COURT:  Go ahead.

5            MR. COOPER:  Just laying the foundation.

6    Q. And do you recall if you signed that retainer agreement?

7    A. Yes, I did.

8    Q. And do you recall how much you had to pay the law firm as

9    a retainer?

10   A. $100,000.

11   Q. And did actually Derivium LLC retain Sherman & Sterling?

12   A. Yes, it did.

13   Q. And in fact, did Sherman & Sterling defend Derivium's

14   interests against the IRS?

15   A. Yes, it did.

16   Q. And you were an owner of Derivium Capital, correct?

17   A. Yes, a minority owner.

18   Q. And as an owner, you agreed to the hiring of the law firm

19   to protect your business, right?

20   A. I agreed with the decision of Charles Cathcart, the

21   principal.

22   Q. I'm going to show you what's been marked as Plaintiff's

23   Exhibit 63.

24            Mr. Debevc, is this an April 4th, 2005 letter that

25   Sterling & Sherman wrote to the IRS?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1          MS. WEIS:  Can we get a clarification as to whether

2     it's a government exhibit or --

3          MR. COOPER:  It's a Nagy exhibit.

4          THE COURT:  Nagy 63?

5          MR. COOPER:  Yes, Your Honor.

6          THE COURT:  Thank you.

7          THE WITNESS: Would you repeat the question, please.

8     Q. Yes.

9          Is this an April 4, 2005 letter that Sterling &

10    Sherman sent to the IRS on behalf of Derivium Capital?

11    A. Yes, it is.

12    Q. And is this what you paid Sherman & Sterling to do for

13    you?

14    A. This was part of the -- this is a product as a result of

15    that retainer.

16    Q. And as an owner of Derivium, did you receive a copy of

17    Sherman & Sterling's letter?

18    A. Yes, I did, through Charles Cathcart.

19    Q. And if you turn to the last page.  Who signed this

20    letter?

21    A. An individual called B. John Williams.

22    Q. And Mr. Williams, was he a lawyer at Sherman & Sterling?

23    A. I believe he was a partner.

24    Q. When you received this letter, did you file it into

25    Derivium's books and records?

DEBEVC - DIRECT

1    A. Yes.  This was part of the business records.

2    Q. Did you maintain this letter in the ordinary course of

3    business at Derivium?

4    A. It was in the files.  Once filed, it stayed there, yes.

5              MR. COOPER:  Your Honor, I would like to move

6    Exhibit 43 in.

7              MR. CLUKEY:  Objection, Your Honor.

8              THE COURT:  Basis?

9              MR. CLUKEY:  Hearsay, relevance, foundation.

10             THE COURT:  Let me see it.  If y'all could give

11   me -- lift them up and then I won't bother you anymore.

12             MR. CLUKEY:  Your Honor, we would have some argument

13   on this, too.

14             THE COURT:  Do you have any other questions with

15   regard to that exhibit in regard to introducing it into

16   evidence?

17             MR. COOPER:  No.  I believe I laid the foundation.

18             THE COURT:  When the jury takes the afternoon break,

19   we can talk about the argument on that, and you can move on

20   to something else?

21             MR. COOPER:  I can.

22             THE COURT:  That's why -- I just asked you, are you

23   going to try to get Mr. Debevc to say anything about this

24   document?

25             MR. COOPER:  Yes.

DEBEVC - DIRECT

1        THE COURT:  Okay.  Let's -- we'll argue about it in

2   the afternoon break, and then you can go back and ask to

3   admit it into evidence.  How does that sound?

4        MR. COOPER:  Hopefully, it sounds good.

5        THE COURT:  Okay.  I'll get to read it.

6   Q. Also Mr. Debevc, do you recall when Mr. Clukey was asking

7   you about your tax losses on the tax returns?

8   A. Yes, I do.

9   Q. And two -- and those tax losses were related to

10  Shenandoah?

11  A. That is correct.

12  Q. But let me -- and did you sign a personal guarantee to

13  Shenandoah?

14  A. Yes, I did.

15  Q. And is being an owner of Shenandoah, did Scott Cathcart

16  also sign a personal guarantee?

17  A. Yes, he did --

18  Q. And --

19  A. -- as well as Charles Cathcart.

20  Q. Right.

21        And because you were -- you were a 25 percent owner,

22  Scott Cathcart was a 50 percent owner and Scott -- Charles

23  Cathcart was a 50 percent owner and Scott Cathcart was a

24  25 percent owner, correct?

25  A. That is correct.

DEBEVC - DIRECT

1    Q. And profits and losses, in accordance with the

2    partnership agreement, were allocated in proportion to your

3    ownership?

4    A. That is correct.

5    Q. And Mr. Clukey said you took all these losses, but you

6    didn't have the money.  Do you remember that?

7    A. That is correct.

8    Q. I'm going to show the second page of Exhibit 38 that's

9    already in evidence.

10        As being an owner of Shenandoah, did you know that

11   Scott Cathcart's 2000 return was audited no change?

12   A. Yes, I knew that.

13   Q. And he was a 25 percent owner of Shenandoah, too?

14   A. That is correct.  But my tax return was also audited.

15   Q. And it was no-changed, too?

16   A. There was a no-change letter.

17   Q. Thank you.  That no-change to you was also sent by the

18   IRS?

19   A. That was sent by the IRS after examining the tax returns.

20   Q. So did you think you were doing anything wrong?

21   A. No.  I was pleased.

22   Q. This is exhibit -- Government's Exhibit 153.

23        And up here is your name, Yuri Debevc.  Do you see

24   that?

25   A. That's correct.

DEBEVC - DIRECT

1    Q. Did you receive this e-mail?

2    A. Yes, I did.

3    Q. Would you agree that Derivium did not provide tax advice?

4    A. Um, Derivium would not provide tax advice upon all of its

5    employees.

6    Q. And you had the disclaimers on all your materials?

7    A. The disclaimers were on all loan documents; and indeed,

8    that Derivium does not provide tax advice and that borrowers

9    should seek advice of their own tax attorneys.

10   Q. And Patrick Kelly worked for you, the man that wrote

11   this?

12   A. Yes, he did.

13   Q. And did y'all share the similar understanding, that Mr.

14   Nagy did not provide tax advice to borrowers?

15   A. Yes, we did have the same understanding.

16   Q. Derivium's website --

17   A. Yes.

18   Q. -- was Mr. Nagy's name listed on that website?

19   A. I don't believe so.

20   Q. Was Mr. Nagy's name mentioned in the standard promotional

21   materials?

22   A. Not that I'm aware of.

23   Q. And were you aware that the IRS was auditing Derivium?

24   A. Yes.

25   Q. And did you know that the IRS gave a no-change letter to

DEBEVC - DIRECT

1   Derivium?

2    A. Yes.

3    Q. Did you know that a financial products specialist was

4   engaged in --

5            MR. CLUKEY:  Objection, Your Honor.

6            THE COURT:  Basis?

7            MR. CLUKEY:  Scope.

8            THE COURT:  Pardon?

9            MR. CLUKEY:  Outside the scope.

10           THE COURT:  Scope of what?

11           MR. CLUKEY:  Of my direct.

12           THE COURT:  Overruled.

13   Q. Did you know?

14   A. Repeat the question, please.

15   Q. Did you know that a financial products specialist was

16  engaged in the audit?

17   A. Yes.

18   Q. And being a business owner, did that no-change letter

19  give you comfort?

20   A. Yes, it did.

21   Q. Now, Mr. Clukey went through a lot of questions about all

22  these offshore entities.  Do you remember going through that

23  for the last three hours?

24   A. Yes, I do.

25   Q. In all these offshore entities in the e-mails, was there

DEBEVC - DIRECT

1    anything about Mr. Nagy's tax advice on the 90% Stock Loan?

2     A. Not that I'm aware of.

3     Q. And you believed these lenders were real, didn't you?

4     A. Yes.

5     Q. And in fact, tell the jury about visiting BVL's office in

6    London?

7     A. In 2000 I visited London, ended up in this house in

8    Mayfair, which is one of the -- one of those London -- one of

9    the premier districts of London.  I was a stone's throw from

10   the United States Embassy, and there was an office for

11   Bancroft.

12          There I met the attorney, Tim Scrantom, and also the

13   attorney for Bancroft, and there were other individuals there

14   at the time.  And it was a very spacious conference room, so

15   they gave me belief that, in fact, they were real.  And there

16   was a plaque on the building, Bancroft.

17    Q. And did you ever meet the financier of Bancroft?

18    A. Yes, I did.

19    Q. And what was their name?

20    A. The name Jeeves, it's father/son Jeeves.  I forget

21   their -- Brian, and I forget the other first name, the other

22   initial.

23    Q. Can you tell the jury about your meeting with the Jeeves?

24   Who were the backers of Bancroft?

25          MR. CLUKEY:  Objection.

DEBEVC - DIRECT

1            THE COURT:  Basis?

2            MR. CLUKEY:  801.

3            THE COURT:  Not to that question.

4    Q. Can you tell the jury about your meeting with the Jeeves?

5    A. It was --

6            THE COURT:  Can't tell them what the Jeeves said and

7    all that, that would be hearsay, unless there was an

8    exception.  If they had a meeting, sure, fine.

9            THE WITNESS:  May I respond?

10            THE COURT:  Yeah.

11            THE WITNESS:  I met the Jeeves in Lichtenstein, and

12    this was prior to the visit through Bancroft in London, and I

13    was at that time becoming a new member of Derivium, and it

14    was more of a social visit.  The individuals that were there

15    were Charles Cathcart, myself and Mrs. Cathcart, and we

16    chatted there for about maybe an hour and a half, two hours,

17    and then took the plane back to Switzerland.

18    Q. And what was your understanding of the Jeeves'

19    background?

20    A. That they were presented as financiers, and also an

21    attorney, Kristina Phalen, who eventually made several visits

22    to the United States.

23            And my understanding was that this was not the first

24    meeting that they had with the Cathcarts; that they had other

25    meetings with Scott Cathcart previous to that.

DEBEVC - DIRECT

1   Q. And so you physically went over there and shook these

2   folks' hands?

3   A. That was the purpose of the trip to -- a social trip to

4   say hello; introduce myself.

5   Q. And then were you aware of questioning about the BVL

6   website?

7   A. Yes.

8   Q. And you saw it after meeting these folks.  Did you

9   believe it?

10  A. Well, I saw it later on and I believed it.  There was a

11  special access to that, and it requires the special access to

12  the website, and which was granted to me by Tim Scrantom, the

13  attorney for Bancroft.

14          And as a matter of fact, I made a copy of the

15  website as -- a paper copy for myself to make reference to in

16  the future.

17  Q. And you had an agreement with these folks, right?  Not

18  folks, but BVL?

19  A. Um, well, let's put it in context of time.

20          Bancroft became the lender sometime during 2000 and

21  became the lender of record with -- all the documentation was

22  done on Bancroft paper as of 2003.  There was an agreement

23  between Bancroft and Derivium Capital LLC for marketing and

24  sales and marketing and administration.  And subsequent to

25  2000, January of 2003, Veridia, the company that I formed,

DEBEVC - DIRECT

1    had a marketing and administration agreement that was signed

2    by Nigel Woods and the folks in Ioma, for administration for

3    of the 90% Stock Loan.

4     Q. And that Nigel Wood fellow, his signature was on that

5    document?

6     A. I believe so.

7     Q. And on the website, Nigel Wood was represented as being

8    an officer of BVL, wasn't he?

9     A. That is correct.

10     Q. And you had a document signed by --

11     A. Not only that document signed, but the bank accounts,

12    domestic bank accounts on behalf of BVL by 10 State Street,

13    the attorneys for BVL.  The account opening documents and

14    brokerage documents were all signed by either Nigel Wood or

15    one of the officers of Bancroft.

16     Q. And you went to work every day and you provided services

17    to BVL, didn't you?

18     A. Yes, I did.

19     Q. That was your life?  I mean, you did work with these

20    folks?

21     A. Yeah.

22     Q. Because you went every day to work and you provided them

23    services, did you believe that there was a real lender?

24     A. Yes, I did.

25     Q. Government's Exhibit 49.  These were those monthly

DEBEVC - DIRECT

1    reports you sent to them?

2    A. Yes.  These were monthly reports, um, that were internal

3    documents and provided to Bancroft Ventures.  And it was

4    really based on these reports and the numbers on these

5    reports that from the inception for Veridia was established.

6    Q. And for the services that Mr. Nagy provided to you, was

7    there any reason to send this document to him?

8    A. There was no reason whatsoever for him to get this

9    document.

10    Q. And you running Veridia and being the owner of Derivium,

11    do you recall Nagy being on the recipient list for this

12    document?

13    A. I don't recall him to be on the distribution list.

14    Q. And I believe you were here, but there is another monthly

15    report for Optech?

16    A. That is correct.

17    Q. And the same question:  Was that an internal report?

18    A. That was an internal report.

19         And there was also separate service agreements with

20    Optech specifying that these are the responsibilities of

21    Veridia to Optech.

22    Q. And again, because that was an internal document going to

23    Bancroft, was there any reason to send it to Mr. Nagy?

24    A. No.

25    Q. And do you recall Mr. Nagy being on those distribution

DEBEVC - DIRECT

1   lists?

2   A. I do not recall Mr. Nagy being on the distribution lists.

3   Q. And both of those reports, they didn't go to borrowers?

4   A. No, they didn't go to borrowers, because this was a

5   snapshot report for the management of the lender and for

6   Veridia, so that it could calculate its compensation on a

7   monthly basis.

8   Q. And I'm also going to show you Exhibit Number 16.  And do

9   you recall Mr. Clukey showing you this document?

10  A. Yes, I do.

11  Q. And it's called an In The Money loan, right?

12  A. Yeah.  That is the name for this report.

13  Q. And would there be an "Out of the Money Loan," too?

14  A. No.  There was a -- I don't recall that there was an Out

15  of the Money Report because those negations -- which would

16  not be negations -- that means that the payoff amount was

17  significantly less than the loan amount.  And under those

18  circumstances, the expectation was that those individuals

19  would not renew the loans and walk away, which they are

20  entitled to.

21  Q. That's the impression that I don't want the jury to get

22  because of all those negative numbers on the right-hand

23  column.  This report was for only those loans where the

24  collateral exceeded the loan balance, right?

25  A. Those were the only ones.  Those are the only loans that

DEBEVC - DIRECT

1    represented a potential financial risk to the company.  The

2    other reports, which are the majority of the loans, they did

3    not represent financials to the company because the payoff

4    amount was less than the collateral value, plus interest.

5    Q. And that's my question:  The majority of the loans where

6    the value of the collateral was less than the loan amount,

7    those don't show up on these reports, do they?

8    A. No, they did not.

9    Q. Right.

10           And you gave this to the lender, right?

11    A. This was provided to the lender as part of their

12    financial management, too, and this was also provided to

13    Charles Cathcart on a more frequent basis than a monthly

14    basis.

15    Q. That's right.

16           Because when you look at that total negative number,

17    that's the lender's risk, right?

18    A. That is their snapshot of the lender's risk on that date

19    if the world came to a grinding halt that day.

20    Q. And that's the risk the lender was to manage with the ten

21    percent of the collateral value, right?

22    A. That is correct.

23    Q. And that's why the lender wanted to see that number, so

24    he could -- so it could manage the risk?

25    A. That would be my impression.

DEBEVC - DIRECT

1              MR. CLUKEY: Government Exhibit 55.  I believe it's

2     in evidence.

3              THE CLERK:  No.

4              THE COURT:  Any objection to putting it into

5     evidence?

6              MR. CLUKEY:  No, Your Honor.

7              THE COURT:  Okay.  In evidence.

8              MR. COOPER:  Thank you, Your Honor.

9              (Thereupon, Government's Exhibit Number 55 was

10    received in evidence.)

11    Q. This is a memorandum from 10 State Street, which was

12    Derivium's lawyers to Charles Cathcart.

13             And you see at the bottom, Mr. Debevc, your CC?

14    A. Yes, I see.  I see that.

15    Q. And at the bottom, the Bates stamps number.  Does that

16    indicate that it came out of your files?

17    A. Yes.

18    Q. And Jack Flader, was he with Optech?

19    A. He was one of the owners of Optech.

20    Q. And they were one of your lenders?

21    A. They were one of the lenders.

22    Q. And this document from Mr. Flader, was this because

23    Optech was engaging in due diligence with Derivium?

24    A. I think Optech was engaging in due diligence in two

25    levels:  One was Derivium, and the other one they were

DEBEVC - DIRECT

1    setting up the standards because the -- for due diligence

2    with borrowers -- because Optech's requirements for

3    borrowers' identity were altogether different than the

4    requirements by Bancroft Ventures's.

5     Q. So you are saying they were doing due diligence to make

6    sure that the loan fully required, met their needs?

7     A. One, that it met their needs; and also, since the loan

8    portfolio that they were acquiring, that those borrowers had

9    not yet submitted the same documents that were required by

10    Hong Kong authorities.  They noticed that we need to gather

11    that information to supply to Optech in Hong Kong to satisfy

12    their local authorities.

13     Q. Okay.  And did Mr. Scrantom, on behalf of Derivium,

14    answer a lot of Mr. Flader's questions?

15     A. Um, yes, I believe that he did.

16     Q. And if you turn to question 6.  Mr. Flader, on behalf of

17    Optech, asks about the hedging strategies?

18     A. That's correct.

19     Q. And Tim Scrantom writes:  "We briefly discussed the

20    hedging strategies with respect to the collateral.  As I

21    understand them, Dr. Cathcart will send you a copy of an

22    overview that explains the basis for the hedging strategy

23    that has been adopted by the other stock loan lenders in the

24    past.

25             "Essentially, this strategy provides that in many

DEBEVC - DIRECT

1    cases the underlying collateral is actually sold with a

2    portion of the sales proceeds being used to fund a reserve

3    account or a purchase of an option list to require the

4    securities at the loan maturity.  This strategy is really

5    only applicable to stock loan transactions."

6        Mr. Debevc, I think you told Mr. Clukey that your

7    understanding of the first part of the sale is, what Dr.

8    Cathcart explained to you, is the first part of the hedge,

9    right?

10   A. That was the first part of the hedge, to mitigate the

11   risk of the stock declining in value immediately after

12   receipt.

13   Q. And what's written here was consistent with your

14   understanding of the first part of the hedge, right?

15   A. It was part of the process that was in existence when I

16   came there, yes.

17   Q. And then also, the lawyer, Tim Scrantom from 10 State

18   Street, tells them in the second part is a use of buying or

19   the purchase of an option to require these securities.

20       So you use the money to buy an option to buy back

21   the stock in the market.  Is that called a call?

22   A. Well, I think that's a way of simplifying it, but it

23   could be described as such.

24   Q. Well, is it describing some kind of hedging strategy of

25   buying puts or calls?

DEBEVC - DIRECT

1    A. That is correct.

2    Q. And again, was that your understanding of the hedging

3    strategy?

4    A. It is the Optech.

5    Q. Yes, the lenders were doing?

6    A. The lenders were doing.  That was what was described to

7    me that -- what was happening.

8    Q. And did you believe your lawyer?

9    A. Well, I believed the attorney and I believed Charles

10   Cathcart, who designed the program.

11   Q. And again, because Optech is doing due diligence to

12   buying this loan portfolio, they are doing all this work, was

13   it your belief that Optech was a real lender?

14   A. Yes.  Um -- and both Mr. Sullivan and Mr. Flader signed

15   the service agreement with Veridia to provide services to

16   Optech, so -- and I see the owners of the enterprise or

17   business signed a service contract.  And they agree on a

18   compensation as a service company, outsource service

19   provider.

20   Q. And again, you went to wok day after day providing these

21   services?

22   A. In addition, they -- these same individuals reached the

23   bank accounts and brokerage accounts.  And then through a

24   power of attorney, giving the power to Veridia to accomplish

25   the requirements of the service agreement.

DEBEVC - DIRECT

1     Q. And again, Dr. Cathcart's background, what was your

2     understanding of his background?

3     A. I worked for Dr. Cathcart in the mid-eighties at

4     CitiBank, and he was at that time the epicenter of the

5     development of derivatives.  Derivative products had not yet

6     had the name as derivatives.

7          So I would -- I ended up working with him,

8     implementing some of the strategies that he designed in the

9     marketplace.

10    Q. And I want to show you Exhibit 38, which is Derivium's

11    marketing materials.

12          THE CLERK:  Is that plaintiff or government?

13          MR. COOPER:  It's Government Exhibit 38, and it's in

14    evidence.

15    Q. And again, he talks about this hedging strategy being his

16    "Coca-Cola syrup".  Do you recall that?

17    A. Yes, I do.

18    Q. And he talks about a proprietary hedging strategy?

19    A. I think everybody on Wall Street thinks they have a

20    proprietary hedging strategy.

21    Q. After the recent events, I think they think a lot.

22          My question is:  Dr. Cathcart was the hedging expert

23    at Derivium, correct?

24    A. He's the one that designed the program, yes.

25    Q. And in these marketing materials, and as an owner of

DEBEVC - DIRECT

1    Derivium, did you ever look to Mr. Nagy for advice about

2    hedging strategies?

3    A. No, I did not.

4    Q. Did you ever look to him for advice on how to implement

5    Risk Management strategies?

6    A. No, I did not.

7    Q. And in the marketing materials, there are certain

8    statements in here where they derive, and it says, "hedging

9    transactions are established to protect the value of the

10   pledged collateral".

11   A. Yes.

12   Q. Is that a statement that Mr. Nagy would have caused

13   Derivium to make?

14   A. I don't believe so.

15   Q. Right.

16        Because Dr. Cathcart was the expert in hedging,

17   correct?

18   A. And the advertising was designed by Scott Cathcart.

19   Q. Right.

20        And Scott Cathcart was responsible for the --

21   A. He was the marketing guru.

22   Q. And Mr. Nagy was an outside accountant, right?

23   A. That is correct.

24   Q. And the people that have the ultimate say at Derivium

25   were Charles Cathcart, right?

DEBEVC - DIRECT

1    A. Correct.

2    Q. And Scott Cathcart, with respect to marketing materials?

3    A. With respect to marketing materials, without question.

4    Q. And as an owner of Derivium, did Mr. Nagy have the

5    ultimate say on what went out, was put in these promotional

6    materials?

7    A. I don't believe so.  And I don't know if he was solicited

8    or not.

9    Q. And also with the website?

10   A. The website, that was, um, the only -- the website was

11   designed by a professional firm contacted by Scott Cathcart.

12   The only -- I can't imagine why Mr. Nagy would be involved.

13   Q. As an owner, you couldn't envision it?

14   A. I said I could not envision.

15   Q. Oh, you could not envision it?

16   A. Right.  It could be Mr. -- just check on the math.

17           THE COURT:  Are you going on to another subject

18   again?

19           MR. COOPER:  Pardon?

20           THE COURT:  Are you going on to another subject

21   again?

22           MR. COOPER:  Yes, Your Honor.

23           THE COURT:  Why don't we take an afternoon break at

24   this time.

25           Ladies and gentlemen of the jury, we'll start again

DEBEVC - DIRECT

1    in about 15 minutes.  Thank you.

2                (Thereupon, the jury retired from the courtroom.)

3                THE COURT:  Okay.  Mr. Clukey, how about giving me

4    about 30 seconds as to your objection on Exhibit 63, so I can

5    think about it while I'm upstairs.

6                MR. CLUKEY:  Yes, Your Honor.

7                The document was prepared in anticipation of

8    litigation, Your Honor, and it's not a business record, it's

9    not an opinion, which we believe Mr. Cooper is going to

10   represent it as -- in fact it says in it, it's simply a

11   statement of fact, which is exactly what lawyers do as far as

12   preparing -- well, let me back up.

13               It's double hearsay in there saying it's facts that

14   have been transmitted to the client.  And it says in it it's

15   not an opinion.  And we haven't offered an opinion about

16   this.  We will do so maybe at later time, but they haven't

17   and they don't ever.

18               THE COURT:  All right.  And your response to that?

19               MR. COOPER:  I'm not -- in anticipation of

20   litigation -- I mean, this is an IRS investigation.  I don't

21   know if it's in anticipation of litigation, but it is a

22   response to the IRS.  So I don't know how work product comes

23   into play if it was disclosed over to the IRS.

24               Secondly, the Government with Mr. Debevc brought up

25   Mr. Nagy was still giving advice when the IRS was challenging

DEBEVC - DIRECT

1    the position.  I'm just showing they were fighting back, they

2    didn't roll over.  It wasn't a foregone conclusion.

3          And they also brought it up with the California

4    Franchise Tax Board.  And part of this addresses that

5    position, as well.

6          We are not saying it's a tax position; we are just

7    saying that there was just basis for it.  It wasn't a

8    foregone conclusion when the IRS started looking at the

9    transaction.

10         MR. CLUKEY:  Your Honor, we would add that he's

11   already testified to that.  All that information is already

12   in the record.  We don't need this hearsay document, which is

13   not an opinion, and clearly states that it's not.  And it was

14   prepared in anticipation of litigation, which is clearly what

15   it says.

16         THE COURT:  It may have been, but it's also

17   transmitted to the IRS.

18         MR. CLUKEY:  The other thing is B. John Williams was

19   on their witness list, and he's not here to talk about this.

20   That's very curious.

21         MR. COOPER:  Well, I mean, he's $2,000 an hour, and

22   I mean --

23         THE COURT:  Well, you know, for Washington, that's

24   not so bad.  The last Washington thousand dollars-an-hour

25   lawyer that I had in this courtroom was worth it.

DEBEVC - DIRECT

1           So I can't -- I want to see a $2,000 dollar lawyer.

2    You may want to bring him down.  I've never seen one.

3           MR. COOPER:  But I believe I laid the business

4    record.

5           THE COURT:  I'll take a look at it, okay?

6           Thanks.

7           (Thereupon, there was a brief recess.)

8           THE COURT: Ready to go?

9           MR. COOPER:  Yes, Your Honor.

10           MR. CLUKEY:  The case of *Palmer vs. Hoffman*, it's a

11    Supreme Court decision, 318 U.S. 109, and it says that when a

12    document is prepared for purposes of litigation, that it does

13    not meet the hearsay exception for business records.

14           THE COURT:  We are doing some additional research on

15    it, so I'm not going to have a decision for you until

16    tomorrow anyway.

17           MR. COOPER:  So would that mean we -- can we release

18    him for now and try to push it along with the transcripts

19    of --

20           THE COURT:  Sure.  Don't you have other things you

21    were going to ask him?

22           MR. COOPER:  I'm almost done.

23           THE COURT:  Good.

24           THE WITNESS:  Thank you.

25           THE COURT:  I'm supposed to make the right decision,

DEBEVC - DIRECT

1    and I can't make a snap decision, and we'll go from there.

2              So go ahead and continue your examination and finish

3    it up.  And if we -- if I decide it's coming in, we can

4    always bring him back for a short period of time.  If not, no

5    harm no foul.

6              Okay.  Good.  Except for Mr. Debevc, who probably,

7    once he leaves here, he probably never wants to walk in these

8    doors again.  He's spent more time in this courthouse than I

9    have in the last couple of years.

10             THE WITNESS:  Not by design.

11             THE COURT:  All right.  Bring the jury in for me,

12   please.

13             (Thereupon, the jury returned to the courtroom.)

14             THE COURT:  Okay.  Mr. Cooper?

15             MR. COOPER:  Thank you.

16   Q. Are you ready, Mr. Debevc?

17   A. Yes.

18   Q. I'm going to show you what's Exhibit 236, Government,

19   it's already been admitted into evidence.  This is the

20   valuation confirmation report.

21             Was this document generated from y'all's back

22   office?

23   A. Um, this would have been a document that would be

24   generated as a consequence of transfer of securities from the

25   borrower's brokerage account into the lender's brokerage

DEBEVC - DIRECT

1    account.

2    Q. And was this document generated by your section of the

3    office?

4    A. This was generated in the administration section of the

5    office, and they would calculate the value as of -- the value

6    of the stock as of the time that it was received --

7    Q. Okay.

8    A. -- and booked in the lender's account.

9    Q. And this document, did Mr. Nagy cause it to be sent to

10   anyone?

11   A. I don't believe so.

12   Q. And again, do you recall if Mr. Nagy had any input into

13   what's in this document?

14   A. No, the -- I don't believe that.

15   Q. And the second page is the activity confirmation.  And

16   again, is this a document generated from your office?

17   A. This would have been a document generated as a

18   consequence of the sale of the stock; therefore, activity

19   confirmation.  And that would represent the actual value of

20   the dollar amount received for -- from the sale of the stock.

21   And based on the value received, the 90 percent was

22   calculated as to what they were owed.

23   Q. My question was:  Was it generated from your office?

24   A. Yes, it was.

25   Q. Okay.  Did Mr. Nagy have any input in what's in that

DEBEVC - DIRECT

1   document?

2    A. No.

3    Q. And did he --

4    A. Not that I'm aware of.

5    Q. And did he cause Derivium to send it out to borrowers?

6    A. No.  This was part of the process notifying the borrowers

7   that the stock has been valued in the amount of proceeds to

8   be disbursed.

9    Q. The next is Exhibit 155, Government.

10        MR. COOPER: Which I believe is also admitted into

11   evidence?

12        THE CLERK:  Yes.

13    Q. This is the quarterly account statement.

14        And again, was this document generated from your

15   office in Derivium?

16    A. Yes, it was.

17    Q. And again, did Mr. Nagy have any input into this

18   document?

19    A. Not that I'm aware of.

20    Q. And did Mr. Nagy cause this document to be sent out to

21   borrowers?

22    A. No, he did not.

23    Q. And again, it -- Mr. Nagy was not an owner of Derivium,

24   correct?

25    A. No, he was not.

DEBEVC - DIRECT

1    Q. He was not part of management, was he?

2    A. No, he was not.

3    Q. And he didn't have final say on what documents looked

4    like before they were sent out to borrowers?

5    A. Not that I'm aware of.

6    Q. I'm going to show you Government Exhibit 189.  It was

7    about this alleged proposal to administer Mr. Nagy sent you

8    to administer loans.

9         Do you recall those questions by Mr. Clukey?

10   A. Yes, I do.

11   Q. And I forgot, which lender were you going to administer

12   loans for?

13   A. Well, Veridia was ceasing operations and was giving up

14   their administering of loans for both Bancroft and for

15   Optech.

16   Q. And did this proposal go anywhere?

17   A. No, it did not.

18   Q. So this Newco was never formed?

19   A. No, it was not.

20   Q. It's basically -- this was -- it never happened?

21   A. Nothing ever materialized out of that document.

22   Q. And the purpose of the proposal was to administer loans

23   that were already in existence, right?

24   A. It was only the FRN loans because of the nature of the

25   loan.

DEBEVC - DIRECT

1    Q. My question was:  This was to administer loans that had

2    already been done?

3    A. That is correct.

4    Q. And in fact, Mr. Nagy wrote:  "Newco will be a domestic

5    entity and will perform loan administration strictly related

6    to FRN transactions.  Newco will not be in the possession of

7    client files and will not handle any loan initiation

8    processing assuming that there might be any future FRN

9    transactions completed."

10         Doesn't that mean that Mr. Nagy was telling you he

11   would not be involved with the initiation of FRN

12   transactions?

13   A. That is correct.

14   Q. Because he gave advice to Derivium that said, FRN

15   transactions were sales for tax purposes, didn't he?

16   A. I believe that that was the advice in one of his memos.

17   Q. And he's trying to follow his own advice by not

18   initiating these transactions, right?

19   A. That's what the document speaks.

20   Q. Government's Exhibit 233 that Mr. Clukey asked you about.

21   Actually for now, I'm going to hand it to you, so you can

22   look at it.

23   Q. And my question is, while you are reading it, is Mr. Nagy

24   providing any tax advice in there about whether the

25   90 Percent Stock Loan transaction is a loan or sale for tax

DEBEVC - DIRECT

1    purposes?

2        A. This is basically a to-do list, if under certain

3    circumstances, but it's not tax advice.

4        Q. And what's the date of that document?

5        A. July 3, 2000.

6        Q. Okay.  When did Optech actually become the lender?

7        A. The first transaction that I can recall Optech being the

8    lender would be sometimes in 2003.

9        Q. Three years later, is that what you are saying?

10       A. Yeah.

11       Q. So what y'all were working on here, too, never came to

12   fruition, did it?

13       A. Nothing.  Not in that format.

14       Q. And then Mr. Clukey asked you in point three about

15   applying for a federal I.D. number.  Isn't that a tax number?

16       A. Yes, it is.

17       Q. And is there anything -- you think he was asking about

18   that's wrong about trying to apply for a tax number?

19       A. I'm not an accountant, so -- I believe so.

20       Q. Is that how you form entities, you get tax numbers?

21       A. I think it's one of the requirements.

22       Q. Mr. Clukey also showed you Government's Exhibit 264.

23          Is Mr. Nagy on this e-mail?

24       A. Yes.  He is originating this e-mail.

25       Q. Is he providing tax advice in this e-mail?

DEBEVC - DIRECT

1    A. No, he is not providing tax advice.

2    Q. Is the 90% Stock Loan even mentioned?

3    A. No, it is not.

4    Q. Derivium Capital U.K.  That was another company that

5    never did anything, right?

6    A. To my recollection, I don't think they ever did any

7    loans.

8    Q. They sent Mr. Sandifer over there to investigate, but

9    they didn't do it because of the events of 9-11, and whatnot?

10   A. They didn't do it for an assortment of reasons.  And I

11   think that stems as to why it was not.

12   Q. And the ten percent that was left between the value of

13   the loan and the collateral, was that the lender's property?

14   A. That was income to the lender.

15   Q. Well, if it's income to the lender, it's the lender's

16   money, isn't it?

17   A. That would be my belief.  Any time you sell something and

18   you get a profit, that is that entity's money.

19   Q. And Mr. Clukey was talking to you about the flow of

20   money.  Do you remember that?

21   A. That is correct.

22   Q. And the investments and the startup companies, you said

23   were accounted for as investments from the lender down into

24   the startup entities?

25   A. That is correct.

DEBEVC - DIRECT

1    Q. And Mr. Clukey showed you Government's Exhibit 36.

2    Government's Exhibit 36.

3        And it said right there that -- he showed you a

4    couple of investments, but isn't the lender an investor here?

5    A. Yes, he is.

6    Q. It's not really strange if someone that owns a company

7    would loan money to it, is it?

8    A. I beg your pardon?

9    Q. If someone that owns part of a company would loan money

10   to it?

11   A. I think that that's natural that they would want to

12   participate in that number.

13   Q. So you didn't think anything was odd about this?

14   A. No.

15   Q. And Mr. Debevc, as an owner of Derivium, and from the

16   years of 2000 until 2005, did you believe that anything --

17   that Derivium was engaged in any wrongdoing during that

18   period?

19   A. I did not.

20        MR. COOPER:  Thank you.

21                    REDIRECT EXAMINATION

22   BY MR. CLUKEY:

23   Q. Mr. Debevc, you started off your testimony this morning,

24   there is a fairly large judgment against you for fraud; is

25   that correct?

425

DEBEVC - DIRECT

1      A. That is correct.  And that is being appealed.

2      Q. And it's being appealed.

3          So anything you say here could affect that appeal;

4  is that correct?

5      A. I assume so.

6      Q. Mr. Debevc, you talked about some meeting with the

7  Jeeves?

8      A. Sure.

9      Q. Alex and Brian Jeeves?

10     A. Thank you for reminding me one of the names, I

11  couldn't --

12     Q. Of The Jeeves Group; is that correct?

13     A. Correct.

14     Q. Now, your partner, Charles Cathcart, when Derivium was

15  getting sued, Derivium Capital was getting sued in 2005, May

16  of 2005, your partner provided an affidavit, because the

17  Jeeves, who were in Liechtenstein, right?  That's where The

18  Jeeves Group is, in Liechtenstein?

19     A. Correct.

20     Q. Lindsay AG, this is actually -- they are involved in this

21  company, Lindsay AG?

22     A. I didn't know the relationship between Lindsay AG and the

23  Jeeves, but I've seen that name before.

24     Q. Well, The Jeeves Group got sued, didn't they, as part of

25  some of these defaults?

DEBEVC - DIRECT

1    A. They did.

2    Q. And they got pretty upset about it, didn't they?

3    A. I think everyone is upset when you get sued.

4    Q. And your partner, Charles Cathcart, wrote a letter saying

5    the Jeeves didn't have anything to do with this scheme,

6    didn't they?  Didn't Charles Cathcart?

7    A. I saw documents to the contrary which were not admitted.

8         MR. CLUKEY: A copy of Exhibit 260, please.

9    Q. Mr. Debevc, take a look at that document, please.

10   A. Yes.

11   Q. Do you recognize the signature on there?

12   A. Yes, I do.

13   Q. Whose signature is that?

14   A. Charles Cathcart.

15        MR. CLUKEY:  Your Honor, we would ask to move in

16   Exhibit 260.

17        MR. COOPER:  802.

18        MR. CLUKEY:  Exception 801(d)(2)(E), Your Honor.

19        THE COURT:  Okay.  Sustained -- I mean, overruled.

20   In evidence.

21        (Thereupon, Government's Exhibit Number 260 was

22   received in evidence.)

23        MR. CLUKEY: Pull up 260, please.

24   Q. So you just said that was Charles Cathcart's signature on

25   the bottom, right?

DEBEVC - DIRECT

1    A. I recognize that as his signature.

2    Q. Okay.  Let's see what this letter says.  May 5, 2005.

3    Veridia is still in existence, correct?

4    A. Correct.

5    Q. And Robert Nagy issues his proposal to do this FRN

6    program after this, correct?

7    A. Correct.

8    Q. So it says:  "As the undersigned, Charles Cathcart hereby

9    confirms that neither The Jeeves Group nor any of its

10   personnel or any of its companies are the cause of

11   nonrepayment to any creditors of Derivium Capital LLC or

12   Bancroft Ventures Ltd.

13           "Furthermore, he's also confirmed that neither the

14   Jeeves group or any of its personnel or companies are or were

15   involved in the running of neither Bancroft Ventures, Ltd.

16   business affairs, nor does it supply any director, officer,

17   manager for that company.

18           "Sincerely Charles D. Cathcart."

19   Q. Did I read that correctly, Mr. Debevc?

20   A. You did.  You read that correctly.

21           And this was in 2005.  However, in 2000, in the year

22   2000, the document which was not admitted --

23           THE COURT:  Wait a minute.  We can't talk about

24   something that's not admitted, Mr. Debevc.

25           THE WITNESS:  The attorneys prevented me from

DEBEVC - DIRECT

1   talking.

2   Q. And in talking about this office of Bancroft U.K. I think

3   you said you went over to; is that right?

4   A. I was in that.

5   Q. Bancroft U.K.?

6   A. Negative.  Yeah.  Bancroft U.K.

7   Q. Bancroft U.K. actually shared office space with one of

8   your companies, didn't it?

9   A. That was operated at the time in, I think in 2000, I

10  think 2001, 2002, they shared office.  They had offices in

11  the same building as Derivium Capital U.K.

12  Q. Derivium Capital U.K., your company?

13  A. Correct.

14  Q. So we understand the timing here:  Bancroft isn't even

15  formed until the end of 2000, correct?

16  A. Sometime in 2000.

17  Q. Sometime in 2000.

18       And so you are saying in 2001, there is another

19  company Bancroft -- which isn't even on here -- Bancroft

20  U.K., and that shares office space with your company,

21  Derivium Capital U.K.; is that correct?

22  A. That's correct.

23  Q. It also shares office space with your lawyer, 10 State

24  Street, correct?  Don't they have an office there, too?

25  A. I don't know that he had an office, but he would have

DEBEVC - DIRECT

1    frequented in the office of his client Bancroft U.K.

2    Q. And there were other employees of -- former employees of

3    Derivium Capital that were over there, weren't there,

4    Jonathan Sandifer?

5    A. Jonathan Sandifer and Catherine Sandifer.

6         MR. CLUKEY: Give me a copy of Exhibit 3, please.  Is

7    this in evidence?

8         THE CLERK:  Yes.

9         MR. CLUKEY:  That makes it easy.

10    Q. Mr. Debevc, is that your signature there?

11    A. Yes, it is.

12    Q. And so we see here, on April 7th, April 7th, 2004, you

13    are writing to Bancroft Ventures in Isle of Man.  You are

14    saying:  "Dear sirs, this letter shall serve to confirm that

15    Veridia Solutions LLC, a limited liability company under the

16    laws of South Carolina, has been performing as an independent

17    representative agent in the territory of North America since

18    January 1st of 2003."

19         That's almost a year and a half later you are

20    writing Bancroft to tell them what you have been doing,

21    right?

22    A. Actually, the document was originated earlier.  It was

23    not signed.  That document presentation was created by the

24    attorneys for Bancroft Ventures, for Bancroft 10 State

25    Street.

DEBEVC - DIRECT

1    Q. So Derivium lawyers created the document?

2    A. Derivium attorneys and Bancroft attorneys.

3    Q. We stated here 10 State Street was everybody's lawyers

4    here, right?

5    A. It appears that way.

6    Q. So we go to the next page here.  This is another cover

7    letter writing to Bancroft:  "Please find enclosed two signed

8    copies of financial representation administration and

9    processing agreement.

10          "After having these documents executed by Bancroft,

11   retain one copy in your files and return one copy to my

12   attention."

13          That's your signature on the bottom, right?

14   A. That's correct.

15   Q. Let's go to the end of this document.

16          MR. CLUKEY: Is this the last page?  Sorry.  There we

17   go.

18   Q. "Bancroft Ventures Ltd."  That's not signed by them, is

19   it?

20   A. I never signed it.  There is a signed copy in existence.

21   Q. You signed this.

22          I guess my point is you signed this copy; you are

23   the one controlling this whole transaction -- this agreement

24   you set in place earlier that you testified about -- you are

25   the one controlling this; you are the one sending it off to

DEBEVC - DIRECT

1    these folks to just fill in their name, right?

2     A. The document was provided to me by 10 State Street and

3    given to --

4         MR. CLUKEY: Let met have a copy of 176, please.

5     Q. Do you recognize that document, Mr. Debevc?

6     A. I was looking at the copy when mailed.  It was around

7    2003.

8     Q. So we are talking about Government's Exhibit 55 earlier,

9    which was written in April of 2003, if you recall, the due

10   diligence letter?

11    A. Yeah.

12    Q. So this is after that, right, October?

13    A. That is correct.

14    Q. And that's to Jack Pfleiderer, right?

15    A. That's what the caption reads.

16    Q. To Jack Pfleiderer.  So he was with Optech?

17    A. He was with Optech.  And it was written by Charles

18   Cathcart.

19    Q. Okay.  Let's go to the next page.  And here we are

20   talking about what Optech is actually doing, right?

21         MR. CLUKEY: Your Honor, we would ask to move this

22   into evidence.

23         MR. COOPER:  Your Honor, we have a 402, 403 on

24   the --

25         THE COURT:  Well, 402 is solved because it's a reply

DEBEVC - DIRECT

1    to what you brought up in cross-examination of Mr. Debevc

2    with regard to the due diligence of Optech.

3         And 403, I don't think its prejudicial value greatly

4    outweighs -- vice versa -- unfair prejudice.  So I'll

5    overrule it.

6         (Thereupon, Government's Exhibit Number 176 was

7    received in evidence.)

8         MR. CLUKEY: Let's go to the second page.

9    Q. So we see here is a letter:  "Charles, thanks for your

10   e-mail.  I marked it on my calendar.  Optech has its own

11   office within our offices and the Optech name is on the sign

12   board; however, we do not have Optech business cards or

13   brochures or other stuff.  Is that okay?  Jack Pfleiderer."

14        And what's Charles?

15   A. Well, I'm -- I don't see the end communicated on at this

16   point in time with this exchange.

17        MR. CLUKEY:  Let's go to the prior first page.

18   Actually, can you back up for a second?  So -- there.

19   Q. You do get this whole e-mail string, right, Mr. Debevc?

20   A. Eventually, this was forwarded to -- or sent to me to

21   forward to Mark Broadwater at 10 State Street.

22   Q. Okay.  So let's see what Charles sent you:  "Jack, I

23   think the lack of brochure is easily explained" --

24        THE COURT:  Slowly.

25   Q. "Optech depends upon Derivium for its marketing and

DEBEVC - DIRECT

1   sales.  It would be best, however, if you could have some

2   business cards made up.  Any chance that could be done

3   locally on an expedited basis?  Mark tells me you are a

4   complete package.

5        "As a backup, we'll check and see if we can get it

6   done stateside and courier it to you.  We would like to have

7   cards for yourself, Marie and Jackie.  Please provide

8   relevant details.  We need to get them done here for Optech

9   at this point in time."

10       Optech is being set up for Derivium's behalf, isn't

11  that right?

12   A. I believe that the document speaks for itself.  I don't

13  know.  Optech was already set up by that time and the loans

14  going.  I'm not aware of any of this being set up.  Optech

15  was operational.

16   Q. Optech had already been set up, hadn't it?

17   A. Yes.

18       MR. CLUKEY: I need a copy of Exhibit 225, please.

19       Before we look at that, would you pull up 223?

20   Q. It was set up by Bob Nagy.  He helped form the company,

21  didn't he?  "Action items for DDA, Optech transition," way

22  back in 2000?

23   A. Well, I don't know that all of those items were

24  implemented at that time.  I think that was -- this was a

25  to-do list or a plan, but I'm not aware that it was executed

DEBEVC - DIRECT

1    at that point in time.

2    Q. Well, we know that Optech is actually set up, right?

3    A. Optech is being set up, and this is a, as the legend

4    said, a checklist, a to-do checklist in July, 2000.

5    Q. Right.

6         And it does -- eventually we know that Optech is --

7    A. Eventually, it does happen.  I don't know the timing of

8    it.  I know that at the beginning of -- in the first half of

9    2003, Optech was operational.

10   Q. And we talked about that earlier on your direct.  Optech

11   was set up, but the shelf company -- it was put on the shelf.

12   And then when you had litigation problems right around here,

13   then Optech comes off the shelf and it picks up the loan

14   business, doesn't it?

15   A. You are asking me to represent a legal opinion.  I'm not

16   an attorney to -- this was a product of the attorneys and the

17   senior partner, Charles Cathcart.

18   Q. Okay.  You are looking at 225.

19         MR. CLUKEY:  Your Honor, we would ask to move this

20   document into evidence.  Can you back out so you can see?

21         THE COURT:  Any objection, Mr. Cooper?

22         MR. COOPER:  402, 403.

23         MR. CLUKEY:  Your Honor, I would ask you to focus on

24   the second bullet and the last name there -- which Mr. Cooper

25   brought up -- at the top that is showing for the contact.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

DEBEVC - DIRECT

1          THE COURT:  Okay.  I'll overrule your objection.

2          (Thereupon, Government's Exhibit Number 225 was

3     received in evidence.)

4      Q. So here we see a memo that Bob Nagy is being cc'd on.

5     Tim Scrantom is saying:  "I've prepared the following

6     checklist of items remaining to be completed for the offshore

7     restructuring stock loan transactions.  Clients have

8     indicated they would like to keep July 15, 2000 as the day

9     upon which they convert to the new operational model."

10          And then if we see that second bullet right there.

11     "Create a Hong Kong international business company to be

12     named Optech Ltd., so Hong Kong Optech, an entity to manage

13     same.  Contact Jack Flader."

14          That's the guy who ultimately does work at Optech,

15     correct?

16      A. I'm not -- you are asking me to comment on a document

17     that I was not copied on and I was not privy to before.

18      Q. Mr. Debevc, I'm not -- I'm just asking you a question, to

19     look at this document.  Jack Flader was the person that

20     Lindsey Cooper just asked you about?

21      A. That's correct.  He is one of the owners of Optech.

22      Q. So Bob Nagy knows who he is back in 2000, doesn't he?

23      A. That's what this document would suggest, but I don't know

24     that.

25      Q. And in fact, Optech is created and Jack Flader is

DEBEVC - DIRECT

 1     involved with it, correct?

 2      A. Ultimately, Jack Flader is involved in Optech.

 3           MR. CLUKEY: If you can pull up Exhibit 189?

 4      Q. Mr. Cooper just asked you about this on cross.  And if we

 5     go to the third page, this document again, this is -- this is

 6     Mr. Nagy's proposal to you regarding the FRN transactions,

 7     correct?

 8      A. That's correct.

 9      Q. Okay.  If we go to the third page.  We didn't talk about

10     the amount of money he was proposing to make off of this.

11           And he's saying:  "All interest payments will be

12     deposited to an account or accounts in the name of the

13     lenders in consideration for the administration services.

14     Newco will be paid 80 percent of the amounts received.

15     Twenty percent will remain with the lender.  Newco will not

16     have any control over the bank accounts."

17           So if you recall, if you go back to the first page

18     of this document, or the second page -- so this is going to

19     be $100,000 a quarter.  And I think in your -- the document

20     basically says, you are not really going to have to do

21     anything, $100,000 a quarter, and you are going to keep

22     80,000 of that and the lender would get 20,000.  Is that

23     correct?

24      A. I think you are telling me that.  You say "you guys,"

25     this was a proposal that -- it was a proposal that was made

DEBEVC - DIRECT

1    that was not accepted; and therefore, for you to tell me that

2    I'm going to keep certain amount of money is ridiculous.

3    Q. You know what, Mr. Debevc?  I wasn't meaning to suggest

4    that, because you rejected this proposal, didn't you?

5    A. I did not accept it.  That's correct.  I rejected the

6    proposal.

7    Q. Thank you.

8                        RECROSS-EXAMINATION

9    BY MR. COOPER:

10    Q. Charles Cathcart took you to go see the Jeeves Group in

11    Liechtenstein, right?

12    A. That's correct.

13    Q. He also sent you to the U.K. to go see the Bancroft

14    offices, didn't he?

15    A. Actually, he accompanied me there.

16    Q. And then Exhibit 260 that he said -- first of all, do you

17    know if Bob Nagy saw this document?

18    A. Which document is that again?

19            MR. COOPER:  I'm sorry, Ms. Gail.

20            THE CLERK:  Okay.

21            THE WITNESS:  I don't know.

22    Q. And after traveling with Charles to go see all these

23    people, he all of a sudden says it didn't exist, right?

24    A. I don't know what circumstances led him to write this.

25    Q. Let me ask you this: After reading this letter, what you

DEBEVC - DIRECT

1    experienced through your employment at Derivium, do you think

2    Charles did all this and hid it from you?

3    A. I don't know what to believe at this point in time, but I

4    don't believe so.

5    Q. There was a lot of confusion, isn't there?

6    A. That's correct.

7    Q. And you don't know what's real and fake anymore, do you?

8    A. I thought I knew what was real in 2002.  I thought -- I

9    certainly knew what was real in 2003 dealing with these

10   people.  As the time goes on and I see these documents, I

11   have to question that.

12   Q. Right.

13        And your question is, Charles Cathcart set all this

14   up and he hid it from you.  That's the question in your mind,

15   isn't it?

16   A. I think I'm curious as a result of not being told

17   everything.

18        MR. COOPER:  Thank you.

19        THE COURT:  Okay.  Thank you, Mr. Debevc.

20        MR. CLUKEY:  We've got a video.

21        THE COURT:  Sure.  This is a video deposition of?

22        MR. CLUKEY:  It's a video deposition of Nigel Wood,

23   another Isle of Man resident.

24        MR. COOPER:  Your Honor, Mr. Debevc needs to be back

25   in the morning depending on --

```
1              THE COURT:  Well, you've got his contact
2      information.  I don't know whether I'll make a ruling, you
3      know, a decision tonight or -- so I'll have Frank e-mail you
4      and you can e-mail him, but you don't have to show up again,
5      Mr. Debevc, until somebody calls you.
6              THE WITNESS:  Right now, I'll be happy to show up
7      with about an hour's notice.
8              THE COURT:  You can stay if you want to; you can
9      leave if you want to.  We may see you again; we may not.
10             (Thereupon, the video deposition of Nigel Wood was
11     played for the jury.)
12             MR. CLUKEY:  Your Honor, this document is in
13     evidence.  Can we put it up side by side?
14             THE COURT:  Sure.
15             (Thereupon, the video deposition of Nigel Wood
16     resumed.)
17             MS. WEIS:  Your Honor, this is Government 42, which
18     is also in evidence.
19             Your Honor, this is Government Exhibit 40 that will
20     be referenced next.
21             THE COURT:  Okay.
22             MR. CLUKEY:  There may be ten minutes left.
23             (Thereupon, the video deposition of Nigel Wood
24     resumed.)
25             That's the end of the video, Your Honor.
```

```
1              THE COURT:  It's as good a time as any to quit right
2    now.
3              So ladies and gentlemen of the jury, we'll start at
4    9:30.  Don't let anyone discuss the case with you, don't make
5    up your mind until you've heard all the evidence in the case
6    and my instructions on the law.
7              So we'll see y'all again at 9:30.
8              (Thereupon, the jury retired from the courtroom.)
9              THE COURT:  Okay.  Mr. Cooper, it's my understanding
10   from the basis of our research, is that you -- your Exhibit
11   Number 63 is -- obviously, it's hearsay, but you have an
12   exception under the Hearsay Rule, 803(6), it's a business
13   record.  That's the basis of your moving it into evidence?
14             MR. COOPER:  Yes, Your Honor.
15             THE COURT:  Anything else?
16             MR. COOPER:  I realize that the Socks deposition we
17   gave you was prior to your motion in limine ruling about only
18   communications between Nagy and the IRS.
19             THE COURT:  Uh-huh.
20             MR. COOPER:  And if you would permit me, without
21   waiving my objection, I would cut it down significantly for
22   your reading time.
23             THE COURT:  Okay.  That's in your case, right?
24             MR. COOPER:  Yes, Your Honor.
25             THE COURT:  Okay.
```

1          MR. COOPER:  Just so you don't go home and read this

2     all.  I'm just trying to --

3          THE COURT:  I appreciate it, thank you.  You know,

4     if it gets late tonight and you are fired up, read the

5     deposition and go to sleep.

6          MR. COOPER:  I have a hard time sleeping anyway.

7          THE COURT:  All right.  And so we'll see y'all at

8     9:00 in the morning.

9          MR. CLUKEY:  There were a couple of pending

10    objections to I guess your rulings.  We want to play those

11    videos tomorrow.

12         THE COURT:  Tomorrow morning.

13         MR. CLUKEY:  You took those earlier.  I don't know

14    if you had a chance to rule on those.

15         We have got them back.  Okay.  So we are done; is

16    that right?

17         MR. COOPER:  One point on the Scrantom deposition.

18         Mr. Nagy was not a party in that case, and the

19    Hearsay Rule about -- he wasn't able to develop to

20    cross-examine him.

21         And I have an affidavit from his lawyer that he was

22    actually instructed -- by Ms. Wall, who was Mr. Scrantom's

23    lawyer -- that he could not ask questions, but he could sit

24    there.  And because Mr. Nagy didn't have the opportunity to

25    develop his case, we don't believe that it meets the hearsay

1    exception.

2            MS. WEIS:  Your Honor?

3            THE COURT:  Yeah.

4            MS. WEIS:  We believe that the Federal Rules of

5    Civil Procedure and Rule 804 allow for the Court to admit the

6    evidence, along with that someone with similar motives had an

7    opportunity to defend against the deposition.  And Mr. Nagy

8    obviously thought this was an important enough deposition for

9    his attorney to attend.

10           And we think that in and of itself, that he had

11   similar enough motives to the individuals who were attending

12   the deposition, and cross-examine -- and I'm not exactly sure

13   on the timing, but I know at some point in connection --

14   well, at some point surrounding this deposition, Mr. Nagy was

15   being sued by the trustee who took the deposition.

16           So it seems like, again, he's having similar enough

17   motives; that the lawsuit arose out of the same conduct and

18   loan program that was the subject of the lawsuit in which Mr.

19   Scrantom was deposed.

20           MR. COOPER:  Your Honor, there was separate

21   lawsuits.

22           And as far as motives, I mean, I think Tim Scrantom

23   didn't have any motive to help Mr. Nagy at that point.  And I

24   think that's very clear from what we are seeing in this case.

25           And Mr. Nagy's lawyer, Fleet Freeman -- I have his

1    affidavit, I can hand it up -- said Ms. Wall said he could

2    sit there, but he could not ask questions because he wasn't a

3    party to the action.

4         THE COURT:  I don't even see anybody -- the pages I

5    have -- Tim Scrantom, is that the February 12, 2008,

6    deposition?

7         MS. WEIS:  Correct.

8         THE COURT:  Before I guess we use his deposition, I

9    guess we have to lay a foundation that Mr. Scrantom is not

10   within 100 miles of the courthouse.  I don't know where he

11   is.

12        MR. CLUKEY:  To my knowledge, he's not, Your Honor.

13   He resides in New York and then has an office in Wyoming, or

14   a home in Wyoming, and an office in DC.

15        THE COURT:  Nothing here?

16        MR. CLUKEY:  Nothing here.

17        And we asked him if he could be subpoenaed here and

18   he said he could not.

19        MR. COOPER:  I don't know, I mean, he may have an

20   office in the People's Building, but if I may hand up Mr.

21   Freeman's affidavit?

22        THE COURT:  Sure.

23        THE COURT:  Okay.  Well, let's go over the

24   objections, because then if I overrule your objections, we

25   will be prepared to go ahead and play it.  If I sustain the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    objections, then what I do is irrelevant, okay.

2              MR. COOPER:  The only objection was, from what I

3    designated, page 52.

4              THE COURT:  Yeah.

5              MR. COOPER:  Line 16 to 21.

6              THE COURT:  Right.

7              MR. COOPER:  And again, he's testifying to what his

8    understanding -- I believe that that portion of what the --

9              MS. WEIS:  Your Honor, the copy of the --

10   unfortunately, we don't have an extra copy of the whole

11   deposition with us right now and a copy of -- oh, you can

12   pull it up?  Mr. Cooper, what was the citation again?

13             MR. COOPER:  Page 52.

14             THE COURT:  16 through 21?

15             MR. COOPER:  Yes, sir.

16             MS. WEIS:  Your Honor, it's complete hearsay.  He's

17   thinking that they were clearly assured, repeating what was

18   presented to him.  And again, Mr. Scrantom's scienter is not

19   an issue in this case.

20             So under any sort of 402/403 argument, it wouldn't

21   come in.  But more importantly, it is explicit hearsay.

22             THE COURT:  Okay.  Are you trying to get that in for

23   the truth of the matter asserted?

24             MR. COOPER:  No.  It's just simply to show

25   consistency.

1            MS. WEIS:  Your Honor, then we would -- if that

2    would be your ruling, if it is, we would ask for the jury to

3    be instructed, and it being offered not for the truth of the

4    matter asserted.

5            THE COURT:  And if you were a juror and I said that

6    to you, what would you understand?

7            MS. WEIS:  Well, it's very hard for me to step back

8    out of my lawyer shoes.

9            THE COURT:  All right.  I'll change -- you can read

10    that in, okay?  I mean, we can play that, assuming you can

11    play anything.

12            So since it's not for the truth of the matter

13    asserted, okay?

14            Now, is Sutherland tomorrow, too?

15            MR. COOPER:  I have very few of that, too.

16            THE COURT:  Okay.

17            MR. COOPER:  Page 23 lines 22 through 25.

18            MS. WEIS:  Your Honor, Mr. Sutherland works for

19    Optech, he doesn't work for Bancroft.  So any understanding

20    that he has lacks any foundation to answer this question in

21    terms of admissible evidence at trial, it seems like we are

22    repeating hearsay testimony again from, what I'm going to

23    assume is Charles Cathcart.

24            MR. COOPER:  I think it's the same as the last one

25    about all those folks talking and what their understanding is

1    and what the assurances were.

2             THE COURT:  Well, you lay a better foundation in Mr.

3    Scrantom's case than in this case, so far as in the

4    deposition.  Yeah.  I'll keep my ruling the same on that one.

5             The next one is lines 5 through 7 on page 31.

6             MS. WEIS:  Your Honor, we don't know at this point

7    what three legal opinions those are.  We've heard testimony

8    today that Derivium didn't receive anything.  So this is

9    testifying that the document is not in evidence.  And we

10   don't have an indication of, even if they are the documents,

11   and the Government will have an opinion that Your Honor has

12   decided could come into evidence.

13            MR. COOPER:  I think it's consistent with what

14   everyone is talking about Charles Cathcart is.  Show them

15   anything, do anything.  And he actually witnessed this.  And

16   he's not testifying as to what the legal opinions are, and

17   it's what did he have personal knowledge of.

18            THE COURT:  He, who?

19            MR. COOPER:  Mr. Sutherland.

20            THE COURT:  Direct personal knowledge of what?

21            MR. COOPER:  Of seeing the legal opinions.  He says

22   he was showed them.

23            MS. WEIS:  I think the clear inference is those were

24   favorable legal opinions.  I mean --

25            THE COURT:  In the history of this and the billions

1    of documents and the hundreds of depositions and the millions

2    of dollars that have been spent, nobody has yet to find a

3    legal opinion on the 90% Loan Program.

4              So I'll sustain that.  You can keep that in.

5              MR. COOPER:  The next one is page 49, 11 through 14.

6              MS. WEIS:  Your Honor, we were -- okay.  Our primary

7    concern is that Mr. Sutherland isn't an expert, and he's

8    offering either a legal opinion or expert testimony at this

9    point on what the collateral was.  He was saying the

10   collateral -- he was told the beneficial ownership or rights

11   or return of the stock, but certainly Mr. Sutherland isn't in

12   a position to tell the jury what the collateral is from a

13   lawyer/accounting perspective.

14             MR. COOPER:  We are just offering for what Mr.

15   Sutherland believed what the transaction was and what the

16   collateral was.

17             THE COURT:  Okay.  I'll stay the way I have it.

18             And the last one is?

19             MR. COOPER:  105, 14 through 22.

20             THE COURT: It doesn't look like he has any personal

21   knowledge of any of that.

22             MR. COOPER:  Again, this is almost exactly like Mr.

23   Scrantom, on getting the assurances, not for the truth of the

24   matter, but simply that was the consistent conduct of the

25   people who were engaged in the Derivium stock loan.  There

1    was always assurances that were hedges.

2              MR. CLUKEY:  Here, Your Honor, he's actually saying

3    he doesn't know.  He actually lacks foundation.  What type of

4    assurance?  Well, I don't know.  I wasn't involved in those

5    operations.

6              MR. COOPER:  If you go on and read it, we think

7    we've got them from Mr. Cathcart.

8              MR. CLUKEY:  I think speculating.

9              THE COURT:  Okay.  I'll stay the same on that one,

10   too, all right?

11             So two things -- you want these back now?

12             MR. CLUKEY:  Yes, Your Honor.

13             THE COURT:  Two things that I'm going to answer at

14   9:00 in the morning.  Number one, about Number 39, whether --

15   I'm sorry, 63 -- whether it qualifies as a business record.

16             And number two, whether or not the Scrantom

17   deposition can come in, period, okay?

18             Anything else?  Okay.  All right.  Thanks a lot.

19             (Thereupon, the court was in recess.)

20                          *   *   *   *   *

21

22

23

24

25

```
1                    *****    *****    *****

2

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-titled matter.

5

6

7

8    --------------------------

9

10   Amy C. Diaz, RPR, CRR              January 11, 2011

11

12   S/  Amy Diaz

13

14    CONTINUED CROSS-EXAMINATION                    280

15    BY MR. COOPER

16    REDIRECT EXAMINATION                           286

17    BY MS. WEIS

18                  RECROSS-EXAMINATION              295

19    BY MR. COOPER

20                  MR. YURI DEBEVC                  298

21    DIRECT EXAMINATION                             298

22    BY MR. CLUKEY

23    Government's Exhibit Number 297                310

24    Government's Exhibits 3, 43, 60, 81, 87, 90 and    325

25    101 were received in evidence
```

1    were received in evidence                                325

2    were received in evidence                                325

3    Government's Exhibit Number 190                          354

4                                                             390

5    Government's Exhibit Number 36                           390

6                    CROSS-EXAMINATION                        392

7    BY MR. COOPER

8    Government's Exhibit Number 55                           407

9    REDIRECT EXAMINATION                                     424

10   BY MR. CLUKEY                                            424

11   Government's Exhibit Number 260                          426

12   Government's Exhibit Number 176                          432

13   RECROSS-EXAMINATION                                      437

14   BY MR. COOPER

15

16

17

18

19

20

21

22

23

24

25