```
 1                 IN THE DISTRICT COURT OF THE UNITED STATES
                        DISTRICT OF SOUTH CAROLINA
 2                        CHARLESTON DIVISION

 3     ROBERT J. NAGY,            )           2:08-CV-2555
                                  )
 4                   Plaintiff    )           Charleston,
                                  )           South Carolina
 5     VS                         )           June 25, 2010
                                  )
 6     UNITED STATES OF AMERICA,  )             VOLUME V
                                  )
 7     Defendant                  )

 8                        TRANSCRIPT OF JURY TRIAL
                  BEFORE THE HONORABLE DAVID C. NORTON,
 9                 CHIEF UNITED STATES DISTRICT JUDGE

10     APPEARANCES:

11     For the Defendant:    MR. NATHAN CLUKEY
                             MR. GREGORY SEADOR
12                           MS. ELLEN WEIS
                             US Department of Justice Tax Division
13                           P.O. Box 7238
                             Ben Franklin Station
14                           Washington, DC 20044

15

16     For the Plaintiff:    MR. LINDSEY W. COOPER, JR., ESQ.
                             LW Cooper Jr. Law Offices
17                           36 Broad Street
                             Charleston, SC 29401
18

19

20

21

22

23     Court Reporter:       Amy C. Diaz, RPR, CRR
                             P.O. Box 835
24                           Charleston, SC 29402

25             Proceedings recorded by mechanical shorthand,
       Transcript produced by computer-aided transcription.
```

1            THE COURT:  Okay.  What we got?

2            MR. COOPER:  For purposes of today, I just believe

3    there is one outstanding objection on Cathcart.

4            MS. WEIS:  Well, I think there is two objections,

5    but the same topic, which is the McDermott Will & Emery --

6            THE COURT:  It's the McDermott Will & Emery chart

7    that is already in evidence that they've already talked

8    about, right?

9            MS. WEIS:  Correct.

10           THE COURT:  You want to put your objections on -- to

11   be consistent, I'll let that testimony in about Dr. Altemose,

12   that talks about him, in, okay?  All the rest of the Cathcart

13   is resolved.

14           And how about Gadsden?

15           MR. COOPER:  You mean Socks?

16           THE COURT:  Socks.

17           MR. COOPER:  We have been working this morning.  I

18   think we don't disagree about anything.  If we could have

19   your indulgence until Monday morning, we can narrow it down.

20           MS. WEIS:  Can I raise the issues?

21           THE COURT:  Yeah.

22           MS. WEIS:  So the Court is aware, there is going to

23   be a lot of overlap between these objections, and to save the

24   Court's time on Monday morning.

25           THE COURT:  If you are going to be here on Monday,

1    you are not going to get any rulings.

2              MS. WEIS:  Tuesday.

3              The first one is, there is several pages of Ms.

4    Socks's deposition that are designated about her background

5    and all the education and training and the courses she's

6    taken.

7              And to the extent that none of that was communicated

8    to Mr. Nagy, it simply, we think, is just trying to bolster

9    what is going to be represented as her reaching a conclusion,

10   which she testifies she didn't reach about the, you know, 90%

11   Loan Program.

12             The second issue on it is things that the IRS did

13   not tell Mr. Nagy, we believe that that was very clearly

14   communicated, things that were not communicated to Mr. Nagy

15   cannot be testified about.  So questions that, well, did you

16   tell him you thought it might be a potential fraudulent tax

17   shelter, questions of that nature we think are excluded under

18   the Court's ruling.

19             The third topic is testimony on the law, or the

20   factors that she was looking at, or that you would need to

21   look at, or what is a bona fide loan.

22             We understand that the Court allowed Mr. Nagy to

23   testify about that to the extent that it went to his scienter

24   and understanding of the law, but to ask the IRS agents to

25   testify about that we believe would be crossing over into

1    improper testimony.

2            THE COURT:  Okay.

3        MS. WEIS:  The fourth is there are a series of

4    questions on, do you think it was reasonable for Mr. Nagy to

5    have interpreted that no-change letter in a certain way.

6    Those are lack of foundation and otherwise improper, we

7    believe.

8            And the fifth issue, which we would like the Court's

9    guidance -- well, you can't give us guidance, but to raise

10   with the Court -- is we had counter designated originally

11   her -- a couple of questions where she had responses that she

12   never reached a conclusion.

13           And to the extent that it would be misleading the

14   jury in offering the rest of her testimony that she was

15   looking at this issue and she reached the no-change letter,

16   and that suggests that she reached this conclusion, we would

17   like to designate that testimony, but not if you are going to

18   rule that opens the door, obviously, into everything else.

19           So depending on if that would open the door, we'll

20   withdraw that, those counter designations.  And if it

21   doesn't, then we would maintain them.

22           I don't know if you can tell me in advance, but --

23           THE COURT:  All right.  So are those outlined in a

24   copy of the deposition that I can read through?

25           MS. WEIS:  Well, there is Ms. Socks when we flagged

1    the questions.

2              THE COURT:  Okay.

3              MS. WEIS:  They are not, you know, categorized.

4              THE COURT:  Okay.  So you flagged them in that.  Is

5    that the one I've already gone through and made rulings on?

6              MS. WEIS:  I don't believe we've gotten Ms. Socks's

7    deposition on that you've made rulings on.  If you have a

8    copy of that.

9              THE COURT:  I don't think I ever got one.

10             MS. WEIS:  It would have been mailed as a part of

11    the binder as a courtesy copy.  It should have been.

12    Maybe -- maybe it wasn't in there.  Okay.  Well --

13             THE COURT:  Well, we'll look for it, okay?

14             MR. COOPER:  Your Honor, Ms. Van Bavel said she

15    e-mailed the cut down version to chambers yesterday, so you

16    don't have to flip through all the pages.  And I believe she

17    wrote in the objections for you, too.

18             THE COURT:  So we'll print that out.

19             So I mean, what you have given me is what's in

20    controversy, as opposed to everything else?

21             MR. COOPER:  Yeah.  And I do believe we can narrow

22    it down to one or two things.  I would agree.

23             THE COURT:  All right.

24             Okay.  Anything else?  Let me -- yeah, I don't know

25    what -- whether y'all are talking about it, since we

1     bifurcated this, there is two issues.  Obviously, if Mr. Nagy

2     wins the first issue, the second issue is irrelevant.

3               Everybody agrees with that?

4               MS. WEIS:  Yes.

5               THE COURT:  And if Mr. Nagy loses the first issue,

6     then y'all are going to litigate the second issue.  But I

7     don't know if you can reach an agreement to the second issue.

8     I don't know where the blood out of the turnip version of the

9     Internal Revenue Code is located, but I mean, it seems to me

10    that you negotiated a -- or agree on a penalty, assuming that

11    Mr. Nagy is found liable, you might want to spend some time

12    doing that, but I can't force you to do it.

13              MS. WEIS:  Your Honor, we will talk about that.

14              THE COURT:  You can talk about it.

15              MS. WEIS:  Just so you know, we don't plan to offer

16    any additional evidence during the penalty phase.  We'll

17    offer all of our evidence today.

18              THE COURT:  Okay.  So just an observation, something

19    like that.

20              MR. COOPER:  Thank you.

21              THE COURT:  Okay.  All right.  We'll print out

22    the -- how many pages did you send us, Ms. Van Bavel?

23              MS. VAN BAVEL:  60 pages.  We have color copies,

24    too.  It's just they are not -- some of it is -- some of it

25    is crossed out because not all the pages are the same.

840

```
 1              THE COURT:  That's okay.  All right.  We'll go up

 2      and take a look at it.  If we need something, we'll let you

 3      know, all right?

 4              Okay.  All right.  And so we've got the two, Mr.

 5      Cohen and the expert, and then you are doing --

 6              MR. CLUKEY:  Yes, Your Honor.

 7              THE COURT:  You are going to read in Cathcart?

 8              MR. COOPER:  Yes, Your Honor.

 9              THE COURT:  What else?  Anything else?

10              MR. COOPER:  Not planned for today, Your Honor.

11              THE COURT:  All right.  So we will, as soon as the

12      jury gets here, we'll see you then.

13              (Thereupon, there was a brief recess.)

14              THE COURT:  Ready to go?

15              MR. CLUKEY:  Yes, Your Honor.

16              THE COURT:  All right.  Bring the jury in.

17              (Thereupon, the jury returned to the courtroom.)

18              THE COURT:  Okay.  Welcome back.

19              Mr. Clukey or Ms. Weiss, or whoever is up.

20              MS. WEIS:  Your Honor, we call Evan Cohen as our

21      next witness.

22              THE COURT:  Okay.

23              THE CLERK:  Place your left hand on the -- thank

24      you.

25              State your name for the record.
```

COHEN - DIRECT

1              THE WITNESS:  Evan Cohen.

2    THEREUPON:

3                        MR. EVAN COHEN,

4    Called in these proceedings and having been first duly sworn

5    testifies as follows:

6              THE CLERK:  Thank you.  Be seated on the witness

7    stand.

8                        DIRECT EXAMINATION

9    BY MS. WEIS:

10    Q. Good morning, Mr. Cohen.

11    A. Good morning.

12    Q. Could you please state your full name for the record.

13    A. Sure.  It's Evan Keith Cohen.

14    Q. Where do you reside?

15    A. I live in Arlington, Massachusetts.

16    Q. And where are you employed?

17    A. I'm employed at the Brattle Group.

18    Q. Mr. Cohen, I'm going to hand you what's been previously

19    marked as Government Exhibit 319.  Take a minute and look

20    through 319.

21              Do you recognize this document?

22    A. I do.

23    Q. How do you recognize it?

24    A. This is a summary of the transactions that I prepared for

25    this case.

COHEN - DIRECT

1    Q. So when you say "a summary of transactions," this is a

2    summary of documents that you were provided?

3    A. Yeah.  I was provided by the Government about 123,000

4    documents that detailed the transactions, and this is a

5    summary of the number of transactions broken out by stock

6    transactions and the FRN or ESOP transactions and the dollar

7    value of each of the transactions.

8    Q. When you say "documents," are these client files, or what

9    kind of documents are they?

10   A. So what we received were something around the order of

11   3,180 client folders.  Within each folder could be any number

12   of documents, Master Loan Agreements, brokerage statements,

13   account summaries, quarterly statements; things like that

14   that detailed the transactions.

15   Q. Did these documents contain any Bates stamps identifiers

16   on the documents?

17   A. They did.

18   Q. What were the Bates stamps by topic?

19   A. The Bates stamps were one of three things:  They were

20   either a file, a box or an optic Bates stamp.  And then there

21   were a bunch of other identifying numbers after that.

22   Q. Now, and you said there was 123,000 documents provided?

23   A. That's right.

24   Q. That's a lot.

25          How many people did you have working on this

COHEN - DIRECT

1    summary?

2     A. So at various times -- we had a different number of

3    people, but I believe the total number of people that helped

4    prepare this summary was on the order of about 20.

5     Q. Could you tell us the procedure that was used to create

6    the chart?

7     A. Sure.  Well, having 123,000 documents, we had to employ a

8    methodology to summarize it per the Government's request.

9           We reviewed the documents and found the best way to

10   capture the information was to look at the quarterly

11   statements which gave us an idea of the total value of the

12   loan, the maturity date, and other identifying information.

13   And from that, we were able to employ a large staff of people

14   to help enter the information into this sheet and give us a

15   summary.

16     Q. And what did you do to ensure the accuracy of the chart

17   that summarizes the underlying documents?

18     A. So after the information was entered into the

19   spreadsheet, we took an error checking process where someone

20   else from the firm who hadn't entered that data reviewed

21   those same documents within this spreadsheet.  We had our

22   list of identifying documents for each transaction where the

23   information was captured, and someone else independently

24   verified that.  And in the event that any errors were found,

25   it was discussed with the person who initially entered the

COHEN - DIRECT

1    information and changed and then audited again and looked

2    over.

3    Q. And Mr. Cohen, in your view, having prepared this chart,

4    does this chart accurately summarize the documents that you

5    were provided?

6    A. Yes.

7         MS. WEIS:  Your Honor, at this time we would move

8    into evidence Government Exhibit 319.

9         MR. COOPER:  No objection.

10        THE COURT:  In evidence.  Thank you.

11        (Thereupon, Government Exhibit Number 319 was

12   received in evidence.)

13        MS. WEIS: Sam, can you pull up the second page?

14   Q. And Mr. Cohen, could you turn to the second page, as

15   well?  And we just blow up the first half of the side.

16        Mr. Cohen, did you describe for the jury what data

17   is being summarized on the first half of page 2?

18   A. So starting from the left, the loan number was a number

19   that we labelled internally to keep track of the transaction.

20   So we started with loan number one, and we went through

21   3,180.  From the quarterly account statements, we were also

22   able to capture the client name, client number and the loan

23   number, or at least part of the loan number.

24        MS. WEIS: And Sam, can you go to the rest of the

25   columns?

COHEN - DIRECT

1    Q. Mr. Cohen, the following -- the columns that are

2    displayed, can you explain what those data points refer to?

3    A. Sure.

4         For amount, it was the total amount of the loan.

5    The ones he highlighted actually don't have a total dollar

6    amount because of the 3,180, not all of them were actual

7    transactions.  Some of them were actually folders of either

8    cancelled loans or other things were happening with them that

9    they weren't actually loans, they were just client folders.

10   Q. Okay.  And then after amount of the loan, what are the

11   other pieces of information that you summarized?

12   A. Um, so we captured the maturity date of the loan, the

13   term, the number of years the loan was supposed to last, the

14   underlying interest rate.  And then after that, we captured

15   the ticker, the shares -- the ticker and the shares that were

16   underlined, the transaction.

17        So if a client were to have given their stock to

18   Derivium or any of the other providers, then we captured the

19   stock ticker information and the number of shares.

20   Q. Now, could you turn to the first page of Exhibit 319, Mr.

21   Cohen?

22        What does the first page of 319 summarize?

23   A. So 319 is a summary of the other 92 pages in this

24   summary.

25   Q. So you look -- it looks like you looked at the number of

COHEN - DIRECT

1    transactions by year and by dollar amount; is that correct?

2    A. So we broke out the number of transactions by year, by

3    whether they were stock or FRN transactions, and by the

4    account and the total dollar amount of each.

5    Q. When you say "total dollar amount," the jury has heard

6    testimony that there was both 100 percent of the stock given

7    over and then 90 percent cash given back as a loan.

8         Did you capture the 90 percent figure or the

9    100 percent figure?

10   A. We captured the 90 percent figure on the quarterly amount

11   statements.

12   Q. Looking at the -- it looks like you have some totals at

13   the end.

14        In terms of total number of transactions, can you

15   walk through the total number of stock and FRN transactions

16   that you found in the data?

17   A. Sure.  I had mentioned there were 3,180 folders.  Of

18   those 3,020 contained documents that described a stock

19   transaction and 91 of them contained documents that described

20   a FRN transaction.

21   Q. And then for the rest of -- you've got 3,111 up there,

22   what are the rest of those documents, the other -- the

23   other --

24   Q. The remaining extra?

25   A. The remaining were duplicates, cancelled, um, ones that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

COHEN - DIRECT

1    were just folders that -- for example, we just had a Master

2    Loan Agreement and then -- but there was no underlying loan

3    in the other documents, or it was an incomplete loan.

4     Q. And dollar-wise, what was the total number, total dollar

5    figure for the stock transactions that you found in the

6    summary?

7     A. It was about $1.25 billion.

8     Q. What about for FRN transactions?

9     A. The total number of FRN transactions was $116 million.

10    Q. And that brings us to $1.36 billion altogether?

11    A. That's right.

12    Q. Do you recall the date of the first FRN transaction that

13    was contained in the documents provided to you?

14    A. Yeah.  I believe there were four transactions in March of

15    2002.

16    Q. And when was the date of the second, you know, the second

17    day of the FRN transactions?

18    A. Um, the second date was August of 2002.

19    Q. What about for stocks?  When was the date of the first

20    stock transaction?

21    A. Um, I don't recall the exact date, but it was sometime in

22    1997.

23    Q. Thank you, Mr. Cohen.  If you can put down 319.

24         I'm going to hand you now what's been previously

25    marked as Government Exhibit 278.

COHEN - DIRECT

1    A. Thank you.

2    Q. Mr. Cohen, do you recognize Government Exhibit 278?

3    A. I do.

4    Q. What is it?

5    A. This is a summary that I prepared of a spreadsheet, or a

6    printout of a spreadsheet, that seemed to be Mr. Nagy's

7    billing records.

8    Q. And approximately how many pages of spreadsheet billing

9    records were you provided?

10    A. Um, this is a summary of about 40 pages or so.  I was

11    provided with a good number of pages more than that.

12    Q. What did you do to ensure the accuracy of Government

13    Exhibit 278?

14    A. So again, as is standard at our firm, we had the data

15    input and then we had the data checked and recorrected to

16    ensure that it was accurate.

17    Q. So the same process that you used for 319?

18    A. That's right.

19    Q. Mr. Cohen, does Government Exhibit 278 fairly and

20    accurately summarize the documents that you were provided?

21    A. They do.

22        MS. WEIS:  At this time we would move into evidence

23    Government Exhibit 278.

24        MR. COOPER:  No objection.

25        THE COURT:  Okay.  In evidence.  Thank you.

COHEN - DIRECT

1              (Thereupon, Government's Exhibit Number 278 was

2    received in evidence.)

3    Q. So Mr. Cohen, can you explain what the entity column

4    refers to?

5    A. So in this spreadsheet, Mr. Nagy seemed to have acronyms

6    for whatever billing entities or clients that he worked for.

7    There were a number of them.  The Government requested that I

8    summarize these 14 entities.

9              MS. WEIS: And just so the record is clear, we've

10   only moved into evidence Government Exhibit 278, the first

11   page, to clarify.

12             THE COURT:  Okay.

13   Q. Now, at the bottom you've got totals.  So the first

14   column, so the jury understands, what period of time does the

15   first column refer to under the totals?

16   A. The first column just refers to the last two months of

17   2004.

18   Q. And for 2005, what was the total invoice charges that you

19   summarized?

20   A. For 2005?

21   Q. I'm sorry.  For 2005.  Yes.

22   A. No, for 2005 or 2004?

23   Q. 2005.

24   A. Okay.  For 2005, the total -- it was the full year 2005,

25   and the total dollar amount of these 14 entities that were

COHEN - CROSS

1    invoiced was $114,454.

2         MS. WEIS:  Thank you, Mr. Cohen.  We don't have any

3    further questions at this time.

4         THE COURT:  Thanks.

5                   CROSS-EXAMINATION

6    BY MR. COOPER:

7    Q. Good morning, Mr. Cohen.  I'm Lindsey Cooper.

8    A. Good morning.

9    Q. What's your billable rate?

10        MS. WEIS:  Objection, Your Honor, relevance.

11        THE COURT:  Overruled.

12        THE WITNESS:  Um, my billable rate is $360 an hour.

13   Q. And you had 20 people working on this at one point or

14   another?

15   A. That's right.

16   Q. How much did the Brattle Group bill putting this

17   together?

18   A. I believe that the total billing to put both of these

19   exhibits together was on the order of about $150,000.

20   Q. And you have been here at trial all week, too?

21   A. That's right.

22   Q. And does 150,000 include your time here all week?

23   A. No.

24   Q. So this line right here, "PERS," is that personal?

25   A. Personal, I don't believe it is, but I believe it's Scott

COHEN - CROSS

1    Cathcart's company, Persivious.

2    Q. Okay.  So Mr. Nagy, over this period, earned about

3    146,000 from your records?

4    A. No.  Um, Mr. Nagy invoiced 146,000 on these 14 entities.

5    Q. Right.

6           A lot of the entities went bankrupt in 2001, 2002.

7    Do you know that?

8    A. Yes.

9    Q. Did he get paid all of that money?

10   A. I have no idea.

11   Q. Did you look into it?

12   A. No.

13   Q. So you spent $150,000 to put that chart together just for

14   Mr. Nagy?

15   A. No.

16   Q. Did you know the IRS went through all the files, too?

17          MS. WEIS:  Your Honor, at this point we would object

18   on relevance grounds.

19          THE COURT:  I'll sustain that objection.

20   Q. Did the Government provide you with the IRS's analysis of

21   the documents?

22          MS. WEIS:  Objection, Your Honor.

23          THE COURT:  Sustained.

24          MR. COOPER:  No further questions.

25          THE COURT:  Thank you.

852
COHEN - REDIRECT

                        REDIRECT EXAMINATION

1  BY MS. WEIS:

2   Q. Mr. Cohen, I just have two questions for you to

3  follow-up.

4            Every single piece of data that are in your 90-page

5  Government Exhibit 319, and in Government Exhibit 278, did

6  someone in your firm independently check every single one of

7  those numbers?

8   A. There is no number in any of those summaries that was not

9  entered and independently checked by me or someone under my

10  direction at the Brattle Group.

11   Q. And the $150,000 that Mr. Cooper asked you about, how

12  many defendants or parties were involved in the cases for

13  which you were asked to prepare these charts, well,

14  Government Exhibit 319 --

15   A. So for --

16   Q. -- the transaction summary chart?

17   A. Government 319, um, there were -- it was prepared for

18  three different litigations, um, and in California that I

19  believe had 11 defendants, and the cases in South Carolina

20  against Mr. Debevc and Mr. Nagy.

21   Q. Do you recall how many defendants were involved in the

22  injunction action?

23   A. I believe 11.

24   Q. Thank you.

PFLEIDERER - DIRECT

1          MR. COOPER:  Nothing further.

2          THE COURT:  Thank you, Mr. Cohen.

3          MR. SEACORD:  For its next witness, the United

4     States calls Professor Paul Pfleiderer.

5          THE CLERK:  Place your left hand on the Bible raise

6     your right.

7          State your name for the record.

8          THE WITNESS:  My name is Paul Pfleiderer.

9     THEREUPON:

10               PROFESSOR PAUL PFLEIDERER,

11    Called in these proceedings and having been first duly sworn

12    testifies as follows:

13         THE CLERK:  Thank you.  You can be seated on the

14    witness stand.

15                   DIRECT EXAMINATION

16    BY MR. SEADOR:

17     Q. Good morning, Professor Pfleiderer.

18     A. Good morning.

19     Q. Could you please tell us your full name and occupation.

20     A. My name is Paul Pfleiderer and I'm a Professor of Finance

21    at the Graduate School of Business at Stanford University.

22     Q. Have you come to court today prepared to state your

23    expert opinion about collateral and hedges as they relate to

24    the 90% Stock Loan Program?

25     A. I have.

854

PFLEIDERER - DIRECT

1    Q. Can you describe for us your educational background?

2    A. I received both a bachelors and a Ph.D. in economics from

3    Yale University, and then after getting my Ph.D. in economics

4    at Yale, I went to the Graduate School of Business at

5    Stanford.

6    Q. Are you a professor there?

7    A. I'm a professor there, yes.

8    Q. Can you tell us some of the types of courses you teach?

9    A. For almost 25 years I have taught the introductory

10   finance course that all masters of business -- masters

11   business MBA students are required to take.

12        I've also taught finance courses in the law school.

13   And I teach extensively to executives and business people, if

14   you will, principles of finance.

15   Q. And can you just give us some examples?  You say you

16   teach to business folks.  What you are referring to there?

17   A. Well, I'm flying back to get back to Stanford to teach a

18   course that is for nonprofit leaders, it's called executives

19   of nonprofit companies, that need to know some of the

20   principles of finance, and I'll be teaching that.

21        And then later in the summer, I teach various

22   courses to various executives, including a program that we

23   have called the Stanford Executive Program.  I teach at the

24   end of the module involving use of derivatives and hedging.

25   Q. Have you been recognized as an expert in any court?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - DIRECT

1      A. Um, yes.  Probably about four times.

2              MR. SEACORD:  Your Honor, at this point the United

3      States tenders Professor Pfleiderer as an expert in the field

4      of business, finance and economics.  He's qualified by the

5      reason of his experience and training and education to

6      provide testimony with regard to collateral hedges as it

7      relates to the 90% Stock Loan Program.

8              MR. COOPER:  No objection.

9              MR. SEACORD:  At this point, Your Honor, I would

10     also like to move a copy of Mr. Pfleiderer's current CV in

11     evidence.

12             MR. COOPER:  None.

13             THE COURT:  Okay.  All right.

14             MR. SEACORD:  I believe the exhibit number is 353,

15     if I'm not mistaken.

16             THE CLERK:  Yes, sir.  353.

17             THE COURT:  In evidence, thank you.

18             (Thereupon, Government's Exhibit Number 353 was

19     received in evidence.)

20             THE CLERK:  Do you need for me to mark that, Mr.

21     Seador?  Thank you.

22     Q. Professor Pfleiderer, can you tell us the underlying work

23     you performed in this case to reach your expert opinions

24     which we'll talk about in a minute?

25     A. Yes.  I have reviewed probably hundreds, if not

PFLEIDERER - DIRECT

1     thousands, of pages of documents; some of the documents that

2     Mr. Cohen just referred to, um, would be an example, but also

3     deposition testimony; some court filings; marketing materials

4     that Derivium and -- various of the companies involved and

5     related to this had website postings of these; a number of

6     materials that have been put on the screen here, I think at

7     various times.

8      Q. And based on the work you performed, can you tell us your

9     understanding of how the 90% Stock Loan Program worked in

10     reality?

11     A. In reality, it was actually very simple.  It's very

12     simple to explain.  The client, so-called client, had stock

13     that basically was turned over to Derivium, or the provider.

14     The provider basically immediately sold the stock and gave

15     90 percent of the proceeds of that sale to the client and

16     retained the other ten percent.

17            The deal was that the client really had no further

18     obligations at all, unlike you would in a conventional loan.

19     And if the stock appreciated substantially, the client could,

20     at least on paper, come back and pay off the loan to acquire

21     the stock.  But that is only if the provider, Derivium or

22     various other entities that were considered the provider

23     here, could actually deliver the stock, because they had

24     actually sold it.

25            So they had to have the money to draw from the open

PFLEIDERER - DIRECT

1    market and buy it, and that required that they put in place a

2    hedge to ensure that they had that money because they sold

3    the stock.

4           And if they didn't place a hedge, or an effective

5    hedge, they wouldn't have the money to basically buy the

6    stock back when it appreciated and turn it to the client.

7           So in essence, it was a sale of the stock,

8    90 percent of the value, ten percent went to the provider.

9    And there was some possibility, but only if the hedges

10   worked, that the client would come back and be paid off the

11   loan, the stock to pay off the loan.

12   Q. Can you tell us, Professor Pfleiderer, from a basic

13   business and finance perspective what collateral is?

14   A. So collateral is basically something that is given when

15   there is a need for some party to perform.

16          So if someone is borrowing money and the lender is

17   concerned that the borrower may not be able to pay off that

18   loan from their income, for example, the lender may demand

19   that the borrower put up what we call collateral, and

20   collateral is something of value.  It could be a house, it

21   could be a security, um, that will be then taken by the

22   lender and sold if the borrower doesn't pay.  So it's a form

23   of security.

24   Q. And using your house example, can you just sort of give

25   us a real world feel for what collateral is?

PFLEIDERER - DIRECT

1    A. Sure.

2        Here is -- here is an example, hypothetical example.

3    Let's assume that you have a couple that's, say, 50 years old

4    and they have a house that's worth 200,000 that they

5    completely paid off, so they owe nothing on that house.  But

6    for some reason, they need $150,000.  They could go to the

7    bank and they could say to the bank loan officer, we need to

8    borrow 150,000.  And the bank loan officer might say to them,

9    well, you can potentially borrow 150,000, but we are going to

10    have to charge you 18 or 20 percent interest.  And that 18 or

11    20 percent interest is basically charged because that's a

12    risky loan and they are concerned that, the bank would be

13    concerned, that the borrowers might not be able to pay it

14    off.

15        But the loan officer might say, well, we can do

16    something else.  We can basically have you take out a

17    mortgage on your home, and then the interest rate would only

18    be 5 or 6 percent.  And the difference here is that in the

19    mortgage, where only a 5 or 6 percent rate is quoted, the

20    house is being put up for collateral.

21        So if the couple doesn't pay off on the loan, then

22    the bank can take the house and sell it to pay off the loan,

23    and whatever is left, give back to the borrower.

24        So in that case, the house is serving as collateral

25    for this $150,000 loan, and that's why you get a much lower

PFLEIDERER - DIRECT

1    interest rate when you put up collateral like that.

2    Q. Based on your work in this case, did any collateral ever

3    exist for the 90% Stock Loan Program?

4    A. No, there was -- there was no collateral whatsoever.

5    Q. Why do you say that?

6    A. Because the so-called collateral that was mentioned was

7    actually sold.  So it's very, very different from the

8    situation that I just talked about where the house wasn't

9    sold, the house is there, and basically can be acquired by

10   the -- by the lender if it needed.

11         In this particular case, the loan was actually

12   loaned, actually funded by selling the stock.  That's where

13   the money came from.  So the stock was in somebody else's

14   hand.  So it was of no benefit to the putative lender here.

15   It provided no security because it was owned by someone else.

16         So there was -- there was really no collateral here

17   whatsoever.

18   Q. Now I'm going to ask you about something you just said.

19   You said "a loan" in quotation marks.  Why did you do that?

20   A. Because this would not be considered a loan, at least

21   from typical business or finance purposes.

22         In a loan, someone is funding it by taking their own

23   money, um, and paying it.  So if I borrowed some money from

24   you, you are paying me $100, and that's $100 that you

25   potentially lose if -- what happens is, as I say, I want to

PFLEIDERER - DIRECT

1    buy $100 from you and you say, fine, give me your watch and

2    I'll sell it for $100 and then give you the hundred dollars,

3    that's not a loan, that's -- that's pretty much what happened

4    here, though, because the money that I was borrowing was

5    really money that I already had, it was the stock, and the

6    stock was just being sold.  Ninety percent of it was being

7    given to the person who was engaged in this transaction and

8    only ten percent was being retained for basically the profit

9    and the potential hedging that should have been done here.

10    Q. There has been some testimony in this case that the 90%

11    Stock Loan was similar to something called a margin loan.

12          Can you give an opinion on that?

13    A. It wasn't similar in any real shape or form.  In almost

14    every circumstance, it really differed.

15          Let's talk about it first from the perspective of a

16    borrower.  So in a margin loan, someone goes to their broker

17    and arranges to get a loan from the broker and the broker is

18    actually providing money, not selling anything, but actually

19    providing money to help that person buy some stock.

20          Now, in a margin loan, the person who is borrowing

21    has to pay interest on that loan, has to make payments.  And

22    if the collateral -- and there is real collateral here

23    because the broker is actually not selling anything, but

24    actually holding the stock if the collateral goes down in

25    value, so that the -- the broker is now in a potentially

PFLEIDERER - DIRECT

1    worse position because they advance the money, but the value

2    of what is securing it, the collateral has gone down, the

3    broker can actually do what's called a margin call and ask

4    that the borrower, the person at the other end of the

5    transaction, put money in.  That never occurred in this

6    particular case.

7            So that would be one of the many ways that is --

8    that this was different.  And from the lender's perspective,

9    the broker, as I said, was actually lending you money, they

10   were actually putting up money that they had.

11           In this particular case, the provider of this 90%

12   loan product was not putting up any of their own money.  They

13   were actually selling the stock to get the money.

14           So that again makes it entirely different from a

15   margin loan.

16    Q. From a basic business and finance perspective, can you

17   tell us what a hedge is?

18    A. So a hedge is something that reduces risk.  If a person

19   has a position where they might lose money, so over here, I

20   might -- my left side, your right side -- I have something

21   that can go down by a certain amount of value which would

22   cause me to lose some money, if it goes down to here, I lose

23   $10.  If it goes down to here, I lose 100.  So that's a risk

24   for me.

25           And what I like to do is have something to hedge

PFLEIDERER - DIRECT

1    that risk, make it less.  And if you go out and acquire

2    another position, where if this goes down by $10, this

3    position goes up by $10.  And if this goes down by 100, this

4    goes up by 100.

5         So the important thing here is that there is an

6    offsetting effect here that comes into play when it's needed.

7    And we talked about that as requiring that these be

8    correlated, actually very highly correlated.  So anything

9    that happens here on the downside happens here on the upside

10   to offset.  So that would be a hedge.

11   Q. Based on your work in this case, did you find any hedges

12   in place for the 90% Stock Loan Program?

13   A. Absolutely no hedges were put into place.

14   Q. For the program to actually work as it was described in

15   the marketing materials, what would have had to have

16   happened?

17   A. Um, this could have been hedged, but not with the terms

18   that were set.  We could never operate it at the 90% level.

19   They would have had to charge a lot more.

20        But basically, what was being promised here was that

21   if the stock appreciated a fair amount, then you would get

22   the difference between the stock price and what you owed on

23   the loan.

24        So if you owed 120 on the loan and the stock went to

25   140, they were responsible for providing you with $20, the

PFLEIDERER - DIRECT

1    difference between that.  If the stock price were to go below

2    120, then everyone just walked away.

3            So what they needed to buy, Derivium to hedge this,

4    a true hedge, would have been to purchase what are called

5    call options.  And a call option is a security that gives the

6    holder of that security the right to buy stock at a specified

7    price.

8            And so what they would have needed in the case, that

9    I just alluded to, they would have needed a call option that

10   had an exercise price, as we call it, of $120.  That would

11   give you the right to buy the stock at 120 no matter what the

12   price is.

13           Now, what's going to happen is in the case where the

14   stock appreciates in value and goes to 150, then if the loan

15   amount is 120, the borrower, so-called borrower in this case,

16   is going to come back and pay off the loan at 120, putative

17   loan, and get the stock at 150.  In other words, you leave

18   that $30.

19           The call option will allow you to go to Derivium, if

20   they have it, to buy the stock for 120, that is the amount

21   that the borrower would have been paying, and acquire the

22   stock back.

23           So you needed something in place in those situations

24   where the person came and paid off the so-called loan to be

25   able to go out and get the -- in the market and get the stock

PFLEIDERER - DIRECT

1    because the stock had been sold, and that would have been a

2    call option.

3     Q. Would the ten percent that Derivium retained in the 90%

4    Stock Loan Program enable them to go out and purchase these

5    call options that you described?

6     A. No, it would have been given -- the way that they had set

7    it up, it would have been woefully insufficient to do that.

8    They needed more, like about 20 or 30, 25 to 35 percent, it

9    all depended upon the stock and the volatility of the stock,

10   but ten percent was down in every case.  It's woefully

11   insufficient to be able to do so.

12    Q. Now, there has been some testimony in this case that

13   there was some European synthetic puts and calls in place.

14          Do those fancy words make it any different from what

15   you just described?

16    A. Um, no.

17          Well, first of all, a put is not -- as I explained,

18   it's a call, but you would need American calls.  And a

19   European synthetic call, um, is nothing more than a call

20   option that's been created by a trading strategy, but it's

21   going to cost you every bit as much as the call option that

22   you need.

23          So there is no free lunch here.  There is no magic

24   way to get these things cheaper.  And the ten percent was

25   insufficient to do it.

PFLEIDERER - DIRECT

1    Q. So either way, whether it was an American call or a

2    European synthetic call, it would have been roughly the same?

3    A. It would have been roughly the same, yes.  That's

4    correct.

5    Q. Are you familiar with a series of companies called the

6    South Carolina startup companies?

7    A. Um, yes, I am.

8    Q. And based on your work in this case, could those

9    companies be a hedge?

10    A. Absolutely not.

11    Q. Why not?

12    A. Um, well, if you remember, in being a hedge, you need

13    something that will go up when this goes down.  And there was

14    no reliability at all in having these speculative investments

15    and startups.  So they are all prospective investments.  And

16    they need to serve this purpose of having something that

17    would reliably go up wherever something else went down.

18         So the South Carolina construction companies,

19    broadly described, were uncorrelated.  They had no relation

20    whatsoever with the actual -- the actual liabilities that had

21    been taken on here.  So they in no way were a hedge.

22    Q. Now, if -- we'll talk about a couple of issues here,

23    hedge and collateral and the like.

24         Would those issues be covered in a basic finance

25    course like the one you teach?

PFLEIDERER - DIRECT

1    A. Yes.  This is definitely a, what we would call finance

2    101 indeed.  Everything that I've talked about, things that

3    I've talked -- not only in the introductory course to MBAs,

4    but some of these things are things that I'll cover when I

5    teach general executives.

6            I teach a course called Finance for the Nonfinancial

7    Executive, which you have people that may have an accounting

8    background, or some other background, that needed to know

9    just the theory, basic principles of finance, and these are

10   the type of things that I would cover.

11   Q. In your opinion, at the outset of the 90% Stock Loan

12   Program, could it actually have worked?

13   A. No.

14   Q. Why not?

15   A. There was -- it was not economically viable.  It was not,

16   as a business proposition, viable.

17           And the basic reason was that what was being

18   promised here cost a lot more than what you could deliver.

19   The hedging that had to be put into place to make this work,

20   which wasn't put into place, would have cost a lot more than

21   the ten percent that was actually collected.

22           So there was -- there was no way that this was a

23   viable business proposition.

24   Q. Okay.  And I think you were in the courtroom yesterday,

25   weren't you?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1     A. Yes, I was.

2     Q. And I believe Mr. Nagy testified that he was aware of

3     some of the defaults that happened on the 90% Stock Loan

4     Program.  Do you recall that?

5     A. I do.

6     Q. As soon as there is a default in a program like the 90%

7     Stock Loan Program, what, if anything, does that indicate to

8     you about the supposed hedge?

9     A. It means either that the hedges aren't in place, um, or

10    it means that whatever hedges, quote unquote, were put into

11    place aren't working.  Because if this were properly hedged,

12    there wouldn't have been defaults.

13              MR. SEACORD:  Thank you, Professor Pfleiderer.

14                        CROSS-EXAMINATION

15    BY MR. COOPER:

16    Q. How are you doing, Professor?

17    A. Good morning.

18    Q. When the borrowers transferred stock to Derivium, did

19    that stock have value?

20    A. I believe in all the cases it did, yes.  In other words,

21    it was selling at a price in the markets that was bigger than

22    zero.

23    Q. Right.

24              And securities that are publicly traded are really

25    transferrable?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1     A. If they are publicly transferable, yes, you can trade

2     them.

3     Q. So if you have a shared GE stock and I have a shared GE

4     stock and we swap it, does it matter really which share of GE

5     stock you have?

6     A. If they are the same class of shares, the answer would be

7     no.

8     Q. Right.

9            Because stock is a, what we call, a fungible asset?

10    A. Um, that would be one way to refer to it.

11    Q. Right.

12           Like cash.  Cash is a fungible asset?

13    A. That's correct.

14    Q. Right.

15           So if we swap $1 bills, it doesn't matter whose $1

16    bill it is?

17    A. Generally no.  Yes.

18    Q. And when you were talking about the collateral, you are

19    not suggesting when I give you my one share of GE stock that

20    it's really not worth that one share of GE stock?

21    A. No, I don't believe I said that at all.

22    Q. I just want to make sure, because you said there was no

23    collateral.

24    A. There was no collateral in the sense that it was sold.

25    Q. Okay.  So the fungible good was sold, the one share GE

PFLEIDERER - CROSS

1    stock?

2     A. One share of GE stock was sold.

3          And at that point, basically what's happened here,

4    is that unlike in a typical loan situation, where I reach

5    into my wallet and if I'm going to loan you a hundred

6    dollars, I take out a hundred dollars and give it to you, now

7    I'm out a hundred dollars.

8          In this case, what you are doing is you are bringing

9    in a share of GE stock that's worth a hundred dollars, and

10   I'm saying, I'll loan you a hundred dollars, and over here I

11   sell the stock and then I give you the money, well, that

12   would involve my money out of my pocket and I don't have any

13   collateral, because basically I've sold the stock.

14    Q. But the hedge, I think you testified, is the mechanism to

15   pull back one share of GE stock?

16    A. Well, the hedge comes into play for the following reason:

17   You came to me and you said, I need some money for my stock,

18   and instead of loaning it to you, reaching into my pocket and

19   taking out a hundred dollars, what I did is I sold the stock

20   over here and then gave you 90, not a hundred.  And then when

21   I say to you, we are going to create something that looks

22   like a loan, and if you come back and pay off this amount,

23   I'll give you back your stock.

24          Well, of course, I don't have the stock because I

25   just sold it to the person that left the stock.  So what I

PFLEIDERER - CROSS

1    need is I need some way that if you do come back, I need some

2    way to get that stock back.

3       Q. Right.

4       A. And that's where you need the hedge.  But there is no

5    collateral here because I sold that stock.

6       Q. But the hedge is the mechanism.  If the hedge is in

7    place, where if they -- if I bring you back the $121 to pay

8    off the loan --

9       A. Right.

10      Q. -- and you take that $121 and you exercise your hedge

11   theoretically and pull the stock back; is that right?

12      A. That's the way it should have worked.

13      Q. Right.

14             So isn't the hedge the collateral for the loan?

15      A. No.

16      Q. Well, I don't understand.  If you have a mechanism to go

17   out and pull that fungible stock back and give it to the

18   client, how is that not security for the return of that

19   collateral?

20      A. I'm in no position at all to lose anything here, other

21   than your demand that I return the stock.

22             So the collateral comes into play in the following

23   way:  If I actually reached into my pocket and give you the

24   $90, then if you don't pay the loan back --

25      Q. Right.

PFLEIDERER - CROSS

1    A. -- I'm out.

2         But that's not the way this happened.  You came to

3    me, you gave me the stock, I sold it and took what was your

4    $90 and gave it to you.

5         I'm not -- at this point I don't need any security.

6    The only security I need here is I made you a promise that if

7    you come back and pay me $120, I'll get your stock.

8         What I've basically done is written you a call

9    option and I need to basically back that up by going out and

10    buying a call option or putting into someplace a hedge.  But

11    that in no way involves collateral.  I've simply taken on a

12    liability here that I need to cover.

13         See, the interesting thing --

14    Q. The calls and assets --

15         THE COURT:  Whoa, whoa, whoa.

16         Go ahead.

17         THE WITNESS:  I was just going to say the

18    interesting thing is that in a normal loan, the person who

19    lent the money is worried that they are going to lose

20    something because the money is not going to be paid back.

21         In this particular situation, the so-called lender

22    was worried that the borrower would come back and actually

23    demand the stock back because that was the position where

24    they were actually in trouble.

25         So it's very, very different from what's a typical

PFLEIDERER - CROSS

1   loan situation.

2   Q. The -- the lender's obligation to return the collateral

3   is a liability, correct?

4   A. The lender's -- I'm trying to think of --

5   Q. The lender --

6   A. The obligation exists in a normal loan.  I'm sorry.  I

7   misunderstood what you were saying.

8       In a normal loan, the lender's obligation is to

9   return the collateral, if it actually held the collateral.

10  Sometimes it's held by a third party if the loan is paid off.

11  Q. And that's a liability to the lender?

12  A. That's a liability to the lender.

13      But in fact, in a typical loan, that's really no

14  liability at all because the lender already has the

15  collateral here.  There is no risk to the lender at that

16  point.  The risk to the lender in a typical loan is that the

17  borrower isn't going to pay him back.

18  Q. Well, no --

19  A. That wasn't the situation here.  The risk to this scheme

20  was that the person would come back and pay them back and

21  they wouldn't have the money to go out and basically buy the

22  stock back, given that they had made that promise.  So that

23  makes it fundamentally different.

24  Q. But again, a typical loan, we are talking about a

25  nonrecourse loan.  And what I'm trying to say is the lender's

873

PFLEIDERER - CROSS

1    obligation to return the stock is a liability to the lender?

2     A. Um, that's true.  If the lender has -- if the lender does

3    have the collateral.

4     Q. Or the obligation?

5     A. I'm sorry.  The obligation.

6     Q. The obligation, the return, it's the obligation that

7    gives rise to liability, right?

8     A. Um, it is a liability to -- if you have possession of the

9    collateral and the loan is paid off, then to return it, that

10    is correct.

11     Q. And you said during your testimony that, I think you said

12    all it was was a promise.  And in fact, isn't every loan

13    supposed to be an unconditional obligation to repay

14    something?

15     A. No.  There -- there -- in this particular situation,

16    there was the risk on one side and not on another side.

17         Basically, the risk in the typical loan, if you --

18    if I lent you a hundred dollars, I would worry about you

19    paying it off.

20         If that's a typical loan, I've taken my own money

21    and I've lent it out to you, I'm worried that you are going

22    to come back and pay me off a hundred dollars.

23         In this particular situation, this 90 percent stock

24    program, the providers of this didn't worry about that at

25    all.  They didn't worry about being paid off, that they

PFLEIDERER - CROSS

1    weren't going to be paid off, they worried that they would be

2    paid off as they would have to come up and buy the collateral

3    back in the market.  And unless you hedge, you weren't going

4    to be able to do it.

5    Q. Right.

6    A. So there is diametric difference here between the typical

7    situation a lender is in where you have collateral because

8    you are worried that the borrower is not going to pay you

9    off.  That's the reason to have collateral.

10          Here, you've sold the collateral to fund the loan.

11   So you were basically not worried about being paid off

12   because you hadn't taken any money out of your own pocket.

13          What you had to worry about was the liability, and

14   there was a liability here, no doubt about it, to return this

15   stock that you had actually sold in the market if the person

16   showed up to pay the loan off.

17          And that's why these hedges should have been in

18   place.

19   Q. Right.

20   A. And given that they weren't, this program was doomed to

21   fail.

22   Q. That's right.

23          Because if you have to return the collateral and you

24   are worried about the return of collateral, you go out and

25   you buy a hedge to bring it back; is that right?

PFLEIDERER - CROSS

1      A. Well, you see, I would say the hedge would return the

2      stock.  It wasn't serving as collateral here.  Collateral

3      basically is something that is in reserve.

4      Q. So from a -- from a -- we did agree just a second ago

5      that the lender's obligation to return the stock was a

6      liability to the lender, correct?

7      A. In the case of a typical lender where I got the

8      collateral right here, if the loan is paid off, then I have

9      the obligation to return it.

10     Q. And that's a liability on the lender?

11     A. That is a liability on the lender.

12     Q. And if you are worried about returning the collateral,

13     the lender goes out and places a hedge to ensure its ability

14     to perform; is that correct?

15     A. No.  No.  There is no -- in a typical loan, there is no

16     reason for a hedge.  See, that's -- you've just hit on the

17     big difference.

18          When a bank basically has your house as collateral,

19     it doesn't have to hedge that, it already has it, it hasn't

20     sold your house in the market.

21          See, if a bank sold your house in the market to fund

22     your loan, then it would have to worry.  Then it would have

23     to have the ability to buy that house back because the house

24     price might go up, but that's not how a typical loan occurs.

25          What happens is the house is just put up for

PFLEIDERER - CROSS

1    collateral, just sits over here, the bank takes money out of

2    its own pocket, and the collateral here is basically security

3    that if the borrower doesn't pay back the loan, then I can

4    use the collateral.  You don't have any liability as a bank

5    to go hedge the house because the house is already there.

6     Q. Really, so this whole housing prices where the value of

7    houses fell below the loan amount, you don't think banks were

8    out hedging that risk that the value of their collateral

9    might go under?

10    A. They could, but that would be different.  That would be a

11    case where they owned the collateral and they would be

12    worried about the collateral going down in value.

13         And in a marginal -- that's exactly what happens

14    when the value goes down, then the borrower has to put in

15    more value to basically up the value of the collateral.

16         But you see, the important difference here, and we

17    can't lose sight of this, collateral is basically put there

18    to give some assurance to the person making a loan that they

19    are going to be covered if the borrower doesn't pay back the

20    money.

21         And that wasn't going on here at all.  And because

22    it wasn't going on here at all, you can't call it collateral.

23     Q. So you used the example of a brokerage account.  And

24    aren't a lot of brokerage accounts margins accounts?

25     A. That was the example I was using, a margin loan.  I used

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1    two examples.  One was the mortgage on a house in which the

2    collateral is the house, and again, it's not sold, it just

3    sits there.  And in the margin loan, the collateral is

4    whatever security that is there and it's not sold, the broker

5    has that security.

6    Q. Well, sometimes you can sort of stay in a house and sell

7    it, like a reverse mortgage?

8    A. So if -- if I have a loan obligation and I want to sell

9    the house, I have to pay off the loan.  In other words, the

10   collateral -- the collateral has to be sold.

11   Q. If you pay off the house and you want money from that

12   house, you can do a reverse mortgage?

13   A. Well, I paid off the house and I paid off the loan.

14   Q. Now, margin accounts, typically in margin accounts, can't

15   the brokerage house or investment bank engage in transactions

16   where the security is in your account, don't you give them

17   that right?

18   A. Typically in many cases, you give the right to have a

19   short sale price, what's been borrowed.

20   Q. Yeah.  Sell it?

21   A. Right.

22   Q. Hypothecate it?

23   A. Typically, the conventional thing is that if I put in

24   $100 of stock and then I borrow $100 so that the broker can

25   buy another $100, it's what has ever been bought with the

PFLEIDERER - CROSS

1    broker's money can be used for short sales and things of that

2    sort.

3     Q. But what I'm saying, I've got an E Trade account and I go

4    in and I put a hundred dollars in there and I buy GE stock,

5    right, under the terms of my margin account, because GE

6    stock's fungible, can't the bank use my shares to sell,

7    hypothecate, pledge and do other transactions behind the

8    scenes?

9     A. Well, as I said, if money is put up by the broker to buy

10    some of of the security, then those securities in the

11    standard account can be lent out.

12     Q. Yeah.

13     A. So that is -- that is true.

14         But basically what happens there is that the broker

15    who lends it out lends it out to someone else who is required

16    to put up money and put up security interest to make sure

17    that that's covered.

18         So in that case, it's -- it's basically there, it's

19    just hedged in that account.  So the collateral is still held

20    at the brokerage house in one form or another.

21     Q. But that's a good analogy.

22         So the bank sells it, moves it over and then hedges

23    it, and that ensures the return of that stock to the

24    customer, right?

25     A. The only -- because the bank has actually lent money --

PFLEIDERER - CROSS

1    remember, what you would have to do is you would have to

2    start at the beginning of the transaction.

3         The beginning of the transaction was that the broker

4    or the bank reached into their pocket and paid some money.

5    And what makes this different, fundamentally different, is

6    that that didn't occur here.  There was no money involved

7    that was being advanced by Derivium.  The money that was

8    given to the client came from actually selling the stock.

9         So in all the examples that we have been talking

10   about, there is this fundamental difference.  In the

11   brokerage account, margin account, in the case of someone

12   taking out a mortgage, and all of these cases, there is a

13   lender who actually reaches into his pocket and pays the

14   money and is worried about, because that was his own money,

15   worried about that money being repaid.

16        And in this particular case, that didn't happen at

17   all.  What happened was that the money that was actually

18   given was obtained by selling the stock.

19   Q. Okay.  I think what's becoming pretty clear is, you are

20   starting with the assumption there is no lender.

21   A. No.  I'm looking at the transaction as it occurred.

22   Q. Right.

23        You looked at Mr. Strickland's report, didn't you?

24   A. Yes.

25   Q. And your background is a Ph.D. in economics?

PFLEIDERER - CROSS

1    A. Um, yes.

2    Q. And you have been in academia since you graduated from

3    Yale?

4    A. Yeah.  That is correct.

5    Q. And I was looking, you have a copy of your CV up there

6    somewhere?

7    A. I don't believe so.

8    Q. Exhibit 253.

9         One more thing before we move on.  I just want to

10   make clear when that borrower gave that stock to the lender,

11   that stock had real value on a publicly traded market?

12   A. I think I answered that question by saying that in my

13   review of all the documents that I saw, every time a stock

14   was turned over, it had positive market price.  It wouldn't

15   make sense to do this if it didn't.

16        So in that sense, yes, it had value.  And it's

17   because it had value that it could be sold and fund the 90%

18   that was actually being given to the client.

19   Q. I guess my question is real simple:  When that borrower

20   gave that hundred shares of GE stock, that GE stock had real

21   value on a public market?

22   A. Again, that's true, because a positive price, which is

23   what gave Derivium the benefit of being able to sell it and

24   get the 90%, that was the way they, quote unquote, funded

25   this loan.

PFLEIDERER - CROSS

1    Q. And at the time, what was the percentage of the money?

2    The GE stock was worth $100, and of the Derivium stock loan,

3    how much was given back to the borrower?

4    A. In, I believe every case, or almost every case, it was

5    90 percent; hence the term 90% Loan.

6    Q. Right.

7         So the borrower gave up ten percent equity by

8    entering into the transaction?

9    A. The borrower basically substituted that ten percent for

10   this putative call option.  It's the ability to come back and

11   buy the stock back at a price.  It turns out that, given that

12   there was no hedging that was done, that that option had very

13   little value.

14   Q. Right.

15        And that's the thing.  That putative call option has

16   value.  That's an asset to the lender, isn't it?

17   A. Um, no, it's a liability to the lender.  It's not an

18   asset, it's a liability.

19   Q. So on the hedge, if the value of the stock goes up,

20   right, and you have a call option, the value of that call

21   option goes up, too, correct?

22   A. That's right.  And that's a liability to the lender.

23        That was the problem here, the lender being Derivium

24   here, that was the liability, not an asset.  The only asset

25   that Derivium actually acquired was that ten percent cash.

PFLEIDERER - CROSS

1               What they should have done with that is use it.

2        Given that they had taken on a liability, they had taken on

3        this call option liability, what they should have done is

4        taken that ten percent cash to go out and hedge it.  However,

5        that ten percent wouldn't have allowed them to hedge it, it

6        was woefully, as I explained before, insignificant --

7        Q. Your opinion --

8        A. -- insufficient to do it.

9        Q. And because the borrower was giving up that ten percent,

10       at that time do you believe there was an economic incentive

11       to repay that loan because they were giving up something?

12       A. Um, there was an incentive to repay the 120, or whatever

13       it was, if that call option turned out in the money.  So the

14       economic incentive here was you would exercise this call

15       option when it was valuable.

16       Q. And at the inception of the transaction, if I gave you

17       $100, you gave me $90 and I could buy it back immediately

18       with 95, wouldn't you have an economic incentive to

19       repurchase it immediately?

20       A. I don't understand your hypothetical.  So you gave me

21       $100 or stock worth $100?

22       Q. Stock worth $100.  You gave me $90.

23       A. So I'm playing the role of Derivium here?

24       Q. Let's do that.  That's fine.

25       A. I'm just trying to understand the hypothetical.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1      Q. That's fine.

2      A. So you've given me $100 of stock and I'm going to give

3      you $90.  The first question is where do I get that $90?

4      Q. Let's say you've got $90 -- we are role playing -- let's

5      say you have $90 and you give it to him.

6      A. This is important because we need to keep it clear where

7      the $90 is coming from.  If what I'm doing is I'm taking $90

8      out of my pocket and giving it to you, then I truly am

9      worried about you coming back and paying me because that was

10     $90 from my pocket.

11          If, on the other hand, you give me the hundred

12     dollars worth of stock and I go out this door and sell it for

13     a hundred dollars and give you $90, I'm not worried at all.

14     I just gave you the $90.  It wasn't my $90, it was really

15     your $90 that I got from selling your stock.

16          What I'm worried about, potentially is, if I made a

17     promise to you that if you pay the stock, if you pay this,

18     quote unquote, loan off, I've got to go run out the door and

19     get that stock, and maybe the stock is worth 200 or 300 at

20     that point, that's why I should have cleared the place over

21     here, some hedges.  And in the case of Derivium, which is why

22     we are here, that wasn't done.

23     Q. And in that promise, that unconditional obligation, or

24     return my stock to me?

25     A. The promise that Derivium made -- see, you have to keep

PFLEIDERER - CROSS

1    this separate from a loan.  If I take a hundred dollars out

2    of my pocket, it's a very different story.  That's not what

3    happened.

4         In the case of Derivium, the promise that was made,

5    it wasn't actually carried out, was that somehow some hedging

6    was going to be put into place so that if you came back and

7    gave me back the $120 that you, quote unquote, owed, then I

8    would give you the stock.  So that was basically a promise to

9    give you the payoff of a call option.

10   Q. And that promise was the Master Loan Agreement entered

11   into between Derivium and the borrowers?

12   A. Basically, if you go through the Master Loan Agreement,

13   the way to interpret that, given how it was actually done, is

14   what I did, if I'm Derivium, is sold the stock, as I said,

15   basically take $90 from that and give it to you, and now take

16   the $10.

17        And the question is what do I do with that $10?

18   Well, what I should have done is gone out and hedged because

19   I made this promise to you that if you come back and paid off

20   the loan, I would return your stock.  But remember, the stock

21   is not here, it's somewhere out there, so I should have taken

22   that $10 and gone and bought call options because that was

23   actually what my liability was.

24        But if I would have picked up the phone and called

25   and gotten a quote from a broker on what it would cost to buy

PFLEIDERER - CROSS

1     that call option, or an investment bank, I would have found

2     out it would have cost $34, not $10.  So now I'm in trouble

3     already.

4      Q. I'm just trying to understand.  Was the Master Loan

5     Agreement the promise that if I pay the loan, you get the

6     stock?

7           MR. SEACORD:  Objection.  Calls for a legal

8     conclusion.

9           THE COURT:  Overruled.

10           THE WITNESS:  My understanding of the interpretation

11     of this -- and certainly I am not a legal attorney and can't

12     interpret the exact legal implications of it -- but my

13     understanding was that the customers, the clients, had the

14     expectation that if they paid back the amount that was

15     putatively due, then they would get the stock back.

16           So that, in fact, didn't happen, given that there

17     was some defaults and it didn't happen, because there was no

18     hedging in place.  But my understanding is that's what

19     clients would have been led to believe by looking to those

20     documents.

21      Q. Did you look at a Master Loan Agreement?

22      A. I did.

23      Q. And if I understand what you are saying is the lender

24     couldn't have done it with the ten percent, but maybe if they

25     had 25 or 35 percent, the transaction could have worked?

PFLEIDERER - CROSS

1    A. It would depend upon the stock and how volatile it is.

2    Because the risk here for Derivium is that the stock goes way

3    up in value.  That's what you are worried about.  The more

4    that that can happen as a possibility, the higher is the cost

5    of putting into place this hedge.

6    Q. Yeah.  But you put the hedge into place, at usually the

7    inception of the transaction, so your cost is fixed at that

8    time?

9    A. That's right.  But it would vary by -- it would vary by

10   the characteristics of the stock, so --

11   Q. Right.

12   A. So if it's Coca-Cola, which is not a very volatile stock,

13   Coca-Cola doesn't move around very much, then the cost of

14   hedging that would be fairly low, maybe 15 percent; again,

15   not 10 percent.  But if it were a volatile stock, such as an

16   airline -- airlines are typically fairly volatile -- then the

17   cost would have been much greater than that, perhaps on the

18   order of 25, 30, 35 percent.

19   Q. And so there would be some kind of approval process for

20   the loan in order to make sure you could sufficiently hedge

21   it at the time of the transaction.  Wouldn't that make sense?

22   A. If -- if I had been doing this and I would -- first, I

23   would want to make sure that it passed legal muster.  But if

24   I were asked to design this, I certainly wouldn't have

25   designed it the way it was designed because customers were

PFLEIDERER - CROSS

1    bringing different types of stocks that had different --

2    different risk characteristics.

3            And what Derivium was doing was giving everybody

4    this option at really what was a discount.  But some people

5    were getting this option on paper for ten percent when it was

6    worth 35 percent, and some people were getting it for ten

7    percent when it was only worth 20 percent.  So you would at

8    the very least if you were doing this make it contingent upon

9    the volatility of the stock, what it was going to cost you to

10   hedge this.  But in almost all cases, that would have been

11   more than they were charging.

12   Q. But I guess my question is if -- I believe your report

13   said if there was 25 to 30 percent, the loan was, I guess

14   that would be 75 to 65 percent of the stock's value, that

15   under your analysis, it could have worked?

16   A. If they would have charged -- first of all, I don't know

17   whether it would be legally a sale or --

18   Q. I'm just asking.  You are doing an economic analysis.

19   A. If I'm doing the economic analysis, basically what I

20   would say is I'm selling your stock, I'm going to give you

21   60 percent or 70 percent, I need to retain the other 25, 30,

22   35 percent to put into place valid hedges.

23   Q. Right.

24   A. So that when you do come back and claim, basically pay

25   off on this call option, I can do it.  I can basically

PFLEIDERER - CROSS

1    perform and I won't default.

2     Q. That's right.

3          But your analysis is you need 25 or 35 percent in

4    order to do that?

5     A. It would depend again on the stock.  But for a typical

6    stock, it would be more like 20 to 30 percent.

7     Q. And did you, um, hear Mr. Debevc testify that the lender

8    did have an approval process for loans?

9     A. I was not on that -- I was not here that day, so no, I

10   did not hear.

11    Q. Now, you raise an issue about -- you didn't do a legal

12   analysis, that's correct?

13    A. No.  That is correct.

14    Q. So you didn't look at the Tax Code to understand as part

15   of your analysis?

16    A. No.  That was not part of my assignment.  And I don't

17   hold myself out as an expert in that area.

18    Q. So you didn't look at Section 1058 of the Internal

19   Revenue Code?

20         MR. SEACORD:  Objection, Your Honor.  We are now

21   asking for a legal conclusion.

22         THE COURT:  I'll overrule that question -- that

23   objection, okay?

24    Q. Did you look at Section 1058 of the Internal Revenue

25   Code?

PFLEIDERER - CROSS

1    A. Um, not in conjunction with this, no.

2    Q. Okay.  What about the 1259?

3    A. No, that was not at all relevant to what I was asked to

4    evaluate.

5    Q. So the Tax Code in its provisions were not relevant to

6    your analysis?

7    A. That's correct.

8    Q. So you didn't look at Mr. Nagy's written memorandum as

9    part of your analysis?

10   A. No, I did not.

11   Q. And in fact, I don't believe Mr. Nagy's name is even

12   mentioned in your report.

13   A. I would have to go back and check.  I don't believe it

14   is, but it may be.

15   Q. And in fact, wasn't your report written to address

16   certain assertions being made by Dr. Cathcart?

17   A. No.  It was -- parts of it were addressing those.  My

18   report, I believe, is about 50 or 60 pages long, um, and a

19   good part of it addresses the very issues that we have been

20   talking about in this last half hour or so, what is

21   collateral, um, basically what was the economics behind this,

22   um, the business sense behind it; things of that sort.

23   Q. Right.

24        And I want to be very clear, you did an economic

25   analysis, not a tax analysis?

PFLEIDERER - CROSS

1     A. I would certainly say it was not a tax analysis.  I would

2     characterize it as a finance economics business analysis.  So

3     putting all those together.

4     Q. And I handed you a copy of your report.

5          MR. COOPER: And I want to hand him what's been

6     premarked as Nagy Exhibit 99, which is page 35 of his report.

7          Any objection to moving that in?

8          MR. SEACORD:  No.

9          (Thereupon, Plaintiff's Exhibit Number 99 was

10    received in evidence.)

11    Q. Now, one of the parts of your analysis is you used

12    something called a Black Scholes model; is that right?

13    A. That's correct.

14    Q. And a Black Scholes model is a formula for pricing

15    options; is that right?

16    A. It's basically considered the standard form.

17          And as a matter of fact, a common standard in

18    accounting for stock options, for example, mention the Black

19    Scholes as one of the primary, if not the primary, valuation

20    methods, yes.

21    Q. And in coming to your conclusions, you used the Black

22    Scholes model, didn't you?

23    A. Coming to some of my conclusions, but many of my

24    conclusions are based upon simple analysis, and I dare say

25    simple common sense.

PFLEIDERER - CROSS

1    Q. That you gleaned from Mr. Strickland's report?

2    A. I'm sorry?

3    Q. That you gleaned something from Mr. Strickland's report?

4    A. Gleaned from?

5    Q. From Mr. Strickland's expert report?

6    A. I'm sorry.  What did I glean from his report?

7    Q. Strike that question.

8         In doing your Black Scholes analysis, didn't you

9    gather up 20 years of data on stocks?

10   A. Um, we -- um, "we," meaning myself and people working at

11   my direction, did analyze a lot of data.  Because although it

12   was very clear to me from the start that the ten percent was

13   going to be insufficient, being a good academic, if you will,

14   you would hold to a very high standard, as does a court of

15   law, very high standard of precision, rather than just

16   sitting here and saying that this is not going to work, I

17   basically did a full analysis to show it wasn't going to

18   work.

19   Q. And as part of that full analysis, you went to a database

20   and you got 20 years of stock issued as part of that

21   analysis, didn't you?

22   A. In some cases, um, I think it went back 20 years.  In a

23   lot of cases, it wouldn't have gone back that far.

24        The reason for getting prior stock data is a very

25   simple one:  What you need to do is figure out how much it's

PFLEIDERER - CROSS

1    going to cost Derivium to hedge this.

2            And as I mentioned, it's about volatility of the

3    stock that comes into play.  So you had to look at the actual

4    stocks that they were hedging, or should have been hedging,

5    and look at how volatile those were.  And the way that you do

6    that, or one way to do that, is to look at the past stock

7    data that you see how volatile it is.

8    Q. Right.

9            And I think you purchased the stock data from the

10   Center for Research and Security Prices?

11   A. That's correct, yes.

12   Q. And that's a provider of financial data?

13   A. That is a provider of -- one of the providers of stock

14   database.

15   Q. I called them up and asked them what a subscription would

16   be, and they said it was between 44 and $50,000 a year.  Is

17   that about right?

18   A. Um, I -- I did not actually negotiate, we negotiated,

19   "we" being the Brattle Group that was providing the support,

20   negotiated to get the data that we needed.

21           So I believe a one-year subscription probably

22   entitles you to the full database.  And if it's my correct

23   recollection here, we didn't want the full database, we just

24   needed the stocks that were actually at issue here.

25           So I believe that the amount they would have charged

PFLEIDERER - CROSS

1    would have been less than that, but I'm not sure.  I wasn't

2    involved in the direct negotiations.

3    Q. And you said "the Brattle Group".  Are you the contractor

4    for the Brattle Group, too?

5    A. I actually submit my bills through the Brattle Group, so

6    I think legally I'm a contractor to the Brattle Group, but I

7    actually -- I actually was engaged in this before the Brattle

8    Group was involved.

9    Q. And did you see anything from Mr. Nagy's files that

10   indicated that he had access to 20 years of stock price from

11   the Center for Research and Security Prices?

12   A. Um, I didn't review his -- his files.

13           Certainly, it's very easy to get access to past

14   stock price data.  If we had an Internet connection, even

15   five, six, eight years ago, we could get it from Yahoo.  That

16   would simply give you the years.

17   Q. And it would be very easy if Mr. Nagy had $40,000?

18   A. No, that would -- this would cost nothing to get -- get

19   the past gauge on a particular stock data.

20   Q. Did you see -- you didn't review his file, so you

21   obviously didn't see if Mr. Nagy ran any Black Scholes

22   modeling?

23   A. No, I did not review his files.

24   Q. And I want to talk about this model, about what goes into

25   it.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1          And I've handed you what's been marked as

2     Exhibit 99 --

3      A. Yes.

4      Q. -- that's been entered.

5               THE COURT:  I assume that's in evidence.

6               MR. COOPER:  I believe I asked if I --

7               MR. SEACORD:  There was no objection.

8               THE COURT:  Okay.  Good.  In evidence.

9               (Thereupon, Plaintiff's Exhibit Number 99 was

10    received in evidence.)

11     Q. Was this the first part of your analysis as you had to

12    value the option for each individual stock with this formula,

13    C = CE -- forget what those are called -- minus DTN(d).  Is

14    that the former formula for it?

15     A. That is the formula for -- again, this is the standard

16    formula that the accounting profession and people in finance

17    use to value these types of calls.  And that is the formula

18    that would value a call option.  That takes into account the

19    actual riskiness of the stock and tells you how much you are

20    going to need to hedge it.

21     Q. Now, is that the Black Scholes formula or is that just

22    the one piece of it that's for each stock?

23     A. Well, it's -- you use the same formula.

24               But what's important here, and what I did emphasize

25    before, is that the actual -- the value, the amount that you

PFLEIDERER - CROSS

1    are going to require in hedging, is going to depend upon the

2    characteristics of the stock.

3           And the particular characteristic that comes into

4    play that's very important is, if you look at what's up on

5    the screen, the second line from the bottom, analyzed

6    volatility of the stock.

7    Q. This one right here?

8    A. Yes.

9    Q. Right.

10   A. That's where Coca-Cola will differ from American Airlines

11   or Cisco Systems or some other stocks that are more highly

12   volatile.

13   Q. And you got that number by going back all those years

14   because you want to -- you want information for those

15   20 years, so you get a better average over the term; is that

16   right?

17   A. Actually, we got that number in two ways.  Given it's my

18   work, and people working at my direction, we got the number

19   in two ways.  One was to look back historically, which is

20   what's being referred to here.

21          And the other is to get what's called the implied

22   volatility from the option traders themselves, basically are

23   providing that through the option pricing.

24          So there are two ways to get this number and they

25   are oftentimes very, very close.  And so to do this work very

PFLEIDERER - CROSS

1    carefully, we did it, we did it both ways.

2     Q. So you can get it also from the Center of Stock Research

3    or you can go get it from option trades?

4     A. You can get it, for instance, from Bloomberg, which is

5    another data vendor site that is actually a service that

6    gives you -- gives you information.

7     Q. And you didn't see anything where Mr. Nagy went out and

8    got option volatility data in his files because you didn't

9    look at them?

10    A. You wouldn't have to necessarily do this on your own.

11    You can simply call a broker, you could call some finance

12    professional and they would be able to get those numbers for

13    you very, very quickly.

14    Q. So this formula here, that's just the formula for the

15    volatility for a single stock?

16    A. No.  Um, the volatility of a single stock is the second

17    line from the bottom.  The formula you see there gives you

18    the value of the call option, and that's what, in this

19    particular case Derivium, actually sold.  This is what they

20    are selling to the client.  So this is the cost of them

21    providing that product.

22          What we are really talking about here is if I am

23    a -- any type of business operation, I'm selling you

24    something, there is a cost to me of producing that.  And this

25    is the cost of producing what was being sold by Derivium, at

PFLEIDERER - CROSS

1    least a component of it.

2    Q. What does this mean, this -DT up there?

3    A. So that is the present value discounting of the dividend

4    flow.

5         So what happens here is that the stock, some stocks

6    pay dividends, and you have to take into account the fact

7    that they do.

8    Q. And then I guess the next series right here, what's that

9    doing?

10    A. That is basically determining on the -- based on the

11    level of the stock price relative to the so-called exercise

12    price, and that would be the amount that is going to be

13    putatively paid back here to get the stock back.  That

14    determines what fraction of the current value of the stock

15    you would have to hold to hedge that risk, and then you would

16    have to basically borrow some money in the market to

17    partially fund that.

18    Q. And then it's XED-RT.  What's that?

19    A. That's just the value of $121.  Just to make this very

20    simple, $121 is what is going to be that magic price.  If the

21    client comes back and says, I'm going to pay back this $121

22    and get my stock back, the XED-RT is just the present value

23    of that $121, how much would you have to put into a bank

24    account so it would grow into $121 in three years?

25         This is being done today.  We are trying to figure

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PFLEIDERER - CROSS

1     out the cost of hedging when this transaction is actually

2     entered into.  So that's why it's being discounted back to

3     the present.

4      Q. And then the next, what is that doing now?

5      A. That again is an adjustment for the volatility and where

6     the stock price is relative to that $121.

7      Q. And this is one of the formulas you used in your

8     analysis?

9      A. That is the formula, again, that is used throughout the

10    world of finance and accounting to value -- to value options.

11    It's very standard.

12            MR. COOPER: Exhibit 100.  I believe there is no

13    objection to it?

14            MR. SEACORD:  No objection.

15            THE COURT:  Okay.  In evidence.

16            (Thereupon, Plaintiff's Exhibit Number 100 was

17    received in evidence.)

18     Q. Now, on Exhibit 100, what in the world is that?

19     A. That's a good question.  And let me answer it here.

20            What happened here is that in some of the cases,

21    clients would come, and instead of selling a single stock

22    into this program, they basically sold a bundle of stocks, a

23    basket of different stocks.

24            So a client might have come with General Electric

25    and with Cisco Systems and with Coca-Cola, and instead of

PFLEIDERER - CROSS

1    selling a million dollars of, say, General Electric, they

2    sold all at once in this transaction a million dollars of

3    General Electric, $500,000 of Coca-Cola, it was a bundle.

4    Q. So the only wrinkle here, and it's a small wrinkle, is

5    that the volatility now becomes the volatility of this

6    bundle, because the agreement now is that, again, I sold the

7    bundle.  If I'm Derivium, I sold all the stocks out the door

8    here, I've got to buy back that bundle.  So it's the

9    volatility of this bundle of stocks that's important, rather

10   than a simple stock.  And that's the correct way to adjust

11   for it.

12   Q. Okay.  And so this formula is the little wrinkle right

13   there?

14   A. That just gives you the volatility of a bundle of stocks,

15   the portfolio of the stocks, rather than the single stock.

16   It's the necessary and appropriate adjustment to make, given

17   that there were a few -- I can't remember how many, um, it

18   wasn't a significant number -- but there were a few cases

19   where clients came forward, and instead of just doing it with

20   one stock, they did it with a bundle of stocks.

21   Q. And then this right here is the actual Black Scholes

22   formula, right?

23   A. That's correct.

24   Q. And there is a lot of inputs that go into the Black

25   Scholes formula?

PFLEIDERER - CROSS

1    A. Not a lot.  Actually, it's fairly simple.  You can even

2    get it in calculators.  So you just put in a few numbers and

3    it will give you the answer.  So you just need to know the

4    current stock price, that's easy.  You need to know that

5    $121, and of course that's easy.  You need to know the time

6    until this is going to come into play, and that's easy,

7    because in most of these cases, it was just three years.  You

8    need to know the interest rate, current interest rate, right

9    now they are fairly low, sometimes they are higher, that's

10   easy, and you need to know the volatility.

11          And the volatility is the one number that's a little

12   bit more difficult to get, but it's easy to get by either

13   calling up a broker and finding out what the applied

14   volatility is or asking very simply, what would you charge

15   for an option having these characteristics?

16   Q. And then in the Black Scholes model, you have a D1 and a

17   D2?

18   A. That's correct.

19   Q. And then you've got more formulas that actually are D1

20   and D2?

21   A. That's correct.

22          So as I was just telling the jury, the numbers that

23   you need -- actually, if you could leave that up there.

24   Q. Sure.

25   A. The numbers that you need are the stock price.  You can

PFLEIDERER - CROSS

1    see it right there, that S, the $121 is that X, that R refers

2    to the interest rate, simply go to the newspaper and find

3    that out.  Um, the D is the dividend rate.  And that sigma,

4    that's where we put it in Greek to make it look like we know

5    what we are talking about, but that is convention, that Greek

6    letter sigma is just the volatility that we talked about,

7    that's what varies across stocks, and what they should have

8    been taking into account as they -- they put together this

9    product.

10   Q. And with all these formulas, doing inputs into the

11   formulas, you didn't see anything in Nagy's files where he

12   was doing this kind of work for his client?

13   A. No, I wouldn't necessarily expect to see that.  Again,

14   it's easy to call up the broker or someone and find out what

15   these would cost.

16   Q. And --

17   A. I should say that I wouldn't be surprised, looking

18   through an accountant's files, to find this because this is

19   used as standard analysis to value -- value any situation

20   where you have options.  The Accounting Standard Board

21   actually puts this as an accepted, and I think even the

22   preferred, one of the preferred methods to value stock

23   options and other options that arise in accounting.

24              So if I were looking in an accountant's files, I

25   wouldn't be surprised to find this being used.

PFLEIDERER - CROSS

1    Q. Right.  And I believe, you know, if you were doing that,

2    if you would be looking at -- if you were asked to look at a

3    bank's portfolio maybe?

4    A. Um, well, in all kinds of situations.

5           As I mentioned, one of the most prevalent would be

6    stock option compensation, but it occurs in a number of

7    different situations.

8    Q. Okay.  Now, Dr. Cathcart also had a Ph.D. in economics,

9    right?

10   A. Yes, I believe he did, yes.

11   Q. And he had a background on Wall Street?

12   A. I believe that's true, yes.  I saw it in the file.

13   Q. And in fact, I think there has been some talks that he

14   was one of the folks that was on the forefront of Derivium

15   trade?

16   A. I don't know that for a fact, but that may have -- that

17   may have been true.  I don't know.

18   Q. So you and Dr. Cathcart would have similar backgrounds,

19   didn't you, Ph.D.s in economics?

20   A. In terms of having Ph.D.s in economics.

21   Q. And you have been in academia where you spent time on

22   Wall Street?

23   A. I think I did know at one time his background in more

24   detail.  I do believe he was on the commercial side of

25   things.

PFLEIDERER - CROSS

1     Q. And I believe in your report, too, you discuss a paper

2     written by Dr. Cathcart on hedging for the 90% Stock Loan?

3     A. I do, yes.

4          MR. SEACORD:  I'm going to object at this point

5     because that's not in evidence.

6          THE COURT:  Well, I mean, overruled.

7     Q. And in the report that Dr. Cathcart writes, do you recall

8     if he talked about selling the stock up front?

9     A. I would have to go back and look at the report to refresh

10    my memory, but I believe that he talked about two forms of

11    doing this.  And one involving selling the stock and

12    basically doing what they did.  But again, the analysis, as I

13    explained in my report, was completely flawed in terms of the

14    actual cost of hedging it.

15    Q. And also what Dr. Cathcart wrote, do you recall him

16    discussing buying, I think what he called synthetic puts and

17    calls?

18    A. I think there are various allusions to that in the

19    report, yes.

20    Q. And this was a document that Dr. Cathcart wrote and you

21    reviewed in reaching your conclusions, correct?

22    A. Um, well, no.  Let's be very clear.  I -- my initial

23    conclusion, that I basically formed in about five or

24    10 minutes after hearing about this, Mr. Clukey called me at

25    some point and described this program and the detail that I

PFLEIDERER - CROSS

1      needed to understand it.  Basically, that the stock was sold,

2      the ten percent was retained, and that the interest rate on

3      the loans would be about 10 or 11 percent.  He described that

4      to me.  And I said over the phone that doesn't sound like it

5      will work.

6           And I went to my spreadsheet to calculate, basically

7      the calculations that you see here.  And within about five

8      minutes, I determined that for the standard stock, this is

9      going to cost not 90 percent, in other words, you couldn't

10     retain ten, you would have to retain more like 20 or

11     30 percent.

12          So at that point, I hadn't seen Dr. Cathcart's paper

13     at all.  Um, as a matter of fact, I think I saw it probably

14     several months after I did some of my initial analysis.

15     Q. But I think my question was didn't you review a paper

16     written by Dr. Cathcart about buying synthetic puts and calls

17     as part of your preparation of your report?

18     A. Yes.

19          I just want to distinguish two things:  One is the

20     nonviability of this as a business proposition was evident to

21     me almost as soon as I heard about it and did a quick, what

22     we call, back in the envelope calculation.  So Dr. Cathcart's

23     report in no way entered that.

24          What I was asked to review and evaluate was Dr.

25     Cathcart's report, which I read then maybe a month or two

PFLEIDERER - CROSS

1    later.  And I looked at the reasoning that was behind that.

2    And basically, it's an argument that you can get a free

3    lunch, that somehow you can get these at a lower price than

4    what they are really worth, and all the arguments were

5    flawed.

6    Q. And I'm just trying to establish that what Dr. Cathcart

7    was telling everyone about these synthetic puts and calls, he

8    actually put in the paper and wrote it.  And you reviewed it

9    as part of -- to the process of producing your report?

10   A. Yes, I did review it, yes.

11   Q. What's your billable rate?

12   A. Um, I believe I am charging $650 an hour.

13   Q. And how much have you billed on this matter total?

14   A. I would have to go back and look at my records.  I

15   don't -- um, I don't recall the precise number.  I certainly

16   worked, I would guess more than a hundred hours on this, but

17   I'm not sure.

18   Q. Plus your travel here to Charleston?

19   A. Um, in terms of what I billed for.  I haven't billed for

20   that yet, no.

21        MR. COOPER:  Thank you.  That's all.

22        THE COURT:  Okay.  It's a good time to take a

23   morning break.  So go to your jury room and we'll start again

24   in about 15 minutes.

25        (Thereupon, the jury retired from the courtroom.)

PFLEIDERER - CROSS

1          THE COURT:  Okay.  We'll see you at 11:30.  And this
2     is the end?
3          MR. SEACORD:  Yeah, right.  There will be a little
4     bit of --
5          THE COURT:  After --
6          MR. SEACORD:  Yes.
7          THE COURT:  -- you are going to rest?  Okay.  And
8     then I'll note your motions and then you can start your case
9     by Dr. Cathcart's deposition and then you quit; is that
10    right?
11         MR. COOPER:  If you don't mind, that would be great.
12         THE COURT:  I don't mind.  It's nice and warm
13    outside.
14         (Thereupon, there was a brief recess.)
15         THE COURT:  Anything before we bring the jury in?
16         MR. CLUKEY:  The only thing I would add at the
17    conclusion of the case, we are going to make a Rule 50
18    motion.
19         THE COURT:  I'll note everybody's motions heard.
20    I'll let you argue them and then I'll deny them.
21         MR. CLUKEY:  Thank you.
22         THE COURT: It's more efficient than to deny them
23    without you arguing.  But if you want to argue them, that's
24    fine.
25         (Thereupon, the jury returned to the courtroom.)

PFLEIDERER - CROSS

```
 1                THE COURT:  Okay.

 2                      REDIRECT EXAMINATION

 3    BY MR. SEACORD:

 4     Q. Before we broke, Professor Pfleiderer, Mr. Cooper had

 5    gone through a series of the analyses that you did in your

 6    report.  Do you recall that?

 7     A. I do, yes.

 8     Q. Did you need to do all of that analysis just for Mr.

 9    Nagy's case here today?

10     A. No, not at all.

11     Q. Was that done for other cases?

12     A. That was done for several litigations to look at

13    basically the entire operation, if you will, to the 90% Stock

14    Loan Program, all those facets.

15     Q. And Mr. Cohen testified this morning that at least in one

16    of those cases, there were 11 other defendants.  Is that your

17    understanding?

18     A. That was my understanding, as well, yes.

19     Q. Okay.  I believe you testified that when you were

20    initially contacted in this matter and you were told about

21    what this thing was all about, you figured out that the 90%

22    Stock Loan Program wouldn't work in a matter of minutes; is

23    that fair?

24     A. I would guess it would have been in 10 or 15 minutes,

25    just based upon this back of the envelope calculation that I
```

PFLEIDERER - REDIRECT

1    did.

2    Q. But as I understand your testimony, you did sort of a

3    full analysis, with all the formulas and everything that Mr.

4    Cooper flashed up on the screen, to actually prove that it

5    didn't work.

6        Is that fair to say?

7    A. That's a fair way of putting it, yes.  I wouldn't have

8    gotten in this scam on the basis of a back of the envelope

9    calculation.

10   Q. Fair enough.

11       Mr. Cooper asked you about the Black Scholes model

12   and a number of other formulas that appear in your report.

13   Do you recall that?

14   A. Yes, I do.

15   Q. Do you need the Black Scholes model and all the other

16   analysis that you did in your report to figure out what

17   collateral is?

18   A. Absolutely not.

19   Q. Do you need any of the Black Scholes model or any other

20   formula or analysis in your report to figure out what a hedge

21   is?

22   A. No.

23   Q. Do you need the Black Scholes model or any other formula

24   or analysis in your report to figure out that if there is a

25   default in the 90% Stock Loan Program that likely means, as

PFLEIDERER - REDIRECT

1    you testified, that there either was no hedge or the hedge

2    wasn't working?

3     A. No, that wouldn't be involved at all.

4     Q. Could any person with a basic understanding of a business

5    understanding of these basic principles understand what you

6    and I just spoke about this morning?

7     A. I don't think so.

8              MR. COOPER:  Nothing further.

9              THE COURT:  Okay.  Thank you, sir.

10             MR. CLUKEY:  Your Honor.  That concludes the

11    presentation of evidence in the Government's case.

12             We have a number of motions we would like to raise

13    with you at this time.

14             THE COURT:  I'll mark them heard and we'll argue

15    about them after the jury leaves, okay?

16             MR. CLUKEY:  Thank you, Your Honor.

17             THE COURT:  And you are resting with the ability to

18    go over the exhibits and make sure that all the paperwork is

19    right?

20             MR. CLUKEY:  That's part of what we want to raise

21    with you.  Thank you, Your Honor.

22             THE COURT:  All right.  Mr. Cooper?

23             MR. COOPER:  Mr. Nagy calls Dr. Cathcart.

24             THE COURT:  Okay.  Because you already had Mr. Nagy

25    in your case, so we are going to call Dr. Cathcart

1    virtually --

2              MR. COOPER:  Yes.

3              MR. COOPER:  Or in the body of Ms. Van Bavel.

4              THE COURT:  Before we get started, there is no

5    reason to give line and page citations.  Everybody has gone

6    over all this and they are all -- I guess if you want to put

7    it in the record, you can use the paper and give it to Gail

8    and we'll make it a court's exhibit or something, okay?

9              (Thereupon, the deposition of Dr. Charles Cathcart

10   was read to the jury.)

11             MS. WEIS:  Your Honor, if we could correct the

12   record, page 196, page 9 through 14, was asked:  "Did Mr.

13   Nagy actually prepare your tax returns?  He did in 2007

14   instead of" -- and the answer is yes.

15             THE COURT:  Okay.  Thank you.  Is that it?

16             MR. COOPER:  Yes, Your Honor.

17             THE COURT:  All right.  Ladies and gentlemen of the

18   jury, I told you midday, high noon, so we are going to quit

19   for this week.  We are going to start again Tuesday morning

20   at 10:00, okay?

21             So don't discuss the case among yourselves, don't

22   let anyone discuss it with you, don't make up your mind until

23   you've heard everything.  So we'll see you at 10:00 on

24   Tuesday morning.  Great.  Thank you.

25             (Thereupon, the jury retired from the courtroom.)

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          THE COURT:  Okay.  Y'all stick around and see what

2     jurors' problems we have.  And I think I'm almost done with

3     reviewing those, the Socks, and I'll send that to you.  And

4     then if we have a real problem before you are done, then

5     we'll do it at 9:00 on Tuesday morning, all right?  And

6     anything else at 9:00 on Tuesday morning, but unless there is

7     a jury problem, then y'all go home and have a good weekend.

8     We'll see you Tuesday.

9          MR. CLUKEY:  Your Honor, we want to move on a Rule

10     50.

11          THE COURT:  Yeah.  Go ahead.

12          MR. CLUKEY:  The United States moves under Rule 50,

13     we believe that Robert Nagy made material false statements

14     and knew or had reason to know were false in connection with

15     the 90% Loan Program.

16          Those statements concern tax benefits.  They also

17     concern underlying facts that were material and necessary for

18     the tax benefits.  He made those statements to both Derivium,

19     to Derivium marketing people and he made those statements

20     directly to customers.

21          Those statements that he made to Derivium and

22     Derivium's marketing people were then in turn furnished to

23     customers.  They were incorporated into marketing materials

24     and loan documents, which Mr. Nagy edited, and marketing

25     materials. And the false statements that he made started in

1    1997, continued through the end of 2005.

2        Based on the evidence in the record and the

3    admissions made by Mr. Nagy, we believe the United States is

4    entitled to judgment as a matter of law under Rule 50.

5        THE COURT:  I'll take that under advisement.

6        Do you want one, too?

7        MR. COOPER:  Your Honor, under Rule 50, we believe

8    that in the promotional materials and any --

9        THE COURT:  Do you want to read what he just read

10    and change the verbs?  Okay.  Go ahead.

11        MR. COOPER:  In the professional materials sent out

12    through Mr. Kelley, Mr. Debevc, and Mr. Nagy's testimony,

13    they all said that he had no final authority on what went

14    out, that was all Derivium.

15        For example, the activity report, the valuation

16    report, any statements in those documents should not be able

17    to be considered by the jury as part of a false or fraudulent

18    statement because Mr. Nagy did not have the authority to have

19    those caused to be sent out.

20        That would also apply to any other ads, marketing

21    material or final form of anything that had to do with

22    Derivium.  He was not an owner.  He was not part of

23    management.  He didn't have anything to say.  I think

24    everyone was consistent on that.  And the jury should not be

25    able to consider those items in support of its saying he made

1    false or fraudulent statements.

2          We believe it's narrowed to what's in his memorandum

3    and not in the Derivium marketing materials.

4          THE COURT:  Okay.  Thank you.

5          All right.  Also, go over the final charge and Frank

6    will probably e-mail it to you later on in the weekend.  And

7    maybe if you have any additions or corrections, please e-mail

8    them back to Frank by Monday.  Okay.  Great.

9          MR. CLUKEY:  And then the last thing is we wanted to

10   meet with the clerk to go over the final exhibit numbers and

11   as you had mentioned previously.

12         THE COURT:  Make sure everything -- do you want to

13   go see what is wrong with one of the jurors?

14         THE CLERK:  Okay.

15         THE COURT:  We'll be at ease until we figure out

16   what's going on with that.

17         I don't know if it would be appropriate or not, if

18   Mr. Altemose is here, and I don't know if they want to voir

19   dire him.

20         How many witnesses would you call for the second

21   half?

22         MR. COOPER:  That would be Mr. Nagy.

23         THE COURT:  You anticipate what?

24         MR. COOPER:  His damages, that would be an hour.

25         MR. CLUKEY:  Your Honor, we would call zero.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
1              THE COURT:  I know.

2              MR. COOPER:  Is there also a convenient time on the

3    motion in limine where I can make a proffer into the record

4    about what would have been testified by a fellow from OTSA,

5    as well as Ms. Socks?

6              THE COURT:  Yeah.

7              (Thereupon, the Court was in recess.)

8

9                    *****     *****     *****

10

11   I certify that the foregoing is a correct transcript from the

12   record of proceedings in the above-titled matter.

13

14

15

16   ---------------------------

17

18   Amy C. Diaz, RPR, CRR              January 25, 2011

19

20

21   S/  Amy Diaz

22

23    MR. EVAN COHEN                                      841

24    DIRECT EXAMINATION                                  841

25    BY MS. WEIS
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1      Government Exhibit Number 319                    844

 2      Government's Exhibit Number 278                  849

 3      CROSS-EXAMINATION                                850

 4      BY MR. COOPER

 5      REDIRECT EXAMINATION                             852

 6      BY MS. WEIS

 7      PROFESSOR PAUL PFLEIDERER                        853

 8      DIRECT EXAMINATION                               853

 9      BY MR. SEADOR

10      Government's Exhibit Number 353                  855

11      CROSS-EXAMINATION                                867

12      BY MR. COOPER

13      Plaintiff's Exhibit Number 99                   890

14      Plaintiff's Exhibit Number 99                   894

15      Plaintiff's Exhibit Number 100                  898

16      REDIRECT EXAMINATION                             907

17      BY MR. SEACORD

18

19

20

21

22

23

24

25
```