```
1                      IN THE DISTRICT COURT OF THE UNITED STATES
                              DISTRICT OF SOUTH CAROLINA
2                                CHARLESTON DIVISION

3        ROBERT J. NAGY,                )         2:08-CV-2555
                                        )
4                     Plaintiff         )         Charleston,
                                        )         South Carolina
5        VS                             )         June 30, 2010
                                        )
6        UNITED STATES OF AMERICA,      )            VOLUME VII
                                        )
7        Defendant                      )

8                            TRANSCRIPT OF JURY TRIAL
                       BEFORE THE HONORABLE DAVID C. NORTON,
9                       CHIEF UNITED STATES DISTRICT JUDGE

10       APPEARANCES:

11       For the Defendant:    MR. NATHAN CLUKEY
                               MR. GREGORY SEADOR
12                             MS. ELLEN WEIS
                               US Department of Justice Tax Division
13                             P.O. Box 7238
                               Ben Franklin Station
14                             Washington, DC 20044

15

16       For the Plaintiff:    MR. LINDSEY W. COOPER, JR., ESQ.
                               LW Cooper Jr. Law Offices
17                             36 Broad Street
                               Charleston, SC 29401

18

19

20

21

22

23       Court Reporter:       Amy C. Diaz, RPR, CRR
                               P.O. Box 835
24                             Charleston, SC 29402

25              Proceedings recorded by mechanical shorthand,
         Transcript produced by computer-aided transcription.
```

```
 1              THE COURT:  Okay.  Do you want me to come take a
 2     look at something?
 3              MR. CLUKEY:  Yes, Your Honor.
 4              MR. COOPER:  This was in a closing Power Point we
 5     did.  This was the deposition testimony that was read into
 6     the record.
 7              MR. CLUKEY:  Impeachment testimony, Your Honor,
 8     impeachment testimony, our understanding of the Rule is
 9     cannot be used to publish to the jury.
10              MS. WEIS:  This is the segment that Mr. Cooper
11     attempted to impeach Ms. Gadsden on.  Because she's not a
12     party and because it was solely offered for the use of
13     impeachment, it is not affirmative evidence that he can offer
14     and publish to the jury in written form.  He couldn't have
15     shown to the jury the excerpt of the deposition transcript at
16     the time, and he certainly can't do it now.
17              MR. CLUKEY:  The other thing is, Your Honor, after
18     all of her testimony, you said the upshot of her testimony
19     was not that the --
20              THE COURT:  That's something I said, okay.  The jury
21     may have a different take on it.
22              So what rule are you citing to say that you can't
23     use it like that?
24              MS. WEIS:  It's hearsay testimony, Ms. Gadsden's
25     deposition transcript.  As you said at the beginning of
```

1    yesterday, we were trying to -- Ms. Gadsden's deposition is

2    hearsay.  She was here.  He can try and quote things that she

3    said perhaps yesterday, but this was solely offered for

4    impeachment, so it would be Rule 801.

5            MR. CLUKEY:  Your Honor, we would also argue that

6    it's 403, as well, because it's taken out of context and

7    being represented as something it's not.

8            THE COURT:  Okay.  Mr. Cooper?

9            MR. COOPER:  My understanding is she read it into

10   the record, it's part of the trial transcript, it's evidence.

11   And whether it came off the deposition or not, that's what

12   was read to the jury as part of her testimony.

13           As far as not a party, I mean, she's an agent of the

14   IRS.

15           MS. WEIS:  Your Honor, the United States, as Mr.

16   Cooper knows --

17           THE COURT:  You are whispering.

18           MS. WEIS:  The United States -- Ms. Gadsden is not a

19   party to this case.

20           MR. COOPER:  She conducted this action in her role

21   as an internal revenue agent, not in an individual capacity.

22           MR. CLUKEY:  Actually, it's not before this Court.

23   We have a no-change letter in, and talk about the very far

24   down the chain, you have the no-change letter in to show Mr.

25   Nagy's state of mind, and here we have --

1          THE COURT:  You want to use this as demonstrative

2     evidence?

3          MR. COOPER:  Just as a demonstrative.

4          THE COURT:  Wait a minute.  And you object?

5          MR. CLUKEY:  Yes, Your Honor.

6          THE COURT:  I'll sustain the objection.  I have

7     never in 20 years let somebody roll out testimony as a

8     demonstrative evidence.  You can argue it, but you can't use

9     it as demonstrative evidence.

10          MR. COOPER:  Can I bring it in as evidence?

11          THE COURT:  No.  You rested.

12          MR. COOPER:  I just --

13          THE COURT:  I mean, I'm real sorry, I ruled, all

14     right?

15          MR. COOPER:  I know.

16          THE COURT:  Okay.  I mean, you can argue anything

17     you want, argue that's in evidence, all right?  But you can't

18     use that as demonstrative evidence.

19          If the jury wanted to hear testimony, I would have

20     the court reporter read it; I wouldn't have the court

21     reporter show it to them.

22          So on that ground, I'm going to say you can argue

23     whatever you want to argue, as long as it's, you know, as

24     long as there is some evidentiary basis for it, but you can't

25     use it like that.

1     MR. COOPER:  Okay.  May I take it and read it to the

2  jury, the testimony, if it's not blown up?

3     THE COURT:  What are you going to read to the jury?

4     MR. COOPER:  What she testified to.

5     THE COURT:  Have you got a copy of the transcript of

6  what the court reporter took down?

7     MR. COOPER:  No, I don't, Your Honor, but this is

8  the part that we -- where you said Mr. Cooper read it, you

9  read your question and she read the answer, and that was the

10  part.

11     MS. WEIS:  Yes, Your Honor.  That's for the purposes

12  of impeachment.  It was not a part of defendants -- we don't

13  actually think this actually impeached her because it doesn't

14  get out what she thought was communicated, the response

15  doesn't say what she thought was communicated to Mr. Nagy;

16  but moreover, it's impeachment evidence, it's not affirmative

17  evidence.

18     So we would have loved to introduce into evidence

19  various exhibits we used to refresh or impeach Mr. Nagy, but

20  we understand that that's not permissible under the Rules of

21  Evidence.  And the basis of that understanding is why we are

22  objecting now.

23     THE COURT:  Never heard -- I guess I've never heard

24  that argument, because I've never had anybody try to do what

25  you are trying to do.  I don't know.  Evidence is evidence.

1    Impeachment.  So I'm supposed to charge that this comes in,

2    that doesn't come in for the -- as evidence in this case, it

3    just comes in as to Ms. Gadsden's credibility?

4              MS. WEIS:  I mean --

5              THE COURT:  That's not a very good response.  I

6    mean, that's my response.  I've never heard of it.

7              MS. WEIS:  That's the purpose of impeachment

8    evidence, Your Honor, is you can impeach with anything.  You

9    can impeach with hearsay.  This is an out-of-court statement

10   offered for the truth of the matter asserted.  Mr. Cooper

11   wasn't allowed at the time of the impeachment to show the

12   transcript to the jury, he was only allowed to read it in

13   and --

14             THE COURT:  I already ruled on that.

15             We are going -- Mr. Cooper has now moved to phase 2.

16   He doesn't like phase 1, he goes to phase 2, he wants to read

17   it.

18             What's the objection to that?

19             MR. CLUKEY:  Same objection, Your Honor.  And he

20   doesn't have a transcript.  If he had a transcript, I guess

21   that's one thing, there is no transcript, and it's

22   collateral.

23             THE COURT:  Okay.  And so assuming I sustain that

24   objection, Mr. Cooper stands up there and argues that Ms.

25   Gadsden said it was a bona fide loan, then you are going to

1    object, right?

2              MR. CLUKEY:  Yes, Your Honor.

3              MR. COOPER:  And I'm obviously --

4              THE COURT:  Pardon?

5              MR. COOPER:  I will argue that.

6              THE COURT:  And your basis for that objection, so I

7    can think about it when he does it?

8              MR. CLUKEY:  801, and it's 403, as well.

9              THE COURT:  What does 801 and 403 have to do with

10   anything on a closing argument?  He's argued it.  It's not

11   evidence.  I'm going to tell the jury that what the lawyers

12   say is not evidence.  What they say in their opening

13   statement, closing argument and at other times is to help you

14   interpret the evidence, but it is not evidence.

15             What do I do then?

16             MR. CLUKEY:  For one, if you look at the statement,

17   it's also misrepresenting whatever it is, whatever that --

18   whatever that impeachment was, it's misrepresenting what

19   actually occurred.

20             You see there, the question says, so there was no

21   change, so you didn't have that -- at that time you issued a

22   no-change letter, it was communicated that it was a bona fide

23   loan?  She doesn't say, yes, it was, at that time it was

24   accepted as a bona fide loan.

25             This is already subject to a motion in limine.

1    That's why we objected when she was -- when he was attempting

2    to impeach her on this, because that is her internal thoughts

3    and what they were thinking at the time it was accepted as a

4    bona fide loan.  She did not say that it was communicated.

5    That's what he tried to impeach her on.  That's why we

6    thought it was improper impeachment and it's not what she

7    said.  So he's going to mischaracterize her testimony that

8    was supposed to be impeachment testimony.

9          THE COURT:  Isn't that what lawyers do for a living,

10   mischaracterize the testimony?

11         MR. CLUKEY:  I'm sure you would know the answer to

12   that very well.

13         THE COURT:  All right.

14         MR. COOPER:  That's all I want to do, Your Honor, is

15   argue about what she talked about and what transpired on this

16   thing.

17         THE COURT:  Well, all right.  You can't do it that

18   way, you can't read to the jury.  You can argue whatever you

19   want to argue.  If you say that and if you object, I'll rule

20   on it, okay?

21         I mean, if you are going to take the position --

22   what you are doing is trying to get around the motion in

23   limine that the no-change letter is not an absolute defense

24   to this action, which is essentially what you are trying to

25   do, I appreciate it, and I know you are being consistent, and

```
 1            I try to be consistent, too, right?
 2                 MR. COOPER:  Yes, Your Honor.
 3                 THE COURT:  You are agreeing with me that you are
 4       trying to get around my motion in limine or --
 5                 MR. COOPER:  No, we have been consistent.
 6                 THE COURT:  I didn't think so.  Okay.  I just wanted
 7       to make sure.  Okay.
 8                 MR. CLUKEY:  So, Your Honor, there is another --
 9                 THE COURT:  All right.  Now, the statement that was
10       accepted as a bona fide loan is probably correct, because
11       what hasn't been accepted as a bona fide loan, she wouldn't
12       have issued a no-change letter.
13                 MS. WEIS:  She testified that no matter --
14                 THE COURT:  It had to be a bona fide loan for them
15       to write off the interest, right?  I know she was misled, and
16       I know everybody was misled, and I know I have been misled by
17       Mr. Cathcart for three years now, okay?  All right.
18                 MR. CLUKEY:  If I may, Your Honor?
19                 THE COURT:  Okay.
20                 MR. CLUKEY:  Ms. Gadsden testified that Scott
21       Cathcart was already in the hole $19,000, it did not matter
22       what the IRS did.  And she explained during her deposition
23       that they didn't need to do anything.
24                 THE COURT:  I agree with that.
25                 MR. CLUKEY:  And so it just -- it just passed -- she
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1   also testified she didn't think that that particular loss was

2   going to be a carry forward, so it's not going to have any

3   impact on next year's taxes, either.  She wasn't certain

4   about that, but that's what she thought.  The no-change

5   letter didn't impact it, that wasn't impacted one bit by the

6   no-change letter.

7           MR. COOPER:  I mean, obviously we have our arguments

8   against that.  I won't get into it, but...

9           THE COURT:  All right.  You can argue what you want

10  to argue, okay?  If he objects that you are mischaracterizing

11  the testimony, then I'll rule on it or not, Mr. Clukey gets

12  to reply, okay?  I mean, you can correct it in reply.  I

13  can't -- you've got a First Amendment right to say anything

14  you want to.

15          MR. COOPER:  Unless the IRS assesses --

16          MR. CLUKEY:  Your Honor, there is additional

17  testimony that I think Mr. Cooper is quoting in these slides,

18  as well.  I mean, there is testimony throughout.  This is --

19  I guess we can come back to that -- but this is highly

20  objectionable, Your Honor.

21          THE COURT:  No.  And that's not evidence of anything

22  in this case.

23          MR. CLUKEY:  I think -- were you also quoting

24  other -- other witnesses in your slides?

25          MR. COOPER:  No.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1            MR. CLUKEY:  Okay.

2            THE COURT:  Okay.  This is a document.  You can post

3       the document.

4            MR. CLUKEY:  Yeah.  No objection.

5            THE COURT:  Okay.

6            MR. CLUKEY:  You don't --

7            THE COURT:  As long as it's an excerpt from a

8       document that's in evidence, it's no problem at all.

9            MR. CLUKEY:  No.  No objection.

10           THE COURT:  Okay.

11           MR. CLUKEY:  You don't quote Mary Socks in that?

12           MR. COOPER:  No.

13           THE COURT:  I mean, if you are trying to put up

14      testimony, the answer is no.  If you try to put up something

15      that is not in evidence, the answer is no.  If you are taking

16      excerpts out of documents which are in evidence, there is no

17      problem with that at all.

18           MR. CLUKEY:  Mr. Cooper, so we are on the same page,

19      you don't have any objection to the demonstrative I showed

20      you; is that right?

21           MR. COOPER:  That one has the cash.

22           THE COURT:  It's got what?  So I mean, it's a

23      demonstrative.  It's not going to the jury.

24           MR. CLUKEY:  Exactly.

25           THE COURT:  All right.  Are you going to use your

1    timeline again that you used in the opening?

2              MR. COOPER:  Yes, Your Honor.

3              THE COURT:  That's no problem.

4              MR. COOPER:  There is a second timeline to show to

5    them.

6              THE COURT:  Which is based on evidence and all.

7    Have you seen that?

8              MR. CLUKEY:  Yes.

9              THE COURT:  All right.  Mr. Nagy, whatever you need

10   to do for your, the situation, you just let me know what the

11   timing is, you will get to do whatever you need to do for

12   your wife, all right?

13             MR. NAGY:  Just to let you know, there is a viewing

14   this evening, and we would need to leave by, say, 3 or 3:30

15   at the latest, and that would be fine.  And then there is a

16   funeral at 11:00 tomorrow morning, that's in Turbeville,

17   Atlanta, so it's about two hours away.

18             THE COURT:  I was going to ask you where it was.  So

19   when we get close, you let me know and we'll deal with it

20   somehow, okay?

21             MR. NAGY:  Thank you.

22             THE COURT:  All right.  Thank you very much.

23             All right.  Anything else, Mr. Clukey?

24             MR. CLUKEY:  I don't think so, Your Honor.

25             THE COURT:  Anything else, Mr. Cooper?

1          MR. COOPER:  No, sir.

2          THE COURT:  Okay.  All right.  So Gail, is everybody

3     here?

4          Just relax and get set up.  And then when y'all are

5     ready and the jury is back, let me know, okay?  All right.

6          (Thereupon, there was a brief recess.)

7          THE COURT:  Okay.  Ready to go?

8          MR. CLUKEY:  Yes, Your Honor.

9          (Thereupon, the jury returned to the courtroom.)

10          THE COURT:  Okay.  Ladies and gentlemen of the jury,

11     welcome back.  I'm glad you didn't get messed up in the

12     action on the Interstate.

13          Everybody has to work today.  First, the lawyers are

14     going to work because they are going to give you their final

15     summations on what they think they have proved.  And then I'm

16     going to work because I'm going to give you a final charge of

17     the law.  And then you are going to work because you have to

18     decide this case.

19          And the Government has the burden of proof, so the

20     Government will open, and then Mr. Cooper will give their

21     argument, and the Government's allowed to give a reply.

22          If you would give your attention to the lawyers, I

23     would appreciate it.

24          Mr. Clukey?

25          MR. CLUKEY:  Good morning ladies and gentlemen.

1          I've got another chart for you that you know we are

2    so fond of.  Can you guys all see that?

3          Ladies and gentlemen, over the course of this trial,

4    you've heard testimony that places Robert Nagy at the center

5    of a billion dollar tax scheme.  The tax scheme, as you know

6    by now, is the 90% Loan Program.  Mr. Nagy was involved in

7    all aspects of the scheme.

8          For example, you heard testimony from Mr. Nagy that

9    he edited the marketing documents that were provided to

10   customers.  He told you that himself.  Those are the very

11   documents that Derivium Capital used to rope customers in

12   this scheme.

13         Mr. Nagy edited the loan documents themselves, the

14   loan documents that customers signed, customers signed

15   believing that this was a real loan.  Mr. Nagy profited from

16   these startup companies, startup companies that were funded

17   with sales from customer stocks, that's where they got their

18   money to operate.  He was profiting from all of those and he

19   was sitting on the advisory boards of a bunch of those

20   companies.

21         Mr. Nagy helped structure the fake foreign lenders.

22   Fake foreign lenders, ladies and gentlemen.  That pretty much

23   says it all.  This program wasn't a real loan because there

24   wasn't a lender and there were fake foreign lenders that Mr.

25   Nagy helped set up.

1           But he did more.  Mr. Nagy talked directly to

2      customers.  He talked to customers telling them that this

3      thing was a real loan, telling customers that this thing

4      worked under the tax laws.

5           And most importantly, most importantly, Mr. Nagy

6      wrote the memos, the tax memos that said this thing works

7      under the tax laws, the tax memos that Derivium Capital had

8      to have in order to market this program.  It couldn't do it

9      without it.

10          You are going to see an exhibit in a little bit,

11     Exhibit 80.  And if you are taking notes, I'll mention some

12     exhibits as we go along.  I'm not going to mention

13     everything, you guys have seen a lot of exhibits obviously.

14          Exhibit 80.  Mr. Nagy's own words.  He says this

15     scheme, he says Derivium Capital cannot market something that

16     was not worth the tax advice.  And it was absolutely the

17     truth.

18          So they needed a cover, they needed a cover from an

19     accountant, from a lawyer, somebody, telling customers that

20     this thing worked under the tax laws.  And he's the only

21     person who would provide it.  No other person in the country

22     would do it.  No law firm, no lawyer, no other accountant.

23          Ladies and gentlemen, ask yourselves, a billion

24     dollar tax scheme and you can't find one other person to

25     corroborate what he's saying?  They couldn't because the

1    thing was a scam.  It was a tax shelter.

2         Mr. Nagy was fundamental to the scheme's success

3    from the time it began until the time it collapsed.  The

4    statements that he put in memos, the statements that he

5    edited to marketing materials and loan documents, those

6    statements were false, ladies and gentlemen, there is no

7    dispute about that.  And this Court has already ruled that

8    those statements were false.  Mr. Nagy knew that these

9    statements were false based on his entire participation in

10   this scheme.

11        Ladies and gentlemen, at the beginning of the trial,

12   we asked you to follow the evidence.  We told you there was

13   going to be a lot of it, there was, and we asked you to piece

14   together all that evidence.  So we are going to walk through

15   some of that, trying to keep it as brief as we can.

16        And we told you that on the surface, the scheme was

17   going to be complex.  And you saw evidence of all these fake

18   foreign companies and all these other companies in the United

19   States.  And Mr. Nagy was a part of all of those.

20        But in the end, he told you it was pretty simple,

21   the core deception was pretty quick.  Customers gave their

22   stock to Derivium Capital, Derivium Capital took that stock

23   and sold it immediately.  They sold it before the transaction

24   was ever finalized.  They sold it before the customer got a

25   penny.  They had to.  They had to sell it so they could take

1    the customer's own asset, sell it and give the customer back

2    its own money.  They didn't have any money in their pocket.

3    There wasn't anything there.  They needed the customer so

4    they could take their own stock and trick them and sell them.

5    Trick them and then tell the customer that it was a loan.

6    Mr. Nagy knew it wasn't a loan because he knew it was sold

7    immediately.

8          Common sense tells you it's not a loan.  You don't

9    have any collateral.  If the collateral that's supposed to

10   exist is the stock and you sell the collateral before it's

11   even gone, common sense tells you that can't be a loan.  You

12   don't need to look at 30 different provisions in the Tax

13   Code, that's just common sense.

14         But you also heard evidence from a whole bunch of

15   witnesses that all backed this up, that this scheme is really

16   simple.

17         Starting in the beginning.  Jerry Pryor.  1997.

18   Inception of the scheme.  Same time Mr. Nagy got involved in

19   this scheme.  Jerry Pryor told the truth.  He said, look,

20   what happens is stock comes in, you sell it.  The customer

21   got back 90 percent of basically their own money and we keep

22   10.  You don't need a lender.  Why do you need a lender?

23   There is no loan.  You don't have to reach in your pocket to

24   get a loan, it's a sale.  They trick customers into thinking

25   it was actually a loan.

1          The people who worked for the fake foreign

2    companies, they are real companies, right?  They are paper

3    companies.  They didn't do anything.  You saw those

4    distinguished Manxmen, men from the Isle of Mann.  One was

5    read into -- his deposition testimony was read in.  They told

6    you exactly how the scheme worked, too.  It was that simple,

7    stock came in, stock was sold, gave customer back their own

8    money, keep ten percent.

9          We saw testimony from the gentleman at Optech.  He

10   said exactly the same thing.  Operated the same way.  You saw

11   Roy Strickland at the very beginning in the trial, the first

12   trial, do you remember Roy Strickland, the local accountant,

13   the certified fraud examiner?  Mr. Strickland is an expert.

14         Mr. Strickland said, look, after I went back and

15   looked at all the books, this is exactly how the scheme

16   worked on the books, too.  Stock comes in, sell the stock,

17   there is no collateral.  He said that from an accounting

18   perspective.  Mr. Strickland was not a Ph.D.  He said from an

19   accounting perspective this stock was sold, it was gone,

20   there was no collateral, period.

21         And you heard Professor Pfleiderer, he was a Ph.D.,

22   and he also explained the same thing from a business

23   standpoint.  He said from a basic finance and business

24   standpoint, any business person could understand this.

25         Mr. Nagy, he's a smart guy, Mr. Nagy could

1    understand what was going on here.  It wasn't complicated.

2    The core deception was not complicated.

3            And lastly, even Yuri Debevc, who is certainly

4    wrapped up and in the heart of the scheme.  You heard

5    testimony about the judgment against him.  Even Mr. Debevc

6    admitted how the scheme really went.

7            Ladies and gentlemen, that is the substance of the

8    transaction, the substance.  What was really going on here?

9    Just a sale, plain as day.  The substance of the transaction

10   was also clear that there was no collateral.  There was no

11   lender.  This transaction had no hedge, we'll talk about that

12   in a little bit, and the transaction wasn't tax free because

13   it wasn't a loan.

14           Those were all words, you remember we put up at the

15   beginning of the trial, wrote them out, just on paper, these

16   were all false statements about this program.  They are made

17   in Mr. Nagy's memos.  They are made in all the marketing

18   materials, all false statements.

19           Now, as Judge Norton just told you, the United

20   States has the burden of proof in this case.  Remember, this

21   isn't a criminal case, and so the burden of proof is an

22   easier standard for the Government to meet here.  We have to

23   prove the facts by a preponderance of the evidence.  And the

24   jury instructions in there, they tell you what that means.

25   That's what Judge Norton told you at the beginning of the

1    trial, too, we have to show that the facts are more likely

2    true than not.

3         What you do, you can put all the evidence, Mr.

4    Nagy's evidence, our evidence, all of them on scales, if the

5    evidence tips just ever so slightly in the Government's

6    favor, that means the Government wins.  Football analogy, it

7    means the Government doesn't have to put the ball in the end

8    zone, we just have to cross the 50 yard line.

9         So what are the four things you have to decide?

10   Those are in the jury instructions.  We are going to walk

11   through those in just a second.

12        The first thing you need to decide is whether Mr.

13   Nagy participated in the organization or sale of the 90% Loan

14   Program.  Did Mr. Nagy participate?  And his participation

15   can be direct or indirect.

16        We are going to walk through some of the evidence.

17   But the evidence shows that Mr. Nagy clearly participated in

18   the organization of the program, the structuring of the fake

19   foreign lenders, participated in the sale of the program, his

20   memos, his memos that were key.  He had to have those memos

21   in order to deal with the marketing program.

22        Second, you need to decide whether Mr. Nagy made or

23   furnished or caused another person to make or furnish a

24   statement with the 90% Loan Program that it involved real

25   loans.

1      Make or furnish.  What's that mean?  Well, ladies
2   and gentlemen, if you go to your jury instructions on the top
3   of page 11, there is some examples here.  So we are in the
4   top paragraph there, page 11.  And if we go down a couple of
5   sentences there, about the middle, it says:  "A person
6   directly makes" -- "the person directly makes or furnishes
7   false statements if, for example, he provides potential
8   customers with documents that contain false statements."  And
9   Mr. Nagy's memos.  "A person indirectly causes false
10  statements to be made when, for example, he authors or edits
11  documents containing false statements that others will
12  distribute to potential customers."  Again, Mr. Nagy's memos.
13      He authored, gave to Derivium.  Those memos were
14  then passed on to customers.  They were also given to
15  marketing people and the marketing people relied on those
16  memos, and then relayed the false statements that this was a
17  real loan on to customers.  It's indirect.  That's the second
18  thing you need to decide.
19      And by the way, if you go to page 9, the four things
20  are listed out that we have to prove.  Beginning at the
21  bottom there:  "Therefore, you must determine" -- and there
22  is one that we just talked about -- "whether Mr. Nagy
23  organized or sold or participated in the organization or sale
24  of the 90% Loan Program."
25      There is number two that we just talked about:

1    "Whether Mr. Nagy made or furnished or caused another person

2    to make or furnish statements that the 90% loan transactions

3    were loans."

4            And then the third thing, ladies and gentlemen, is

5    on page 10, if you turn over, just item number 3:  "That Mr.

6    Nagy knew or had reason to know that the statements that 90%

7    loan transactions were false or fraudulent."

8            Did Mr. Nagy know his statements claiming this is a

9    real loan, did he know that those were false or fraudulent

10   statements?

11           So what does know or reason to know mean?

12   Fortunately, the Court explained that in the instructions

13   here, too.  And if we could flip over to page 11, the middle

14   paragraph -- actually, I'm sorry.  It's the bottom paragraph

15   there.  It starts with actual knowledge.  Everybody is there?

16           Actual knowledge.  So that's -- that's whether Mr.

17   Nagy knew.  If he knew, if he had actual knowledge.  It says:

18   "Actual knowledge ordinarily cannot be proved directly."

19           There is no way of fathoming or scrutinizing the

20   operation of the human mind.  You can't look into somebody's

21   head, right?  "Therefore, you may infer a person's knowledge

22   or intent from circumstantial evidence.  Thus, you may

23   consider all of the surrounding facts and circumstances in

24   evidence, including all relevant testimony and exhibits

25   received in evidence," and you can consider all the

1    statements that Mr. Nagy made in connection with the scheme,

2    and things that he didn't say, things that were omitted.

3         So all of that just goes to what Mr. Nagy actually

4    meant.  But this Statute under which penalties were being

5    asserted, 6700, it allows you to find for the Government if

6    you conclude that Mr. Nagy had reason to know, reason to know

7    that his statements were false.

8         So the Court explains what reason to know is on page

9    12.  If we go to the second sentence there on the top:  "In

10    deciding whether Mr. Nagy had reason to know, as opposed to

11    actual knowledge, you should consider the extent of Mr.

12    Nagy's reliance upon knowledge of professionals."  And I'll

13    stop right there.  There wasn't any testimony that Mr. Nagy

14    relied on knowledge of professionals.  "Mr. Nagy's level of

15    sophistication and education; Mr. Nagy's familiarity with tax

16    penalties."

17         Mr. Nagy is familiar with tax matters.  He's an

18    accountant, he's a CPA, when he held himself out as being an

19    expert on the tax laws.  So Mr. Nagy was sophisticated.  You

20    should also consider what a reasonable person in Mr. Nagy's

21    position would have discovered.  What he would have

22    discovered?  What would a reasonable person in Mr. Nagy's

23    position, a reasonable accountant, a person with the same

24    knowledge and training, business background and experience,

25    what would that person have discovered in connection with the

1    scheme?  What would they have concluded?

2           So that information, what a reasonable person would

3    have discovered, that information can be imputed, it can be

4    attributed to him.  That's what reason to know says.

5           Lastly, the fourth thing we have to prove, the

6    United States has to show that the false statements that this

7    program was a real loan, those were material.  They are

8    material.

9           What's material mean?  Again, on page 12, the bottom

10   of that, of the page, the Court explains material.  "Material

11   matters are those which would have a substantial impact on

12   the decision-making process of a reasonably prudent investor

13   and include matters relevant to the availability of a tax

14   benefit."

15          Ladies and gentlemen, all of Mr. Nagy's memos say

16   this is a real loan.  He's the only guy in the country

17   telling Derivium that, so that they can then take his memos

18   and use those memos with customers and incorporate those

19   statements in the marketing materials on the website and

20   marketing materials that were handed out to customers, he's

21   the only guy doing it.  Those statements are material, ladies

22   and gentlemen.

23          The definition goes on, it says:  "A statement is

24   material whether or not a customer relies on the statement."

25   In other words, the United States doesn't need to prove that

1    any of the customers of the 90% Loan Program relied on Mr.

2    Nagy's statements.

3         So whether a reasonable person would have thought

4    this was material, Mr. Nagy is telling you that this is a

5    real loan.  As a matter of fact, this just a sale, but the

6    United States did bring someone in who talked about that.

7    Remember Ken Polk?  He represented different customers and he

8    got Mr. Nagy's memo and he said the fact that it was called a

9    loan, that was important, and he wouldn't have done this

10   transaction if he thought it was a sale.  If he had known the

11   stock would have been sold, he wouldn't have done it.

12        The last thing I want to mention about materiality,

13   and that's now on page 13, the top there:  Additionally, an

14   otherwise material statement does not become immaterial

15   simply because it includes a disclaimer that the prospective

16   customer does not rely on the statement.  Remember those

17   disclaimers, ladies and gentlemen?  All those memos were

18   given to customers.  I'm not responsible.  Consult your own

19   tax advisor.  Doesn't mean it's not material because it says

20   that.

21        He also, if you look on further on the same page,

22   this is materiality, but this is also whether Mr. Nagy can

23   escape liability in this case.  It says:  "A person who makes

24   or furnishes or causes to be made or furnished a statement

25   with respect to tax benefits of a program may not avoid

1    liability on the Internal Revenue Code Section 6700 by

2    including a disclaimer."

3         You can't include a disclaimer that says the

4    person's statements are not tax advice.  You can't include a

5    disclaimer that says it's not to be relied on.  You can't

6    escape liability by putting a disclaimer that says customers

7    need to consult their own tax advisors.  And you remember

8    that, Mr. Cooper made sort of a big deal about bringing that

9    to the witness's attention, these disclaimers, he can't

10   escape from that.

11        So ladies and gentlemen, I want to walk through some

12   of the evidence that you've seen over the course of this

13   trial, I'll try to keep it as brief as possible, some of the

14   evidence you need to consider and to piece together to

15   understand whether the Government has met and shown these

16   four things.

17        Let's start in 1997.  1997.  That's the year that

18   Mr. Nagy told the Government, when we took his deposition, he

19   talked to Charles Cathcart for two hours, two hours in

20   Derivium.  And the Government asked him generally, not just

21   with respect to the 90% Loan Program, but how much time did

22   you meet with him?  Two hours.

23        The truth is, Mr. Nagy met with Charles Cathcart,

24   did work for Charles Cathcart, for over 50 hours.  And it

25   wasn't just looking at a tax return, doing something like

that, kind of innocuous, things that accountants do all the
time, you might just forget.  What he was doing was helping
to structure a transaction that was very similar to the 90%
Loan Program.  He was actually -- you saw pictures of his
notes where he actually made those boxes in Newco, arrows
drawn, he was helping to structure this thing in 1997, and he
said two hours.  The memos that we looked at showed there
were 50 hours.

Well, what he was doing with those transactions,
with that transaction, it was very important.  It was
important to what Mr. Nagy knew, what he knew at the very
beginning of the scheme back in '97.  It's important to what
he knew about what he had to do with respect to the IRS, if
he wanted to make sure the IRS thought this thing was okay.

Do you recall those memos that said, one of his
clients asked him if he should get a private letter ruling, a
client that was someone who was affiliated with Derivium,
should we get a private letter ruling?  Mr. Nagy talked about
that, talked about some of the pros and cons.  A lawyer at
the IRS, a lawyer looks at the law, says, can you do this
transaction?  If you get that private letter ruling, you are
covered.  You are covered even if the IRS changes its mind.

So of course, someone at Derivium said, well,
shouldn't we get a private letter ruling?  Mr. Nagy said, no
no, don't do that.  Why not?  Because the IRS is going to

1    argue substance over form.

2         Substance over form.  The doctrine that this Court

3    said the 90% Loan Program violated in 2009.  That's the same

4    thing that Mr. Nagy identified himself back in 1997, '97,

5    ladies and gentlemen.

6         If we could look at Exhibit 210, please.  Here we

7    go.  Dave Kekich.  Mr. Debevc testified he was one of the

8    early owners of First Security Capital.  He was also one of

9    the early owners of DDA, one of the fake foreign lenders.

10   And he gets bought out eventually.  But in the beginning of

11   1997, Bob Nagy is being asked about a private letter ruling.

12   And Mr. Nagy said, as I just mentioned, says, don't do that,

13   most likely they would not issue a ruling.  They will most

14   certainly try to argue substance over form.  Ladies and

15   gentlemen, that's Exhibit 210, if you are taking notes, if

16   you want to look at that for yourself.

17        So Mr. Nagy knows what you've got to do.  You've got

18   to get a private letter ruling.  Mr. Nagy knows what the IRS

19   is going to say if you try to get that private letter ruling.

20   They are going to say this transaction doesn't work on the

21   substance over form doctrine, because all it is is a sale.

22   That's the substance of this, is what's really going on, it's

23   just a sale.  That happens at the very beginning.

24        But let's look at another exhibit.  And Mr. Nagy

25   communicates what he's really thinking in respect to

1    promoting tax shelters.  Let's look at Exhibit 335.  So the

2    date up top, still 1997, December.  Mr. Nagy tells his client

3    not to promote this scheme that involves the sale of property

4    that Derivium pretends is a loan.  Basically, the same thing

5    as a 90% loan scheme.  And he says, if I was advising a

6    customer on this, I would say, don't do it.  He says, if I'm

7    telling a customer, that's actually my client who is thinking

8    about entering into this transaction, I would tell him it's

9    going to blow up in your face, that's how bad this thing is.

10           So what does Mr. Nagy do?  Does he say, guys, so I

11   would tell a customer that there's no way you can promote

12   this, you can't do it, you've got to back away from this,

13   this thing stinks?  No, Mr. Nagy says, go ahead and promote

14   it, just promote it with as little attention as possible so

15   as not to draw IRS curiosity.

16           That's what he knew, ladies and gentlemen, back in

17   1997.  That's what he was really thinking.  He knew about the

18   substance over form doctrine.  We are going to go through his

19   memos in a minute.  It wasn't in any of his memos that

20   actually go to clients.  He knew what the key was to the

21   answer to the scheme as early as 1997 and he didn't care.  Go

22   ahead and promote it anyway.

23           Why would he do that, ladies and gentlemen?  Why?

24   Remember Jerry Pryor's testimony?  Charles Cathcart held the

25   gold.  So Mr. Nagy was fundamental to this scheme.  It could

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  not have worked without him.

2          Let's look at Exhibit 80.  Mr. Nagy told Charles

3  Cathcart, the bottom line is, Derivium cannot market a

4  product that does not work tax-wise.  This is a confidential

5  memo that he's telling Derivium, Mr. Nagy knew that, he knew

6  that all along.  You can't market a product that doesn't work

7  under the tax laws.  You need the cover of an accountant, a

8  lawyer, somebody, so you can talk to customers and say, sure,

9  of course this thing works under the tax laws.  Because who

10  is going to do a transaction that had a minimum amount of

11  $100,000 if you didn't think that this thing works under the

12  tax laws?  Who is going to do that?  Nobody would.

13          Let's look at Exhibit 248.  Cover pages.  A couple

14  of his memos right there.  Exhibit 45, Exhibit 248.  These

15  are his main memos, his general memos that he provided to

16  customers.  And he wrote, provided Derivium, Derivium then

17  used with its marketing people, that the marketing people

18  then either shared directly with customers or they orally

19  told customers that this thing worked under the tax laws,

20  yeah, we've got it covered, we've got an accountant, CPA that

21  says this thing is fine.  These are his main memos.

22          Derivium, the people at Derivium, relied on those

23  memos.  We heard Yuri Debevc talk, you heard the deposition

24  transcript from Charles Cathcart, it said they gave us --

25  those memos gave us comfort.  They had to have those memos.

1         Marketing people that I just mentioned, you heard

2    from Randolph Anderson.  That was another deposition that was

3    read in.  And he told you that they used these memos.  He

4    told you that they looked to Robert Nagy for the statement

5    that this thing was a real loan.  He told you, and they

6    actually kept copies of Robert Nagy's memos on the shared

7    drive of the computer for their marketing materials.  They

8    actually had it on the computer.  They just spit it out

9    whenever they needed it to actually give copies to customers.

10        And Mr. Nagy, he talked to the customers, too.  He

11   talked about his memos, about tax questions.  He talked

12   directly to customers and told them this thing was okay under

13   the tax laws.

14        Now, these memos, ladies and gentlemen, the

15   statements in them are material, material because they are

16   saying this is a real loan.  Derivium has got to have

17   somebody that says this is a real loan under the tax laws, or

18   they can't do that.  This means those statements are

19   material.

20        Now, what these memos don't say.  Do you remember

21   this, when Mr. Nagy was up on the stand I was asking him

22   about some of the memos and some of the statements, what they

23   don't say?  I just mentioned this.  They don't say substance

24   over form.  They don't say that anywhere in the memos.  The

25   doctrine that he knew way back in 1997, the doctrine that he

1    knew about, that's not in there.

2         And that was the answer, that was the key.  This

3    Court used that doctrine to say the 90% Loan Program wasn't a

4    real loan, it was just a sale.  That's not in the memos.

5    These memos say that the stock is sold and sold right away.

6    It was sold before the transaction begins.  They don't say

7    that.  He can't say that.  If he told the customer that this

8    stock was sold, the customer would head for the hills.  I'm

9    not going anywhere near this.

10        You heard Ken Polk talk.  He testified that if he

11   knew that the stock was sold, of course he wouldn't do this

12   transaction.  Nobody would because that's a sale.

13        The memos do say, however, that there is collateral.

14   They mention collateral, that stock is collateral.  That's

15   not true, either.  You heard that from Roy Strickland.  He

16   told you there is no collateral from an accounting

17   perspective.  Same background as Mr. Nagy.

18        You've heard that from Paul Pfleiderer.  He also

19   told you from a business perspective.  He's a professor of

20   finance.  Of course, the collateral is gone.  Where is the

21   collateral?  You remember Mr. Pfleiderer, it's out that door.

22   It's gone.

23        These memos also say that the stock is going to be

24   hedged.  Again, we'll get to that in a minute, ladies and

25   gentlemen.  You all know that there weren't any hedges.

1    There weren't any hedges because all those defaults that
2    happened, customers were defrauded here.  They didn't get
3    their stock back.
4            And the other things all these memos have, all these
5    memos that are prepared to be given to customers, we just
6    talked about it, the disclaimer.  The disclaimer that says,
7    hey, I'm not responsible.  I'm making these statements in
8    here, but I'm not responsible.
9            As we just read that jury instruction, Mr. Nagy is
10   responsible.  He cannot escape responsibility simply by
11   putting that disclaimer.  What that disclaimer tells us, and
12   we'll see this in other memos, it tells us that that document
13   went out to customers.
14           So let's talk about the FRN memos that Mr. Nagy
15   prepared.  You remember the FRN's.  There is two parts to
16   this program.  Most of the time Derivium just used stock, got
17   the customers stock in, sold the stock, they also used these
18   things called floating rate notes, FRN's, kind of like a
19   bond.  You heard testimony about that.
20           Well, Mr. Nagy was asked to look at that issue, hey,
21   can we use FRN's?  And there is some quirks to them in the
22   specific provision in the Code.  Mr. Nagy identified 1042.
23   So even Mr. Nagy determines that FRN's, no, you can't do that
24   because of this one code provision.  If you do, what you
25   normally do selling the stock in the beginning, that this is

1    not going to work.  This thing is going to violate the tax

2    laws.  He tells Charles Cathcart that in 2000.  Let's look at

3    that exhibit, 218.

4            Confidential.  Confidential memo.  This isn't to be

5    distributed to customers.  Charles Cathcart's eyes only.  "I

6    do not believe the ESOP loan is currently structured with

7    floating rate note collateral so the FRN's can stand up to

8    IRS scrutiny."  Mr. Nagy knew this in 2000, ladies and

9    gentlemen.  How many transactions -- how many FRN

10   transactions does Derivium promote in 2000?  Zero.  Nobody in

11   the country will tell Derivium that the FRN transactions work

12   under the tax laws; not even Mr. Nagy.  They can't market

13   them.

14           Well, Derivium wants to market these things.  They

15   ask him again two years later, come back, hey, we really want

16   to market these things.  What's Mr. Nagy say?  Exhibit 80.

17   2002.  Another confidential memo.  Charles Cathcart's eyes

18   only.  Sorry, Charles, still doesn't work.  It's been two

19   years.  Looked at this issue for a long time.  Doesn't work.

20   I'm sorry.  You can't market it.

21           How many transactions have they marketed since then,

22   since 2000 to 2002?  In a single day, one day, they marketed

23   four transactions.  That's it.  Four transactions before this

24   memo.  And this memo they don't market any.

25           So Charles Cathcart still really wants to market

1    this thing.  So Mr. Nagy does additional research.  Who does

2    he consult?  He goes to a specialist, someone that he used to

3    work with, Becky Miller.  She's a specialist in ESOP's and

4    FRN's, these exact transactions.  Smart.  Go consult somebody

5    who really knows what is going on with these things.  That's

6    Exhibit 150.  What does she tell him?  Bad news.  Bad news,

7    Mr. Nagy.  If you use these FRN transactions, it's a disaster

8    waiting to happen.

9           She feels it's very risky and would not recommend

10   this structure to a client.  That's it, right?  That's it.

11   He's now -- he's done research for two years.  He's consulted

12   with an expert.  She tells him you can't do this thing, so we

13   are done.

14          And this, ladies and gentlemen, is an internal memo,

15   it's a memo to the file.  He doesn't even give this chart to

16   Cathcart.  He doesn't give it to anyone.  Internal memo.

17   This is what Mr. Nagy really knew.  We actually get a

18   snapshot in his mind because this is the memo to the file and

19   he knew this transaction stunk, did not work under the tax

20   laws, and nobody would recommend this because it's a disaster

21   waiting to happen.

22          Well, what happens after this?  In just a month,

23   what happens?  Exhibit 26.  Exhibit 26.  June 27th, Robert

24   Nagy, Certified Public Accountant.  There we go.  We've got

25   his letterhead.  "Dear Charles, you have inquired about the

1     applicability of the Internal Revenue Code 1042 provision.

2     As you know, we've discussed this issue at length."  Yes, we

3     have, over two years we talked about this.

4          And then he says in this memo, "Several weeks back,

5     I had a lengthy conversation with a partner in a national

6     accounting firm, Becky Miller."  But what does he say in this

7     memo?  What does he represent that conversation was, the

8     substance of that conversation?  He says, all she says is the

9     IRS knows about these transactions.  And based on that, it

10    serves to reinforce the argument that the transactions stand

11    on their own as nontaxable events.

12         Is that what Becky Miller said?  Becky Miller didn't

13    say anything of the kind.  Becky Miller said this was very

14    risky.  Becky Miller said this was a disaster waiting to

15    happen.

16         Well, what is this document, ladies and gentlemen?

17    This is a document to be used to market to customers the FRN

18    transactions.  Mr. Nagy knew, we saw in his private file that

19    wasn't even shared with Charles Cathcart, he knew, he had

20    actually not -- not just reason to know, actual knowledge

21    that this thing didn't work under the tax laws, and he didn't

22    care.  He didn't dare.

23         Well, why?  Charles Cathcart controlled the gold.

24    Charles Cathcart wasn't there.  Mr. Nagy had done a whole

25    bunch of work.  He had done a whole bunch of work on a memo,

1    the May 2002 memo, that says this thing doesn't work under

2    the tax laws.  Charles Cathcart can't do anything with that.

3    How can he market the transaction?  He can't show the

4    customers a confidential memo that says this doesn't work.

5    He needs something that does work.  The exhibit right there,

6    26 that we are just looking at.

7            Take a look at that, ladies and gentlemen.  Look at

8    the last page of that document.  And he says:  "It's

9    reasonable to conclude that this does work under the tax

10   laws."  And it's got the disclaimer, the disclaimer that is

11   used with all the customers, the disclaimer saying, hey, I'm

12   not responsible.  The disclaimer that tells us, tells us all

13   that that document actually went out to customers and was

14   used with customers.  Well, I just said he needed money, or

15   wanted money.

16           So let's look at Exhibit 78.  Who are we talking

17   about?  How much money are we talking about?  August 6, 2002

18   memo from Mr. Nagy to Charles Cathcart.  Open invoices.

19   Invoices with Derivium and Shenandoah totalling just over

20   63,000 in billing for July, which will go out in the next few

21   days will be 22,000, billing for July.  So this is billing

22   for June and May, $63,000.

23           Mr. Nagy isn't getting paid.  He's not playing ball.

24   He's not telling Charles Cathcart what he needs to market

25   this transaction.  Because the truth is, it stinks and it

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    doesn't work under the tax laws and he knows it, but if he's

2    going to tell the truth, he's not going to get paid.

3         Well, after he writes that memo saying this thing

4    does work under the tax laws when he knows the truth:

5    "Please let me know when Yuri can cut a check."  Time to get

6    paid.  $63,000, another $22,000, $85,000.  Ladies and

7    gentlemen, that was the price.

8         Now, how many FRN transactions were marketed?  We

9    just mentioned that one day, four transactions before this

10   memo, all of the other transactions happened, over $100

11   million in transactions, in FRN transactions, after he writes

12   the memo saying this is okay.

13        It's material, ladies and gentlemen.  That memo was

14   material to all those transactions because Derivium couldn't

15   market it without it.

16        Participating.  The first point.  He's participating

17   in the scheme.  He's writing the very memos that Derivium has

18   to have to be able to market the transaction and it has to be

19   provided to customers.

20        He's furnishing false statements.  He's furnishing

21   the false statements to Charles Cathcart so that Charles

22   Cathcart can take that memo and use it with customers.  The

23   statements are false.  This Court ruled those statements are

24   false.  It was not a loan.  And that transaction -- those

25   memos say it's a loan.  False statements.  Mr. Nagy knew the

1   statements were false.  And we saw that from his own personal

2   files.

3          So Mr. Nagy didn't just provide tax advice, he was

4   involved in all aspects of this scheme.  And we just talked,

5   when I just started, we talked about the marketing.  He

6   admits that in the marketing documents.  Well, let's look at

7   Exhibit 38.

8          Marketing documents say, you don't have to sell.

9   90% Loan Program, what a great program.  Give your stock to

10  us.  You don't have to sell and you are not going to trigger

11  a capital gains tax.  That was false, ladies and gentlemen.

12         Marketing materials say you don't have to sell your

13  shares, trigger tax liability because loans are not taxable

14  events.  Mr. Nagy edited marketing materials like this.

15         Here we've got a picture from the website.  Same

16  thing.  You don't have to sell your shares and trigger tax

17  liability because loans are not taxable events.  False,

18  because this wasn't a loan and Mr. Nagy knew it wasn't a

19  loan.

20         Mr. Nagy also edited tax advice that was given

21  directly to the marketing people.  Charles Cathcart would

22  give some tax advice that Mr. Nagy would have hid that

23  advice.

24         If you recall, there was an interesting exhibit,

25  212.  There is a tax benefit that Derivium wants to talk

1    about, but they want to hide that from the IRS.  This memo

2    says, you see up at the top there, Bob Nagy from Charles

3    Cathcart:  "This tax benefit they are talking about, it will

4    be a red flag for the IRS.  We need to keep that information

5    strictly verbal.  Don't write it down."  Don't tell the IRS.

6    And Mr. Nagy, that's his handwriting, he testified that was

7    his handwriting on there.  And he's editing this document.

8    And this document is going to the FSC staff, the marketing

9    staff, First Security Capital, the company that becomes

10   Derivium Capital.

11           Mr. Nagy edited the loan documents.  What is that

12   amount?  Who cares.  It matters because those loan documents

13   say these things alone, the whole document is false.  This

14   isn't a loan, it's just paperwork.  Paperwork to make it look

15   like this thing was really a loan.

16           Mr. Nagy edits this.  He gets copies in 1997, going

17   way back from what he just said, he spent two hours on this.

18   He gives copies of the first loan documents, and he edits

19   those and he admitted that he edits those.  And we saw an

20   example, one example of some of his edits.  Let's look at

21   Exhibit 261.

22           I'm not going to read all that.  You can look at

23   this exhibit if you want when you go back.  The point about

24   this is Mr. Nagy isn't correcting typos, he's changing the

25   actual wording in the agreement, the actual document that is

1     going to be used with customers.  He's changing words like

2     collateral.  He's changing material words, important words so

3     customers think that this thing is a real loan when it's just

4     a sale.

5          And you remember the jury instruction, the jury

6     instruction on page 11, there was an example there, it said,

7     if you are editing documents that are being provided to

8     customers, that's evidence of furnishing false statements.

9     It's indirect evidence of you furnishing false statements to

10    customers.

11         So Mr. Nagy was indirectly involved in furnishing

12    false statements regarding the loan documents, indirect

13    evidence of Mr. Nagy furnishing false statements regarding

14    the marketing documents that were used with customers in

15    addition to his own memos.

16         The tax memos were the key.  The tax memos were the

17    key.  If he didn't write the tax memos, then Charles Cathcart

18    wasn't going to have him do any of this work.  That's what he

19    had to do in order to be able to sit on the boards, the

20    advisory boards of these companies, in order to do -- prepare

21    their tax returns, to do other accounting work, to do --

22    provide general business advice.

23         The cost.  The key were these tax memos.  And you

24    saw what happened with the FRN's, the document we just looked

25    at, when he wasn't playing ball, he didn't get paid for

1    anything, they withheld the money.

2          So in order to be able to do all this stuff and bill

3    all these companies, he had to play ball.  He had to write

4    those tax memos saying this thing worked under the tax laws,

5    and he got to play ball after doing that.  He got to do all

6    that work for all these startup companies that were funded

7    with sales of customer stock.  He got to do work for these

8    fake foreign lenders.  He got to help structure the fake

9    foreign lenders and he got to do work for all these companies

10   over here by writing those tax memos.

11         Now, Mr. Nagy's claimed that he's independent, he's

12   an outside person.  He wasn't.  The opposite is true.  He was

13   at the center of all of this.

14         More than that, Mr. Nagy was so intertwined with the

15   scheme that beginning in 1997, he agreed to be a backup, a

16   backup to Charles Cathcart, 1997.  That's Exhibit 334.  Won't

17   show that to you.  If you want to write that down, 334 shows

18   it.  He agreed to be the backup.  That's the year he really

19   denied much involvement with Derivium.  He's so intertwined

20   with Derivium, he knew sensitive information about the

21   scheme.  He knew sensitive information that not even Yuri

22   Debevc and Charles's son Scott Cathcart knew.

23         If we could look at Exhibit 147.  It's the cover

24   letter to a status update about all the business advice and

25   all the other stuff, all the work he's doing for all these

1    companies he's providing to Charles Cathcart.  And in this

2    cover, this is just going to Charles Cathcart, it's not going

3    to Yuri or Scott, and he says:  "Are Scott and Yuri plugged

4    in regarding Aero at this point?"  And Mr. Nagy testified

5    that Aero is this company right here, (indicating).  It's the

6    earlier name to Aqulius.

7            Are Scott and Yuri plugged in?  Charles's own son

8    doesn't know information about this company, but Mr. Nagy

9    knows.  He called it, he said it was sensitive information,

10   that's what he described it, I had sensitive information,

11   because he's at the center.

12           Mr. Nagy also knew information customers didn't

13   know.  He knew the stock was sold before the transaction ever

14   began.  And you might see, there is some loan documents, and

15   they have some word and some -- that they say that Derivium

16   had the ability to sell, hypothecate stock, and some language

17   that is used in margin loan agreements.

18           Mr. Cooper asked some folks about that language.

19   Well, you are not going to see in any document nowhere in

20   this case is it told to customers that the stock is sold

21   before the transaction begins.  Collateral is sold

22   beforehand.

23           That's a critical distinction, ladies and gentlemen,

24   because Derivium didn't have any money of their own to

25   provide a loan because -- and there weren't any lenders, so

1    they had to have the customer's stock and sell it to give

2    them back their own money.  That's why it's as simple as

3    that, that's why common sense says this wasn't a loan.

4         Now, Mr. Nagy also knew information that Derivium's

5    marketing people didn't know, like Mr. Anderson.

6    Mr. Anderson didn't even know that DDA existed.  He didn't

7    know about Bancroft until about 2003.  Mr. Nagy knew.  He

8    knew about Bancroft.  He knew about Bancroft because he

9    helped set the company up.  He helped form the company.  He

10   structured DDA and Bancroft.  That's information some of his

11   own people didn't know.  That's how intertwined he was.

12        He was so intertwined with the inner workings of

13   Derivium and its partnership that he was involved in the

14   creation of the partnership document.

15        If you remember this exhibit, ladies and gentlemen?

16   This exhibit, the document is written in 2000.  November of

17   2000.  And the document on its face says it was signed and

18   executed in 1998.  January of 1998.

19        Mr. Nagy got a copy of that document.  It's in his

20   files.  We looked at that Bates number that showed it's in

21   his files.  He edited the cover, the cover that shows that

22   this thing was transmitted in 2000, November of 2000.

23        But the document itself, the partnership agreement

24   for this very company, for FSC and Derivium Capital, the

25   partnership agreement is a critically important document that

1    you have to have in place.  This was all real, this

2    critically important document that you have to have to

3    actually show how the profits are distributed amongst the

4    very partners that were involved in this scheme.  That

5    document doesn't even exist until 2000.

6         Why does that matter?  It's a backdated document.

7    It's a fraudulent document, ladies and gentlemen.  It's --

8    it's a falsehood to the world that this partnership is

9    something else.  I mean, it really isn't.

10         Mr. Debevc testified it was impossible that he

11    signed that document in 1998 because he wasn't even there in

12    January of 1998.  Impossible.  Mr. Nagy knew that he knew

13    that because Mr. Nagy was there then.  He was there in '97,

14    before Mr. Debevc ever arrived.

15         Let's take a look at that document a little closer.

16    This is Exhibit 58.  There is two exhibit stickers on the

17    end, exhibit number for this case is 58.  That's Mr. Nagy's

18    handwriting above the operating agreement for Derivium

19    Capital.  That's his handwriting.  November 22, 2000.

20         And the document, you see that Nagy Bates number on

21    the bottom, this document, the operating agreement of First

22    Security Capital.  And if you page through that document, you

23    will see Yuri Debevc's signature on there falsely claiming

24    that he signed this thing on January 2nd, 1998.

25         This, ladies and gentlemen, goes to what Mr. Nagy

1    actually knew during the existence of this whole scheme.  He

2    knew that there wasn't -- there weren't real marketing

3    companies.  He knew that there weren't real lenders.  The

4    whole thing was fake.

5          Mr. Nagy was so intwined with this scheme, he's the

6    guy that brings to Charles Cathcart's attention, to

7    Derivium's attention, the problem with this company here,

8    DDA, he's the one who spots it.

9          He says, hey, Charles, to Cliff Lloyd -- Cliff

10   Lloyd, the guy that Yuri Debevc testified, the person who

11   really formed this company -- there is a problem.  You've got

12   a problem.  The way that you set up this structure, you are

13   going -- there are going to be tax implications in the U.S.,

14   you need to restructure everything, change everything.

15         Let's look at Exhibit 101.  So here he is, November,

16   '99:  "The current structure is fraught with problems."  And

17   then he goes through -- this is Exhibit 101, if you want to

18   write that down -- and he outlines a whole bunch of things,

19   all these different problems with this structure.

20         One of the things that on line 2, you can't really

21   see it, it's so small, but it said, desired relationship

22   between FSC and DDA, let's create some kind of relationship

23   between this company and Diversified Design Associates

24   because there isn't really a relationship, because there is

25   no DDA.  You heard that from Jerry Pryor, there is no lender.

1          So this led to more work for Mr. Nagy, because now

2     he gets to bill Derivium Capital for restructuring and he

3     gets to spend time working on those lenders.

4          Let's look at Exhibit 223.  About six months later.

5     July of 2000.  Action items for DDA, Optech.  Steps to be

6     taken to conclude the restructuring.  So Mr. Nagy has been

7     working on this thing, and here are the steps.  And you see

8     that highlighting there, that's RJN, Robert Nagy, tasks that

9     he has been assigned.

10          One of the tasks he has been assigned, item number

11     7, which is blown up there:  "Make sure that the terms of the

12     Marketing Administration Agreement between DDA and Derivium,

13     then FSC, has been reduced to writing."

14          Remember I asked Mr. Nagy about this when he was on

15     the stand, "reduced to writing."  There is no contract

16     between this company, DDA, and FSC.

17          This is a billion dollar scheme, ladies and

18     gentlemen, and there is no contract between the company that

19     is supposedly the lender, and the company that is doing the

20     marketing.  Ask yourselves if that could possibly happen.

21     How could there be a billion dollar transaction and no

22     agreement, no contract?  It couldn't.  It's impossible.

23     Unless the lender was fake.  That's the only way it could

24     possibly happen, because no lender would engage in

25     transactions up to a billion dollars.  They wouldn't do it.

1          Well, Mr. Nagy knows the answer.  He participates in

2     creating the document.  Another fake document.  Another fake

3     document to pretend to make it look like DDA had a contract

4     with Derivium since 1998.  He's actually tasked with that.

5     His initials are next to that.  He's actually participating

6     in that fraud.

7          Ladies and gentlemen, this whole -- his involvement

8     with these fake lenders, all of this goes to his

9     participation in this scheme.  It goes to what he knew, what

10    he actually knew.  He knew this thing wasn't real.  Of course

11    it goes to what he had reason to know.

12         And all of this work goes to the materiality of

13    these statements where first customers were saying this was a

14    real loan, he knew it was -- QRP wasn't a real loan all along

15    because he knew there wasn't a real vendor.

16         Mr. Nagy's connected to other fake companies.

17    Remember the chart that I like so much that I put up that had

18    all the foreign entities?  Let's look at one real quickly.

19    Exhibit 190.

20         This is Transcent, Yuri Debevc's company.  It was

21    the company that was a St. Vincent in Grenadines company.

22    And then it in turn owned a Liechtenstein company, Lindsey

23    AG.  Well, Yuri Debevc, this is his company, and Robert Nagy,

24    what's his job?  He's the protector for the company, whatever

25    that is.  Mr. Nagy, he's the protector of the company.

1    That's how involved he is in this scheme.

2         The last document I want to show you on these fake

3    foreign lenders, perhaps the most telling document in this

4    case, Exhibit 221, ladies and gentlemen.

5         Mr. Nagy's own handwritten notes about who really

6    owns DDA.  Exhibit 221.  DDA new ownership, Charles, Scott,

7    Yuri.  Same ownership percentage as those backdated, fake

8    documents, the fake marketing agreement or fake partnership

9    agreement, rather, that we saw, the same ownership

10   percentage.  Mr. Nagy knew that.  That's his own handwriting.

11   He testified that is his handwriting, and he knew this back

12   in 2000.

13        Reason to know.  Actual knowledge.  Lenders were

14   owned by Charles Cathcart.  They are owned by Derivium, the

15   fake lenders.

16        Ladies and gentlemen, you heard testimony about tax

17   returns that Mr. Nagy didn't file.  Now, why is that

18   important in this case?  Why did that happen, ladies and

19   gentlemen?  It's just more circumstantial evidence.  You

20   can't get inside the mind of someone.  More circumstantial

21   evidence of what Mr. Nagy knew about the tax laws.

22        The same time he's providing these memos to

23   Derivium, he's failing to pay his own taxes.  He's failing to

24   file his own tax returns.

25        So again, why does that matter?  It matters because

1     he doesn't care.  He doesn't care about complying with the

2     tax laws.  He cares about getting money from Charles

3     Cathcart.  He cares about making sure he can continue to keep

4     doing all this work.  That's what he cares about.  He doesn't

5     care about complying with the tax laws.  And year after year

6     after year when he fails to file his own tax returns and pay

7     his own taxes, that all goes to what he knew or had reason to

8     know.  It goes to his state of mind.

9          Now, the other thing to keep in mind that at the

10    same time he's doing that and not filing his own tax returns,

11    he is preparing the tax returns for other people.  Preparing

12    them for Scott Cathcart.  He's preparing them for Yuri

13    Debevc.  Yuri Debevc, the person who testified he didn't have

14    $5 million, he didn't have $6 million.  Robert Nagy said, go

15    ahead and take losses of 5, 6, 7, $8 million, money that he

16    never had.  Go ahead and do that.  It's okay.  He's doing

17    that at the same time that he's not filing his own tax

18    returns and paying his own taxes.

19         Let's look at Exhibit 297.  297.  This is kind of a

20    thick exhibit.  This is in the middle.  And we see in 2002

21    Mr. Debevc's return.  This is your adjusted gross income.

22    How much money -- how much money in taxes did Mr. Debevc pay

23    that year?  Zero.  Instead, he took a $5 million loss that

24    Mr. Nagy said he could take.  $5 million of money that he

25    never had.  He never had money to lose, so he couldn't take

1    losses.  If you don't have the money, you can't take losses.

2          And there is Mr. Nagy's signature.  Mr. Nagy is the

3    guy who prepared this and signed it.  At the same time he's

4    not filing his own taxes.

5          Okay.  McDermott Will & Emery.  There is a tax

6    opinion.  It's not an opinion, it's a tax memo on a different

7    product that Derivium gets wind of.  Fantastic.  Finally,

8    there is a law firm, a law firm that has seen the light.

9    It's going to give Derivium an opinion saying this thing

10   works under the tax laws.  This is fantastic.  Well, there is

11   a problem, because McDermott Will & Emery didn't give

12   Derivium an opinion they just got a hold of it, somebody got

13   a hold of it.

14         Let's look at Exhibit 59. Okay.  Here we go.  So

15   that right there, ladies and gentlemen, is Mr. Nagy's

16   Exhibit 59 on the left, and that's Government's Exhibit 69 on

17   the right.

18         Now, what's important here is that Mr. Debevc and

19   Mr. Nagy both testified McDermott Will & Emery never gave

20   Derivium Capital an opinion or a tax memo saying this thing

21   works under the tax laws.  Never happens.

22         So what's the timeline we are talking about from the

23   time that Mr. Nagy gets wind of this supposed decision from

24   McDermott Will & Emery?  April 5, 2001.  Not even two months

25   later, we've got the memo that everybody at Derivium Capital

1    knew that there was no chance McDermott Will & Emery would

2    give Derivium an opinion.

3        Because as soon as Derivium heard about this in

4    April, 2001, they weren't running to McDermott Will & Emery,

5    fantastic, let's get that opinion.  This is what we need.

6    Because all we've got is one guy telling us this thing works,

7    that's all we have.  This thing would be fantastic.  Talk

8    about good for marketing.

9        They do go to McDermott Will & Emery, and they say,

10   no way, we are not going to give you an opinion.  Why?  We

11   are in the wrong pew at McDermott Will & Emery on this.

12   McDermott Will & Emery has engaged in a witch hunt.  What

13   kind of witch hunt?  McDermott Will & Emery wanted to know is

14   the lender real?  It's important information to know if you

15   are going to give a tax opinion and provide tax advice.  Is

16   there a real lender?  What information about the lender?

17   They want to know are there hedges?  Are there hedges?  Could

18   anybody possibly do this?  It sounds too good to be true.

19   Could anyone possibly do this?

20       Well, no one at Derivium is going to give that

21   information because there is no lender.  It's a fake lender.

22   There are no hedges.  So they are in the wrong pew with

23   McDermott Will & Emery.  That's it.  That's the end of it.

24   Two months, ladies and gentlemen, two months of hope, hopes

25   that were dashed by the truth that McDermott Will & Emery

1    would never give Derivium Capital an opinion saying this

2    worked under the tax laws, because it was a scam.

3            So let's talk about the hedge.  Some of the

4    information that McDermott Will & Emery wanted.  Let's talk

5    about the hedge.  Derivium told customers there was a real

6    hedge in place.  There had to be for the scheme to work.

7    Because in addition to the tax benefits you remember, no

8    matter how much that stock went up in price, Derivium told

9    people you get your stock back.

10           Well, since they sold the stock, didn't hold any

11   collateral or any of their assets, they had to have some way

12   to get the stock back, so they hedged.  Mr. Nagy confirmed in

13   2001 that not one penny, not a single penny from the sales of

14   customer stock was spent on hedges.  He confirmed that.

15           Shocking information.  He confirmed that of all this

16   money, these billion dollar transactions, not a penny being

17   spent on hedges in U.S. accounts, and virtually all the money

18   stays in the U.S., in U.S. accounts.  And he's looking at it,

19   where is the money being spent on hedges?

20           Roy Strickland, his testimony, you remember his

21   testimony, he looked at the books, certified fraud examiner,

22   poured through those books.  No money on hedges anywhere, any

23   of those accounts.

24           Okay.  Mr. Nagy has got a story about what he did.

25   Why do we know that story is not true?  Because Derivium

1    defaults right after those.  Mr. Nagy confirms that there is

2    no money being spent on hedges, Derivium can't perform, can't

3    give the customer stock back.  Customers have been promised

4    they get their stock back, Derivium can't get it, can't do

5    it.

6          2001.  Same year.  Mr. Nagy knows about defaults.

7    He said he knows about defaults.  You heard Professor

8    Pfleiderer talking about principles of business of finance.

9    If there is supposed to be a hedge and you default, that's

10   proof, proof that there is no hedge.

11         If the hedge isn't working, if that hedge, and there

12   was no money being spent on hedges, actual knowledge, ladies

13   and gentlemen, of a massive fraud, 2001.

14         Now, Mr. Nagy keeps on participating.  He knows all

15   this stuff about the fake foreign lenders.  He knows all of

16   this stuff where the money comes from, all the money is going

17   to these companies that he's profiting from, massive fraud.

18   Does he get out?  No.  He keeps on going.

19         More tax memos.  More work for these companies.

20   Until what happens to these companies, ladies and gentlemen?

21   These companies all go bankrupt.  Except for one, they all go

22   bankrupt.  Mr. Nagy gets to keep charging them until they do,

23   profiting from them.

24         So Mr. Nagy got paid not just for writing these tax

25   memos, he got paid for all of this stuff I just mentioned.

1    The tax memos were the key.  He couldn't get paid without

2    those tax memos.  And this, well, this cash cow, Mr. Nagy

3    wanted to keep on going.

4            And we saw different memos over the years that

5    showed him saying, I need to get paid for my work.  You've

6    seen a couple of these.  Real quickly, Exhibit 78, we

7    actually already saw that one, that's the one where he says,

8    I want to keep the doors open.  That's the one, the $63,000,

9    and the 22,000, $85,000, he wants to get paid we saw that,

10   that was in a 2002 exhibit.  So I won't show that to you.

11           342 is another one.  Look at that real quick.  He's

12   writing to Charles Cathcart, what's the possibility of

13   getting another check?  Next week.  The wolf is starting to

14   snarl outside my door.  That's 2003.  He's already discovered

15   there is no hedges.  2003.  Charles, can you pay me, please?

16   I need some money.

17           2004.  There is more memos like this.  This is

18   Exhibit 343.  You need to get a chunk of what is owed to me,

19   the total balance after April billing coming out, $48,000.

20   That's 2004.

21           Remember Mr. Nagy when he described sort of what was

22   happening in this scheme, a decline, went up, up, now 2001,

23   and then down, down, down.  This is 2004.  He's making pretty

24   nice money.  This is $48,000 right now, 2004.

25           Well, in 2005 the wheels have come off.  Mr. Debevc

1    testified there was 11 to 14 customers had sued him in 2005

2    because they defaulted that many times.  And you remember he

3    said in the end there was 126 defaults.

4         So 2005, Mr. Nagy makes approximately $100,000 from

5    the scheme that's in its death throws in 2005.  People suing

6    it left and right.  The Government is suing the scheme and

7    Mr. Nagy still takes money.  $100,000.  Not bad for a scheme

8    that's basically over.

9         2005.  Ladies and gentlemen, remember we saw that

10   check, it was up on the screen?  Who is this check from?

11   Yuri Debevc.  Yuri Debevc who said, I never lived in the Isle

12   of Mann.  I'm not from the Isle of Mann.  Mr. Nagy knew that.

13        In fact, look at the date on this check is

14   June 2005.  The Isle of Mann people weren't participating in

15   the scheme anymore.  They were out.  They testified it was

16   April 2005 is when they formally resigned.  They were gone.

17   The only people left standing, Mr. Nagy, Mr. Debevc, and

18   that's Mr. Nagy's company, Veridian Services.

19        A month after this check, what does Mr. Nagy do?  So

20   the FRN's that we were talking about, that even Mr. Nagy knew

21   that those things were, didn't work under the tax laws, what

22   does he do in connection with that?  Let's look at

23   Exhibit 189.

24        Creates a proposal.  Proposal to make money off

25   something that he knows doesn't work under the tax laws.  FRN

1    transactions generate approximately $100,000 per quarter.

2    This is an assured cash flow for a potential 30- to 40-year

3    period based on the terms of the FRN laws.  30 to 40 years,

4    $100,000 a quarter.  Wow.  That's some good money.  For a

5    scheme that he concluded in his private memos that it doesn't

6    work under the tax laws, even Mr. Debevc turned this thing

7    down.  He said no thanks.

8         2005.  That's all those defaults.  Mr. Nagy knew

9    this thing didn't work, all of it, and he didn't care, just

10   didn't care every step of the way.  Didn't work under the tax

11   laws.  Didn't matter.

12        Ladies and gentlemen, you heard a story from Mr.

13   Cooper in his opening about a boy and his father and some

14   grape juice.  Well, I think that the boy is supposed to be

15   Mr. Nagy and the father was the IRS.  Mr. Nagy is no boy.

16   Mr. Nagy is a grown man.  And the IRS is not his father.

17        One look at Neva Gadsden makes that pretty clear,

18   the revenue agent who testified yesterday.  Mr. Nagy was a

19   grown man with years and years of experience.  Professional.

20   Tax professional.  And what did he do to the IRS?  He lied.

21        We caught them in a lie in different documents he

22   provided the IRS, and he had no explanation.  He lied to Neva

23   Gadsden, not -- he lied about the accounts.  He lied about

24   other aspects of the transaction multiple times.  He lied to

25   Frank Guida, the international examiner who is coming in to

1     look at this transaction.  He lied to Mary Socks.  You saw

2     the memos.  Painful stuff to see.  The lies are in black and

3     white.  He had to do it so the IRS would get off his back.

4     Had to do it.

5          Mr. Nagy told you, told you twice, when Mr. Cooper

6     was asking him, he told you, and when I was asking him, you

7     can't lie to the IRS.  He told you that, but he did.  He

8     lied, just like Jerry Pryor lied to customers.  He admitted

9     that.  He lied because Charles Cathcart controlled the gold.

10    If he wanted to continue to participate in this scheme back

11    in 2002, he's going to have to lie, and he did.

12         And ladies and gentlemen, you also heard, so this is

13    clear, he lied about important things.  These weren't light

14    lies.  He admitted that the things that the IRS was asking

15    about, those questions, there weren't that many questions on

16    there, those were important things, the information that the

17    IRS needed to do its job.  They had to know the answer to

18    that stuff and he lied to them.

19         Last document I'm going to show you right now.  Last

20    two documents.  This final memo, Mr. Nagy's final memo that

21    he writes saying this thing is all okay under the tax laws,

22    2005.  That's Exhibit 27.  Loan versus sale, treatment of the

23    90% Stock Loan.

24         And Mr. Nagy tried to explain this document away.

25    Right there, this discussion, intended to provide an overview

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    of the relevant tax considerations and to provide guidance

2    that may be helpful to potential borrowers and/or their tax

3    advisors.

4        Why does this memo matter?  Remember what is

5    happening in 2005, 2004, February of 2004, the California

6    Franchise Tax Board, the largest state taxing authority in

7    the country has come in and said this thing is a tax shelter.

8    2004 Mr. Nagy knows that.  He knows it in February of 2004.

9        And not just the largest state taxing authority in

10   the country, they are not the only ones that say this is a

11   tax shelter, the IRS tells Mr. Nagy, tells Derivium in 2004

12   the thing is a tax shelter.  Not a word of that is in this

13   memo.

14       You heard Mr. Nagy say the information that might be

15   important to buyers, the IRS has challenged this as a tax

16   shelter might be important to borrowers, customers.  Would

17   you enter into this transaction?  Would you take this hundred

18   thousand dollars and enter into this transaction if you knew

19   it was a tax shelter?  No, you wouldn't.

20       And if you did, at a minimum, you would want to know

21   that information, make a conscious decision about, I'm going

22   to go ahead and do this risky thing.  At a minimum you would

23   absolutely want to know, not maybe possibly want to know this

24   information, absolutely you would want to know.  It's not in

25   there.  It's not in there because of Mr. Nagy's memos are

1    used to promote the scheme to customers.  They are critical.

2    Derivium can't do this, do this scheme without them.

3         And I'll mention something else that is in these

4    memos.  2003-7.  What's that?  Revenue ruling from the IRS.

5    Revenue ruling from the IRS.  An issue, basically legal

6    opinions about this, a different transaction.  And that

7    revenue ruling has a number, 2003-7.  That's in here.

8         Mr. Nagy updates his other memos that are used with

9    all the other customers, he puts that in there as a different

10   transaction.  But when the IRS comes and actually tells him

11   that this exact -- this specific transaction violates the tax

12   laws, that's not in there.  But Mr. Nagy knew or had reason

13   to know.

14        Now, Mr. Nagy tried to say this was some kind of

15   defense opinion, or something along those lines, okay?  I

16   know I said this is helpful to potential borrowers,

17   potential, not past borrowers, because past borrowers already

18   know this thing stinks, because unfortunately they are being

19   challenged by the IRS.  Potential borrowers.  I know I said

20   that, but that's not really what it means.  Who does he send

21   this to, ladies and gentlemen?  He sends it to Charles

22   Cathcart and the marketing people at Derivium.

23        Exhibit 99.  Exhibit 99.  Here is the long awaited

24   update from Bob Nagy.  January 24, 2005.  That's his e-mail.

25   Same date as the document, January 24, 2005.  And he sends it

1    to Randolph Anderson, the marketing person who you heard the

2    deposition testimony from.  And he sends it to Charles

3    Cathcart and then other marketing people, Alison Skinner and

4    Lynn, other marketing people at Derivium.

5         This document was furnished to Derivium.  It was

6    furnished to their marketing people.  Information in it was

7    used directly with potential customers.  The information was

8    given directly to potential customers.  And we also know that

9    because this document has a disclaimer, a disclaimer that he

10   puts in all his documents that get passed around to

11   customers.  It's in here, too.

12        So ladies and gentlemen, you've received a verdict

13   form, I believe that's at the end of your materials; is that

14   right?

15        THE COURT:  No.  Gail has got a verdict form.

16        MR. CLUKEY:  I'll just show it to you.  There's a

17   verdict form.

18        THE COURT:  Here it is right up here if you want

19   one.  That's it.

20        MR. CLUKEY:  Thank you.

21        And so it's going to ask you when you go back there,

22   did the United States prove by a preponderance of the

23   evidence Robert Nagy is subject to penalty under Internal

24   Revenue Code 6700?  A finding of yes means finding in favor

25   of the United States.

1           We ask you to put a checkmark in the yes column of

2      the United States.

3           Thank you.

4           THE COURT:  Okay.  We'll take a break right now.

5      We'll start again in about 15 minutes.  I'm sure Amy needs a

6      break.

7           (Thereupon, the jury retired from the courtroom.)

8           THE COURT:  Okay.  We'll start at 20 after.

9           (Thereupon, there was a brief recess.)

10          THE COURT:  Ready to go?

11          MR. CLUKEY:  Your Honor, we had a quick question.

12     There was an exhibit we provided to Mr. Cooper back, and we

13     exchanged demonstratives way back, six days ago, whenever it

14     was.

15          THE COURT:  Yeah.

16          MR. CLUKEY:  And we covered up one item that there

17     wasn't any evidence on the case on that.

18          THE COURT:  Okay.

19          MR. CLUKEY:  Mr. Cooper has an objection to the

20     characterization of one event.  Um, we believe it's just

21     argument.  We are not trying to get this to go back to the

22     jury, it's just a timeline we want to use potentially on

23     rebuttal, under water, $219 million.  We based that on Yuri

24     Debevc's testimony, and we showed him a document from that

25     exact date.

1          THE COURT:  In the Money report?

2          MR. CLUKEY:  Yes, In the Money report.  That's what

3     that is based on.

4          MR. COOPER:  He didn't say it was under water.

5     That's just the risk of it.  The under water is deceptive

6     about what he testified to.  He said that was a snapshot of

7     those loans that weren't performing, but it didn't reflect

8     all the other loans where the value of the collateral was

9     less.  I mean, I think that's misleading, under water.

10          MR. CLUKEY:  I won't even mention that.

11          THE COURT:  Okay.  All right.

12          MR. COOPER:  Can they cover it up like the other

13     one?

14          THE COURT:  I don't think the case hangs on that

15     characterization.

16          All right.  If you want this, Mr. Cooper, it's up

17     here.  I'm sorry I didn't give it to you.  You don't have to

18     have it.  It will be right there.  That's why we give it to

19     the jury.

20          MR. COOPER:  I have a copy.

21          THE COURT:  Okay.

22          MR. CLUKEY:  Your Honor, the other thing is the

23     objection.  If Mr. Cooper said he's going to talk about Neva

24     Gadsden, can we just say "objection," so I'm not saying,

25     "mischaracterizing evidence" and interrupting his --

1              MR. COOPER:  Can we preserve it right now?

2              THE COURT:  Depends on what you say.  You can say

3        "objection" and I'll just rule on it.  You don't have to say

4        anything.

5              MR. CLUKEY:  Okay.  Thank you.

6              THE COURT: But I guess in your reply, if you say

7        "objection" and I sustain it, or whatever I do on it, then

8        you can't say the reason I object is X, and the reason I

9        objected in your reply, whatever it is.

10             MR. CLUKEY:  I'm not going to say it.

11             THE COURT:  Okay.  Anything else?  All right.

12             (Thereupon, the jury returned to the courtroom.)

13             THE COURT:  Okay, ladies and gentlemen.  What we'll

14       probably do now is Mr. Cooper will give you his final

15       summation, and then Mr. Clukey will give you his reply, and

16       then we'll take a break and I'll have the marshal bring you

17       menus back there, because I'm buying lunch today, just

18       buying, I'm not cooking.  I'm not vouching for the quality.

19             So then when you come back, I'll give you the final

20       charge on the law and then you will be able to go back and

21       the lunch will be there relatively soon thereafter.

22             So Mr. Cooper, you are up.

23             MR. COOPER:  Thank you, Your Honor.

24             I love it when other people use my analogy.  Because

25       that means it means something.  That means it's real.  I

1    didn't use that analogy to try to convey to you that Mr. Nagy

2    is not a grown man.  We can all see that for ourselves.

3         What I was trying to convey, and I think what is

4    understood, is that father was silent all those months.  He

5    was quiet in the face of what his son was doing.  He changes

6    his mind, punishes him.  Is that punishment just?  Does it

7    meet its purpose?  Don't think so.  Does that cause the child

8    to feel disdain?  Does that child have mistrust?  Yes.

9         This is a penalty case.  This is about the IRS

10   trying to punish that man for what he did.  And in the face

11   of the IRS audit, it was silent.  That needs to be kept in

12   mind.  This is a penalty case about what that man believed.

13        That is one fact that was not addressed.  In the IRS

14   audit, who was involved?  Neva Gadsden, CPA, Mary Socks,

15   Financial Products Specialist, Frank Guida, International

16   Examiner.

17        Ms. Gadsden told you these exams don't happen every

18   day.  It was thorough.

19        Mary Socks is a Financial Products Specialist.  The

20   deposition testimony is she looked at the loan sale issue.

21   She was trained to look at complex financial instruments and

22   understand the law behind it.

23        She was a part of this audit and he knew it.  She

24   sent him an IDR.  And what did it state at the top of that

25   document?  Exhibit 1 for Mr. Nagy.  It said, loans, hedging

1    activities.  That was the subject.  What did that communicate

2    to Mr. Nagy?  She was looking at the loans and the hedging.

3    The testimony is during the course of the audit, Mr. Nagy

4    cooperated.  In fact, I think the words were very

5    cooperative.  Ms. Gadsden requested information and testified

6    he gave them everything that was asked for.

7             I want you to focus on Exhibit 5.  Mr. Clukey got up

8    here and said my client lied to the IRS during the audit.  I

9    want you to look at Exhibit 5, and I believe it's that number

10   at the bottom, 20 or 21.

11            What did he tell Ms. Gadsden?  DDA was the lender in

12   1998.  Her handwritten note, out of existence.  Then what did

13   he disclose after that?  In 2002, when they had the

14   conversation, he said it was Bancroft Limited Ventures.

15            He told her who the new lender was.  They're

16   complaining that he didn't disclose the successor.  It's in

17   her handwritten notes, Bancroft Venture Limited.

18            Then they focus on two more exhibits, Government

19   Exhibits 221 and 223.

20            When we look at 221, you remember that's that

21   handwritten note that Mr. Nagy did about percentage of

22   ownership of DDA.  What does it say before ownership?  It

23   says, new, new, not old, new.  Who became the lender in 2000?

24   Not DDA, it was BVL.

25            Also 223.  This restructuring from DDA to the new

1    DDA.  Mr. Nagy testified over and over that transaction never

2    happened.  And why can you believe him?  Don't believe his

3    words.  Who was the lender?  It was BVL in 2000.  It's

4    undisputed.  That transaction in 2000 from DDA to Optech

5    never happened.  BVL was the lender.  That's what the

6    evidence shows.  The evidence shows that Mr. Nagy did not lie

7    to the IRS.

8         Now, the one thing that Mr. Clukey used, he used the

9    word there was no corroboration.  He did not rely on other

10   tax professionals.  And he talked about -- he talked about

11   they sold the stock.  It was so common sense, how could you

12   not realize this?

13        What did he tell the IRS?  Ladies and gentlemen,

14   what did he tell them?  If it was so common sense, and he

15   writes to a financial products specialist and says, the stock

16   is sold -- look at number two, his response to her question

17   number two.  We couldn't put it up there because it's too

18   big, but he told her again, the stock is sold.  He told her

19   twice.  If it's so common sense, how can an IRS special agent

20   trained in tax shelters not say that it wasn't so clear,

21   ladies and gentlemen.

22        Ms. Gadsden testified she went to Mr. Nagy's office.

23   He set up a computer.  He brought her all the electronic

24   files.  She could sit there and push buttons, print out

25   whatever she wants.  Exhibit Number 7, the printouts, DDA

1    broker activity.  There is the brokerage activities.  Did she

2    summons it?  No.  Did she ask for it?  No.  He gave her

3    everything she wanted.

4            Mr. Nagy even testified with the financial products

5    specialist, he believed this was his opportunity to receive

6    confirmation about what he was providing tax advice on was

7    correct.  That's one side of the audit.

8            Three agents.  CPA Neva Gadsden, International

9    Examiner, Financial Products Specialist.  The promoter.  This

10   is the promoter of the tax shelter doing all this bad stuff.

11           What's on the other side?  Scott Cathcart being

12   audited at the very same time.  He did 11 loan transactions

13   in excess of a million dollars and took over $150,000 in

14   investment interest expense on his return.  They are auditing

15   both sides of the transaction at the same time.

16           Mr. Nagy knows that.  He represents both of them

17   during these audits.  He knows this is going on.  This is his

18   chance.  What happens?  No-change letters.  No change.  No

19   penalties.  Nothing disallowed.

20           Folks, I want you to remember dates.  You didn't

21   hear a lot of dates.  Don't take it in a vacuum.  These

22   no-change letters came out in May/June of 2003.  Keep that in

23   mind.  Time is a continuum.

24           But during these no-change letters, the IRS did not

25   utter a single concern.  The IRS did not tell my client that

1     anything bad was going on.  The IRS did not tell my client,

2     this is so common sense, how could you be doing this?  My

3     client told them it was a nontaxable event and they didn't

4     say a word.  Just like that, father.

5            Don't take it from me, take it from Neva Gadsden.

6     Ms. Gadsden, from your interaction with my client, what was

7     your impression that he believed that this was a real loan?

8     Their own IRS agent said, my impression was he believed it

9     was a loan.

10           This is a penalty case, about his state of mind.

11    How better can you get?  Their own IRS agent said, I thought

12    he believed it.

13           I also asked Ms. Gadsden, did you communicate that

14    this was a bona fide loan to Mr. Nagy?  She said no.  Then

15    she read her deposition transcript.  When in March, she did

16    tell him that she communicated to Mr. Nagy and accepted it as

17    a bona fide loan.

18           MR. CLUKEY:  Objection, Your Honor.

19           THE COURT:  Overruled.  Go ahead.

20           MR. COOPER:  What better evidence can you get of

21    that?  Communication there was a bona fide loan.  May and

22    June of 2003 from the IRS.  The very entity charged by the

23    Government of the United States of administering and

24    enforcing the tax laws of this country.  No one else

25    corroborated it?  Yes, it was corroborated.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          Based on the no change audit on those facts, did Mr.

2     Nagy know or have reason to know that his tax advice was

3     wrong or false?  Don't think so.

4          This is not a money thing.  The law was not clear on

5     the subject.  When you are going down the timeline -- and I'm

6     sorry to jump back.  Mr. Nagy received the no-change letters

7     there, (indicating).  All the tax memos, Nagy Exhibits 41 and

8     45, which were directed at the 90% Stock Loan transaction,

9     and all the other memorandums were written before the

10    no-change letters.  Time is a continuum.

11         He also talked about the last two memos.  '05.

12    January '05 that he talked about at the end.  Mr. Nagy

13    testified that that memorandum was meant to be a defense.

14    Moreover, I would suggest to you just because the IRS says

15    something doesn't mean it's right.  Some people spend their

16    whole lives fighting with the IRS over interpretations of the

17    tax law.  Just because the IRS says it's right doesn't mean

18    it is.

19         In 2001 -- in 2000 -- he received it in 2001 -- he

20    received the memorandum from McDermott Will & Emery.  This is

21    a major law firm.  The testimony was a qualified advisor for

22    Derivium that referred loans to Derivium received that

23    memorandum, merging money corporation.  The testimony was a

24    merging money corporation has rebranded the product.  This

25    memorandum, it's law.  Look through it.  You read the

1    structure of the transaction.  What happened?  There was a

2    90% Stock Loan.  If you look into the memorandum, in that

3    supplemental memorandum at the back, it's the last 11 pages,

4    I believe it's Exhibit 58, was written in December of 2000.

5          And we talked about this with Mr. Nagy.  What did

6    McDermott Will & Emery look at?  They looked at Section 1259.

7    What did Mr. Nagy spend most of his time talking about in his

8    memorandums, Exhibits 41 and 45?  Section 1259.

9          McDermott Will & Emery concluded Section 1058 was

10   not applicable.  Mr. Nagy concluded Section 1058 was not

11   applicable.  The Government is using catchwords that he

12   didn't put economic substance into the memorandum.  There is

13   no form over substance.

14         McDermott Will & Emery in the supplemental

15   memorandum said there is no form over substance analysis for

16   nonrecourse loans.  But there is a plethora of case law to

17   ensure that there is an economic incentive, or it has

18   economic substance, the transaction.

19         What is that economic incentive?  They both said the

20   value of the collateral was $100, the value of the loan was

21   90 percent, because you had the ability to use that ten

22   percent equity, that is your economic incentive to repay

23   them.

24         Mr. Nagy looked at the same case law.  He went

25   through the same analysis.  He received the McDermott Will &

1    Emery, I think he's used the word, I was flattered, because

2    they had gone through the same analysis.  Did this

3    corroborate?  Was it so simple that a major law firm had to

4    go do the analysis?

5         The law at the time was not clear.  You will see in

6    your jury instructions that the Courts did not rule until

7    2009 that the 90% Stock Loan transaction was a sale.  Prior

8    to 2009, it was subject to people's interpretation.

9         In America, people can have opinions, probably voice

10   them too much, but we get to have our opinions.  Lawyers, we

11   argue unsettled points of law every day.  They do exist.

12   These courts haven't ruled on everything.  That's why lawyers

13   have jobs.  Mr. Nagy went through his analysis.  He came to

14   his opinion on an unsettled point of law.

15        If the IRS is able to assess penalties against tax

16   practitioners just because there is a disagreement, think of

17   the chill that will run through the industry.

18        They had a difference of opinion.  What's additional

19   evidence that the law was unclear?  Their very own document.

20   You remember that article about Lee Shepard that was attached

21   to that memo?  Lee Shepard said Congress has got to change

22   the law to fix this.  What -- if they have to fix it, you can

23   do it.

24        Their own witness, Kenneth Polk, he represents rich

25   people, family offices.  He said, I am a fiduciary, and I am

1    a fiduciary to my clients.  So what did he do?  He had two

2    people on his staff review the transaction.  And guess what?

3    He testified that there was a reasonable basis in the law for

4    the loan transaction.  The Government's own witness said

5    that, and he had two people looking at that.

6         Mr. Nagy testified he did talk to tax advisors and

7    they, too, agreed there was basis for the loan treatment.

8    Corroboration?  Yes.

9         So McDermott Will & Emery, Kenneth Polk, unclear

10   law, other advisors.  Nagy's work.  Look at it.  They are

11   long letters.  He did a lot of analysis.

12        Remember I was up here drawing all those numbers on

13   the board and the revenue rulings?  That was a lot of stuff

14   to be looking at.  He did the best work he could do.  And he

15   told you he did the economic substance analysis, which is the

16   case law, because of the equity.

17        All right.  These FRN memos.  Mr. Nagy wrote two

18   memoranda to Dr. Cathcart saying, can't do an FRN loan

19   because there is no economic incentive to repay it in the

20   inception of the transaction.  He wrote two of them, okay?

21        There has been a lot of harping about this May 2002

22   memo that talks about qualified replacement property.  He

23   spent a lot of time about that, you know, he didn't get paid

24   and he's doing this -- read that memo.  What three letters do

25   you not read in that memo?  FRN.  Qualified replacement

1    property, was just not floating rate notes, it's also stock,

2    stock.  That's what that memo was about.  You don't read the

3    words FRN anywhere.

4         Also, what did he say in that memo besides them

5    shooting out a sentence here and a sentence there?  He said,

6    I can find no case law on this.  None.  He said, I can't find

7    any case law.  This is weird.  There is no case law.  He did

8    look through it.  And his words were at the end is, all I can

9    give is negative assurances.

10        Now, even if this was sent to somebody, which they

11   haven't shown, if it was shown to one person, even if it was,

12   and you got it and read it, there is no case law, there is no

13   negative reassurance, it doesn't mean anything.  And he never

14   said you can do the FRN because that memorandum was about

15   stock.

16        Did Nagy know his tax -- also, if you listen to the

17   Government's analysis, they never challenged his analysis.

18   They never challenged how he went through it.  All they said

19   is a court ruled in December of '09; therefore, you are

20   wrong.

21        This case is about what he believed at the time he

22   wrote it.  And the Government did not challenge the analysis

23   in any of those documents as written at that time under the

24   controlling authority.  Take that into consideration.

25        But then again, Neva Gadsden said her impression was

1    he believed.  This case and these documents, they asked Mr.

2    Nagy about how much time he spent on something in 1997.  That

3    was his deposition time in '09.  That was 12 years ago.  The

4    PLR memorandum where they say he had his notes scribbled

5    behind it, as well as the memorandum about IRS scrutiny, they

6    are saying in 1997 he was involved?  If you will notice on

7    this document, the verdict form, 1997 ain't on there.

8         And Mr. Nagy testified over and over and over again

9    about those documents.  It was a different transaction.

10   Remember, he even alluded to some kind of mortgage security

11   loan where you transferred into the Newco, it was not a stock

12   loan transaction.  And he told you that over and over on the

13   stand.  The PLR memorandum in Exhibit 335 of the Government

14   adds nothing to the Government's case.

15        The FRN memo, somehow they imply that trying to give

16   him partial advice is wrong.  He told them they couldn't do

17   it.

18        Exhibit -- Government Exhibit 212 that had the Jerry

19   Kaplan on the bottom of the e-mail, Mr. Nagy testified that

20   was about some estate planning product that never happened.

21   It lends nothing to the Government's case.

22        Government Exhibit 334, the confidentiality

23   agreement.  Mr. Nagy's going to be a backup.  He said he

24   never became a backup.  He never owned any part of Derivium.

25   He never was a manager of Derivium.  All those other

1    companies, he never owned any of it.  He never was a manager

2    of any of it.  Scott Cathcart was brought into the fold.

3            Government Exhibit 147.  Oh, Nagy knew stuff that

4    not even Yuri Debevc or Scott Cathcart know.  You remember

5    Aero that turned into Aqulius?  What did Mr. Nagy testify to?

6    Dr. Cathcart's former son-in-law ran the company.  It was

7    sensitive to his family.  That's why he didn't tell his son.

8    There is nothing insidious about that.

9            Exhibit 58.  The partnership document.  The lawyer

10   drew it up, gave it to Mr. Nagy.  There is no proof that he

11   drew that document up.  The lawyer gave it to him.  He put

12   something in his file.  Shame on him for keeping documents.

13   What does a partnership agreement have to do with his tax

14   advice?

15           Government Exhibit 101.  "The current structure is

16   fraught with problems."  Yeah.  When he started working in

17   1998 and he saw how the lender was structured, he said it

18   can't work.  You should restructure to meet your objectives

19   and comply with the tax laws.  He was giving good tax advice.

20           The FRN proposal.  What is it written right there in

21   the document by Mr. Nagy?  "We will not originate anymore new

22   loans."  Because he knew they were not loans.  We will not

23   originate them.  But for those folks who did do them, we'll

24   administer them in the future. Did that project ever get off

25   the ground?  No.  Mr. Debevc, Mr. Nagy testified to that

1    fact.

2          The Government in its case said the lender didn't

3    file 1099s.  Go back to Exhibit Number 5.  What did Mr. Nagy

4    tell Ms. Gadsden?  Page 20 of Exhibit 5.  Lender is not

5    required to send 1099s.

6          The Government showing tax returns about big losses.

7    Ms. Gadsden said she looked at those flow through items on

8    Scott Cathcart's and allowed them.  It was permissible.  It

9    was allowable under the Internal Revenue Code.

10          These are complaints without complying with the law.

11    These complaints about the IRS rules are crazy.  Have you

12    ever seen the Code?  It's huge.

13          Yuri Debevc said he got no changed.  Neva Gadsden

14    said there was basis.  They were permissible.

15          Now the money thing.  We all got to make a living.

16    The wolf was snarling at my door.  Mr. Nagy said he had

17    employees to pay for.  Derivium wasn't paying them money.

18    Yeah, he wants to pay his bills.  I think most people want to

19    do that.  And I think when clients aren't paying, you send

20    them e-mails and say, cough it up.  He had employees

21    depending on him.  He had leases to pay.  He had the lights

22    to keep on.

23          And then lastly, the nonfiling of returns.  Picking

24    on a man that was going through a series of family problems.

25    He admitted to you it was wrong.  And he was going through a

1     tough time.

2          So now we are brought back into, what are the other

3     statements the Government is complaining about?  Hedging

4     transactions, alleged statements about the lender and tax

5     advice that he not say the stock is sold.

6          These are the statements in his memorandum about the

7     hedging transaction.  Mr. Nagy did not know, or have reason

8     to know that these statements were false.

9          When Mr. Clukey got up in his opening and he said

10    this is a case about deception, do you remember that?  The

11    one thing the Government proved was Dr. Cathcart deceived

12    everyone.  That was the deception proved.  Dr. Cathcart.  It

13    wasn't mentioned in the closing because it was Dr. Cathcart's

14    deception.

15         Jerry Pryor, the Government's own witness, came on

16    the stand and said something pretty remarkable, he said, I

17    lied.  And he said, I lied at the direction of Dr. Cathcart.

18         Everyone was told there was hedging being done from

19    Derivium.  You heard testimony from Randolph Anderson,

20    Patrick Kelley and Yuri Debevc.  All told hedging was being

21    done by the offshore lender.

22         The lenders even got up there and testified Dr.

23    Cathcart said that hedging would be done.  James Sutherland

24    said it from Optech and Nigel Wood from BBL, both testified

25    that Dr. Cathcart said hedging was going on.  The

1    publications, not only did he tell these people, he told the

2    world that hedging was going on.

3         Dr. Pfleiderer got on the stand and said in his

4    report he read Dr. Cathcart's dissertation on hedging the 90%

5    Stock Loan.  He said in that document, he talked about

6    synthetic puts and calls.  Dr. Cathcart put his deception to

7    paper.

8         In 2001 when Mr. Nagy was first asked to go look at

9    the brokerage accounts, he testified over and over, I did not

10   see what I expected to see.

11        So he went to Bob Brandenburg and asked him,

12   Mr. Brandenburg.  He went to Tim Scrantom and asked Mr.

13   Scrantom, Mr. Scrantom didn't know.  So he went to the

14   horse's mouth, Dr. Cathcart.  And Dr. Cathcart said, the

15   reason you don't see them in the brokerage account is because

16   the lender is doing the hedging.  He was told that the lender

17   was doing the synthetic puts and calls.

18        Even Dr. Cathcart in his deposition said, I never --

19   I never told Nagy what the hedging strategy was.  Dr.

20   Cathcart said that.

21        The evidence you heard never showed that Mr. Nagy

22   was told anything different than the lender was doing the

23   hedging.

24        And again, remember what Mr. Nagy is not, he is not

25   a Ph.D.  He has not worked on Wall Street.  Mr. Nagy knew Dr.

1    Cathcart's background and he relied on him.

2           For Dr. Pfleiderer to get up there and say this is

3    easy stuff, I asked the question, why do you charge $650 an

4    hour then if this is easy stuff?  Why have you got formulas

5    that stretch across the screen?  This is not stuff that Mr.

6    Nagy's background was about.  And it was reasonable for him

7    to rely on Dr. Cathcart that did have that background.

8           Now, when you read the jury instructions and you go

9    back to page 9, I want you to read the Section 6700 with what

10   he is being penalized for has no duty of inquiry.  Let me

11   repeat that again:  No duty of inquiry.

12          And when it goes on, it says, because there is no

13   duty of inquiry, it is not necessary when your client tells

14   you something to go get proof of what you are told.  That's

15   the standard for this case.

16          The statements about the lender, the deception of

17   Cathcart, the BVL shot.  BVL had a website.  On the website

18   there was Nigel Wood, there was Colin Bowen and there was

19   Paul Jarvis.  It was there on the computer.  How did it hold

20   itself out to be?

21          Go to Exhibit 40 and look at it.  "We are a stable

22   institution that do syndicated pools of capital investment.

23   We have years of commitment to our clients."  They

24   represented they had three business lines, securities,

25   lending, nonbank lending, and also venture capital.  They

1    presented themselves to be a real bank.

2           BVL had an office in London.  Yuri Debevc went

3    there.  Tim Scrantom had an office in London, right next

4    door.  Said there was a plaque on the wall.  Yuri Debevc went

5    back.  He went to Liechtenstein.  He met with the Jeeves that

6    were supposed to be the bankers behind BVL.  Paul Jarvis flew

7    from London to Charleston.  Paul Jarvis is listed as the CFO,

8    chartered public accountant.  He flew to Charleston.  Mr.

9    Nagy shook his hand.

10          Remember, Mr. Nagy also was getting financial

11   information every six months and sending it to him, so they

12   could compile their broader financials as he was told.

13   Patrick Kelley and Yuri Debevc, their whole working existence

14   was answering phones for these lenders, sending them

15   paperwork.  Their whole working lives went around providing

16   services to these lenders.

17          Folks, this is the stuff of substance, meeting

18   people, seeing their offices, your whole life revolving

19   around providing services to these entities.

20          When you go and look at what the foreign lender

21   said, they said one or two things:  One, they never heard of

22   Mr. Nagy.  And if they recall his name, they didn't know what

23   he did.  They never talked to him and they didn't know what

24   relationship he had to the 90% Stock Loan transaction.

25          Mr. Nagy was not in bed with these lenders, as the

1    assumptions would be made.  They used words like

2    restructuring and regurgitate.  I think we spent an hour on

3    those words.  Now, that is putting form over substance.

4         Mr. Nagy never even went to Europe to meet these

5    folks.  Everything he did was to provide services stateside

6    here in Charleston.  Candidly, Mr. Debevc got up there

7    talking about the deception.  Mr. Debevc, what's that

8    question in your head?  Is that question that you were

9    deceived all these years by Dr. Cathcart?  He told you he

10   didn't know what to believe anymore.  Should Mr. Nagy be held

11   liable for these lenders?  Don't think so.

12        Stock was sold.  For the IRS to say he didn't tell

13   them the stock was sold in the memorandum violated 6700, when

14   they were told twice that the stock was sold, the IRS was

15   told twice.

16        What you do look at.  In his memorandum where he

17   says, engages in various hedging transactions.  Every client

18   signed a loan document.  And in the loan document, these

19   words are written.  The client gives the lender the right,

20   without notice, to sell the stock outright.  How was that

21   him?  Randolph Anderson testified that folks called him and

22   said, what is this about selling stock?  It was disclosed.

23        For them to say it is so easy because a stock was

24   sold and it went back begs the question.  Mr. Nagy told them

25   twice it was sold.  They had access to all the books and

1    records.  Ms. Gadsden told you they wanted to get brokers'

2    statements, they could have summonsed them.  How is he to

3    believe that him writing in his memorandum that they engage

4    in various hedging transactions was false or fraudulent when

5    he told the IRS it was sold?  And the loan document tells

6    them what those transactions are.  Sell outright.

7           Did Mr. Nagy make a false statement about selling

8    stock?  Don't think so.  Now, one thing that I cannot get

9    over in this courtroom was the testimony about complex

10   transactions and the IRS having to play catch up.  Catch up.

11          What was the IRS trying to catch up with?  They were

12   told in 2002 about the selling of the stock.  They were

13   disclosed where the brokerage account statements were.  They

14   were given the books and records of Derivium.  They brought

15   in a financial products specialist.  What were they playing

16   catch up with?  If anyone was playing catch up, it was Mr.

17   Nagy.

18          2002.  The IRS issued no-change letters from an

19   audit in South Carolina.  In 2008, Mr. Nagy is assessed

20   penalties under 6700 from California.  Different office.

21          When I think of the word catch up, y'all know what a

22   homonym is?  Words that sound alike but mean different

23   things.  You know that thing you read stuff trying to pop out

24   of the bottle, slow moving, that's catch up, that's the IRS.

25   They are playing catch up.  It's bureaucracy.  They were told

```
1    what they needed to know and they didn't do a thing.  And

2    they didn't mention a word to my client.

3            The IRS has the burden of proof, and they have to

4    prove all four factors.  If they don't meet one of them, they

5    lose.  It's what we call a conjunctive test.  They have to

6    meet every single factor.  They don't prove one, they don't

7    get their gold, they can't prove any of them.

8            Folks, I want you to think of the immense size and

9    complexity of the tax system.  I want you to understand that

10   Nagy walked hand in hand with those folks for 18 months,

11   reviewed the loan versus sale, and the IRS communicated it

12   was a bona fide loan.

13           I think you are witnessing the deterioration of the

14   tax system.

15           MR. CLUKEY:  Objection, Your Honor.

16           THE COURT:  I'll sustain that one.

17           MR. COOPER:  The office in South Carolina, the

18   office in California left him not knowing what the right

19   thing to do.  Things are so bad, they won't recognize the

20   inconsistencies of the position and having to play catch up

21   four and a half years.

22           The cost to this man will be immense, his

23   livelihood, his family.

24           MR. CLUKEY:  Objection, Your Honor.

25           THE COURT:  I'll sustain that.
```

1          MR. COOPER:  I, too, want you to go back in the jury

2     room, and I want you to mark no for Mr. Nagy.  Send him home

3     to his wife of 31 years.

4          Thank you.

5          THE COURT:  Mr. Clukey?

6          MR. CLUKEY:  A couple of points I want to address,

7     ladies and gentlemen, before you go back to the jury room.

8          First thing, Mr. Cooper has a habit of saying we are

9     from the IRS.  We are not from the IRS, ladies and gentlemen,

10    the Department of Justice represents the Department of

11    Justice, the Department of Justice represents the American

12    taxpayers, American people; not from the IRS.

13         Mr. Cooper was saying that we said the IRS didn't

14    know the stock was sold.  We didn't say that, never heard

15    that one time, not from us.

16         We understand that the IRS was told the stock was

17    sold, but in conjunction with that, they asked very important

18    information.  Frank Guida, that's very important information.

19    Mr. Nagy knew he couldn't lie to the IRS.  They asked

20    material information for their investigation, and Mr. Nagy

21    lied about that, about a whole bunch of things.

22         Mr. Cooper kind of glossed over a few things.  Let's

23    look at one of the responses.  We didn't get into this whole

24    document, the document from Frank Guida, or to Frank Guida

25    from Robert Nagy.  We didn't cover this whole thing, we just

1     talked about a couple of things on here, a couple of false

2     statements in there.

3          So this is to Frank Guida.  Robert Nagy,

4     August 13th, 2002.  This is what Mr. Nagy sends to Mr. Guida.

5     It's Exhibit 20.  If you want to take a look at it.

6     Plaintiff's Exhibit 20.

7          "Neither of the DDA companies has nor has ever had

8     an option or right to acquire shares or interest in Derivium

9     or vice versa.  Finally, there is not and has never been any

10    common owner of the capital stock or interest of the DDA

11    entities and Derivium."  Mr. Cooper tried to explain it away.

12         Exhibit 221.  Let's look at that.  DDA new owners.

13    When is this written?  2000.  2000, when Mr. Nagy told the

14    IRS is that there was never, never any common ownership

15    between DDA and the people in Derivium in 2002.  He knew that

16    wasn't the truth.

17         The next down there.  "The legal relationship

18    between the DDA companies and Derivium, although now

19    terminated, was based at all times on contract."

20         Exhibit 223.  This is the action items for DDA.  Two

21    things about this document Mr. Cooper just referenced, he

22    said some of these things never happened.  That's true, DDA

23    did not become Optech.  Optech was created.  Mr. Nagy knew

24    about the creation.  It's a Hong Kong company.  Jack Flader

25    is involved in that.  You heard testimony about that.  That

1    actually happened.  It just went on the shelf for a little

2    while.  When there is other litigation and all kinds of

3    problems with the Government, then it came off the shelf in

4    2003.

5         So it goes on the shelf.  What Mr. Nagy testified to

6    is that DDA became BVL.  BVL was the successor.  We are going

7    to talk about that in a second.  But right here I want to

8    draw your attention to paragraph 7.  "Make sure the terms of

9    the Marketing Administration Agreement between DDA and

10   Derivium, then FSC, has been reduced to writing."  Make sure

11   it's been reduced to writing.  And Mr. Nagy testified there

12   was no contract.  That's what that means, it's plain from the

13   language, right?  There is no contract.  And he testified

14   there is no written contract.

15        Go back.  "The legal relationship between DDA

16   companies and Derivium, although now terminated, was based at

17   all times on contract."  That's not the truth, ladies and

18   gentlemen.

19        Number 4.  "Is there any other business relationship

20   between Derivium Capital and Diversified Design Associates

21   work successors involved together, if so, tell us what that

22   is?  We do not know if there is a successor to either DDA

23   Ireland or DDA Canada."  "We don't know if there is a

24   successor."

25        Mr. Nagy testified he knew exactly who the successor

1    was, Bancroft Ventures.  He not only knew it, he helped form

2    Bancroft Ventures.  He helped form the successor and then he

3    told the IRS, we don't even know who it is.  False statement.

4         Let's look down a little bit further.  "Does Charles

5    Cathcart own an interest in Diversified Design Associates?"

6    We just saw, ladies and gentlemen, Exhibit 221, you know the

7    answer, of course he does.  Mr. Nagy knows it, and he put it

8    in his own handwriting:  "Charles Cathcart does not own an

9    interest in DDA Ireland or DDA Canada or either of the

10   successors, if any."  Asks for Scott Cathcart.  Doesn't own

11   it.  Not true.  Asked for Yuri Debevc.  He says Yuri Debevc

12   doesn't own it.  Again, not true.  Exhibit 221.

13        Again, in this short request, the IRS asks:  "Who

14   owns interest in DDA or its successor?"  And then Mr. Nagy

15   says:  "We do not know if DDA Ireland has a successor."  Not

16   true.

17        Ladies and gentlemen, this is just Frank Guida's

18   letter.  You saw Ms. Socks's letter and the false statements

19   in there, too.  This is the no-change letter.  This is the

20   grape juice we are talking about, the no-change letter.  IRS

21   did nothing.  The IRS was repeatedly lied to.

22        No-change letter.  That's interesting.  If you look

23   in your jury instructions, there is a definition of the

24   no-change letter in it that Mr. Cooper didn't read to you.

25   It's on page 13.  "You've heard evidence regarding no-change

1    letters the IRS sent to various people or entities associated

2    with the 90% Loan Program.  Mr. Nagy cannot rely on the

3    no-change letter as binding determinations made by the IRS or

4    legal determinations made by the IRS."

5         So you can consider them, what Mr. Nagy is telling

6    you he thought they meant.  But we know Mr. Nagy knew that

7    the no-change letters weren't good enough because he lied to

8    get them.

9         Mr. Cooper just got up here and told you the law was

10   complicated, it was complex.  Go back.  The reason why, we

11   showed you those documents from 1997 that Mr. Nagy was

12   writing about substance over form, the reason is, he knew

13   what the outcome was going to be.  When you take property and

14   you sell it and you pretend it's a loan, the outcome is the

15   IRS reports are going to say it violates substance over form.

16        This is not new stuff.  The substance over form

17   doctrine has been around for a long time.  Mr. Nagy knew

18   about it.  We know by 1997 because he puts it in a memo,

19   don't bring it to the IRS's attention because they are going

20   to argue substance over form.  And that's what this very form

21   is, substance over form.  What's really going on?

22        Mr. Cooper just told you -- they showed a page from

23   a document that, by the way, had the "sell outright" blown

24   up, the document -- you can look at the exhibit -- the

25   document didn't say that, it's not blown up in all caps.  And

1    you can look at it for yourselves.

2         Margin loan agreement language.  You heard Professor

3    Pfleiderer talk about margin loans, how it's not like what is

4    going on here.  Why?  Why is that?  Because in a margin loan,

5    a customer is given their stock in the company, the broker

6    has used their own money.  They took money out of their own

7    pocket and then gave that back to the customer.  It was a

8    real loan.

9         Then behind the scenes, brokers are allowed to trade

10   stocks.  And you've got contracts in place, and things can

11   happen kind of behind the scenes, but not before the

12   transaction even starts.  That's not a margin loan, and you

13   didn't see anything else in the contract.

14        Blowing up some language that would imply this is a

15   margin loan, well, it's not a margin loan, ladies and

16   gentlemen, because the stock is sold before the transaction

17   ever starts.  They don't have any money to loan to anybody

18   because they've got to the take the stock and sell it and

19   they don't tell the customers that.

20        Mr. Cooper mentioned Mr. Polk.  He said, oh, Mr.

21   Polk, he corroborated this, he said it would work.  Mr. Polk,

22   the analysis that he did, he didn't know that the stock was

23   sold before the transaction started.  He didn't know that.

24   And you heard him say, I wouldn't even have done this

25   transaction.  I certainly wouldn't have recommended it to my

1    customers, my clients.  I wouldn't have done this transaction

2    if I had known that.  Nobody would because it's just a sale.

3         Mr. Cooper showed that McDermott Will & Emery

4    document.  And we put side by side the timeline.  Mr. Cooper

5    didn't mention the timeline matters.  Of course it does.

6         So for two months, maybe for two months, the people

7    at Derivium and Mr. Nagy thought, hey, great, we can get an

8    opinion from McDermott Will & Emery.  Well, it never

9    happened, and you know the reason why, because it's in that

10   internal memo, that e-mail.  And it says, we can't, we can't

11   get it because McDermott Will & Emery wants to know how can

12   you possibly get the stock out?  What's going on?  What's the

13   hedge?  How can that be?  And there is no way Derivium is

14   going to give that information to them, information that Mr.

15   Nagy knows.

16        They are also saying, is this a real lender?  Mr.

17   Nagy knows there is no real lender.  He knows it the whole

18   time.  McDermott Will & Emery didn't have the information

19   that Mr. Nagy had.  Shocking information, information that

20   not a single penny was spent on hedges in order to be able to

21   return customer stock.  Not a penny.  Mr. Nagy knew that.

22        We mentioned Lee Shepard, a document that Lee

23   Shepard wrote in 1999.  Commentator on tax issues.  Nobody

24   knew the stock was sold.  She was talking even without

25   knowing that the stock was sold.  Lee Shepard said, you know,

1    this thing doesn't smell right.  This doesn't look right.

2    They didn't know the stock was sold.

3         The reason why we mentioned that document is because

4    it put everybody on notice, the world on notice that she said

5    in there, how can this thing possibly work?  We've talked to

6    people on Wall Street, no one can figure this out.  Well, the

7    answer is because it was a big fraud, a scam.  That's how it

8    could work.

9         And the Becky Miller document, that's exhibit -- can

10   you pull up 150, please?  Blow up the bottom part right

11   there.  Mr. Cooper tried to say this was QRP, that the memo

12   where he says, this is okay, go ahead and promote it, but

13   that just pertains to stocks.

14        The discussion with Becky Miller wasn't just the

15   FRN's, be it stocks or FRN's.  "Today, at this time, based on

16   what I have found in my discussions with Becky, I am of the

17   opinion that if an individual transfers QRP to Derivium, be

18   it stocks or FRN's, and Derivium puts in place its normal

19   hedging transactions, this will constitute a disposition

20   under Section 1042 generally resulting in taxable gain to the

21   borrower."

22        That's what he -- it doesn't matter what Mr. Cooper

23   tries to explain away whether it was stocks or FRN's.  He

24   wrote a memo.  He knew the truth.  It really was a sale, and

25   he wrote a memo to Mr. Cathcart saying, fine, go ahead and

1    promote it.  It's okay.  It's okay.  It wasn't the truth,

2    ladies and gentlemen, and he knew it.

3         Mr. Cooper went through a bunch of the other

4    documents, the internal structuring documents, and trying to

5    say, what does this have to do with tax advice?  Why does it

6    matter?  It matters, ladies and gentlemen, because Mr. Nagy

7    is participating in the scheme at all levels from day one.

8    He's central to this scheme.  They can't function without

9    him.  His tax memos are essential, and he's got this internal

10   knowledge.  It goes to his state of mind.  What does he

11   really know?  He knows the truth the whole time.

12        Mr. Cooper said Mr. Nagy testified over -- he

13   testified over and over and over about things.  It's true, he

14   did, but the documents tell a different story.  Mr. Nagy is

15   up here on the stand telling you something different than

16   what the documents tell you.  The documents are telling you

17   the truth, ladies and gentlemen.

18        You know, one of the parts of the story that Mr.

19   Nagy talked about was what did he do when he discovered that

20   not a penny was being spent on hedges?  Oh, I ran and talked

21   to Bob Brandenburg.  Who is Bob Brandenburg?  Remember the

22   Bobbsey Twins?  The person who shares office space with him?

23   Did you see him up here testifying, corroborating Mr. Nagy's

24   story?  Tim Scrantom, a lawyer that he supposedly told,

25   didn't hear from Tim Scrantom.  The documents tell you a

1     different story.

2          Mr. Cooper mentions no duty of inquiry.  That's

3     right.  No duty of inquiry under 6700.  What that means is

4     you are a marketing person, you don't have to go dig around

5     and find out all kinds of details if someone is lying to you

6     and the IRS can't come in and make 6700.  That makes common

7     sense.  It would be outrageous if the Government could do

8     that.  No duty of inquiry.

9          But what it doesn't say is if you already know, you

10    already know the truth, of course penalties can be imposed.

11    Also, there is this reason to know.  What does that mean?  So

12    that duty of inquiry has to be taken in conjunction with this

13    reason to know because it's not just what Mr. Nagy knows,

14    it's what he had reason to know.  That's what the Statute

15    allows.  This is a balancing area.  Reason to know.

16         Remember, that's a reasonable person.  What would a

17    reasonable person in Mr. Nagy's position, what would that

18    person have discovered?  When Mr. Nagy actually discovered

19    stuff, not what a reasonable person discovered, he actually

20    discovered the fact that not anything was being spent on

21    hedges, and he coupled that with his actual knowledge that

22    Derivium was defaulted.  But they couldn't give customer

23    stock back.  So he -- he knew the truth about the no money,

24    and then he confirmed the truth unequivocally.  There is no

25    doubt left.  They can't perform.  The thing's a fraud.

1          The last thing I want to say is, to try and put this

2     no-change letter back in context, this appears to be the

3     centerpiece of their case, this no-change letter that was

4     issued.  Of course, I've got another chart.

5          Three Government lawyers, ladies and gentlemen, to

6     fix a demonstrative.

7          THE COURT:  The high point of most trials is when

8     they start, this stuff usually collapses.

9          MR. CLUKEY:  Ladies and gentlemen, there is a whole

10    bunch of stuff that's going on.  And Mr. Cooper talked to you

11    about the no-change letter and when that's issued.

12         Middle of 2003.  We've obviously been talking, and

13    you've seen in evidence, we've got a whole bunch of things

14    that have happened up until that point.  This is just a

15    couple of points on here.

16         For example, the '97 memo to discuss the substance

17    over form, the fact that Yuri Debevc joins after Mr. Nagy.

18    Mr. Nagy's memo on restructuring, when he's saying that this

19    whole transaction is fraught with problems, we've got to do a

20    whole bunch of stuff, all this stuff happens before the IRS

21    ever issued a no-change letter.

22         IRS issues a no-change letter February, 2004.  What

23    happens then?  The largest state tax shelter, 90% Loan is a

24    tax shelter, and this is the period of time upon which Mr.

25    Nagy's case rests.  This cancels out everything and excuses

1    everything afterwards.  That's what he would have you

2    believe.

3            But you just heard the definition of a no-change

4    letter.  It's not what Mr. Nagy's implying it is.  But we

5    know Mr. Nagy knows that it doesn't mean that.  And we know

6    this.  Why do we know it?  2005 memo, ladies and gentlemen,

7    if Mr. Nagy really believed that the no-change letter was

8    protection that the IRS was really saying in the no-change

9    letter that this thing was good, if he really believed that,

10   you better believe that would be in there.  He would be

11   shouting it from the rooftops.  He would have been in here,

12   the first page, great news everybody, IRS issued no-change

13   letter and this thing works under the tax laws.  It's not in

14   here.

15           The thing from 2003 where the IRS was talking about

16   a different transaction, that's in here.  He updated the memo

17   and put it in here, no-change letter, it's not here.  It's

18   not here because he knows it doesn't mean what he's saying it

19   means to him.  He knows it.  He knew he pulled a fast one on

20   the IRS.  He wasn't going to go broadcasting that.  Not a

21   chance.

22           Thank you everybody.

23           THE COURT:  Okay, ladies and gentlemen.  Why don't

24   you go back to the jury room, order lunch, and then knock on

25   the door when you are ready to come back and I'll read that

1    charge to you, and then you can go back and deliberate, and

2    we'll give you all the exhibits.

3              (Thereupon, the jury retired from the courtroom.)

4              THE COURT:  Waiting for the door to slam.

5              Okay.  Do you want anything on the record about the

6    objections?  And I sustained the first objection.  I think it

7    was a fair reading.  I think he used it in context for

8    credibility.

9              Second one when you objected as to ruin, all that

10   kind of thing, about his financial ruin, there is no evidence

11   in the record to support that at this stage of the trial,

12   okay?  I don't know whether that argument will be proper in

13   the next phase of the trial, but it's not proper in this one.

14   That's the basis for that ruling, okay?

15             All right.  Third thing is back when -- yeah?

16             MR. COOPER:  The first objection I think you

17   overruled.

18             THE COURT:  Yeah.  Yeah.  I did.  Overruled.  I'm

19   sorry.  I overruled it because I thought it was a fair

20   position.

21             The third thing is back when I was in math, we used

22   to pronounce it insidious, all right?

23             And fourth thing, this is just something to

24   consider, Mr. Nagy has to leave around 3:00 for the funeral,

25   for the visitation.  I don't know how long they are going to

1    be out there.  If you want to consider taking his testimony

2    and deciding -- me deciding the penalties nonjury, that's

3    something that I -- we can do in the meantime, but I'm not

4    forcing you to do that, that's -- it will have to be agreed

5    by both sides.  That's just something I'm throwing out.

6    Because all these people from all over this part of South

7    Carolina, if they had to go to the second phase of the trial,

8    then we start at 2:00 tomorrow, or something like that, I

9    don't know.

10              If we have to do it, we have to do it, I just -- but

11   I think it's more important for Mr. Nagy to be out with the

12   family members than it is for me to discommode the jury one

13   more day.  That's just something to think about, all right?

14              MR. COOPER:  The Nagies want me to tell you thank

15   you very much for accommodating.

16              THE COURT:  The first rule in my chambers, I tell

17   every law clerk and every employee, family comes first, okay?

18   So that's theirs, too, all right?  Thanks.

19              So we'll be at ease until they get done ordering,

20   okay?

21              THE CLERK:  They've already taken the menus back to

22   them.

23              THE COURT:  Thank you.

24              (Thereupon, there was a brief recess.)

25              THE COURT:  Ready to go?  All right.  Bring them

1    back in.  I'll read the charge and we'll talk about whatever

2    we're going to talk about.

3                            *   *   *

4              THE COURT:  Okay.  Anything else?

5              MR. COOPER:  No, sir.

6              THE COURT:  All right.  Assuming that the jury is

7    still deliberating at 3:00, Mr. Nagy can go, we can take the

8    jury verdict without him being here.

9              MR. COOPER:  Thank you.

10             THE COURT:  Okay.  So then we'll go to plan B,

11   whatever is going to happen, and then -- I don't know what is

12   going to happen.  We'll figure something out, all right?

13             MR. COOPER:  Thank you.

14             THE COURT:  Okay.  So we'll be at ease.  If y'all --

15   I'm sure you are going to get some lunch.  So give Gail your

16   cell phone number so she can contact you in case the jury has

17   a question.  And if in fact, let's say the jury has a

18   question while Mr. Nagy is in Turbeville, or Atlanta, or

19   whatever it is, I'm just going to bring them back in here,

20   I'll ask the question and I'll explain their absence if I

21   have to.

22             MR. COOPER:  Thank you.

23             THE COURT:  Or else I'll write out the answer, okay?

24   Great.

25             All right.  Thank y'all very much.  Make sure that

1    Gail takes everything back that is supposed to be back.  Make

2    sure she doesn't take back anything that isn't supposed to go

3    back.

4              THE CLERK:  They are going to look through them.

5              THE COURT:  Good.  Okay.

6              (Thereupon, the Court was in recess at 3:29 PM.)

7              THE COURT:  Okay.  All right.  Before I bring the

8    jury in, what are we going to do, assuming they find

9    penalties are appropriate?  I mean, Mr. Nagy has got to go,

10   he's got a funeral at 11:00 tomorrow in Turbeville, right?

11             MR. NAGY:  Yes, Your Honor.  And I think there is

12   some family things after that.  Just as a general statement,

13   I think it would be very difficult for me to be here

14   tomorrow.

15             THE COURT:  I was thinking 10:00 Friday morning.

16             MR. CLUKEY:  Your Honor, just -- I'm going to let

17   the Court know, as your statement earlier about family

18   matters, my wife is actually eight months pregnant.  I'm

19   driving her to the beach Friday morning.  I have five

20   children, child number six.

21             THE COURT:  That's a lot of deductions.

22             MR. CLUKEY:  It is a lot of deductions.  So it is

23   what it is.

24             I'm wondering to the extent of what Mr. Nagy is

25   going to testify about, I wonder if it could happen today.

1    My understanding is we're talking about 15 minutes of

2    testimony, so if it could happen today, then we are done with

3    that.

4              THE COURT:  Doesn't matter.  I thought he was

5    already going to be gone.  I thought he was leaving at 3:00.

6              How long is his testimony going to be?

7              MR. COOPER:  I mean, it may be a little bit longer

8    than 15 minutes.

9              THE COURT:  So if they did leave, we could be done

10   by 4:00, and then you could leave?  I mean, he could be done

11   with his testimony at 4:00 and then you can argue and that

12   would probably solve everything.

13             MR. CLUKEY:  Your Honor, we waive opening.

14             THE COURT:  It's not your money.

15             MR. COOPER:  Yes, we'll expedite.

16             THE COURT:  All right.  I'll send Frank -- there is

17   no portion to this portion of the charges.  I'll send Frank

18   up to do that and -- all right.

19             Now, how about bring the jury back, do whatever we

20   are going to do, and then Mr. Nagy, assuming we get that far,

21   then you can have -- then I can let Mr. Nagy go, say there

22   has been a death in the family, Mr. Nagy has to leave, he

23   stayed here especially for this, and then you can go off as

24   soon as you get done, rather than wait for the jury to

25   deliberate again, assuming we get that far.

1          Is there any problem with that?

2          MR. COOPER:  I don't have any problem with that.

3          MR. CLUKEY:  No problem with that.

4          THE COURT:  If they don't find penalties, there is

5     no problem.  Then what we'll do is y'all can each do a short

6     opening about what this phase is about, you open, you can

7     reply, you call Mr. Nagy, you don't call anybody, you open

8     and you reply, you respond, and then we'll be able to do the

9     penalty.

10          How does that sound?

11          MR. CLUKEY:  There is one evidentiary evidence issue

12     that we teed up, the $8 million initial assessment, we don't

13     believe it's relevant for this phase.

14          So I don't know what Mr. Nagy is going to testify

15     about as far as the penalties go.  We put in our basis for

16     penalties, and that's the summary chart Mr. Cohen prepared.

17     That's in evidence.  The IRS initial assessment is not in

18     evidence, and so we would object to that coming in.  And I'm

19     not sure if that's --

20          THE COURT:  Okay.  What about the initial penalty?

21          MR. COOPER:  I will show it to them.  And this is

22     what it started at.  This is the next part of the penalty,

23     and then --

24          THE COURT:  What's the difference between the

25     initial penalty and the revised penalty?  Just

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1   miscalculation?

2        MR. CLUKEY:  It was a change in the law, Your Honor.

3   And so the Government went back and recalculated the

4   penalties.  Now we are looking at about 2.7 instead of

5   $8 million initially.

6        MS. WEIS:  We would raise a 408 objection to that,

7   as well, to that testimony coming in.  It implies that the

8   Government has conceded X million dollars, and that forms our

9   view on the liability issue.  And we don't believe it's

10  relevant.

11       THE COURT:  Did you do the recalculation as a result

12  of Mr. Cooper's advocacy or Mr. Nagy's position or did you do

13  it --

14       MR. CLUKEY:  No, we did it -- we wanted to make sure

15  we had the right number.  We went back, calculated the total

16  number of transactions, that's what Mr. Cohen did, so that we

17  knew that whatever number we had was absolutely rock solid.

18  So that's sort of -- so the evidence that we put in was

19  absolutely independently based.  This is a de novo review.

20  That's where our figures is based on this recalculation.

21       THE COURT:  Okay.  And what does the initial penalty

22  have to do with anything, since this is a de novo case?

23       MR. COOPER:  It has to do with the miscalculation.

24  Because the miscalculation we are really concerned about

25  happened post October 2004 where they imputed 100 percent of

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1      Derivium's income to Mr. Nagy.  So his assessment was like

2      $8.3 million.  And after that, you know, it went way down

3      because he's not an owner, and just to show them that he's

4      not liable for all these penalties and miscalculations.

5              THE COURT:  They already conceded that without even

6      asking for them?

7              MR. CLUKEY:  Correct.

8              MR. COOPER:  I understand.  I would just like to

9      show the jury, I mean, like in 15 minutes, this is what it

10     started out, this is what it is.  Am I going to expect to get

11     paid for the rest of this, you know.

12             THE COURT:  Okay.  And what is your -- I don't

13     understand what the 408 exhibit and offer of compromise,

14     since there wasn't anybody on the other side.

15             MS. WEIS:  One of the exhibits that we believe will

16     be used to get the $8 million, it's a letter from the

17     Government saying we have conceded X million dollars for the

18     different periods.  And Mr. Cooper is basically intending to

19     argue against himself.  Nobody on the Government's side is

20     saying $8 million is the the figure the jury should find.

21             So he's trying to suggest that the jury should

22     basically be upset about the $8 million original assessment.

23     Nobody here is saying that is the number that the jury should

24     find; and therefore, the Government's concessions on how it

25     recognizes the erroneous figure, that's not in evidence, not

1    relevant.

2          MR. CLUKEY:  Something else that's relevant, Your

3    Honor, is that for this, this later figure, the law changed,

4    so that it's just the amount of money that you actually

5    earned or expected to have earned.  We didn't actually get

6    Mr. Nagy's billing records he provided until at some point in

7    2009, July of 2009.  So when we got that, that's when we

8    hired Mr. Cohen to go back and look at this, and he did, he

9    recalculated, and it was a long process, sort of conceding

10   amounts, and we went through that process.

11         And so here we are today with the Government saying

12   it's, you know, we think this is the proper penalty amount

13   and this is what has supported it, whatever the IRS did

14   before this, it's a de novo hearing.  The only point is to

15   try to inflame the jury under 403.

16         THE COURT:  All right.  I'll sustain the objection

17   as to the $8 million under 402.  I don't know if it makes

18   anything more or less relevant in a de novo transaction.  And

19   if there is any relevancy, I think the prejudicial effect is

20   greatly outweighed -- you know what I mean.  It's late in the

21   day, okay?  All right.  So anything else?

22         All right.  Then -- yeah?

23         MR. COOPER:  Then I can show them the concession

24   letter to show the assessment amount as we sit here today?

25         THE COURT:  As we sit here today?

1           MR. COOPER:  Yeah.

2           MS. WEIS:  The concession letter says we have

3    conceded $5.5 million in penalties.  How is that possibly

4    relevant?  It's based on the $8 million figure.

5           MR. COOPER:  They've got to know what the assessment

6    is.

7           MS. WEIS:  We don't have any objection to him

8    testifying as to the amount of assessment.

9           MR. CLUKEY:  The amount of money that is at issue is

10   fine, but not the amount that is conceded.  We just simply

11   have to subtract it out, if that's what Mr. Cooper is

12   suggesting.

13          THE COURT:  The charge lays out the transactions and

14   the penalty for 1998 through October 22, 2004.  It's a

15   thousand dollars per transaction.  And then the second part

16   of the charge is what 50 percent of the gross proceeds, or

17   whatever that -- and I assume there is something in evidence

18   that supports whatever your argument is.

19          MR. CLUKEY:  Yes.

20          THE COURT:  Okay.  What relevance does -- the

21   $8 million is irrelevant.  Under the 403 analysis, what

22   relevance does that letter conceding $5 million -- isn't that

23   the same issue?

24          MR. COOPER:  The ultimate assessment amount is

25   relevant because under the variance doctrine, they can't,

1   because there is more transactions than 2.3 million, they

2   can't award anything above 2.3.

3           MR. CLUKEY:  We'll concede that, Your Honor.  We

4   cannot -- the jury cannot award more than 2.7, is it?

5           MR. COOPER:  I can't remember.

6           MR. CLUKEY:  Whatever the figure is at issue, the

7   jury cannot award.

8           THE COURT:  So I add it to the charge in

9   paragraph -- no matter what your calculation is, you cannot

10  award a penalty of no more than -- you've got to give me a

11  number.

12          MS. WEIS:  2 million 730 something.

13          MR. CLUKEY:  That's fine, Your Honor.

14          THE COURT:  The third heading on this charge, that's

15  going to say maximum penalty allowable, okay?  And again,

16  this letter, I assume it's not in evidence?

17          MR. CLUKEY:  It's not in evidence, Your Honor.

18          THE COURT:  All right.  Mr. Cooper, we'll make this

19  Court's Exhibit, whatever it is.

20          MR. COOPER:  2.

21          THE CLERK:  3.

22          THE COURT:  3, because I put -- um, I put the memo

23  that you gave me, most of my rulings in this trial as Court's

24  Exhibit 2.  So this will be Court's Exhibit 3.

25          MS. WEIS:  Your Honor, the figure is $2,733,797.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1        THE COURT:  Right.

2        Okay.  I'm going to add a section that says, maximum

3    penalty allowable under Section 6700, the maximum penalty

4    which you are permitted to award is $2,733,797.

5        Any problem with that language?

6        MR. CLUKEY:  No, Your Honor.

7        THE COURT:  Okay.  All right.  Gail, here is Number

8    3.

9        THE CLERK:  Thank you.

10       THE COURT:  All right.  Ready to bring the jury in?

11       MR. CLUKEY:  Yes, Your Honor.

12       MR. COOPER:  Yes.

13       THE COURT:  Okay.  Good.

14       (Thereupon, the jury returned to the courtroom at

15   3:30 PM.)

16       THE COURT:  How was lunch?  Good.  Good.  All right.

17   Mr. Foreman, I understand you and your jury have reached a

18   unanimous agreement on some verdicts; is that correct?

19       MR. KATTE:  Yes.

20       THE COURT:  Can you hand it to the marshal for me?

21       THE CLERK:  If it please the Court, in the case of

22   *Robert J. Nagy vs. United States of America*, each of the

23   following years, did the United States prove by a

24   preponderance of the evidence that Robert J. Nagy is subject

25   to penalty under Internal Revenue Code Section 6700?  A

1    finding of yes means finding in favor of United States, a

2    finding of no means a finding in favor of Mr. Nagy.

3              1998:  Yes.

4              1999:  Yes.

5              2000:  Yes.

6              2001:  Yes.

7              2002:  Yes.

8              2003:  Yes.

9              2004:  Yes.

10             2005:  Yes.

11             Signed by the foreperson, Dan C. Katte on June the

12   30th, 2010.

13             THE COURT:  Okay.  Thank you, ladies and gentlemen

14   of the jury.

15             All right.  We've got some good news and I've got

16   some bad news, and I've got some good news, all right?  I

17   have some bad news and some good news.

18             All right.  This case, the lawyers said this was a

19   penalty case.  Now that you've found the penalties are

20   warranted, you have to have a very, very short trial, and

21   that's the good news, about the amount of penalties, okay?

22             So in this case, there is just going to be one

23   witness, Mr. Nagy.  His testimony is going to take less than

24   a half an hour, and then you are going to get another verdict

25   form to determine the amount of penalties.  I'm going to give

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    you another two-page charge telling you how to calculate

2    these penalties.

3         So we are going to go -- we had to bifurcate the

4    case because the evidence in the first part is not relevant

5    in the second part, vice versa.  If you found there was no

6    penalties, we wouldn't have to do anything.  So we'll do

7    phase 2 and you will be out of here very quickly, all right?

8         Mr. Cooper, if you want to go ahead and give us your

9    opening statement as to phase 2, and then who is going to do

10   it for the Government?

11             MR. CLUKEY:  Ms. Weis.

12             MR. COOPER:  This phase is simple, I'm going to put

13   Mr. Nagy on the stand.  Your job is to determine in

14   connection with how many transactions violates 6700.

15        Right now, the Government assessed against him $2.7

16   million.  Your job is to go back there with all those

17   transactions and determine what his participation was in

18   those thousands of transactions and determine what his

19   overall liability is.

20        For the post-October 2004, it's based upon

21   50 percent of the income he received or expected to receive.

22   You've seen a chart from Mr. Cohen, a lot of those companies

23   filed bankruptcy, and was it reasonable for Mr. Nagy to

24   receive that.

25        Thank you.

1          THE COURT:  Ms. Weis?

2          MS. WEIS:  Ladies and gentlemen, as the Judge

3    indicated, the Government doesn't have any additional

4    evidence to put on.

5          As Mr. Cooper said, it's very simple:  The number of

6    transactions between 1998 and October 22, 2004, the

7    Government has provided you with an exhibit already, and

8    that's Exhibit 319 which Mr. Cohen testified about.  It's the

9    transaction summary chart.

10          The next question is for post-October 2004, how much

11   income did Mr. Nagy, gross income did he earn or expect to

12   earn?  And that is Government Exhibit 278, which Mr. Nagy --

13   or I'm sorry -- Mr. Cohen already put on.

14          So those are our two exhibits.  You've already heard

15   the evidence in that matter.  And I don't recall if Mr.

16   Cooper mentioned, because he went first, I should tell you,

17   Mr. Cooper -- or I'm sorry -- Mr. Nagy has the burden of

18   proof here.  So we would ask just to weigh the evidence, and

19   Mr. Clukey will talk to you in a little bit.

20          THE COURT:  Okay.  All right.

21          MR. COOPER:  Call Mr. Nagy.

22          THE COURT:  Okay.  Mr. Nagy, you are still under

23   oath.  Go ahead and take the stand.

24                         DIRECT EXAMINATION

25   BY MR. COOPER:

NAGY - DIRECT

1    Q. Mr. Nagy, in your time of giving tax advice, how many tax

2    advisors did you talk to?

3    A. Somewhere between 50 or 60 tax advisors and/or potential

4    borrowers or borrowers.  And I don't know how many -- some of

5    the people I had talked -- some of the people I talked to

6    actually had done a loan already, so I didn't have any

7    contact with them before they did the loan.  There was some

8    people who were contemplating loans, and I have no idea

9    whether or not they actually did a loan.  But probably

10   maximum number of people I talked to was maybe 60.

11   Q. And we discussed on your direct for the promotional

12   materials, how did you cause Derivium to send out those

13   promotional materials?

14   A. Well, I didn't cause them to send out any promotional

15   materials.  The only thing -- my understanding with them was

16   that if someone contacted them and had some questions about

17   tax aspects, they could call me or they could be provided

18   with a copy of my memo.  But my memo was not part of the

19   marketing materials, if you will.

20   Q. And besides the 50 or 60 people you talked to, how many

21   people do you know received a copy of the memo?

22   A. I have no idea.  The only -- the only thing that I had

23   heard was I think Randolph Anderson said he may have, he may

24   have given that to 40 people perhaps.  I think he said

25   something about, the testimony was something like 25 to 40

NAGY - DIRECT

1    people.  That's the only thing I know about.

2    Q. And because of your advice on the FRN, what's your belief

3    that you caused those transactions to happen?

4    A. I don't believe I did FRN.

5    Q. So what you are saying, on these total transactions here

6    of 3,111, you had direct contact with about 40 or 50 people?

7    A. I had -- well, as I said, I don't know.  I had contact

8    with a maximum of maybe 60 people.

9           And the way I determined that was I went back

10   through my records, I actually looked at my time records

11   through all of these years to see how many people, because I

12   actually kept a record of the people that I talked to, so

13   that was about 60 people, and how many of them actually did

14   transactions, I don't know.

15   Q. And the number of transactions are relevant to the

16   pre-October 2004 penalty computation?

17   A. That's correct.

18   Q. And this is Government Exhibit 278.

19          And Mr. Nagy, can you identify which of these

20   entities were bankrupt?

21   A. Which were bankrupt?

22   Q. Yes, went bankrupt?

23   A. Um, well, starting from the top, BVL is Bancroft

24   Ventures, I guess you could -- I guess you could say they

25   were bankrupt if the Government contends that they were not a

NAGY - DIRECT

1   real entity.

2          Um, CATC is Charleston Aluminum Trading Company.

3   That company did not go bankrupt.

4          And there is -- the next is Scott Cathcart and

5   Charles Cathcart.  CC is Charles Cathcart.  I -- at that

6   time, they were not bankrupt.

7          D.C. U.S. is Derivium Capital U.S.A.  I, um, I don't

8   know whether that company filed bankruptcy.  I know that they

9   were insolvent probably, but I don't know what time they were

10  insolvent.  So I really can't testify to that.

11         Yuri Debevc, um, he was not insolvent at that time.

12         Derivium was bankrupt, went bankrupt.

13         Scienda went bankrupt.

14         Shenandoah was bankrupt.

15         Veridia, I cannot say about that.

16         Um, the next one down is Persivious.

17         Um, the next one Scrantom, that's Tim Scrantom, I

18  don't know what he's doing on there, that Scrantom.

19         And then next is TSS, that's 10 State Street.

20         And TSS-Gen, that's -- that's a -- that's actually

21  work that I did for 10 State clients that -- that's Scrantom

22  TSS.  TSS-Gen is totally -- it's unrelated to this.  I mean,

23  they had Tim Scrantom, that's personal work that I did for

24  him, and he was -- his money came to his law firm and other

25  sources.  And then 10 State Street, they had other clients.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

NAGY - DIRECT

1          In fact, at this point, 2005, I -- I know that there
2     was a substantial sum of money that was owed to 10 State
3     Street that was never paid by Derivium.
4     Q. And in fact, 10 State Street was a local law firm?
5     A. Yes.
6     Q. And are they around anymore?
7     A. Um, I don't think that they are really practicing law.  I
8     think the organization still exists, and they do one or two
9     things, but then as far as being an active law firm now, I
10    don't believe that they are.
11    Q. What expectation do you have to be paid from 10 State
12    Street?
13    A. Well, I -- I -- I expect I will be paid, but it's not
14    Derivium source money.
15    Q. And what about the entities that are insolvent or filed
16    bankruptcy?  What expectation do you have to be paid for
17    that?
18    A. Well, none.  I've actually got on my books, I don't try
19    to collect it anymore, because there is no source, but there
20    was about close to, when they stopped paying, if you will,
21    there was about, I think about $92,000 that was owed to me
22    that I never got.
23    Q. Okay.  You don't expect to get that money?
24    A. No, it's not -- it's not possible.
25          MR. COOPER:  I have no further questions.

NAGY - CROSS

1                           CROSS-EXAMINATION

2    BY MR. CLUKEY:

3     Q. Pull up Exhibit 319, please.

4          Mr. Nagy, you haven't provided anything to the

5    Government challenging these total numbers of transactions,

6    have you?

7     A. No, I -- I think there was some discussion about some

8    small discrepancy, but no, I haven't.

9     Q. So as far as you know, there is no other evidence

10   challenging the Government's calculation of these total --

11   these total numbers of transactions; is that right?

12    A. None.

13    Q. Exhibit 278, please.

14          We just went through this.  A couple of questions

15   here.  First of all, to your understanding, this is based on

16   your billing records, correct, this summary?

17    A. Yes, that's correct.

18    Q. So you prepared billing records because you were

19   preparing to bill these various clients, correct?

20    A. Yes, but I would say -- I said to Mr. Cooper, and I would

21   say again to you, Mr. Clukey, that those three at the bottom

22   should not be on there.

23    Q. I understand.  We'll get to that.

24          But before we get to that, I just want to make sure

25   we are clear with your answer.  You prepared billing records

NAGY - CROSS

1   because you had done work for all these companies, correct?

2    A. That's correct.

3    Q. And so you prepared billing records because you expected

4   to get paid, correct?  You had hoped to get paid?

5    A. I hoped to get paid.  And in 2005, I was still doing

6   work, um, I knew that -- that, um -- I knew that these

7   companies, you know, that there were financial problems.  I

8   don't know -- I don't know the date by month of these

9   billings.  You know, at some point, yes, I was continuing to

10  do work, but I realize I probably wasn't going to get paid, I

11  billed them anyway.

12   Q. Let's break these up into two categories.

13        The entity BVL and all those down, all the way down

14  to Veridia, those are companies that, in your opinion, those

15  are Derivium-related companies, correct?

16   A. That's correct.

17   Q. Okay.  And as far as you know, those are the -- those are

18  proper summaries of the total amount of work that you did for

19  them, correct?

20   A. Yes.

21   Q. Okay.  So let's go down to PERS.  That's Scott Cathcart's

22  company, correct?

23   A. Persivious, correct.

24   Q. Scott Cathcart, you would consider that part of the

25  Derivium-related companies, wouldn't you?

NAGY - CROSS

1    A. Related through ownership with Scott Cathcart, I don't

2    recall.  At some point Persivious had other income.

3    Persivious was a consulting company, I believe, that Scott

4    operated.  So you know, it's related because he was related

5    to Derivium, but the source of income for that, I don't know

6    in 2005.

7    Q. You don't know what it was?

8    A. No.

9    Q. So the other three here -- so Scrantom, you said that's

10   Tim Scrantom?

11   A. Tim Scrantom.  That's correct.

12   Q. Tim Scrantom is the lawyer for all those companies that

13   we saw that -- the foreign companies, correct?  And you heard

14   testimony to that effect, right?

15   A. Right.  He was -- at one point was a lawyer for Derivium.

16   And then he was in the firm, I think with the attorneys for

17   BVL.  But they had -- they had many other clients.

18   Q. And there has been no evidence presented in this case

19   that the work you did for Tim Scrantom wasn't related to the

20   90% Loan Program, correct?  You are just telling us now; is

21   that right?

22   A. Well, nobody has asked me that until now, Mr. Clukey.

23   I'm telling you that's what it is.  Nobody -- nobody asked

24   how much work did 10 State or Tim Scrantom do for BVL or

25   these companies or any other clients I had.  I just -- I have

1177

NAGY - REDIRECT

1    been the accountant for Mr. Scrantom and for 10 State Street,

2    I know they have a lot of other clients.  That's all I'm

3    saying.

4     Q. You would agree you have an incentive to say that that

5    work you did for Tim Scrantom, that's different work, that's

6    not the 90% Loan work, because if you say that, the jury

7    believes you, then it's going to lower your penalty amount,

8    correct?

9     A. Well, that's right.

10    Q. TSS, that's 10 State Street.  That's the same law firm

11    that Tim Scrantom worked for, the same law firm that

12    represented Derivium, Bancroft and all those other companies

13    we saw on the chart; is that right?

14    A. That's correct.  But again, they had -- they had many

15    other clients.

16    Q. So you mentioned you started off with 50 to 60 tax

17    professionals or potential borrowers that you talked to,

18    correct?

19    A. That's correct.

20    Q. That's people you directly spoke with, right?

21    A. Yes.  And again, I don't know how many of them did a

22    stock loan or actually did a transaction, I don't know.

23    Q. You would agree that this jury already found that you did

24    participate from 1998 through 2005?

25    A. Yes.  That's what they found, yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

NAGY - REDIRECT

1          MR. CLUKEY:  Thank you.  Nothing further.

2                    REDIRECT EXAMINATION

3    BY MR. COOPER:

4     Q. Just one other question.

5          For 1998, was it your first tax advice on the 90%

6    Stock Loan on December 12, 1998?

7     A. I believe that's right.  It was late in the year.

8     Q. And then from December 12th to December 31st, were there

9    any stock loans?

10    A. I have no idea.  I mean, I can assume -- I could assume

11   that there may have been, I just don't know.

12          MR. COOPER:  That's all I have.

13          THE COURT:  Anything else?

14          MR. CLUKEY:  Nothing further, Your Honor.

15          THE COURT:  Okay.  Thank you, Mr. Nagy.

16          THE COURT:  Does he want to leave?

17          MR. COOPER:  Pardon?

18          THE COURT:  Does Mr. Nagy want to leave?  All right.

19          Ms. Green?  I promised you you would be there at

20   5:00, all right?

21          A JUROR:  Thank you.

22          THE COURT:  Okay.  Thank you for your service in

23   this case.  I appreciate it.

24          Gail just -- Gail just reminded me, okay?

25          MS. GREEN:  Yes.

1             THE CLERK:  Let me take that over there to Ms.

2      Green.

3             THE COURT:  While you are handing out paper, hand

4      that out.

5             Yes, sir?

6             MR. COOPER:  Thank you.

7             This has been a long case for us, and what we ask

8      here at the end with the damages, since you think he violated

9      6700, is to assess him for the advice he actually gave the

10     customers.

11            He testified that was $50,000.  He's not an owner of

12     Derivium.  He didn't have the final say.  If Mr. Nagy is

13     going to be assessed, assess him with 50 or 60 folks that he

14     admits he talked to post-2004.  Assess him for that income

15     that was -- the expectation that he would receive.

16            A lot of those entities were bankrupt, in

17     dissolution.  He testified 10 State Street, he did other

18     work.  Take that into consideration in computing the penalty.

19     Because the post-2004, the penalty is 50 percent of the

20     income that he derived or expected to be derived for the

21     pre-October 2004 income, is for each transaction, it's a

22     thousand dollars per transaction.

23            Thank you.

24            MR. CLUKEY:  Ladies and gentlemen, this case has

25     indeed been lengthy.  Thank you for your service.

1        You might have come out a different way if you knew

2    you have to sit here for a little bit longer and do another

3    penalty calculation, but there's not really much to say,

4    that's the good news.  You don't often hear lawyers say there

5    is not much to say.

6        You already heard, and I already went through all

7    the evidence, Mr. Nagy was integral to the scheme.  It wasn't

8    just that he talked to 50 or 60 people, yes, he did, and he

9    just told you, it's that his memos allowed the scheme to go

10   forward.  The scheme would not have happened without this.

11       And that's why you began and you found, by doing

12   those memos, Mr. Nagy was able to profit from all those

13   companies.  And you have the companies in the chart, all the

14   money coming in.  By writing those memos, he was allowed to

15   do that.  You've got all those memos.  In addition to the

16   conversation with the customers, you've got all those memos.

17       The burden of proof this time is on Mr. Nagy.  It's

18   on Mr. Nagy to now say, I didn't engage in this number of

19   transactions.  I'm not responsible for those number of

20   transactions.

21       And what are the numbers we are talking about?  You

22   just saw the charts.  319.  I won't put it up again.  You

23   just saw the number.  So you guys are taking notes.  Look at

24   319.  That's the total number of transactions.  Mr. Nagy

25   didn't dispute the total number of transactions.  That's the

1    number of transactions that occurred through the years.

2    Those transactions would not have happened but through Mr.

3    Nagy.  And as you know, he's the only guy in the country that

4    said that it worked with the tax advice.

5           The other item, Exhibit 278, that's his income.  We

6    just walked through his income.  The United States believes

7    that he's liable for all of those companies that were on

8    there.  Mr. Nagy admits that he did work for the top 10 and

9    11 companies really on there.

10          I just want to mention one thing in the jury

11   instructions for that period.  I'm afraid my pages are a

12   little bit off, I had an earlier draft, but there is a title

13   there, calculation of penalties from October 22, 2004 to

14   2005.

15          If you look on there, this explains the law change

16   met for calculating the penalties changed.  And so we see

17   here the law now imposes a penalty equal to 50 percent of the

18   total gross income received or expected.  The key word

19   "expected" to be received from the plan by the person.

20          It doesn't matter if any of those companies went

21   bankrupt.  What matters is what was on Mr. Nagy's billing

22   records, what he thought he was really going to get or what

23   he hoped he was going to get.  You heard him say he hoped he

24   would get that.  Of course he did.  That's why he was doing

25   the work.  He wanted to get paid.

1          We contend that the proper penalty is the amount

2     that's on that chart.  The companies went bankrupt, that was

3     foreseeable that the companies would go bankrupt, because

4     this was a massive fraud.

5          Thank you, ladies and gentlemen.

6          THE COURT:  Mr. Cooper, any reply?

7          MR. COOPER:  No, sir.

8          THE COURT:  Okay.  All right.  Ladies and gentlemen

9     of the jury, now I'm going to read this to you, and then you

10    get to determine.  All right.

11                            *   *   *

12    (Thereupon, the jury retired from the courtroom at 4:00 PM.)

13         THE COURT:  Okay.  We'll be at ease until whatever

14    decision they make.  Mr. Nagy, we'll see you later on.

15         MR. NAGY: Okay.

16         MR. CLUKEY:  The person who prepared the summary is

17    on the plane right now, so we are trying to see if there is

18    any person -- any other person in his office that we can

19    reach, the total number of transactions of December of '98.

20         THE COURT:  What's on the summary form?

21         MR. CLUKEY:  The summary doesn't break it out by

22    month.  There are supporting, you know, there is work papers,

23    so I don't know if Mr. Cooper would want to introduce that

24    particular paper or --

25         THE COURT:  What's -- I don't even remember what --

```
 1    how many transactions are there in '98?
 2              MR. CLUKEY:  I'm sorry, Your Honor?
 3              THE COURT:  So there is 113 total in 1998?
 4              MR. CLUKEY:  Right.
 5              THE COURT:  What do you want to do?
 6              MR. CLUKEY:  As soon as we hear back, I mean,
 7    hopefully it will just be a couple of minutes, and then --
 8              THE COURT:  Well, do you have -- you don't have the
 9    exhibit?
10              MR. CLUKEY:  We don't have the underlying work
11    papers behind it.
12              THE COURT:  Is the underlying work papers attached
13    to the summary exhibit that the jury has?
14              MR. CLUKEY:  I don't think so.  I think we only
15    introduced the first page.
16              THE CLERK:  Yes, sir.  It was just one page.
17              MR. COOPER:  You didn't introduce the whole thing?
18              THE CLERK:  It's just one page.
19              THE COURT:  Like I said to Mr. Debevc, I mean, we've
20    got to give this penalty to the blood out of a turnip portion
21    of the Internal Revenue Service.  I mean, what difference
22    does it make?
23              MR. COOPER:  I mean, we looked at it.  I think our
24    chart showed there were nine after that, but obviously, I
25    didn't put it in there.
```

1              MR. CLUKEY:  Do you want to stipulate to ten?  I

2   just don't know what the number is.

3              THE COURT:  I tell you what we'll do, why don't

4   y'all agree on ten, and if the jury finds all ten and the

5   underlying evidence is nine or eight, then how is that then?

6              MR. COOPER:  That's very fair, Your Honor.

7              MR. CLUKEY:  That's fine, Your Honor.

8              THE COURT:  All right.  I'm just going to write ten.

9   I'll just put ten on here, okay?

10             THE CLERK:  Do it on the original?

11             THE COURT:  So I just wrote ten on there, okay?

12             THE COURT:  Each one of the copies of -- what

13   exhibit was it?

14             THE CLERK:  319 and 278.

15             THE COURT:  They wanted individual copies.  I guess

16   they are going to work and do some calculating.  So I made

17   copies for each one of them, two exhibits, okay?  All right.

18   We'll be at ease.

19              (Thereupon, there was a recess.)

20             THE COURT:  Bring the jury in.

21              (Thereupon, the jury returned to the courtroom at 5

22   PM.)

23             THE COURT:  Okay.  Y'all have a verdict,

24   Mr. Foreman?

25              All right.  Just add that up, which I'm sure you

1    did.

2         THE CLERK:  If it please the Court?

3         In the case of *Robert J. Nagy vs. The United States*

4    *of America*, for each of the following years, you have found

5    that Robert J. Nagy is subject to penalties under Internal

6    Revenue Code Section 6700.  Please state the amount of

7    penalties for which Mr. Nagy is liable for each year.

8         1998:  57,000.

9         1999:  384,000.

10        2000:  735,000.

11        2001:  498,000.

12        2002:  366,000.

13        2003:  229,000.

14        2004:  354,000.

15        2005:  13,000.

16        Signed by foreperson, Dan Katte on June the 30th,

17   2010.

18        THE COURT:  Okay.  Ladies and gentlemen of the jury,

19   I've got more surprises for you, so you can go home.

20        I want to thank you for your service in this case.

21   I hope you enjoyed it.  Now, the lawyers may want to talk to

22   you about this case.  Because as you know, they are excellent

23   lawyers.  They represent their clients fully, but they can

24   always learn by talking to jurors.

25        If you want to talk to them, you are welcome to talk

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    to them.  If you don't want to talk to them, you certainly

2    don't have to talk to them, just say, I don't want to talk to

3    you.  If you want to, that's fine, that's totally up to you.

4    They may not call you.  But if they do, you can talk to them.

5              You can go back to the jury room.  And it's rush

6    hour right now, so go back to the jury room and I'll send

7    Gail back in case you need any work excuses or any parking

8    tickets that you need fixed or anything like that, okay?

9              Thank you.

10              (Thereupon, the jury retired from the courtroom.)

11              THE COURT:  Okay.  That's 2.636.  Of course, it's

12    under the 2.7. You have any time under the Federal Rules to

13    make any motions.

14              It seems under the stipulation that $57,000 for ten

15    transactions may not be totally accurate, but so we'll go

16    from there.  So you have any time to do whatever you want to

17    do.  We'll hear the motions whenever you get them made, okay?

18              Thanks for all your hard work.  You made it a lot

19    easier for everybody.

20              And good luck on your -- you must have an

21    extraordinary wife who has been taking care of five kids,

22    okay?

23              Thank you very much.

24              (Thereupon, the Court was in recess.)

25                        *****     *****     *****

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1
 2       I certify that the foregoing is a correct transcript from the
 3       record of proceedings in the above-titled matter.
 4
 5
 6
 7       --------------------------
 8
 9       Amy C. Diaz, RPR, CRR              February 17, 2011
10       S/  Amy Diaz
11
12                                                              1169
13        DIRECT EXAMINATION                                    1169
14        BY MR. COOPER
15        CROSS-EXAMINATION                                     1174
16        BY MR. CLUKEY
17        REDIRECT EXAMINATION                                  1178
18        BY MR. COOPER
19
20
21
22
23
24
25
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER