1                    IN THE DISTRICT COURT OF THE UNITED STATES
                           DISTRICT OF SOUTH CAROLINA
2                             CHARLESTON DIVISION

3     ROBERT J. NAGY,                )           2:08-CV-2555
                                     )
4                   Plaintiff        )           Charleston,
                                     )           South Carolina
5     VS                             )           June 29, 2010
                                     )
6     UNITED STATES OF AMERICA,      )              VOLUME VI
                                     )
7     Defendant                      )

8                        TRANSCRIPT OF JURY TRIAL
                   BEFORE THE HONORABLE DAVID C. NORTON,
9               CHIEF UNITED STATES DISTRICT JUDGE

10    APPEARANCES:

11    For the Defendant:     MR. NATHAN CLUKEY
                             MR. GREGORY SEADOR
12                           MS. ELLEN WEIS
                             US Department of Justice Tax Division
13                           P.O. Box 7238
                             Ben Franklin Station
14                           Washington, DC 20044

15

16    For the Plaintiff:     MR. LINDSEY W. COOPER, JR., ESQ.
                             LW Cooper Jr. Law Offices
17                           36 Broad Street
                             Charleston, SC 29401

18

19

20

21

22

23    Court Reporter:       Amy C. Diaz, RPR, CRR
                            P.O. Box 835
24                          Charleston, SC 29402

25            Proceedings recorded by mechanical shorthand,
       Transcript produced by computer-aided transcription.

1         THE COURT:  Okay.  I'm ready when y'all are.

2         MR. CLUKEY:  We've got a number of issues we would

3    like to address.

4         First of all, the parties have just discussed

5    regarding the total number of transactions upon which the

6    penalties would be based, and we are willing to recommend

7    stipulating -- the Government is going to have to go up to my

8    boss to approve this, it's going to have an impact on the

9    total number of -- the total amount of penalties -- but we

10   are willing to recommend -- we would stipulate to the number

11   that -- Mr. Nagy calculated and prepared a summary chart, and

12   we would be willing to stipulate, just for purposes of this

13   case only, to the total number of transactions, which would

14   obviate having to have the jury decide, weigh our chart that

15   we did, and the IRS chart.

16        THE COURT:  And everybody is on pins and needles

17   about what the number is.  What's the number?

18        MR. CLUKEY:  The number is actually broken up by

19   year, so --

20        THE COURT:  Are you stipulating per year or are you

21   stipulating in total, or what are you doing?

22        MR. CLUKEY:  Stipulate by year and do the

23   calculations to get the total number, I think it's 2387 total

24   number of transactions.

25        THE COURT:  You and Mr. Cooper have agreed on a

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    number, but it has to be approved in Washington?

2              MR. CLUKEY:  Correct.

3              THE COURT:  And will it be approved in Washington

4    prior to the time we have to get it to the jury?

5              MR. CLUKEY:  We actually teed this up with

6    Washington yesterday.  So hopefully, we'll get things moving

7    as fast as we can.

8              THE COURT:  So what happens if we don't get word

9    back from Washington, assuming we get to the jury and they

10   find liability?

11             MR. CLUKEY:  We are going to make -- move it as fast

12   as possible.  I can't promise you anything, but I'm going to

13   try.

14             THE COURT:  Sometimes it's like pushing a chain, it

15   can't be done.

16             MR. CLUKEY:  Things are in motion.

17             THE COURT:  You agree with that, Mr. Cooper?

18             MR. COOPER:  Yes, Your Honor.

19             MR. CLUKEY:  So just for clarification, there is

20   also a total of FRN transactions.  Mr. Nagy says he's not

21   liable for FRN transactions.  We'll stipulate to the number

22   of FRN transactions.  Mr. Nagy is not stipulating to

23   liability of any of these numbers.  This doesn't pertain to

24   the conduct after October 2004 when the Statute changes, so

25   we've got evidence of the total that we think Mr. Nagy

1    earned, but I think Mr. Nagy still, there is evidence about

2    what he earned after 2004, if I understand things correctly.

3            MR. COOPER:  That's correct.

4            THE COURT:  All right.  What else?

5            MR. CLUKEY:  Okay.  Secondly, there was -- we had

6    one issue with the Socks deposition.  I think this is a

7    single --

8            MS. WEIS:  I can hand it to the Court, but it's

9    pages 66 to 67.  You had overruled the objections we had for

10   calling her testimony under the law and --

11           THE COURT:  Okay.  Let me see.  Okay.

12           MR. COOPER:  Your Honor, I haven't seen that yet.

13   If you've already made your rulings -- thank you.

14           MS. WEIS:  Your Honor, this is an issue that we

15   believe will also come up with Ms. Gadsden that these are --

16   they are being called as fact witnesses.  They couldn't be

17   called as witnesses on the law.  And the questions that Ms.

18   Socks are asked in the deposition on pages 66 and 67 are on

19   the legal effect of whether or not the IRS can allow or

20   disallow certain deductions and the consequences with that

21   for the 90% program.  And she's basically being asked to

22   speculate on a law.

23           So we would say that that would be improper

24   testimony, both from Ms. Socks, via her deposition, and also

25   from Ms. Gadsden.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1            And on that issue actually, Your Honor, we want

2       to -- I have relayed a note -- just so Your Honor is aware,

3       Ms. Gadsden is here today and will be testifying.  We believe

4       Mr. Nagy is going to call her.

5            And the way that it works with IRS agents, they have

6       to get authorization from the IRS to be able to testify.  We

7       believe that the testimony that she's been -- the scope of

8       that testimony is broad enough that we won't encounter any

9       problems.  And she's been told that if Your Honor says she

10      needs to testify about something, she will.  One of the

11      things --

12           THE COURT:  You -- I couldn't hear what you just

13      said.

14           MS. WEIS:  Sure.

15           So in her authorization, which is required, the IRS

16      has to sort of create a testimony authorization for Ms.

17      Gadsden.

18           One of the issues that she's not allowed to testify

19      about, unless Your Honor, of course, you know, overrules

20      that, is questions on the law.  She's being called here to

21      testify as a fact witness about things that she personally

22      observed, and it's just not a judge or an attorney or anyone

23      that could offer testimony on the law.

24           So as to Ms. Gadsden, and also to Ms. Socks and the

25      testimony that we just identified, we believe that that

1    should be excluded.

2              THE COURT:  Okay.  Let's go back just to square one.

3              If Ms. Gadsden is going to be here, you can't read a

4    deposition and have her here.

5              MS. WEIS:  No, Your Honor.  Ms. Socks's deposition

6    testimony will be read.  Ms. Gadsden is here.

7              THE COURT:  Okay.

8              All right.  What you say, Mr. Cooper?

9              MR. COOPER:  Well, starting with Ms. Gadsden, the

10   fact is she allowed the interest expense deduction, that's a

11   fact, and that fact was communicated to Mr. Nagy.  And the

12   simple basis is you have to allow it if there is a bona fide

13   loan.  And that's all she's going to say.

14             As a revenue agent, she allowed the interest expense

15   deduction because it was a bona fide loan, and that was

16   communicated to Mr. Nagy.  And that's her exact words in the

17   deposition.  And we believe the jury has to understand that

18   as to what the actual IRS agent did and what that

19   communicated to Mr. Nagy for them to understand Mr. Nagy's

20   state of mind.

21             The same is true with Ms. Socks.  She has special

22   training in tax law.  And as I pointed out, the simple

23   question, can you allow interest expense if it's not a bona

24   fide loan, the answer is no.  So we don't think it's law,

25   it's the fact that it can't be allowed unless it's a bona

1    fide loan.

2              MS. WEIS:  Your Honor, we would say that's a fact of

3    a legal conclusion.

4              Ms. Gadsden also testified in her deposition that

5    she did not have the expertise to make that determination,

6    and, in fact, did not make the determination that Mr. Cooper

7    just referenced, that, you know, this was going to be

8    accepted as a bona fide loan.

9              In fact, Ms. Socks and Ms. Gadsden are very

10   consistent in their testimony during their, both of their

11   depositions, that nobody made an ultimate conclusion as to

12   whether or not this was a loan or a sale, and that nobody

13   communicated that act, communicated that such a determination

14   had been made to Mr. Nagy.

15             So that's getting into both the motion in limine,

16   and our main objection to Ms. Socks's testimony is that it is

17   calling for a legal conclusion and it is improper testimony

18   under the law.

19             THE COURT:  Now --

20             MR. COOPER:  Your Honor, I mean, she testified

21   specifically that she accepted it as a bona fide loan -- and

22   I'm looking for the deposition testimony -- and because she

23   accepted it, that's why she issued the no change with no

24   changes.  And she also testified by doing that, she

25   communicated that the loan was accepted at that time.

1              I mean, those are very relevant facts to Mr. Nagy's

2       state of mind.

3              MR. CLUKEY:  At the same time she testified that,

4       Your Honor, I, of course, objected that it was calling for a

5       legal conclusion.  That actually precedes her answer.

6              And she did repeatedly testify throughout the

7       deposition she lacked the expertise to make any determination

8       of whether this was a bona fide loan or sale.  And that's the

9       reason why she referred this to Mary Socks.

10             And the reason why she referred it to an

11      international examiner, it's just that she's a -- she just

12      doesn't have that expertise.  And it's clearly -- Mr.

13      Cooper's clearly trying to get her legal conclusion, A, what

14      he thinks he's calling a conclusion into evidence and have

15      her testify as an expert on law.

16             MR. COOPER:  Your Honor, the question is:

17             "Question.  So there was a no change -- so -- so did

18      you have -- that time you issued a no-change letter, it was

19      communicated that it was a bona fide loan for which an

20      interest expense could be taken, correct."

21             "Objection to form foundation."

22             "Witness.  At the time it was accepted as a bona

23      fide loan."

24             And if that is the whole basis of Mr. Nagy's belief,

25      is that when she issued that no change, everyone knows that

1    that revenue agent has to accept that position in order to

2    make no changes.  And that's exactly what it communicated to

3    Mr. Nagy.

4         And the revenue agents want to confirm that, Mr.

5    Nagy has already testified to it, but the revenue agent, in

6    her belief is what happened and what was communicated at that

7    time.

8         THE COURT:  Who issued the no change?

9         MR. COOPER:  She issued --

10        THE COURT:  She, who?

11        MR. COOPER:  I'm sorry.  Ms. Gadsden.

12        THE COURT:  Okay.

13        MR. COOPER:  She issued something called a revenue

14   agent report, which is Exhibit 37.  And that has -- it's a

15   report that has line items in it about any changes that are

16   going to be made to that tax return.

17        Her report has no changes in it, and it's written at

18   the top:  "Subject to approval by the area director."

19        And ultimately in Exhibit 38, their area director

20   issued the no change because that's -- he was just talking

21   about the -- the pyramid of command, that the area director

22   is the one that has to issue the no change in order for it to

23   be legally binding.

24        THE COURT:  You mean legal and not binding?

25        MR. COOPER:  Well, but --

1          THE COURT:  I mean, I understand your argument, but

2     there is no evidence.  I mean, there is nothing that's going

3     to be in the record that says a no change is binding.

4          MR. COOPER:  Binding?

5          THE COURT:  Binding.

6          MR. COOPER:  No.  I'm not saying it's binding.

7          THE COURT:  That's what you just -- you just said

8     pyramid in command is -- the area director is the one to

9     issue the no change in order for it to be legally binding.

10    Those are your words.

11         MR. COOPER:  To be procedurally correct, it has to

12    come out of the area.

13         THE COURT:  All right.

14         MR. COOPER:  But you know, the fact of the no change

15    and what it communicated and why it was communicated is

16    paramount to Mr. Nagy's state of mind.  Because anyone that

17    practices before the IRS knows when that no change is issued,

18    those tax positions in the return have been accepted.

19         And as we saw, Scott Cathcart's return took an

20    interest investment interest deduction on the loans.  And the

21    jury is -- needs to hear that from Ms. Gadsden, too.

22         MR. CLUKEY:  Your Honor, I think Mr. Cooper just

23    nailed it.  It's what was communicated, actually

24    communicated, and this Court's already ruled on that.

25         Ms. Gadsden did not communicate to Mr. Nagy, I'm

```
1        accepting this loan and I'm accepting this interest

2        deduction; therefore, it's a bona fide loan; therefore, that

3        never happened.

4               This is all information that Mr. Cooper was asking

5        about in 2009 in the deposition.  And he's asking for her

6        opinion about the law and what that -- what that meant.  That

7        was not communicated.  This Court's already ruled that the --

8        in a motion in limine, the information that wasn't

9        communicated, that's not coming in.  So Mr. Cooper is trying

10       to back door the --

11              THE COURT:  It's not communicated, it's not coming

12       in.  If the no change was communicated, I'll let it in.

13              MR. COOPER:  But she is testifying as to what that

14       no change communicated.  I mean, you can't take it --

15              THE COURT:  She can't testify to what that no change

16       communicated.  It means different things to different people.

17       Mr. Nagy indicated what the no change meant to him.  It's his

18       state of mind.

19              MR. COOPER:  I mean, how is it not important with

20       what the IRS we believed was communicating to Mr. Nagy?  I

21       mean --

22              THE COURT:  I already ruled, and you can take me to

23       Richmond, because I just got back yesterday and there is a

24       lot of courtrooms up there, okay?  You can take it up, but it

25       doesn't make any difference.
```

1        Mr. Nagy's -- Mr. Nagy's state of mind, what the IRS

2   did is not binding.  I mean, there is hundreds -- the cases

3   that I've been given, there is -- it's irrelevant what

4   happened in the internal workings of the IRS, if anyone can

5   define what happens over there, unless it was communicated to

6   Mr. Nagy.

7        MR. COOPER:  But Your Honor, I mean, the issuance of

8   that no-change letter is what was communicated.

9        THE COURT:  I understand, and that's already in

10  evidence.

11       MR. COOPER:  But it's coming from an admission from

12  a party opponent on what was communicated.  She -- she was

13  lead agent on the exam.

14       THE COURT:  I'll listen to you all morning, but my

15  ruling is still going to be the same.

16       MR. COOPER:  I -- okay.  I just don't understand how

17  to -- for Mr. Nagy's state of mind, to accept that in a

18  vacuum of what the industry practice is before the IRS.

19       THE COURT:  I understand what you are trying to do,

20  okay?  And I understand what you have been trying to do

21  since -- for the last six months.  And I'll put, chalk it up

22  to a good try.  It's not coming in.  And I really don't know

23  what your expert is going to testify to after reading his

24  report.

25       MR. COOPER:  Well, the expert will be on two things.

1          One, he can talk about from his experience how

2     in-depth the review was.

3          THE COURT:  What difference does it make?  Tell me

4     what difference the review makes?  What relevance that has to

5     this case?

6          MR. COOPER:  It has relevance because it's not some

7     cursory review.  I mean, this was an in-depth audit.  He's

8     going to say in the 30 years he was at the IRS, he's seen a

9     handful of times where you've had this amount of specialists

10    involved in an exam, and this amount of in-depth review.  So

11    it adds substance to what happened during the audit.

12         THE COURT:  But did Mr. Nagy know that at the time

13    that he got the letter?  Did he know any of that at the time

14    he got the letter?  I mean, all he got was a no-change

15    letter.  And in his experience, it's not an irrational

16    position to take, that that's a good deal.  I mean, did he

17    know that there were -- he knew that he got some -- some

18    document requests from a couple of people, right?  Ms. Socks,

19    and he already testified about all that, right?

20         MR. COOPER:  Yes, he did.

21         THE COURT:  So I mean, what difference does it make?

22         MR. COOPER:  It makes a difference to his state of

23    mind.  This is not an everyday audit.  It's not as if I sat

24    down with a revenue agent for a half a day and picked out a

25    couple of line items on a tax return and close it within a

1    week.  This went on for 18 months.  There was an agent that

2    had a CPA's license.  There were two specialists looking at

3    it.  I mean, it was a substantial review.  And someone that's

4    been in the IRS for 30 years should be able to communicate

5    that to the jury because it's not, you know, some back of the

6    envelope determination on what was going on.

7          And secondly, as an expert under, I believe it's

8    704(b), he's allowed to testify as to what import the

9    conclusion of the audit had on Mr. Nagy's state of mind.

10          THE COURT:  Oh, no.

11          MR. CLUKEY:  Your Honor, as to the first point -- I

12   think we are in agreement with Your Honor on the second

13   point.

14          As to the first point, Mr. Nagy's already testified

15   as to what he believed, whether or not he believed this was

16   an in-depth or a cursory audit.  He's already testified to

17   that.  Ms. Gadsden is going to get up here and testify, he

18   can certainly ask her about that, she's a fact witness.

19          Mr. Altemose, as you just touched on, Your Honor,

20   didn't communicate any of his views to Mr. Nagy at the time.

21   So whatever his views are about the in-depth, whether the

22   audit was in-depth or not, clearly has no bearing on Mr.

23   Nagy's state of mind.

24          THE COURT:  704(b), which you just cited, doesn't

25   even come close to saying what you think it says.

1          MR. COOPER:  I'm sorry, 704(a).

2          In the case law that we cited in our -- in our

3     opposition to the motion in limine on Mr. Altemose was

4     *Bouygues Telecom S.A. vs. Tekelec* 472 F.Supp. 2d, 722,

5     Eastern District of North Carolina, as well as *U.S. vs.*

6     *Winfelder*, 790 F.2d 576 on page 580, the Seventh Circuit.

7          Those cases say in a civil case that an expert may

8     testify to the ultimate issue.  And in all the cases, the

9     exception that 704(a) says is, you can't do it in 704(b),

10    that is -- the cases they cited, they are all criminal cases.

11         In a civil case --

12         THE COURT:  That's because -- you cited a criminal

13    case, United States versus somebody.

14         MR. COOPER:  No, Your Honor, it was a civil case.

15         THE COURT:  Okay.

16         MR. COOPER:  It was talking about a civil case.

17         THE COURT:  Okay.

18         MR. COOPER:  So we believe that Mr. Altemose in the

19    industry practice can come in and say at the conclusion of

20    the audit, what was Mr. Nagy's perception as to the

21    transaction?

22         THE COURT:  You might put him up as a proffer.  And

23    if I'm wrong, then the Fourth Circuit will reverse me.

24         MR. COOPER:  I mean, I would just respectfully

25    request that at lunch we take a look at the cases, because I

```
1    mean, we are talking about what's being communicated to my
2    client by the IRS.
3              THE COURT:  I understand that.  That's all coming
4    in.  What's being communicated to your client by the IRS, all
5    those document requests and all of that kind of stuff, that's
6    already in, isn't it?
7              MR. COOPER:  It is.
8              THE COURT:  Okay.
9              MR. COOPER: But the conclusion of the audit, that
10   that event happening, what does that communicate in the
11   industry practice?  It communicates that the conduct and the
12   positions you have taken on your tax returns are okay because
13   there is no change.
14             THE COURT:  What do you mean by lunchtime?  I
15   thought we were going to be through by lunchtime, but I guess
16   we are not.
17             MR. COOPER:  Well, with Ms. Gadsden, and reading it
18   in.  I would just -- because this is highly important.  I
19   mean, these are our three witnesses today, Ms. Gadsden,
20   reading in Ms. Socks, and Mr. Altemose.
21             THE COURT:  Okay.
22             MR. CLUKEY:  Your Honor, if I could direct you
23   to -- this is a quote from Mr. Altemose's report.  He
24   concludes that the no-change letter is the highest level of
25   IRS confirmation of a technical or legal opinion of the
```

1    issuance of a no change examination report.

2            This Court has already ruled that that is simply not

3    true.

4            MR. COOPER:  Well, he's going to testify as an

5    industry practice when you conclude an audit, what does that

6    mean, and there is no changes to the return?

7            And it's going to mean that items on there, just

8    like I said, that they report it correctly and the conduct

9    and how you are going about reporting it is correctly.  He's

10   not going to talk about what a no change means.

11           He's going to say when the audit concludes and it's

12   done with the no change, what import does that have to a

13   person's state of mind as to the items on the return and the

14   conduct they are engaging into.

15           THE COURT:  I'll let him testify to that and then

16   charge the jury that a no-change letter really doesn't mean

17   anything.

18           MR. COOPER:  Well, I don't think that the no change,

19   as far as a tax determination, meaning can you take that

20   deduction, the IRS can reverse itself, we've never disputed

21   that.

22           THE COURT:  It's not binding.  I mean, the cases are

23   legion that it is not binding on anybody about anything.

24   Isn't that right?

25           MR. COOPER:  For a tax purpose.  But we are talking

1     about penalty conduct.

2          This is -- the cases we cited to you, and I believe

3     I put them in the margins of my comments, they all say that

4     when the no change is issued, that that gives someone a

5     reasonable belief that they are engaged in the appropriate

6     conduct.  And that's exactly what Mr. Altemose is going to

7     reinforce.

8          We don't dispute Your Honor that it's not legally

9     binding as to a tax position, but this is not a tax case,

10    it's a penalty case.  There is a big difference, Your Honor.

11    I'm sorry, I mean, you said you don't do the -- you know --

12          THE COURT:  And I never will again.  I promise you.

13          MR. COOPER:  Hopefully you will, because I live

14    here.

15          THE COURT:  No, never.

16          Okay.  Your proposed amendment to my charge -- and

17    I'm not going to charge where it says, as to the validity of

18    incorrect tax treatment of the 90% tax loan, he's entitled to

19    rely on the no-change letter as a defense under the 6700

20    penalty, I'm not going to charge it.

21          MR. COOPER:  He can take it into consideration as to

22    his belief that he engaged -- was engaging in conduct --

23          THE COURT:  What does his belief have to do with my

24    properly charging the jury on the law?  I mean, you are

25    trying to get around what my charge is going to be, it sounds

1    like to me.

2            MR. COOPER:  No, I'm just trying to clarify your

3    charge.

4            THE COURT:  Who doesn't get to clarify my charge?

5    The people in Richmond get to clarify my charge.  I mean, I

6    can't let people off the street come in here and tell them

7    what the law is before I tell them what the law is.  Because

8    I've told them in the opening argument, or statement, and I'm

9    going to tell them that the law comes from me.

10           MR. COOPER:  But Mr. Altemose is not going to tell

11   them the law, he's just going to say at the conclusion of the

12   audit what would be Mr. Nagy's belief that he was engaged in

13   penalty conduct.

14           THE COURT:  I'm just sorry.  He's not going to say

15   that.  I'll look at the cases again.

16           And you know, I'm doing the best I can, I'm just not

17   going to go there.  I don't think it's proper.  I don't think

18   he can say that.  I don't think any expert can say that as to

19   what somebody's state of mind is, but I'll look at the cases,

20   like you said, I'll look at them again.  If I change my mind,

21   I'll let you know.

22           All right.  Anything else on any other matter?

23           MS. WEIS:  Yes, Your Honor.  Just one housekeeping

24   matter.

25           As Your Honor might be aware, there is a Federal

1    Statute 26 USC Section 4103, which --

2             THE COURT:  I'm sure I'm not aware of that.

3             MS. WEIS:  Well, it prohibits the IRS employees,

4    among others, from testifying or revealing information about

5    other taxpayers in a case that doesn't involve them unless

6    there are specific exceptions where that taxpayer has made a

7    waiver.

8             So because Ms. Gadsden will be asked questions about

9    Scott and Whitney Cathcart, who are not parties to this

10   action, we just want to put on the record that Mr. Cooper

11   obtained a waiver from Scott and Whitney Cathcart allowing

12   them to discuss their tax return.

13            THE COURT:  So that's -- that waiver allows her to

14   testify as to something she wouldn't be able to testify to

15   otherwise?

16            MS. WEIS:  Correct.

17            MR. CLUKEY:  Your Honor, actually, there is one

18   other housekeeping matter.  Will the Government be allowed a

19   rebuttal after the closing, as part of the closing?

20            THE COURT:  Yes.  And then the second half of the

21   case, if we get that far, then Mr. Cooper will be allowed the

22   rebuttal.

23            I mean, the burden of proof -- the rebuttal goes to

24   the burden of proof.  You have the burden of proof in this

25   half of the case.  And if we have a second half of the case,

1       then Mr. Cooper gets to open and close.

2               MR. COOPER:  I'm sorry.  I mis -- my understanding

3       is because he opened, that when we close, I go first, because

4       I thought the local rule said that the burden of proof, that

5       he opens and ends the case, and then I will be entitled to

6       rebuttal at the end.

7               THE COURT:  In this half of the case, since the

8       Government has the burden of proof, Mr. Clukey makes his

9       closing argument, you make your closing argument, and then he

10      has a rebuttal in the second half of the case, if we get

11      there.  You have the burden of proof, so you get to open, Mr.

12      Clukey gets to respond, and then you get a rebuttal.

13              MR. COOPER:  Thank you.

14              THE COURT:  The rebuttal goes with the burden of

15      proof.

16              MR. COOPER:  Thank you for that.

17              THE COURT:  Okay.  Sure.

18              Okay.  All right.  Anything else before I go look at

19      Mr. Cooper's cases?

20              MR. COOPER:  Going back to Mr. Altemose, will he be

21      able to testify as to the nature of the in-depth exam it was?

22              THE COURT:  I mean, you get -- you can ask him any

23      questions you want to, and they can object, and I'll rule on

24      them at the time.

25              I mean, I'm just -- I just said as a general matter,

1    looking at his report, most of the stuff in his report is not

2    admissible into evidence in the case.  But I mean, there may

3    be some other things that are, that's why I brought it up.  I

4    mean, I don't want to blindside you, but I'll go look at

5    those two cases again.

6              MR. CLUKEY:  Your Honor, just looking at his report,

7    we fail to understand how any of this could be relevant,

8    either.

9              In his executive summary of his report, which is on

10    page 2, he says the IRS issuance of the no change report

11    generates three potential consequences, and then it goes

12    through these consequences of what the no-change letter is,

13    is trying to backdoor the meaning of the no-change letter.

14              And he starts off with IRS procedures,

15    administrative significance of the no-change letters.  Mr.

16    Cooper proposing what he will testify about is to go to one

17    of these consequences, it's to underlie from an

18    administrative viewpoint, the highest -- from an

19    administrative viewpoint, the highest level of IRS

20    confirmation of a technical or legal opinion will be the

21    issuance of a no change examination report.  That is the

22    sentence that precedes this discussion of the significance

23    and the depth of the audit.

24              So it's simply another way to backdoor the meaning

25    and import of the no-change letter.  That's what this entire

1    report is on.  There is nothing else in this report that we

2    can see that he could possibly testify about apart from that.

3    I mean, it's elicited in his executive summary and flushed

4    out a little bit more.

5         THE COURT:  All right.  Well, I guess we'll take one

6    step at a time.  I'll go look at the cases that Mr. Cooper

7    just gave me and then we'll go from there.

8         MR. CLUKEY:  And Your Honor, we also obviously cite

9    cases in rebuttal to Mr. Cooper's cases.  We've got -- it's

10   our reply, actually, to Mr. Cooper.

11        THE COURT:  And I'll look at 704(a), too.  I don't

12   think he can do it, but I'll look at it.

13        Yeah?

14        MR. COOPER:  Just with the 704(a), I can't -- it's B

15   O U Y G U E S, that case that, the page number is with the

16   portions that are relevant, 726.

17        THE COURT:  Okay.  Thank you.  All right.

18        MR. COOPER:  Our rebuttal, Your Honor, was Docket

19   Number 84.

20        THE COURT:  I think we've got that, too.  Okay.

21        MR. CLUKEY:  Thank you, Your Honor.

22        THE COURT:  Anything else?  Yeah?

23        MR. COOPER:  Just to hand up, as I said, I provided

24   it to opposing counsel, the proffer.

25        THE COURT:  What?  Okay.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1              MR. COOPER:  The proffer.

2              THE COURT:  Okay.  Thanks.  All right.  We'll be

3      back down when the jury gets here.  Okay.  Thanks.

4              (Thereupon, there was a brief recess.)

5              THE COURT:  All right.  What's the batting order for

6      today, Mr. Cooper?

7              MR. COOPER:  Ms. Gadsden, and reading in the

8      deposition of Ms. Socks, and then Mr. Altemose.

9              THE COURT:  Okay.  We looked at the cases which you

10     cited, one is a criminal case, the one out of the Seventh

11     Circuit, and the second one is the District Court of, Eastern

12     District of North Carolina, which is Judge Flanagan, who

13     allowed some sort of opinion testimony.  But I'm going to

14     grant the Government's motion in limine for Mr. Altemose.

15             Mr. Altemose's testimony is based on the effect of

16     the no-change letter.  As I've already said, I'm going to

17     charge the jury of what the effect of a no-change letter is.

18     And so I don't know what else he's going to testify to.

19             MR. COOPER:  Well, if I understand you -- if he

20     can't talk about what import it had on Mr. Nagy, he wouldn't

21     be testifying.

22             THE COURT:  So to preserve this, you know, part of

23     my job is to make a ruling.  Sometimes I make the wrong

24     ruling.

25             Do you want to put in his report as your proffer, if

1    in fact you need to take it to the Fourth Circuit?  I mean --

2              MR. COOPER:  May I do that right now, Your Honor?

3              THE COURT:  Huh?

4              MR. COOPER:  May I do it right now?

5              THE COURT:  I was just going to say, that's fine.

6              MR. COOPER:  I believe Mr. Altemose's report -- I'm

7    objecting to your ruling.  I would like to proffer

8    Exhibit 79, which is Mr. Altemose's report.

9              THE COURT:  We will make that Court's Exhibit Number

10   1, all right?  So it doesn't go back to the jury.  And so you

11   are preserved.

12             (Thereupon, Court's Exhibit Number 1 was marked.)

13             Any objection to that?

14             MR. CLUKEY:  No objection, Your Honor.

15             THE COURT:  All right.  And so that will -- that

16   will preserve your objection.  And if I'm wrong, I'll get it

17   right next time.

18             MR. COOPER:  One other thing?

19             THE COURT:  Sure.

20             MR. COOPER:  I don't believe I heard specifically

21   whether you ruled on pages 66 to 67 of the Socks depo.

22             THE COURT:  I got sidetracked.  Do you want me to

23   see it again?

24             MS. WEIS:  Your Honor, I think it's actually up on

25   the counter.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1              MR. COOPER:  No, I borrowed it.

 2              THE COURT:  I guess -- back on the Altemose issue,

 3    as a general matter Rule 704(a) does permit an expert's

 4    opinion on the ultimate issue.  Here, Mr. Nagy wants to

 5    testify on the ultimate issue of scienter, had reason to

 6    know, given the change letter.

 7              The problem is his conclusion is based on a

 8    definition and legal import of the no-change letter that this

 9    Court has already rejected; therefore, his opinion is not

10    helpful.

11              Based on the understanding of the law that the Court

12    has already observed, in addition under a 403 analysis, the

13    probative value of his testimony is greatly outweighed by the

14    prejudice and confusion of the issues.

15              So that's the ruling.  And then you've got the

16    proffer on there.  So if I'm wrong we'll go from there, okay?

17              All right.

18              MR. COOPER:  Your Honor, one other thing, is I

19    talked to Mr. Clukey, with Ms. Gadsden, because she's an IRS

20    agent --

21              THE COURT:  Yeah.

22              MR. COOPER:  -- he's going to allow me to treat her

23    adversely, just --

24              MR. CLUKEY:  In conjunction with that, we'll still

25    be able to cross her.  Mr. Cooper agreed to that, as well.
```

```
1              THE COURT:  Okay.

2              MR. COOPER:  And by the way, with Ms. Gadsden's -- I

3    work with her on a regular basis, so it's just a technical

4    term that I get to ask her.  She's not adverse, she's a nice

5    lady.

6              THE COURT:  Okay.  Well, that depends upon your

7    point of view, okay?  Some taxpayers think she's adverse,

8    some taxpayers think she's not, all right?

9              MR. COOPER:  And Ms. Van Bavel told me I screwed up

10   the exhibit, it's 78.

11             THE COURT:  So 78 is marked as Court Exhibit Number

12   1.

13             (Thereupon, Plaintiff's Exhibit Number 78 was marked

14   as Court Exhibit Number 1.)

15             MR. COOPER:  Sorry for that mistake.

16             THE COURT:  That's no problem, that's what she's

17   here for.

18             And so Ms. Gadsden's first, and then we are going to

19   read this -- the deposition of Ms. Socks second?

20             MR. COOPER:  Yes, Your Honor.

21             THE COURT:  So let me go ahead, and while you are

22   doing Ms. Gadsden, I'm going to go ahead and read the

23   preceding pages, and then before we read that, I'll let you

24   know, okay?

25             All right.  Anything else before?
```

1          MR. CLUKEY:  No, Your Honor.

2          MR. COOPER:  I think I brought it up with Ms. Weis

3     also in the Socks testimony, it's page 26, line 8, through

4     page 27, line 6, and page 38, 19 through page 39, line 3,

5     it's a similar issue.

6          THE COURT:  Okay.  And I would say that's okay.

7          MS. WEIS:  Actually, before we received your

8     rulings, we had agreed that those were counter designations

9     that we were going to withdraw based on the motion in limine.

10         THE COURT:  Now I don't know where we are.  What

11    does that mean?  Are you going to read them or not?

12         MR. COOPER:  I was planning on not reading them.

13         THE COURT:  You agree with them not reading them?

14         MS. WEIS:  Correct.

15         THE COURT:  Okay.  Good.  Thanks.

16         Okay.  Anything else?  All right.  Now -- all right.

17    So what we need to do, then, is Ms. Gadsden, read the Socks

18    deposition, and then you rest, right?

19         MR. COOPER:  Yes, Your Honor.

20         THE COURT:  Are you going to anticipate any reply?

21         MR. CLUKEY:  We reserve our right, but we do not

22    anticipate any reply.

23         THE COURT:  What we'll do is after that, I'll let

24    the jury go have lunch, we'll go over the final charge, and

25    then we'll argue and charge this afternoon, okay?  Any

1   problem with that?

2           MR. CLUKEY:  No, Your Honor.

3           THE COURT:  I mean, I think y'all have had most 99.9

4   percent of the final charge over the weekend, so I guess I've

5   made some rulings on your objections, and I think we

6   incorporated them, and then we'll give you those, we'll argue

7   about them while they are -- and then because I've got to

8   make copies for each one of the jurors.

9           MR. COOPER:  Before we start, may I grab your

10  version of the testimony so we can use it reading --

11          THE COURT:  What version of the testimony?

12          MR. COOPER:  Ms. Socks to read in.

13          THE COURT:  Yeah.  Let me make a ruling on it -- do

14  you want to read it now?

15          MR. COOPER:  No, Your Honor.  You are right.  I'm

16  sorry.

17          THE COURT: I'm going to -- I'm going to rule on 67,

18  68, and then I'll give it to you.  I don't think you have it

19  memorized, so I'll let you read it from the deposition

20  transcript.

21          MR. COOPER:  Thank you.

22          THE COURT:  All right.  Any problem with that?  So

23  how long do you think, two hours this morning?

24          MR. COOPER:  Well, that would be a fair assessment.

25          THE COURT:  Okay.  Bring in the jury.

1              (Thereupon, the jury returned to the courtroom.)

2              THE COURT:  Okay.  Ladies and gentlemen of the jury,

3    welcome back.  I hope y'all had a nice weekend.  We are going

4    to continue with this case here this morning.

5              Based on my experience yesterday, as a recovering

6    lawyer, I'm going to give you some legal advice, never, ever,

7    ever, fly through Atlanta in the summer, okay?

8              So with that in mind, we'll start and continue with

9    the testimony in this case.

10             Yes, sir, Mr. Cooper?

11             MR. COOPER:  We call Revenue Agent Neva Gadsden.

12             THE CLERK:  Right here, Ms. Gadsden.

13             Place your left hand on the Bible and raise your

14   right hand.

15             State your name for the record.

16             THE WITNESS:  Neva Gadsden.

17   THEREUPON:

18                          MS. NEVA GADSDEN,

19   Called in these proceedings and having been first duly sworn

20   testifies as follows:

21             THE CLERK:  Thank you.  Be seated over on the

22   witness stand.

23                          DIRECT EXAMINATION

24   BY MR. COOPER:

25    Q. Good morning, Ms. Gadsden.

1          A. Good morning.

2          Q. Would you state your full name, please.

3          A. Neva A. Gadsden.

4              THE COURT:  Ms. Gadsden, would you pull that

5      microphone over closer to you and speak into it, so that

6      everybody can hear you?  Okay.

7              THE WITNESS:  Neva A. Gadsden.

8          Q. And Ms. Gadsden, where do you work?

9          A. For the IRS here in Charleston.

10         Q. And what position do you hold with the Internal Revenue

11     Service?

12         A. I'm a --

13             THE COURT:  Wait a second.  Move it a little bit

14     closer to you.  You can pull that whole thing -- the chair

15     doesn't move, but the microphone does.

16             THE WITNESS:  Is that better?

17             THE COURT:  I want to make sure everybody can hear

18     you.  Okay.  Great.

19         Q. I'm sorry.  I'll ask it again.  What position do you hold

20     at the Internal Revenue Service?

21         A. I'm a revenue agent.

22         Q. And how long have you been a revenue agent?

23         A. 22 years, since January, 1988.

24         Q. And do you hold any licenses or certifications?

25         A. I'm a CPA licensed in South Carolina.

GADSDEN - DIRECT

1     Q. And when did you get your CPA license from South

2     Carolina?

3     A. January 1991.

4     Q. And in order to keep that license, you have to do

5     continuing education on tax and accounting issues?

6     A. Yes, um, actually, there was a period of time since I

7     worked with the Government that I didn't have to do CPA, but

8     now I do.

9     Q. And do you still hold that license today?

10    A. Yes.

11    Q. And then can you explain to the jury that, as an IRS

12    revenue agent, what you do?

13    A. I audit tax returns.

14    Q. Well, we use that word a lot.  Can you tell them what an

15    audit is?

16    A. It depends on if it's an individual 1040, a corporate

17    return, a partnership return.  The taxpayers, on their

18    returns, sign their audit.  We generally tell them what

19    issues appear to be the -- are the ones that we want to

20    address on the returns, schedule an appointment and meet with

21    the taxpayer, interview them.

22          If it's a business return, we find out about how --

23    what their business is, how they keep their books and

24    records, because that way our job will be a little bit

25    easier, so that we understand what they are doing.  And we

GADSDEN - DIRECT

1    look at their books and records and try to decide if the

2    return is correct.

3    Q. And when you look at the return, are you trying to decide

4    if the income is reported correctly?

5    A. Right.  The income is properly recorded and that expenses

6    that are on the return are allowed as deductions.

7    Q. So you also look at the expense and deduction side, too,

8    of your return?

9    A. Um-hum.  Yes.

10   Q. Thank you.

11         And then you mentioned during the initial meeting

12   you want to learn, if it's a business, you want to learn

13   about the business.  Why would you want to learn about the

14   taxpayer's business?

15   A. Well, it helps us understand how they record

16   transactions, what their sources of income are, how they

17   determine whether the income is -- when it's earned, what to

18   keep in their accounting records, the flow of transactions.

19   It helps us evaluate internal control, and the controller of

20   the income as it comes in, or the assets of the business, and

21   it's interesting, too.

22   Q. And as part of an audit, too, are you trying to determine

23   whether any penalties would be appropriate?

24   A. Yes.  Um, if -- generally the penalties that I assess as

25   a revenue agent are based on tax law, if there is an increase

GADSDEN - DIRECT

1   in tax or a tax liability.  So yes, we are evaluating whether

2   penalties, taxpayer penalties are applicable.

3   Q. And do you know Mr. Nagy?

4   A. Yes.

5   Q. And do you know him from the audit that you did of

6   Derivium and Scott Cathcart?

7   A. Yes.  I think that's the only case I ever worked with Mr.

8   Nagy, I think.

9   Q. And what was Mr. Nagy's role in the audits of Derivium

10   and Mr. Cathcart?

11   A. He was their representative.  He's the -- actually, he

12   stood as their representative, as their taxpayer.

13   Q. And when you say "a representative," we have been using

14   the word power of attorney.

15   A. Um-hum.

16   Q. Are those interchangeable?

17   A. We usually call them power of attorneys, yes, because

18   they give them power of attorneys, you act on taxpayers'

19   behalf in regards to the audit.

20   Q. And you received power of attorney forms from Mr. Nagy so

21   he could represent his taxpayers?

22   A. Yes.

23   Q. And like you said, through the audits of Derivium and Mr.

24   Cathcart, did you communicate information through Mr. Nagy?

25   A. Well, yes.  If I was sending letters and stuff, I would

GADSDEN - DIRECT

1    send a letter to the taxpayer and to Mr. Nagy.

2     Q. Because the representative gets copied on all the

3    correspondence, correct?

4     A. Correct.  But if I was making phone calls, I wouldn't

5    call the taxpayer and Mr. Nagy, I would call Mr. Nagy.

6     Q. And Mr. Nagy, he also communicated information to you

7    that his client provided him?

8     A. Yes.  That's how it's represented to me.

9     Q. And during an audit, I'm going to show you what's been

10   premarked as Nagy Exhibit Number 4.  Is this your activity

11   record?

12    A. Yes.

13    Q. I should say redacted version of your activity record?

14    A. Um, yes.  This is an -- even though I don't have the

15   taxpayer's name, I'm assuming it's for the Derivium audit.

16    Q. Okay.  Because you said that was the only case you ever

17   worked with Mr. Nagy?

18    A. Yes.

19         And then also -- well, there is other -- I've got a

20   little number up here that tells me what case file number it

21   is in our computer program, and that's a 1065, so that's the

22   type of return.  So it's a partnership return.

23    Q. And the un -- did you keep this -- is this part of a

24   document you generate as part of being a revenue agent?

25    A. Yes.  Yes.  We record all -- we date -- there is little

GADSDEN - DIRECT

1    codes here, there is a date.  And any kind of significant

2    activity on the case, any work that we do, contacts that we

3    make, are recorded on the activity record.

4    Q. And do you keep this document in the ordinary course of

5    conducting your duties as an IRS agent?

6    A. Yes.

7    Q. Okay.  And then if you flip through here, the unredacted

8    versions, do they indicate times when either you communicated

9    to Mr. Nagy or Mr. Nagy communicated to you?

10   A. Well, this one -- you are saying would I normally do?

11   Q. No, I'm talking about the actual entries in Exhibit 4.

12   Do those notes reflect when either you communicated to Mr.

13   Nagy or Mr. Nagy communicated to you?

14   A. Yes.  What I can see, without reading every page, but it

15   looks like, yeah, these are phone calls for Nagy.

16           MS. WEIS:  Objection, Your Honor.  The exhibit is

17   not yet in evidence.

18           THE COURT:  Okay.

19           MR. COOPER:  I would move it into evidence.

20           THE COURT:  Any objection?

21           MS. WEIS:  Yes, we have an objection.  Your previous

22   motion in limine ruling as to what was and was not

23   communicated to Mr. Nagy.

24           THE COURT:  Okay.  I'll sustain the objection for

25   the time being, but she can use it to refresh her

GADSDEN - DIRECT

1    recollection as to any contact that she had with Mr. Nagy and

2    Mr. Nagy to her, okay?

3            MR. COOPER:  Okay.  Let me take that back.

4    Q. And then you had also mentioned at the beginning of your

5    audit that you have an initial meeting with the taxpayer; is

6    that correct?

7    A. Yes.  We call it an initial interview.

8    Q. And did you have an initial interview with Mr. Nagy

9    during the Derivium exam?

10   A. Yes.

11   Q. And do you recall if that initial interview was on

12   December 4th?

13   A. No, not really.

14   Q. Would your activities transcript help you refresh your

15   recollection?

16   A. Oh, um, well, I believe -- I believe the December

17   meeting -- when Mr. Nagy and I first talked, um, I faxed him

18   a copy of our -- my initial information document request.

19   Q. Right.

20           And let me show you Exhibit Number 1.  Is this the

21   initial information document request you sent to Mr. Nagy?

22   A. Yes.  I faxed that to him and then I think he and I met

23   on the 4th and actually talked about the information document

24   request and what was relevant or, you know, what -- like,

25   this was kind of a standard one that went out to a business

GADSDEN - DIRECT

1    return.  And there is things in here that we just discussed

2    what they have, what they didn't have, what was relevant for

3    Derivium.

4            Like just as an example, I've got -- number 16 lists

5    beginning and ending accounts payable and accounts

6    receivable.  I think Derivium was on a cash basis, so that

7    may not have been relevant.

8    Q. So before your meeting with Mr. Nagy on December 4th, you

9    faxed the IDR to him beforehand?

10   A. Um-hum.  And then we talked on the 4th and he told me

11   what they had and what they didn't have.

12   Q. And then on the 4th, do you recall if you took notes

13   during that meeting?

14   A. I don't think so because I think we were just going over

15   the information document request.  I really don't think I

16   took any notes.  I may have taken notes on my copy, just so

17   that I would know, you know, when we did have our initial

18   interview that those documents weren't relevant, or that that

19   item on the document request didn't fit Derivium.

20   Q. So when you had the initial interview, did you have a

21   more in-depth discussion about the business of Derivium?

22   A. Yes.

23   Q. And during the initial interview, do you recall if you

24   took handwritten notes during that interview?

25   A. Yes, I did.

GADSDEN - DIRECT

1    Q. And I'll hand you what has been marked as Nagy's Exhibit

2    Number 5, and they're Bates marked U.S. 15 at the bottom --

3    A. Um-hum.

4    Q. -- through 28.  And in the back, there is a type written

5    form in the document.

6         Does that form reflect the questions that you would

7    have asked Mr. Nagy during the initial interview?

8    A. Yes.

9    Q. And the handwritten notes before the form, are those the

10   answers that Mr. Nagy communicated to you during your

11   interview?

12   A. Yes.

13   Q. And did you take these notes in the ordinary course of

14   being a revenue agent?

15   A. Yes.

16   Q. And did you keep them in your audit file as part of your

17   practice?

18   A. Yes.

19        MR. COOPER:  Your Honor, I would like to move this

20   in as reflective of what Mr. Nagy communicated to Ms.

21   Gadsden.

22        MS. WEIS:  Your Honor, we have the same objection.

23   This particular document falls within the motion in limine

24   ruling.

25        THE COURT:  Let me see it.

GADSDEN - DIRECT

1        MS. WEIS:  Your Honor, we believe that these notes
2    would be the same sorts of thing as an attorney taking notes
3    in context of a witness.  It's reflecting what they are
4    interpreting, not necessarily what all the books say.
5        THE COURT:  She can clearly say what Mr. Nagy told
6    her.
7        MS. WEIS:  Of course.
8        THE COURT:  And she can clearly say what she told
9    Mr. Nagy.
10        MS. WEIS:  Correct.  We object to offering that
11    exhibit into evidence.  We don't have any objection to
12    switching to the prior exhibit used to refresh her
13    recollection as to what she was communicating.
14        MR. COOPER:  She just testified that that was what
15    Mr. Nagy communicated to her.
16        THE COURT:  The last three pages of the form is what
17    you focus your question on.  I don't know whether it was all
18    of these notes.
19        MR. COOPER:  Well, if I can clarify?
20        THE COURT:  Sure.  That's fine.
21    Q. The firsthand written notes before you get to the
22    typewritten form, those are the notes that you took of what
23    Mr. Nagy communicated to you in response to questions,
24    correct?
25    A. Yes.  Yes.

GADSDEN - DIRECT

1          THE COURT:  Go ahead.

2          THE WITNESS:  They are not word for word, I guess,

3    is that what -- you know, it's not -- I can only write so

4    fast.  And so as people tell me things, you know, there is

5    missed spellings and abbreviations and things in there, as

6    well, so it's not verbatim.

7          THE COURT:  Okay.  Go ahead and ask her what she

8    told him and he told her.  She can use her notes to refresh

9    her recollection.  I'll think about whether you can put them

10   all into evidence.  And I'm not saying it's not coming in,

11   I'm not saying it is coming in, I need to listen to it.

12         MR. COOPER:  May I remain a copy with her?

13         THE COURT:  Sure.

14   Q. And these notes, again, reflect what you discussed with

15   Mr. Nagy about the business of Derivium, correct?

16   A. Yes.

17   Q. And then if you turn the page to U.S. 16.

18         MS. WEIS:  Objection, Your Honor.  The document is

19   not in evidence.  He hasn't established that she has a need

20   to refresh at this point.

21         THE COURT:  I am not going to ask you to go through

22   that dance and ask her if she remembers five years ago every

23   time he wants to ask her a question, all right?

24         So overruled.

25   Q. And if you look at the first part of its addenda, does

GADSDEN - DIRECT

1     that help you recall if Mr. Nagy told you that Derivium made

2     its money from marketing and administering loans?

3      A. Yes.

4      Q. And then right below that, did Mr. Nagy start to discuss

5     to you the mechanics of the stock loan transaction, um,

6     meaning the borrow of transferred stock to Derivium that held

7     the stock as collateral for the loan?  Did Mr. Nagy tell you

8     that?

9      A. Yes.  This is, um, I'm trying to capture what he's

10    telling me in these notes.

11     Q. Okay.  And he also told you that that worked with one

12    lender?

13     A. Correct.

14     Q. And if you look down farther, to help you with the little

15    slashes, did he tell you the dividends were applied against

16    the interest that accrued on the loans?

17     A. Yes.

18     Q. And did he also tell you that there was -- it was a

19    nonrecourse loan during this interview?

20     A. Correct.

21     Q. And he also told you that it was Derivium's position that

22    there was a no capital gains for the loan transaction?

23     A. That's what he told me, correct.

24     Q. And he also told you that Derivium operated nationwide in

25    marking and administering these loans?

GADSDEN - DIRECT

1    A. They operated nationwide.  And I didn't understand what

2    you said at the end.

3    Q. They operated nationwide with respect to their business?

4    A. Correct.

5    Q. And then if you flip back to U.S. 20.

6         And again, y'all started discussing the stock loan

7    transactions, right?

8    A. Yes.

9    Q. And Mr. Nagy told you that the lender turned around and

10   loaned the money within two or three days?

11   A. This is what -- yes.  This is what he told me.  There is

12   a two- to three-day turnaround time.

13   Q. And he also told you that the loans were noncallable and

14   nonprepayable during the interview?

15   A. That's what he said.

16   Q. And he also explained to you that at the end of the

17   transaction, there were three things that the borrower could

18   do, that he could pay off the loan and get the stock back,

19   default, and the borrower would incur a capital gain, or they

20   can renew the loan?

21   A. Correct.  That's what I have written down that he told

22   me.

23   Q. And then if you go down from there, he also told you --

24        THE COURT:  Mr. Cooper, Ms. Weis, come over here,

25   please.

GADSDEN - DIRECT

1          (Thereupon, there was a brief off-the-record
2     discussion.)
3          THE COURT:  Nagy 5 in evidence.
4          (Thereupon, Plaintiff's Exhibit Number 5 was
5     received in evidence.)
6     Q. So when we were just discussing your notes, when I asked
7     you about the three options for the client, that would have
8     been what this note reflected right there at the maturity?
9     A. Correct.  That's what he was telling me.
10    Q. And did he also tell you that it was his belief that the
11    lender didn't have to file 1099s with the IRS?
12    A. Yes.  Correct.
13    Q. And he also told you below there that Derivium, instead
14    of 1099s, issued statements to clients reflecting the
15    dividend on them?
16    A. Yes.
17    Q. And down here again, he tells you that it is -- there is
18    no gain on the transaction because it's a loan?
19    A. He said it's not a sale, it's a loan transaction.
20    Q. Right.  So this would have been a second time he told you
21    that that we've gone over?
22    A. Correct.
23    Q. And also during the interview, he disclosed to you that
24    the lender in 1998 was Diversified Design?
25    A. Yes.  I'll do my best on that one.  I'm sorry.

GADSDEN - DIRECT

1    Q. And then in 2002 during this meeting, that the lender was

2    Bancroft Ventures Ltd.?

3    A. Correct.

4    Q. And he told you that Bancroft was on the Isle of Man?

5    A. Correct.

6    Q. And then you also asked him questions about related

7    returns.  What's a related return?

8    A. Um, this was a partnership return, so the partners'

9    returns would be related returns.  And then if there is

10   interest with common holdings, they, you know, the same three

11   people had interest in other entities, those are related

12   returns, as well, or potential related entities.

13   Q. So Mr. Nagy down here told you that Alert Holdings was a

14   related return?

15   A. Yes.

16   Q. And actually wasn't that a predecessor to Shenandoah?

17   A. I don't know.

18   Q. And he also discussed the Charleston Construction being a

19   related return?

20   A. Well, in here -- well, right now to even understand what

21   I was drawing -- I think I was trying to capture that Alert

22   Holdings had the, um, the three partners of this LLC, or

23   members, or members of Alert Holdings, but also Charleston

24   Construction and three C's were in that.

25            But again, you know, this is what I'm trying to

GADSDEN - DIRECT

1    capture with this little drawing, and I don't think I did a

2    very good job.

3       Q. Okay.  Like you said, people talk fast and you do the

4    best you can to take notes?  I'm sorry.  You have to answer,

5    Ms. Gadsden.

6       A. Yes.

7       Q. Thank you.

8             And then again, I believe here the DDA account, he's

9    the -- are y'all discussing how the loan transactions are

10   recorded to the borrower -- to the lender?

11      A. No, I think we are discussing how they were recorded on

12   Derivium's books.

13      Q. Okay.  So Derivium's reporting what's owed the lender?

14      A. Well, what -- Derivium got this stock.  I think this is

15   how Derivium records getting the stock on their books.

16            And then let's see, because the first entry is a

17   debit to cash, which cash goes into the bank, and the credit

18   to the broker account.  And this is money coming from DDA to

19   Derivium.  And then they would make another entry to debit

20   the stock loans and credit the cash, and when Derivium was

21   first to the borrower.

22      Q. Okay.  I -- so I guess my takeaway from your answer was,

23   they were recording the stock loans on Derivium's books?

24      A. Yes.  That's -- this is how it was represented to me.

25      Q. And you had mentioned brokerage accounts.  Were you aware

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1   that the stock was being sold in brokerage accounts?

2    A. At some point, yes.  Um, I think earlier -- that earlier

3   page you referenced.

4    Q. Yes, ma'am.  This one?

5    A. No, that was right -- it was at the beginning of my

6   notes.  On this page.

7    Q. Yes, ma'am.

8    A. Well -- the broker's stock -- borrower's stock, rather,

9   is transferred to Derivium, who holds as collateral on the

10  right.  So it was -- the borrower's stock was transferred to

11  Derivium, who holds as collateral on behalf of the lender.

12  They work with one lender who is not related to Derivium.

13         And there were -- these were not mortgages, they

14  were unsecured loans, or they were not mortgages or unsecured

15  loans.

16   Q. And I guess my question was, is from your discussions,

17  did you understand that Derivium accounted for these loans on

18  its books?

19   A. I was getting the impression that Derivium was more a

20  conduit, you know, the money came into and out of Derivium.

21  I really don't remember who recorded the loans.  I don't

22  recall that.

23   Q. But I guess you were talking about credits and debits.

24  And would those be entries in Derivium's books?

25   A. Right.

GADSDEN - DIRECT

1           And I think in my notes it says the money, that

2   there was money going in and out of Derivium from DDA, then

3   to the borrowers, and Derivium got a percentage.

4           And this is all I think, you know, what Mr. Nagy was

5   telling me, Derivium earned its income as a percentage of

6   diverse loans that they facilitated --

7   Q. Yes, ma'am.

8   A. -- and DDA and Derivium sold at the end of the year.

9   Q. Okay.  And then going back to U.S. 22, you took some

10  additional notes on the stock loan transaction, that the

11  client could borrow up to 90 percent of the stock loan?

12  A. Yes.

13  Q. And down here at the bottom, not forgiveness of debt.

14          Do you recall discussing the tax treatment upon a

15  customer's default?

16  A. And this I was telling -- writing down what Mr. Nagy was

17  telling me, that this was not forgiveness of debt.  I can't

18  read the other things.  Again, I'm writing fast with a

19  pencil.  So sometimes -- I had what he wrote for POA is

20  shorthand for power of attorney.

21  Q. And did -- during the initial interview, did Mr. Nagy

22  answer all the questions that you asked?

23  A. Yes.

24  Q. And you were talking about debiting and crediting.  This

25  has been introduced as Exhibit Number 7.

GADSDEN - DIRECT

1          THE CLERK:  What was the number?

2          MR. COOPER:  7.

3     Q. Do you recall if this -- you see at the top up here it

4     says "Due to DDA."  Do you recall Mr. Nagy giving you the

5     financials of the company so you could look at the due to DDA

6     issues?

7     A. I got books and records of Derivium, yes.  Well actually,

8     they were computer and electronic format.

9     Q. Right.

10          And Mr. Nagy actually set up a work station for you

11    at his office?

12    A. Correct.

13    Q. And I believe you testified you spent a couple of days at

14    his office going over books and records?

15    A. I think I was there two days.  Well, yes, I was there two

16    days.  Part of the day was spent talking to Mr. Nagy and then

17    I think another day part of that day we were actually walking

18    around Derivium's office.

19    Q. Oh, so they took you to 1 Poston Road and showed you

20    around?

21    A. Um-hum.

22    Q. Right.

23          And I think I mentioned this earlier, the IRS office

24    is now located at 1 Poston Road, isn't it?

25    A. Correct.

GADSDEN - DIRECT

1    Q. And when you went to his office, you said he gave you the

2    books and records on a diskette.  What does that mean?

3    A. They were electronic, it was a little disk, and he had a

4    terminal set up of, you know, a work station kind of terminal

5    that I could flip through and look at pages.  And I think I

6    could print out pages as I needed them.  It was -- you know,

7    it wasn't a paper thing.  I don't think I got paper books and

8    records.

9    Q. So when you say "terminal," do you mean a computer?

10   A. Yeah.  Like a -- well, I think it was like a dumb

11   terminal.  All I could do is put in the disk and bring it

12   out.  I couldn't access anything else.

13   Q. You couldn't access his file?

14   A. No.

15   Q. It was a stand-alone computer, is what you are saying?

16   A. Yes.

17   Q. He gave you the books and records on a CD and you had the

18   ability to print those if you wanted?

19   A. Yes.  Um, it was quite voluminous.  There were a lot of

20   pages in there, so a lot of stuff I would have on screen, I

21   think, or -- and just printed out pages and -- a number of

22   papers.

23   Q. And was there anything with regard to the books and

24   records that you asked for that wasn't provided to you by Mr.

25   Nagy?

GADSDEN - DIRECT

1    A. No.  I think he -- um, if I asked for something, then he

2    gave it to me.

3    Q. And would you say that during the audit that Mr. Nagy

4    cooperated with you?

5    A. Um-hum.  Yes.

6    Q. And in fact, I think it was described as being very

7    cooperative?

8    A. Yes.  He was very professional, very cooperative.

9    Q. Now, because of the initial interview -- oh, and on the

10   general ledger where it says "broker activity," you see J.C.

11   Bradford.  Do you understand J.C. Bradford to be a brokerage

12   house?

13   A. In relation to Derivium, or just general?

14   Q. Just in general?

15   A. Yes.

16   Q. And more specifically, did you understand that J.C.

17   Bradford appeared on Derivium's books and records?

18   A. Now I don't remember.

19   Q. Now, besides asking Mr. Nagy for information, does the

20   IRS have summons authority?

21   A. Yes.

22   Q. So a summons is an administrative document that requires

23   people to either turn over records or provide testimony?

24   A. Yes.

25   Q. And you can also issue that summons out to third parties

967

GADSDEN - DIRECT

1     to get information, too?

2      A. Yes.

3      Q. So with the brokerage houses, a summons could be issued

4     to the brokerage houses for their records?

5      A. Yes.  Um, as a -- we generally try to get things directly

6     from the taxpayer.  Because a summons is, um, it -- it's kind

7     of a last resort way to get records.  And I don't want to say

8     last resort, but the taxpayer is unwilling or unable to

9     provide records and read them to make a determination, and

10    then we'll issue a summons.  We have issued summons where the

11    records exist, the taxpayer can't afford to get them, to go

12    to the bank and have copies of their bank statements made, so

13    we'll issue a summons to get that information.

14     Q. And that was my question, because Derivium was willing

15    and they were able to produce the records, you didn't have to

16    resort to any other sources to get information?

17     A. Correct.

18     Q. And during the initial interview, Mr. Nagy made you aware

19    of the loan transaction, correct?

20     A. How Derivium derived this income, was facilitating the

21    loans?

22     Q. Yes, ma'am.

23     A. Correct.

24     Q. And --

25              THE CLERK:  What's that document?

GADSDEN - DIRECT

1    MR. COOPER:  Yes, ma'am.  It's the second page of

2    Exhibit Number 1.

3    THE CLERK:  Okay.

4    Q. And what's this document?

5    A. This is an information document request.

6    Q. And was this request more specific to the loan

7    transaction?

8    A. Yes.

9    Q. And did Mr. Nagy respond to your IDR?

10   A. Yes.  And there is probably a due date at the bottom on

11   how to respond, so I had checked -- we hadn't planned

12   appointments.  I don't know whether he was supposed to mail

13   it in or whether I was going to pick it up.

14   Q. Okay.  And Exhibit Number 12 that's already into

15   evidence, is this Mr. Nagy's response to your second IDR?

16   A. Yes.

17   Q. And I'm going to hand you what is Exhibit Number 8, which

18   is U.S. 62 through 69.  And did Mr. Nagy provide you the

19   stock loan agreement that you asked for?

20   A. Yes.  This was the Master Agreement.  I think it's --

21   it's a sample.

22   Q. And also in the IDR, didn't you ask for a copy of the

23   contract between the lender and Mr. Nagy?

24   A. Well, if you put the IDR back up there, I'll put that in

25   again.

GADSDEN - DIRECT

1    Q. I believe it's point number two.

2    A. A copy of the contract with the lender that specifies the

3    duties of the taxpayer and how compensation is determined and

4    paid, and then how they determine what their 1998

5    compensation was for the Tax Code.

6    Q. And do you recall if Mr. Nagy provided you with a copy of

7    that contract?

8    A. Well, in the cover letter you just had up there, it was

9    either to --

10   Q. Then I'm going to show you what is U.S. 55 through 61.

11   A. Do you want this one back?

12   Q. And it is a portion of Exhibit 86, which is the IRS audit

13   file.

14        Ms. Gadsden, does this look like a copy of the

15   contract between Diversified Design Associates and First

16   Security Capital?

17   A. As of January 1, 1998, the two parties are Diversified

18   Design and First Security.

19   Q. And from the Bates numbers, was this a document provided

20   to you in response to number 2 that was kept in your audit

21   file?

22   A. I'm sorry?

23   Q. Was this contract a document that was provided to you by

24   Mr. Nagy in response to question number 2?

25   A. It appears so.  I really -- if this is what he's

GADSDEN - DIRECT

1    referencing in his letter, then he gave it to me.

2    Q. And did you keep that document as part of your audit

3    file?

4    A. Yes.

5    Q. Did you keep it as part of your ordinary course of

6    business?

7    A. In my audit file?

8    Q. Yes, ma'am.

9    A. Yes.

10           MR. COOPER:  Your Honor, I would like to move in

11   pages 55 through 61 of Exhibit 86.

12           MS. WEIS:  Can we just get a copy of what --

13   Exhibit 86 is quite a few.

14           THE COURT:  Right.

15           MR. COOPER:  It's U.S. 55.

16           MS. WEIS:  Your Honor, can we request a side bar to

17   discuss this exhibit?

18           THE COURT:  Okay.  Y'all can stand up and stretch if

19   you want to.

20           (Thereupon, there was a brief off-the-record

21   discussion.)

22           (In open court:)

23           THE COURT: Okay.  All right.  I'll overrule your

24   objection.  You can -- let's mark it as a separate exhibit as

25   an apart from the part of the huge exhibit.  So it's the next

GADSDEN - DIRECT

1    one.

2          MR. COOPER:  I believe it's 101.

3          THE CLERK:  101.

4          THE COURT:  Plaintiff's 101 into evidence, subject

5    to the Government's objection, which we can discuss and put

6    on the record.

7          (Thereupon, Plaintiff's Exhibit Number 101 was

8    received in evidence.)

9    Q. And we were talking about the contract between First

10   Security Capital and DDA before we broke.  Do you recall

11   that?

12   A. Yes.

13   Q. And those handwritten notes at the top, those are your

14   reports indicated as part of your audit file?

15   A. Correct.

16   Q. And was this a document that was provided to you in

17   response to your request number 2 in the IDR for a contract,

18   correct?

19   A. As best as I can remember, yes.

20   Q. And you wanted the contract to ensure that their

21   percentage of management fee, what that was that was shown on

22   the contract?

23   A. Correct.

24   Q. Right.

25          And in fact, at the end of the audit, didn't the

GADSDEN - DIRECT

1    income reported by Derivium match the percentage that was

2    called for in the contract?

3       A. Without looking at my case file -- and yes, I remember

4    doing a computation, or Bob provided a computation, to verify

5    that Derivium's income was correct as recorded.

6       Q. And again, in response to IDR number 2, did Mr. Nagy

7    provide anything you asked for?

8       A. As best as I can recall, yes.  I didn't have to issue

9    another IDR.

10      Q. And then at some point other agents got involved in the

11   audit?

12      A. Yes.

13      Q. Can you tell the jury who they were?

14      A. Mary Socks, who was a financial products specialist, and

15   the other was Frank Guida, who was an international agent.

16      Q. And Ms. Socks, um, what's your understanding of a

17   financial products specialist?

18      A. There was a mention of hedging transactions which I don't

19   understand, and that's the kind of work that she did.  So

20   that's why he made a referral for a financial products

21   specialist to do what they -- she needed to do in regards to

22   the hedging transactions.

23      Q. And when you say specialty, what's your understanding of

24   what their specialty is, financial products specialist?

25      A. I -- well, I really don't understand what hedging

GADSDEN - DIRECT

1   transactions are, um, so their job is to evaluate the -- what

2   the document -- what the taxpayer provides to see if they are

3   doing them correctly or reporting their income correctly.

4   And that's --

5   Q. What about assist with the loan versus sale issue?

6          MS. WEIS:  Objection, Your Honor, foundation.

7          THE COURT:  Overruled.

8          THE WITNESS:  I'm sorry?

9   Q. What about -- was Ms. Socks to assist with the loan

10  versus sale issue?

11  A. I think originally what I recall -- well, I don't

12  remember -- I don't have my referral with me, um, what my

13  manager -- and I think that we needed to make a referral

14  because --

15         MS. WEIS:  Objection, Your Honor.  Motion in limine.

16         THE COURT:  Okay.  I'll sustain that.

17         Why don't you lay a foundation for that question?

18  Q. Let me show you page 3, which is the mis -- what's this

19  document?

20  A. Well, um, since it says at the top FP001, and it's an

21  information document request, it appears to be Mary Socks's,

22  or the financial products person's, information document

23  request.

24  Q. And that's her name at the bottom?

25  A. Um-hum.

GADSDEN - DIRECT

1    Q. Now, what's the subject matter of the IDR?

2    A. Loans and hedging activities.

3    Q. Does that help you recall whether Ms. Socks was brought

4    in to assist with the loan versus sale issue?

5    A. Again, I don't have the referral, so --

6    Q. Did you think a loan versus sale issue was something you

7    could resolve independently?

8    A. No.

9    Q. And that's why you sought the help of the financial

10   products specialist, correct?

11   A. Yes, because it was a transaction that we didn't know

12   whether it was an appropriate transaction.

13   Q. And in fact, it was your belief that the loan versus sale

14   issue --

15        MS. WEIS:  Objection, Your Honor.

16        THE COURT:  You would have to rephrase that

17   question.  I mean, she -- she already said she doesn't know.

18   I mean --

19   Q. Did you -- Ms. Socks's IDR, did you review this before it

20   was sent out?

21        MS. WEIS:  Objection, Your Honor.  Motion in limine.

22        THE COURT:  Overruled.  She can answer that yes or

23   no.

24        THE WITNESS:  I don't think so.  I think Mary sent

25   me a copy after it was sent to Mr. Nagy.

GADSDEN - DIRECT

1    Q. And did this IDR ask specific questions about the hedging

2    transactions?

3    A. I put what she sent me in my case file.  I don't know if

4    I really looked at it that hard to see what she was asking

5    for, but Mr. Nagy was responding directly to her and not

6    through me.

7    Q. Were you ever privy to any communications where Ms. Socks

8    said to Mr. Nagy he wasn't cooperating?

9    A. No.  I don't understand what you -- what you mean by

10   privy, can you --

11   Q. Did you participate in any conversations where Ms. Socks

12   told Mr. Nagy he wasn't cooperative?

13   A. No, I don't think so.  I don't think we had any

14   conference calls with me, Mary and Mr. Nagy, and I don't

15   recall them.

16   Q. And do you recall any part of any conversations with Mr.

17   Nagy where Ms. Socks said that Mr. Nagy didn't provide all

18   the information requested?

19            THE COURT:  I mean, she already said she didn't have

20   any three-way conversations, and so that question is asked

21   and answered.  So I'll sustain the objection.

22   Q. Was it your understanding that Mr. Nagy was cooperative

23   with Ms. Socks's requests?

24            MS. WEIS:  Objection, Your Honor, foundation.

25            THE COURT:  Sustained.

GADSDEN - DIRECT

1    Q. To your knowledge, um -- and then what's an international

2    examiner?

3    A. There's -- this is my understanding.  There is treatise

4    between the United States and other countries about tax

5    matters and transactions.  And the international agents --

6    there is some type of international component -- we can

7    request their assistance to see if it's within the realms of

8    those treatise.

9         And because there was a foreign lender, um, we made

10   a referral for an international agent to evaluate something

11   called permanent establishment, which again, that's another

12   term that I don't understand, but it had something to do with

13   the fact that there was an international component.

14   Q. And again, you were able to make the referral for the

15   international examiner because Mr. Nagy disclosed to you the

16   existence of the international lender, correct?

17   A. Right.  He told me that the international -- that the DDA

18   was a foreign entity and there was no relationship or common

19   ownership between DDA and Derivium.

20   Q. And you were able to make the referral to the financial

21   products specialist because Mr. Nagy described to you the

22   stock loan transaction?

23   A. Correct.

24   Q. And in fact, because Mr. Nagy told you in the initial

25   interview you were able to identify the loan versus sale

GADSDEN - DIRECT

1    issue quickly in the examination, right?

2          MS. WEIS:  Objection.

3          THE COURT:  You are not --

4          MS. WEIS:  Sorry, Your Honor.

5          THE COURT:  -- talking very loud, okay?

6          MS. WEIS:  An attempt not to speak quickly.

7          THE COURT:  I'm getting old and I can't hear you

8    very well.

9          MS. WEIS:  Objection, 602.  Already covered the loan

10   versus sale issue.

11         THE COURT:  Unless you lay a foundation for that

12   issue, which I don't think you've laid that, I'll sustain the

13   objection.

14   Q. Mr. Nagy, in the initial interview, disclosed the stock

15   loan transaction to you, right?

16   A. He disclosed how Derivium arrived at its income and

17   facilitating the loan and that 90 percent of the loans that

18   are facilitated.

19   Q. But he also told you the borrower transfers the stock?

20   A. Right.  That's what I have in my notes, the borrowers

21   transfers its stock to Derivium.

22   Q. And he also told you the loan turnaround time was two to

23   three days?

24   A. Right.  Yes.

25   Q. He also told you the lender engaged in hedging

GADSDEN - DIRECT

1    transactions, right?

2      A. I'm not sure if the lender did or Derivium did.

3      Q. But he told you they engaged in a hedging transaction?

4      A. Right.

5      Q. He told you it was a nonrecourse loan?

6      A. Yes, it is.

7      Q. He told you the stock was the collateral?

8      A. Yes.

9      Q. And from those communications to you, did that allow you

10   to identify the loan versus sale issue early in your

11   examination?

12           MS. WEIS:  Objection, Your Honor, 602.

13           THE COURT:  I'll sustain that objection.

14     Q. Now, at the conclusion of the Derivium audit, did you

15   issue a no-change letter, or recommend a no-change letter?

16     A. Yes.

17     Q. And from your recommendation, the area director sent out

18   the no-change letter, correct?

19     A. Correct.

20     Q. And does the no-change letter signify the conclusion of

21   the audit of Derivium?

22     A. Yes.  We were done.

23     Q. That's all I'm asking.

24     A. Okay.  Yes.

25     Q. And the no-change letter means you made no --

GADSDEN - DIRECT

1          MS. WEIS:  Objection.

2          THE COURT:  Sustained.  Better rephrase that

3 question.

4   Q. Because the no-change letter was issued, there was no

5 change to Derivium's income?

6   A. Correct.

7   Q. Likewise, there was no change to its expenses?

8   A. Correct.

9   Q. And in fact, there was no penalties asserted at the

10 conclusion of the audit, correct?

11   A. That's right, for the type of -- generally, the penalties

12 that I -- well, that I recommend, I get my manager's

13 approval.  There was no deficiency, there was no penalty.

14   Q. And during the course of the audit, did you ever

15 communicate to Mr. Nagy that he was engaging in conduct that

16 would be subject to a penalty?

17          MS. WEIS:  Objection, Your Honor.

18          THE COURT:  I'll sustain that because -- you need to

19 rephrase the question because you said, "he engaged in".  So

20 I mean, with no allegation he engaged in any conduct in this

21 audit.

22          MR. COOPER: That's what I'm trying to establish.

23          THE COURT:  Well, ask the question again.

24   Q. During the course of the audit, did you tell Mr. Nagy

25 that Derivium was promoting a tax shelter?

GADSDEN - DIRECT

1    A. No.

2    Q. During the course of the audit, did you tell Mr. Nagy

3    that he was promoting a tax shelter?

4         MS. WEIS:  Objection, Your Honor, 403.

5         THE COURT:  I'll sustain that objection.  This is a

6    de novo hearing and that's what the jury issue is.

7    Q. Did you communicate to Mr. Nagy any concerns that

8    Derivium would be subject to promoter penalties?

9         MS. WEIS:  Objection, Your Honor, per your motion in

10   limine.

11        THE COURT:  Sustained.

12        MS. WEIS:  Thank you.

13        MR. COOPER:  I mean --

14        THE CLERK:  What number is that?

15        THE COURT:  You are going on to another issue?

16        MR. COOPER:  Yeah, I mean --

17        THE COURT:  Calm down, okay?  We are getting ready

18   to take the morning break, because Amy is tired, and we'll

19   talk about what we talked about while the jury is relaxing,

20   how about that?

21        Ladies and gentlemen of the jury, you can go back to

22   your jury room and we'll be back in about 15 minutes.

23        (Thereupon, the jury retired from the courtroom.)

24        THE COURT:  Okay.  Do you want to state your

25   position with regard to that exhibit I admitted into

GADSDEN - DIRECT

1      evidence?

2                MS. WEIS:  Yes, sir, Your Honor.

3                THE COURT:  So I can make mistakes on both sides

4      when it goes to Richmond?

5                MS. WEIS:  Your Honor admitted Nagy Exhibit 5, which

6      is Ms. Gadsden's notes that she took during interviews with

7      Mr. Nagy, and also an interview guide that she had.

8                Mr. Cooper failed to lay a foundation that those

9      documents were ever produced to Mr. Nagy.  They reflect, we

10     would agree, some of the communications that Mr. Nagy made to

11     the IRS, but we feel that it also reflects her interpretation

12     of what those communications were, which was was not

13     communicated to Mr. Nagy; and therefore, should have been

14     excluded.

15               THE COURT:  Okay.  All right.  I overruled that

16     objection.

17               How about the next one?

18               MR. CLUKEY:  Yes, Your Honor.  So exhibit, I believe

19     it's Mr. Nagy's 101, we object to that document being a

20     fraudulent document.  Mr. Nagy testified in connection with

21     Exhibit 223, which is in evidence, that there was no

22     marketing administration agreement between Diversified Design

23     Associates and FSC as of 2000.  This document purports to be

24     this 1998 document that was provided to the IRS in 2002.  And

25     we believe it's a complete fabrication; and therefore, it

GADSDEN - DIRECT

1    would not meet any exception to the hearsay rule.

2         THE COURT:  Well, that's totally within your

3    knowledge.  And I said I would let it in and I would let you,

4    in reply, show that it's a fabrication, and then the jury can

5    consider anything it wants to consider, okay?

6         Now, you seem to be pained by something I have been

7    doing, so go ahead and tell me why you are pained, and

8    I'll --

9         MR. COOPER:  I'm asking her what she communicated to

10   Mr. Nagy.  And I asked her, did you communicate that Mr. Nagy

11   was promoting a tax shelter?  I mean, I don't -- if that's

12   something that we talked about, about what's communicated

13   between the two, I don't understand why that's objectionable.

14        MS. WEIS:  Because Mr. Cooper knows that it wasn't

15   communicated.  And by asking the questions, he's implying

16   that there was information that was withheld that was not

17   communicated to Mr. Nagy and that the IRS engaged in

18   misconduct in that regard, which is what he's argued, and

19   Your Honor denied, or sustained our motion in limine, to

20   exclude that information.

21        MR. COOPER:  But it's a fact.  I mean, they are

22   drawing an inference with the fact; I'm just trying to

23   establish -- I have to bring it into evidence that what she

24   did and didn't communicate, and she issued a no change.  Did

25   you communicate --

983

GADSDEN - DIRECT

1          THE COURT:  Well, you have to bring in evidence what

2    she did communicate.  That's the basis of the ruling.  What

3    she didn't communicate, I've excluded, right?  I mean, all

4    those notes and all that kind of stuff I excluded in the

5    motion in limine.

6          MS. WEIS:  Mr. Nagy has also testified as to what

7    she did communicate.  So we are not exactly sure what

8    additional evidence is being offered by having her testify

9    about what wasn't communicated.

10          MR. COOPER:  It's from her side.  Did you

11    communicate that?  That's all I'm simply asking.  And I don't

12    understand why the reaffirming what he testified is

13    objectionable.

14          THE COURT:  You did a motion in limine, you argued

15    it.  I said you could get anything in evidence that was

16    communicated to Mr. Nagy or that Mr. Nagy communicated to the

17    IRS.  Something that was not communicated to Mr. Nagy, isn't

18    that within that motion in limine?  I mean, I guess we could

19    go, you know, did you communicate to Mr. Nagy that there was

20    no income tax before 1922?  I mean, you know, I assume that

21    would probably be something, too.  There is lots of things

22    that aren't communicated.  We are talking about your client's

23    state of mind.

24          MR. COOPER:  Right.

25          THE COURT:  And things that are not communicated to

984

GADSDEN - DIRECT

1    your client, how do they have any effect on his state of mind

2    back in, whatever this was?

3              MR. COOPER:  Because he wouldn't believe anything

4    was wrong.  He's now being assessed for conduct for allegedly

5    promoting a tax shelter.  They did an audit at the time.  And

6    all I'm trying to establish is, did you communicate that he

7    was involved in any penalty conduct?

8              MS. WEIS:  He needs to first establish that was an

9    issue that he knew about.

10             THE COURT:  An issue from her.  I mean, there is no

11   testimony so far that she has anything to do with anything

12   with tax shelters or anything like that, is there?  I mean,

13   that's why she referred, right?

14             MR. COOPER:  That's right.  But the lead agent is

15   the person who the information is supposed to be -- goes

16   through and who was --

17             THE COURT:  Now we are getting back into IRS

18   internal stuff, which I've excluded one hundred thousand

19   times.

20             MR. COOPER:  I'm caught between -- I can't get

21   behind the IRS to show what they do and what they consider,

22   and then objectively when I'm trying to show what was

23   communicated, I'm getting barred on it because I can't lay a

24   foundation because I can't go behind the veil.

25             THE COURT:  I'm sorry.  Do you want me to bend the

GADSDEN - DIRECT

1    Rules of Evidence so you can get something in that I don't

2    think you can get in?

3              MR. COOPER:  But I don't believe it's bending the

4    Rules of Evidence.

5              THE COURT:  Well, the problem is, the problem with

6    that retort is that your name was not on the door.

7              MR. COOPER:  Yes, Your Honor.

8              THE COURT:  Okay?  That's my job.

9              MR. COOPER:  Yes, Your Honor.

10             THE COURT:  I do the best I can.  You seem to think

11   I'm trying -- I'm here to screw your client.  I mean,

12   that's --

13             MR. COOPER:  Not at all.

14             THE COURT:  -- I mean, that's -- so the subtext is

15   every time I make a ruling that is adverse, you give me this

16   wince, like I'm stabbing you with a pin on a voodoo doll.

17   I'm not trying to do that, okay?  I just call them as I see

18   them, and I'm real sorry.  I'm here to let evidence in that I

19   think is admissible.  I'm in here to exclude evidence which I

20   don't think is admissible.  I'm just doing the best I can,

21   okay?

22             And I've got -- and you've made great arguments on

23   some things and you won some, and you made great arguments on

24   other things and you lost some.  I'm just doing the best I

25   can.  And I'm sorry that you can't get things in you want to

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    get in, but that's -- 100 percent of the time -- that happens

2    in every trial.  And I may be wrong, I'm just doing the best

3    I can, okay?

4              MR. COOPER:  Yes, Your Honor.  I'm sorry.  I

5    understand.

6              THE COURT: You are a wonderful, zealous advocate,

7    okay?  And when the IRS comes against me, I'm going to hire

8    you, okay?  All right.  But hopefully, that will never

9    happen, all right?

10             MR. COOPER:  Yes, Your Honor.

11             THE COURT:  Although I filed an extension, I didn't

12   realize it was bad, okay, to file an extension, okay?

13             All right.  Where else are we going?  I mean, I

14   don't --

15             MR. COOPER:  I am over halfway done.

16             THE COURT:  Okay.  Are there any other issues you

17   want to --

18             MR. COOPER:  Well, the other issue that we brought

19   up was the -- in Exhibit Number 8, it was that page 6 that

20   they objected to.

21             THE COURT:  Okay.  Let's see it.  Thank you.

22             Isn't this already in?

23             MR. COOPER:  You did not let Exhibit 6 in.

24             MR. CLUKEY:  Your Honor, that page does not appear

25   to be part of that document.  It looks like it was never

GADSDEN - DIRECT

1     intended to be part of that.  It looks like it was

2     inadvertently stuck in there.

3             THE COURT:  Okay.  Because it's got a U.S. Bates

4     stamp on it, I guess that came from the IRS files.

5             MR. CLUKEY:  Whatever happened, if it got mixed up

6     in the files, we don't know what the problem is.  Just

7     reading the context of the document clearly does not appear

8     to be part of it.

9             MR. COOPER:  My understanding of the document is

10    that it is the actual approval of the lender to permit the

11    loan, and that's why it appears within the document.  And

12    then below it is the subsequent assignment to the new one.

13            THE COURT:  Let me take a look at it while we take a

14    break.  We'll start again in about ten minutes, okay?

15            MR. COOPER:  Can I ask one thing?  And I will bring

16    this up for laying the foundation for this.

17            THE COURT:  Oh, sure.

18            MR. COOPER:  The Internal Revenue Manual, that is a

19    public document --

20            THE COURT:  Right.

21            MR. COOPER:  -- says that common penalties to be

22    considered are promoted dollars.  And if I can lay the

23    foundation with her on the Internal Revenue Manual, may I

24    then ask her did she communicate that the -- whether --

25            THE COURT:  If you ask her the question, did you

GADSDEN - DIRECT

1    consider promoter penalties, period, what would her answer

2    be?

3        MR. COOPER:  It would be yes.  That's why I can't do

4    that because you dropped the veil.  So I have to lay the

5    foundation somehow.  I will have to say, are these common

6    penalties that you are supposed to consider?  Yes.

7        MS. WEIS:  Your Honor, that is not what happened.

8    She never -- she was deposed in a full deposition last March

9    and she did not say that she considered promoter penalties as

10   part of the audit.

11       MR. COOPER:  They referred the transaction to the

12   Office of Tax Shelter Analysis.  They brought in a lawyer to

13   issue a John Doe summons on a promoter investigation.

14       MS. WEIS:  We still don't understand how this is

15   getting around the motion in limine.

16       MR. COOPER:  That's why I'm trying to be careful in

17   addressing it with you beforehand.

18       THE COURT:  Let me see that, too.

19       MR. CLUKEY:  Your Honor, this is -- it's feeding

20   into the argument that we provided to you with the witness on

21   Friday with those cases saying that taxpayers can't rely on

22   the Revenue Manual.  But as a fundamental nature, by asking

23   about the Internal Revenue Manual, we are now getting into

24   what she was thinking and what was not communicated to her.

25       THE COURT:  All right.  I'll take a look at both of

GADSDEN - DIRECT

1    those.

2              All right.  We'll start again at ten till.

3              (Thereupon, there was a brief recess.)

4              THE COURT:  Correct me if I'm wrong, Mr. Cooper,

5    your client's defense is that he didn't have the state of

6    mind that would deserve a penalty being assessed by the IRS,

7    right?

8              MR. COOPER:  That's correct, Your Honor.

9              THE COURT:  And this is a de novo hearing that the

10   jury has to decide whether or not he had the state of mind in

11   order to have the IRS issue a 6700 penalty, right?

12             MR. COOPER:  That's correct.

13             THE COURT:  Okay.  And is there any issue as to

14   whether or not, at this proceeding between your client and

15   the IRS, is not a legal and properly instituted civil

16   procedure under the Code of Civil Procedure, and the Internal

17   Revenue Code?  I'm talking about this lawsuit.  I mean --

18             MR. COOPER:  That's correct.

19             THE COURT:  They institute whatever they have to

20   institute and issue the 6700 penalties, and then your

21   recourse is to sue them in Federal Court?

22             MR. COOPER:  That's correct.

23             THE COURT:  So the procedure they went through in

24   order to force your client to sue them in Federal Court was

25   properly instituted under their --

GADSDEN - DIRECT

1    MR. COOPER:  Yes.

2    THE COURT:  I mean, and so -- and so since it's a de

3    novo proceeding, and it's properly instituted in Federal

4    Court, because you had to be in Federal Court, because they

5    assessed your client with 6700 penalties, what difference

6    does anything before that make as to your client's defense?

7    What difference does it make whether they brought this issue

8    up?  What difference does it make that they went through all

9    this audit and the issue of the no-change letters and then

10   someone else decided to do a 6700 penalty?  That's really

11   not -- and your client had no knowledge of that?  What

12   defense is that to this lawsuit?  I mean, I understand why

13   you don't like it, I understand you take offense at it and

14   you should be up front with me, but what defense is that in

15   this lawsuit?

16   MR. COOPER:  Well, the defense is it goes to his

17   state of mind because the de novo proceeding is the

18   assessment of the 6700 penalty.  What did the IRS consider to

19   make the assessment?  What did they do behind the assessment?

20   This audit was not part of the 6700 assessment.  This is a

21   separate fact.

22   So the de novo proceeding you have to have a

23   demarcation line.  This audit is not the 6700 administrative

24   file that constitutes the de novo proceeding.  This audit is

25   a process in facts that affected my client's state of mind

GADSDEN - DIRECT

1    and that might be some of the confusion, is how broad is that

2    de novo?  The de novo goes behind what did they do in

3    determining that the assessment was valid, the 6700

4    assessment.  This is an audit of Derivium.  It's not had

5    anything to do with the 6700 assessment.  So that's why it's

6    relevant.

7            MS. WEIS:  Your Honor, he just said the audit had

8    nothing to do with the Section 6700 analysis.

9            Now, also he hasn't answered the question of, well,

10   if it wasn't communicated to Mr. Nagy, what bearing does that

11   have on Mr. Nagy's state of mind?

12           MR. CLUKEY:  I would also add, Your Honor, this

13   interpretation of de novo, I'm not sure what Mr. Cooper is

14   getting at.  We are not aware of any cases that say you only

15   look at one item, and de novo doesn't relate to anything else

16   in the history of the IRS.  I'm not sure where that comes

17   from.  If Mr. Cooper has some legal authority for that, I

18   would be anxious to see that.

19           MR. COOPER:  Well, I think it gets back to what's

20   reasonable for him to believe.  I mean, when we used to argue

21   this, the Justice Department, if someone goes and makes an

22   assessment for whatever it is, that the facts that the IRS

23   agent relied on in determining if the assessment was correct

24   or incorrect is what is behind that assessment.

25           And that's what the de novo proceeding protects.

GADSDEN - DIRECT

1     This was a whole different audit.  It was totally different.

2     It happened five years beforehand.  So the facts of the audit

3     go to his state of mind at the time he was giving this tax

4     advice.  This audit was not the 6700 investigation, nor could

5     it be, because Mr. Nagy didn't get the 6700 letter until

6     2007, I believe.

7              THE COURT:  Yes, sir?

8              MR. CLUKEY:  We just reiterate what we just said,

9     Your Honor, not relevant.  I didn't hear a case cite from Mr.

10    Cooper supporting that notion.  And the information, as

11    you've already ruled with respect to the motion in limine, if

12    it was not communicated, it was not communicated, so how can

13    it have any bearing?

14             THE COURT:  All right.  Well, if I'm going to be

15    wrong, I might as well be wrong consistently, okay?  I'll

16    sustain your objection as to this document.  And as to the

17    Socks exhibit, I'll retain my ruling and say it's okay, okay?

18    So that's in.

19                  This exhibit already in, except for this page?

20             MR. COOPER:  Yes, Your Honor.

21             THE COURT:  And what number exhibit is that?

22             MR. COOPER:  Number 8.

23             THE CLERK:  Number 8.

24             THE COURT:  Okay.  And there is no dispute that U.S.

25    0067 was given to one of the agents and maintained in the

GADSDEN - DIRECT

1    file?

2            MR. CLUKEY:  Correct, Your Honor.

3            THE COURT:  And your objection to 67 is, what, just

4    out of -- go ahead.

5            MR. CLUKEY:  Our objection would be again a

6    document, part two.  It's also --

7            THE COURT:  I didn't understand.  My hearing may be

8    going.  I didn't understand what -- either part of what you

9    explanation was.

10           MR. CLUKEY:  Sure.  That it's a fabrication.  That,

11   to be consistent with your prior ruling, you've let in

12   another document that we allege was fraudulent.

13           So then in connection with this, our main objection

14   would be it's simply not part of this document.  It appears

15   from the face of the document it's not a piece of it.

16           THE COURT:  And is -- is this -- I'm sorry,

17   Plaintiff's 8 is the -- did Mr. Nagy testify that he gave

18   this to the IRS or --

19           MR. COOPER:  Did he testify to that?

20           THE COURT:  Yeah.  How did this get into evidence or

21   just by -- everybody agreed except for this page?

22           MR. COOPER:  That's correct.

23           MR. CLUKEY:  That's right.

24           THE COURT:  And when this was discovered in the IRS

25   files, was it -- was it stapled together, for lack of a

GADSDEN - DIRECT

1    better term?

2              MR. CLUKEY:  We have no idea how it was copied.  It

3    could have been put in inadvertently to the file.  We just

4    don't know.

5              THE COURT:  And maybe in the Derivium files, is this

6    document found in the same form?  You know, it looks like the

7    sample form, the John Q sample, or does anybody know?

8              MR. CLUKEY:  Your Honor, we do have a John Q sample

9    document, and that page is not in that example that comes to

10   mind.  We are not aware of it otherwise being, existing in

11   that same format.

12             MR. COOPER:  I suppose that if the IRS has it, there

13   would have been no other way for them to get it except for --

14             MR. CLUKEY:  Your Honor, if you look at the bottom

15   page of that document, every page is numbered, it's 1, 2, 3,

16   4, 5, and there is no page for that particular document.

17             THE COURT:  And those notes on the top of each page,

18   Derivium 1069, 188, 12 are Gadsden?

19             MR. CLUKEY:  We believe so, Your Honor.

20             MS. WEIS:  She made those notations on every single

21   page, whether or not it was --  we understand that she made

22   that notation on every page, regardless of whether it was in

23   the same document or not.

24             So those notations are not unique to this particular

25   John Q sample.  Mr. Cooper pulls up her activity record, for

995

GADSDEN - DIRECT

1     instance.

2          THE COURT:  Does anybody know whether this page

3     is -- it seems to me like it's not part of this document,

4     especially the main thing is 1, 2, 3, 4, 5, then this page,

5     and then 6.

6          MR. COOPER:  Um, my understanding is this is the

7     approval that would have been in like a John Q sample for the

8     loan to be done.  This is a lender's agreement.

9          MR. CLUKEY:  As we said, Your Honor, we are not

10    aware of that page existing in any of the John Q sample of

11    documents in this case.

12         MS. WEIS:  Exhibit 38 contains a John Q sample and

13    it does not have that document.

14         THE COURT:  How about the last page of the document?

15    What does that have to do with this document?  It seems to be

16    a separate document, also.

17         MR. CLUKEY:  We're not sure what that is, either,

18    Your Honor.

19         THE COURT:  It's got the same date as the fax date

20    John Q.

21         Okay.  Anything else, Mr. Cooper or Mr. Clukey?

22         MR. COOPER:  No, Your Honor.

23         MR. CLUKEY:  No, Your Honor.

24         THE COURT:  I'll overrule your objection.  I mean, I

25    don't -- I mean, I just don't have any facts to keep it out.

GADSDEN - DIRECT

1    It's in that form, the Bates stamp, it looks like it, for
2    what it's worth, and then you can argue that it's out of
3    context and all that.
4              So I'll admit whatever the DDA schedule that came
5    into evidence as part of Plaintiff's Exhibit Number 8.  Okay.
6              Anything else?
7              (Thereupon, the jury returned to the courtroom.)
8              THE COURT:  Okay.  Mr. Cooper?  Oh, do you want this
9    back?
10             THE CLERK:  What number?
11             MR. COOPER:  Exhibit 33.
12   Q. Ms. Gadsden, at the end of the Derivium exam, the IRS
13   issued Derivium a no-change letter, correct?
14   A. Correct.
15   Q. And Ms. Gadsden, are you aware that there are penalties
16   associated with -- for promoting tax shelters?
17   A. Yes.
18   Q. And in fact, with the approval of the territory manager
19   or the area director, you could recommend --
20             MS. WEIS:  Objection, Your Honor.
21             THE COURT:  Let him get the question out.
22   Q. You can recommend the assessment of tax shelter promoter
23   penalties?
24             MS. WEIS:  Objection, Your Honor.
25             THE COURT:  Overruled.

GADSDEN - DIRECT

1        THE WITNESS:  I think I can, but there is a process

2    involved in doing it, and I truly don't know that much about

3    promoter penalties.

4      Q. But you can make the recommendation, right?

5        MS. WEIS:  Objection, Your Honor.

6        THE COURT:  Asked and answered.  Sustained.

7      Q. Now, you also audited Mr. Scott Cathcart, correct?

8      A. I picked up the return of Scott and Whitney Cathcart

9    because they had not filed.  So as part of the Derivium

10   audit, we looked at the partner returns because they are

11   partners in the partnership.  So we considered the related

12   returns at the time of the Derivium audit.  Not all of the

13   partners had filed their returns and Scott and Whitney

14   Cathcart had not filed the returns.

15     Q. So you obtained the returns from Mr. and Mrs. Cathcart,

16   correct?

17     A. Mr. Nagy was there as the representative.

18     Q. You obtained those returns?

19     A. Yes, the delinquent returns.  And I really can't

20   recall -- I know it was more than one year, but -- I can't

21   recall which years they had not filed returns for, but those

22   returns were filed with the local -- I sent them to the

23   service center.

24     Q. And do you recall that you audited the Cathcart's 2000

25   return?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    A. Yes.  That was one year that I secured their delinquent

2    return, yes.

3    Q. And I'm sorry to interrupt you.

4    A. Well, I secured their delinquent return.

5    Q. And for the 2000 return, do you recall if Scott Cathcart

6    did Derivium stock loan transactions?

7    A. I did not recall that until the deposition when you

8    showed me the return, that there was interest --

9         THE COURT:  You are dropping your voice again.

10        THE WITNESS:  I didn't recall that there was an

11   interest expense deduction on Scott and Whitney Cathcart's

12   return until I gave the deposition.

13   Q. All right.  And during the deposition I showed you, this

14   was the 2000 tax return, correct?

15   A. Correct.

16   Q. And it has been previously introduced, and I'll hand you

17   a copy of the return.

18   A. Thank you.

19   Q. And do you recall this being the return that you audited?

20   A. I secured the loan, but I don't necessarily do a complete

21   audit, we just look it over to make sure that it appears to

22   be substantially correct.  I did question -- there is losses

23   on line 17 from partnerships that flowed through his returns,

24   so I requested support for that.

25        And then as you showed me with the information

GADSDEN - DIRECT

1    document request, I requested support for the interest

2    expense deduction on the schedule.

3      Q. Right.  And the interest expense deduction arose from the

4    Derivium stock loans?

5      A. And again, I didn't remember that until you showed that

6    to me.

7            Also, though, what I did remember is that I

8    requested K1's from the partnerships, and the partnership

9    returns that Scott or Whitney held in, I think it was

10   probably greater than 20 percent interest in, because the

11   biggest thing on the return are the partnership losses.

12           And actually, once I verified that those partnership

13   losses appeared to be correct, the information Mr. Nagy

14   provided, the Cathcarts had negative adjusted gross income,

15   they were already in the negative, they were in the hole.

16           So once that's -- the interest expense deduction is

17   further on the return as an itemized deduction.

18           So I really -- you know, once -- no matter what I

19   did with interest expense deduction, they had negative

20   taxable income.  And if I disallowed that, it would have made

21   a negative, so it was smaller.  It was not a real productive

22   use of resources for me or anybody else to really start

23   getting into the expense deduction, because there was -- he

24   was going to be -- have negative taxable income anyway.

25     Q. But first of all, looking at the partnership losses, you

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    did allow those losses?

2     A. Based on what Mr. Nagy provided, the K1's that showed --

3    when you first look at the K1 about the partnership

4    information, that those get through loans that Scott Cathcart

5    could have been responsible for, partnership loans, they did

6    have basis to be able to take a partnership loss.  You know,

7    that's really about all I did is looked over those K1's that

8    were provided to me.

9     Q. And because they had basis, those losses were

10   appropriate?

11    A. Correct.

12    Q. And back here is the 4952 with the investment interest

13   expense deduction?

14    A. Um-hum.

15    Q. And on the return --

16         THE COURT:  For the record, would you say what

17   exhibit that is?

18         MR. COOPER:  Exhibit 34.

19         THE COURT:  34?

20         MR. COOPER:  Yes, sir.

21    Q. And then the attachment to the schedule showed that

22   $150,036 was related to the Derivium stock loan, correct?

23    A. That's what this shows.

24    Q. And you were aware of this deduction being taken on the

25   return, correct?

GADSDEN - DIRECT

1    A. I must have been during the time, yes.

2         Again, I didn't remember it when I made -- if you

3    had asked me before the deposition, I did not recall.

4    Q. And I believe the reason you recall, it was Exhibit 31,

5    it's point number 4, you asked for the statements that showed

6    that interest deduction, correct?

7    A. I did request them.

8    Q. And Mr. Nagy provided them to you, didn't he?

9    A. To the best of my recollection, yes.

10   Q. So you were auditing that interest expense deduction,

11   correct?

12   A. Like I said, once I got past the partnership thing and

13   realized those partnership losses were deductible, he was

14   already in the negative.  So to me, it became a nonissue.

15   Q. And the report and recommendation, which is Exhibit 37,

16   issued to Mr. Nagy --

17   A. Show the letter number down on the bottom right-hand

18   corner?  Okay.

19   Q. Is this the cover letter to -- I think it's called -- I

20   get it confused, it's called a revenue agent report?

21   A. Correct.

22   Q. And attached to this letter, you sent a revenue agent

23   report?

24   A. Correct.

25   Q. And in your revenue agent report, you indicated that the

GADSDEN - DIRECT

1   return was subject to a no change request, correct, in the

2   first audit?

3   A. What does it say period ended there at the -- is this a

4   2000 no change report or the 1999 --

5   Q. Thank you.  That was a good point.

6         If you go back farther, there is the 2000.

7   A. Right.  And if you go down to line 3, you can see the

8   taxable income was a negative $358,000.

9   Q. Right.

10        But if you disallow the investment interest expense

11  deduction, it would have reduced that loss, correct?

12  A. But it would have made the negative 350,000 negative

13  200,000.

14  Q. So it reduced it?

15  A. Right.  The taxable income is zero.

16  Q. Right.

17        But don't taxpayers have loss carry forwards?

18  A. Some losses can be carried forward, um, most -- and I

19  don't have the words to go by by what the net operating

20  losses -- most schedule items do not create an operating

21  loss.  The only thing I can think of quickly is a casualty

22  loss from a theft or something like that is generally the

23  only Schedule A item that will create an operating loss.

24  Q. You can carry forward the loss for a few years, correct?

25  A. The law has changed -- before you could carry -- it

GADSDEN - DIRECT

1    changes from years to years, we have to carry it back and

2    then carry it forward.  And if you are going to elect not to

3    carry it back, you would have to make that election in the

4    loss year.  And sometimes -- again, it changes.  It changed

5    that period from year to year, then you have to -- you may

6    have to have made that election at the time you filed the

7    return, as well.  So --

8    Q. So if you changed the loss, it could have had an impact

9    on the amount he could have carried back --

10             MS. WEIS:  Objection, Your Honor.

11   Q. -- or carried forward?

12             THE COURT:  Basis?

13             MS. WEIS:  She's already testified that she doesn't

14   know the answer to these questions.

15             THE COURT:  I don't think she said that, so I'll

16   overrule your objection.

17             THE WITNESS:  I didn't understand.

18   Q. I'll go ahead and reask the question.

19             If you change the amount of loss, it could have

20   affected the amount of loss that could have been carried

21   back, or if the election was made, carried forward?

22             MS. WEIS:  Objection, Your Honor, 602.  Testimony of

23   law.

24             THE COURT:  Overruled.

25             THE WITNESS:  What I would say is there are -- this

GADSDEN - DIRECT

1    deduction was taken on Schedule A, itemized deductions.

2    Without looking at the Code, I don't know whether interest --

3    investment interest expense as a deduction could create a

4    loss that he can carry forward or back.

5              I do know for Schedule A items a casualty loss can

6    create a net operating loss.

7    Q. And in fact, do you know whether an investment interest

8    expense can be carried forward?

9    A. Investment interest expense can be carried forward.

10   Investment interest expense is only allowable up to the

11   amount of investment income, and generally that's why

12   taxpayers use that form that you just had up here, to use the

13   amount.

14   A. But are you talking about the carry forward to the

15   investment interest expense or are you talking about a net

16   operating loss?

17   Q. Just the carry forward -- if you would have disallowed

18   the $150,036 as investment interest expense, Mr. and Mrs.

19   Cathcart could not have carried that forward.

20   A. Correct.

21   Q. So if there was a bunch of income in future years, that

22   loss could not be used to offset the investment income in

23   future years, right?

24   A. Well, let's look at this form, because on line 4-A is

25   their investment income, and it's $168,000, right?

1005

                              GADSDEN - DIRECT

1      Q. Yes, ma'am.

2      A. And their investment interest expense is 150.  So they

3    had enough to be able to take it all in this year.

4      Q. Right.

5           So if you disallowed it, they would have paid more

6    tax in this year?

7      A. No, because they were already to the negative.

8      Q. It would have affected that negative number.  You said it

9    would have been about 200,000?

10     A. Well, but you don't pay tax on negative taxable income.

11     Q. But it is a tax item that affects -- that could affect

12   income in future years, right?

13     A. No, because like the schedule that you just had up there,

14   he had enough investment income to be able to take that

15   expense in this year, and he did, he claimed it on the

16   return.

17          The only time investment interest expense gets

18   carried over is if you don't have adequate investment income.

19     Q. But if there wasn't adequate income, he could have

20   carried forward the loss in future years, correct?

21          MS. WEIS:  Objection, Your Honor, asked and

22   answered.

23          THE COURT:  Asked and answered.

24          Go ahead.

25     Q. The investment interest expense item was something you

GADSDEN - DIRECT

1    audited, though, correct?

2    A. I requested documents about it, but again, once the

3    partnership losses were allowable, it became a nonissue.

4    Q. Let me ask you this:  When you do an audit, do you try to

5    get -- do you try to reach the most correct result you can?

6    A. We try to get to a substantially correct tax.

7    Q. And the Cathcart audit, you tried to get to the correct

8    result?

9    A. Again, this was a secured delinquent return in

10   relationship to a partner return, another entity.  So really

11   what I was focused on was to try to get the taxpayer in

12   compliance with filing their returns.

13   Q. Well, do you know if Mr. Cathcart took the investment

14   interest expense deduction in 2001 and 2002?

15   A. I don't.  If I did know at one time, I don't remember

16   now.

17   Q. Wouldn't it be, denying it on this report, the way of

18   telling Mr. Cathcart he wasn't entitled to that deduction?

19            MS. WEIS:  Objection, Your Honor.

20            THE COURT:  I'll sustain that.  I mean, you've

21   already gone over it two or three times.

22   Q. Isn't a report recommendation, to your understanding, a

23   way to tell the taxpayer --

24            MS. WEIS:  Objection, Your Honor.

25   Q. -- whether he's --

1007

GADSDEN - DIRECT

```
 1              THE COURT:  Ms. Weis, you are a lot smarter than I
 2       am, you probably know what the question is going to be, but
 3       I'm real slow.  Let him get the question out and then you
 4       object and then I'll rule, okay?
 5              Go ahead.
 6        Q. Is it your understanding that the report recommendation
 7       is a way to let the taxpayer know whether or not tax items
 8       are being recorded correctly?
 9              MS. WEIS:  Objection, Your Honor.
10              THE COURT:  Overruled.
11              THE WITNESS:  You give the taxpayer a report, it
12       tells them the things that we looked at, changes that we make
13       on their return, and generally whether we are accepting the
14       return or changing the return.
15        Q. So is the answer yes, it tells a taxpayer that they're
16       reporting items correctly?
17              MS. WEIS:  Objection.
18              THE COURT:  Overruled.
19              THE WITNESS:  It all depends on what kind of
20       reporting you are saying.  Sometimes there is a report that
21       gives them a refund, sometimes there is a report that they
22       owe money, and sometimes it's a no change report.  We can't
23       audit every line item on every return.  So, yes.
24        Q. But you ask for information on the investment interest
25       expense, right?
```

GADSDEN - DIRECT

1    A. Correct.  I did ask for information.

2    Q. And in fact, do you remember sitting in Mr. Nagy's office

3    and specifically discussing the original interest discount

4    rules as applicable to the investment interest expense?

5    A. The interest discount rule?

6    Q. The original interest discount rules?

7    A. No.  Is it in my notes?  You are talking about OID,

8    original issued --

9    Q. Yes.  Do you recall sitting in Mr. Nagy's office and

10   having a conversation about whether those rules applied to

11   Mr. Cathcart's investment interest expense?

12   A. No, I don't.

13   Q. And again, the no change report that is issued at the end

14   of the Cathcarts' audit, that report indicated the conclusion

15   of the audit, correct?

16   A. Correct.

17   Q. And Exhibit 37, which is your report and recommendation,

18   that indicated the conclusion of your review of the returns,

19   correct?

20   A. Correct.

21   Q. And was it your understanding when you issued the no

22   change report for Scott Cathcart that you communicated to Mr.

23   Nagy that the Derivium stock loans were bona fide?

24         MS. WEIS:  Objection.

25         THE COURT:  Sustained.  Rephrase that question.

GADSDEN - DIRECT

1    Q. When you issued the no change reports in 2000 on Mr. and

2    Mrs. Cathcart's return, is it your understanding you

3    communicated to Mr. Nagy that you accepted the stock loans as

4    a bona fide loan?

5                 MS. WEIS:  Objection.

6                 THE COURT:  Basis?

7                 MS. WEIS:  Rephrasing the previous question.  He was

8    asking for her understanding of what the no change meant and

9    communicated.

10                THE COURT:  Overruled.

11                THE WITNESS:  Could you say the question for me?

12                MR. COOPER: I'll do my best.  I may elicit another.

13                THE COURT:  Do you want me to read it for you?

14                MR. COOPER:  Read it for me?

15                THE COURT:  I have it right here.

16                MR. COOPER:  Oh, really?

17                THE COURT:  Magic, isn't it?

18                All right.  The question is:  "When you issued the

19   no change reports in 2000 on Mr. and Mrs. Cathcart's return,

20   is it your understanding you communicated to Mr. Nagy that

21   you accepted the stock loans as a bona fide loan?"

22                MS. WEIS:  I don't mean to object to your question.

23                THE COURT:  If you did object to it, I would

24   overrule it, okay?

25                Now, do you remember?

GADSDEN - DIRECT

1          THE WITNESS:  No.

2      Q. Do you recall when I took your deposition on

3    March 27th --

4      A. I remember that.

5      Q. And on March 27th, 2009, and you were sworn to tell the

6    truth.

7          Do you recall that?

8      A. Um-hum.

9      Q. And do you recall me asking you questions about what the

10    no-change letter communicated to Mr. Nagy?

11     A. I reread the deposition.  I really don't. That was truly

12    not a very fun experience for me, so I'm sorry if I don't

13    remember.

14         MR. COOPER:  Your Honor, I would like to have her

15    read in page 174, lines 3 through 10.

16         MS. WEIS:  Your Honor, we would object.  We don't

17    believe that that is actually --

18         THE COURT:  That's why I give them the deposition.

19         Okay.  Why don't you read your question and she can

20    read her answer, okay?

21     Q. "Question.  So there was a no change.  So didn't you

22    have, that time you issued a no-change letter, it was

23    communicated that it was a bona fide loan for which an

24    interest expense could be taken?"

25     A. Correct.  And I said at that time it was accepted as a

GADSDEN - DIRECT

1    bona fide loan.

2     Q. From the time you issued the no-change letter to Mr.

3    Cathcart in June of 2003 until January of 2009, did anyone at

4    the IRS contact you about the examination?

5              MS. WEIS:  Objection, Your Honor, relevance and

6    motion in limine.

7              THE COURT:  What was the second part?

8              MS. WEIS:  Motion in limine.

9              THE COURT:  I'll sustain that.  I think it's subject

10   to the motion in limine.

11             MR. COOPER:  Your Honor, I would like to move in

12   Exhibit Number 76 under 801(d)(2) as a party admission.

13             MS. WEIS:  Your Honor --

14             MR. COOPER:  Nagy Exhibit 76.  Look at question B in

15   the definition on the third page.

16             THE COURT:  I'll sustain the objection to that right

17   now and we can argue about it at lunchtime.

18             MR. COOPER:  Thank you, Your Honor.

19             Your Honor, after I ask about that document, I'll

20   have five minutes of conclusion and I'll be done.

21             THE COURT:  Okay.  So if I sustain the objection to

22   that conclusion, that means you are done?

23             MR. COOPER:  Well, I will conclude, but I would like

24   to be able to talk to you about Exhibit 76.

25             THE COURT:  All right.  Okay.  So -- all right.

GADSDEN - DIRECT

1    We'll go to lunch right now and we'll start again at 2:00.

2            Ladies and gentlemen, enjoy your lunch and we'll

3    start again at 2:00.

4            (Thereupon, the jury retired from the courtroom.)

5            THE COURT:  Ms. Gadsden, you are off the hook right

6    now.  We'll see you at 2:00.

7            Yeah?

8            MR. COOPER:  I would like to introduce it as a --

9    under 801.

10           MS. WEIS:  Your Honor, if he's trying to introduce a

11   court-ordered interrogatory from the California injunction

12   action about whether or not the IRS and the IRS agents made

13   any determinations that this was a -- the 90% Loan Program

14   was a taxable loan, Ms. Gadsden repeatedly testified she did

15   not make that determination.

16           We also have the financial product specialist who

17   said that she also never made that determination.  So

18   while -- and we have the last question which we will be

19   intending to offer when Ms. Gadsden is questioned on

20   cross-examination when she was asked:  "Did you actually make

21   a determination of the loan Scott Cathcart was engaging in,

22   the 90% loan -- did you actually make a determination that

23   the loans that Scott Cathcart was engaging in, the 90% loans

24   that he was engaging in, that those were bona fide?  Did you

25   make that affirmative determination?"

GADSDEN - DIRECT

1          "I really don't recall," is her response to that

2    question.  And at another time she says she didn't think that

3    she did.

4          So we don't understand the relevance of offering in

5    a consistent statement of the Government, where Ms. Gadsden

6    or no IRS agent has made that determination in the first

7    place.

8          MR. COOPER:  She just communicated she accepted it

9    as a loan.

10          And in fact, if you go to page 3, when you look at

11    the Government's own definition of determination, Ms. Gadsden

12    testified that the report, Exhibit 37, was the conclusion of

13    her audit.

14          She also testified the no-change letter was the

15    final conclusion of the audit, which fits within the

16    definitions that the Government set forth in the definition

17    of determination.

18          Therefore, this is an inconsistent statement, as

19    well as an admission.

20          And B, that there was a determination of a bona fide

21    loan in accordance with the Government's definition of the

22    document.

23          MR. CLUKEY:  Your Honor?

24          THE COURT:  Yeah.

25          MR. CLUKEY:  This Court has already issued jury

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    instructions about what a no-change letter means.  And Mr.

2    Cooper is trying ever so desperately to get behind that and

3    thinks that he's on the precipice here to be able to do that

4    with the testimony of Ms. Gadsden.  Ms. Gadsden did not

5    testify that she ever made a determination.  Repeatedly

6    throughout her deposition, she says she wasn't qualified to

7    make that determination.  So that's 601, 602.  She says it

8    repeatedly.

9         Mr. Cooper just asked her on the stand if she --

10   about this hedging and sale, purchase loans, transactions,

11   she referred that to other people, she did not make a

12   determination that this was a valid loan and that she was

13   consistent with that.  So any statement, consistent statement

14   from California litigation, how that could have any possible

15   bearing --

16        MR. COOPER:  Your Honor, I can hand up her

17   deposition and I can lay it with her, 172, 10 through 173, 2,

18   that she says that you can only take investment interest

19   expense if it's a bona fide loan.  So I could get that out.

20        And secondly, it's not your jury instruction, this

21   is the Government's definition in this document, and that's

22   all I'm trying to establish.

23        MS. WEIS:  Your Honor, if we could direct your

24   attention to the financial products specialist reports, since

25   Ms. Gadsden said she didn't have any expertise to make this

GADSDEN - DIRECT

1    determination, the report of the financial products

2    specialist states -- it's exhibit -- Nagy Exhibit 28, page 4:

3            "Conclusion.  Issue:  Loan versus sale is not being

4    pursued any further because international examiner's

5    conclusion was that the taxpayer was not considered a

6    permanent United States establishment of a foreign entity.

7    The potential adjustment under the issue would be considered

8    and would have no United States impact.  No adjustment

9    required."

10           Eventually the financial products specialist who was

11   the person to ask to looking at this issue reached a

12   determination on the loan versus sale question.

13           MR. COOPER:  Your Honor, this is Scott Cathcart's

14   examination and what Ms. Gadsden did during that examination.

15           If you read her deposition, she testified you can't

16   allow the investment interest expense unless it's a bona fide

17   loan.  We just read into the record where she accepted it as

18   a bona fide loan.

19           From this interrogatory, I can demonstrate that the

20   answer to here is not right, and under the Government's own

21   determination that it was a legitimate bona fide transaction.

22           THE COURT:  Okay.

23           MR. CLUKEY:  Your Honor, we would add that to

24   backdoor this in, Mr. Cooper's trying to get in IRS's agents

25   to testify about the meaning of the law under *Teague* and

GADSDEN - DIRECT

1    under *Adelman*, both Fourth Circuit decisions, people cannot

2    testify about what's the role of the Court.

3          Here you have a nonattorney that Mr. Cooper has

4    asked questions about the meaning of the law.  So to backdoor

5    some kind of determination here, he's having her attempt to

6    have her testify about the law.  And this information was

7    never communicated to Mr. Nagy.  I mean, this is all wrapped

8    up in the motion in limine that has been decided, and Mr.

9    Cooper is attempting to circumvent that.

10          THE COURT:  All right.  I'll think about it and I'll

11   let y'all know.

12          Anything else we need to deal with?  It looks like

13   to me that we'll probably argue the charge tomorrow.  I don't

14   know how long it's going to take your redirect examination of

15   this, and then reading in -- how long is the reading of the

16   deposition going to take?

17          MR. COOPER:  I think it's only 35 pages.

18          THE COURT:  All right.

19          MR. CLUKEY:  We don't expect the redirect will take

20   very long.

21          THE COURT:  We'll cross that bridge when we come to

22   it.  Y'all have the jury charge now, so you are ready to go.

23          I mean, I'll -- I'll be -- if y'all want to go for

24   it, it's fine with me.  I'll take a look at this and we'll be

25   back.

GADSDEN - DIRECT

1              We'll see you about five minutes until 2, okay?

2       Thanks.

3              (Thereupon, there was a lunch recess.)

4              THE COURT:  Okay.  Any other additions or

5       corrections on the final charge?

6              MR. CLUKEY:  We have a number.

7              THE COURT:  Pardon?

8              MR. CLUKEY:  Yes, Your Honor, we have a number of

9       objections we would like to discuss.

10             THE COURT:  On the charge?

11             MR. CLUKEY:  Yes.

12             MS. WEIS:  Based on what was added from Mr. Nagy's

13      suggestions.

14             THE COURT:  Oh boy.  Okay.  All right.  So how about

15      you?

16             MR. COOPER:  I profess I didn't have the time to

17      look at it.

18             THE COURT:  It looks like more and more we'll be

19      going tomorrow morning then.  I've got to discuss it with you

20      and make copies of them and all that.  I thought I gave you

21      everything you wanted.

22             MR. CLUKEY:  We are happy with everything you gave

23      us, it's some additions that came from Mr. Nagy that we got

24      at 5 PM last night.

25             THE COURT:  So did I.  And there is three of yours.

GADSDEN - DIRECT

1      MR. CLUKEY:  You provided us --

2      THE COURT:  All right.  How about as to Plaintiff's

3   Exhibit 76?  Do you have any other objections you want to put

4   on the record?

5      MS. WEIS:  I guess, Your Honor, this is the

6   court-ordered interrogatory; is that correct?

7      THE COURT:  Yeah.

8      MS. WEIS:  A clarification?  We understood that Your

9   Honor was not going to allow evidence on what was not

10  communicated to Mr. Nagy.  So starting from that point, we

11  don't understand why Mr. Cooper is attempting to offer

12  Exhibit 76 --

13     THE COURT:  Okay.

14     MR. COOPER:  -- for two reasons:

15     One:  That in accordance with their definition of

16  determination was made.

17     And two, for impeachment purposes.

18     MS. WEIS:  Well, Ms. Gadsden wasn't making a

19  statement, so he can't impeach her.

20     And two, it still doesn't answer the question that

21  why information that was not communicated to Mr. Nagy is

22  trying to be admitted into evidence.

23     MR. COOPER:  I guess I'm using it through Ms.

24  Gadsden because that's the witness I have.  But it's a

25  statement by the Government.  It's an authorized statement by

1019

GADSDEN - DIRECT

1    their agent.

2           And you remember Judge Carr, well, he -- you upheld

3    his ruling.  They told me I couldn't take a deposition.  And

4    part of the basis was they gave you written responses to

5    written discovery and you can use that at trial.  So this is

6    what I'm stuck with.

7           THE COURT:  Okay.

8           MR. CLUKEY:  Your Honor, we would like to add some

9    additional context to Ms. Gadsden -- to the answer that was

10   read into the record.  The way that we -- the way that we

11   read that final couple sentences that were read in, it was

12   not impeachment.  Ms. Gadsden had not said that anything was

13   communicated to Mr. Nagy.  She had simply said that at the

14   time the IRS had accepted, so internally had accepted a bona

15   fide loan.  So there is a whole lot of context -- in fact,

16   the prior pages to that places this whole discussion in

17   context.

18          And if I can give you two cites.

19          THE COURT:  Sure.

20          MR. CLUKEY:  Page 142, line 6, through 144, line 9.

21   And then later on in the deposition, which precedes what Mr.

22   Cooper read, which was 171, line 14, through 174, 10.

23          And just to summarize this, Your Honor, Ms. Gadsden

24   was asked in the context of the interest deduction what the

25   IRS was doing and she said, look, this has been referred over

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    to, to see whether this was actually a tax shelter.  There

2    hadn't been any determination about whether there is a sale

3    versus a loan.  I didn't have the expertise to make that

4    determination.

5              And so then Mr. Cooper follows up, what about this

6    $150,000?  That's what this whole context is laid out.  She

7    says we had not made the determination, I didn't know whether

8    this was a valid loan or not.  That's the point.  And there

9    is an explanation here.  It is simply no changed because they

10   didn't want to keep the audit open, and that's what the first

11   cite relates to, sort of customer service reasons.

12             They were auditing it because of Derivium, the

13   partner got swept in, there had been a year and a half and

14   there had been no change, all of that context is critical to

15   the answer that was taken out of context that some

16   determination was made that's clearly not communicated in any

17   form to Mr. Nagy.

18             THE COURT:  Okay.

19             Yes, sir?  Anything?

20             MR. COOPER:  I'm happy for what was --

21             THE COURT:  I'll sustain your objection to 76.

22             And so the total upshot of what she testified here

23   today is that once she looked at the -- at Mr. Cathcart's

24   returns and she found that the $150,000 is irrelevant, then

25   she didn't make any determination at all, okay?

GADSDEN - DIRECT

1              So what's -- what's next?  Okay.  Are you just going

2    to finish your examination of her examination?

3              MR. COOPER:  Yes, sir.

4              THE COURT:  Okay.  All right.  Bring the jury in.

5              (Thereupon, the jury returned to the courtroom.)

6              THE COURT:  Okay.  Mr. Cooper?

7     Q. Ms. Gadsden, because the audit of Derivium entailed you

8    as the agent, a financial product specialist, and then an

9    international examination, would you consider the audit to

10   have been thorough?

11    A. Of Derivium?

12    Q. Yes, ma'am.

13    A. Yes.

14    Q. And in fact, audits that entail financial product

15   specialists, international examiners of a governing agent,

16   they happen seldom?

17    A. At that time, yes.  Um, we are actually using more and

18   more referrals.  So I guess in my experience at that time

19   that was unusual.

20    Q. And as an employee and an agent of the Internal Revenue

21   Service, do you try to provide good customer service to

22   taxpayers?

23    A. I try.

24    Q. And is part of that customer service effective

25   communication with the taxpayers?

GADSDEN - DIRECT

1          MS. WEIS:  Objection, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4     Q. And during your communications with Mr. Nagy -- and I

5    believe you testified to this beforehand -- but from your

6    interactions with Mr. Nagy throughout the course of the

7    audit, you were under the impression that Mr. Nagy believed

8    this was a legitimate transaction --

9          MS. WEIS:  Objection, Your Honor.

10    Q. -- a legitimate loan transaction?

11          MS. WEIS:  Objection.

12          THE COURT:  Basis?

13          MS. WEIS:  602.  Asking for her understanding of his

14    belief.

15          THE COURT:  Overruled.

16          THE WITNESS:  So you are asking me if during this

17    audit I felt that Mr. Nagy believed this was a valid

18    transaction?

19          MR. COOPER: Yes.

20    Q. From your interaction with him and your impression you

21    got from him.

22    A. Yes.

23    Q. Now, we talked at the beginning that this transaction,

24    during the initial interview, Mr. Nagy told you that Derivium

25    administered it nationwide.

GADSDEN - DIRECT

1                 Do you recall that?

2     A. Um, I believe my notes said they operated nationwide.

3     Q. Yes, ma'am.

4                 Do you recall that?

5     A. Yes.

6     Q. And Mr. Nagy told you that it was Derivium's position

7     that the stock loan transaction was a loan and not a sale for

8     tax purposes, right?

9     A. Yes.

10    Q. And you were auditing Derivium, correct?

11    A. I was auditing Derivium's income and expenses, yes.

12    Q. And you were auditing Scott Cathcart, correct?

13    A. I said he was found to be not in filing compliance.  And

14    as part of that audit of Derivium, I picked up his -- secured

15    his billing and returns and inspected them for accuracy and

16    questioned a few items on them.

17    Q. But you're auditing Scott Cathcart for the 2000 tax year?

18    A. Yes, but it really was more a result of Derivium rather

19    than just a regular audit of Scott Cathcart's return.

20    Q. And you knew Scott Cathcart did Derivium's stock loan

21    transactions because you audited his return, right?

22    A. From looking at this return, again, I must have, because

23    it's on their interest related to stock loans on that return.

24    Q. Right.

25                 In fact, Mr. Nagy provided you with specific

1024

GADSDEN - DIRECT

1    information about that?

2     A. And it's on here.  And then he provided me the interest

3    statements, I believe, or the total interest, accrued

4    interest as of what was deducted on the return.

5     Q. Now, when you issued the no-change letter to Scott

6    Cathcart, did you consider what that the acceptance of Scott

7    Cathcart's loan transactions at the time would have had on

8    Derivium's future conduct?

9          MS. WEIS:  Objection, Your Honor, 402, motion in

10   limine.

11         THE COURT:  I'll sustain the objection to that

12   question as being indecipherable because I'm reading it and I

13   don't understand it.

14         So if you want to rephrase it, go ahead.

15    Q. When you issued a no-change letter to Scott and Whitney

16   Cathcart in 2000, did you consider the implications of the

17   no-change letter or what it would have on Derivium's future

18   conduct?

19         MS. WEIS:  Same objection, Your Honor, 402 and

20   motion in limine.

21         THE COURT:  I'll overrule the objection.

22         THE WITNESS:  No.

23         MR. COOPER:  That's all I have.

24                    CROSS-EXAMINATION

25   BY MS. WEIS:

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

GADSDEN - DIRECT

1    Q. Good afternoon, Ms. Gadsden.

2         Now, Mr. Cooper asked you some questions about the

3    Derivium audit and I want to talk a little bit about that

4    today.

5         When you were talking with Mr. Nagy about the lender

6    that was involved in the 90% Loan Program, he told you that

7    there was a real lender; is that correct?

8    A. Yes.

9    Q. It was a real lender that was independent from Derivium?

10   A. Correct.

11   Q. Now, Mr. Nagy also told you, I think we saw in your

12   notes, that that that lender had a brokerage account and

13   Derivium managed the brokerage account for the lender; is

14   that correct?

15   A. Yes.

16   Q. And he told you that the lender's name was on the

17   brokerage account; is that correct?  You can look at your

18   notes.

19   A. Yes.

20   Q. Okay.

21   A. I don't have a copy of them.

22        MS. WEIS:  Can you pull up N-05, page 6?

23        THE WITNESS:  It says:  "Broker account.  Taxpayers

24   management control over this for the lender."

25   Q. Okay.  Here.  I'll hand you up a hard copy.

GADSDEN - CROSS

1              So your notes say that stock was transferred to the

2    broker account of lender that is managed by Derivium?

3    A. Correct.

4    Q. And this is what Mr. Nagy told you was happening in 1998;

5    is that correct?

6    A. Correct.

7    Q. And your audit was looking at the 1998 tax year.  So any

8    questions you had were about 1998?

9    A. Yes.

10   Q. And he told you the lender's name was on the brokerage

11   account?

12   A. Yes.

13   Q. Now, are you aware that last week Mr. Nagy testified that

14   in 1998 Derivium's name was on the brokerage account that was

15   used?

16   A. No.  Well, no.

17   Q. All right.  Now, Mr. Nagy also told you, I believe your

18   notes reflect if you look down on the page, Exhibit 5, page

19   6, it says:  "Lender is not required to issue 1099s as it is

20   foreign."

21              Is that what he told you?  Mr. Cooper asked you some

22   questions about that.

23   A. Yes.

24   Q. So Mr. Nagy, he told you again that there was a real

25   lender involved, and that they weren't issuing 1099s because

GADSDEN - CROSS

1    it was a foreign lender --

2     A. Correct.

3     Q. -- right?

4         Now, when you met with Mr. Nagy, he also told you

5    that the lender was independent from Derivium; is that

6    correct?

7     A. Yes.

8         MS. WEIS: Can we pull up Exhibit 221?  Government

9    Exhibit 221?  Pull up the top portion.

10    Q. So now Mr. Nagy testified last week, these are his

11    handwritten notes:  "DDA new ownership, 8-4, 2000.  Charles,

12    Scott, Yuri, percentages."

13        Did Mr. Nagy show you this document when you met

14    with him in 2002?

15    A. No.

16    Q. Now, Mr. Cooper asked you about your impressions of how

17    cooperative Mr. Nagy was at the time that you met with him

18    during the audit.

19        Do you recall that?

20    A. Yes.

21    Q. At the time I think you said you thought that he

22    looked -- appeared cooperative to you?

23    A. That's correct.

24    Q. Knowing now that some information wasn't given to you,

25    would you still describe him as being cooperative with you

1    during the audit?

2     A. No, because it seems like he told me what he wanted me to

3    know.

4            MS. WEIS:  No more questions.

5            MR. COOPER:  Nothing further.

6            THE COURT:  Thank you, ma'am.  Okay.

7            MR. COOPER:  We call Mary Socks by deposition

8    testimony.

9            THE COURT:  Okay.  All right.  So we are now going

10    to have the deposition of Mary Socks like we had before.

11            MR. COOPER:  She might play a little bit better than

12    Dr. Cathcart.

13            THE COURT:  How about just, let's explain the

14    deposition.  Tell the jury who Mary Socks is.  I don't know

15    whether it's in the deposition or not.  I think she's the --

16            MR. COOPER:  She's the financial products specialist

17    that was brought into the exam.

18            THE COURT:  Okay.  Good.  Thank you.

19            (Thereupon, the deposition testimony of Mary Socks

20    was read to the jury.)

21            MS. WEIS:  Your Honor, I think these last couple of

22    pages we went through are counter designations.

23            THE COURT:  You mean there is some more that should

24    have been read?

25            MS. WEIS:  No, that we had -- I don't know how much

1    you want me to get into it now, but there had been some

2    cutting down on the testimony and some counter designations,

3    and I thought we moved through this sort of to keep it short.

4            THE COURT:  All right.  Based on what you just told

5    me, where should it start again?

6            MS. WEIS:  I think actually that was it.

7            MR. COOPER:  That's it.

8            THE COURT:  That's it?  Okay.  All right.  Good.

9            MR. COOPER:  We rest our case.

10           THE COURT:  Okay.  Reply?

11           MR. CLUKEY:  No reply, Your Honor.

12           THE COURT:  Okay.  Ladies and gentlemen of the jury,

13   why don't you go back to the jury room now, because we've got

14   to talk about the jury charge.  And I'll be back in about ten

15   minutes to see whether we can go forward today or if it's

16   better to give us more time to go over the jury charge,

17   because I've got to make copies of it.  And I've already done

18   it three times, but I've got to do it again for each one of

19   you.  We may go forward today or first thing tomorrow

20   morning.

21           So give me about ten minutes and I'll talk to the

22   lawyers and we'll go from there, okay?  Either way, you will

23   have it done tomorrow.

24           (Thereupon, the jury retired from the courtroom.)

25           THE COURT:  Okay.  All right.  Mr. Clukey, you've

1    got -- anywhere you need some additions or corrections or

2    objections to the jury charge?

3            MR. CLUKEY:  Yes, Your Honor.  The first one is on

4    page 6.

5            THE COURT:  Page 6?  Okay.  So there was an addition

6    by Mr. Cooper, the second paragraph of page 6.

7            THE COURT:  Uh-huh.

8            MR. CLUKEY:  "In deciding whether or not to believe

9    a witness, keep in mind that sometimes people forget things."

10   In addition --

11           THE COURT:  I can read it.  I understand, all right?

12           What's your objection?

13           MR. CLUKEY:  To substantial -- really right here,

14   that's an issue for the jury, whether they consider that to

15   be substantial time or not.  A period of time may have

16   transpired since their witness prepared or reviewed a

17   document, that's fine, it's really the adjective

18   "substantial," we object to that.

19           THE COURT:  Okay.

20           All right.  What's the next one?  All right.  You

21   can argue substantial.  I'll take that out.

22           MR. CLUKEY:  Your Honor, the next one would be on

23   page 12.

24           THE COURT:  All right.

25           MR. CLUKEY:  So the bottom paragraph there on the

1    page.

2            THE COURT:  Wait a minute.  I just remembered

3    that -- now Mr. Cooper hadn't had time to go over it, so I

4    don't know -- at lunchtime, I remember.  I think that's what

5    you said, right?

6            MR. COOPER:  Yes, Your Honor, but I'm keeping up

7    right now.

8            THE COURT:  Okay.  That's fine.  I just didn't want

9    to -- if you needed some time to go over it, and we can do it

10   in half an hour, 45 minutes, I don't care, tell me what you

11   want.

12           MR. COOPER:  I'm fine right now.

13           THE COURT:  So if you feel unfine, let me know and

14   we'll give you whatever time you need.

15           MR. COOPER:  Thank you.

16           THE COURT:  Okay.  Page 4.

17           MR. CLUKEY:  The bottom paragraph there, an

18   additional factor is the clarity of the law, the time the

19   advice was given, and then the rest of that.

20           Your Honor, we believe this all relates to a couple

21   criminal cases that Mr. Cooper cited, and those criminal

22   cases, there is a vastly different standard that's in place

23   for willfulness in a criminal case.

24           This Court ruled that the transaction violated

25   substance over form.  That doctrine had been around since the

1      1940s.  And many cases of the Supreme Court have cited

2      substance over form over the years.  It's not like this area

3      of the law was unclear about substance over form.

4           So we believe that this -- this portion of the

5      instructions should be removed.

6           THE COURT:  Okay.  So you wanted to remove the last

7      paragraph on page 12 and the first two lines on page 13?

8           MR. CLUKEY:  Correct, Your Honor.

9           THE COURT:  Okay.  I'll think about that.

10          All right.  What's next?

11          MR. CLUKEY:  And, Your Honor, also, we discussed the

12     cases that Mr. Cooper cited.  And I could actually hand that

13     up to you, it's in our --

14          MS. WEIS:  Our opposition to his motion for summary

15     judgment.  He cited the same cases and made a similar

16     argument.

17          MR. CLUKEY:  Yeah.  You denied that motion for

18     summary judgment.  That's Docket Number 75.

19          THE COURT:  Okay.

20          MR. CLUKEY:  That's on pages 14 to 15 primarily this

21     issue is discussed.

22          THE COURT:  You are talking about the issue --

23          MR. CLUKEY:  We are just talking about the section

24     we wanted to strike.

25          THE COURT:  Docket number, what?

```
1              MR. CLUKEY:  75.

2              THE COURT:  Okay.

3              MR. CLUKEY:  And pages 14, 15 -- I can actually give

4    you these two pages if you would like, Your Honor.

5              THE COURT:  That's good.

6              MR. COOPER:  With that regard, I would just point

7    out you denied summary judgment.  That doesn't mean the law

8    is wrong; that just means it was material issues of fact as

9    to what may or may not influence his state of mind.

10             THE COURT:  All right.  What's next?

11             MR. CLUKEY:  Your Honor, that might be it.  I recall

12   that there was one more item, but I don't have anything else

13   written down.

14             THE COURT:  Okay.  Well, maybe since it's importantt

15   and I need to do research, why don't I bring the jury back

16   in, let them go, we'll start first thing in the morning.  How

17   does that sound, Mr. Cooper?  That will give you some time to

18   go over it and react to what they just told me.  We can argue

19   about it later this afternoon, and we'll have everything done

20   and start first thing in the morning.

21             Is that okay with you?

22             MR. COOPER:  Absolutely.

23             THE COURT:  Is that okay with you?

24             MR. CLUKEY:  Yes, Your Honor.

25             THE COURT:  Okay.
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    (Thereupon, the jury returned to the courtroom.)

2    THE COURT: Okay, ladies and gentlemen.  I think

3    it's -- based on what we have to do here this afternoon with

4    regard to the jury charge, and make copies of everything,

5    every time I try to make copies, my government-issued copy

6    machine breaks.

7    So it's probably a better use of your time to let

8    you go and we'll start again with the argument and the charge

9    first thing tomorrow morning at 9:30.

10    Don't discuss the case among yourselves, don't

11    discuss -- you've heard all the evidence in this case,

12    tomorrow you will hear the final arguments of the lawyers and

13    my final charge of the law, which I'll give you each copies

14    of, and then you will be able to deliberate and decide this

15    case.

16    But rather than have you sit there in the jury room

17    and mess around, we'll let you mess around at home or

18    wherever you are, okay?  So we'll see y'all at 9:30 in the

19    morning.

20    (Thereupon, the jury retired from the courtroom.)

21    THE COURT:  Okay.  So why don't we be at ease until

22    3:30, or if you are ready before that, I'll be upstairs and

23    I'll come on down.  I'll go over -- I'll take a look at what

24    you've given me and what your complaints are.

25    Mr. Cooper, if you find anything, just e-mail Frank,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    or whatever, and I'll take a look upstairs and we'll decide

2    the whole thing.  I think Frank has already e-mailed each of

3    you the verdict form, that's not rocket science.

4        So take a look at that.  If y'all agree on it, if

5    that's okay, and we'll go ahead and make those.

6        So we'll be at ease until 3:30.  Okay.  Great.

7    Thanks.

8        (Thereupon, there was a brief recess.)

9        THE COURT:  Okay.  Did y'all find anything else?

10        MR. CLUKEY:  Yes, Your Honor.  I sent Frank an

11    e-mail.  We wanted to renew our motion, which we presume was

12    implicitly denied under Rule 50.  We are just raising it on

13    the same grounds --

14        THE COURT:  Okay.

15        MR. CLUKEY:  -- for judgment in favor of the United

16    States.

17        We also wanted to, on 50 with the issue of

18    materiality, the reason why we believe materiality has

19    already been established, the case law explains materiality,

20    that material matters are those which would have a

21    substantial impact on the decision making process of a

22    reasonably prudent investor and would include matters

23    relevant to the availability of tax benefits.

24        And this Court found when we filed for summary

25    judgment one great benefit to the customer if he participated

1    in the program is favorable tax treatment because the

2    transactions were marketed as loans by Derivium.

3         Your Honor, no contradictory evidence is in the

4    record indicating that the statements made by Mr. Nagy were

5    not material.  We don't believe that that is an issue, that

6    there is any evidence upon which the jury could conclude that

7    the statements were not material.

8         THE COURT:  Okay.  When I read Document 75, after

9    you cited it to me in there, part of the Summary Judgment

10   Motion you said Mr. Nagy does not dispute materiality.  I

11   don't know whether that --

12        MS. WEIS:  I think that was for summary judgment.

13        THE COURT:  Okay.  What you say, Mr. Cooper?

14        MR. COOPER:  Well, as to materiality, I think Mr.

15   Polk also said that customers relied on diversification,

16   possibly estate planning.  So I don't think tax purposes was

17   established as the only reason for doing this transaction.

18        THE COURT:  Well, certainly that is a subset of tax,

19   at least until this year.  So I think if I wanted to die, I

20   would die this year so I could preserve the estate; is that

21   right?

22        MR. COOPER:  I believe there is a variety of

23   reasons.  With respect to each transaction, you know, I would

24   think that they had the burden under the Statute to prove

25   whether it was material, each transaction was, to try and

1    promote the penalty.  I think there is a dispute in the

2    record about why individuals did this.

3         Specifically, if you look at the economics of it,

4    you excluded it.  That in fact, if you take the 90 percent

5    loan and then pay capital gains three years down the road,

6    you end up with less than you would have if you would have

7    just sold it on day one.

8         So the very implication of the economics of the

9    transaction is there would be reasons besides the tax

10   benefits.  And I think Mr. Polk actually testified very

11   clearly that it was for diversification purposes with the

12   ability to participate in upside.  I don't believe that had

13   any implication to tax.

14        THE COURT:  Okay.

15        MR. CLUKEY:  Your Honor, we would add that this law

16   doesn't require it be the only reason, it merely has to have

17   a substantial impact on the decision making process, that's

18   what the law requires, not it's the only reason.

19        Secondly, Congress specifically eliminated taxpayer

20   reliance as an element of the offense.  So no matter what Mr.

21   Polk said, even if for some reason the Court was to think

22   that it had to be the only reason, it doesn't matter what the

23   customer found, it's the reasonable prudence standard,

24   whether that had a substantial impact on that person.

25        And we believe all the evidence in the record shows,

1    as this Court found previously, that there was a great

2    benefit to the customer in this transaction being tax

3    deferred.

4           THE COURT:  Okay.  Anything else, Mr. Cooper?

5           MR. COOPER:  No, Your Honor.

6           THE COURT:  All right.  What else?  Anything else?

7           MR. CLUKEY:  That's it, Your Honor.  And then any

8    ruling you would have on materiality would impact, obviously,

9    the jury instructions in a couple pages in there.

10          THE COURT:  All right.  How about, is there any

11   other additions or corrections that you found, Mr. Cooper?

12          MR. COOPER:  With regard to the jury instructions?

13          THE COURT:  Yes, sir.

14          MR. COOPER:  Yes, Your Honor.  I would like to focus

15   on page 11.

16          THE COURT:  Uh-huh.

17          MR. COOPER:  And in the first full paragraph, and

18   it's the third sentence that starts, "A person directly makes

19   or furnishes."

20          THE COURT:  Um-hum.

21          MR. COOPER:  The examples in the following sentence,

22   "Authors or edits documents containing false statements that

23   others will distribute to potential customers."  That example

24   is the finding of fact on if you made any corrections to

25   documents.  And I think that the jury should be able to

1    decide whether or not he caused directly or indirectly for

2    that to be sent out.

3         I believe, one, we don't know, for instance, if the

4    versions of the documents he corrected were even sent out.

5         Number two, whether or not he had ultimate say.

6         I think all the folks from Derivium testified, as

7    well as Mr. Nagy, that he didn't have ultimate say on what

8    went out and what form went out.

9         So by giving this direction, I believe it

10   established that you are directing the jury as to a fact,

11   which I believe is in dispute in this trial, on whether he

12   caused, directly or indirectly through his actions of editing

13   things.

14        So I would request that that last sentence be taken

15   out and allow the jury to deliberate on that fact, instead of

16   instructing them to it.

17        MR. CLUKEY:  Your Honor, those factors are both

18   mentioned in the *Estate Preservation Services* case, the Ninth

19   Circuit leading case on this on 6700, as well as *Alexander*,

20   which is a District of South Carolina case, where tax packets

21   were distributed to members and the group's owner made or

22   caused statements to be made regardless of whether he

23   actually authored the materials.  There is two cases that we

24   cited in connection with that.  We don't believe that the

25   jury is making a finding here by including this.

1        THE COURT:  You mean the Court?

2        MR. CLUKEY:  I'm sorry.  That the Court is making a

3    finding by including this in here.  These are simply factors

4    recognized by courts as being -- as being relevant to

5    answering the question of whether this has been furnished or

6    not.

7        THE COURT:  Okay.  Anything else, Mr. Cooper?

8        MR. COOPER:  In that same paragraph, and you made

9    the insertion on the previous page, that the second sentence

10   we say, "this court has already ruled," I just ask again, for

11   clarity, you just insert in December of 2009 for that.  And

12   then --

13       MR. CLUKEY:  Your Honor, we would object to that

14   insertion.

15       THE COURT:  Why?  It's true.

16       MR. CLUKEY:  It is true.

17       THE COURT:  You mean you don't want me to give the

18   jury the truth?

19       MR. CLUKEY:  Of course we want the jury to have the

20   truth, Your Honor, the whole truth.

21           I guess we would -- at that point we might ask for

22   an instruction clarifying the substance over form doctrine

23   has been around since the 1940's, and that could accompany

24   that 2009 ruling.  I would be perfectly comfortable with

25   that.

1          THE COURT:  Okay.  What makes it more egregious

2     included on page 11 than having it included on page 10 since

3     there wasn't any objection to doing it on page 10?

4          MR. CLUKEY:  It's no more egregious, Your Honor.  I

5     just missed that.

6          THE COURT:  Okay.  Well, if you miss it, it must not

7     have been very important when you read it.  I think I'll

8     overrule your objection to his inclusion.  I'll put it in.

9          MR. COOPER:  The last line on page 11.

10         THE COURT:  Uh-huh.

11         MR. COOPER:  Where it says "statements made or

12    omitted," the use of "omitted" the statute says specifically

13    "a statement with respect" -- and it doesn't include the word

14    "omitted".  So I would ask that it be removed.

15         MR. CLUKEY:  Your Honor, this is pertaining to

16    scienter, it's not that.  So it's obviously statements made

17    or omitted clearly pertain to scienter.  So that's -- that's

18    simply not an accurate reflection of Mr. Cooper's making two

19    different portions of the Statute, two different elements.

20         THE COURT:  Okay.

21         MR. CLUKEY:  So this is just a statement, you are

22    talking about actual knowledge, and you can't prove that.

23    This is just standard charging.

24         THE COURT:  Because really, the Statute at page 9

25    and 10 I say -- it says it over and over and over again.

1          MR. COOPER:  Okay.  I thought that was consistent.

2     I didn't understand why the omitted language was put in after

3     you used the word statement.

4          THE COURT:  It's kind of circumstantial evidence

5     charge.  So I'll leave that in there, okay?

6          MR. COOPER:  On page 13, the first full paragraph,

7     the last sentence that starts with "additionally," from there

8     down, this charge about the disclaimers, um, I don't know, I

9     sort of dug around -- I don't understand the legal basis of

10    saying that the disclaimer as a matter of fact, and that's

11    just my --

12         MR. CLUKEY:  Your Honor, in connection with our

13    proposed jury instruction there, we provided the Court with

14    citations of three different cases, one of which is the

15    District of South Carolina case.  The case is *Alexander*, the

16    citation is 2010 WL --

17         THE COURT:  1643425.

18         MR. CLUKEY:  We believe it was also cited in *Schulz*,

19    which is a 2007 case from the District of New York, and then

20    *Kukhahn*, it's a 2008 case from the Western District of

21    Washington.

22         MR. CLUKEY:  The other thing, Your Honor, Mr. Cooper

23    put those disclaimers clearly at issue with numerous

24    witnesses, so we believe it's a very important instruction

25    clarification for the jury.

1          MR. COOPER:  I just didn't know, in the context -- I

2     looked for it in the context of 6700 cases and didn't see it,

3     so I didn't know why that could not be -- I just didn't know

4     about the application of the law to a 6700 case.  But the

5     instruction is, I perceive, is relatively strong on the

6     issue.  And I didn't -- I guess I lacked an understanding as

7     to the basis for it.

8          THE COURT:  The *Alexander* case, which is the one

9     from three months ago from Ross Anderson, is a 6700 case, and

10    that's where that language came from.

11         Although it's been my rule just to quote Ross, but

12    follow Joe, and this one I'll follow Ross -- we have two

13    federal Andersons, Ross Anderson and there is Joe Anderson,

14    for those people who don't know, okay.

15         So I'll overrule your objection as to that on page

16    13.

17         MR. COOPER:  And the last one is to take up the

18    issue on page 14 with the no-change letters.

19         THE COURT:  Uh-huh.

20         MR. COOPER:  What I submitted to Mr. Ulmer, I cited

21    law as to being able to rely on no changes as to having a

22    reasonable basis or a reason that you weren't engaged in

23    conduct subject to penalty, because those cases found that

24    audit determinations were a defense to penalties.

25         And I tried to clarify that in my proposed language

1    and none of it was accepted.  And I went back and tried to

2    redraft it, you know, where it would be more acceptable or

3    something like, "While Mr. Nagy cannot rely on the no-change

4    letters as binding determinations as to validity or correct

5    tax treatment of the 90% Stock Loan, he is entitled to rely

6    on the no-change letters in support of what he believed at

7    the time."  Something to that effect.

8         Because I believe your comments in the trial was

9    they are not determinations, but they may go to what he

10   believed at the time, and something consistent with that,

11   instead of just saying they are not determinations, because I

12   believe there is something about determinations for tax and

13   defenses to penalties and that's why I have been trying to

14   craft some kind of language that would be consistent.

15        THE COURT:  Yes, sir?

16        MR. CLUKEY:  Your Honor, Mr. Nagy testified about

17   what he thought the no-change letter meant.

18        You warned Mr. Cooper at the beginning of trial that

19   you were going to define what a no change was, the definition

20   of a no change is; however, Mr. Nagy cannot rely on the legal

21   determinations by the IRS.  Mr. Cooper knew that was going to

22   be the case going in the trial.

23        And so since Mr. Nagy was allowed to testify about

24   what his interpretation and view of it was, we are not sure

25   why another instruction should go in here, and I'm not

1  exactly entirely sure what Mr. Cooper wants the instruction

2  to read.

3              THE COURT:  Actually, what he wants me to tell them

4  is that because he got a no-change letter, it's a complete

5  defense and he ought to walk out of the courtroom, and that's

6  what he wants.

7              Would that be a fair summary?

8              MR. COOPER:  Um --

9              THE COURT:  Just being a little flip, but...

10             MR. COOPER:  A wink and a nod.  Yes, absolutely.

11             THE COURT:  Okay.

12             MR. COOPER:  But you can -- actually, you can leave

13  the sentence exactly like it is and just add a sentence

14  saying, while it is not a determination, you can consider it

15  as to Nagy's state of mind at the time, or you may consider

16  whether it could have had an impact on Nagy's state of mind

17  at the time.

18             And I think that is consistent with the comments

19  you've made to me.

20             THE COURT:  Because the three cases that you rely on

21  are individual taxpayer cases, they are not 6700 cases, and

22  there is no reasonable cause defense in 6700 like there were

23  in the *Gilmore* and *Stewart* cases.

24             MR. COOPER:  Right.  That's definitely right, Your

25  Honor.

1            But I will say if you look at the regulations for

2      the reasonable cause defense, which is under the Internal

3      Revenue Code, there is two defenses, and there is two prongs

4      to it, Your Honor.

5            The first is there has to be substantial authority

6      for the transaction.  That's one part of the reasonable cause

7      defense, or you have a reasonable basis for the transaction,

8      and a good faith belief as to that position.  And if you read

9      those cases, they talk about the good faith belief, which is

10     a state of mind.  So again, we are dealing with 6700.  There

11     is not a lot of case law.  There isn't a reasonable cause.

12            But in the same vein, Section 6700 does have an

13     intent or belief aspect to it, just like that second prong of

14     reasonable cause.

15            So it's the best law we've got, and we used it under

16     those circumstances to show that that taxpayer had a good

17     faith belief.  And that's why we are trying to use it here.

18     And I think Your Honor has agreed with that, saying even

19     though it may not be a tax determination, it may have had

20     some impact on Mr. Nagy's belief.

21            MR. CLUKEY:  Your Honor, I believe the instruction,

22     if you just go up the instruction a little bit further, it's

23     already implicit in the instruction itself, that they could

24     take this no-change letter into consideration.  It says, "you

25     should consider this" -- talking about the no change -- "you

1    should consider this evidence in determining whether or not

2    the Government has met its burden of proving that Mr. Nagy

3    knew or had reason to know statements regarding the 90% loan

4    transactions were false or fraudulent."

5         It goes on additionally with you further expanding

6    on that.  We just think the instruction is pretty clear as

7    written.  To go so far beyond that would be basically to

8    undercut the last sentence in the instruction.

9         MR. COOPER:  I don't think it would undercut it if

10   you craft it to the effect of while it's not a tax

11   determination or legally binding, you may consider it as to

12   Nagy's belief.

13        THE COURT:  Isn't that what it says in the sentence

14   before, though?

15        MR. COOPER:  It doesn't.  He said implicitly, I

16   would agree with that.  It was sort of like, what's the

17   implicit of Ms. Gadsden not saying something?  I mean, it's

18   better to say it and define it correctly instead of having

19   the jury draw the incorrect conclusion upon it.

20        We would just ask that that's what the case law

21   supports and I think Your Honor has said that.

22        THE COURT:  Okay.  Maybe this will be better, all

23   right, in that paragraph, "You have heard evidence regarding

24   no-change letters that the IRS sent to the various

25   people/entities associated with the 90% Loan Program."  I'm

1    using the last sentence as the next sentence.  "Mr. Nagy

2    cannot rely on the no-change letters as binding

3    determinations made by the IRS or legal determinations made

4    by the IRS, but you should consider this evidence in

5    determining whether the Government has met its burden of

6    proving Mr. Nagy knew or had reason to know that certain

7    statements are false or fraudulent."

8            So I'm just rearranging that paragraph, which is

9    essentially what you want.

10           MR. COOPER:  Yes, Your Honor.  That is helpful.

11   Thank you.

12           THE COURT:  I'll just flip that, okay?

13           MR. CLUKEY:  That's fine.

14           THE COURT:  Okay.  All right.  I'm not going to

15   excise those two examples, I think they are from case law.

16   The first one may or may not apply to Mr. Nagy, the second

17   one certainly doesn't apply to Mr. Nagy, it's just another

18   example.  So you can argue those, and they say they are

19   examples, they are not findings.

20           Okay.  Anything else, Mr. Cooper?

21           MR. COOPER:  No, Your Honor, that's all I have.

22           THE COURT:  Okay.  How about -- anything else, Mr.

23   Clukey?

24           MR. CLUKEY:  Just the -- I presume you are going to

25   tell us, just the items that we raised concerning the

1    instructions.

2           THE COURT:  On the bottom of page 12, top of page

3    13.

4           MR. CLUKEY:  Yes, that's one of them.

5           THE COURT:  Okay.  What was the other one?

6           MR. CLUKEY:  The stipulation.  The substantial -- I

7    can't remember, did you actually strike the word substantial?

8           THE COURT:  Yeah.

9           MR. CLUKEY:  Okay.  Thank you. And then obviously

10   material, materiality, whether --

11          THE COURT:  Okay.  It seems to me that I'm going to

12   take out the bottom of page 12 and the top of page 13,

13   because the law in this area is not unclear whatsoever.  The

14   law in this area is that if it's a sale, you pay taxes on it,

15   and if it's a loan, you don't.  That's the law.

16          Now, the facts in this case may be foggy or

17   indeterminate or unclear, but the law certainly isn't

18   unclear.

19          MR. COOPER:  I would agree as to the ultimate issue,

20   if it's a sale, you pay tax; if it's a loan, you don't.

21          THE COURT:  And that's the law.

22          MR. COOPER:  I would agree with that, but the

23   analysis on whether it's a sale or a loan --

24          THE COURT:  That's fact based, isn't it?

25          MR. COOPER:  Pardon?

1          THE COURT:  Isn't that fact based?

2          MR. COOPER:  It's legal based, too.  I went through

3     1058, 1036, 1239, the revenue rulings, and there was no cases

4     or IRS directive on point until Judge Hamilton ruled in

5     California in December of '09.

6          So it's like a legal argument, or my opinion -- I

7     take a position, I look for the law, I make the best argument

8     I can, and that's my opinion, and it's grounded in certain

9     statutes, case law, revenue rulings.  So ultimately, you are

10     right.  If you get to the opinion, the tax applications fall

11     out, but it's that process of getting to that conclusion for

12     which there was no law.

13          THE COURT:  There was law.  I mean, being very

14     unsophisticated, if it's a sale, there is tax; if it's not a

15     sale, if it's a loan, there's no tax, right?  That's where we

16     start and end.  That's where we end, right?

17          MR. COOPER:  That's where you end.

18          THE COURT:  But to get there, isn't everything else

19     fact based?

20          MR. COOPER:  No.  But you remember when we briefed

21     this and they raised their motion for summary judgment, and

22     they said it was a sale, and I argued before Your Honor that

23     it was a loan, and I brought up the *Welch* test, the *Grodt*

24     test, I argued Revenue Ruling 2003-7, I argued *Odend'hal*, I

25     argued *Bees Ferry Associates*, all those cases that set forth

1    parties' intention, the value of the collateral is more than

2    the value of the loan, and all of those factors supported our

3    position.

4          At that time, you know, that I attempted to make

5    that argument before you, that was the legal basis for my

6    conclusion it was a loan.  I was making that argument

7    grounded in case law and revenue rulings, no different than

8    what Mr. Nagy was doing when he was giving his opinions to

9    his client.

10         And that's why if there is no case law directly on

11   point that impacts your state of mind, and I think the *U.S.*

12   *vs. Weir* case in the Northern District of Alabama said

13   specifically, the Mid-South scheme may have been almost too

14   good to be true, but it had a semi-logical basis in the tax

15   laws which permitted, even encouraged schemes not unlike this

16   one.

17         The Court went on to say, "never actually realize,

18   nor he had reason to believe in 1982 and 1983 that what he

19   was representing to the 34 customers by way of purportedly

20   favored tax consequences wasn't false and that's because the

21   Court didn't rule until 1985 on that issue."

22         So it's the same analysis the Court went through in

23   *U.S. vs. Weir*, that if there was no direct case law on point,

24   but if I had a semi-logical basis in law to make the argument

25   and Mr. Nagy had a semi-logical basis in law, that that went

1    to his intent at the time on whether he believed that advice

2    was false.

3         MR. CLUKEY:  Your Honor, Mr. Cooper just referenced

4    a whole bunch of sale versus loan cases.  So a whole bunch of

5    sale versus loan cases that existed has been around for a

6    very long time.  And anybody can go look at these cases and

7    find out factors that determine whether it's a sale versus a

8    loan.  It's not complicated.  He just referenced the *Weir*

9    case.  The *Weir* case involved Mid-South Music.

10        Mid-South Music was found prior to the decision in

11   *Weir*, was enjoined as a tax shelter.  Penalties were imposed

12   and the core promoters were penalized.  The person in *Weir*

13   was a subpromoter who was duped by the -- by the main

14   promoters.  And he relied on the opinion of lawyers he had.

15   He had opinions.

16        And so it was a very fact-based analysis, it wasn't

17   as a legal matter.  The area of the law was unclear; and

18   therefore, he couldn't be held that -- there needed to be

19   some kind of explanation or he couldn't be held liable, is

20   absolutely not the case.  And actually, it's referenced in

21   the *Estate Preservation* case.  So it's a very factually

22   determinative case.

23        So one, there is a lot of case law out there on sale

24   versus loan.

25        Second, this Court also said it violated substance

1       over form.

2                So again, a second reason that it was out there.

3       And Mr. Nagy testified he knew about substance over form in

4       '97.  So there are two things that are absolutely clear at

5       the time he was rendering all his decisions.

6                MR. COOPER:  I think the case that makes the point

7       here is the McDermott Will & Emery position in 2001, they

8       went through the same analysis as Mr. Nagy to get to the end.

9       It was the analysis that mattered.  They looked at the same

10      statutes, they looked at the same type of case law.  It was

11      the analysis.

12               I mean, there was no case law on point.  McDermott

13      Will & Emery said that -- they also said that there is no

14      form over substance cases related to nonrecourse loans.

15      Instead, they looked at the *Estate of Franklin* case that says

16      that if the value of the collateral is more than the loan,

17      the transaction has economic substance.  They wrote that in

18      their opinion.  Mr. Nagy did the same analysis in Exhibit 41.

19               So it is the analysis under the law.  I would agree

20      that after you ruled in December of '09, anyone that does one

21      of these transactions knows it, but before then, no tax court

22      had ruled.

23               In fact, we briefed a tax court case in early '08 in

24      the *Commissioner vs. Shao*, or *Shao vs. Commissioner*, the

25      Judge has yet to rule on it.  So if a tax court hasn't ruled

1    on it in two years, there must be some semi-logical basis, or

2    even a substantial basis for going through the analysis and

3    coming to a conclusion that differs with the IRS.

4          So that's what we want the jury to understand is if

5    there was no direct on point and there is unclarity in the

6    law, that that goes to his state of mind in doing the

7    analysis.

8          MR. CLUKEY:  Your Honor, just because somebody

9    creates a new transaction that hasn't been done before

10   doesn't mean the state of the law is unclear.  That's a

11   ridiculous proposition.  They created something called a 90%

12   Stock Loan.  If it's called something else, they simply

13   changed the name.  So the Court hasn't ruled on that.  You

14   change the security involved.  When the core issue is sale

15   versus loan, the core issue is substance over form, those two

16   issues just -- I mean, it's -- it's -- frankly, it's hard to

17   understand.

18         And then when you try to pair it with this

19   instruction that Mr. Cooper would have, he's now assuming

20   that the state of the law is unclear.  And when the law is

21   vague or highly debatable, a person is less likely to know or

22   have reason to know that a position of law taken by the

23   person is false, I mean, that comes straight out of criminal

24   cases where there is a very high standard.  In tax criminal

25   cases, it is a very different standard than the standard

1    under 6700.

2         MR. COOPER:  The Fourth Circuit case, the *Critzer*

3    case, it relied on the Second Circuit case, I'm going to

4    butcher the name, it's *Kahr vs. Commissioner*, it's 414 F2d

5    621.

6         So the Fourth Circuit in a criminal case looked to a

7    civil case against the IRS in the Second Circuit coming to

8    the principle, and he said it exactly right, when it's

9    debatable and it's unclear, you lack intent, and that's all

10   the proposition is for.

11        And I don't understand this proposition that -- the

12   Fourth Circuit in the *Odend'hal* case that we briefed to you,

13   Your Honor, they drew a bright line rule.  They said if the

14   value of the collateral is more than the nonrecourse loan,

15   there is an economic incentive to pay it off at the inception

16   of the transaction, and that's what you look at for economic

17   substance.  And that's what McDermott Will & Emery analyzed

18   in the *Estate of Franklin* case in the supplemental

19   memorandum, and that's the exact same analysis my client did.

20        So if that's the law and that's economic substance,

21   and there is no direction from the IRS saying 90% stock loans

22   are a tax shelter, they never issued that.  So if he had a

23   basis in the law for saying it's a loan, and they had that

24   economic intent.

25        THE COURT:  Okay.  All right.  I'll think about it

1    and I'll -- we'll e-mail you another copy of the charge, all

2    right?

3           Anybody have any problem with the verdict forms?

4           MR. CLUKEY:  No, Your Honor.

5           THE COURT:  Okay.  Anybody have any problem with any

6    other part of the charge that we haven't addressed?  Okay.

7           All right.  I'll e-mail you a final copy of the

8    charge and we'll go from there.  And so if there is anything,

9    we'll see y'all at 9:00 tomorrow morning.  The jury is coming

10   back at 9:30.

11          You may want to stay here and make sure all the

12   exhibits are in evidence, so we can do that now rather than

13   have the jury wait for them.

14          If there is anything that comes up that you think of

15   between now and tomorrow morning, e-mail Frank and let him

16   know.  Once I give you copies of the charge, then I'm going

17   to make copies for the jurors, so they will have them here

18   and you can know tonight when you are replanning your closing

19   arguments, you can refer to the same pages the jury will

20   have.  And I think it helps the lawyers and that helps the

21   jurors out for sure, because I've done cases and they

22   underline them and all that kind of stuff.

23          So we'll let you know, all right?  Anything else?

24          MR. CLUKEY:  Yes, Your Honor.  What is the jury

25   going to be told, if anything, about the second phase of the

1    trial?  Are they going to be told anything about that?

2         THE COURT:  Not until the first phase is over.

3         And the second phase of the trial, from what I

4    understand, is Mr. Cooper goes first, you are going to call

5    Mr. Nagy, assuming we get that far, you are not going to call

6    anybody, and then we are going to have a short argument, I

7    guess, as to the amount.

8         And then like I said, Mr. Cooper goes first, you go

9    second and he has a rebuttal, okay?  I don't know what he's

10   going to put in, but besides Mr. Nagy, is there anybody else

11   that you are going to call in the second phase, assuming we

12   get that far?

13        MR. COOPER:  No, sir.

14        THE COURT:  And everybody agrees, I assume, that if

15   the verdict is in Mr. Nagy's favor in the first half, we

16   don't have to go to the second half, do we?

17        MR. CLUKEY:  Correct, Your Honor.

18        THE COURT:  Okay.  Thanks.

19        And 78 is the -- the Altemose report, that's the one

20   that we are making Court's Exhibit 1, right?

21        MR. COOPER:  Yes, sir.

22        THE COURT:  There.  It's right there.

23        THE COURT:  Thank you.

24        (Thereupon, the Court was in recess.)

25                                    *   *   *

```
 1
 2                        *****      *****      *****
 3
 4     I certify that the foregoing is a correct transcript from the
 5     record of proceedings in the above-titled matter.
 6
 7
 8
 9     ---------------------------
10
11     Amy C. Diaz, RPR, CRR              February 17, 2011
12
13
14     S/  Amy Diaz
15
16      Court's Exhibit Number 1                           940
17      MS. NEVA GADSDEN                                    945
18      DIRECT EXAMINATION                                  945
19      BY MR. COOPER
20      Plaintiff's Exhibit Number 5                        959
21      Plaintiff's Exhibit Number 101                      971
22
23
24
25
```