```
 1                   IN THE DISTRICT COURT OF THE UNITED STATES
                          DISTRICT OF SOUTH CAROLINA
 2                          CHARLESTON DIVISION

 3        ROBERT J. NAGY,              )
          YURI DEBEVC,                 )          2:08-CV-2555
 4                                     )
                         Plaintiffs    )          Charleston,
 5                                     )          South Carolina
          VS                           )          June 18, 2010
 6                                     )
          UNITED STATES OF AMERICA,    )
 7                                     )
          Defendant                    )

 8                       TRANSCRIPT OF PRETRIAL HEARING
 9                 BEFORE THE HONORABLE DAVID C. NORTON,
                    CHIEF UNITED STATES DISTRICT JUDGE
10
          APPEARANCES:
11
          For the Defendant:      MR. NATHAN CLUKEY
12                                MR. GREGORY SEADOR
                                  MS. ELLEN WEIS
13                                US Department of Justice Tax Division
                                  P.O. Box 7238
14                                Ben Franklin Station
                                  Washington, DC 20044
15

16
          For the Plaintiff:      MR. LINDSEY W. COOPER, JR., ESQ.
17                                LW Cooper Jr. Law Offices
                                  36 Broad Street
18                                Charleston, SC 29401

19                                MR. YURI DEBEVC
                                  Appearing pro se
20

21

22

23        Court Reporter:         Amy C. Diaz, RPR, CRR
                                  P.O. Box 835
24                                Charleston, SC 29402

25                  Proceedings recorded by mechanical shorthand,
          Transcript produced by computer-aided transcription.
```

```
 1              THE COURT:  Okay.  I'm ready when y'all are.
 2              MR. CLUKEY:  Your Honor, we've -- we exchanged a
 3    number of exhibits with opposing counsel, and Mr. Debevc had
 4    done the same.
 5              I believe Mr. Debevc had had something he wanted to
 6    raise before we got started with this.
 7              THE COURT:  Okay.
 8              MR. DEBEVC:  Your Honor, good afternoon.
 9              THE COURT:  Hi.
10              MR. DEBEVC:  Um, I don't know how this Court is
11    aware, but I have been trying to settle this matter with the
12    United States.  Previously, their offer was rejected, and I'm
13    at a point right now that the -- one moment please.
14              THE COURT:  Sure.
15              (Pause in proceedings.)
16              MR. DEBEVC:  That I would still be willing to settle
17    with the Department of Justice Tax Division for a consent
18    judgment in -- providing to a number, that a consent judgment
19    would be without a finding of any wrongdoing or admission of
20    any wrongdoing on my part.
21              And I raise that the -- it is my understanding that
22    there is some flexibility on the part of the personnel in the
23    Department of Justice on that number.  The current number is
24    $3,353,633, and apparently there is some flexibility of half
25    a million dollars less than that.
```

1          So I would be looking for a -- for a judgment,

2     provided that we can reach the language without finding of

3     any wrongdoing or admitting any wrongdoing on the part of

4     Debevc.

5          THE COURT:  Okay.

6          MR. CLUKEY:  Your Honor, I was speaking in general

7     terms.  I was talking to Mr. Debevc as far as flexibility,

8     what we do in settlements, kind of explaining the process and

9     procedure.

10          I think, what it sounded to me, and I wanted Mr.

11     Debevc to raise it with you, because I didn't want to give

12     him legal advice, but it sounded that what he wanted to do

13     was something to the effect of default judgment, or some kind

14     of consent judgment, and then I wasn't sure if he was

15     offering to settle or exactly what was happening, so --

16          THE COURT:  Well, let me see, my understanding of

17     what Mr. Debevc just said is he would be amenable to entering

18     into a consent judgment with the -- in this case with the

19     Justice Department for an amount of money, which, somewhere

20     between 3.3 and $2.8 million, as long as the consent judgment

21     does not find any --

22          MR. DEBEVC:  Wrongdoing.

23          THE COURT:  -- wrongdoing on his part.

24          MR. DEBEVC:  My part admitting any wrongdoing.

25          THE COURT:  Or admitting any wrongdoing.

```
 1              MR. DEBEVC:  On my part.

 2              THE COURT:  I hear that kind of stuff going on all

 3      the time in Washington.  I've never it done it down here.  Is

 4      that --

 5              MR. CLUKEY:  We'll consider it, Your Honor.  He just

 6      raised it before you came down, and I'll talk to the front

 7      office and ask them.

 8              THE COURT:  I note, not to be pejorative, sometimes

 9      it takes a while to get an answer in the Justice Department.

10              MR. CLUKEY:  You are right.  That's dead on.

11              THE COURT:  Can one of the three of y'all call

12      somebody in Washington before they take the week off and see

13      if that's a possibility?  I mean, there is a lot of work -- I

14      mean, a lot of things to be done.

15              MR. CLUKEY:  We will, Your Honor.

16              THE COURT:  Okay.

17              MR. CLUKEY:  We'll call today.

18              THE COURT:  Since there is three of you here and

19      only one of you can speak at a time, it may be a good use of

20      resources for one of y'all to get on the phone and see if you

21      can work something like that out while the rest of us are in

22      here hashing out documents.

23              MR. CLUKEY:  That's fine, Your Honor.  I'm lead

24      counsel in this case and I'm really the one who should make

25      the call.
```

1          THE COURT:  Okay.

2          MR. CLUKEY:  At the same time I have a very vested

3     interest in discussing some of these exhibits.

4          THE COURT:  Okay.

5          MR. CLUKEY:  I think I can leave, at least the

6     initial part, I think I could leave it in the hands --

7          THE COURT:  Or we can stop for ten minutes, and you

8     know -- I don't know whether you can get through in ten

9     minutes or an answer in ten minutes, but you will certainly

10    know if the person you have to call will or will not be in

11    this afternoon.

12         MR. CLUKEY:  Um --

13         THE COURT:  Are you familiar with these type of

14    settlements in your --

15         MR. CLUKEY:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. CLUKEY:  Yeah.  I can make a call right now,

18    Your Honor.  Is it okay if we take a 10-minute recess?

19         THE COURT:  Yeah.  Here are two depositions which

20    have been marked up.  So y'all can do some responsive

21    reading.

22         As usual, you win some and you lose some.  So here

23    they are right here, and you can take a look at them while

24    I'm gone.  So you might win your motion after all.

25         MR. COOPER:  It would be the first one.

1          (Thereupon, there was a brief recess.)

2          THE COURT:  There is at least one juror who has

3    fallen down the stairs whose doctor says he can't come, and

4    there is another juror who has been diagnosed with Shingles,

5    who may be contagious for 48 to 72 hours.  And we'll call

6    back, and if that juror is contagious, she won't come back.

7          So we are going to have 11 right now, okay?

8          Well, Mr. Clukey, make my day.

9          MR. CLUKEY:  It's in process, Your Honor.

10         And so I did -- I did reach folks in Washington, and

11   they now have to talk to IRS counsel, but things are in the

12   works right now.

13         THE COURT:  So we'll just keep going, and then

14   hopefully -- are they going to call you back?

15         MR. CLUKEY:  I'm going to call them back in a little

16   while, and hopefully, they've made some progress.

17         THE COURT:  Sounds good to me.

18         So Mr. Debevc, they didn't reject it out of hand.

19   So we'll just have to start, go on two tracks right now,

20   okay?

21         MR. DEBEVC:  Understood.

22         THE COURT:  And it's my understanding from my court

23   reporter that sometimes that y'all drop your voices and don't

24   speak directly into the microphone.  So if everybody would

25   please try to speak in the microphone, because we -- she has

```
1     to hear before she can put it down, okay?
2               MR. CLUKEY:  Yes, Your Honor.
3               THE COURT:  Okay.  What we got now?
4               MR. CLUKEY:  We would like to start, since we are
5     going first, we would like to start with some of the
6     exhibits, if that's okay.
7               THE COURT:  All right.  Sure.
8               MR. CLUKEY:  Actually, Your Honor, we've got a
9     number of exhibits for which there are no objection.
10              THE COURT:  Okay.
11              MR. CLUKEY:  We would like to move those into
12    evidence.
13              THE COURT:  All right.  Do you want to just read
14    them out?  Are there -- have they already got stickers on
15    them and all that?
16              MR. CLUKEY:  Yes, they have, yes, because Mr. Nagy
17    is going to start at 400, and ours are already numbered.
18              THE COURT:  So do you want to go ahead and -- yeah?
19              MR. COOPER:  I discussed it yesterday.  We are going
20    to do plaintiff's 1 through -- we are instructed to do
21    plaintiff's 1 through, I think we have 80 something.
22              THE COURT:  Okay.
23              MR. COOPER:  And they'll do Government 1 through 300
24    something.
25              MR. CLUKEY:  Your Honor, we actually don't have the
```

1    physical exhibits here, so...

2         THE COURT:  All right.  And so just go ahead and put

3    those numbers on the record, and Gail will have a copy of

4    them, and she'll mark those into evidence.

5         I guess this is for both sides.  You have some on

6    your side, too, Mr. Cooper and Mr. Debevc, that are not

7    objected to?

8         MR. COOPER:  Yes, Your Honor.

9         THE COURT:  Okay.  Just put -- we'll just do those,

10   the Government, you do those, read those into the record.

11   And then Mr. Cooper, you can read yours into the record.  And

12   y'all check -- and Mr. Debevc, you can read yours into the

13   record to which there have been no objections, and then Gail

14   will have them, and on Monday we'll know which ones are in

15   evidence.  And then if somebody hasn't marked them correctly,

16   or we have marked them incorrectly, then we'll take care of

17   it then.

18        Go ahead.

19        MR. CLUKEY:  Exhibit 48, 210, 212, 335, 193, 194,

20   207, 204, 223, 42.

21        (Thereupon, Government's Exhibit Numbers 48, 210,

22   212, 335, 193, 194, 207, 204, 223 and 42 were received in

23   evidence.)

24        THE COURT:  Does that comport with everybody else's

25   records?

1          MR. COOPER:  Your Honor, Mr. Nagy has no objection

2     to those exhibits.

3          THE COURT:  Okay.

4          MR. DEBEVC:  Mr. Debevc doesn't have any objections.

5          THE COURT:  Okay.  Good.  Thank you.

6          THE COURT:  All right.  How about Mr. Nagy's

7     exhibits, of which we need to mark into evidence, perhaps?

8          MR. COOPER:  Your Honor, 39, 41, 42, 43, 44, 45, 46,

9     47, 48, 51.  That's all, Your Honor.

10          THE COURT:  Okay.

11          MR. CLUKEY:  Your Honor, those are -- I guess it

12     depends on different local rules on it -- those are all our

13     exhibits; is that correct?

14          MR. COOPER:  No, those were Mr. Nagy's exhibits.

15          MR. CLUKEY:  I'm sorry.  Okay.  Sure.

16          No objection, Your Honor.

17          (Thereupon, Plaintiff's Exhibit Numbers 39, 41, 42,

18     43, 44, 45, 46, 47, 48 and 51 were received in evidence.)

19          MS. WEIS:  To clarify for the record, I think those

20     will be not 39, but 439 and --

21          MR. CLUKEY:  Right.

22          MR. COOPER:  No, we just explained that we are going

23     Plaintiff's 1 through 87, and then --

24          THE COURT:  So they are going to go Plaintiff's 1

25     through 87, Government 1 through 87, rather than Exhibit 400

1     something.  I think we have different colored stickers for

2     each side, too.

3           How about, Mr. Debevc, what you got?

4           MR. DEBEVC:  I am actually a little confused, Your

5     Honor, because I think that I have submitted the exhibits

6     that there were objection to exhibits.  So I'm a little bit

7     confused in terms -- there are certain exhibits that were not

8     objected to by any party.

9           THE COURT:  Okay.

10          MR. DEBEVC:  And there are some that are -- that the

11    United States objects to, but I would like to introduce them.

12          THE COURT:  So right now, I think if you could read

13    into the record those exhibits which you propose to introduce

14    into evidence to which there have been no objection.

15          MR. DEBEVC:  Thank you, Your Honor.

16          THE COURT:  Okay.

17          MR. DEBEVC:  That would be Exhibit 19.

18          THE COURT:  All right.

19          MR. DEBEVC:  Exhibit 25.  That is -- that is all.

20          THE COURT:  Okay.

21          MR. CLUKEY:  There is no objection, Your Honor.

22          THE COURT:  Okay.  So Mr. Debevc's 19 and 25 in

23    evidence.  The ones that are read out by Mr. Cooper and Mr.

24    Clukey are both in evidence, too, okay?

25                (Thereupon, Plaintiff Debevc's Exhibit Numbers 19

1    and 25 were received in evidence.)

2             MR. COOPER:  Your Honor, and maybe if, to try to

3    speed things along, I don't know if Mr. Debevc raised

4    exhibits, but I withdrew objections to Government Exhibits

5    11, 12, 20, 54, 116, 120, 142, 143, and then I'm going to go

6    out of order, also 38 and 40.  Two of them are on the list

7    they sent me yesterday, 38 and 40, which was the last two.

8    The other ones I simply --

9             MR. CLUKEY:  Your Honor, we would like to move in 38

10   and 40.

11            THE COURT:  Okay.  And there have been no objections

12   by Mr. Debevc to 38 and 40.

13            MR. CLUKEY:  I'm sorry.  There have been?

14            MR. CLUKEY:  No objection to 40.

15            THE COURT:  Okay.  And that's Government Exhibit 38

16   and 49?

17            MR. COOPER:  That's correct, Your Honor.

18            THE COURT:  And the remaining ones that Mr. Nagy has

19   objected to, did Mr. Debevc also object to those?

20            MR. CLUKEY:  In most cases, Your Honor.

21            THE COURT:  Okay.  They are not always identical

22   objections.

23            (Thereupon, Government Exhibit Numbers 11, 12, 20,

24   54, 116, 120, 142, 143 , 38 and 40 were received in

25   evidence.)

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          THE COURT:  Okay.

2          MS. WEIS:  Um, Your Honor, how would you prefer for

3     exhibits where there are disputes as to whether or not should

4     come in under a particular objection for your purposes to see

5     the exhibit?

6          THE COURT:  I can barely hear you.

7          MS. WEIS:  And it's probably me they were talking

8     about.

9          THE COURT:  No, it was everybody.

10         MS. WEIS:  For the exhibits where there are --

11         THE COURT:  Except for Mr. Cooper, Mr. Cooper, we

12    don't need a microphone for him, all right?

13         Yes.

14         MS. WEIS:  For exhibits where there are objections,

15    how would you prefer to see -- to look at the exhibit in

16    order to rule on it?

17         THE COURT:  I think we'll have to do it the

18    old-fashioned way.  When you want to propose to put it in,

19    you give it to the witness, whoever the witness is, you give

20    it to them, I hand you Government's Exhibit No. 51, which is

21    marked for identification, do you recognize this?  Yada,

22    yada, yada.  Lay a foundation for it.  Move it into evidence.

23    And then they can object or withdraw their objection, or I'll

24    hear their objection and rule on it.  I don't see any other

25    way to do it.

1           MS. WEIS:  Well, for today I guess was my question,

2     the exhibit that we wanted to discuss today that there are

3     objections to, do you want us to give you physical copies?

4           THE COURT:  We'll talk about it.  And then if I need

5     physical copies, then we'll go from there.  How is that?

6           MS. WEIS:  Okay.

7           THE COURT:  All right.  I guess maybe one thing is,

8     I'm sure we will get to it sooner or later, McDermott Will &

9     Emery.

10          So I understand the objection to it.  I've looked at

11    it.  I've looked at the cover memorandum.  I understand that

12    whoever is going to try to -- the plaintiffs are trying to

13    put it in as a -- under the business record rule, and I also

14    understand from, I think an e-mail to Frank last night, that

15    there is nobody who can authenticate this record.

16          MR. COOPER:  Actually, I wasn't real happy with the

17    ad lib to the clerk.  I worked last night and called a man to

18    pay for the opinion and gave it to Mr. Lancaster, and he's

19    provided a declaration under 901, authenticated the document.

20    He looked at it.  He talked about the procedures.  He said it

21    was not altered.

22          If I may hand it up, Your Honor?

23          THE COURT:  Sure.  What, you mean --

24          MR. COOPER:  It's the declaration authenticating --

25          MS. WEIS:  Your Honor, we haven't seen a copy of

1     that.

2           MR. COOPER:  I'll hand it to them right now.

3           MR. COOPER:  Mr. Straus is the owner of EMC

4     Corporation.  He says he was doing Derivium stock loans at

5     the time the opinion was written.  It's unaltered form.  He

6     gave it to Mr. Lancaster, who sent the memorandum to Mr.

7     Nagy.  Under 901, we think it comes in under many exceptions.

8           901 is, the purpose is to make sure that the

9     document is unaltered.

10          THE COURT:  Have you given them a copy of the

11    declaration?

12          MR. COOPER:  Yes, Your Honor, we did, to make sure

13    it's unaltered and reliable.

14          We think several reasons it comes in.

15          First of all, Mr. Straus, in his declaration,

16    demanded, paid for it and retained it and gave it to

17    Derivium, attests to that fact.  Your indulgence.

18          (Pause in proceedings.)

19          MR. COOPER: Secondly, I believe it's 904(d)(2), the

20    trade -- the trade subscriptions exception to the Rule.  It's

21    901(b)(4), where it has a distinctive characteristic to the

22    like.

23          Here, the opinion on the top cover letter has a

24    Derivium letterhead.  Mr. Debevc can certify that.

25          Also, you have --

1          THE COURT:  I don't think they are talking about the

2     cover letter.  All I think they are talking about is the

3     opinion.

4          Isn't that right?

5          MS. WEIS:  Yes, Your Honor.

6          MR. CLUKEY:  Right.

7          THE COURT:  Okay.  Cover letter.  I mean, that's a

8     no brainer under a business record talking about the

9     enclosure.

10          MR. COOPER:  The first part on the business record,

11     my understanding that the Rule of that document was

12     transmitted in the -- under the business.

13          So if it's -- Mr. Nagy can testify that he kept it,

14     didn't alter it in his business records, the entire

15     document --

16          THE COURT:  I believe that's a little broad, but

17     that's okay.

18          MS. WEIS:  Your Honor, if I could clarify?  We still

19     have a 402 and 403 objection to the subject matter.  So I

20     just want to make sure.

21          THE COURT:  Okay.  All right.

22          MR. COOPER:  But going to your position, Your Honor,

23     on the underlying --

24          THE COURT:  I didn't give a position yet.

25          MR. COOPER:  Your question.

1            THE COURT:  Okay.

2            MR. COOPER:  That the underlying document under

3    901(d)(4), the distinctive characteristics, it's on McDermott

4    Will & Emery letterhead, as well as --

5            THE COURT:  Well, it's unsigned.

6            MR. COOPER:  But it is on their letterhead,

7    memorandum.

8            THE COURT:  I used to be a lot easier on this stuff

9    until Photoshop and all kinds of stuff.  I mean, there is

10   some strange stuff that people try to get in that comes out

11   of nowhere.  I'm not saying this is one of them.  So we can

12   change the Rules to reflect all that, too.

13           MR. COOPER:  Also under 902(7), the

14   self-authentication, again with the letterhead.

15           But on top of it, to add to the significance of the

16   self-authentication, the very man that paid for it, withheld

17   it and gave it to Derivium, is attesting to it's a true and

18   correct copy.

19           And we believe we've laid a correct foundation

20   requirement, and there is no -- that there -- there is no

21   risk of that document having been altered.

22           THE COURT:  Okay.  All right.  Well, since we didn't

23   have this and it's brand new, we'll talk about this Monday

24   morning.  I mean, I've got to give the Government a chance to

25   take a look at the declaration.  I've got to get a chance to

1    research authentication.  Because as of last night, this one

2    you couldn't authenticate.  If you can't authenticate it,

3    that makes my job pretty easy.

4         So now you've made my job harder, so I get to earn

5    my money this weekend.

6         MR. CLUKEY:  Thank you for giving us time to address

7    that.

8         One thing we would like to mention just beforehand,

9    this declaration states, which we just obviously just got a

10   couple of minutes ago, that the stock loan was similar to

11   Derivium's.  That's testimony regarding the comparison of two

12   different types of stock loans.

13        And this person was not named as a witness.  We

14   didn't have the opportunity to cross-examine him.  This is

15   factual testimony that to exclude that portion, which then we

16   think the entire authentication is going to fall apart from

17   that.

18        MS. WEIS:  In addition, we don't know what aspects

19   of the program were similar and not similar, which certainly

20   goes to, you know, whether or not McDermott Will & Emery's

21   opinion is reliable in any respect as to the applicability of

22   the 90% Stock Loan Transaction.

23        MR. CLUKEY:  Did this other program and hedges, did

24   they tell the people it wasn't tax free?  There is just a

25   host of things that we don't know about that would require

1    factual testimony.

2              THE COURT:  Okay.  All right.  We'll take care of

3    this argument and this document at 9:00 Monday morning.

4              MR. CLUKEY:  Thank you, Your Honor.

5              MS. WEIS:  Your Honor, I want to speak up.

6              The first exhibit that, the Government exhibit that

7    we wish to address objections to, and I'll just go in order

8    of the numbers, is Exhibit 23.  It's a letter from Yuri

9    Debevc to Kevin Haase dated March 18, 2005.

10             And both Mr. Cooper and Mr. Debevc have made 402 and

11   403 objections.  And I don't know if they want to address

12   those first, or how you want us to address the issue.

13             THE COURT:  Well, I think if we are going -- I'm

14   going to have to see this one.  I mean -- yeah?

15             MR. COOPER:  Your Honor, I thought the purpose of

16   today was to talk about objections to exhibits used for our

17   opening statement.  I didn't know we were going to do all the

18   objections for all the exhibits today.

19             THE COURT:  Well --

20             MR. COOPER:  I mean --

21             THE COURT:  We probably aren't, because we don't

22   have enough time.  I've got to do them sooner or later, and

23   I've got all afternoon.

24             MR. CLUKEY:  These are exhibits we provided to Mr.

25   Cooper last night in an e-mail.  We listed all these

1    exhibits.  So we gave him notice.  We got some from Mr.

2    Cooper this morning and Mr. Debevc this morning, as well.  So

3    we certainly teed these up, and it's 25 or so exhibits; not

4    350.

5                THE COURT:  You've got them, what, I think Mr.

6    Cooper left all his here last night.

7                MR. SEADOR:  If we could get the screen down, we

8    could put them up on --

9                THE COURT:  I mean, yeah.  Okay.  I guess Gail knows

10   how to do that.  I don't.

11               THE CLERK:  I got it down.

12               THE COURT:  I've got people who do, all right?

13   There we go.

14               MS. WEIS:  It's a letter from Yuri Debevc to Jane

15   Montgomery Scott, in which he's confirming that the following

16   employees have authority to act, transfer funds and engage in

17   other's actions on behalf of Optech's account.

18               THE COURT:  Okay.  Since there is -- since there is

19   a 402 and a 403 challenge, what does this letter make more or

20   less likely in this litigation between the Government and Mr.

21   Nagy and Mr. Debevc?

22               MS. WEIS:  It goes to whether or not Mr. Nagy -- I'm

23   sorry -- Mr. Debevc.  Mr. Nagy also viewed the books and had

24   contact with these individuals.

25                    Each of those individuals knew or had reason to know

1    that Optech was a legitimate company, and because it

2    demonstrates the extent to which bringing Mr. Debevc and the

3    people in the United States, as opposed to the people in the

4    office in Hong Kong who were actually operating the so-called

5    lender.

6                THE COURT:  I can see how it might be relevant to

7    Mr. Debevc, his involvement in this, but how does -- how is

8    it relevant to Mr. Nagy?  I mean, Mr. Nagy is not on it.

9                Did you ask him about it in his deposition?

10               MS. WEIS:  No, Your Honor.  This wasn't raised in

11   Mr. Nagy's deposition.

12               However, because Mr. Nagy was involved in reviewing,

13   for instance, transfers between some of the letters, and in

14   addition, because Mr. Nagy had personal contact with all of

15   these individuals, and we believe Patrick Kelly can discuss

16   this letter, he also had personal contact with Mr. Nagy.

17               That certainly the fact that these individuals had

18   business already and were engaging in transfers for Optech

19   and otherwise operating, providing operations services for

20   Optech, makes it more -- makes it more likely that Mr. Nagy

21   was aware that these services were being provided to Optech,

22   as well, which goes to the relevance of whether or not Optech

23   was a bona fide lender in the view -- in the eyes of Mr.

24   Debevc and Mr. Nagy.

25               THE COURT:  Yes, sir?

1           MR. COOPER:  Your Honor, I don't understand that at

2       all.

3           I mean, this is someone authorizing people to do

4       money.  Mr. Nagy is not a part of this.  He wasn't an owner

5       of Veridia.  He wasn't a manager of Veridia.  He didn't have

6       signature account.  Same thing with Derivium.  I don't

7       know -- again, if you want, our exhibits are right next to

8       the court reporter, 91.  If you looked at the Statute, it has

9       to go to tax advice, and I don't know how this is relevant at

10      all to his tax advice.

11          THE COURT:  Okay.  All right.  So Mr. Kelly is the

12      one that's going to testify as to this?

13          MS. WEIS:  Yes, Your Honor.

14          THE COURT:  So we'll do it the old-fashioned way.

15      You ask him about it and we'll mark it for identification,

16      and then there may be an objection, there may not be an

17      objection, and I'll tee it up at the time.

18          MS. WEIS:  Very well, Your Honor.

19          Then I imagine -- we'll come to the same situation

20      with exhibit -- Government Exhibit 25, which is the next on

21      our list.  And this is the first page.  I can read that.

22      There is three pages to this exhibit.

23          THE COURT:  Okay.  I think we'll have to do that at

24      the same time, okay?

25          MS. WEIS:  The next exhibit is Government

1    Exhibit 45.

2              THE COURT:  That makes a little more --

3              MS. WEIS:  I'm sorry, Your Honor, Government

4    Exhibit 45, there is no objections to by either Mr. Nagy or

5    Mr. Debevc.

6              THE COURT:  Oh, good.

7              MS. WEIS:  I don't believe that was moved into

8    evidence previously, but we would like to move it into

9    evidence.

10             THE COURT:  Is there any objection to 45, which is

11   on Mr. Nagy's letterhead?

12             MR. COOPER:  No, Your Honor.

13             THE COURT:  Okay.  How about you, Mr. Debevc?

14             MR. DEBEVC:  I don't believe -- one moment, I have

15   to double-check.

16             THE COURT:  Let's see here.  You've got no objection

17   to that.

18             MR. DEBEVC:  No objection to that letter.

19             THE COURT:  45 in evidence without objection.

20             (Thereupon, Government Exhibit Number 45 was

21   received in evidence.)

22             MS. WEIS:  Your Honor, the next exhibit is

23   Government Exhibit 67.  And because this is a rough copy, I'm

24   going to flip down, we have two copies of it, one of which is

25   a little bit cleaner version.

1          THE COURT:  Okay.

2          MS. WEIS:  So it's an e-mail with an attachment.

3          THE COURT:  So it's an e-mail from Charles

4     Cathcart -- well, of Derivium Capital to Tim Scrantom, and a

5     carbon copy to Mr. Debevc dated 4-20-01.

6          MS. WEIS:  Correct.

7          And we've had deposition testimony verifying from a

8     number of individuals that the attachment, although it has a

9     May 22, 2007 date on it, it should have been in April of

10    2001, as we see on the following pages, the automatic

11    updating feature.

12         So this is a letter by a law firm, Shartsis Friese,

13    that was obtained by Derivium to provide legal advice in

14    connection with the Department of Corporations challenging

15    tax -- Your Honor, I'm sorry.  Mr. Clukey has informed me

16    that Mr. Debevc's Exhibit 19 was just admitted, and that that

17    is the same document as the exhibit, Exhibit 67.

18         THE COURT:  Okay.  So --

19         MS. WEIS:  We would like to move for an entry of

20    Government Exhibit 67, as well, given that Mr. Debevc's

21    Exhibit 19 is the identical document that has been admitted

22    into evidence.

23         THE COURT:  Okay.  Any problem with that?

24         MR. COOPER:  A little bit.  I'm sorry, it would have

25    been an oversight by me, and especially if he's out of the

 1     case.  This is a securities lawyer opinion.  Mr. Nagy never

 2     got it.  I believe he testified that he never received this

 3     document.

 4             We do object on 802 and 803, and there is a hearsay

 5     objection, too.  And I apologize for the oversight.

 6             THE COURT:  Yes, sir?

 7             MR. CLUKEY:  I'll start with a copy of the identical

 8     document has been admitted.  So I think we've already crossed

 9     that bridge, the time to make objections to that document is

10     passed, as an initial matter.

11             Secondly, this is a document that was received by

12     Derivium Capital, which is Mr. Nagy's client, and it concerns

13     the legality of the 90% Loan Program from a securities loss

14     standpoint.

15             Not only that, but also specifically instructs

16     Derivium Capital to go out and get a McDermott -- to go get a

17     legal opinion from a law firm.  And it is directly relevant

18     to both whether they are in compliance with the law, whether

19     the people at Derivium Capital knew or had reason to know

20     whether they were in compliance with the law, because there

21     is a law firm telling them that they are not.  And it also

22     goes to their scienter as to whether they need to have a

23     legal opinion from a law firm on the tax issues in this case.

24             So they are told in 2001 that they have to go and do

25     this.

1          THE COURT:  Okay.  And I understand that.

2          MR. CLUKEY:  And as far as 801, it would be --

3          THE COURT:  Let's -- you've got to connect this

4    somehow to Mr. Nagy.  I mean, is there anything in the record

5    that Mr. Nagy had ever seen this document that would go to

6    scienter?

7          MR. CLUKEY:  Mr. Nagy was asked to talk to McDermott

8    in order to get a legal opinion.  And there is documents in

9    the record that show that, that McDermott refused to give

10   them a legal opinion.  Mr. Nagy has admitted that during his

11   deposition, that he talked to them and that he knows that no

12   opinion was ever obtained from McDermott, or any law firm,

13   and Mr. Debevc has also confirmed it, as has Mr. Charles

14   Cathcart.

15         MR. COOPER:  That's McDermott.  This is -- I'm going

16   to butcher the name -- Shartsis Friese -- and he never saw

17   this.  So they can talk about McDermott, but they can't

18   connect the dots on this.  And at the very least, they would

19   have to lay the foundation at trial.

20         THE COURT:  Okay.  I think you will have to lay the

21   foundation at trial, because we may be here with just Mr.

22   Nagy, and I don't know whether there is any -- whether even

23   Mr. Debevc has ever seen this document.

24         MR. CLUKEY:  He has and he testified during his

25   deposition.

```
 1                    THE COURT:  Okay.  So -- all right.  So we'll do
 2          that one at trial, too.
 3                    MS. WEIS:  The next exhibit is Government
 4          Exhibit 95.
 5                    THE COURT:  Yeah.
 6                    MS. WEIS:  There are 901, 802 objections to this by
 7          both Mr. Nagy and Mr. Debevc.
 8                    THE COURT:  So how are you going to authenticate it?
 9                    MS. WEIS:  Mr. Polk will be coming to testify.  He
10          will also be able to authenticate it, that it is a business
11          record that was maintained by him as an advisor to the 90%
12          Loan customers.
13                    THE COURT:  First was authentication.
14                    What was the second objection?
15                    MR. COOPER:  802, Your Honor.  I'm so sorry about
16          that.
17                    THE COURT:  That's all right.  No problem.
18                    MS. WEIS:  We believe both of those will be taken
19          care of in Mr. Polk's certification of this as a business
20          record under 803(6) and 901(11).
21                    MR. COOPER:  When you look at the e-mail, it talks
22          about being upset.  I don't understand what that has to do
23          with tax advice.  It's just inflammatory.  It was written in
24          October of '05 after the bankruptcy was filed.
25                    MS. WEIS:  Well --
```

1          THE COURT:  Go ahead.

2          MS. WEIS:  We would have two responses to that.

3          One, we would have disagreement with Mr. Nagy about

4    whether or not the only relevant evidence is the exact memos

5    that were providing tax advice, and we disagree with that.

6          The sales personnel, Alison Skinner being one of the

7    sales personnel for Derivium, literally had access to fewer

8    facts than Mr. Nagy had access to in the course of his

9    participation in the 90% Loan Program.  She is surprised by

10   revelations that Mr. Nagy knew throughout the entire time

11   that he was providing tax advice to Derivium.

12         MR. COOPER:  I don't see tax advice in that

13   document.  I see the word "hideous".

14         THE COURT:  Yeah?

15         MR. CLUKEY:  Your Honor, we addressed this

16   yesterday.  And I keep going back to what statements may be

17   considered by the jury, what facts would be considered.  And

18   so I feel like it's -- it's Ground Hog Day, in a sense, by

19   Mr. Cooper's argument that every document has to pertain

20   specifically to tax advice.

21         Dr. Paul Pfleiderer is going to testify that there

22   was no hedge in this program and that that was a false

23   statement, these were false statements underlying this

24   program.

25         So here we have a marketing person who understands

1     that there are false statements that were made.  She is

2     simply communicating with a person who represents customers.

3     And this is during the time that penalties were assessed.  So

4     it's end of 2005 and 2006.  This is during -- during the

5     existence of the -- of the 90% Loan scheme.

6          MR. COOPER:  Your Honor, I think this is a helpful

7     exercise.

8          I mean, in the binders we've provided to you is a

9     copy of the Statute, um, that you can understand, even though

10    it's Ground Hog Day, you know, maybe you can understand why

11    those cases say the facts have to pertain to the tax advice.

12    Because if not, this is going to blow -- this is not going to

13    become a tax case anymore, and they represent the IRS.

14         MR. CLUKEY:  Oh, Your Honor, there is no 402 or 403

15    objection to this document, but --

16         THE COURT:  I mean, this is a 2005 reaction to a

17    Forbes Magazine article.  What does the Forbes article say?

18    That Derivium went bankrupt.  I mean, is it -- the cat out of

19    the bag when Derivium goes bankrupt?  I mean, the 90% Loan

20    scheme, isn't it over by then?  I mean, they didn't sell

21    anything.

22         MR. CLUKEY:  They did, Your Honor, after that.

23    There was -- the 90% Loan scheme was still going on in 2006.

24    That's not part of our case.  It was still in existence

25    through on that.

```
1              THE COURT:  Congressman Grayson was the only one
2       involved at that time.
3              MR. CLUKEY:  There were a number of folks who
4       apparently didn't get the message.
5              THE COURT:  All right.  We'll do this one the
6       old-fashioned way, okay, if we need to.
7              MR. CLUKEY:  Very well, Your Honor.
8              MS. WEIS:  Next exhibit is Government Exhibit 123.
9       It's a letter from Pat Kelly to Don Hancock dated
10      January 31st of 2002.
11             THE COURT:  Okay.  And what's the objection to that
12      one?
13             MS. WEIS:  There are 802, 402 and 403 objections
14      made by both Mr. Nagy and Mr. Debevc.
15             THE COURT:  Okay.  Yeah?
16             MR. COOPER:  I won't repeat myself, from the face,
17      Mr. Nagy nowhere found tax advice.  It has nothing to do with
18      his tax advice.
19             THE COURT:  The facts that he knew or should have
20      known has something to do with his tax advice.  I don't think
21      you can take the position that, you know, I give tax advice,
22      but I don't know any facts unless he's -- that's not his
23      position, is it?  I don't know nothing about nothing, I'm
24      just going to give you a tax letter saying that this is okay
25      without knowing anything behind it?
```

1           MR. COOPER:  Well, he knew certain things behind it.

2      Um, this obviously is not relevant to his tax advice.  I

3      mean, in particular, Your Honor, this whole line of

4      questioning we would have seen at the trial with Mr. Hancock,

5      and I read it from what they designated.

6           And what they are going to show is what's in these

7      statements was allegedly false to that client.  My client had

8      nothing to do with that.  He was an outside accountant

9      working by the hour.

10          And in fact, I mean, if Mr. Debevc is in trial, I

11     would want to discuss possibly giving the jury some kind of

12     instruction up front to understand that documents that Mr.

13     Nagy was not privy to, or had knowledge of, should not be

14     taken into consideration.

15          Because, I mean, the -- I'm sincerely scared about

16     all this coming through and it meshing in the jury's mind

17     when Mr. Nagy is not a part of any of this and he didn't

18     consider it when he gave his tax advice.

19          MS. WEIS:  Your Honor, we would say the exhibit is

20     one of the documents demonstrating false statements that were

21     made to customers, and also go towards the operation of the

22     entire scheme.

23          Now, we understand Mr. Nagy's position is that he

24     was simply an outside advisor operating on an hourly basis,

25     as Mr. Cooper said, but we believe that the evidence at trial

1    will show that he was quite intimately involved in the 90%

2    Loan Program.  And this is circumstantial evidence of, you

3    know, knowledge he should have had about false statements

4    being made, as well as the operation of the program.  Mr.

5    Kelly can also testify to this.

6              THE COURT:  Okay.  Let's see what Mr. Kelly has to

7    say.

8              I notice from the exhibits it says, "We held in the

9    account of General Holdings."  They didn't hold anything,

10   okay?  The jury could determine whether that's not the truth.

11             Now, whether they have to connect it with Mr. Nagy

12   or not, that's certainly the Government's burden.

13             MR. COOPER.  Right.  I mean, listen, we'll concede

14   they sold the stock and he told the IRS that.

15             THE COURT:  It's hard not to concede that because

16   it's true.  Nobody takes the position he didn't sell the

17   stock.

18             MR. COOPER:  He told the IRS that.

19             So I mean, this letter, we will stipulate that the

20   stock was sold.  I don't -- you know, it was sold.  He'll

21   concede that, and he took that into account and knew about it

22   when some of his opinions were given later in 2002.

23             THE COURT:  All right.  Well, we'll have to listen

24   to Mr. Kelly.

25             MS. WEIS:  The next is Government Exhibit 125, which

1    is a cover page fax from Mr. Cathcart to Don Hancock.  I

2    imagine the Court is familiar with the document and its

3    attachment, which --

4            THE COURT:  Let me see the next page.

5            MS. WEIS:  It's a letter purporting to be from

6    Bancroft Ventures Ltd. to Dr. Cathcart concerning --

7            THE COURT:  And the last page?

8            Okay.  Which one of the Manx signed this one?

9            MS. WEIS:  I'm sorry?

10           THE COURT: Which one of the Manx signed this?  The

11   people from the Isle of Man are called Manx.

12           MS. WEIS:  Actually, there is no 901 objection to

13   it, and there is an 802.

14           But we believe this document to have been a

15   fabrication, and there will be testimony to that effect.

16           We are not offering the letter, or quite frankly the

17   representations made by Dr. Cathcart, for the truth of the

18   matter asserted.  So the 802 objection that Mr. Nagy

19   registered we don't believe applies.

20           As to their remaining objections, which are 402 and

21   403, both Mr. Debevc and Mr. Nagy raised, you know, again, it

22   goes to knowledge of the illegitimacy of the scheme, which we

23   believe was communicated to Mr. Nagy and Mr. Debevc, and the

24   operation of the program, false statements that were being

25   made to cover up the, what we say to be the fairly obvious

1    nature of the program, as not containing legitimate lending.

2            THE COURT:  It's just -- the closure, the Bancroft

3    closure to this letter, is that going to be testified to by

4    one of the Brits?

5            MR. CLUKEY:  Yes.  One of the Isle of Man.

6            THE COURT:  And he's going to say, I do this letter,

7    this isn't our letter, somebody fabricated the whole thing?

8            MR. CLUKEY:  Actually, there is two individuals who

9    will testify to that.

10           THE COURT:  All right.  I think we are not making

11   much headway, and I'm not so sure we are going to make any

12   headway if we are going to go through those one by one.

13   Until I get the testimony, there is really nothing much I can

14   do about it.

15           MS. WEIS:  Well, Your Honor, we can address a broad

16   issue --

17           THE COURT:  Okay.

18           MS. WEIS:  -- that perhaps at least we can raise

19   today and resolve today.

20           THE COURT:  Sure.

21           MS. WEIS:  Mr. Nagy has made a number of 802

22   objections to exhibits that we will be offering for the truth

23   of the matter asserted.  And we would like to discuss why we

24   believe that statements made, for instance, by Dr. Cathcart,

25   and to others that are, you know, that Mr. Debevc, Derivium's

1   records, etcetera, are not hearsay against Mr. Nagy.

2          Which is that we believe that the coconspirator

3   exception to 801(d)(2)(E) applies.  We have a short brief

4   prepared, we provided to the other side and to Your Honor for

5   consideration.

6          THE COURT:  Okay.  Good.

7          MS. WEIS:  So Your Honor, just the first thing to

8   point out is that it's already been established and conceded

9   in this case that Mr. Nagy and Mr. Debevc participated in a

10  plan or arrangement under Section 6700.

11         And as the cases that we cite in the brief discuss,

12  it's not necessary to show criminal conspiracy or conspiracy

13  as a, you know, in a criminal sense to be considered, but

14  simply for there to be a business venture or a common goal.

15         Even merely two people working together to fire an

16  employee, which there is a Fourth Circuit case on that, has

17  found that is sufficient for there to be a conspiracy.

18         Given that Mr. Nagy and Mr. Debevc are part of the

19  same plan or arrangement, and part of their participation, we

20  believe they are coconspirators, as well as Derivium and Mr.

21  Cathcart, they're employees under the Rule.

22         THE COURT:  Coconspirators in the evidentiary sense?

23         MS. WEIS:  Correct.  We are not talking about

24  anything other than that.

25         THE COURT:  I got you.  All right.

```
 1              So it sounds like something for 9:00 Monday morning.
 2      I mean, that's -- unless you are ready now.
 3              MR. COOPER:  No.  I haven't been conspiring with
 4      them.
 5              THE COURT:  Okay.  This is not a joint undertaking,
 6      so you can't do it now.  All right.
 7              MR. CLUKEY:  Your Honor, to shorten this, do you
 8      mind if we just -- to give a couple that we're more
 9      interested in, do you mind if we take five minutes to run
10      through that, and that will save some significant time?
11      Because there are a number of these, if we pull them up one
12      by one, that are going to fall into the Kelly category that
13      you've already ruled.
14              THE COURT:  I don't understand what you just asked
15      me to do.
16              MR. CLUKEY:  I'm sorry.  Do you mind if we take a
17      five-minute break to narrow --
18              THE COURT:  And then you can call Washington, too.
19      And it's raining outside, too, so you can't leave anyway, all
20      right?
21              So y'all just, when you are ready, just call me and
22      I'll come back down all right?
23              MR. CLUKEY:  Thank you, Your Honor.  We would
24      actually -- there are a number of additional things we've
25      gone through that there are no objection to that we would
```

```
1     like to move in, and then we just have three to argue.
2               THE COURT:  Sure.
3               MR. CLUKEY:  Okay.
4               (Thereupon, there was a brief recess.)
5               MR. CLUKEY: Should we go through the ones to which
6     there are no objection?
7               THE COURT:  Yeah.  That would be good.
8               MR. CLUKEY:  These are out of order.
9               THE COURT:  That's what I pay Gail for.
10              MR. CLUKEY:  334, 344, 80, 248, Exhibit 94, the only
11    objection is it was three documents.  Would you be -- would
12    you be happy with us -- with making it 94 A, B and C?
13              MR. COOPER:  I can't -- if he would just let me look
14    at it real quick.
15              THE COURT:  Go ahead and look at it real quick.
16              MR. COOPER:  Are there more?
17              MR. CLUKEY:  That's the only --
18              MR. COOPER:  Those are the only three?
19              MR. CLUKEY:  27, 219, 218, 80 -- I'm sorry, I think
20    I already mentioned 80 -- 150, 26, 57, 216, 336, 220, 183,
21    228, 230, 147, 261 and 342.
22              THE COURT:  Go ahead and let him look at 94.
23              MR. CLUKEY:  Of course.
24              THE COURT:  Are y'all waiting on me?
25              MR. COOPER:  No.  They are out of order.  I'm sorry,
```

```
 1          no.
 2                    THE COURT: I just didn't want -- take your time.
 3                    MR. COOPER:  I want to just read them back in the
 4          order.
 5                    THE COURT:  Okay.
 6                    MR. COOPER:  No objection to 334, 344, 80, 248, 9,
 7          27, 219, 218, 150, 26, 57, 216, 336, 220, 183, 228, 230, 147,
 8          261, 342.  That's all of them.
 9                    MR. CLUKEY:  And what about 94?  It was the three
10          documents together.
11                    MR. COOPER:  That's fine if they separate them.
12                    THE COURT:  So 94, A, B and C?
13                    MR. COOPER:  A, B and C.  Yes, Your Honor.
14                    THE COURT:  Okay.  Good.
15                    (Thereupon, Government Exhibit Numbers 334, 344, 80,
16          248, 9, 27, 219, 218 150, 26, 57, 216, 336, 220, 183, 228,
17          230, 147, 261, 342 and 94 A, B and C were received in
18          evidence.)
19                    MR. CLUKEY:  189.  Your Honor, the only objection to
20          this, there are two objections, 402 and 403 on this exhibit.
21                    MS. WEIS:  I can pull up the attachment.
22                    THE COURT:  Sure.
23                    THE COURT:  What does FRN mean?
24                    MR. CLUKEY:  The FRN, there was the 90% Stock Loan
25          and there was -- part of that they were selling, instead of
```

1    using stocks as the supposed collateral, they would use FRN

2    as floating rate notes.

3            So Mr. Nagy, in his own tax advice, actually told

4    Derivium at one point that he thought the FRN program would

5    violate the tax laws.

6            So he has a change of heart in 2005 -- well

7    actually, he has a change of heart earlier -- but this is

8    reflecting forming a new company in connection with

9    administering those loans.

10           MR. COOPER:  Your Honor, this memorandum, the e-mail

11   was sent on July of '05, and none of the assessments for Nagy

12   are for this time period.  So it would be irrelevant because

13   it's after the fact.

14           Secondly, he testified this company never came to

15   fruition and it doesn't go to his tax advice.

16           MR. CLUKEY:  If I may address that?

17           THE COURT:  Sure.

18           MR. CLUKEY:  Mr. Nagy was assessed penalties for

19   2005.

20           Secondly, this is a program that is now under, at

21   this point in time, is under attack by the IRS.  It's under

22   attack by the Franchise Tax Board.  Derivium is filing for

23   bankruptcy because it's been sued by so many customers at

24   this point in time, and Mr. Nagy is proposing with Mr. Debevc

25   to form to administer these illegal FRN programs.

1          That, we believe, clearly goes to whether he knew or

2     had reason to know that the tax advice he provided was not

3     truthful.

4          THE COURT:  Is there another -- is there another

5     page or just one page?

6          MS. WEIS:  Yeah.

7          THE COURT:  Okay.  Yes?

8          MR. COOPER:  Yes, Your Honor.

9          You are aware that even though Derivium filed

10    bankruptcy, people still had loans and they had to do things.

11    This never came to fruition.  It doesn't go to his tax

12    advice.  He didn't, obviously after Derivium filed

13    bankruptcy, he didn't provide Derivium tax advice anymore.

14    And it's an after-the-fact memorandum, nothing that came to

15    fruition.

16          THE COURT:  Yes, sir?

17          MR. CLUKEY:  Your Honor, if -- the jury is entitled

18    to consider actions -- and there is actually a case called

19    *Harkins* that goes to all the circumstantial evidence

20    surrounding a person's conduct.  And *Harkins* is a case in the

21    District of Oregon that considered simply refusal to comply

22    with discovery, and that was a factor that went into the

23    person's scienter, who knew or had reason to know.

24          This is actually occurring during the time of the

25    scheme.  The scheme -- Optech is still in existence.  New

1    loans are still done in 2006.  Mr. Nagy, everyone knows that

2    this thing is illegal by this point in time.  He certainly

3    knows the IRS is challenging it because they've told him.

4    They've told everybody.

5         Here he is, any law-abiding citizen, one would

6    think, or at least the jury is entitled to consider whether

7    someone who is truly a law-abiding citizen would pose forming

8    a new company to administer an illegal product and penalties

9    were assessed at the same time.

10        MR. COOPER:  Your Honor, I mean, this -- the law

11   abiding -- the only time that anyone ever ruled that this was

12   a sale was Judge Hamilton in California, and Your Honor has

13   the distinction of being the second person to rule that.

14        So until 2009, there was never a ruling, and it

15   wasn't illegal.

16        And you know -- in fact, the jury instruction -- the

17   jury should be instructed that the lack of law goes to intent

18   as the *Dahlstrom* cases go to.

19        So the insinuation it was illegal at this time is

20   wrong.  In fact, I briefed it.  If it was illegal, am I a

21   coconspirator now?  I mean, um --

22        THE COURT:  You don't want to talk yourself into

23   anything.

24        MR. COOPER:  I know, especially with the Justice

25   Department here, but I'm just --

```
 1                    THE COURT:  You, too.

 2                    MR. COOPER:  People had loans and Derivium customers

 3          filed proof of claims with the bankruptcy saying, give me my

 4          collateral back.  Obviously, they believed it was a loan and

 5          they weren't doing anything illegal.  So this does not go to

 6          his tax advice.

 7                    MR. CLUKEY:  Your Honor, this goes entirely to what

 8          Mr. Nagy knew or had reason to know.

 9                    The IRS has told him by this point in time this

10          thing is a tax shelter.  California's Franchise Tax Board has

11          told him it's a tax shelter.  Customers are being frauded and

12          Derivium is refusing to give them back their stocks because

13          all this is a scam.  All of this is circumstantial evidence

14          of whether he knew or had reason to know.

15                    The *Dahlstrom* cases have been briefed and those are

16          criminal cases.  The leading case on this, the *Estate*

17          *Preservation* case, specifically addresses *Dahlstrom*, and

18          that's been briefed by both parties.

19                    THE COURT:  Okay.  All right.  Get it back to the

20          first page.

21                    So this has got two stickers on it.  This is

22          Government Exhibit 189 against Plaintiff's Exhibit Number 1

23          from the Nagy deposition?

24                    MR. CLUKEY:  Yes, Your Honor.

25                    THE COURT:  All right.  I'll overrule your objection
```

to that.

            MR. CLUKEY:  Our next one is 58, Your Honor.

            I'm sorry.  Can we move in 189 into evidence, then, Your Honor?

            THE COURT:  Yeah, it's in evidence.  He's preserved on the objection.

            I mean, it's relevant -- um, you know, there is lots of things that make it relevant.  I mean, you can see -- I mean, the exhibit that Mr. Nagy is in the same building, I believe, with some of the other people that are involved in all this kind of stuff, so that, plus the -- I hate to use common scheme or plan, but that seems to -- yeah?

            MR. COOPER:  He wasn't in the same building, Your Honor.

            THE COURT:  Well, 10 Maritime Street, whatever that building is, the first page of that.

            MR. COOPER:  With Derivium or 10 State Street.

            THE COURT:  10 State Street, yeah.  180 East Bay Street.

            And at one time or another, if I remember from the last trial, 180 East Bay Street was where Mr. Debevc was, that the supersonic transport computer -- I may be wrong, I may be misremembering that.

            Did you ever own 180 East Bay Street?

            MR. DEBEVC:  No, sir.  I'm just there from time to

1   time, but did not have an office.

2          THE COURT:  Were you early in the -- I know -- is

3   Poston Road one of the addresses?

4          MR. DEBEVC:  Right.  And the claim that Mr. Grayson

5   made about the copy check, I think that he is very, very

6   imaginative, because there is no sense there.

7          THE COURT:  Well, since this is on the record, I

8   won't comment on that, okay?  I won't disagree with you, or I

9   won't agree with you, all right?  There is no comment.

10         Who was at 180 East Bay Street?

11         MR. DEBEVC:  John Kern.  His office is at 180 East

12  Bay Street, as did 10 State Street, and also Robert Nagy.

13         THE COURT:  Okay.  All right.  I knew it was

14  somebody.  So -- it's been a long time and a lot of water

15  under the bridge, so -- okay.

16         Let's look at 58, right?

17         (Thereupon, Government Exhibit Number 189 was

18  received in evidence.)

19         MR. CLUKEY:  Yes, Your Honor.

20         So 58 is -- it's a 402, 403 objection.

21         And this is a document that came from Mr. Nagy's

22  files.  And it's the operating agreement for First Security

23  Capital.

24         Now, this is the cover -- so this is the cover

25  letter, I'm sorry, attaching the operating agreement.  And

1       Mr. Nagy testified that's his handwriting under -- on top of

2       the operating agreement for Derivium Capital.  So he received

3       this document and he admits that.

4               And the import of this document is, Tim Scrantom,

5       Tim is telling the participants in the scheme that they are

6       going to back -- they are going to create an operating

7       agreement and they are going to backdate it.

8               So if we could flip ahead whenever you are ready.

9               THE COURT:  Okay.  Go ahead.

10              MR. CLUKEY:  So here is the operating agreement.

11      That's January 2, 1998.

12              THE COURT:  Okay.

13              MR. CLUKEY:  Mr. Debevc has testified that that was

14      not signed on that date.  And he said it was impossible it

15      was signed on that date.

16              And go back.  So we believe this -- this document

17      shows the scope and extent of Mr. Nagy's involvement in this

18      scheme.

19              THE COURT:  And the last page with the cover letter

20      says to Robert Nagy, hand delivered.  And Mr. Nagy in his

21      deposition said he received it --

22              MR. CLUKEY:  Yes.

23              THE COURT:  -- as part of his files?

24              MR. CLUKEY:  Yes.

25              THE COURT:  All right.  And what does it make more

1    or less likely in this case, which is the 402?

2            MR. CLUKEY:  His knowledge of the structure of the

3    scheme and his involvement in the structure of the scheme.

4    He claims he was an independent, outside, third-party, really

5    didn't know the inner workings of Derivium, and this shows

6    otherwise.

7            THE COURT:  Okay.

8            Yes, sir?

9            MR. COOPER:  Well, I mean, they provided him with an

10   operating agreement.

11           And as you can see, they are going to bring in these

12   issues where the lawyer hands it along.  He didn't have

13   anything to do with it, but they are going to be bringing up

14   these backdating issues, and it's irrelevant to his tax

15   advice.

16           In fact, it would be inflammatory.  When someone

17   does something, they just hand him a document, and just

18   because you have it in the file, it doesn't mean anything.

19           THE COURT:  It's kind of like the McDermott Will &

20   Emery memorandum, because you don't file it, it doesn't mean

21   anything.

22           MR. COOPER:  That's tax advice on the 90% Stock Loan

23   Transaction.

24           THE COURT:  That's tax advice on something, not the

25   90% Stock Loan.  That doesn't have anything to do with the

```
1    90% Stock Loan in this case.
2              MR. COOPER:  Mr. Straus says in that declaration he
3    referred people in Derivium under his program to the
4    90% Stock Loan Program.
5              THE COURT:  Mr. Straus's declaration is not in
6    evidence.  It can't be going into evidence.  He's not going
7    to testify, is he?
8              MR. COOPER:  No, Your Honor, but it can be used to
9    authenticate the document's reliability.
10             THE COURT:  That's two separate things.  You are
11   talking about authentication, you are talking about evidence.
12   That's not evidence of anything that is going to come into
13   this trial.
14             MR. COOPER:  What's not evidence?
15             THE COURT:  His declaration.
16             MR. COOPER:  No, it's for authentication.
17             THE COURT:  It's not going to the jury.  I just
18   didn't want you to --
19             MR. COOPER:  I understand that.
20             THE COURT:  I just wanted to make sure.
21             MR. COOPER:  It's meant to convince you that that
22   document is reliable under 901.
23             THE COURT:  All right.  I'll overrule your
24   objection.  It seems to be relevant to one or more of the
25   issues in this case, number one.
```

1          Number two, under 403, the probative value of the

2    operating agreement and this letter, which was found in Mr.

3    Nagy's files, was not greatly outweighed by the prejudice,

4    okay?

5          So 58 in evidence.

6          (Thereupon, Government Exhibit Number 58 was

7    received in evidence.)

8          MR. CLUKEY:  343.

9          THE COURT:  That's authenticated and he's identified

10   it and all that kind of stuff.

11         MR. CLUKEY:  It's only 402 and 403.

12         THE COURT:  Okay.  Good.  Thank you.

13         THE COURT:  Okay.  What, under 402, what relevance

14   is this?

15         MR. CLUKEY:  This is relevant, Your Honor, again to

16   show his involvement in the scheme.

17         He's talking about taking credits for BVI, I think

18   that's BVI's books, which is the one of the fake foreign

19   lenders here.  And he's talking to Charles Cathcart about

20   money that he needs to get in connection with the schemes.

21         It's directly regarding his compensation that he

22   received for a whole host of activities that he's doing.  And

23   there is, remit payment to Shenandoah.

24         So there are a number of things.  It's relevant on a

25   number of grounds, Your Honor, to show his involvement in the

1    scheme.

2            THE COURT:  Did you -- did you ask him about this in

3    his deposition?

4            MR. CLUKEY:  Actually, I don't recall.

5            THE COURT:  Okay.  How about it, Mr. Cooper?

6            MR. COOPER:  Well, to me it just seems like

7    bookkeeping entries and needing to transfer money.  And

8    again, I mean, I keep on pounding on the fact this is about

9    his tax advice in a tax case.

10           THE COURT:  I think we'll have to do this one the

11   old-fashioned way.  I'm going to have to get -- I can

12   understand the operating agreement of Derivium, this is a

13   little foggier.  I'm not sustaining the objection, I'm not

14   overruling the objection.

15           Do what you do and I'll mark it.

16           MR. CLUKEY:  Can we raise one final exhibit?

17           THE COURT:  Sure.

18           MR. CLUKEY:  200.

19           THE COURT:  200.  Okay.

20           MR. COOPER:  Will I still get a quick turn after

21   this?

22           THE COURT:  Sure.  You are no longer a

23   coconspirator, how about that?

24           MR. COOPER:  Can I submit an order, Your Honor, that

25   says that?

1          THE COURT:  In South Carolina law, there is a

2     possibility of reverter in property, so there may be a

3     possibility of reverter in a conspiracy, too.  So you might

4     get --

5          MR. COOPER:  My law clerk who is going to come work

6     for me, if you talk about property reversion, she might break

7     out in a sweat.

8          MR. CLUKEY:  Your Honor, when you are ready, this

9     document continued more on the second page.

10          THE COURT:  Okay.  Second page.

11          Okay.  Yes, sir?

12          MR. COOPER:  Your Honor, this whole document, they

13     are going to use it to show that Mr. Nagy took a loan from

14     one of the companies for personal needs at that point in

15     time.

16          It's prejudicial.  It doesn't add any significance

17     to his tax advice.  We would ask that you keep it out for the

18     prejudicial value.

19          MR. CLUKEY:  Your Honor, this document goes directly

20     to Mr. Nagy's role in the scheme.

21          And if you look at the bottom paragraph, we -- so

22     it's true, this does relate to a loan, very substantial loan,

23     which goes to whether Mr. Nagy was actually providing tax

24     advice and conflicts of interest.

25          Secondly, so we look down here in the last

1    paragraph:  "We have not discussed the matter of interest on

2    that."  "We appreciate your assistance."  "When I desperately

3    need it."  "From my standpoint."  "My number one priority

4    position."

5            So this really goes to the heart of what Mr. Nagy

6    really is, an independent accountant.  "Hopefully, I have

7    been of significant assistance to you."  "Virtually since the

8    inception of our relationship."

9            And then he says, a couple of sentences down:

10   "Respectfully request that we forego interest on the

11   balance."

12           So here he is at this point in time in 2002 --

13           THE COURT:  '3, I think.

14           MR. CLUKEY:  Sorry, '3.  In 2003, the height of the

15   scheme, the scheme goes on for many years.  And so we now

16   learn from this document that he considers Derivium his

17   number one priority client.

18           THE COURT:  Yes, sir?

19           MR. COOPER:  Again, I mean, with the bringing up not

20   for his tax advice, but it's a character assessment of Mr.

21   Nagy of taking a loan from a client and putting this in front

22   of the jury to try to skew them.  There is no value in this

23   under 6700.

24           When you look at the Statute, what was his tax

25   advice?  I mean, as I raised yesterday, I mean, that first

1    part of the Statute, did he participate in it?  I mean, we

2    give it up.  It's the tax advice, you know, in the heart of

3    the matter.

4          But even in a participation of the scheme, this is

5    him taking a personal loan for personal reasons, and the

6    prejudicial effect of this is outweighed by the probative

7    value.

8          MR. CLUKEY:  Your Honor, the legislative history and

9    the Statute --

10          THE COURT:  I think you got that backwards.  You

11    mean the probative value is outweighed by the prejudicial --

12          MR. COOPER:  Thank you, Your Honor.

13          THE COURT:  No problem.  I do that all the time.  So

14    I have been there, done that.

15          Yeah?

16          MR. CLUKEY:  The Statute and the legislative history

17    specifically indicate that knowledge may be imputed to

18    someone based on their role in the enterprise, and it's

19    whether you knew or had reason to know.  And so this clearly

20    goes to Mr. Nagy, directly goes to Mr. Nagy's role.

21          MR. COOPER:  But what's the activity here?  It's

22    taking a loan from a client for personal reasons.

23          MR. CLUKEY:  The activity is --

24          MR. COOPER:  What does that have to do with the

25    activity of Derivium setting up a 90% Loan structure?

1        MR. CLUKEY:  It's circumstantial evidence regarding

2    his role in the scheme.  It's also his admission that

3    Derivium is not just any one of his clients, which in various

4    pleadings it's been asserted before that Mr. Nagy had many

5    clients and Derivium is just one of his clients, that

6    corrects that misimpression.

7        THE COURT:  Okay.  I'll overrule your objections

8    under 402 and 403.

9        (Thereupon, Government Exhibit Number 200 was

10   received in evidence.)

11       MR. COOPER:  Your Honor, I would just like to

12   address some exhibits I would like to use in my opening.

13       THE COURT:  Sure.  Have they been marked into

14   evidence?

15       MR. COOPER:  Yes, Your Honor.  They are in those

16   books for you.

17       THE COURT:  Like I said yesterday, if they are

18   agreed into evidence, you can use them.

19       MR. COOPER:  No, this was the MIL, the IDR -- the

20   motion in limine.  They objected on the motion in limine --

21   this is the -- Exhibit Number 1 is the IDR, is the

22   informational document requests the IRS sent to Mr. Nagy.  I

23   would like to use those in the opening.

24       THE COURT:  I mean, if they are in evidence, you can

25   use them in opening.  If there is objections to them, you

1    can't use them in opening.

2              MR. COOPER:  There is still a 402 and 403.

3              THE COURT:  So we are going to go through that now?

4              MR. COOPER:  If you don't mind.

5              THE COURT:  That's no problem, yeah.

6              Are you done, Mr. Clukey?

7              MR. CLUKEY:  Yes, Your Honor.

8              THE COURT:  All right.  Have you -- have you heard

9    back from people that are working overtime in the Nation's

10   Capital to answer your question?

11             MR. CLUKEY:  I have, Your Honor.  There is a bit of

12   disagreement.

13             THE COURT:  So is it -- the disagreement means that

14   it's still under consideration, that you are going to talk

15   about it, or does the disagreement mean that Mr. Debevc, you

16   need to be here Monday morning at 9:00?

17             MR. CLUKEY:  We are still talking about it, but Mr.

18   Debevc as of this time still needs to be here Monday.

19             THE COURT:  That's fine.  So if, in fact, something

20   this weekend happens, y'all have Frank's e-mail address, and

21   so we will have to retailor some things.  So let us know as

22   soon as y'all know one way or the other.  If it's over, it's

23   over; if it's not over, it's not over, okay?

24             MR. COOPER:  May I approach the bench?

25             THE COURT:  You bet.  Mr. Cooper, are these our

1     copies of your exhibits?

2             MR. COOPER:  Yes, Your Honor.

3             THE COURT:  Why don't you give them all to me?

4             MR. COOPER:  She has to --

5             THE COURT:  The boss has spoken.  All right.

6        When I was practicing, when I put my hand on a

7     document, the paralegal said no and she would also slap my

8     hand.  So I know where you are coming from, okay?  All right.

9             MR. COOPER:  Would you mind striking that from the

10    record, so we don't know who my boss is?

11            THE COURT:  Okay.  So this is a five-page form 4564.

12            MR. COOPER:  Yes, Your Honor.  Each page is a

13    separate informational document request that the IRS sent to

14    Mr. Nagy --

15            THE COURT:  Okay.

16            MR. COOPER:  -- when they were auditing Derivium

17    from 2000, 2003.

18            THE COURT:  Okay.

19            MR. CLUKEY:  Your Honor, there are a number of these

20    documents like this that were in the IRS's files and they

21    have handwriting on them.  And you've already ruled, I think,

22    on -- and we objected obviously under relevance grounds -- I

23    think you overruled us on that.

24        And so to the extent this is coming in, we would

25    like any of these documents to have them, information that

```
1    was not transmitted to Mr. Nagy, which is consistent with
2    your ruling, that that be redacted.
3              THE COURT:  Okay.  So the handwriting?
4              MR. CLUKEY:  Yes, Your Honor.
5              THE COURT:  All right.  And assuming that I haven't
6    changed my mind about what I've already -- all right.  Of
7    course the handwriting on page 1, there is handwriting that
8    says Bob Nagy, that's going to be very difficult to redact.
9              MR. CLUKEY:  That's not Mr. Nagy's handwriting.
10             THE COURT:  Okay.
11             MR. CLUKEY:  It's the agent's handwriting.  This was
12   not communicated back -- so this is -- Bob Nagy sent it, and
13   Bob Nagy sent this document to -- oh, I'm sorry.  So the IRS
14   sent this to Bob Nagy, right?  And then this is a copy they
15   have in their files, and they made a handwritten notation
16   based on responses, or whatever it is, but it's information
17   that was not received by Mr. Nagy.
18            This is the Government's production to opposing
19   counsel and Mr. Debevc, and it happened to have this
20   handwriting on it.
21             THE COURT:  So if you look on the upper right-hand
22   corner, it says, "submitted to Bob Nagy," that was not in the
23   original one, or -- I mean, so --
24             MR. CLUKEY:  For that, we have no objection to that,
25   but it's the rest -- it's the other margin.
```

1          THE COURT:  The margin on, looks like outside of 11,

2     14, 15, 16 and 20?

3          MS. WEIS:  And 19, Your Honor.

4          THE COURT:  And 19?  Okay.  Yeah.  And that's -- any

5     objection to cleaning that page up?

6          MR. COOPER:  Can I raise this in connection with

7     another exhibit that's redacted, which is Exhibit 4 in your

8     binder?  Because my understanding of your ruling was, is the

9     information from the audit file could come in if it reflected

10     what was communicated between the auditor and Bob Nagy, so

11     there was a direct correspondence.

12          And if you look to paragraph 4 or to -- well,

13     especially if you will go to Exhibit 5, Your Honor, the

14     handwritten notes of the auditor, Neva Gadsden.  And she took

15     those notes and testified she took these notes during a

16     personal interview with Mr. Nagy.  So it was what Mr. Nagy

17     was communicating to her actually about the topics on

18     Exhibit 1, which is the IDR.

19          The way it happened was she issued the IDR to Mr.

20     Nagy.  They met on December 4th and they had an interview

21     going over all these topics.  And the handwritten notes

22     behind Exhibit 5 reflect the substance of that conversation.

23          And under your ruling, the way I understand it,

24     information that reflected direct communication back and

25     forth about what happened and he had personal knowledge of

1     during the audit could stay in and be introduced at trial.

2          Because this will help Ms. Gadsden understand,

3     remember what she talked about with Mr. Nagy, and what he

4     told her.

5          And I have deposed her on all the pages in here and

6     she has said that he communicated this information to her.

7          THE COURT:  I think my ruling was any information in

8     the IRS audit file that was communicated to Mr. Nagy, not

9     back and forth to Mr. Nagy, the -- Exhibit 1 was communicated

10    to Mr. Nagy?

11         MR. COOPER:  Right.

12         THE COURT:  Exhibit 5 was not?

13         MR. COOPER:  But that was a -- I thought your ruling

14    was of what he had direct knowledge of and communication, and

15    this would reflect exactly what he told her during the

16    interviews.

17         THE COURT:  Now, my understanding that Exhibit 1 was

18    communicated from the IRS to Mr. Nagy, nobody disputes that,

19    right?

20         MR. CLUKEY:  No, Your Honor.

21         MR. COOPER:  No, Your Honor.

22         THE COURT:  The dispute on page -- on the first page

23    is whether the margin area was communicated from the IRS to

24    Mr. Nagy?

25         MR. CLUKEY:  Yes, Your Honor.

1          THE COURT:  And you want the marginalia excluded?

2          MR. CLUKEY:  Correct.

3          THE COURT:  Is there any problem with that?

4          MR. COOPER:  The marginalia, no.  For that exhibit,

5     no.

6          THE COURT:  All right.  Now, number 5 is Ms.

7     Gadsden's notes that she took in her interview of Mr. Nagy

8     with regard to his responses to Exhibit 1, right?

9          MR. COOPER:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. CLUKEY:  Or in connection with the --

12          MR. COOPER:  Can I point out the significance of

13     this?

14          If you turn to U.S. 20, within that file, the Bates

15     stamp number, Your Honor.

16          THE COURT:  Oh, okay.

17          MR. CLUKEY:  Which exhibit?

18          MR. COOPER:  Exhibit 5.

19          And if you look at U.S. 20, Ms. Gadsden testified

20     here Mr. Nagy, in the very first interview, discloses to her

21     the stock loan transaction and the steps of the stock loan

22     transaction.

23          And we believe that's highly important for Mr. Nagy

24     because they are saying conspiracy.  We are saying Mr. Nagy

25     told them everything.  And Ms.  Gadsden said that she took

1    these notes.

2           And if you look to the left, "client has three

3    choices of maturity," he lays it all out.  At the top,

4    "client transfers stock to Derivium."  Down below, "they have

5    control over the lender's brokerage account".

6           So it was all disclosed to her.  And in order to put

7    the audit in context in what Mr. Nagy did communicate, this

8    is objective evidence verifying what he told her.

9           And Ms. Gadsden, in her deposition, concurred with

10   all that.

11        MR. CLUKEY:  Your Honor, your ruling, as I

12   understood it, said information that was not provided to Mr.

13   Nagy was out.

14          And that was in accordance with that case that we

15   discussed when we actually had the hearing, the *Secord* case,

16   the very high profile Iran-Contra case, where General Secord

17   made exactly the same argument, that I am entitled in a

18   discovery matter to discover the executive files and to have

19   those files and I can present those to -- as corroboration of

20   what was going on.

21          And so whether this information was communicated or

22   not to Mr. Nagy, he can -- Mr. Cooper, as I understand, is

23   calling Neva Gadsden to be a witness in this case, and he can

24   ask her about what she told him.  These are her internal

25   notes.  I doubt all this information -- I highly doubt all

1    this information was communicated to him verbally, first of

2    all.  And we know without a doubt these notes were not

3    communicated to him, the notes themselves.

4         MR. COOPER:  The *Secord* case is what we were trying

5    to show, you remember where the IRS made the internal

6    memorandum to the Office of Tax Shelter Analysis, those were

7    activities that Mr. Nagy had no direct activity with.

8         And I believe the *Secord* case wasn't as broad as Mr.

9    Clukey is saying.  It had to do with what he had direct

10   participation with.  And this is direct evidence of his

11   direct participation in the audit and what he told the

12   revenue agent.

13        THE COURT:  All right.  For the purposes that you

14   are asking for to get it in, so you can use it in your

15   opening argument, the answer is no.  We may be able to get it

16   in during the trial, but not now.

17        MR. COOPER:  Okay.  I just wanted to address the

18   issue because I redacted some of the document -- I have

19   redacted the documents the same way.  That if there was a

20   communication with which Mr. Nagy had a direct communication

21   or the IRS left a phone message or the IRS called him and the

22   document reflects that call, I have left that unredacted.

23        THE COURT:  Okay.

24        MR. COOPER:  Okay?

25        THE COURT:  But I guess, keep the initial part and

1    get -- that you said you wanted to use Exhibit 1 in your

2    opening statement, and as redacted, it's in evidence, you can

3    do it, okay?

4              MR. COOPER:  I'm sorry.  My mind -- I just -- we

5    started talking about redaction, so I wanted to bring up --

6              THE COURT:  That's no problem.  That's, you know,

7    all right.

8              Any other one that you want to talk about that you

9    want to use in your opening argument?

10             MR. COOPER:  Yes, Your Honor.  Exhibit 19.

11             THE COURT:  19.

12             MR. COOPER:  And in there there is two exhibits.

13   The second exhibit has got the marginal notes in it.  We'll

14   simply take that out, if that's okay with Your Honor, to

15   solve that problem.

16             MS. WEIS:  Your Honor, there is also highlighting to

17   those documents.

18             MR. CLUKEY:  I guess I'm not sure -- I'm not even

19   sure what this document is.

20             THE COURT:  Wait a minute.  I didn't understand a

21   word you said, Ms. Weis.

22             MS. WEIS:  There is highlighting on the document, as

23   well, which we believe the IRS placed on the document.  So

24   it's an additional issue.

25             MR. CLUKEY:  Your Honor, the first page it says:

1    "Neva, for your information" -- "have a great day, Miriam."

2            Again, this information was never communicated to

3    Mr. Nagy.  He never saw that.  And this is his own memo.  I

4    guess I'm failing to understand even --

5            THE COURT:  Don't you have one that's a copy that

6    doesn't have the marginalia on it?

7            MR. COOPER:  Well, we'll redact it, Your Honor.

8            THE COURT:  I mean, I don't think --

9            MR. COOPER:  It's kind of innocuous.  I mean, "have

10   a nice day".

11           THE COURT:  Innocuous is in the eye of the beholder.

12   If it's innocuous, then it's irrelevant, throw the whole

13   thing out.  How about that?

14           MR. COOPER:  I'll stop laughing at this point.

15           THE COURT:  No problem.

16           So if in fact it's cleaned up, does the Government

17   have any exhibit -- any objection to Plaintiff's Exhibit 19?

18           MR. CLUKEY:  If there is some way he can get rid of

19   the highlighting, then no.

20           THE COURT:  All right.  So --

21           MR. CLUKEY:  That's going to be a tough task.

22           MR. COOPER:  Yeah.  I mean --

23           THE COURT:  Clean it up the best you can, and

24   then -- at least the marginalia, I don't know if -- I'm not

25   going to try to make him do the impossible and have a clean

1    copy.  If you can't do the underlining, you can't do the

2    underlining, that's certainly not something -- the case is

3    not going to turn upon whether something is underlined

4    because nobody is going to mention it in court, okay?

5                MR. CLUKEY:  Okay, Your Honor.  This does come from

6    Mr. Nagy's files.

7                THE COURT:  If he has a clean copy.

8                MR. COOPER:  No, we gave you the best we've got.

9                THE COURT:  I mean, but he doesn't keep a file copy,

10   or this is -- a file copy that wouldn't have any of this

11   stuff on it?

12               MR. COOPER:  Um, not that I'm aware of, no, Your

13   Honor.

14               THE COURT:  Well, ask him over the weekend.  And if

15   he's got a file copy, that solves everybody's problem.

16               MR. CLUKEY:  Actually, Your Honor, may I have a

17   clarification of your rulings?  Is there a ruling that

18   anything that went from Mr. Nagy to the IRS, as well as to

19   the IRS back, that's relevant and that's admissible evidence?

20               THE COURT:  Well, anything that he sent to the IRS,

21   if he wants to get it in, if he can, and he can authenticate

22   it, that's up to him.

23               MR. CLUKEY:  I just meant in the spirit of your

24   Order.

25               THE COURT:  Well, the Order says, um, the Motion is

1   granted as to evidence of the IRS Section 6700 administrative

2   investigation that was never communicated to Nagy or Debevc,

3   including conduct.  Motion is denied to income tax, audit

4   evidence, unless either plaintiff can establish he

5   communicated to the IRS.

6           So I think this would be covered in that part of it

7   right there.

8           MR. CLUKEY:  Right.  I didn't understand based on --

9   that's what I thought.

10          THE COURT:  Okay.

11          MR. CLUKEY:  So we would have no objection to this

12  cleaned up, not withstanding our original objection to the

13  whole category.

14          THE COURT:  Okay.  Yeah.

15          MR. CLUKEY:  Thank you.

16          MR. COOPER:  The next exhibit --

17          THE COURT:  I guess it could come in if it weren't

18  in your file, too.

19          So, yeah?

20          MR. COOPER:  Exhibit 20, the next exhibit, Your

21  Honor.

22          THE COURT:  So number 19 will come into evidence

23  cleaned up, and you can use it in your opening statement if

24  you want to, that's where we are going.

25          MR. COOPER:  That's what I'm asking Your Honor.

1           THE COURT:  That's fine.

2           (Thereupon, Plaintiff's Exhibit Number 19 was

3     received in evidence.)

4           MR. COOPER:  The next one is 20, Your Honor.

5           THE COURT:  Okay.

6           MR. COOPER:  And it's the same type of document.

7     It's a response that Mr. Nagy made to the international

8     examiner of the IRS.  And the second version does have

9     highlighting.  It is not as clean.  We will remove that from

10    the binder to solve that.

11          THE COURT:  Okay.  So you are -- number 20, the

12    objection is, again, this should be a clean copy?

13          MR. CLUKEY:  Yes, Your Honor.

14          THE COURT:  So clean it up, um, and then you can use

15    it in your opening argument, okay?

16          (Thereupon, Plaintiff's Exhibit Number 20 was

17    received in evidence.)

18          MR. COOPER:  The next exhibit, Your Honor, is 33.

19          THE COURT:  All right.

20          MR. COOPER:  Which is the no-change letter that the

21    IRS sent to Derivium.

22          THE COURT:  Yes.  Consistent with my ruling, that's

23    going to come into evidence over the Government's objection.

24          So 33 will be in evidence and you can use it in your

25    opening argument.

1          (Thereupon, Plaintiff's Exhibit Number 33 was

2     received in evidence.)

3          THE COURT: But you know, nobody gets to define the

4     no-change letter, what the no-change letter means except me,

5     not you, because you may not define it the same way I define

6     it, and that wouldn't be a good thing for the jury to

7     consider.

8          MR. COOPER:  I'm sorry.  I can't hear you.

9          THE COURT:  You may not define it the same way I

10     define it and that would not be a good thing.

11          MR. COOPER:  Hopefully, we get to discuss that.

12          THE COURT:  Maybe in closing, but not in the

13     opening.

14          MR. COOPER:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. COOPER:  Exhibit 38 is the no change category.

17          THE COURT:  Okay.  Same thing.

18          (Thereupon, Plaintiff's Exhibit Number 38 was

19     received in evidence.)

20          MR. COOPER:  Exhibit 39, I would like to use, and I

21     don't believe there is an objection to that.

22          THE COURT:  Okay.

23          MR. COOPER:  I would like to discuss --

24          THE COURT:  39 already in evidence, Gail?

25          MR. COOPER:  Yes, Your Honor.

```
 1                    THE COURT:  Okay.  Good.  No problem.
 2                    MR. COOPER:  Exhibit 40.
 3                    THE COURT:  Yeah.
 4                    MR. COOPER:  This is a memorandum that Mr. Nagy
 5      wrote about the tax treatment of the transaction if a
 6      borrower defaulted.  He gave advice that it would be a tax
 7      rule.  They have objected under relevance.  We think it's tax
 8      advice on the transaction.
 9                    THE COURT:  Yes, sir.
10                    MR. CLUKEY:  We objected under 801, Your Honor.
11                    MR. COOPER:  Oh, I'm sorry.  It's on his letterhead.
12                    THE COURT:  Ms. Weis, you have been overruled by Mr.
13      Clukey.
14                    MR. COOPER:  Maybe one at a time.
15                    MS. WEIS:  Your Honor, well, whether or not it's on
16      his letterhead, as you know under 801, any out-of-court
17      statement that's offered for the truth of the matter asserted
18      is hearsay.  And because Mr. Nagy's offering it in support of
19      his case, it's certainly not a party admission.  That's the
20      primary basis for our objection.
21                    THE COURT:  Okay.  I'll overrule that objection.
22      I'll admit it into evidence if you want to use it.
23                    MR. COOPER:  Thank you, Your Honor.
24                    (Thereupon, Plaintiff's Exhibit Number 40 was
25      received in evidence.)
```

1           MR. COOPER: And then the next, the same is also with

2     Exhibit 49, Your Honor.

3           MS. WEIS:  Your Honor, with Exhibit 49, I think that

4     it's a little bit of a closer call if you are going to make

5     an 807 ruling, because it's getting into proper treatment of

6     lender hedge costs, which is a fairly, I would say complex

7     topic.  It's getting into expert testimony.

8           And Mr. Nagy is offering for the truth of the matter

9     asserted how to treat lender hedging costs.  It's basically

10    expert testimony at that point that he's offering through a

11    hearsay document.

12          MR. COOPER:  The document goes to two things:

13          It's one, the client asks him to give him -- how do

14    you account for hedges?  Certainly, that goes to his state of

15    mind if he believed there were hedges or not.

16          Second, it goes to him giving, again, what he

17    thought was his best tax advice.

18          MS. WEIS:  Your Honor, with respect to whether or

19    not Mr. Nagy knew there were costs, first of all, prior

20    inconsistent statement.  I don't think he can admit it

21    through that argument.

22          In addition, at this point in time, Mr. Nagy has

23    testified, although there might be some dispute about it, at

24    what point in time he knew that BVL had no hedging costs

25    reflected on any of its books.  We have some question -- on

1    its U.S. books.

2              Therefore, the proper treatment of the hedging

3    costs, we don't understand why he would be writing this memo

4    if, in fact, it was written at the time with regard to a

5    topic that he knows is completely irrelevant.  There are no

6    hedging costs reflected on the books.

7              MR. COOPER:  That's -- he was told, and I think --

8    he's read the depositions, everyone was told there was

9    hedging going on on the lender's side.  He was asked to write

10   a memo on it.

11             THE COURT:  I've read the depositions.  And that

12   part of the deposition is not coming into evidence, but

13   that's irrelevant.  What someone told somebody about hedging,

14   if you look at my designations, is not coming into evidence,

15   it's hearsay.

16             Now, this one we'll do the old-fashioned way.  I'm

17   not going to make a blanket ruling on this one until I

18   understand where we are, and Mr. Nagy gets on the stand or

19   somebody tries to put it in.

20             So you can't use it in your opening argument, but

21   you may be able to get it in.

22             MR. COOPER:  And may I approach, Your Honor?

23             THE COURT:  Sure.

24             MR. COOPER:  The last one is a demonstrative

25   exhibit, which is 84.

1           THE COURT:  84?

2           MR. COOPER:  84.

3           This is simply a timeline of all the memoranda that

4    have been admitted into evidence.  And I would like to use it

5    as a demonstrative during opening.

6           MS. WEIS:  We don't have an objection as to it being

7    used as a demonstrative.  We have an objection to it being

8    admitted into evidence.  It's an improper summary under

9    Rule --

10          MR. COOPER:  It's just the memos that are all in

11   evidence.

12          THE COURT:  We don't know that yet.  So you don't

13   have any objection to him using it as a demonstrative right

14   now; is that correct?

15          MS. WEIS:  No, Your Honor.

16          THE COURT:  Okay.  That's what you want.

17          MR. COOPER:  That's all I have.  Thank you.

18          THE COURT:  Okay.  Great.

19          MR. CLUKEY:  Your Honor, there is one more

20   demonstrative we were thinking about using during our

21   opening.

22          THE COURT:  Okay.

23          MR. CLUKEY:  We teed that up with Mr. Cooper, and I

24   can't remember where we left off with the foreign entity

25   chart that we showed you.  I would just --

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1          MR. COOPER:  Okay.  The foreign entity chart, it's

2     got all those foreign entities and these types of

3     communications, and you've withheld the relevancy objections

4     on some of those documents.

5          THE COURT:  Okay.

6          MR. COOPER:  We just ask that it not be shown in

7     front of them.

8          THE COURT:  I guess looking at color, I don't know

9     who did the annotation of the deposition, but it was very

10    well done, and I appreciate it.  It made my job a lot easier.

11         MR. CLUKEY:  That was Ms. Weis, Your Honor.

12         THE COURT:  Well, that's -- because, you know,

13    sometimes what I have is highlighted and handwritten notes.

14    So this is, you know, my ruling couldn't be any better, but

15    at least it makes it easy for me to make rulings.

16         And what's your objection, Mr. Cooper?

17         MR. COOPER:  Just what entities are going to be

18    talked about and brought into evidence, and what's relevant.

19    We don't think it reflects what will come in.  Obviously, I'm

20    going to be fighting over it.

21         THE COURT:  All right.  So as long as there is

22    demonstrative evidence, I'll allow you to use it in your

23    opening.  It may not be true in closing, but it's not coming

24    into evidence until you admit it into evidence.

25         I think the jury is going to be -- I mean, there is

1     so many things going on in this case, I think it would help

2     the jury to understand the lay of the land.  And some of the

3     things may not come true, and if they don't come true, you

4     can tell them it didn't come true at the end of the case,

5     because -- the same thing for your exhibits, you are going to

6     use demonstratives, some of those may not come in, either.

7     So I don't know, they may be.  I haven't looked at all those,

8     so --

9             MR. COOPER:  And Your Honor, I raised it earlier

10    today, if Mr. Debevc is still sitting at the table, is it

11    appropriate before the start of evidence for you to instruct

12    the jury to consider who is on what documents and what they

13    may or may not have known about it?  Because a majority of

14    these documents are e-mails and correspondence that did not

15    come out of his files and he was not -- he was not -- he was

16    not part of the correspondence, and we would want that made

17    clear up front instead of trying to ask for forgiveness at

18    the end of the trial.

19            MR. CLUKEY:  Your Honor, this is directly relevant

20    to our conspiracy requests that you are going to hear on

21    Monday.

22            THE COURT:  Okay.  All right.  Now, I know we are

23    going to give a jury charge as to the one uncommon witness,

24    the one that's not common to everybody, so -- and I think

25    there may be something in the opening charge, and we may --

1    to the effect that there is some evidence that may be only

2    applicable to Mr. Nagy, there is some evidence that may be

3    only applicable to Mr. Debevc, and pay attention for that

4    reason, which when you take notes, which one is relevant to

5    which one, you will have to bring -- you know, we'll have to

6    bring that out on cross-examination.

7            MR. COOPER:  No, I understand.  But I would just --

8    coming from you, it's a little bit more powerful than me

9    crossing, so they have that in their mind when I'm crossing.

10           THE COURT:  We'll try to make that.  I think we'll

11   have two defendants, and we have a charge, we'll probably do

12   that, yeah.  So there will be some general charge in the

13   opening.

14           MR. COOPER:  And then I have a petition, plea, is

15   there any way that we could try to get some kind of ordering

16   of the witnesses?

17           THE COURT:  Yeah.

18           MR. COOPER:  Just for lifestyle reasons and

19   preparing?

20           THE COURT:  So the night before or, you know, if you

21   can give them a lineup, each side, you give it to them.

22           MR. COOPER:  I'll be more than happy to.

23           THE COURT:  And tell them who you are going to be

24   calling the next day.  I think that's a good idea for both

25   sides.

1          MR. CLUKEY:  Yes.

2          MR. COOPER:  It would just make -- thank you.

3          MS. WEIS:  Along those lines, there is a couple --

4    at least one witness, Patrick Kelly, who appears on multiple

5    parties' witness list.  Mr. Debevc has him listed, as well.

6          So that we are not calling people multiple times, I

7    wanted to just sort of raise with you and with Mr. Debevc, I

8    mean, should we expect, you know, tell the witnesses they

9    should expect to be called, you know, this week in our case

10   in chief, and then next week in their case in chief, or will

11   they be subject to cross and direct by both sides at the same

12   time?

13         THE COURT:  Um, you know, I can't prevent a local

14   witness from being recalled, but perhaps at the end of the

15   testimony, if you can tell the witness whether they may be

16   subject to recall next week or not -- I mean, how -- how are

17   you going to do it?  I mean, are you going to -- there is a

18   witness that's on the Government's list and your list, are

19   you going to try to get what you want out on

20   cross-examination or do you want to try to get it out on

21   direct examination next week?

22         MR. COOPER:  I'm a big believer on doing things

23   once.  So I will do my best to get it all out, except for the

24   one caveat to that is if they call Mr. Nagy, he would be

25   someone that I probably would call him.

1          THE COURT:  Okay.  I was going to -- I mean, I

2     guess --

3          MS. WEIS:  We will be calling Mr. Nagy.

4          MR. CLUKEY:  We will be calling Mr. Nagy and Mr.

5     Debevc at some point in our case in chief.

6          THE COURT:  Okay.  That's fine.

7          So then if, in fact, he calls Mr. Nagy and can't

8     cross-examine him anyway, because the Rules don't let you,

9     you just stand up and say, I have no questions at this time,

10    but I'm going to call Mr. Nagy in my case next week, or

11    something, to tell the jury why you didn't ask any questions,

12    but you can't do it twice.

13         MR. COOPER:  Pardon?

14         THE COURT:  You can't do it twice.

15         MR. COOPER:  I can't? I thought we had this

16    conversation, cross him twice.  I can't ask my own witness

17    questions?

18         THE COURT:  Yeah.  I mean, you can't -- you can't

19    fully put your case out in, quote/unquote, cross-examination

20    and then call him again next week, and say, do it again.

21         MR. COOPER:  Oh, yes, Your Honor.  I would not do

22    that.

23         THE COURT:  You may want to ask the question,

24    clarifying questions, and then get the whole story the next

25    week.

1          But I mean -- I mean, you can't -- again, you can't

2     use -- you can't, quote/unquote, cross-examine your own

3     witness.  I mean, you can ask him --

4          MR. COOPER:  Direct questions.

5          THE COURT:  Direct, you know, direct questions.

6     They get to cross-examine the witness on one of those Rules

7     of Evidence.

8          MR. COOPER:  I forget so quickly.

9          THE COURT:  All right.  Yes, sir?

10         MR. CLUKEY:  Nothing further.

11         THE COURT:  Okay.  Mr. Debevc, how about you, do you

12    want to say anything?  Anything you want to bring to the

13    Court's attention?  Any exhibits or anything like that?

14         MR. DEBEVC:  I do have some exhibits, but I do have

15    a request, perhaps this would be an appropriate time to take

16    a break, so we can find out what kind of response we got?

17         MR. CLUKEY:  I found out there won't be another

18    response today.

19         THE COURT:  There won't be a response today?  All

20    right.  Not to be pejorative again, does that mean that there

21    won't be a response until 9:00 Monday morning at the

22    earliest?

23         MR. CLUKEY:  We'll have a response to the Court by

24    9:00 Monday morning definitely.

25         THE COURT:  Okay.  But there is going to be some

1    consideration and some discussion over the weekend?

2             MR. CLUKEY:  Yes, Your Honor.

3             THE COURT:  I just didn't know whether --

4             MR. CLUKEY:  Yes, sir.

5             THE COURT:  And I know you are not 40-hour people,

6    but I just -- I don't know anybody in Washington -- sometimes

7    there may be somebody up there who is lucky to be a 40-hour a

8    week person.

9             Okay.  All right.  Mr. Debevc may or may not, so we

10   might as well handle what we can handle today.

11            MR. DEBEVC:  Well, Your Honor, I think that up to

12   this point in time, I did present certain -- notified the

13   United States of the documents that I would like to present,

14   and that they objected to those, and I would like to discuss

15   that.  I understand that -- I think that my e-mail today --

16            THE COURT:  Let me -- and I'll be glad to do -- do

17   you think perhaps that since you go second, Mr. Debevc, and

18   perhaps that you may not be in the case as of Monday, it

19   would be more efficient, perhaps, to do this sometime next

20   week when you know that you are going to be in the case?

21            MR. DEBEVC:  Um, I would actually prefer that.

22            THE COURT:  Okay.  All right.  Then I won't make you

23   do something you don't want to prefer at this time, okay?

24            MR. DEBEVC:  Thank you.  I appreciate that, your

25   consideration.

1          THE COURT:  Okay.  That's no problem.

2          MR. CLUKEY:  I guess for clarification, if there are

3    any exhibits that Mr. Debevc planned to use in his opening --

4          THE COURT:  Right.

5          MR. CLUKEY:  -- it might make sense to cover those.

6    We were just handed, for example, a document that was

7    hearsay.

8          THE COURT:  Okay.

9          MR. CLUKEY:  And a settlement offer we were handed.

10   So I just want to make sure that Mr. Debevc doesn't want to

11   use those in his opening.

12         THE COURT:  Is there any documents that you are

13   planning on using in your opening statement Monday that --

14         MR. DEBEVC:  I think in terms of the documents, um,

15   no, because I think I just want to paint the picture to the

16   jury, and then the documents will come out as trial

17   progresses, if that happens.

18         THE COURT:  Okay.  All right.  If, in preparing for

19   the case -- you get together Monday morning at 9:00 -- if in

20   fact you think of something over the weekend, please let the

21   Government know and let us know, and then we can try to

22   handle that Monday morning first thing, okay?

23         MR. DEBEVC:  If I find that in my thinking over the

24   weekend in preparing the opening statement that I do need to

25   include the document, I will have the information for

```
 1          Mr. Clukey and I can make him aware of that.
 2                THE COURT:  Okay.  Good.  Thank you very much.
 3                So anything else before y'all go and ruin your
 4     weekends?  Nope.
 5                All right.  Have as good a weekend as you can, and
 6     we will see you at 9:00 Monday morning.  And Gail, bring the
 7     jury in at 10:00 Monday morning.  We'll bring them in at 10,
 8     because it takes a while for them to find out the parking
 9     places and things like that, but we'll start at 9:30 the rest
10     of the time, okay?
11                All right.  Thank you very much.
12                (Thereupon, the Court was in recess.)
13
14                *****     *****     *****
15     I certify that the foregoing is a correct transcript from the
16     record of proceedings in the above-titled matter.
17
18
19
20     --------------------------
21
22     Amy C. Diaz, RPR, CRR            February 22, 2011
23     S/  Amy Diaz
24
25
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1        Government's Exhibit Numbers 48, 210, 212, 335,     8
 2        193, 194, 207, 204, 223 and 42
 3        Plaintiff's Exhibit Numbers 39, 41, 42, 43, 44,     9
 4        45, 46, 47, 48 and 51
 5        Plaintiff Debevc's Exhibit Numbers 19 and 25       10
 6        Government Exhibit Number 45                       22
 7        Government Exhibit Numbers 334, 344, 80, 248, 9,   37
 8        27, 219, 218 150, 26, 57, 216, 336, 220, 183,
 9        228, 230, 147, 261 342 and 94 A B and C
10        Government Exhibit Number 189                      43
11        Government Exhibit Number 58                       47
12        Government Exhibit Number 200                      52
13        Plaintiff's Exhibit Number 19                      65
14        Plaintiff's Exhibit Number 20                      65
15        Plaintiff's Exhibit Number 33                      66
16        Plaintiff's Exhibit Number 38                      66
17        Plaintiff's Exhibit Number 40                      67
18
19
20
21
22
23
24
25
```